

*VIRGINIA*
# Loudoun County
## WHERE TRADITION MEETS INNOVATION



# *Board of Supervisors*
# *Operations Manual*






# *2016-2020*

BOS Orientation Manual
2016 - 2020
Table of Contents

1. General Information
   a. Loudoun County Mission Statement
   b. Loudoun County Values
   c. County Government Organizational Chart
   d. General Information Briefing
   e. Attachments
      - Sample Budget
      - Procurement Orientation Document
2. Powers and Duties of the Board and the County Administrator
3. Board of Supervisors Rules of Order
4. Freedom of Information Act (FOIA) /Conflicts of Interest Act (COIA)/Records Retention
5. Agenda and Packet Preparation Processes
6. Boards, Committees, and Commissions
   a. Regional Boards, Commissions and Committees
   b. Policies Applicable to Local Boards, Commissions and Committees
   c. Local Boards, Commissions and Committees
7. Issue Papers
8. Guide to Emergency Operations and Significant Incident Notification
9. Public Affairs and Communications
10. Staff Aide Information
   a. General Information
   b. Sample Offer Letter
      - Staff Aide Policies
      - Benefits for Staff Aides
11. Miscellaneous
   a. County Administration Organizational Chart
   b. County Administration Contact List
   c. County Attorney Organizational Chart
   d. Leadership Team Contact List
   e. 2016 Holiday Calendar
   f. Map Index
   g. Acronyms
   h. Allowable Expenditure Policy
   i. Communication Policy
   j. Travel Policy
   k. Mileage Policy
   l. VDOT Guide



   

# Chapter 1

# General Information

- **Loudoun County Mission Statement**

- **Loudoun County Values**

- **Organizational Chart**

- **General Information**

- **Attachments:**

    - **Sample Budgets**

    - **Procurement Orientation**



*Loudoun County*
*Board of Supervisors*
*2016-2020*

# Loudoun County Mission

Our mission is to conscientiously serve our community and our citizens in a dynamic world; to protect and enhance the general health, safety and well being; to attract and nurture talented people in a work environment which will inspire us to serve the public with integrity, creativity, high standards and respect; to make the most of our resources to create, foster and maintain the best possible quality of life; to invest in tomorrow.

In carrying out this mission, the life we envision for our community is rich and full of promise. We envision citizens proud of their community and the accomplishments of their government.



# *Statement of Values*



The primary mission of the Loudoun County government is to provide high quality **SERVICE** to the public.

We demonstrate our commitment to **EXCELLENCE** by striving for the highest level of performance to meet the needs of our customers.

We carry out our responsibilities with **INTEGRITY** by conducting county business in a responsible, conscientious, ethical and professional manner.

By creating a climate that rewards the anticipation of problems, the sharing of new ideas, and creative problem-solving, we encourage **INNOVATION**.

We are committed to maintaining the highest degree of **EFFICIENCY** by using our time wisely and our resources in a cost effective manner.

By accepting responsibility, communicating clearly and following through with our commitments, we demonstrate **ACCOUNTABILITY** to our customers, fellow employees, and citizens of Loudoun County.

We show **COURTESY** by treating our customers and co-workers with respect, politeness and consideration, and by treating all people equally and without prejudice.

We demonstrate **TEAMWORK** by working and supporting one another to achieve the organization's goals.

Recognizing that our **EMPLOYEES** are the organization's primary resource for providing service to the public, the County of Loudoun places a high priority on the personal and professional success of our employees.

# Loudoun County Government Organization



October 2015

**Loudoun County Residents**

- Commissioner of the Revenue
- Treasurer
- Sheriff

- Court System
- Board of Supervisors
- School Board
- County Administrator
- County Attorney
- Commonwealth Attorney
- Clerk to the Circuit Court

**Public Safety & Judicial Administration**
- Animal Services
- Community Corrections
- Court Administration
- Fire, Rescue & Emergency Management
- Juvenile Court Service Unit

**Parks, Recreation & Culture**
- Library Services
- Parks, Recreation & Community Services

**Health & Welfare**
- Extension Services
- Family Services
- Mental Health, Substance Abuse & Developmental Services
- Health Department

**General Government**
- Elections & Voter Registration
- General Services
- Information Technology
- Management & Financial Services

**Community Development**
- Building & Development
- Economic Development
- Mapping & Geographic Information
- Planning & Zoning
- Transportation & Capital Infrastructure

Departmental Policy Boards
- Community Services Board
- Library Board of Trustees

Board Standing Committees
- Economic Development
- Finance, Government Services & Operations
- Joint Board/School Board
- Transportation & Land Use

# BOARD OF SUPERVISORS GENERAL INFORMATION

Congratulations on being elected a member of the 2016-2020 Loudoun County Board of Supervisors. Staff has developed some general information to assist the Board as you assume office. Please feel free to contact Tim Hemstreet, County Administrator, or his staff, should you have any questions regarding this information.

## GENERAL INFORMATION AND FORMS

### Swearing In:
The Code of Virginia requires all elected officials to take an oath of office before acting in your official capacity. The oath of office must be administered by the Clerk of the Circuit Court by December 31, 2015. The Clerk can administer the oath to all elected Board members at the same time in the Board Room or each individual supervisor can make an appointment with the Clerk.

**Contact: Gary M. Clemens, Clerk of the Circuit Court, 703-777-0273 or**
**gary.clemens@loudoun.gov**

### Disclosure Forms for Real Property and Economic Interests:
The State Code requires every local elected official and some appointed officials to file annually, with the County Administrator, disclosure forms of real property and economic interests. These forms will be provided to the Board. The completed forms should be provided to Jenny Grimmell, in County Administration by December 31, 2015. Leo Rogers, County Attorney, can assist with any legal questions.

**Contact: Jenny.Grimmell, Office of the County Administrator, 703-777-0201 or**
**jenny.grimmell@loudoun.gov and Leo Rogers, County Attorney, 703-777-0478**
**leo.rogers@loudoun.gov**

### Board Salary:
Members of the Board of Supervisors are paid a salary for their services, which is based on a scale established by a previous Board. State law prohibits any sitting Board from setting a salary schedule for itself. On December 19, 2006, the Board of Supervisors approved increasing the salaries for the Chairman, Vice Chairman and District Supervisors, effective January 1, 2008. The annual salaries have not changed since that date and are as follows:

| | |
|---|---|
| Chairman | $50,000 |
| Vice Chairman | $45,320 |
| District Supervisor | $41,200 |

### Benefits:
Members of the Board of Supervisors are eligible to participate in several of the County's benefit programs offered to the general county workforce including group medical, prescription drug, dental and vision coverage, deferred compensation plan, payroll Roth IRA, flexible spending account program and limited-term disability. Health Plan coverage becomes effective on the 1st day of the month following

your first day in office as an elected official.  Therefore, the effective date for new Board of Supervisors members will be February 1, 2016.  Benefits materials will be provided to each Board member-elect at orientation.  Additional information is also available on the County's Benefits portal on the County's Intranet (accessible only through the County network).  Benefits related questions should be directed to Nelia Larson-Mann, Manager, and Employee Benefits & Risk in the Department of Human Resources.

**Contact:  Nelia Larson-Mann, Manager, Employee Benefits & Risk 703-777-0299**
     **or e-mail nelia.larson@loudoun.gov**

**Payroll:**
Direct deposit of your County paycheck is required.  You are asked to complete a Direct Deposit Authorization Form and attach a voided check.  You are also asked to complete the appropriate federal and state withholding tax forms.  These forms will be provided to you and can also be found on the County's intranet site at http://intranet.loudoun.gov/428/Workforce-Planning-Reports-Forms.  Eileen Hall-Tobey will be working with you to obtain your completed direct deposit authorization and tax withholding forms.  Payroll related questions should be made to Michelle McTier, Operations Manager in the Department of Finance and Procurement.

**Contact:  Michelle McTier, Operations Manager, 703-771-5368**
     **or e-mail michelle.mctier@loudoun.gov**

**Human Resources:**
Federal law requires that you must complete a Form I-9 Employment Eligibility Verification that documents your identity and eligibility to work in the United States.  You are required to provide appropriate documentation as listed on the Form I-9 which will be provided to you by Eileen Hall-Tobey in County Administration.  The I-9 form can be completed in HR on the 4th floor of the Government Center at any point between now and January 4, 2016.   Human Resources questions should be referred to Jeanette Green, Director of Human Resources in the Department of Human Resources.

**Contact:  Jeanette Green, Director of  Human Resources, 703-737-8632**
     **or e-mail jeanette.green@loudoun.gov**

**OFFICE SPACE AND EQUIPMENT**

**Office Space:**
Each Board member will have assigned office space located on the fifth floor of the County Government Center, 1 Harrison Street, Leesburg, VA 20177.  The space generally includes one or two desks, chairs, a bookcase, file cabinet, personal computer and phone.  Please work with Eileen Hall-Tobey in County Administration regarding office furniture needs.  Though the office space was designed for one Board member, the designated office space for each Supervisor is also shared with the Board member's staff aide(s).  Currently, the Board's office suite includes two small conference rooms that can accommodate approximately 6-8 people.  The Board's staff can also assist you in reserving meeting space for meetings in the County Government Center as well as other County facilities.

A copy/scanner/fax machine is centrally located for use by the Board members and staff aides in the Board of Supervisors Office suite. The fax number is 703-777-0421. An additional Xerox Copier is available for the District offices to use in the Board's back hallway. Both copiers require a cost center

2

code (which will be assigned to your respective District office) to be entered prior to making copies in order to properly charge each District budget. In addition, computers can be configured to require a passcode to be entered at the Xerox before a print job is completed, for confidentiality and security needs.

Some District offices have chosen to purchase individual printers for small volume jobs in the past, but recent Countywide policy has been to disallow the purchase of individual, local printers in favor of the less expensive, networked printers. Other copiers are also available on the 5th Floor, for larger projects or if the Board copiers are occupied, and would require the use of cost center codes, as well. Administrative staff in the Board's Office and County Administration can assist with any printing/copying questions you or your staff aides may have.

<u>**Computers and Other Equipment**</u>
Each office will be provided up to two (2) computers, which may be laptop or desktop.  The County has a replacement schedule for all County office computers, and Board offices adhere to this policy and are only upgraded after each election. Staff from the Department of Information Technology will be in contact with each Board member regarding a tablet device for official email, calendar, contacts, and Board meeting documents.

Board members and aides can acquire a phone through the County which is to be used for conducting County business only, provided that there are sufficient funds within the district budget.  County Administration staff can assist with the procurement of mobile devices utilizing County plans/discounts. A technology checklist is provided for you to indicate your preference for computer(s) and smartphones.

Board members will have Microsoft Outlook accounts for email, contacts, and calendars.  Eileen Hall-Tobey, Executive Assistant who serves as the Office Manager in the Office of the County Administrator, will work with you or your Board Aide(s) on setting up your voice mailbox and e-mail system.  Eileen can also assist you for questions pertaining to status of personal computer equipment in coordination with the Department of Information Technology. Email can also be retrieved online through the County's website at www. loudoun.gov.

<u>**Telephones:**</u>
Each Board member is provided with two telephone extensions in the respective District offices.  These phones are shared between each Board member and his or her staff aide(s).  Additional phone lines may be procured but will require funding from the Board member's District budget. The main Board of Supervisors' office phone line, 703-777-0204, is answered by general office staff from 8:30 a.m. to 5:00 p.m., Monday-Friday and is then placed on voice mail for the other hours of the day allowing for 24-hour phone service.  During work hours, calls are forwarded to the appropriate Board member or staff aide according to guidelines discussed below under "Administrative Support and Aides."

**Contacts:** **Eileen Hall-Tobey, Office of the County Administrator, 703-771-5330**
**Caleb Weitz, Office of the County Administrator, 571-439-6294 (cell) and 571-258-3334 (desk)**

**CORPORATE AND DISTRICT BUDGET INFORMATION**

**Corporate Board Budget:**
The Corporate Board Office has an annual budget that includes line items ranging from salaries and fringe benefits for Board members to operational needs such as public advertising and the County's external auditor contract. Gwen Kennedy, Project Manager in County Administration, has been designated by the County Administrator to manage the Board's budget and will prepare the proposed budget for the Board's Office in consultation with the Chairman.

**Chairman and District Budgets:**
Beginning in FY04, the Board established a separate Chairman and District budget structure. Use and management of these funds is at the discretion of each Supervisor based on his/her district needs. This budget contains funds for the staff aides' base salary and fringes, operational needs such as office supplies, smartphone expenses, and conduct of business expenses. It should be noted that each Board Member will be appropriated equal amounts and the amount of available operational funds would be impacted by the level of staff support. A monthly report is provided to each Board member/staff aide that will reflect expenditures and the current balance. Gwen Kennedy, Project Manager in County Administration, provides guidance and support for District offices regarding the status of individual budgets.

Each District budget is set at $120,597 annually ($161,040 for the Chairman). Since the County operates on a fiscal year of July 1-June 30, incoming Board members will receive one-half of the annual allocated amount for the remainder of Fiscal Year 2016. A chart showing the suggested breakdown of District budgets is provided as an attachment to this General Information document.

**Board of Supervisors' Budget Expenditure Guidelines:**

1. All expenses charged to the district budget or submitted for reimbursement are subject to public review. Appropriate supporting documentation, such as itemized receipts is required.

2. All expenditures should be necessary to support District and Corporate Board operations in serving the citizens of the County.

   All expense reimbursement must satisfy the requirements of the IRS qualified reimbursement plan. The County's travel procedures meet these requirements and apply to all members of the Board of Supervisors. The County's Travel Policy and "Allowable Expenditure of County Funds" Policy is provided in the last chapter of this binder (under Miscellaneous).

3. The following are considered inappropriate expenditures: donations to special interest groups, support to political campaigns or activities, personal activities, purchase of alcohol, etc.

**Reimbursement for Conduct of Business:**
The Chairman and the District budgets will contain funding that can be used for conduct of business reimbursement. Conduct of business expenses include meals, mileage, parking fees, tolls, etc., which are related to County business. All expenses are subject to public review. Due to the County's policy and audit controls, Board members must submit receipts for reimbursement expenses to be processed. Mileage reimbursement does not require a receipt.

4

A copy of the County's policy regarding Mileage Reimbursement is provided in the last chapter of this binder (under Miscellaneous). This policy reflects the most recent IRS and State guidelines for mileage reimbursement. Please note that normal commuting distance from your residence to your standard County worksite is not reimbursable. The standard County worksite for Board members and Staff Aides for this purpose will be interpreted as your office here at the County Government Center, unless staff hears from you that you use your home or other office location as your "standard" County worksite. Please provide this information prior to submitting for mileage reimbursement. For budget management purposes, staff requests that these expenses be filed on a monthly basis. It generally takes fourteen days (two weeks) for the reimbursement check to be processed. Please contact Gwen Kennedy should you have questions regarding the appropriate types of expenses.

The Board of Supervisors follows the County's Travel Policy, which is used as a guide to all County employees and boards and commissions. Again, a copy of the Travel Procedures is provided is provided in the last chapter of this binder (under Miscellaneous). This policy will include limits for meal reimbursement as it relates to out of town conference and travel.

**Contact: Gwen Kennedy, Office of the County Administrator 703-777-0208 or gwen.kennedy@loudoun.gov**

**GENERAL BUILDING INFORMATION**

**Keys:**
Each Board member will be provided with an electronic card key to allow access to the Government Center, the Board's office suite in the County Government Center, and the break area behind the Board Room. It is recommended to always keep the card key with you at all times to access areas that may be restricted to public access. Physical door keys for individual offices are also available and will be provided upon office assignment.

**Photo ID:**
Each Board member will be issued a photo id tag that can be worn with the card key. Photos for this badge will be taken in the Human Resources Division located on the fourth floor of the County Government Center. Eileen Hall-Tobey in the Office of the County Administrator will assist in coordinating a schedule for the photo/badge. This can be accomplished at the Board's first meeting, if preferred.

**Parking:**
Spaces are reserved for Board member parking on the second level of the garage. Decals for Board and Staff Aide vehicles will be provided to you by Eileen Hall-Tobey. Spaces are designated for the Chairman, Vice-Chairman, and are then assigned by district in alphabetical order. There are some spaces designated for Staff Aides. With the approval of his/her Board Member, Board aides may park in their respective district parking spaces at times when the Board member is not coming to the government center. See Caleb Weitz for further information or if a space is needed, but not designated.

**Break Room for Board Members/Staff Aides:**
A small kitchen area is reserved off the hallway on the east side of the 5th floor for Board members and their staff. This area contains a refrigerator, microwave, dishwasher and coffee maker for use during the work hours.

In addition, the Board also has a kitchen area behind the Board Room on the 1st floor. Snacks and beverages are provided for Board members during each meeting, and meals are provided as necessary when meetings overlap the dinner hour. There are also restrooms behind the Board Room for the Board's use during meetings.

**County Car Usage:**
There are occasions when Board members are asked to represent the County in an official capacity at regional meetings, General Assembly sessions, etc. If a Board member does not choose to use his/her personal vehicle, a County car may be reserved through the County Administration administrative staff.

**Wireless Connection in the Building:**
The Government Center Building, along with select other County facilities, are equipped with free wireless Internet connection. Board members and the public are welcome to bring their laptop to the Board Room during Board meetings. DIT will automatically connect each County mobile device to the staff Wi-Fi.

 **Contact: Caleb Weitz, Office of the County Administrator, 571-439-6294 (cell) and 571-258-3334 (desk) or caleb.weitz@loudoun.gov**


**ADMINISTRATIVE SUPPORT AND STAFF AIDES**

**General Office Staff Support:**
The Office of the County Administrator provides full-time Board office administrative support from two Administrative Assistants, Amy Stewart and Amanda Fisher. These positions provide full-time phone coverage, assist walk-in visitors, and give general office support to the Corporate Board office. Examples of general office support include mail distribution, maintaining the Corporate Board e-mail account, compiling comments from the Board's Comment Line, and maintaining basic office supplies. Administrative Staff, when answering phone calls, will ask for the caller's name, district, and the general nature of the call. Certain basic items can be dealt with directly, such as information on meeting dates, contact information, and other corporate Board items. Specific constituent needs or questions must be handled by the individual Board office. Further, Board staff aides are responsible for providing support to their respective Board members district offices to include managing calendars, maintaining correspondence files and providing other support at the direction of the Board member.

It should be noted that an office supply area is maintained for the Board members/staff aides within the Board office suite area. Staff in County Administration will process orders through the County's contract for office supplies. Each District budget includes funding for office supplies that may be required above the standard supplies normally provided, such as special office requirements, items pertaining to large mailings, or other needs.


 **Contacts: Amy Stewart, Office of the County Administrator, 703-771-5803,**
 **amy.stewart@loudoun.gov**

  **Amanda Fisher, Office of the County Administrator, 703-771-5072**
  **amanda.fisher@loudoun.gov**

**Staff Aides for Chairman and Board Members:**

Additional information for staff aide support is contained in Chapter 10 of this binder. Please reference these documents in hiring your Staff Aides. Caleb Weitz, Chief of Staff for the County Administrator, will contact you in regard to hiring staff support.

> **Contact: Caleb Weitz, Office of the County Administrator, 571-439-6294 (cell) and 571-258-3334 (desk) or at or caleb.weitz@loudoun.gov**

**Request for Information and Staff Support:**

Board members and their aides are requested to contact and work with the County Administrator or one of the Assistant County Administrators when requesting staff support, attendance at meetings, and general information. This minimizes staff scheduling conflicts and helps ensure an appropriate and timely response to Board member requests. The County Administrator has established a specific policy for Departments communicating with individual Board offices. This "Communication Policy" is provided in the last section of this binder (under Miscellaneous). In short, Departments have been directed that written requests from a Board office must be responded by or through the Department Director to ensure complete, timely, and accurate information (phone/verbal requests can be responded directly by the staff member). Additionally, for matters that are before the Board as a whole, or that are of a large and potentially Countywide nature, responses to individual Board member requests will be provided to the full Board.

The County Administrator and staff work for the Board of Supervisors as a corporate body and thus do not work at the directive of individual Board members. However, at the direction of the County Administrator's Office, staff will always do its best to work with individual Board members in offering information and professional advice within their particular area of expertise. A general rule of thumb for requests from the Board's office is that individual Board members/aides may "Ask, not task." Any request that requires more than compiling information or general constituent support may require approval by the full Board.

The Board's primary contact for Constituent Services is Emily Watkins in the Public Affairs Office, at 703-777-0450 or Emily.watkins@loudoun.gov. Filtering constituent needs through Ms. Watkins helps reduce redundancy if more than one Board member received a request from the public. Additional information on constituent services is provided in the binder under "Public Affairs and Communications."

## RECORDS RETENTION AND EMAIL ARCHIVE

**Records Retention**

Under the Virginia Public Records Act, the Library of Virginia is charged with establishing a records management program that provides "procedures and techniques for effective management of public records" (§42.1-85). Public records are defined as "information that documents a transaction or activity by or with any public officer, agency or employee of state government or its political subdivisions. Regardless of physical form or characteristic, the recorded information is a public record if it is produced, collected, received or retained in pursuance of law or in connection with the transaction of

public business."  Public records can be formatted as paper, microforms, electronic records, magnetic tapes, maps, disks, photographs, film and sound recordings.

There is additional information on Records Retention as part of Chapter 4 of this binder.

**E-mail and Record Retention**
Like other Board documents, e-mail created, sent, or retrieved can meet the criteria of a public record and is therefore subject to the Virginia Freedom of Information Act (§2.2-3700).   The county email system automatically archives every email received by and sent to county email addresses.  Even if mail is deleted from the Microsoft Outlook client, it remains permanently saved in the mail archive, which can be accessed if needed.

**Contact:       Jenny Grimmell, Office of the County Administrator 703-777-0201 or jenny.grimmell@loudoun.gov**

**PROCUREMENT AND CONTRACTING POLICIES**

The Board has adopted a Procurement Resolution incorporating the details and provisions of the Virginia Public Procurement Act, including portions related to Contracting Authority and Ethics/Conflicts of Interest. A briefing of that information is also provided as an attachment to this chapter.

**ATTACHMENTS:**

FY 2016 District Budgets
Board of Supervisors' Procurement Orientation

**Sample District Budget – FY2016**

|  | Total FY16 Budget | Second Half- FY16 Jan 1 – July 31, 2016 |
|---|---|---|
| **Salaries** | $80,934 | $40,467 |
| **Fringes:** |  |  |
| *FICA* | $6,192 | $ 3,096 |
| *Long Term Disability* | $200 | $100 |
| *Other Fringes (includes funds formerly budgeted for Group Health Insurance and VRS/Group Life Plans/benefit allowance expenses)* | $28,771 | $14,385.50 |
| **Total Personnel** | $116,097 | $58,048 |
| **O & M** | $4,500 | $2,250 |
| **Total District Budget** | **$ 120,597** | **$60,298.50** |

**Sample Chairman's Budget – FY2016**

|  | Total FY16 Budget | Second Half- FY16 Jan 1 – July 31, 2016 |
|---|---|---|
| **Salaries** | $ 97,986 | $ 48,993 |
| **Fringes:** |  |  |
| *FICA* | $7,496 | $3,748 |
| *Long Term Disability* | $200 | $100 |
| *Other Fringes (includes funds formerly budgeted for Group Health Insurance and VRS/Group Life Plans/benefit allowance expenses)* | $ 40,858 | $ 20,429 |
| **Total Personnel** | $ 146,540 | $73,270 |
| **O & M** | $14,500 | $7,250 |
| **Total District Budget** | **$ 161,040** | **$ 80,520** |

Updated 11/3/2015

## BOARD OF SUPERVISOR'S PROCUREMENT ORIENTATION

**Background:** The Virginia Public Procurement Act (VPPA) governs public contracting in Virginia. The VPPA authorizes public bodies to fashion certain details of how to carry out the provisions of the Act. In addition, the Board of Supervisors has adopted a Purchasing Resolution which incorporates these details and provisions. While the Procurement Resolution still follows the principals of the VPPA, it serves as a comprehensive end use guide and cites several sections of the VPPA while also providing more detailed procedures on day-today Procurement functions. Key areas of interest are:

1. Contracting Authority

   a. The County Administrator or designated Purchasing Agent has the authority to award and amend contracts up to $500,000, without Board of Supervisor approval. The competitive requirements are as follows:

      i. Purchases up to $5,000 require only one (1) written quote.

      ii. Purchases over $5,000 but up to $30,000 require at least three (3) written quotes

      iii. Purchases for goods and nonprofessional services over $30,000 up to $100,000 (professional services up to $60,000) require the Procurement Division to issue written Requests for Quotes (RFQ) to at least 4 vendors.

      iv. Purchases for goods and nonprofessional services over $100,000 (and professional services over $60,000) require formal competition and may only be awarded by the Procurement Division.

   b. Contracts and/or leases in excess of $500,000 require approval by the Finance/Government Services and Operations Committee and Board of Supervisors.

   c. For non-construction contracts over $500,000 authorized by the Board of Supervisors, the County Administrator or designated Purchasing Agent may amend contracts, including single or cumulative increases up to twenty-five percent (25%) of the original contract price, without prior approval of the Finance/Government Services and Operations Committee. However, on such contracts, the Finance/Government Services and Operations Committee shall approve single or cumulative increases exceeding twenty-five percent (25%) of the original contract price before the County Administrator or designated Purchasing Agent authorizes the change.

   d. For construction and/or design build contracts over $500,000, the County Administrator or designated Purchasing Agent may amend the contract, including increases up to five percent (5%) of the original contract amount for those items reasonable and incidental to the normal course of construction, including but not limited to, field changes, unforeseen existing conditions, and errors and omissions.

e. Staff updates the Finance/Government Services and Operations Committee every quarter of upcoming contracts that exceed $1 million or contracts that affect service delivery that will require future action by the Committee and the Board of Supervisors.

f. Most departments have delegated authority up to $5,000. In addition, a Buyer or Contracting Officer supports each department, with additional support and oversight as needed from Procurement.

2. Ethics/Conflict of Interest

No public official shall be involved in any procurement transaction when they know that:

- When the public official is contemporaneously employed by a bidder, offeror or contractor involved in the procurement transaction;
- The public official, the public official's partner, or any member of their immediate family holds a position with a bidder, offeror, or contractor such as an officer, director, trustee, partner or the like, or is employed in a capacity involving personal and substantial participation in the procurement transaction, or owns or controls an interest of more than five percent;
- The public official, the public official's partner, or any member of their immediate family has a pecuniary interest arising from the procurement transaction; or
- The public official, the public official's partner, or any member of their immediate family is negotiating or has an arrangement concerning prospective employment with a bidder, offeror or contractor.

3. There are no provisions in the VPPA which allow for a local preference except in the case of a tie bid.
   - Procurement staff can target local business when selecting vendors for informal procurements (less than $100,000).
   - Procurement sends all formal solicitations to the Department of Minority Business for their members to access.
   - Procurement holds monthly vendor information meetings to educate local firms on procurement laws and regulations.
   - Procurement is a member of the Loudoun County Chamber of Commerce.

4. Only Procurement staff may sign contracts. Procurement must have all contracts approved as to form by the County Attorney's Office prior to signing. All contracts for the purchase of goods or services must go through the Procurement Division.





# Chapter 2

# Powers and Duties of the Board of Supervisors and the County Administrator

No. 17-2002 Viewed 12/18/2018



*Loudoun County*
*Board of Supervisors*
*2016-2020*

## POWERS AND DUTIES OF THE BOARD OF SUPERVISORS
## AND
## COUNTY ADMINISTRATOR

**Board of Supervisors**

The Code of Virginia provides that each county be governed by a Board of Supervisors, composed of three to eleven members. In Loudoun County, the Board is composed of a Chairman At-Large and eight district supervisors. Supervisors are elected for four-year terms. At the first meeting of the year, the Board organizes itself and selects one of its members to serve as vice-chairman. The Chairman and the Vice-Chairman continue to be voting members of the governing body.

The Board of Supervisors has both administrative and legislative responsibilities, some of which are discharged in the role of the local governing body and some of which have derived from its function as an administrative subdivision of the state. The powers and duties of the Board of Supervisors include:

** Adopting the county budget (establishing appropriations and setting the tax rates);

** Approving and enforcing the county's comprehensive land use plan and related ordinances;

** Making and enforcing ordinances for public safety, sanitation, health and other regulations permitted by state laws; and

** Providing for the care and treatment of indigent and handicapped citizens.

The first and most difficult challenge faced by a member of a local governing body in Virginia is to understand the role he or she has in local government affairs.

1

The powers, duties, and responsibilities of each individual supervisor stem primarily from his or her position as a member of a collective body, the Board of Supervisors. The supervisor has no district duties to perform other than representing the inhabitants of the district on the county Board. It is in the role as representative that the individual supervisor will have to balance obligations to the election district from which elected with obligations to the county as a whole.

**County Administrator**

The duties of the county administrator can be summarized in terms of three broad functions. As the chief administrative officer of the county, the county administrator executes the policies established by the Board or mandated by the state, prepares and administers the budget, supervises the functioning of county departments, and serves as the emergency manager for the county.

As advisor to the Board of Supervisors, the county administrator keeps the Board informed of the county's financial and administrative conditions and presents, with recommendations, various policy options for the Board's decision. Sound policy decisions cannot be made in a vacuum, and no other county employee has the opportunity for such a broad, overall view of county operations as does the administrator. The Board should expect the administrator to bring before it positive proposals for action, based on principles of public management.

For the Board to disagree with the administrator's recommendation or to develop its own policy alternatives does not indicate a loss of confidence. Rather, it means only that the Board, which is politically accountable, prefers a different course of action that recognizes the impact of the political element. Representative government cannot exist without give and take in political decision-making, and the governing body's sensitivity to political necessity is the means by which the public will is expressed.

Finally, as the public representative of the Board, the county administrator represents the governing body corporate and politic and interprets the Board's actions to the public and any number of commissions, boards, or other bodies with which the Board of Supervisors may have responsibilities on both state and local levels. The administrator must be careful to represent the Board as an official entity, not to take a position that conflicts with that of the Board, and not to commit the Board to a course of action without authority to do so.

The following functions are required by law to be performed by the county administrator without Board action:

** See that all ordinances, resolutions, directives and orders of the governing body and all laws of the Commonwealth required to be enforced through the governing body or officers subject to the control of the governing body are faithfully executed;

** Make reports to the governing body from time to time as required or deemed advisable upon the affairs of the locality under his control and supervision;

3

**     Receive reports from and give directions to, all heads of offices, departments and boards of the locality under his control and supervision;

**     Submit to the governing body a proposed annual budget, in accordance with general law, with his recommendations;

**     Execute the budget as finally adopted by the governing body;

**     Keep the governing body fully advised on the locality's financial condition and its future financial needs;

**     Appoint all officers and employees of the locality, except as he may authorize the head of an office, department and board responsible to him to appoint subordinates in such office, department and board; and

**     Perform such other duties as may be prescribed by the governing body.

Additional duties and responsibilities may be assigned to the county administrator by the Board, and the extent of administration delegated depends upon the desires of the Board of Supervisors. These responsibilities can be as broad and flexible as necessary to meet the needs of the county government. The county administrator has no identity separate and apart from the Board. Within the broad scope of the law, the county administrator may be delegated as much or as little authority as the governing body desires. Whatever the duties assigned by state law or by the governing body, the county administrator functions as the administrator of the affairs of the Board of Supervisors.

*NOTE: This information was extrapolated from the Virginia County Supervisors' Manual*



# Chapter 3

# Rules of Order

## (adopted January 7, 2015)

No. AZ 2002, viewed 12/18/2018



*Loudoun County*
*Board of Supervisors*
*2016-2020*

Adopted January 7, 2015

# RULES OF ORDER
# BOARD OF SUPERVISORS
# LOUDOUN COUNTY, VIRGINIA

## I. Business & Public Hearing Meetings

A.     Business meetings will be held on the first and third Wednesdays of each month at 4:00 p.m.

B.     A time for public input will be included on the agenda of the Business meetings, starting at 6:00 p.m. For the second Business meeting each month, an additional time for public input will be included at the beginning of the agenda. This time will be limited to a total of 16 minutes for up to 8 speakers who will be given 2 minutes each and who must have signed-up in advance by the end of business the day prior the meeting. These speakers will not be permitted to speak again at 6:00 p.m. at the same meeting.

C.     Each member of the public recognized to address the Board will have a minimum of two minutes, but no more than five minutes, except as otherwise noted. Time allotted will be determined based on the number of speakers and the length of the meeting agenda. The order of speakers will be determined on first call in/register, first speak basis.

D.     Public Hearings will be held on second Wednesday of the month at 6:00 p.m.

E.     The Board may provide for special and additional meetings or public hearings, and all regular, special, and additional meetings or public hearings shall be in accordance with applicable provisions of the Code of Virginia with regard to public notice. The Chair may schedule Committee of the Whole work sessions at which the Board does not take final action on any item or matter of business. In accordance with Va. Code Section 15.2-1418, the Chair or two or more Members may call a special meeting.

F.     Meetings will be held in the County Government Center, Board of Supervisors' Meeting Room (First Floor), 1 Harrison Street, S.E., Leesburg, VA. Meeting days and times may change due to holidays and inclement winter weather. In cases of inclement winter weather, the Chair in consultation with the Vice-Chair and County Administrator may postpone scheduled Board business meetings and public hearings. The Chair in consultation with committee Chairs and County Administrator may postpone scheduled Board committee meetings.

G.     No Board Business meetings, Public Hearings, or committee meetings will be scheduled during the month of August except in case of emergencies or when timely action is needed.

H.     All cell phones, pagers, and other electronic devices shall be set on silent mode while in the Board Room. If approaching the podium or a microphone, please turn off all cell phones or leave them in the seating area.

I.     Smoking is not permitted in the County Government Center.

1

J.  If any member of the public requires a reasonable accommodation for any type of disability in order to participate in a public meeting, please contact the Office of the County Administrator at 703-777-0200/TTY-711. Three business days advance notice is requested.

## II.  Order of Business at Regular Meetings

A.  The order of business at the Board Business meeting shall be set out by the Chair in the printed agenda and shall include, but not be limited to, the following items:

   I.     Call to Order
   II.    Invocation/Pledge of Allegiance
   III.   Adoption of Consent Agenda
   IV.    Requests for Additions/Deletions to the Agenda
   V.     Closed Session (As Needed)
   VI.    Chairman's Information Items (As Needed)
   VII.   Administrator's Comments
   VIII.  Information Items
   IX.    Action Items & Board Standing Committee Reports
   X.     Presentation of Ceremonial Resolutions (1st meeting of the month only; to start as early as 6:00 p.m.)
   XI.    Public Input (to start as early as 6:00 p.m.)
   XII.   Board Comment & Disclosure (to follow Public Input)

   (An additional time of Public Input will be shown at the beginning of the agenda of the second Business meeting each month)

B.  The order of business at Public Hearings of the Board shall be set out by the Chair in the printed agenda and shall be limited to the following:

   I.   Call to order
   II.  Hearing of Items in Order as set by the agenda

## III.  Duties of the Chair and Vice-Chair

A.  The Chair shall preside at business meetings, committees of the whole meetings and public hearings, call the same to order, enforce these rules of order, and enforce all time limits imposed by the rules of order.

B.  In the absence of the Chair, the Vice-Chair shall perform the duties of the Chair.

   In the absence of both the Chair and Vice-Chair from a Business meeting or Public Hearing, the following "Chain of Command" shall apply: Chair, Finance/Government Services and Operations Committee; Chair, Transportation and Land Use Committee.

C.  The Chair shall decide all questions of order, subject to an appeal from any Member, on which appeal no Member shall speak more than once, unless by unanimous consent of the Board.

No. 17-2002, viewed 12/18/2018

D.    The Chair shall be responsible for preparation of the Board agenda for each meeting or hearing of the Board, in consultation with the members of the Board and the County Administrator, and shall lay the order of business before the Board in a parliamentary order.   Inclusion on the agenda brings items to the table for discussion.

E.    The Chair shall nominate the standing committees and the committee Chair, subject to the approval by the full Board.   The Chair shall nominate regional appointments subject to approval by the full Board.

F.    In urgent, but non-emergency situations, where the Chair and Vice-Chair are not available, the following is the "Chain of Command" which shall apply until a temporary Chair can be elected to perform official and ceremonial functions:

> Chair, Finance/Government Services and Operations Committee
> Chair, Transportation and Land Use Committee

G.    In the event of a Countywide emergency or when the Emergency Operations Center (EOC) is activated, the following "Chain of Command" should be followed:

> Chair
> Vice-Chair
> Chair, Finance/Government Services and Operations Committee

If none of the above are available or are unable to physically man the EOC, the County Administrator will obtain a replacement beginning with the closest available Member (Leesburg District) and continuing until at least one Member of the Board is present at the EOC or the scene of the emergency, as appropriate.

## IV.   General Rules Governing Placing Items on the Board Agenda and Establishing the Consent Agenda

A.    Board Members shall receive enough advance notice of agenda items to enable them to study the item, request and receive additional information, and consult constituents.

B.    The tentative agenda for Board meetings and the Consent Agenda shall be set by the Board Chair approximately two weeks prior to a regularly scheduled Board meeting.

C.    A copy of the tentative agenda shall be emailed to each Board Member's selected email address by 5:00 p.m. Friday [twelve days prior to the meeting].

D.    Staff shall be responsible for notifying individual Board Members of new agenda items, both Action and Information Items, that pertain to that Board Member's District.

E.    Agenda items may be placed on the agenda by staff or individual Board Members, only with approval of the Chair or two other Board Members and in one of the following ways:

1.    Staff may refer matters to Board standing committees in consultation with the Board Chair and Committee Chair. (All Board Members, whether a member of a particular committee or not, shall receive prior notification of the agenda for all Committee meetings in the weekly packet delivered to Board Members.)

2. Action Items may be brought to the Board in the normal course of conducting Board business through the Public Hearing or Committee process.

3. Staff or Board Members may request the Board Chair to place an item on the agenda. Such requests shall be made prior to the pre-agenda meeting which generally occurs two weeks prior to a Business meeting.   No item shall be placed on the Board's agenda without prior notification of the Board Chair, and in accordance with notification requirements in IV-D above.

4. Resolutions of Appreciation, Resolutions of Respect and Resolutions of Commendation can be placed on the Board agenda only by a Member of the Board of Supervisors.   If a County agency or non-profit organization would like to have such an action considered by the Board, they must contact a Board Member for sponsorship. Board Members shall notify County staff of such Resolutions for the agenda two weeks prior to the Board meeting. Presentation of resolutions adopted by the Board will be presented at the first Business meeting of each month.

5. After the Tentative Agenda has been set by the Board Chair, no new items may be added to the printed agenda, except:

   a)    Old items, of which Board Members are already aware, on which staff work has been completed.

   b)    Routine housekeeping items such as implementing a change in state law or an authorized budget item.

   c)    Emergency items, which are deemed those items that need Board action prior to the next regularly scheduled business meeting.

   d)    Committee items, provided such items, including a complete staff report, can be included in the Board packets.

   e)    After receipt of the tentative agenda, any Board member may recommend adding items to the agenda by informing the Chair by close of business a week before the meeting, provided such items can be placed in the Board's packet.

   f)    Any items requested through rules (a), (b), (c), (d) and (e) above are subject to approval by the Board Chair.

6. Staff and Board Members may request amendments to the agenda during a regular meeting during the portion designated "Additions/Deletions" to the agenda.   Only the following actions may be taken on any new items offered as an amendment to the agenda at the Board meeting:

   a)    Referral to a committee.

   b)    Referral to a future Board meeting for action.

   c)    Direction to staff to provide further information.

4

In the event such an amendment requires immediate action, the Board of Supervisors may take action at the same meeting during which it is introduced, only after suspension of the rules.   For purposes of this subsection, the following are not considered new items:

    a)    An item brought up for reconsideration.

    b)    An item reported out of committee after the agenda was published.

7.  Require timely and complete availability of agenda documentation to the public.

    a)    All meeting item documentation for both Board and Committee items (both paper versions and online versions) must be made available to the public no later than the day of or after the packet distribution prior to the Board meeting or public hearing.

    b)    All meeting item documentation (including attachments) received by Board Members in their packets for any item must be made available to the public in both paper format and electronically.

    c)    Any item which fails to meet the requirements of either (a) or (b) may be deferred to the next Board business meeting.

(\*\*During an emergency situation where the information had not been posted on the County website due to technical or other reasons within twenty-four hours, the item could be dealt with by a Board motion to suspend the rules.)

F.  Consent Agenda

1.  The Consent Agenda is a group of actions on which there is unanimous agreement of the Members so that they may be voted on as a block, The Consent Agenda is proposed by the Board Chair.

2.  Board Members are to be notified of the Proposed Consent Agenda in their packet prior to a Board Meeting.

3.  Board Members may ask that any item on the Consent Agenda be separated from the "block." Such items are then considered during the meeting as scheduled on the published agenda.

G.  Notification of the Public of the Board's Agenda

When Board packets are furnished to the Members, a copy of the agenda and the packet shall be made available for review by the public in the County Administrator's Office. Agenda packets are to be available by close of business Friday of the week prior to the Board Meeting.

## V.   Board Comment & Disclosure

At each regular meeting an item will be included on the agenda for "Board Comment and Disclosure".   At that time, each Board Member shall have up to five minutes to disclose meetings and discussions that regard matters of public business and/or make comments of general interest on matters such as public issues, community events or milestones, or constituent concerns.   With

No. 17-2002 viewed 4/21/2018

the consent of the Board, the Chair may delete or reduce the time for Board Comment in the event the time for the Board to conduct its business is constrained or the agenda is unusually lengthy. Board Comment and Disclosure will take place immediately following Public Input, unless otherwise moved on the agenda by the Chair without objection by any Board Member.

## VI.   Debate

A.      When any Member desires to speak or deliver any matter to the Board, the Member shall respectfully address the Chair, and on being recognized by the Chair, may address the Board, and shall confine his/her comments to those questions under debate.

B.      All comments, criticisms, etc., will be addressed to the Chair. Cross debate between Members will be conducted through the Chair. All matters of discussion, debate, or questions to staff shall be timed, and each Member shall be given 3 minutes (whether a formal motion has been made or not). Responses by staff to questions will be counted against the time allotted for a Member's comments.

C.      When two or more Members seek recognition at the same time, the Chair shall name the Member who is to speak first.

D.      The Member reporting a measure under consideration from a committee may open and close debate.

E.      During regular Board meetings, Board deliberations will be held among Board Members unless the Board consents to invite other participants.

F.      Participation during Board discussion by members of the public, interested parties or applicants may be permitted only upon unanimous approval of Board Members present and voting.

G.      Following all debate and when the motion is brought to a vote, the Chair will proceed with a roll call vote if requested by a Board Member and seconded by another.

## VII.   Motions and Their Precedence

A.      Every motion made to the Board and entertained by the Chair shall be reduced to writing on the demand of any Member, and shall be entered in the Minutes with the name of the Member making it.

B.      When a motion has been made, the Chair state it, or (if it be in writing) cause it to be read aloud before being debated, and it shall then be in possession of the Board, but may be withdrawn at any time before a decision or amendment.

C.      A motion to object to consideration of a question must be made prior to the Board's entering into discussion on the question.

D.      When a question is under debate, no motion shall be received by the Chair but:

      1.     To adjourn.
      2.     To adjourn to a day certain or when the Board adjourns, it shall be to a day certain.
      3.     To take a recess.
      4.     To proceed to the consideration of other business.
      5.     To lay on the table.
      6.     To postpone indefinitely.
      7.     To postpone to a day certain.
      8.     To commit to a committee of the Board
      9.     To amend.

E.      If in the judgment of the Chair a motion to amend or to substitute is essentially the opposite of the motion on the floor, then it shall be out of order.

F.      Rulings of the Chair may be overturned by a majority of the Members present and voting.

## VIII.   Previous Question

There shall be a motion for the previous question which shall have the effect to cut off debate and bring the Board to a direct vote upon the immediate question on which it has been asked and ordered.  The previous question may be asked and ordered upon a single motion, a series of motions allowable under the rules, or an amendment or amendments, or may be made to embrace all motions and include the pending measure to its passage or rejection.  It shall be in order, pending the motion for the previous question or after the previous question shall have been ordered on passage of a measure, for the Chair to entertain and to submit to the Board a motion to commit, with or without instructions, to a standing committee.

## IX.   Reconsideration

When a question has been decided by the Board, it shall be in order for any Member voting with the prevailing side or who has not voted on the question, to offer a motion for reconsideration thereof during the same meeting or succeeding Business meeting, and such motion shall take precedence of all other questions except a motion to adjourn.

## X.   Amendments and Motions

A.      Any motions or amendments shall be reduced to writing at the request of any Member, and shall be read aloud before it shall be debated.

B.      The maker of the motion will be allowed three minutes for justification.   Member comments will have a limit of a total of three minutes per Member.   No Member other than the maker of the motion will be allowed to speak more than once.

C.      In the event a Member, including the maker, believes that an item warrants further discussion than allowed under paragraph B, that Member may move the Board to dissolve into a committee of the whole for further discussion.

D.    Any motion, amendment, or resolution may be withdrawn or modified by the mover at any time before a decision, amendment or ordering of the yeas and nays, except a motion to reconsider, which shall not be withdrawn without leave.

E.    When a motion or proposition is under consideration, a motion to amend and a motion to amend that amendment shall be in order, and it shall be in order to offer a further amendment in the nature of a substitute, to which one amendment may be offered, but which shall not be voted on until the original matter is perfected.

F.    On amendments, the maker is allowed three minutes to speak to justification.   Members may have three minutes each to respond to amendment.

G.    Maker of original motion may reserve his/her time to close debate.

H.    Votes will be taken on amendments as they are brought up.

I.    When an amendment proposed to any pending measure is laid on the table, it shall not carry with it, or prejudice, such measure.

J.    It shall not be in order to consider any proposed committee amendment which contains any significant matter not within the jurisdiction of the committee proposing such amendment, unless determined proper by the Chair.

K.    On the demand of any Member, before the question is put by the Chair, a question shall be divided, if it includes propositions so distinct in substance that, one being taken away, a substantive proposition shall remain.

L.    A motion to strike out and insert is indivisible, but a motion to strike out and insert being lost shall not preclude amendment nor further motion to strike out and insert.

M.    No motion or proposition on a subject different from that under consideration shall be entertained by the Chair under color of amendment.

All matters not otherwise provided for in the Code of Virginia shall be determined by a majority of the Supervisors voting on the question except that a two-thirds vote of the Members voting should be obtained for the following:

1.    A motion to suspend rules.
2.    A motion to cut off debate or to call the previous question.
3.    A motion to object to consideration of the matter.

N.    The votes to carry a motion shall be as follows:

| Members Present and Voting | Majority | Two-Thirds |
|---|---|---|
| 9 | 5 | 6 |
| 8 | 5 | 6 |
| 7 | 4 | 5 |
| 6 | 4 | 4 |
| 5 | 3 | 4 |

Note 1 –   Five Members in attendance are needed for a quorum. The Board of Supervisors operates without the use of a tiebreaker.

Note 2 –   Tie vote on a motion will not carry the motion.

Note 3 –   A Member who abstains is counted for quorum meeting purposes but is not counted as a Member present and voting.

Note 4 –   Failure of a motion couched in the negative does not authorize positive action.

Note 5 –   It is noted that any vote to appropriate funds requires a majority of the full membership of the Board for approval, not simply a majority of Members present.

O.   Voting at a Public Hearing

It shall normally be the policy that the Board not vote to approve or deny an item during public hearing on matters that are on the agenda, unless all matters are resolved. If an item is moved for approval or denial at the public hearing, a motion to suspend the rules shall be in order to bring the matter to a vote.   All other motions to forward the item to a business meeting for action or standing committee are in order and do not require suspension of the rules.

# XI.   Citizen Appointments

A.   Whenever a vacancy exists on a board, committee, commission or other such body for which the Board of Supervisors makes appointments, the staff, in consultation with the Chair, shall notify the Board.   For each regular meeting, an item shall be prepared listing all appointments which are ripe for action, including the term of each appointment, and, if applicable, the district from which the appointment shall be made and the interest of incumbents to be reappointed.

B.   It is the Board's intent to search for broad-based representation on its committees.   Unless directed otherwise by the Chair, staff will generally advertise vacancies for a 30-day period through a press release.

C.   The Chair shall entertain nominations for appointments at any regular meeting at which a vacancy is so listed.   A second is not required. Nominees shall submit the Application for Advisory Board, Commission, or Committee prior to their appointment. Upon the receipt of all nominations, the Chair shall declare the nominations closed, provided that any Member may make a motion to leave the nominations open.   Such motion shall require a second and a majority vote.

D.   Once the nominations have been closed, no action shall be taken on the appointment until the next regular meeting, unless the Board suspends its rules.

E.   At the next regular meeting, the Board shall vote on the outstanding nominations for appointment.   The nominations previously made shall be included in the item listing appointments.   When more than one person have been nominated, the Chair shall present each nomination for a vote in the order in which it was made.   When more than one appointment is to be made, and only one nomination has been made for each appointment, the Chair may propose a slate of candidates for the appointments to be voted upon as a group.

F.   All appointments require a majority vote of the Board.

G. When the Board creates an advisory committee, board, commission or task force, the Board may establish a sunset provision for the body, except as otherwise required by State law.

H. Except as otherwise established by State law, the Board shall establish the terms of office for members of any advisory committee, board, commission or task force it appoints.

I. Unless otherwise provided by law, any appointee whose term of office has expired shall continue to serve until such time as the Board confirms a reappointment or a replacement appointee.

J. The Public Affairs and Communications Officer shall develop a monthly press release outlining all board and commission vacancies.

K. Flow of information from the advisory boards and commissions shall be through the appropriate Board standing committee.

## XII.  Record Keeping

Official minutes shall be kept by the Clerk to the Board as a summation of the public meetings, public hearings, and actions of the Board and its Committees.   In addition, the staff shall record and maintain archived audio recordings of all public meetings and hearings of the Board and its Committees.

## XIII.  Establishment and Jurisdiction of Standing Committees

A. The committee structure provides the Board of Supervisors the opportunity to study in depth, with the highest degree of public participation, the major items that the Board must take action on.   Any Member of the Board may participate in the discussion of issues before a Committee.

B. The Board shall have the following standing committees:

Finance/Government Services and Operations Committee (5 Board members)

Transportation and Land Use Committee (5 Board members)

Economic Development Committee (5 Board members)

Joint Board and School Board Committee (3 Board members)

The Chair, subject to Board approval, shall appoint such other committees as the Board may deem necessary.

C. In order to assist the Board in its analysis, appraisal and evaluation of Loudoun County government and conditions and circumstances which may indicate the necessity or desirability of enacting new or additional ordinances and policies, the standing committees of the Board shall have oversight responsibilities for specific areas of concern.   Upon approval by the Board each committee shall review and study, on a continuing basis, the application, administration, execution and effectiveness of those ordinances, policies, and programs, the subject matter of which is within the jurisdiction of that committee and the organization and operation of the County agencies and entities having responsibilities in or

for the administration and execution thereof, in order to determine whether such ordinances, policies, and programs are being carried out in accordance with the intent of the Board.

D.    All Standing and Ad Hoc Committees shall review and/or work on only those items or topics that are under its jurisdiction or referred to the Committee by the Board.  Any item not sanctioned by the Board that will require substantial staff time and/or cause a change in the schedule the Board has approved, the work program shall first receive Board approval. Each resolution, or other matter related to a subject under consideration by a standing committee shall be referred by the Chair of the Board to that committee except when the Board, by a majority vote, shall determine otherwise.

E.    The standing committees specified in this rule shall be comprised of five Members of the Board, one of whom shall be named as Chair thereof by the Chair of the Board.  Any Board Member may make a motion to amend any appointment or appointments made by the Chair provided that such motion to amend is made within thirty (30) days of when the appointments were made by the Chair.

F.    Each committee Chair shall appoint a Member of the committee to serve as Vice-Chair of the committee.  The duty of the Vice-Chair is to chair any committee meetings in the absence of the committee Chair.

G.    Three Members present shall represent a quorum.

H.    Each standing committee specified in this rule is authorized at any time to conduct such meetings, hearings, investigations, and studies as it may determine necessary or appropriate in the exercise of its responsibilities under this rule as approved by a majority of the committee Members or by the Board.

I.    All committees shall establish regular meeting dates. If this schedule would cause a regular meeting to fall on an official County holiday, then the meeting shall be held the next day at the same time and place, or as otherwise scheduled.   All committee meetings and hearings shall be open to the public as required by the <u>Code of Virginia</u> and all such meetings and hearings shall be announced by the Chair of the committee either during the regular meetings of the Board or at such other times as the committee deems appropriate, so long as every effort is made to provide each Member of the Board and concerned citizens advance notice of the meeting or hearing.

J.    A portion of the committee meeting, conducted in a manner as determined by the committee Chair, may provide an opportunity for committee Members to receive information from the public and staff and to ask questions of those testifying.

K.    It shall be the duty of the Chair of each standing committee or Member acting in the Chair's behalf specified in this rule to report or cause to be reported promptly to the Board any measure approved, disapproved, passed over or recommending no action be taken.   Both majority and minority views should be reported. At the time reported to the Board, any item for which a committee vote was taken, but which does not require Board action, may be reviewed by the full Board, and the Board may confirm, amend or overrule the committee action upon proper motion.   Notwithstanding the above, the Finance/Government Services and Operations Committee shall review and recommend to the Board of Supervisors all contracts in excess of $500,000.   The Transportation & Land Use Committee shall be granted authority to waive land use application fees up to $36,000, unless any Board Member notifies the Transportation & Land Use Committee Chair prior to or at the committee meeting that the recommendation for waiver should be forwarded to the full Board.

11

L.   The following rules shall be observed for the presentation of committee reports at Board Business meetings:

1.   Committee Chair shall be recognized for three minutes to present the report and will yield to Members wishing to ask questions.   All questions from Board Members shall be addressed to the committee Chair who is presenting the report.

2.   The  floor will then be open for amendments from the Board under the existing "three minute" rule.

3.   After amendments, general debate will occur under the "three minute" rule, and the question will be brought to a vote.

4.   Jurisdiction of Standing Committees:

The standing committees of the Board shall have the jurisdiction and related functions assigned to it by these rules, and all resolutions, and other matters relating to the subjects within the jurisdictions of any standing committee listed in this rule shall, in accordance with and subject to this rule, be referred to such committees, as follows:

a)   Transportation and Land Use Committee
   • Planning, Zoning, Land Development, Energy and Environmental Policy
   • VDOT Policy Issues
   • Transportation Issues

b)   Finance/Government Services and Operations Committee
   • Financial Management
   • Budget Policy and Issues
   • Procurement Issues
   • General Government Matters
   • Human Resources Policy

c)   Economic Development Committee
   • Economic Development Policy
   • Business Development & Retention

d)   Joint Board and School Board Committee
   • School Budget
   • School Capital Facilities Planning and Implementation
   • Community Education

Mission Statement: This Committee will provide collaborative review, analysis, and recommendations supporting excellence in public education for all residents of Loudoun County in an emerging global economy. The Committee will meet quarterly or at the discretion of the Co-Charis to work on topics including, but not exclusively, the following: fiscal clarity, capital construction planning and implementation, and assurance of a 21st century global education. Membership includes three members of the School Board, three members of the Board of Supervisors, and one member of the Economic Development Commission.

(Each committee may select from its body a Vice-Chair to serve in the absence of the committee Chair. This shall not apply to the Joint Board and School Board Committee as this committee will be served by Co-Chairs appointed by each respective governing body)

## XIV.   Amendments to Rules

These rules may be altered, amended or repealed and new rules may be adopted by a majority of the Board, in such manner and at such times as the Board may determine.

## XV.   Robert's Rules of Order

The latest edition of Robert's Rules of Order will apply to the extent consistent with the Rules.

## XVI. Rules of Order for Public Comments and Public Hearings

It is the purpose and objective of the Board of Supervisors to give each citizen an opportunity to express his/her views during any Business meeting and on the issue(s) at hand at a public hearing and to give all speakers equal treatment and courtesy.

While at a public hearing it is often necessary to have a presentation by the applicant and staff, it is the desire of the Board to hear from the public and, therefore, the applicant and staff presentations will be as brief as possible and the Board will refrain from comment and questions until after the public has been heard.   In order to accomplish this objective, it is necessary that certain rules of order with respect to public comment prevail at all Business meetings and Public Hearings of the Board of Supervisors, as follows:

A.     Business Meetings:

  1.  Speakers are encouraged to sign-up in advance by calling the Office of the Board of Supervisors or the Office of the County Administrator at (703) 777-0204 or (703) 777-0200, respectively. Speakers will be asked the date of the Business meeting at which they wish to speak.   The speakers shall identify the topic to be presented to the Board of Supervisors, their name, address, telephone number, e-mail address, election district, and any organization they represent, if applicable.   Cut-off time for advanced sign-up is at noon on the Business meeting date.

  2.  Sign-up will also be taken by the Deputy Clerk at the Business meeting.   A registration form will be provided and shall be filled out in its entirety in order to speak. Such registration form shall include the subject, speaker's name, address, telephone number, email address, election district, and any organization they represent, if applicable. Sign-up at the meeting will begin 30 minutes in advance of the start of the meeting.

  3.  At the Business meetings, all speakers, unless otherwise noted, will have a minimum of two minutes, but no more than five minutes, except as otherwise noted, to address the Board whether speaking as an individual or as a representative of any group or organization.   The Chair has the authority to set the time allotted to each speaker based on the number of citizens who are signed up to speak. A timer is located on each podium in the Board Room, indicating the amount of time remaining for the current speaker. When the timer reaches 00:00, the speaker shall yield the floor.

  4.  Members of the public who have not called in advance to register but wish to speak at a meeting should sign in prior to the start of the meeting.   Order of speakers will be

13

determined on first call-in/register, first speak basis.   The Chair may call up out of order any public official wishing to speak to the Board.

B.    Public Hearings:

1.    The order of business for consideration of a matter on the Board's public hearing agenda shall be as follows:

a)   Staff presentation:

Staff presentation will be heard in accordance with Board policy.   Brief, concise summaries for the public's information and understanding are permitted.   When written information has been provided prior to the hearing only summary and/or new information should be presented. Any questions from a Member of the Board to staff shall be limited to three minutes per Member;

b)   Applicant's presentation (if applicable):

A reasonable and sufficient time will be afforded the applicant to properly and fairly present the subject matter. Ten minutes shall be allocated to the applicant's presentation. If additional time is believed to be necessary, the applicant should contact the Chair prior to the Public Hearing. Board questions of the applicant will come following the public comments. Any Member of the Board may ask the applicant to respond to specific questions raised by the public after all public comments have been heard;

c)   Comments, statements or presentations from members of the public:

Unless otherwise noted, each speaker may have a minimum of two minutes, but no more than five minutes, to address the Board whether speaking as an individual or as a representative of any group or organization. The Chair has the authority to set the time allotted to each speaker based on the number of citizens who sign up to speak. The order of speakers will be determined on first call in/register, first speak basis;

d)   Questions from Board Members, which shall be limited to three minutes per Member; and

e)   Board discussion, at which time the Chair may entertain a motion to place the matter on a future agenda for action, to refer the matter to a committee, or to suspend the rules and bring the matter to a vote.

The Chair may declare the Public Hearing continued to a time certain on any or all matters, unless an objection is made by any Member.   In the event such an objection is made, the Public Hearing may be continued only by action of the Board. No action of the Chair or Board is required to close the Public Hearing.

2.    Speakers are encouraged to sign-up in advance by calling the Office of the Board of Supervisors or the Office of the County Administrator at (703) 777-0204 or (703) 777-0200, respectively.   Sign-up date will coincide with the delivery of Public Hearing packets, which is approximately 12 days prior to the hearing. The public will be asked to identify the agenda item, their name, address, telephone number, e-mail address, election district, and/or any organization represented.   Cut-off time for advanced call-in sign-up is at noon on the day of the Public Hearing. Sign-up will also be taken by the Deputy Clerk at the Public Hearing.   A registration form will be provided which will include the speaker's name, address, telephone number, email address, election district, and any organization they represent, if applicable.   Sign-up at the meeting will begin 30 minutes in advance of

the start of the meeting. The Chair may call up out of order any public official wishing to speak to the Board.

3. Speakers will be limited to a presentation of their points of view; however questions of clarification may be entertained by the Chair.

4. Debate is prohibited.

5. All comments will be directed to the Board of Supervisors as a body.

6. Decorum will be maintained.  This includes a common courtesy from the audience, the staff and Board to the speaker and from the speaker to the audience, the staff and the Board. Statements which are demeaning or inappropriate shall be ruled out of order.

7. In the event of a large number of speakers resulting in the continuation of the hearing, any persons not heard at the initial Public Hearing will be the first to speak at the continued hearing.

8. A timer is located on each podium in the Board Room, indicating the amount of time remaining for the current speaker. When the timer reaches 00:00, the speaker shall yield the floor.

9. Board Members will be limited to asking questions dealing with clarification of statements made by speakers, staff and/or the applicant and to correct any obvious areas of misinformation.  However, such questions, responsive answers or the correction of misinformation shall be made after the public has been heard or by Board action.  Each Member will be permitted three minutes total for questions and answers. Members requiring additional information or answers should seek them on their own time and not take the time of other Members.

10. It shall continue to be Board policy to not vote on matters appearing on a Public Hearing agenda at the time of the Public Hearing, and instead the item is to be placed on a future agenda for action.  However, a motion to suspend the Rules shall be in order to bring the matter to a vote at a Public Hearing.   It shall be the policy of the Board to leave the record open to receive written comments following a Public Hearing up until the time that a vote is taken.

11. Speakers who wish to leave written statements/comments are encouraged to bring ten copies for distribution to the Board Members.

12. Individuals speaking for an organized group shall file with the Deputy Clerk a copy of the Resolution of such Board authorizing their presentation

13. Rules of Order for Public Comment and Public Hearings will be available in the Board of Supervisors' Meeting Room.

## XVII. Legislative Contact

During the General Assembly session the Chair, working in consultation with the Vice-Chair, shall serve as the point of contact for all actions as may be required in order to reach the Board of Supervisors for any votes. All straw votes taken prior to a Business meeting of the Board will be confirmed at a regularly scheduled Business meeting.

No Member shall speak on behalf of the full Board of Supervisors or presume to represent the full Board of Supervisors before the legislature on any question or issue that the full Board has not taken a position on by the majority vote.

## XVIII. Remote Participation in Board Meetings*

*This Policy was adopted by the Board on September 3, 2014, as required by amendments to Virginia Code § 2.2-3708.1 during the 2014 General Assembly session.*

It is the policy of the Board of Supervisors that individual Board members may participate in meetings of Board of Supervisors by electronic communication means from a remote location that is not open to the public only as permitted by Virginia Code § 2.2-3708.1, as amended, and this policy. This policy shall apply strictly and uniformly to the entire membership and without regard to the identity of the member requesting remote participation or the matters that will be considered or voted on at the meeting.

An individual member may participate from a remote location only if a quorum (5 members) of the Board of Supervisors is physically assembled at the primary or central meeting location, and the Board has made arrangements for the voice of the remote participant to be heard by all persons at the primary or central meeting location.

Remote participation in a meeting due to an emergency or personal matter may be approved only if, before 12:00 noon on the day of the meeting, the requesting member notifies the Chairman of the Board that such member is unable to attend the meeting due to an emergency or personal matter and identifies with specificity the nature of the emergency or personal matter.

Remote participation in a meeting due to a temporary or permanent disability or other medical condition may be approved only if, before 12:00 noon on the day of the meeting, the requesting member notifies the Chairman of the Board that such member is unable to attend the meeting due to a temporary or permanent disability or other medical condition that prevents the member's physical attendance.

As required by law, in the event of any such participation by a member from a remote location, the Board shall record in its minutes the specific nature of the emergency, personal matter, temporary or permanent disability or other medical condition, and the location from which the Board member participated remotely.

As required by law, remote participation that is due to an emergency or personal matter shall be limited in each calendar year for each individual member to two (2) meetings or 25 percent of the meetings of the Board, whichever is fewer. This limitation shall apply separately with respect to the meetings of each of the Board's Standing Committees.

An individual member's request for participation from a remote location under this policy shall be considered approved upon communicating the request to the Chairman of the Board, pending review by the County Attorney for compliance with the Code of Virginia and this policy. If a member's participation from a remote location is disapproved because such participation would violate this policy, such disapproval shall be recorded in the minutes with specificity.





# Chapter 4

- ## Freedom of Information Act (FOIA)

- ## How to Respond to a FOIA Request

- ## Conflicts of Interest Act (COIA)

- ## Records Retention



*Loudoun County*
*Board of Supervisors*
*2016-2020*

# Introduction to the Virginia Freedom of Information Act (FOIA)

Virginia Code Sections 2.2-3700 et seq.

# It's Not Information and It's Not Free

- Found in Va. Code §§ 2.2-3700 et seq.
- http://leg1.state.va.us/000/cod/TOC02020000003700000000000000.HTM

- Records
- Requests
- Exemptions
- Charges
- Penalties
- Meetings

# What is a Record?

**All writings and recordings** that consist of letters, words or numbers, or their equivalent, set down by handwriting, typewriting, printing, photostatting, photography, magnetic impulse, optical or magneto-optical form, mechanical or electronic recording or other form of data compilation, however stored, and regardless of physical form or characteristics, prepared or owned by, or **in the possession of a public body** or its officers, employees or agents **in the transaction of public business.**

Records that are **not** prepared for or used in the transaction of public business are **not** public records.

## Records:

Minutes    Reports    Notes
Videos    Calendars    Drafts
Emails    Drawings/Photos    Maps
Spreadsheets    Voicemails    Texts

...if used in the transaction of public business.

## Not Records:

Doctor's Appointments
Kid's drawings
Grocery Lists
Chain emails

No. 18-002, viewed 1

# FOIA Requests

- Are requests for **RECORDS**
- Do not have to say "FOIA"
- Do not have to be in writing
- Do not have to come from an attorney

- Existing Records are responsive
- Do not have to create anything or provide/infer any information
- Can be provided in electronic or hard copy formats

## MOTIVE IS IMMATERIAL!

# FOIA Requests <u>Must</u>

- Be reasonably specific – that **does <u>not</u>** mean it must be brief!

- Be requested by a citizen of the Commonwealth or a media outlet that operates in the Commonwealth

- You can require that the requestor provide name and legal address

- Provide <u>**existing**</u> records; however, records retention rules apply

# Responding to FOIA Requests

## 4 ANSWERS:

*Yes*, here are the records, wholly or in part;

*No*, those records do not exist;

*No*, those records are exempt pursuant to...

OR

We need *more time* to fulfill the response.

No. 17-2 Vol. 9 pdf 12/17/2018

# Response Time

- A response with one of the answers must be provided within 5 working days.
  - If the answer is *Yes* – provide a response letter along with the records.
  - If the answer is *No* – provide a response letter along with an explanation of why the documents are being withheld, citing the exemption in the Code, or explain that the documents do not exist.
- If the public body that received the request knows that another public body has the requested records, the response shall include contact information for the other public body.

Reviewed 12/18/2018

# Response Time

- If it is *not practically possible* to provide the requested records or to determine whether they are available within the five-work-day period, ask for more time in the response letter.

- The response letter shall specify the conditions that make a response impossible.

- If the response is made within five working days, the public body shall *automatically* have an additional seven work days in which to provide a response.

# If You STILL Need More Time

- Any public body may petition the appropriate court for additional time to respond to a request for records.

- Before proceeding with the petition, however, the public body shall make reasonable efforts to reach an agreement with the requester concerning the production of the records requested.

# General Records Exemptions

1. Personnel records

2. Written advice of legal counsel

3. Legal memoranda and other work product compiled specifically for use in litigation

4. Any test or examination used, administered or prepared by any public body for purposes of evaluation of (i) any student or any student's performance, (ii) any employee or employment seeker's qualifications or aptitude for employment, retention, or promotion, or (iii) qualifications for any license or certificate issued by a public body.

5. Records recorded in or compiled exclusively for use in closed meetings lawfully.

6. Vendor proprietary information software

7. Computer software developed by or for political subdivision of the Commonwealth.

8. Appraisals and cost estimates of real property

9. Records concerning reserves established in specific claims administered by the Department of the Treasury through its Division of Risk Management

10. Personal information, as defined in § 2.2-3801, including electronic mail addresses, furnished to a public body for the purpose of receiving electronic mail from the public body

11. Communications and materials required to be kept confidential pursuant to § 2.2-4119 of the Virginia Administrative Dispute Resolution Act (§ 2.2-4115 et seq.).

12. Records relating to the negotiation and award of a specific contract

13. Those portions of records that contain account numbers or routing information for any credit card, debit card, or other account with a financial institution of any person or public body.

Va. Code 2.2-3705.1

However, access shall not be denied to the person who is the subject of the record.

# FOIA Charges

A public body may make ***reasonable charges*** not to exceed its actual cost incurred in accessing, duplicating, supplying, or searching for the requested records.

- Duplication
- Staff time
- Materials
- Postage

All charges for the supplying of requested records shall be estimated in advance at the request of the citizen.

# Billing and Payment

- If the cost of producing a FOIA request is expected to exceed $200, you can require prepayment.

- You can require payment of amounts owed prior to fulfilling a FOIA request for a person with previous unpaid FOIA request charges.

# Negotiation is Key

- If there is an extremely large or particularly cumbersome request:

  - Be aware of the time and schedule for response;
  - Stay in contact with the requestor to make sure they know you are working on it;
  - Ask if the requestor can accept it in a format that is easier;
  - See if the requestor can narrow the scope of the request;
  - and COST is a big incentive...

- Remember: Failure to respond to a request for records shall be deemed a denial of the request and shall constitute a violation of FOIA.

# Violations and Penalties

- If the Court finds that a violation was willfully and knowingly made:

  - Impose upon such officer, employee, or member *in his individual capacity*, whether a writ of mandamus or injunctive relief is awarded or not, **a civil penalty of *not less than $500* nor more than $2,000.**

  - For a second or subsequent violation, such civil *penalty shall be not less than $2,000* nor more than $5,000.

- That means you *personally* will pay for a willful violation of FOIA.

# Public Meetings



# Open Meetings

- ***Three members discussing public business is a meeting (2 can be)***
- Must be open to the public
- People may record/photograph/ open meetings
- Date, time, location published at least three days prior

- Meeting notice must be provided to individuals upon request
- Agenda must be available
- Minutes must be recorded
- Provide reasonable notice even in emergencies
- Not over the phone/email

# Closed Meetings

- Legal closed meetings may be held for a few purposes
- Discuss legal matters
- Personnel matters
- Contractual matters
- Acquisition of Property
- And more

- Legal closed meetings must be certified:
  - Affirmative vote by board members
  - Cite provision for closed meeting
  - Discuss only items pursuant to the Code section cited
  - Certify in open session

# FOIA Jeopardy

| Records | Charges | Exemptions | Meetings | Requests | Penalties |
|---------|---------|------------|----------|----------|-----------|
| 100 | 100 | 100 | 100 | 100 | 100 |
| 200 | 200 | 200 | 200 | 200 | 200 |
| 300 | 300 | 300 | 300 | 300 | 300 |
| 400 | 400 | 400 | 400 | 400 | 400 |

No. 17-2002, viewed 12/18/2018

# Records – 100 Points

## Is this a public record?



# Records – 200 Points

## Is this a public record?



# Records – 300 Points

## Is this a public record?



# Records – 400 Points

## Is this a public record?

**Milbourne, Susan**

| | |
|---|---|
| **From:** | Milbourne, Susan |
| **Sent:** | Wednesday, January 07, 2015 3:51 PM |
| **To:** | 'Toby' |
| **Subject:** | Availability |

Mr. Mac,

I am writing to confirm your availability to appear at our office luncheon on January 13, 2016 to share your upcoming projects and events.

Sincerely,

Susan Milbourne
Administrative Manager
Office of the County Attorney
County of Loudoun
1 Harrison Street S.E.
P.O. Box 7000
Leesburg, VA 20177-7000
Phone:   703-777-7000
Facsimile:  703-771-5025
Susan.Milbourne@loudoun.gov

No. 17-2002, reviewed 12/18/2018

# Charges – 100 Points

**True or false:**

**You can charge for the time it takes you to copy the documents requested in a FOIA request.**

# Charges – 200 Points

True or false:

You can get the chief executive officer to copy documents for a FOIA request and charge an hourly rate based on his/her salary for fulfillment of the request.

# Charges – 300 Points

True or False:

If you store all the records related to a request on an electronic spreadsheet, but the requestor wants paper copies of the information in the spreadsheet, you are not required to create a paper document.

# Charges – 400 Points

True or False:

If a FOIA is estimated to take 410 copy pages at $0.10 per page, 8.0 hours of staff time at $22/hour and $18 in postage, you can ask the requestor to prepay for the FOIA request.

Reviewed 12/18/2018
No. 17-2002

# Exemptions – 100 Points

Is the performance evaluation of an employee an exempt record?

No. 17-2002 Received 12/18/2018

# Exemptions – 200 Points

A contract has been negotiated for printing services. Is the contract information exempt from FOIA?

# Exemptions – 300 Points

A former employee asks to receive their personnel file. Is this allowed under FOIA?

# Exemptions – 400 Points

A citizen asks to receive the salary data for everyone in the organization. Is that allowed under FOIA?

No.

Reviewed 3/18/2018

# Meetings – 100 Points

Three members of a public body attend the opening of a new business. Is this a violation of meeting rules?

Reviewed 9/18/2018

No, II.

# Meetings – 200 Points

An emergency meeting of a public body must be called. Must you push the meeting back to provide three days' notice to the public?

Viewed 12/18/2018

# Meetings – 300 Points

The meetings of a public body are held in a public building in a conference room. It is not practical to televise the meetings. What can the public body do to make sure they do not violate the open public meeting requirement?

# Meetings – 400 Points

A public body goes into a lawful Closed Session pursuant to § 2.2-3711(A)(1) to discuss personnel matters. While they are in the closed meeting, they also discuss the lawsuit that the employee might bring. Is this allowable under FOIA?

# Requests – 100 Points

What are the answers you can provide in response to a FOIA request?

No. 1:17-cv-02002, answered 12/18/2018

# Requests – 200 Points

Is it considered a FOIA request if someone asks why a public body chose a specific contractor?

Viewed 12/18/2018

# Requests – 300 Points

What is the maximum number of days you have to respond to a request before petitioning the court?

17-2002 Archived 12/18/2018

# Requests – 400 Points

Should you fulfill the FOIA request of a person who lives in Washington D.C.?

viewed 12/18/2018

# Penalties – 100 Points

What is the minimum civil penalty for a violation of FOIA?

No.

viewed 12/18/2018

# Penalties – 200 Points

If you are charged with a violation of FOIA, who is responsible for payment of the civil charges?

# Penalties – 300 Points

What is the maximum civil charge penalty for a third violation of FOIA?

# Penalties – 400 Points

A FOIA request is made for all FOIA requests from the last election, four years ago. The request is denied. Is there a penalty?

Reviewed 12/18/2018

answer: No

## RESPONDING TO A FOIA REQUEST

The Freedom of Information Act contains specific requirements on how and when to respond to such requests. Members of public bodies need to be aware of these requirements and to be prepared to respond with records in their custody.

**Persons who may request records:** Any citizen of the Commonwealth or members of the media with circulation or broadcasts in the Commonwealth.

**Scope of records covered by the Act:** Public records are broadly defined to cover writings or recordings of any nature, including electronic and graphic records, "prepared or owned by, or in the possession of a public body or its officers, employees or agents in the transaction of public business." The request, however, must identify the records with "reasonable specificity."

**Exemptions from the Act:** Various types or categories of records are not required to be disclosed under the Act. This list is quite lengthy, and in many cases it involves records of specific agencies. As general guidance for Board members, you should identify any records dealing with property acquisition or other matters under consideration in closed session, personnel matters, and attorney-client communication, and consult with the County Attorney's office on whether these can be withheld.

**Time to respond:** Five working days. You may have an additional seven working days if it is not practically possible to provide the requested records or to determine whether they are available within the five-work-day period. You must tell the requester the conditions that make a response impossible.

**Form of response:** Within the five working days you must provide the records to the requester or provide one of the following responses in writing:

- The requested records are being withheld entirely because their release is prohibited by law or the custodian is exercising the discretion to withhold allowed under one of the exclusions. You must specify with reasonable particularity the volume and subject matter of the records withheld and the specific Code section authorizing you to withhold them.

- The requested records are being provided in part and withheld in part. For those records withheld, you must provide the same type of information identifying the records and the statutory exemption. You may delete or excise only that portion of a record to which an exemption applies.

- The requested records could not be found or do not exist. If you know that another department, office or agency of the County is the custodian of the records, you need to include that contact information.

- It is not practically possible to provide the requested records, or determine whether they are available, within the five-work-day period, and you will respond within an additional seven work days. You must specify why it is not possible to respond in the shorter period. Within the additional period, you must provide the records or make one of the responses above.

**Electronic records:** Electronic mail and documents are covered. This includes the records concerning the transaction of public business on any computer you use for this purpose. If you are using a home account to receive and send public business e-mail, you may wish to establish protocols to ensure that these records are routinely separated and saved. You must provide electronic records in the medium identified by the requester, unless the format is not regularly used by the public body.

**Costs:** You may make reasonable charges for responding, not to exceed your actual costs in accessing, duplicating, supplying or searching for the requested records. If requested by the citizen, you must provide an estimate in advance. Whether or not an estimate is requested, if you determine in advance that the charges are likely to exceed $200, you may require the requester to make a deposit up to the amount of the advance determination. The time for response is tolled between the advance determination and the response of the requester. When the request is not subject to an advance deposit, or the cost exceeds the advance deposit, you should not withhold the records pending payment. Provide the records and a bill for the unpaid charges. Before processing any new request for records from the same citizen or member of the media, however, you may require payment of any amounts owed for previous requests that have been billed and unpaid for more than thirty days.

**Contact:** Jennifer Grimmell, Deputy Clerk in County Administration (x0201), will assist the Board in responding to FOIA requests. Please contact her immediately upon receiving a request and she will coordinate with the appropriate offices and departments. Any legal questions should be directed to the County Attorney.

# Conflicts of Interests & Disclosure
### under the
# Virginia Conflict of Interests Act

## Va. Code Sections §§ 2.2-3100 et seq.



# State and Local Government Conflict of Interests Act

- Virginia Code § 2.2-3100, et seq.

- **Policy statement:**

- Representative Government depends on:

  - Citizen legislative members representing fully the public in the legislative process; and

  - Citizens maintaining the **highest trust** in their public officers and employees

NOT for Viewing 12/18/2018

# General Assembly Policy

Your judgment is to be guided by law that:

- Prohibits inappropriate conflicts; and
- Requires disclosure of economic interests

No. 1002; copied 12/18/20



# State and Local Government Conflict of Interests Act

## Your First Assignment:

- County Administration will provide you a copy of the Act within two weeks of your election.

- You must "read and familiarize" yourself with the Act.

# State and Local Government Conflict of Interests Act

## Why should I care?

- Any person who knowingly violates ANY of the provisions of the Act shall be guilty of a **misdemeanor (felony re: Statement of Economic Interests)**.

- Any person who knowingly violates any of the provisions of the Act shall be guilty of malfeasance in office or employment.

- If convicted, **forfeiture** of office possible.



# Who can officials/staff turn to?



- **County Attorney**

- **VA COIA & Ethics Advisory Council -**
(Not yet up and running) Staff – Legislative Services

- **Commonwealth's Attorney**



KEEP
CALM
AND
PAY
ATTENTION

# State and Local Government Conflict of Interests Act

## OVERVIEW

- Improper Conduct (Gifts, Bribery, Misuse of Public Position/Confidential Info, Family Employment, Other)

- Personal Interest In Contracts (& VPPA)

- Personal Interest in Transactions

- Disclosure of Economic Interests

# How to Avoid Confusion



viewed 12/18/2018

# Gift Issues



- ## Is it a Gift?

- ## Is it prohibited?

- ## Reporting requirements for certain gifts

No. 17-2002, viewed 1/8/18

# State and Local Government Conflict of Interests Act

- **"Anything of value,** including any gratuity favor, discount, entertainment, hospitality, loan, forbearance, or other item having monetary value, and includes services as well as gifts of transportation, local travel, lodgings, and **meals,** whether provided in-kind or by purchase of a **ticket,** payment in advance, or reimbursement after the expense has been incurred."

- Section 2.2-3101 until Jan. 1, 2016

# Special Gift Rule

Applicable to **Disclosure Form Filers**

- Board members
- The County Administrator and anyone in a position of trust designated by Board
- Candidates required to file Disclosure Form

Reviewed 12/18/2018

# Special Gift Rule

## No Soliciting, Accepting, Receiving:

- Single gift or combined > $100 in 1 calendar year
- Single gift of < $20 does not count for $100

## FROM

- Lobbyist (or Principal),
- Person who has or wants a contract with the County

## EXCEPTIONS

- Widely Attended Event (Disclosure Form)
- Personal Friendship (Multiple Factors)
- Travel, lodging approved by Ethics Council

# Exception
## Widely Attended Event
### Effective 1/1/2016

- > 25 attendees reasonably expected
- Common interest
- Members of public, civic, charitable or Professional Organizations, or
- From a particular industry or profession, or
- Who represent persons interested in a particular issue.
- Report on Disclosure Form
- **Food, Drinks, Entertainment, Admission at Event**

Viewed 12/0/2016, no later than 8/2018

# Exception – Give It Back

## Effective 1/1/2016

- Gift is not used
- Gift or equal in $ is given to donor or charity
- No claim of charitable tax deduction taken
- Within reasonable time of learning value OR
- Pay donor value within reasonable time

Received 12/18/2018

# Exception
## Meritorious Service Award



- County employees may accept

- Award/Payment in honor of

  – Meritorious or exceptional service

  – Given by a 501(C)(3)



# Prohibited Contracts
## of
# Board Members

# Prohibited Contracts



Thou shalt not have a **personal interest** in a County contract

- Financial benefit or liability
- To Member or **Immediate Family**



No. 17-2002, viewed 12/18/20...

# Prohibited Contracts

**"Immediate family"** means (i) a spouse and (ii) any other person who resides in the same household as the officer or employee and who is a dependent of the officer or employee.

# Prohibited Contracts Exceptions



- Interest in employment contract pre-dates election to Board of Supervisors

- County sells items to the public at uniform prices

- Competitively sealed bid award in very limited circumstance

# VPPA as Supplement to COIA

Those with **Official Responsibility** for a Procurement Transaction cannot act on it if:

- Public employee works for bidder;
- Immediate family holds high level position with bidder;
- Immediate family or employee participates personally & substantially in the transaction;
- Employee or family own >5% of business;
- Have any financial interest; and
- Are negotiating for employment with bidder.

# VPPA as Supplement to COIA

Official Responsibility means:

- Administrative or operating authority, whether intermediate or final, to initiate, approve, disapprove or otherwise affect a procurement transaction, or any claim resulting therefrom.

Nullified 12/18/2018

# VPPA as Supplement to COIA

No official with responsibility for a procurement transaction shall:

- Solicit or accept anything more than nominal or minimal value from a bidder or contractor unless the official pays the amount over nominal or minimal value.

viewed 12/18/20



# Prohibited Transactions of Board Members

# Prohibited Transactions

**Personal Interest in a transaction means:**

- A personal interest of the employee or immediate family in any matter of the County.

- " …Reasonably forseeable direct or indirect benefit or detriment…."

# Prohibited Transactions

**Shall disqualify, except may participate if ....**

- Member of a group affected by Board decision and he makes a public declaration of interest, then may participate;

- Client has the interest and he does not rep the client and he makes public declaration;

- Matter affects the public generally even though his personal interest may also be affected.

# Prohibited Transactions

**Group member public declaration:**

1. Nature of transaction

2. Personal interest affected

3. Business, Professional, Occupational Group Affected

4. Able to participate in the transaction: "fairly, objectively and in the public interest"

No. 2002, reviewed 12/18/2018

# Prohibited Transactions

## Self Disqualification – 3 Parts

- Full and public disclosure of the conflict of interest

- No participation (leave room)

- No discussion with employees

No. 1(2002, Vacated 12/18/2018

# In sum for transactional issues – the official or employee must either:

- **Disclose** in writing and verbally if they have a conflict that they can declare and then vote on objectively & in the public interest

- **Disclose** in writing and verbally but not vote because they are legally **Disqualified** –

  – as a matter of law

  – because they cannot vote objectively & in the public interest



# State of Economic Interests

False Statement of Material Fact = Felony 5

Condition to assume office

Thereafter, file semiannually:  June 15, December 15





# Statement of Economic Interests

**County Clerk Duties:**

- Sends form at least 20 days prior to deadline;

- Notifies Commonwealth Attorney after 30 days of failure to file the form;

- Commonwealth Attorney **shall** assess and collect **$250 penalty**.



# Nepotism

Unlawful for Board member or County officer to recommend any person for a job if that person is his or her:

. . . Immediate family member including father, mother, brother, sister, spouse, son, daughter, son-in-law, daughter-in-law, sister-in-law or brother-in-law.

# QUESTIONS









# Chapter 5

# Agenda and Packet Preparation Processes

- ### Business Meetings

- ### Committee Meetings

- ### Public Hearings

No. 17-2002, viewed 12/18/2018



*Loudoun County*
*Board of Supervisors*
*2016-2020*

# AGENDA PROCESS

## BOARD OF SUPERVISORS

## BUSINESS MEETINGS, COMMITTEE MEETINGS, AND PUBLIC HEARINGS

The agendas for the Board's regular business meetings are a compilation of items from numerous sources. All matters are placed on the agenda pursuant to policies set forth in the Board's Rules of Order, which are adopted each year at the first meeting in January. The Rules of Order are subject to review and revision by the Board at any time during the year. The Rules of Order are discussed in a separate briefing document.

The purpose of this information about the agenda is to familiarize you with the current sequence of events of Board meetings, with the type of information or action that is associated with each portion of the agenda, and with information about how items actually get on the agendas.

**Section I**         Current Agenda Format

**Section II**        Discussion of Agenda Format

**Section III**       Current procedures for placing items on business meeting and public hearing agendas

**Section IV**        Packet Procedures

**Section V**         Electronic Packets

**Section VI**        Record-Keeping

The Agenda and Agenda Summary of the October 7, 2015, Business Meeting are included at the end of this chapter so you can see how the outline is fleshed out for an actual meeting.

**SECTION** I:     **CURRENT AGENDA FORMAT**

LOUDOUN COUNTY BOARD OF SUPERVISORS ORDER OF BUSINESS - BUSINESS MEETINGS

The Board shall conduct public meetings on the first and third Wednesday of each month, beginning at 4:00 pm.  Meetings are held in the Board of Supervisors' Meeting Room, County Government Center, 1 Harrison Street, S. E., Leesburg, Virginia 20175.

The order of business of the Board meeting shall be as follows:

I.       Call to Order - Chairman

II.      Invocation/Pledge of Allegiance (Rotation Schedule)

III.     Adoption of Consent Agenda

IV.      Requests for Additions/Deletions to the Agenda

V.       Closed Session (AS NEEDED)

VI.      Chairman's Information Items (AS NEEDED)

VII.     Administrator's Comments

VIII.    Information Items

IX.      Action Items

X.       Presentation of Ceremonial Resolutions (To start as early as 6:00 p.m.)

XI.      Public Input (To start as early as 6:00 p.m.)

XII.     Board Comments/Disclosures (5 Minutes Each)

XIII.    Adjourn (An additional time of Public Input will be shown at the beginning of the agenda of the second Business meeting each month.)

## SECTION II:     DISCUSSION OF AGENDA FORMAT

I.     Call to Order - Chairman

The Chairman, or in his/her absence, the Vice-Chairman, calls the meeting to order promptly at 4:00 pm.

II.     Invocation/Pledge of Allegiance

The Invocation is given by a different Supervisor at each meeting.  The Supervisor's name appears on the agenda and on the summary.  Following the Invocation, the Supervisor turns toward the flag and leads the Pledge of Allegiance.

III.     Adoption of Consent Agenda

The Consent Agenda is comprised of action items which are non-controversial, are not expected to require discussion, and recommend actions which the Chairman and Vice-Chairman believe are unanimously supported by the Board.  Committee Reports may also be placed on the Consent Agenda provided certain requirements are met.  The Consent Agenda is proposed by the Chairman and the Vice-Chairman, and are marked with an "*" on the Agenda.  Board members are requested to notify staff prior to the start of the meeting of their concurrence or objection to the items proposed.  The items on the Consent Agenda are voted on as a block, without discussion. However, if a Board member objects to the inclusion of an item, he/she may ask that it be removed from the block at any time prior to the vote on the Consent Agenda, and it will be taken up in the order in which it appears on the regular agenda.

IV.     Requests for Additions/Deletions to the Agenda

Board members, the County Administrator, or the County Attorney, have an opportunity to request the addition or removal of items from the agenda at this time.  Explanations are provided when items must be removed from the agenda.  Only the following actions may be taken on any new item proposed as an amendment to the agenda:  1) referral to a committee; 2) referral to a future Board meeting for action; 3) direction to staff to provide further information on the matter.  In the event an amendment requires immediate action, the Board may vote to suspend its Rules of Order and place the item on the agenda for action at the same meeting at which it has been introduced.

3

The following are not considered new items:  1) an item brought up for reconsideration; 2) an item reported out of committee after the agenda was published.

V.    Closed Session (AS NEEDED)

Staff will notify the Chairman if a closed executive session is required, or individual Board members may request a closed executive session.  Closed Executive sessions should be scheduled in time for inclusion on the printed agenda if at all possible.  The requisite motions for going into and out of closed executive session, and certifying the subject areas of discussion, are provided to the Board at each meeting.  Closed Executive sessions are discussed in Section 3 of this Manual under Freedom of Information matters.

VI.   Chairman's Information Items (AS NEEDED)

During this portion of the agenda the Chairman makes special announcements or provides information on matters of interest to the Board and the citizenry.

VII.  Administrator's Comments

During this portion of the agenda the County Administrator makes special announcements or provides information on matters of interest to the Board and the citizenry.

VIII. Information Items

Information items are a formal means of providing information to the Board, such as status reports on County projects, consultants' studies, report updates, or responses to Board requests for information.  Information items do not require action, so there are no draft motions.  The Board may direct staff to follow up on an item, or refer the matter to committee for further consideration.

IX.   Action Items

During this portion of the agenda the Board takes up all items other than those already approved on the Consent Agenda. Action Items are presented to the Board for a vote of approval, disapproval, deferral, or referral to a committee.  Staff reports for each item include the purpose of the item, recommendations for Board action, background information, discussion of issues, fiscal impact statements, alternatives, and draft motions for Board consideration.

4

The first Action Item on the agenda is usually the Appointments Item, which informs the Board of vacancies in the membership of Board-appointed committees, commissions, and advisory boards.  Nominations are made by Board members at one meeting, with the vote for confirmation taking place at the next meeting.  Reappointments are normally voted on at the first meeting.

The second Action Item on the agenda is usually the Administrative Items Report, which is a compilation of administrative matters which require Board action but are routine in nature and normally require no discussion.  These might include budget adjustments, approval of the Minutes of previous board meetings, construction/performance bond matters, acceptance of grant awards, extensions of decision deadlines, road acceptances, authorizations for public hearings on routine matters, or routine agreements.  Financial summaries and other routine reports are also included for the Board's information.  The Administrative Items Report is usually addressed as part of the Consent Agenda; however, any item may be removed from the Administrative Items Report for discussion and separate action.

The Board of Supervisors currently has four standing committees (Economic Development Committee; Finance/Government Services and Operations Committee; Joint BOS/School Board Committee; and Transportation and Land Use Committee). Most legislative and policy issues are considered by one or more committees before they reach the full Board.  Committee reports bring these items forward with recommendations for Board action or as information for the Board if action is not needed or is not appropriate at the time.  The Committee chairman presents the reports and moves the committee recommendations to bring them before the Board for a vote.

X.      Presentation of Ceremonial Resolutions (To start as early as 6:00 p.m.)

These items are drafted by the Board's staff at the request of Board members.  Resolutions of Appreciation or Commendation recognize individuals who have made significant contributions to the County.  Recipients are invited to attend the meeting.  The Board votes approval of the Resolution and the Chairman presents the framed document to the recipient.  The Chairman often invites the Board members to join him in making the presentation.  Resolutions of Respect memorialize County citizens who have made significant contributions to the County and have recently passed away.

XI.     Public Input (To start as early as 6:00 p.m.)

At every business meeting the public is afforded the opportunity to address the Board on any subject.  Each speaker will have up to five minutes, whether he/she is speaking for himself or as a representative of a group, unless extra time has specifically been granted

5

by the Chairman or by majority vote of the Board. However, the Chairman has the authority, under the Rules of Order for Public Comment and Public Hearings, to reduce the amount of time allotted to each speaker based on the number of citizens who sign up to speak. Each member of the public recognized to address the Board, whether speaking individually or as a representative of a group, will have a minimum of two minutes but no more than five minutes during Public Comment, unless extra time has specifically been granted by the Chairman or by majority vote of the Board.

An additional time of Public Input will be shown at the beginning of the agenda of the second Business meeting each month.

XII.    Board Comments/Disclosures (5 Minutes Each)

Board members are provided up to five minutes to make comments on matters of general interest, community events or milestones, or constituent concerns, and to disclose their meetings with applicants, representatives, organizations, and individuals on current land use applications. The Chairman calls on each Supervisor in turn. With the consent of the Board, the Chairman may delete or reduce the time for Board Comment in the event the time for the Board to conduct its business is constrained or the agenda is unusually lengthy.

XIII.   Adjourn

# SECTION III:   PROCEDURES FOR PLACING ITEMS ON THE AGENDA

I.   REGULAR BUSINESS MEETINGS

The agenda process is intended to ensure that Board members have ample opportunity to be aware of items requiring Board action so they can reflect on the issues, receive answers to their questions, and consult constituents if they so desire.

<u>Resolutions of Appreciation and Commendation, Resolutions of Respect</u>

These items can be placed on the agenda only by a member of the Board of Supervisors. If County agencies wish to have such an action considered by the Board, they must contact a member of the Board and ask him/her to sponsor the resolution.  Department heads frequently identify individuals or groups whom they feel have earned Countywide recognition in this manner.  Resolutions requested by or sponsored by Board members are prepared by the staff aide of the Board member sponsoring the resolution.

Resolutions of Appreciation:

Board members may request that a Resolution of Appreciation be prepared for a citizen who has contributed significantly to the well-being of the County through his/her personal endeavors or service to the County.

Resolutions of Commendation:

Resolutions of Commendation are awarded to individuals who have achieved an outstanding level of success (such as becoming an Eagle Scout), or who have performed in an exemplary manner for the benefit of Loudoun County or its citizens.  Board members usually receive requests directly from the families of Eagle Scouts.  The Sheriff or Chief of Fire and Rescue Services frequently request the Board to recognize public safety personnel who have acted above and beyond the call of duty.

Resolutions of Respect:

By sponsoring a Resolution of Respect for a County citizen who has recently passed away, a Board member provides an opportunity for the Board of Supervisors to

memorialize the significant contributions that individual has made to Loudoun County during his or her residence here.

Information Items

Staff will bring Information Items forward as appropriate in response to specific Board requests for information, to provide updates on on-going projects, or to present staff or consultants' reports.

Appointments

Information about vacancies on the Board's advisory committees and commissions is forwarded to the Board's office by staff or by Board members who have been contacted by their appointees. An Appointments Item is prepared for each meeting listing the vacancies, terms of appointment, and whether the vacancy is from an election district or is at-large. Board members nominate candidates for their own district representatives; any Board member can nominate an at-large candidate. Frequently the advisory committee itself or staff will submit a list of possible nominees for the Board to consider.

The Appointments process is explained in more detail in a separate briefing document.

Action Items

An Action Item is placed on the agenda by Board members, by the standing committees of the Board, or by staff, by notifying County Administration that the item is ready for consideration by the full Board.

A Board member may place any matter on the agenda of a Board meeting, with the approval of the Chairman and Vice Chairman and pursuant to the Board's Rules of Order.

The full Board may vote to place a public hearing item on the agenda of a subsequent business meeting for action.

Staff members place items on the agenda in the following circumstances:

1.     By a majority vote, the Board has directed staff to prepare an item and it is ready for Board consideration.

2.      Situations arise which, in the judgment of the County Administrator, warrant Board Consideration.

Board Standing Committee Reports

Committee Reports are prepared by staff at the direction of the committee when it has concluded its consideration of an issue, voted on its recommendation, and forwarded the item to the full Board at a specific meeting.

Amendments

Amendments are items requiring Board consideration which are added to the agenda by Board members or staff after the Agenda has been reviewed and approved by the Chairman and Vice-Chairman.  Amendments may be identified soon enough to be included on the final printed agenda, or they may be added during the Additions/Deletions portion of the meeting.  When an amendment is listed on the printed agenda the Chairman and Vice Chairman have been informed and have authorized the County Administrator to bring the item forward.

Pursuant to the Rules of Order, only the following actions may be taken on any new item offered as an amendment to the agenda at the Board meeting:

- Referral to a committee

- Referral to a future Board meeting for action

- Direction to staff to provide further information

In the event an amendment requires immediate action, the Board of Supervisors may take action at the same meeting in which it is introduced, only after voting to suspend the Rules.

The following are not considered new items:

- An item brought up for reconsideration;

- An item reported out of committee after the Board packets were distributed.

II.      COMMITTEE MEETINGS

There are three ways an item can be placed on a Board Standing Committee agenda:

  1)  By the Chairman of the Board

  2)  By the full Board referring an item to committee

  3)  By the Chairman of the Standing Committee

Staff having issues which require committee consideration will work through the committee liaison, who in turn will work with the Board Chairman or the Committee Chairman to determine the appropriateness and timing of the committee's consideration of the item.

III.     PUBLIC HEARINGS

The Board holds public hearings on the items listed on the following page.  Many of these are part of the application processes established by State Code and/or County Ordinances, and items come forward to the Board pursuant to the timeline of the application review process.  Others, such as bond referendum questions, are the result of Board initiatives, but are also governed by legal requirements.  In many instances the Board will take action at a business meeting to authorize a public hearing on an item and to direct staff to prepare and place the appropriate advertisements.  On routine matters, the authorization for a public hearing may be brought forward in the <u>Administrative Items Report.</u>

The development of a public hearing agenda and the publication of the ads are coordinated by staff.  Legal advertisements and public notices are placed in the newspaper by the County Administrator's office. A copy of the current legal advertisement of a Public Hearing is posted on the County's website and in the County Administrator's Office.

The Board of Supervisors holds public hearings on the following matters:

  1)  Rezonings

  2)  Special Exceptions

  3)  Comprehensive Plans and Amendments

  4)  Proffer Appeals

10

5) Road Abandonments

6) Adoption or Changes in Fee Schedules

7) Subdivision Exceptions

8) Requests for Resolutions of Support for Tax-Exempt Status

9) Bond Referendum Questions

10) Conveyance of Interest in County Property

11) Applications for Kennel Permits

12) Increases in Taxes Levied Due to Assessments

13) Proposed Budget

14) All Ordinances and Ordinance Amendments (resolution of "Intent to Amend" needed)

15) Redistricting

16) Special Taxing District Matters

17) Appeals on Historic District Review Committee's decision

In addition, public hearings or public meetings are not required but in practice are held on the following matters:

1) Acquisition of Parkland

2) Selection of Landfill Sites

3) Appointments to Fill Unexpired Terms on Board of Supervisors

4) Other matters deemed appropriate for public comment.

11

# SECTION IV:     PACKET PROCEDURES

I.     CONTENTS OF PACKETS

Packets of information are prepared and distributed to each Board member, appropriate staff members, and to the media who routinely cover the County government, prior to each Board and Committee meeting.  The packet primarily contains the staff reports on the agenda items; however, some additional informational material is occasionally included.

The purpose of this briefing paper is to acquaint Board members with the type of information they can expect to find in their Board packets, and with the current procedures for assemblage and distribution.

Regular Meeting Packets

The Board of Supervisors' regular business meetings are held on the first and third Wednesdays of each month at 4:00 pm.  Packets are delivered electronically. An email notification is sent to Board members once packets are available for review.

Regular meeting packets are assembled in the following order:

1.     Agenda

        All items scheduled for Board consideration on the day of the meeting are included on the agenda.

        The agendas are compiled and organized by County Administration from information and requests submitted by Board members and staff.

2.     Agenda Summary

        This document is an executive summary of all the items on the agenda.  It provides a brief synopsis of each item to be considered by the Board and recommended actions.

12

3.    Consent Agenda

This agenda is a printed listing of the items proposed by the Chairman and the Vice-Chairman for adoption as a block, without discussion.  If a Board member objects to the inclusion of an item, he/she may ask that it be removed from the block at any time prior to the vote on the Consent Agenda.

4.    Tentative Board Calendar

The tentative calendar is the schedule of corporate Board events for the coming 2-3 months.  It is updated on a bi-weekly basis.  The newest calendar begins with the first meeting scheduled in the week after the calendar is distributed.

5.    Information Items

Information Items are assembled in the packet in the order in which they appear on the agenda.

6.    Action Items and Standing Committee Reports

Staff reports for each Action Item and Committee Report are assembled in the packet in the order in which they appear on the agenda.

7.    Resolutions and Proclamations

Resolutions and Proclamations are assembled in the packet in the order in which they appear on the agenda.

Committee Packets

Committee meeting packets are made available to all Supervisors, whether or not they are members of a particular Standing Committee. Packets are delivered electronically.  An email notification is sent to Board members once packets are available for review.

Electronic packets include:

1.  Agenda for the committee meeting.

13

2. Summary of the items to be considered.

3. Staff report on each item.

4. Most recent Tentative Board Calendar and Weekly Calendar will also be included if no business meeting packet is being distributed that week.

Public Hearing Packets

The Board of Supervisors' regularly scheduled public hearings are held on the second Wednesday of each month at 6:00 pm. Special public hearings and joint public hearings with the Planning Commission are scheduled as needed. Electronic packets include:

1. The Public Hearing Agenda.

2. Agenda Summary.

3. Staff Report for each item.

Supplemental Packets

Supplemental packets are usually scheduled for delivery if any staff reports of items on the agenda of business meetings, public hearings, or standing committees are not included in the regular packet delivery. Supplemental packets may be scheduled for delivery as late as two days prior to the scheduled meeting.

1. A staff report of items that were not included during regular packet delivery.

2. Addendum to the staff reports.

II. STAFF PROCEDURE FOR PREPARING THE PACKETS

Regular Meetings

A tentative agenda is prepared for each business meeting from information provided to County administration staff by Board members, the County Administrator, and the staff liaisons to the Board's Standing Committees.

Approximately 10 days prior to the Board business meeting, drafts of all items are submitted to County Administration for review by appropriate staff. Necessary revisions are made and items are returned to staff to prepare final items for the packet.

14

As specified by the Rules of Order, the tentative agenda is emailed to the Board and their staff aides and a copy placed in each Board member's mailbox on Friday of the week before the packet is distributed.

The County Administrator discusses the tentative agenda with the Chairman and Vice Chairman at a pre-Board meeting the week before Board meeting.  Any item which is brought forward after the Chairman's and Vice Chairman's review will be deferred to a subsequent meeting, or if immediate consideration is requested and the Chairman and Vice Chairman approve the addition, the item will be listed as an Amendment to the Agenda.

On the Thursday prior to the Board meeting, final copies are delivered to the County Administrator's Office by close of business. Staff assembles the packets into one electronic packet, which is provided electronically on the Friday prior to the Board meeting for Members to review.

<u>Public Hearings</u>

The advertisement copy for public hearing items is submitted by staff to the County Administrator's Office five weeks prior to the public hearing for publication in the <u>Loudoun Times-Mirror</u>, pursuant to the requirements of the Code of Virginia.  The advertised items will comprise the agenda of the public hearing.

Draft staff reports are submitted to County Administrator's Office for review.

Final copies are delivered to the County Administrator's Office by close of business Thursday, nine business days prior to the public hearing. Staff assembles the items into one packet, which is provided electronically on the Friday prior to the Board meeting for Members to review.

<u>Committee Meetings</u>

Committee meeting agendas, agenda summaries and staff reports are reviewed and assembled into one packet, which is provided electronically on the Friday prior to the Board meeting for Members to review.

## SECTION V:     ELECTRONIC PACKETS

The Board of Supervisors' packets for Business Meetings, Committee Meetings, and Public Hearings are posted on the Internet for the convenience and easy access by the public, the media and staff.

The packets are posted on the Internet as soon as possible after they are distributed to the Board of Supervisors. In most instances the electronic packets are available the same day the packets are made accessible to Board members. The public is able to view, print, or download all items in the electronic packets.

To access Board packets and other Board of Supervisors documents, follow this Internet pathway: www.loudoun.gov/bosdocuments.

The following is a list of all Board of Supervisors documents which are available on the County website:

Business Meeting Packets (Current or Archived)
Business Meeting and Public Hearing Minutes (Current or Archived)
Business Meeting and Public Hearing Action Reports (Current and Archived)
Business Meeting and Public Hearing Copy Teste(s) (Current and Archived)
Public Hearing Packets (Current or Archived)
Public Hearing Advertisements (Current or Archived)
Board Standing Committees (Current or Archived)
Rules of Order (Current)
Special Meetings (Current)

## SECTION VI:     RECORD-KEEPING

Official minutes are kept by the Deputy Clerk to the Board as a summation of the public meetings, public hearings, and actions of the Board and its Committees.  In addition, the staff records and maintains archived audio recordings of all public meetings and hearings of the Board and its Committees.  Also, these meetings are webcast live on the internet at http://www.loudoun.gov/webcast.  To see posted agendas along with the live webcast of meetings, click Live Webcast and Archives.  Starting in March 2006, all Board meetings, public hearings, and Committees with audio/video streaming files are archived and can be retrieved at the same address above.  The Minutes which are prepared by the Deputy Clerk are the official record of the Board's proceedings and actions.  The Recording Secretary for each Standing Committee prepares an official Action Summary following committee meetings.

The audio recordings, minute books, and resolution books containing Copies Attest of official Board actions are kept in County Administrator's Office.

The Deputy Clerk is available to assist Board members, and to a limited extent staff and the public, in researching issues which have been considered by the Board.  The Deputy Clerk or an Administrative Assistant attends the Board's meetings and public hearings, takes notes, runs the recording and audio-visual systems, and assists the Board, staff, and the public as needed during the meetings.  After the meetings, a report is compiled of the Board's actions for the County Administrator to use in preparing his follow-up directions to staff, Copies Attest of Board actions, and Minutes are also finalized.

Minutes of all Business Meetings and Public Hearings are submitted to the Board for review and approval as part of the Administrative Items Report.  It is helpful for Board members to call the Deputy Clerk if they have questions about the accuracy of the minutes to check the recording before the issue is raised at a meeting.  Any needed corrections should be identified before the Consent Agenda is voted on if the Administrative Items Report is included on Consent.  This can be done during Additions/Deletions to the Agenda.

If an error is typographical in nature, simply notify the Deputy Clerk and the necessary correction will be made.  Correction during a Board meeting is not necessary.

Committee Action Summaries are included in the packets for the Board's information, but do not require approval by the full Board.  Corrections would be in order at the next meeting of the Committee.

For the convenience of the public, following Board approval, the Action Reports, Copy Teste(s) and Minutes are posted by date on the County's web site at <u>Action Reports, Copy Teste(s), and Minutes</u>  More information on access to Board documents on the web site is provided in the section on electronic packets.

No. 17-2002, viewed 12/18/2018



Loudoun County, Virginia
Board of Supervisors
1 Harrison Street, S.E., 5th Floor, P.O. Box 7000, Leesburg, VA 20177-7000
Telephone (703) 777-0204 • Fax (703) 777-0421
www.loudoun.gov

**BOARD BUSINESS MEETING**
**AGENDA**
Board Room, First Floor, Government Center
Wednesday, October 7, 2015
4:00 P.M.

**4:00 P.M. Call to Order**

(*\* Proposed on Consent*)

**I.      Call to Order - Chairman York**

**II.     Invocation/Pledge of Allegiance – Supervisor Delgaudio**

**III.    Adoption of Consent Agenda**

**IV.    Requests for Additions/Deletions to the Agenda**

**V.      Closed Session**

**VI.    Chairman's Information Items (AS NEEDED)**

**VII.   Administrator's Comments**

**VIII.  Information Items**

I-1     Briefing Item: Land Development Applications, October 14, 2015 Public Hearing (Merrithew/Barker) (Countywide)

I-2     Text to 9-1-1 Services in Loudoun County (Maguire/Brower) (Countywide)

I-3     Silver Line CPAM Update (Klusek/Barker) (Countywide)

**IX.    Action Items**

1.  APPOINTMENTS

    1a.  \*Confirmations
    1b.  Nominations

2.  \*Administrative Items Report of October 7, 2015

3.  Legislative Program for the 2016 General Assembly Session and Federal Program Update (Kennedy/Yudd) (Countywide)

10/07/2015 Agenda
Page 2

4.  Housing Stakeholder Group Update (Etro/Kennedy/Young) (Countywide)

5.  Installation of Traffic Calming Measures in the Forest Manor Subdivision (Thring/Leidich/Kroboth) (Dulles)

6.  *2015 Fiscal Impact Committee Guidelines (Hilkemeyer/McLellan) (Countywide)

7.  CMPT-2015-0008, Pacific Substation (Birkitt/Barker) (Broad Run)

8.  CMPT-2015-0006, Springdale Regional Park (McConnell/Barker) (Catoctin)

9.  CMPT-2015-0005, Mount Defiance Regional Park (McConnell/Barker) (Blue Ridge)

10. ZMAP-2012-0017 & SPEX-2013-0007, Brambleton Business Campus (McConnell/Barker) (Blue Ridge)

11. ZRTD-2013-0007, SPEX-2013-0020, SPMI-2014-0016 ,ZMOD-2015-0007, SPEX-2013-0023 & CMPT-2013-0008 / Cascades Business Center (E. Harlow/Barker) (Sterling)

12. Naming of the East Gate Park & Ride/Park Site (Torpy) (Dulles)

13. Unmet Housing Needs Units (UHNU) Rental and Purchase Programs (Marrocco/Grunewald) (Countywide)

14. Board Member Initiative:  Request to Reschedule the November Board of Supervisors' Public Hearing Date (York)

15. Board Member Initiative:  Woodland Road Industrial Park Street Improvements (York/Buona)

16. Board Member Initiative:  Prioritization and Funding Identification for Missing Bicycle and Pedestrian Segments in the Dulles Community (Letourneau)

17. **Transportation and Land Use Committee Report:**

    17a.  *Intent to Amend Chapter 1066 of the Codified Ordinances (Franklin/Goodfriend) (Countywide)

    17b.  *Shellhorn Road Alignment Review (Mosurak/Kroboth) (Broad Run)

X.  **Presentation of Ceremonial Resolutions (To start as early as 6:00 p.m.)**

R-1   *Proclamation Recognizing the Rock Ridge High School iGEM Competition Team (York) (Approval & Presentation)

R-2   *Proclamation Declaring October 23-31, 2015 as "Red Ribbon Week" (York) (Approval)

R-3   *Proclamation Declaring October 17, 2015 as STEM Day (York) (Approval & Presentation)

10/07/2015 Agenda
Page 3

R-4    * Proclamation Declaring October as National Disability Employment Awareness Month (Clarke/Higgins) (Approval & Presentation)

R-5    *Resolution of Commendation for Betty Wiley (Clarke) (Approval & Presentation)

R-6    * Resolution of Commendation for Eagle Scout John Spriggs III, Troop 997, Ashburn, Virginia  (Letourneau) (Approval & Presentation)

**XI.    Public Input (To start as early as 6:00 p.m.)**

**XII.    Board Comments/Disclosures (5 Minutes Each)**

**XIII.    Adjourn**

Please note:

Advanced sign-up for Public Input is available. Contact the Office of the County Administrator at (703) 777-0200 to sign-up to speak. Advanced sign-up is open until noon the day of the Business Meeting. The meeting can be viewed via webcast at:
http://www.loudoun.gov/index.aspx?NID=2203.

Copies of agenda items are available in the County Administrator's Office and also available on-line at http://www.loudoun.gov/bosdocuments.  If you wish to provide information to the Board via the visual display equipment in the Board Room please notify County Administration in advance of the meeting at 703-777-0200.

Agenda packets are usually posted by close of business on the Friday prior to the Business Meeting. The Action Report of the meeting is usually available in this packet by close of business two days following the Business Meeting.  If you need assistance accessing this information contact County Administration at 703-777-0200.

If you require a reasonable accommodation for any type of disability in order to participate in the Board of Supervisors Business Meeting, please contact the Office of the County Administrator at (703) 777-0200/TTY-711. Three business days advance notice is requested.

**FM Assistive Listening System is available at the meeting.** Agenda –10-07-15



Loudoun County, Virginia

Board of Supervisors

1 Harrison Street, S.E., 5th Floor, P.O. Box 7000, Leesburg, VA 20177-7000
Telephone (703) 777-0204 • Fax (703) 777-0421
www.loudoun.gov

**BOARD BUSINESS MEETING**
**AGENDA SUMMARY**
Board Room, First Floor, Government Center
Wednesday, October 7, 2015
4:00 P.M.

**4:00 P.M. Call to Order**

(*\* Proposed on Consent*)

**I.      Call to Order - Chairman York**

**II.     Invocation/Pledge of Allegiance – Supervisor Delgaudio**

**III.    Adoption of Consent Agenda**

**IV.     Requests for Additions/Deletions to the Agenda**

**V.      Closed Session**

**VI.     Chairman's Information Items (AS NEEDED)**

**VII.    Administrator's Comments**

**VIII.   Information Items**

I-1     Briefing Item: Land Development Applications, October 14, 2015 Public Hearing
(Merrithew/Barker) (Countywide)

The Board of Supervisors' October 14, 2015 Public Hearing agenda includes two
land development applications, both requesting approval of telecommunication
facilities. Both applications come from the Planning Commission with
recommendations of approval. The Catherine's Rest monopole application drew
five speakers; most in favor of the application. One speaker was in opposition,
citing visual impact on the Appalachian Trail and adjoining properties.

The agenda also includes ZOAM-2015-0003, which is an amendment to the
Floodplain Overlay District (FOD). This amendment was initiated by the Zoning
Ordinance Action Group (ZOAG) to increase the flexibility in regulations
including permitted uses and performance standards. County staff, worked with a
subcommittee of the ZOAG, to complete the review and amendments to the
regulations. Input from the Stakeholders and ZOAG proposed: 1) expanding the

10/07/2015 Agenda Summary
Page 2

allowable stormwater management facilities and best management practices (BMPs) in the Major Floodplain; 2) expanding parking areas in the Major Floodplain; 3) allowing density credit for Major Floodplain located on site; and 4) allowing more general development in the FOD.

The Planning Commission and staff had issues with these proposals and the Commission did not incorporate these changes into the current draft. At the same time, during the County's work with FEMA to revise the Flood Insurance Rate Map (FIRM) to continue eligibility in the National Flood Insurance Program (NFIP), FEMA issued a report that identified concerns/deficiencies in the FOD. Staff has also addressed FEMA's concerns within the draft ZOAM. To remain eligible for participation in the NFIP, FEMA set a deadline of December 31, 2015 for the County to adopt a ZOAM that corrects the deficiencies identified in the CAV report.

I-2     Text to 9-1-1 Services in Loudoun County (Maguire/Brower) (Countywide)

Text to 911 is a free program for sending a text message from a mobile device addressed to 911 instead of placing a phone call. Text to 911 may be useful for any situation whereby it may be dangerous to speak. The FCC stresses that text to 911 should be thought of as a last resort and not the normal process for calling in an emergency. In addition, The FCC advises that people who are deaf, hard of hearing, and/or speech impaired should continue to use the TTY for calling 911.

It is estimated that Loudoun County will be able to provide Text to 9-1-1 services in early 2016. In order to meet this goal, respective agencies are working together to assure the following areas are addressed: technology is in place and tested; training of the Emergency Communications Center staff; public service announcements/community outreach efforts are created and disseminated through various outlets, notification to the Federal Communications Commission; and notification to cellular carriers.

I-3     Silver Line CPAM Update (Klusek/Barker) (Countywide)

This item will provide continuing discussion of the two Silver Line CPAM studies. Staff will provide any available updates regarding the Market Analysis and Best Practices Study in response to questions and direction received at the September 16, 2015 Board Meeting. Staff will also continue discussion with regard to the Scenario Planning Study. Staff will seek additional feedback the Board may have relating to the first four scenarios and performance measures to finalize the Final Report.

IX.     **Action Items**

1.  APPOINTMENTS

    1a.  *Confirmations
    1b.  Nominations

10/07/2015 Agenda Summary
Page 3

2.  *Administrative Items Report of October 7, 2015

This Report contains the following items for the Board of Supervisors approval on October 7, 2015: Budget Adjustments; Board of Supervisors' Minutes; Deeds for Approval; Appointment Of Designee/Voting Delegate For Virginia Association Of Counties Annual Meeting; Grant Of Easement Over County Property – Loudoun County Landfill (Northern Virginia Electric Cooperative Utility Easement); f. Secondary Road Addition: Canby Subdivision; Secondary Road Addition: Cedar Green Lot 8; Secondary Road Addition: Ashbrook Place.

3.  Legislative Program for the 2016 General Assembly Session and Federal Program Update (Kennedy/Yudd) (Countywide)

The purpose of this item is to continue the annual update of the Board of Supervisors (Board) legislative program for the 2016 General Assembly Session and provide a federal program update on unaccompanied and undocumented minors. The Board of Supervisors will be asked to consider whether certain newly proposed positions and language offered by Board members and others should be adopted for inclusion within their legislative program for the 2016 Virginia General Assembly Session. These new items combined with past adopted positions from the 2015 Session and earlier will constitute the Board's 2016 Legislative Program. This item is one of several legislative related items expected prior to the start of the 2016 Session, which begins on January 13, 2016. The federal update outlines action to date with regard to one issue with updates related to program numbers and fiscal impact.

4.  Housing Stakeholder Group Update (Etro/Kennedy/Young) (Countywide)

On January 21, 2015, the Board of Supervisors directed to move forward on five Housing Stakeholders Groups recommendations related to 1) developing a housing needs assessment and a work program for a detailed build-out analysis; 2) developing an Affordable Housing Assistance team; 3) developing a formal marketing plan and rebrand of housing programs; 4) drafting a written policy establishing that the County will not purchase an ADU resale unit for judicial sale, and 5) County Attorney review of the County of Loudoun Housing Trust agreement and the potential for amending the agreement. Staff will provide an update on work completed to date and recommendations for moving forward.

5.  Installation of Traffic Calming Measures in the Forest Manor Subdivision (Thring/Leidich/Kroboth) (Dulles)

The Forest Manor Homeowners Association has requested the installation of signage to address the perceived vehicular speeding in their community. As a result, the Department of Transportation and Capital Infrastructure is proposing to install the "Watch for Children" and the "$200 Additional Fines for Speeding" signs in the Forest Manor community. Staff will recommend endorsement of this project to the Board of Supervisors and request authorization for the use of County funds.

6.  *2015 Fiscal Impact Committee Guidelines (Hilkemeyer/McLellan) (Countywide)

The Fiscal Impact Committee meets periodically to develop a series of recommendations on demographic and economic information and growth scenarios that are used as inputs to the County's forecasts of housing units, households, population and employment. The Committee met from June through September 2015.

The 2015 Fiscal Impact Committee Guidelines report contains the Committee's assumptions and the resulting long-range forecasts. The forecasts contained in the Guidelines will form the basis for the forecasts submitted to the Metropolitan Washington Council of Governments as part of the Round 9.0 regional demographic update.

7.  CMPT-2015-0008 / Pacific Substation (Birkitt/Barker) (Broad Run)

Dominion Virginia Power has submitted an application for a Commission Permit to allow an electrical distribution substation on the west side of Pacific Boulevard, south of Moran Road (Route 634) and north of Relocation Drive (Route 775) in the Broad Run Election District in Sterling. The reason for the substation is to meet forecasted demand in the Sterling Park area. Separate from this Commission Permit application, Dominion Power has submitted an application to the Virginia State Corporation Commission for a new double circuit 230 kV transmission line that will tap into the existing 230 kV Beaumeade-Greenway Line approximately 100 feet south of Waxpool Road. Pending approvals, construction of the substation is anticipated to begin in fall of 2015 with the substation completed and energized in May of 2016.

The Planning Commission held a public hearing regarding this application on September 15, 2015. One member of the public spoke in general support of the application, stating that Dominion Virginia Power has cooperated with him to minimize potential negative impacts upon his business. The Commission approved (9-0) the Commission Permit and forwarded it to the Board for ratification. The Board has 60 days (or November 14, 2015) after the Commission's action to ratify or overturn the Commission's decision. Staff recommends that the Board ratify the Commission's approval of the Commission Permit. Staff finds that the location, character, and extent of the proposed electrical distribution substation are in substantial accord with the Comprehensive Plan. There are no Conditions of Approval for Commission Permits. The item is ready for action.

8.  CMPT-2015-0006, Springdale Regional Park (McConnell/Barker) (Catoctin)

The purpose of this item is to consider ratification of the Planning Commission's decision on the Northern Virginia Regional Park Authority's (NOVA Parks) application for Commission approval to permit a regional park with passive recreational uses in the AR-1 (Agricultural - Rural) zoning district. This application is subject to the Revised 1993 Zoning Ordinance and the proposed use is permitted in this zoning district. The Planning Commission is asked to determine if the location, character, and extent of the proposal are in substantial accord with the Comprehensive Plan. The subject property is located northeast of Route 15, east of Potomac Overlook

10/07/2015 Agenda Summary
Page 5

Lane, on the south side of the Potomac River, and west of Quarter Horse Lane, and in the Catoctin Election District.

It is anticipated that the Commission will make their decision on the Commission Permit at the September 15, 2015 Planning Commission Public Hearing. Staff recommends the Planning Commission approve the Commission Permit. The general location, character, and extent of the proposed passive regional park is in substantial accord with the Rural Area, Green Infrastructure, and Transportation policies of the Comprehensive Plan. There are no outstanding issues with the application.   The Critical Action Date is May 22, 2015.

9.  <u>CMPT-2015-0005, Mount Defiance Regional Park (McConnell/Barker) (Blue Ridge)</u>

The purpose of this item is to consider ratification of the Planning Commission's decision on the Northern Virginia Regional Park Authority's (NOVA Parks) application for Commission approval to permit a regional park with passive recreational uses in the AR-2 (Agricultural - Rural) zoning district. This application is subject to the Revised 1993 Zoning Ordinance and the proposed use is permitted in this zoning district. The Planning Commission is asked to determine if the location, character, and extent of the proposal are in substantial accord with the Comprehensive Plan. The subject property is located at 35945 John Mosby Highway (US Route 50), approximately one mile west of the Town of Middleburg, along the south side of Route 50, opposite Dover Road (VA Route 1220) and approximately 520 feet west of Zulla Road (VA Route 709), and in the Blue Ridge Election District.

It is anticipated that the Commission will make their decision on the Commission Permit at the September 15, 2015 Planning Commission Public Hearing. Staff recommends the Planning Commission approve the Commission Permit. The general location, character, and extent of the proposed passive regional park is in substantial accord with the Rural Area, Green Infrastructure, and Transportation policies of the Comprehensive Plan. There are no outstanding issues with the application. The critical action date is May 22, 2016.

10.  <u>ZMAP-2012-0017 & SPEX-2013-0007 / Brambleton Business Campus (McConnell/Barker) (Blue Ridge)</u>

Brambleton Group, LLC of Brambleton, Virginia is requesting the following approvals: 1) ZMAP-2012-0017 – A request to rezone approximately 54.39 acres from the PD-GI (Planned Development – General Industrial) zoning district to the PD-IP (Planned Development –Industrial Park) zoning district to develop up to 936,191 square feet of Office, Educational Institution, or other by right uses at a floor area ratio of 0.45; 2) SPEX-2013-0007 – A special exception application to permit the property to be developed with Office uses that does not meet the Office Standards in Section 4-503(G) of the Zoning Ordinance; and 3) Approval of two modifications of the Zoning Ordinance. The property is an approximately 54.39 acre portion of a larger 287.34 acre parcel, and is located in the northwest quadrant of future Loudoun County Parkway

and existing Arcola Road/Old Ox Road intersection and south of Broad Run in the Blue Ridge Election District.

At the June 7, 2015 Work Session, the Planning Commission voted (6-2-1, Salmon, Syska opposed; Klancher absent) to forward the applications to the Board of Supervisors with a recommendation of approval and with a recommendation to include a proffer commitment of interior airport noise mitigation should an Educational Institution use be established on the property. Staff cannot support the rezoning request as proposed. The application is not consistent with the Revised General Plan, as it proposes Office or Educational Institution uses as a predominant use in an area planned for Industrial uses as the predominant use.

At the September 9, 2015 Board of Supervisors Public Hearing, the Board voted (6-0-2, Higgins and Reid absent) to forward the application to the October 7, 2015 Board Business Meeting. The final decision deadline is October 28, 2015.

11. <u>ZRTD-2013-0007, SPEX-2013-0020, SPMI-2014-0016 ,ZMOD-2015-0007, SPEX-2013-0023 & CMPT-2013-0008 / Cascades Business Center (E. Harlow/Barker) (Sterling)</u>

The Applicant, Cascades Business Center, LLC request approval of the following; 1) Zoning Conversion in the Route 28 Tax District (ZRTD) to rezone 2.25 acres from the PD-IP zoning district under the 1972 Zoning Ordinance to the PD-IP zoning district under the Revised 1993 Zoning Ordinance, 2) a Special Exception to permit an 11,000 square foot, 180-student child care center in the PD-IP zoning district. 3) a Minor Special Exception (SPMI) to reduce the required child care center outdoor play area from 13,500 square feet to 5,000 square feet and to permit the required 9 student drop off/pick up spaces to count towards the overall site parking requirements, 4) a Commission Permit and Special Exception to permit a 400 square foot expansion of an existing telecommunications monopole base compound and 5) a zoning modification to reduce the parking setback from Cascades Parkway from 35 feet to 25 feet.

The Applicant also requests to modify the required tree plantings around the existing telecommunications equipment facility pursuant to Condition #1 of SPEX-1990-0010 and requests to modify the buffering and screening requirements to eliminate certain portions of the Type 2 side yard buffer along the northern and western property boundaries to accommodate future stormwater management facilities.

The property is approximately 2.25 acres in size, and is located at the west and along Cascades Parkway, just north of the Cascades Parkway and Woodland Road intersection in the Sterling Election District.

The Planning Commission held a public hearing on these items June 16, 2015. No members of the public spoke on the application. the Planning Commission voted 9-0 to forward the applications to the Board of Supervisors with a recommendation of approval.

10/07/2015 Agenda Summary
Page 7

The Board held a public hearing on September 9, 2015. No members of the public spoke on the application. The Board voted 6-0-2 (Higgins and Reid absent) to forward this item to the October 7, 2015 Business Meeting for action.

12. Naming of East Gate Park & Ride/Park (Torpy) (Dulles)

East Gate Park & Ride/Park is part of a co-located facility consisting of a 220-space Park & Ride Lot and a public park on a proffered site in the East Gate Community located in the Dulles Election District. The park consists of a large rectangle irrigated athletic field, parking, restrooms, trails and pavilion. The park is located near the intersection of East Gate View Drive and Tall Cedars Parkway. The address is 43664 Tall Cedars Parkway, Chantilly, VA. 20152.

Per Board of Supervisor direction at the June 3, 2015 business meeting, staff advertised to the public that it was accepting recommendations for the naming of the park in accordance with the adopted policy. Recommendations from the public were accepted and reviewed by the Parks, Recreation, and Open Space (PROS) Board at its' September 12, 2015 meeting.  This item brings forth the recommendation of the PROS Board to name the park "Eastgate Park".

13. Unmet Housing Needs Units (UHNU) Rental and Purchase Programs
    (Marrocco/Grunewald) (Countywide)

The Revised General Plan defines Unmet Housing needs as households earning up to 100% of the Washington Metropolitan Area Median Income (AMI) (Policy 2, page 4) Since the adoption of the policy, the Board of Supervisors has worked with residential rezoning applicants to obtain commitments for the development of Unmet Housing Needs Units (UHNUs) to address housing needs that cannot be addressed by the Affordable Dwelling Unit program. UHNU Rental and Purchase programs have been developed to administer the UHNUs proffers approved by the Board of Supervisors. The County currently has 11 units under its administration with up to an additional proffered 743 units already approved by the Board. In order to fully implement the UHNUs proffers, the County Attorney's Office has advised DFS to obtain approval from the Board of Supervisors for the programs that have been established to implement the proffered UHNUs. Staff recommends approval of the UHNU Rental and Purchase programs.

14. Board Member Initiative:  Request to Reschedule the November Board of Supervisors
    Public Hearing Date (York)

The Board Public Hearing and the Finance, Government Services and Operations Committee are both scheduled for November 10, 2015. Board public hearings are regularly scheduled on the second Wednesday of each month; however, November 11, 2015 is Veterans Day holiday.

This is to request that the public hearing be rescheduled to Thursday, November 12, 2015, in order for all members of the Board to attend.

USCA4 Appeal: 17-2002     Doc: 88-1     Filed: 01/07/2019     Pg: 147 of 547

15. Board Member Initiative:  Woodland Road Industrial Park Street Improvements (York/Buona)

Direct staff to work with VDOT to bring the streets in the Woodland Road Industrial Park up to current VDOT standards to improve safety and so they may be accepted in the VDOT system for state maintenance.

16. Board Member Initiative:  Prioritization and Funding Identification for Missing Bicycle and Pedestrian Segments in the Dulles Community  (Letourneau)

At the September 16, 2015 Board of Supervisors' Business Meeting, staff from the Department of Planning and Zoning presented the Dulles Community Outreach Project consensus report and recommendations.  The study area for the report includes the Blue Ridge and Dulles Districts.  The report recommended making missing bicycle and pedestrian segments on Countywide Transportation Plan roads a priority.  This item directs staff to direct staff to work with stakeholders to identify missing pedestrian and bicycle trails and report back to the Board of Supervisors with a comprehensive list of missing bicycle and pedestrian segments on Countywide Transportation Plan roads that serve the greatest amount of bicycle and foot traffic and to identify possible sources of funding.

17. **Transportation and Land Use Committee Report:**

17a.  *Intent to Amend Chapter 1066 of the Codified Ordinances (Franklin/Goodfriend) (Countywide)

On September 18, 2015 staff presented an item to the Transportation and Land Use Committee (TLUC) seeking an intent to amend Chapter 1066 of the Codified Ordinances of Loudoun County.  In addition to State regulations, Chapter 1066 regulates onsite sewage treatment systems in Loudoun County. Although it has been amended periodically, Chapter 1066 has not been updated through a general revision since it was initially enacted in 1976.  Input from stakeholder groups will be considered in the revision process.  A draft of the proposed amendments and a work plan are included in the item.

The TLUC voted 4-0-1 (Clarke absent) to recommend that the Board of Supervisors approve the work plan to amend Chapter 1066 of the Codified Ordinances of Loudoun County, as provided in Attachment 1 of the September 18, 2015 Action Item.

17b.  *Shellhorn Road Alignment Review (Mosurak/Kroboth) (Broad Run)

At the June 10, 2015 Board of Supervisors Public Hearing on CPAM 2014-0002 (Prentice Drive), the Board of Supervisors (Board), without objection, directed Staff to review the planned alignment of Shellhorn Road east of Loudoun County Parkway as shown on the Countywide Transportation Plan (CTP) and report back to the Transportation and Land Use Committee (TLUC) on July 17, 2015.  Specifically, the Board directed Staff to look at options for

shifting the alignment of Shellhorn Road southward from the location as currently shown on the CTP map towards the Dulles Greenway in order to (1) better align Shellhorn Road with the Route 606 (Loudoun Gateway) Metrorail Station area and (2) potentially connect Shellhorn Road with the planned Sterling Boulevard Extension to the east. At the July 17, 2015 TLUC meeting, staff presented a conceptual alignment to the Committee, and certain affected property owners along the corridor presented other alternatives to the Committee for further consideration.  The Committee directed staff to meet with affected property owners to review options and report back with a recommended option and alternative at the September 18, 2015.  Staff held this meeting with the affected property owners on August 27, 2015.  On September 18, 2015, the TLUC discussed the result of the August 27, 2015 meeting and voted 4-0-1 (Clarke absent) that the TLUC recommend to the Board that the Board amend the CTP to incorporate the revised Shellhorn Road alignment, as shown in Attachment 4 and Note "K," as part of a future amendment to the CTP.  The TLUC also recommended (4-0-1, Clarke absent) that the Board direct staff to research the Multimodal Street Design Guidelines developed by the Virginia Department of Transportation and the Department of Rail and Public Transportation and report back to the Board or the TLUC at a future date as to how these guidelines could be applied in appropriate locations within Loudoun County.

X.  **Presentation of Ceremonial Resolutions (To start as early as 6:00 p.m.)**

R-1  *R-1   Proclamation Recognizing the Rock Ridge High School iGEM Competition Team (York) (Approval & Presentation)

To recognize the ingenuity and hard labor that Loudoun County students have shown in their research on a prevention against Lyme disease.

R-2  *Proclamation Declaring October 23-31, 2015 as "Red Ribbon Week" (York) (Approval)

This proclamation recognizes Red Ribbon Week. This week was first established by Congress in 1988 to promote the belief and encourage a drug-free lifestyle and involvement in drug prevention efforts.   In addition to raising awareness of the drug prevention efforts, it is to honor Special Agent Camarena, an 11-year veteran of the Drug Enforcement Agency killed in the line of duty. A red ribbon is worn in memory of Special Agent Camarena, to honor his work as well as to remind everyone to talk to their children about the dangers of drugs.

R-3  *Proclamation Declaring October 17, 2015 as STEM Day (York) (Approval & Presentation)

Loudoun County STEM Day is a collaborative effort between Northern Virginia Community College, Loudoun County Chamber of Commerce, Loudoun County Public Schools, and NOVA SySTEMic Solutions to expose Loudoun County youth to opportunities in science, technology, engineering, and math. Designed for

10/07/2015 Agenda Summary
Page 10

students of all ages, the day features hands-on exhibits, workshops, food, and music in a festival-like atmosphere. Watch a robotics demonstration, wander through our Exploring Mars Exhibit, or learn about extracting DNA in our biotechnology lab! This will be held on October 17, 2015 and is free to the public. This proclamation is declaring October 17, 2015 as STEM day in Loudoun County.

R-4    *Resolution Proclaiming October as National Disability Employment Awareness Month (Clarke/Higgins) (Approval & Presentation)

National Disability Employment Awareness Month (NDEAM) is a time to celebrate the many and varied contributions of America's workers with disabilities. This October marks the 70th Anniversary, and the theme this year is "My disability is one part of who I am".

R-5    *Resolution of Commendation for Betty Wiley (Clarke) (Approval & Presentation)

A Resolution of Commendation for Betty Wiley for over 50 years of community service to Loudoun County. Supervisor Clarke recommends approval.

R-6    *Resolution of Commendation for Eagle Scout John Spriggs (Letourneau) (Approval & Presentation)

John Spriggs of Troop 997, Ashburn, Virginia, Boy Scouts of America has earned the rank of Eagle Scout. He has earned twenty-two merit badges, the Seabase and Northern Tier Duty to God award, and the Seabase Captain's Club award, Snorkeling BSA, and BSA Stand Up Paddle Boarding. For his Eagle Scout Project, John led a team of friends, Boy Scouts, and Scouters in a Food Drive and collected ½ ton of food for Loudoun County's Homeless and Displaced children sponsored by Mobile Hope. The resolution would honor his achievement of earning the rank of Eagle Scout.

XI.    **Public Input (To start as early as 6:00 p.m.)**

XII.    **Board Comments/Disclosures (5 Minutes Each)**

XIII.    **Adjourn**

Please note:
Advanced sign-up for Public Input is available. Contact the Office of the County Administrator at (703) 777-0200 to sign-up to speak. Advanced sign-up is open until noon the day of the Business Meeting. The meeting can be viewed via webcast at: http://www.loudoun.gov/index.aspx?NID=2203.

Copies of agenda items are available in the County Administrator's Office and also available on-line at http://www.loudoun.gov/bosdocuments. If you wish to provide information to the Board

10/07/2015 Agenda Summary
Page 11

via the visual display equipment in the Board Room please notify County Administration in advance of the meeting at 703-777-0200.

Agenda packets are usually posted by close of business on the Friday prior to the Business Meeting. The Action Report of the meeting is usually available in this packet by close of business two days following the Business Meeting.  If you need assistance accessing this information contact County Administration at 703-777-0200.

If you require a reasonable accommodation for any type of disability in order to participate in the Board of Supervisors Business Meeting, please contact the Office of the County Administrator at (703) 777-0200/TTY-711. Three business days advance notice is requested.

**FM Assistive Listening System is available at the meeting.** Agenda Summary–10-07-15



# Chapter 6

# Boards, Commissions and Committees

- ## Regional Commissions and Committees

- ## Local Commissions and Committees



*Loudoun County*
*Board of Supervisors*
*2016-2020*

# Boards, Commissions, and Committees

The Board of Supervisors has the opportunity to appoint members (both Board members and citizens) to advisory boards, commissions, and committees. The following documents provide a listing of all bodies to which the Board may appoint members*. The bodies are separated in this document as regional advisory bodies and local advisory bodies.    Before each section, staff has provided a matrix indicating whether a Board member and/or a citizen appointee serve on each body.

Subsequent to a review conducted in 2008 and 2009, the Board of Supervisors adopted specific policies for advisory boards, commissions, and committees. Those policies are provided prior to the section on local advisory commissions and committees.

Questions about advisory bodies can be directed to:

Amanda Logan, County Administration, 703-771-5679 or Amanda.logan@loudoun.gov  or
Julie Grandfield, Assistant to the County Administrator, 703-777-0502 or
julie.grandfield@loudoun.gov

*There are a few groups included in this section, such as the Electoral Board, Board of Equalization, and the Finance Board, which are appointed by other entities or whose membership is mandated by the Code of Virginia.

# REGIONAL
## COUNCILS, COMMISSIONS, COMMITTEES AND ADVISORY BOARDS

| Advisory Body | Board Member Representative? | Citizen Appointee? |
|---|---|---|
| *County/Town Commissions and Committees* | | |
| Coalition of Loudoun Towns | X | |
| Joint Annexation Area Development Policy Committee | X | |
| Leesburg Executive Airport Commission | | X |
| *MWCOG:* | | |
| Board of Directors | X | |
| Chesapeake Bay and Water Resources Policy Committee | X | |
| Climate Energy and Environment Policy Committee | X | |
| Human Services and Public Safety Policy Committee | X | |
| Region Forward Coalition: | X | |
| Metropolitan Washington Air Quality Committee | X | |
| National Capital Region Transportation Planning Board | X | |
| *Regional Councils, Commissions and Committees* | | |
| Birmingham Green | X | X (if a Board member does not serve) |
| Bull Run ASAP Policy Board | | X |
| Health Systems Agency of Northern Virginia | | X |
| Northern Virginia Community College Board | | X |
| Northern Virginia Manpower Consortium Workforce Investment Board | X | X |
| Northern Virginia Regional Commission | X | |
| Northern Virginia Regional Park Authority | X | X (historically 1 Board Member and 1 Citizen – currently 2 Citizens |
| Potomac Watershed Roundtable | X | |
| Leesburg Executive Airport Commission | | X |
| Loudoun Soil and Water Conservation District | | X |
| *Transportation Councils, Commissions and Committees* | | |
| Commonwealth Transportation Board: *All members appointed by Governor* | | |
| Dulles Area Transportation Association | X | X |
| Northern Virginia Transportation Authority | X | |
| Northern Virginia Transportation Commission | X | |
| Route 28 Highway Transportation Improvement District Commission | X | |
| Route 28 Highway Advisory Board | | X |
| | | |

# COUNTY/TOWN COMMITTEES AND COMMISSION

No. 17-2002, viewed 12/18/2018

# COALITION OF LOUDOUN TOWNS

(Tim Hemstreet is meeting in December to find out if this has been dissolved)

**Appointing Authority(ies):** The Board of Supervisors appoints one of its members as a representative

**Number of Members:** Seven, representative of each of the Towns of Loudoun and a member of the Board of Supervisors

**At-Large or District:** members are representatives of the seven Loudoun County towns: Hamilton, Hillsboro, Leesburg, Lovettsville, Middleburg, Purcellville, and Round Hill.

**Term:** Appointed at January organizational meeting.

**Current Loudoun County Representative:** none

**Contact:** Unknown

**Standard Meeting Date, Time and Place:** When needed

**Stipend or Expense Payment:** none

**Mandating Agency:**

**General Purpose:** The Coalition meets to share ideas and information.

## JOINT ANNEXATION AREA DEVELOPMENT
## POLICY COMMITTEE/LEESBURG

**Appointing Authority(ies):**  Board of Supervisors and Town Council of Leesburg

**Number of Members:**  Two Board appointed, two by Leesburg Town Council

**Current Loudoun County Representatives:**  Two (2) BOS representatives – Ken Reid and Geary Higgins for 2015.

**Meeting Place and Time:**  As needed - afternoons - County Government Complex/Leesburg Town Hall.

**Staff Contacts:** Iwanczuk, Rodion, Department of Planning, 703 771-5109
          Susan Berry-Hill, Department of Planning, Town of Leesburg, (703) 771-2770

**Stipend or Expense Payment:**  none

**Mandating Agency:**  Loudoun County Board of Supervisors

**By-Laws on File:**  _____ Yes __x___ No

**General Purpose:**  Consider amendments to adopted County/Town of Leesburg annexation agreement and do required updates for agreement.  The Committee considers land use issues that develop in areas delineated by the AADPs and make recommendations to their respective governing bodies for final decisions

## LEESBURG EXECUTIVE AIRPORT COMMISSION

**Appointing Authority(ies):** Board of Supervisors and Town Council of Leesburg

**Current Representatives:** Bruce Gemmill as the Board of Supervisors representative. Term expires December 31, 2015.

**Meeting Place and Time:** The commission meets on the 1st Thursday of each month at 7:00 p.m. in the 3rd floor conference room at the Leesburg Executive Airport, Stanley F. Caulkins Terminal.

**Staff Contacts:** Scott Coffman at SCoffman@LEESBURGVA.GOV
                          Lee Ann Green at LGreen@LEESBURGVA.GOV

**Stipend or Expense Payment:** none

**Mandating Agency:** Town of Leesburg

**By-Laws on File:** _____ Yes __x___ No

**General Purpose:** The Commission oversees rules and regulation at the town executive airport, make recommendations to the Town Council and the Airport Director to ensure effective and efficient administration of the airport

No. 17-2002, viewed 12/18/2018

# METROPOLITAN WASHINGTON COUNCIL OF GOVERNMENTS (MWCOG)

# METROPOLITAN COUNCIL OF GOVERNMENTS
## BOARD OF DIRECTORS

**Appointing Authority(ies):**  Loudoun County Board of Supervisors appoints one Board member.

**Number of Members:**  27 members - four selected by the District of Columbia, three from Fairfax County, two from Prince William County, two each from Montgomery and Prince George's counties, one from each of the remaining suburban jurisdictions and one member each from the Maryland and Virginia legislatures **(note: due to population increases Loudoun will have two (2) seats in 2012.**

**Term:**  Members appointed annually by jurisdictions.

**Current Loudoun County Representative:** Two (2) BOS representatives –Scott York and Matt Letourneau for 2015.

**Meeting Date, Place and Time:** 12:00 noon, second Wednesday of each month -- August and December excluded unless necessary, COG Board Room, Third Floor, 777 North Capitol Street, N.E., Suite 300, Washington, D.C.  20002

**Staff Contact:   Chuck Bean, Executive Director**
Phone: 202-962-3260
Email: cbean@mwcog.org

**Clerk to the Board**
Phone: 202-962-3212
Email: d@mwcog.org
COG 202 962-3200

**Stipend or Expense Payment:**  None.  Parking sticker or Metro fare provided for committee members

**Mandating Agency:** N/A

**General Purpose:** The Board of Directors is the governing body of COG and is responsible for its overall policies, functions and funds.  The Board is selected annually by appointments made by the participating local governments and by caucuses of state legislative delegations from the region. The Board meets monthly, excluding August, and meetings are usually two hours long.  Items on the Board agenda are normally generated from COG's policy and technical committees.  At these meetings, the Board takes action on recommendations coming from these committees, discusses current and emerging regional problems and receives briefings on issues facing the region.  Board meetings are open to the public.

**METROPOLITAN WASHINGTON COUNCIL OF GOVERNMENTS**
**CHESAPEAKE BAY AND WATER RESOURCES POLICY COMMITTEE**

**Appointing Authority(ies):**  Loudoun County Board of Supervisors appoints one Board member.

**Number of Members:** One elected official from the legislative bodies of each COG member and the elected executives or their designees from COG member governments with executive representation on the Board.

**Term:** Appointed annually at Board organizational meeting in January.

**Current Loudoun County Representative:**  One (1) BOS representative – Suzanne Volpe for 2015.

**Meeting Date, Place and Time:**  777 North Capitol Street, NE, Suite 300, Washington DC  20002. Normally meets on the third Friday in January, March, May, July, September & November at 10:00 a.m.

**Staff Contact:**
Heidi Bonnaffon
Phone: (202) 962-3216
Email: hbonnaffon@mwcog.org

**Stipend or Expense Payment:**   None.  Parking sticker or Metro fare provided for committee members

**Mandating Agency:**  On September 9, 1998, COG took action to create the new committee in response to the report of its Ad Hoc Subcommittee on the Chesapeake Bay.  The Board approved Resolution R26-98 calling for creation of the committee.

**General Purpose:**   The committee is charged with developing and coordinating a means for local governments in the region to influence the development of future Bay Program policies.

Chesapeake Bay Policy Committee (CBPC) was established by the COG Board of Directors in 1998 in recognition of the importance to local governments in the region of the Chesapeake Bay Program. The Committee's focus is on developing proactive Bay policy on behalf of the COG membership, as well as communicating with COG member governments on Bay program activities.

## METROPOLITAN WASHINGTON COUNCIL OF GOVERNMENTS
## CLIMATE ENERGY AND ENVIRONMENT POLICY COMMITTEEE

**Appointing Authority(ies):** Loudoun County Board of Supervisors appoints one Board member.

**Number of Members:** Membership on the CEEPC includes representatives from COG's 21 member governments, state environmental, energy, and transportation agencies, state legislatures, the Air Quality Public Advisory Committee, federal and regional agencies, electric and gas utilities, environmental organizations, business organizations, and members of the academic community.

**Term:** Appointed annually at Board organizational meeting in January.

**Current Loudoun County Representative:** One (1) BOS representative – Ralph Buona for 2015.

**Meeting Date, Place and Time:** The CEEPC normally meets on the 4th Wednesday of January, March, May July, September and November, at 777 North Capitol Street, N.E., Suite 300, Washington, DC 20002.

**Staff Contact:**

Jeff King
Phone: (202) 962-3238
Email: jking@mwcog.org

**Stipend or Expense Payment:** None. Parking sticker or Metro fare provided for committee members

**Mandating Agency:** N/A

**General Purpose:** The CEEPC will collaborate closely with other COG policy boards and committees including the National Capital Region Transportation Planning Board (TPB), Metropolitan Washington Air Quality Committee (MWAQC), Chesapeake Bay and Water Resources Policy Committee (CBPC), Metropolitan Development Policy Committee (MDPC), and the Human Services and Public Safety Policy Committee.

The CEEPC will be assisted by a series of technical committees, workgroups, and advisory committees including COG's Energy Advisory Committee, Intergovernmental Green Building Group, Recycling Committee, Solid Waste Managers, Streetlight Working Group, Alternative Fuels Partnership, Clean Air Partners, Water Resources Technical Committee, MWAQC Technical Advisory Committee, TPB Technical Committee, Planning Directors Technical Advisory Committee, and MWAQC's Air Quality Public Advisory Committee. It also received input from the recently formed Climate Adaptation Workgroup.

## METROPOLITAN WASHINGTON COUNCIL OF GOVERNMENTS
## HUMAN SERVICES AND PUBLIC SAFETY POLICY COMMITTEE

**Appointing Authority(ies):** Loudoun County Board of Supervisors appoints one Board member.

**Number of Members:**  The HSPSPC shall be composed of the following voting members appointed annually by COG participating jurisdictions: a) an elected official serving on each the legislative bodies of COG participating jurisdictions; b) for COG participating jurisdictions with a population in excess of 300,000, an additional elected official from the legislative body or, in the case of participating jurisdictions with an elected executive, said executive or a designated representative; c) a member of the Maryland legislature; and d) a member of the Virginia legislature.

**Term:**  Appointed annually at Board organizational meeting in January.

**Current Loudoun County Representative:**  Two (2) BOS representative – Suzanne Volpe for 2015.

**Meeting Date, Place and Time:**  The HSPSPC shall meet at a frequency necessary for the conduct of its business, generally at noon on the third Friday of the months of January, March, May, July, September, and November, or at other times as the HSPSPC may determine.

**Staff Contact**: For more information on the committee contact:
Paul Dsjardian
202-962-3293
pdsjardian@wmcog.org

David McMillion
202-962-3708
dmcmillion@wmcog.org

**Stipend or Expense Payment:**  None.  Parking sticker or Metro fare provided for committee members.

Mandating Agency:  N/A

General Purpose: The HSPSPC's purpose shall be to develop and maintain, in accordance with Article II, all policies, plans, agreements, and programs, other than those specifically assigned to other units within COG, concerning human services and public safety issues. Human service areas of responsibility shall include, but may not be limited to: aging; education; family issues (including child care and foster care); affordable housing; human relations; substance abuse; and health issues, other than those relating to the epidemiology, prevention, or treatment of pandemics, regional epidemics, or bioterrorism.

Public safety areas of responsibility shall include, but may not belimited to: criminal justice, corrections, emergency medical services, fire safety, hazardous materials control and law enforcement. From time to time the HSPSPC on its own volition may, and at the request of the

Emergency Preparedness Council, the Chief Administrative Officers Committee, or the COG Board shall, consider issues of homeland security and emergency preparedness, including epidemiology, prevention, and treatment of pandemics, regional epidemics, or bioterrorism. The HSPSPC shall be responsible for developing and presenting to the Board for action all reports, policy statements, recommendations and proposals relevant to human services and public safety. The HSPSPC shall at all times strive to ensure a balanced work program that includes all of the diverse issues under its authority and maintains the focus and mission of human services and public safety.

## METROPOLITAN WASHINGTON COUNCIL OF GOVERNMENTS
## REGION FORWARD COALITION

**Appointing Authority(ies):** Loudoun County Board of Supervisors appoints one Board member.

**Number of Members:** Membership includes governing officials appointed from each of the 21 participating governments, federal agencies and various stakeholders.

**Term:** Appointed annually at Board organizational meeting in January.

**Current Loudoun County Representative:** One (1) BOS representative (or staff alternate) – Ken Reid for 2015.

**Meeting Date, Place and Time:** normally meets on second Wednesday in January, March, May, July, September and November - 777 North Capitol Street, N.E., Suite 300, Washington, DC 20002 (http://www.mwcog.org/)

**Staff Contact:** For more information on the coalition please contact:

Paul DesJardin
Director of Community Services and Planning
Phone: (202) 962-3293
Email: pdesjardin@mwcog.org

**Stipend or Expense Payment:** None. Parking sticker or Metro fare provided for committee members

**Mandating Agency:** N/A

**General Purpose:** The mission of the Region Forward Coalition is to oversee the implementation of Region Forward, act as the principal policy advisor to the COG Board on comprehensive long-range regional planning and implementation programs, and oversee annual work programs and budgets for these program areas.

Note: (As of January 2011, the Metropolitan Development Policy Committee (MDPC) has been replaced by the Region Forward Coalition. The adoption of Region Forward created the impetus for reexamining COG committee structure to effectively implement the next steps recommended in Region Forward. For more information on Region Forward, please see www.regionforward.org. The MDPC no longer holds regular meetings.)

**METROPOLITAN WASHINGTON COUNCIL OF GOVERNMENTS**
**METROPOLITAN WASHINGTON AIR QUALITY COMMITTEE**
**(MWAQC)**

**Appointing Authority(ies):** Loudoun County Board of Supervisors appoints one Board Member.

**Number of Members:** 38 members - elected officials of COG-member jurisdictions plus members from Charles, Calvert and Stafford Counties, the air management and transportation directors of the District of Columbia, Maryland and Virginia, members of the Maryland and Virginia General Assemblies, and the chair of the Transportation Planning Board.

**At-Large or District:** At-large

**Term:** Appointed annually at Board organizational meeting in January.

**Current Loudoun County Representative:** One (1) BOS representative – Janet Clarke for 2015.

**Meeting Date, Place and Time:** 12:00 noon fourth Wednesday of every month except August--additional meetings may be scheduled as needed. 777 North Capitol Street, N.E., Suite 300, Washington, D.C 20002   (http://www.mwcog.org/)

**Staff Contact:** For more information on this committee please contact:
Jennifer Desimone
Phone: (202) 962-3360
Email: jdesimone@wmcog.org

**Stipend or Expense Payment:** None. Parking sticker or Metro fare provided for committee members.

**Mandating Agency:** N/A

**General Purpose:** The Metropolitan Washington Air Quality Committee (MWAQC) was established to conduct interstate air quality attainment and maintenance planning for the Washington, D.C. - Maryland-Virginia Metropolitan Statistical Area. The authority of MWAQC is derived from certifications by the Mayor of the District of Columbia and the governors of Maryland and Virginia pursuant to Title I of the Clean Air Act Amendment of 1990. In particular, the Committee is charged with the responsibility of conducting air quality planning for the region in order to meet interim and 1999 attainment deadlines for reducing levels of ozone and carbon monoxide pollution. The MWAQC is supported by a policy, technical, and coordinating committee structure designed to secure all necessary inputs into a planning process that can be supported by all local and state interests. On December 9, 1992 the MWAQC established the Air Quality Public Advisory Committee (AQPAC). The AQPAC serves as a mechanism for facilitating dialogue among diverse interest groups, the community at large and the MWAQC. The primary purpose of AQPAC is to inform, educate and to solicit participation from the general public in the development of an air quality plan for the region.

**METROPOLITAN WASHINGTON COUNCIL OF GOVERNMENTS**
**NATIONAL CAPITAL REGION TRANSPORTATION PLANNING BOARD**

**Appointing Authority (ies):** Loudoun County Board of Supervisors appoints one Board member.

**Number of Members:** 33 Members - includes representatives of the transportation agencies of the states of Maryland and Virginia and the District of Columbia, local governments, the Washington Metropolitan Area Transit Authority, the Maryland and Virginia General Assemblies, and non-voting members from the Metropolitan Washington Airports Authority and federal agencies.

**Term:** Appointed annually at Board organizational meeting in January.

**Current Loudoun County Representative:** One (1) BOS representative (or staff alternate) – Scott York for 2015.

**Meeting Date, Place and Time:** Meetings are scheduled for the third Wednesday of the month at noon (except August). Lunch is served to members and alternates at 11:45 a.m. 777 North Capitol Street, N E., Suite 300, Washington, DC 20002 (http://www.mwcog.org/)

**Staff Contact:** For more information on this Board please contact:

Kanti Freikamp
Phone: 202-962-3257
Email: kfreikamp@wmcog.org

**Stipend or Expense Payment:** None. Parking sticker or Metro fare provided for members

**Mandating Agency:** Federal Law

**General Purpose:** The National Capital Region Transportation Planning Board (TPB) at COG, is the designated unit that fulfills federal requirements for regional transportation planning, a condition for eligibility for federal transit and highway assistance. The TPB develops and adopts regional transportation plans and programs based on assessing and analyzing data on travel patterns.

The TPB ensures compliance with federal laws and requirements. Federal requirements inject consistency and coordination into regional transportation decision-making. The federally mandated metropolitan planning process requires all MPOs across the country to produce two basic documents—a long-range plan, which in the Washington region is called the Financially Constrained Long-Range Transportation Plan (CLRP), and a Transportation Improvement Program (TIP), which lists projects and programs that will be funded in the next six years. Since 2000, the CLRP has used a planning horizon of 25 years. In order to receive federal funding, transportation projects must be included in the CLRP and the TIP.

The TPB provides a regional transportation policy framework and a forum for coordination. While federal law and regulations drive much of the region's regular transportation planning activities, the TPB has also developed a policy framework—known as the Vision— that is intended to guide the region's transportation investments in the new century.

No. 17-2002, viewed 12/18/2018

The TPB provides technical resources for decision-making as a technical resource and is continually working in close coordination with the staffs from the local and state jurisdictions and WMATA, as well as with outside consultants, to produce numerous studies and analyses.

# REGIONAL COUNCILS, COMMISSIONS & COMMITTEES

No. 17-2002, viewed 12/18/2018

## BIRMINGHAM GREEN
### (d/b/a Northern Virginia Healthcare Center at Birmingham Green)

**Appointing Authority(ies):**  Board of Supervisors appoints one Board member or citizen to serve as a member of the Commission

**Number of Members:**  5, one representative each from Alexandria, Fairfax, Fauquier, Loudoun and Prince William Counties

**At-Large or District:**  At-large

**Term:**  As designated by Board of Supervisors (by custom, a four-year term)

**Current Loudoun County Representative:**  Betsy Murphy, 20114 Airmont Road, Round Hill, VA, Term date: 9/30/2019;  Jennifer McLaughlin,  Department of Family Services as alternate member

**Meeting Date, Place and Time:**  Quarterly (Jan., April, July, Sept.)  third Thurs 9:30 a.m. at Birmingham Green, Manassas.  Committees meet during intervening months.

**Contact:** David Rumford, President & CEO, Northern Virginia Health Center Commission, 8605 Centreville Road, Manassas, VA  22110 - 703 257-0935.

**Stipend or Expense Payment:**  Loudoun County reimburses $25.00 for each meeting attended

**Mandating Agency:** Code of Virginia, Title 15.2, Chapter 52

**General Purpose:**
Northern Virginia Health Center Commission was established in 1987 through resolutions adopted by the governing bodies of the Counties of Fairfax, Fauquier, Loudoun, Prince William, and the City of Alexandria.  The Commission owns and operates a 180-bed nursing home known as Northern Virginia Healthcare Center at Birmingham Green, located near Manassas.  The Healthcare Center primarily serves persons who are eligible for Medicaid because of limited incomes, and who are thus often unable to gain admission to a private nursing home in the area.

## BULL RUN ALCOHOL SAFETY ACTION PROGRAM (ASAP)

**Appointing Authority(ies):** The Board of Supervisors appoints one citizen to represent Loudoun County

**Number of Members:** 11 members eligible from jurisdictions; additional members may also be appointed by the Policy Board

**At-Large or District:** Serves: Loudoun, Prince William, Manassas, Manassas Park, Dumfries, Haymarket, Leesburg, Middleburg, Occoquan, Purcellville, Quantico and members are of these jurisdictions.

**Term:** Three years, or at pleasure of appointing jurisdiction

**Current Loudoun County Representative:** Lorraine Gunzerath, dr.gunzerath@post.harvard.edu Term date: May 31, 2017.

**Contact:  Kimball Peele**, Bull Run ASAP, 9108-D Manassas Drive, Manassas Park, VA 20111 – 703 369-7979   bullrunasap1@aol.com

**Loudoun County Office**:      9 Loudoun St., SE
                                              Leesburg, VA  20175
                                              (703) 771-4702

**Standard Meeting Date, Time and Place:** Quarterly, location varies Loudoun & Prince William County

**Stipend or Expense Payment:** none

**Mandating Agency:** Commission on Virginia Alcohol Safety Action Program

**General Purpose:** The Policy Board strives to improve highway safety by helping to reduce the incidence of driving under the influence of alcohol/drugs through local user-funded specific deterrence programs of education and treatment for DUI offenders, and through general deterrence programs for the public at large in coordination with regional and statewide efforts.  The efforts to reduce driving under the influence of alcohol/drugs shall be directed through these program components: enforcement, adjudication, case management and offender intervention, public information, and evaluation/certification.

**HEALTH SYSTEMS AGENCY OF NORTHERN VIRGINIA**

**Appointing Authority(ies):**  Board of Supervisors appoints two Loudoun County citizens

**Number of Members:**  30

**At-Large or District:**  Majority of HSA Board members must be consumers who are broadly representative of the health service area.  Should include individuals representing the principal social, economic, and racial populations of the area.  Remaining members are provider members who must be representative of a wide range of health care professionals.  A reasonable balance of providers and consumers is sought.

**Term:**  Three-year terms

**Current Loudoun County Representatives:** Robin Brown (Consumer) – term expires June 30, 2017 and Robin Brown (Provider) - term expires June 30, 2017

**Meeting Place and Date:**  Generally second Monday each month, 8:00 p.m., Falls Church, VA Held at NVRC headquarters: NVRC  3060 Williams Drive, Suite 510, Fairfax Virginia.

**Staff Contact:**

Dean Montgomery
Executive Director, Region II
Health Systems Agency of Northern Virginia, Inc.,
7245 Arlington Boulevard, Suite 300
Falls Church, VA  22042
Phone: (703) 573-3100
Fax : (703) 573-1276
Email: **hsanv@aol.com**

**Stipend or Expense Payment:**  None.  Expenses incurred in the course of HSANV business (e.g., mileage) are reimbursable at local government rates

**Mandating Agency:**  Virginia General Assembly (Certificate of Public Need Law and Health Planning Statute

**General Purpose:**   HSANV is a non-profit organization established under Virginia law to plan for the balanced and orderly development of health care facilities and services in Northern Virginia (Virginia Health Service Area II)

## NORTHERN VIRGINIA COMMUNITY COLLEGE BOARD

**Appointing Authority(ies):**  Board of Supervisors appoints one Loudoun County citizen

**Number of Members:**  The board shall consist of eleven (11) members.

**At-Large or District:**  The cities of Alexandria, Fairfax, Falls Church, Manassas, and Manassas Park, and the counties of Arlington, Loudoun, and Prince William shall have one representative each, and the County of Fairfax shall appoint three representatives.

**Term:**  Members shall be appointed for a term of four (4) years. No person having served on the community college board for two successive four-year terms shall be eligible for reappointment to the college board for two years thereafter provided that a person appointed to fill a vacancy may serve two additional successive terms.

**Current Loudoun County Representative:**  Rick Pearson – Term date: 6/30/2019

**Meeting Date and Time:**  Third Monday each month except during the summer - Annandale Campus

**Contact:** Northern Virginia Community College
        4001 Wakefield Chapel Road, Annandale, VA 22003-3723
        Ph: (703) 323-3000

**Stipend or Expense Payment:** None

**Mandating Agency(ies):**  Title 23, Chapter 16, Section 23-220 of the Code of Virginia.

**General Purpose:**  The college board performs such duties with respect to the operation of a community college as may be delegated to it by the State Board. In general, a college board is responsible for assuring that the community college is responsive to the needs existing within its service region within the statewide policies, procedures, and regulations of the State Board for Community Colleges.

## NORTHERN VIRGINIA MANPOWER CONSORTIUM
## WORKFORCE DEVELOPMENT BOARD

**Appointing Authority(ies):** Loudoun County Board of Supervisors appoints five representatives, including business leaders and participating organizations such as the local school system, economic development agency, Welfare-to-Work programs, and a member of the Board of Supervisors as their representative (CLEOs).

**Number of Members:** Five, at-large

**Term:** Four-year terms for citizen representatives, Loudoun County CLEO elected annually at organizational meeting.

**Current Loudoun County Representative:** One (1) BOS representative – Ken Reid for 2015.

**Citizen Representative:** Shiley Bazdar (Education Rep) Term date: 4/30/2019; Christopher Turner (Business Rep) Term date: 9/30/2019.

**Staff Representative :** Walter "Buddy" Rizer, Department of Economic Development representative.

Fran Coughlin, Department of Family Services representative

Dr. David Miles, Chairman, The Miles-Lehane Group (Term expires April 2012. **Dr. Miles was elected Chairman of the Northern Virginia Workforce Investment Board for 2011-2013**).

 Shirley Bazdar, Director, Career, Technical and Adult Education, Loudoun County Public Schools (Term expires October 2014).

Tony Howard, President and CEO, Loudoun County Chamber of Commerce (Term expires June 2014).

**Meeting Date, Place and Time:** Meeting dates are quarterly and the current schedule is online at www.myskillsource.org . CLEO representative meetings are scheduled twice annually. Contact Paula Gomez at 703.752.1606 or email at paula.gomez@myskillsource.org to verify schedule.

David Hunn, Executive Director
Northern Virginia Workforce Investment Board
8300 Boone Boulevard, Suite 450
Vienna, VA 22182-2633   Phone 703.752.1606  Fax 703.752.1609
David Hunn direct line: 703.752.1607    Email david.hunn@myskillsource.org

**Stipend or Expense Payment:**  None

**Mandating Agency:** State legislation created the Virginia Workforce Council in addition to designating the Virginia Community College System (VCCS) as the State fiscal agent and lead agency for the implementation of the Federal Workforce Development Act. There are fifteen (15) local workforce areas in Virginia.

**General Purpose:** The NVWDB addresses workforce development issues in the Northern Virginia Workforce Investment Area (#11): Fairfax, Loudoun, Prince William counties, and the cities of Fairfax, Falls Church, Manassas, and Manassas Park.  The Board oversees the Northern Virginia Workforce System and is responsible for making the following critical decisions: how best to organize the service system to most effectively serve varying customer needs; how best to deploy available resources to achieve desired results and build capacity for continuous improvement; and how to expand the resource base and service capacity through the development of strategic partnerships and an integrated service delivery system. The Northern Virginia Workforce System currently includes five (5) certified *SkillSource* Centers in the region, including one (1) Center in Leesburg (the Loudoun Workforce Resource Center).

NOTE: Federal Workforce Investment Act was renamed the Federal Workforce Development Act. As of July 1, 2015 the all workforce boards had to be renamed "Workforce Development Board".

New Agreement/By-laws will be sent to the Office of the County Administrator shortly.

# NORTHERN VIRGINIA REGIONAL COMMISSION

**Appointing Authority(ies):** Board of Supervisors

**Number of Members\*:** As of a July 2004 amendment to the NVRC Charter Agreement, all appointees are to be elected members of the respective governing bodies of member jurisdictions; the first representative shall be its chief elected officer or his/her designee, except when another elected official of the local governing body is designated by the governing body; citizen representatives are no longer appointed regardless of population; and the population increment to qualify any member government for appointment of additional representatives was increased from 75,000 to 150,000 population, or fraction thereof, in excess of 100,000 population.

**At-Large or District:** Loudoun County residents.

**Term:** Appointment is for three years unless jurisdiction stipulates otherwise. Loudoun County appoints representatives at each January organizational meeting.

**Current Loudoun County Representative:** Two (2) BOS representatives – Janet Clarke and Scott York for 2015.

**Meeting Date and Time:** Fourth Thursday of each month at 7:30 p.m. at the NVRC office in Annandale. There is no meeting in August and the November/December committee meetings are combined and usually meet on the second Thursday of December.

**Contact:**
Mark Gibb, Executive Director
Northern Virginia Regional Commission
3060 Williams Drive, Suite 510
Annandale, VA 22031
Ph: (703) 642-0700)
Email: gmg@novaregion.org   or
Gina Kesselmann-Smith at (703) 642-4622 or email: gkesselmann-smith@novaregion.org

**Stipend or Expense Payment:** none

**Mandating Agency:** Title 15.2, Chapter 42 of the Code of Virginia.

**General Purpose:** This is a body created in 1969 to promote the orderly and efficient development of the physical, social and economic elements of the District. The work of the Commission is supported by annual contributions from member local governments, appropriations from the General Assembly and grants from Federal, State and private foundations.

## NORTHERN VIRGINIA REGIONAL PARK AUTHORITY

**Appointing Authority(ies):** Loudoun County Board of Supervisors appoints two citizens (historically one Board member and a citizen)

**Number of Members:**   Twelve members.

**At-Large or District:**  Two members each from Arlington County, Fairfax County, Falls Church, City of Fairfax, City of Alexandria, County of Loudoun.

**Term:**  Four Years

**Current Loudoun County Representatives:**
Daniel Kaseman – 611 S. 32nd Street, Purcellville, VA 20132
Cell: 703 217-0664
Email: dkaseman@verizon.net
Term expires: October 31, 2019

Cate Maginnis Wyatt – P.O. Box 55 Waterford, VA
Email: cate@jthg.org
Term expires: October 31, 2017

**Standard Meeting Date and Time:**   Third Thursday of each month at 7:30 p.m., at NVRPA headquarters 5400 Ox Road, Fairfax Station, VA 22039.

**Staff Contact:**
Paul A. Gilbert, Executive Director
Northern Virginia Regional Park Authority
5400 Ox Road
Fairfax Station, Virginia  22039
Ph: (703) 359-4605
Email: executiveoffice@NVRPA.org

**Stipend or Expense Payment:**  NVRPA reimburses for mileage at $.51/mile

**Mandating Agency:**  Required by membership in Authority

**General Purpose:**  The NVRPA is a multi-jurisdictional agency established for the purpose of providing a system of regional parks for the Northern Virginia area.  The Authority strives to offer park, open space and recreational opportunities and facilities not provided by the local parks and recreation department.

## POTOMAC WATERSHED ROUNDTABLE

**Appointing Authority(ies):** Board of Supervisors appoints one Board Member

**Number of Members:**
The voting members of the Roundtable comprise representatives from:
- six Conservation Districts
- nine Virginia Counties
- seven Virginia Cities and Towns
- other Stakeholder Groups

There are also ten additional Federal and State Agencies who have non-voting representatives. The Roundtable also maintains a list of interested parties who receive notifications of the Board's meetings and activities.

**Term:**  appointed at organizational meeting each January

**Current Loudoun County Representative:** One (1) BOS representative – Geary Higgins for 2015; David Ward, Department of Building and Development serves as staff alternate.

**Meeting Date and Time:** The Roundtable meets four times a year at sites throughout the region (See www.potomacroundtable.org)

**Laura Grape**
District Administrator, Northern Virginia SWCD

**Stipend or Expense Payment:**  none

**Mandating Agency:**

**General Purpose:** The Roundtable is created to promote a regional approach to the management and improvement of the Virginia portion of the Potomac watershed and to foster collaboration among watershed stakeholders. The Roundtable will act as an advisory body to governmental and non-governmental decision-makers and will make recommendations on watershed management policy and program options.

Nov-17-2002 viewed 12/18/2018

## LOUDOUN SOIL AND WATER CONSERVATION DISTRICT

**Appointing Authority:** Virginia Soil and Water Conservation Board

**Number of Members:** 5 directors (2 appointed, 3 elected)

**Term:** 4 years

**Current Board of Supervisor representatives:** None

**Meeting Date and Time:** First Wednesday of each month at 4 P.M. at 30 Catoctin Circle, SE, (Wachovia Bank Building, 2nd floor) in Leesburg.

**Staff Contact:** Peter Holden or Suzanne Brown **at (571) 918-4530.**

**Stipend or Expense Payment:** Reimbursement for mileage and meals (no salary)

**Mandating Agency:** Virginia Dept of Conservation and Recreation

**General Purpose:** The Loudoun SWCD is a political subdivision of the Commonwealth of Virginia responsible for administering all soil and water conservation programs within the County of Loudoun. The directors guide their staff in carrying out the mandates set by the Virginia Dept of Conservation and Recreation. The staff works with the landowners within the county on various cost share practices designed to reduce the level of nutrients entering our streams and ultimately polluting the Chesapeake Bay.

# TRANSPORTATION COUNCILS AND COMMITTEES

## COMMONWEALTH TRANSPORTATION BOARD

**Appointing Authority(ies):**   Governor of Virginia

**Number of Members:**   17 members appointed by the Governor -- 14 citizen members, plus
Secretary of Transportation (serves as Chairman); VDOT Commissioner (serves as Vice Chairman);
and Director of Department of Public Transportation.

**At-Large or District:**   Nine district representatives; five at large

**Term:**    Four years

**Current Loudoun County Representative:**   Gary Garczynski (Northern Virginia District)
Appointed by Governor.  Term expires June 30, 2016

**Meeting Date, Place and Time:**   Third Wednesday of each month at 9:00 a.m. at the VDOT
Central Office Auditorium, 1221 E. Broad St., Richmond .

**Contact:**  Office of the Secretary of Transportation**,** 202 North 9th Street, 5th Floor, Richmond,
Virginia, 23219 --- Phone: (804)786-8032   FAX:  (804)786-6683

OR

**Carol Mathis, assistant secretary to the board**
Phone: (804) 786-2701
E-mail: Carol.Mathis@vdot.virginia.gov

**Stipend or Expense Payment:**  $50.00 per diem plus allowable expenses

**General Purpose:** The Board is primarily responsible for locating routes, approving construction
contracts, creating traffic regulations, naming highways and administering and allocating the
Transportation Trust Fund. The Virginia Secretary of Transportation is chairperson of the Board.

## DULLES AREA TRANSPORTATION ASSOCIATION (DATA)

**Appointing Authority(ies):** The Board of Supervisors appoints one principal representative and two additional representatives from the Board, and one citizen representative.

**Number of Members:** approximately 140

**At-Large or District:** Membership is open to dues-paying businesses, property owners, state and local governments/departments, nonprofit organizations, other groups and individuals concerned with growing traffic congestion and its resulting effects on the area's social and economic environs. Members of the Board of Directors are nominated by a nominating committee made up of members of the Executive Committee and by nominations from the general membership. Officers and the Board are elected by the membership.

**Term:** Board members serve one-year terms and are elected/reelected at the annual meeting usually held in mid-December. Established by precedence, the four representatives appointed by the Board of Supervisors serve on the Board. The principal representative is appointed by the President to serve on the Executive Committee.

**Current Loudoun County Representative:** Three (3) BOS representatives – James Bonfils and Scott York for 2015.

**Business Representative:** Bill Soltesz – term expires 12/31/2015.

**Meeting Date, Place and Time:** Board of Directors/Membership meetings are held five times a year and the location rotates among member company/organization headquarter sites. In addition, a Holiday Reception/General Membership meeting is held in mid-December for the purpose of electing officers and the Board for the ensuing year. The location is rotated among member hotel sites. An annual Anniversary Celebration for members and guests is held in late April or early May at one of the member hotel sites.

**Contact: For more information on this Association please contact:**
Jim Larsen, CAE
Executive Director
Dulles Area Transportation Association
4160 Pleasant Valley Road
Burgess & Nipple Building, Suite 200
Chantilly, Virginia 20151-1512
Phone (703) 817-1307
E-mail execdir@datatrans.org,

**Stipend or Expense Payment:** None

**Mandating Agency:** DATA is a 501 © 3nonprofit, non-stock corporation incorporated in 1988.

**General Purpose:** The Dulles Area Transportation Association (DATA) is a nonprofit, public-private Transportation Association (TMA) dedicated to maintaining the transportation mobility necessary to retain economic vitality and protect the quality of life in the Greater Dulles Area surrounding Dulles International Airport in Fairfax, Prince William and Loudoun Counties involving the corridors of Routes 7, 28, 29, 50, 606, and 625, I-66, Dulles Access and the Greenway. DATA serves its members by identifying transportation issues pertinent to them and the public in general; addressing their unique transportation

concerns; assisting elected officials and their staffs in formulating effective solutions to transportation challenges; and, promoting voluntary residential community and employer-based transportation benefit programs.

No. 17-2002, viewed 12/18/2018

## NORTHERN VIRGINIA TRANSPORTATION AUTHORITY

**Appointing Authority:** The chief elected officer of Loudoun County

**Purpose:** The Authority is responsible for long-range transportation planning for regional transportation projects in Northern Virginia. In carrying out this responsibility, the Authority, will set regional transportation policies and priorities for regional transportation projects. The policies and priorities are guided by performance-based criteria such as the ability to improve travel times, reduce delays, connect regional activity centers, improve safety, improve air quality, and move the most people in the most cost-effective manner.

**Jurisdictions Embraced by Authority**.  The Authority shall embrace the counties of Arlington, Fairfax, Loudoun, and Prince William, and the cities of Alexandria, Fairfax, Falls Church, Manassas, and Manassas Park.

**Authority Members**. The Authority shall consist of seventeen (17) members as follows:

(1) The chief elected officer of the governing body of each of the counties and cities embraced by the Authority.  The chief elected officer may, in his or her discretion, appoint a designee upon written notice signed by the chief elected officer provided to the Chairman, which designee shall be a current elected officer of the same governing body as the chief elected officer, to serve as a member of the Authority in the place and stead of the chief elected officer and who shall serve until the designee resigns as the designee or ceases to be an elected officer of the governing body, the chief elected officer making the appointment leaves office, the chief elected officer  replaces the designee, or the duration of the designation expires.

(2) Two members of the House of Delegates who reside in different counties or cities embraced by the Authority.  The House members shall be appointed to the Authority by the Speaker of the House and shall be, to the extent practicable, from the membership of the House Committee on Appropriations, the House Committee on Finance, or the House Committee on Transportation.

(3) One member of the Senate who resides in a county or city embraced by the Authority.  The Senate member shall be appointed by the Senate Committee on Privileges and Elections and shall be, to the extent practicable, from the membership of the Senate Committee on Finance and the Senate Committee on Transportation.

(4) Two citizens appointed by the Governor.  One of the citizens shall be a member of the Commonwealth Transportation Board who resides in a county or city embraced by the Authority. The other citizen appointed by the Governor shall be a person who has significant experience in transportation planning, finance, engineering, construction, or management who resides in a county or city embraced by the Authority but who is not a resident of the same county or city as the other citizen appointed by the Governor to the Authority.

(5) The Director of the Virginia Department of Rail and Public Transportation, or his or her designee, shall be a non-voting member of the Authority.

(6) The Commonwealth Transportation Commissioner, or his or her designee, shall be a non-voting member of the Authority.

(7) The chief elected officer of one town in a county which the Authority embraces to be chosen by the Authority shall be a non-voting member of the Authority. The Town member shall be selected at the annual meeting and shall be rotated on an annual basis.

**Officers**: The Authority shall annually elect from its members a Chairman and a Vice Chairman. The Authority may further elect such other subordinate officers from among its members as it may from time to time deem appropriate

**Current Loudoun County Representative**: Chairman Scott York

**Meeting Dates, Place and Time:** The proposed meeting dates for 2016 are the second Thursday of each month with a start time of 7:00pm. The NVTA is located at 3040 Williams Drive, Suite 200, Fairfax, VA 22031

**Executive Director**. The Authority employs a full time Executive Director who has direct authority for the employment, retention, and supervision of all of the other employees of the Authority. The Executive Director has direct control, subject to the Authority, of the management of the day-to-day administrative affairs of the Authority. The Executive Director proposes activities to the Authority and carries out policies, programs and projects approved by the Authority, and is responsible for preparing and presenting the annual budget.

**Staff**. The Authority currently employs five full time staff:
1   Chief Financial Officer
1   Assistant Finance Officer
2   Program Coordinators
1   Administrative Assistant/Clerk

**Contact:** Monica Backmon, Executive Director, 703-642-4650, monica.backmon@thenovaauthority.org

**Funding:** When HB 2313 was passed by the General Assembly in 2013 it provided a source of revenue for transportation projects and specific requirements to the Northern Virginia Transportation Authority about the selection of projects for funding. The Authority strictly adheres to these requirements

**Legislative History:** The Authority's enabling legislation, Senate Bill 576 (SB 576), details the composition, charge, powers functions, and responsibilities of the Authority. The Authority's transportation funding stream was established through House Bill 2313 (HB 2313). In order to be eligible to receive regional funding from the Authority, as mandated in HB 2313, all projects must be contained in the Authority's long-range transportation plan, and have been rated under the House Bill 599 (HB 599) Rating and Evaluation process, or mass transit capital projects that increase capacity. The HB 599 process was not applicable for regional revenues

programmed in the FY2014 Program. When House Bill 1470 (HB 1470) was passed, it required that in addition to being contained in the Authority's long-range transportation plan, all projects funded with regional revenues must undergo the HB 599 rating process. Additionally, any projects requesting funding from both the Authority and the State must undergo the HB 2 prioritization process.

**Powers and functions** (Code of Virginia Title 15.2, chapter numbered 48.2, consisting of sections numbered 15.2-4829 through 15.2-4840)

1. The Authority shall prepare a regional transportation plan for Planning District Eight, to include, but not necessarily be limited to, transportation improvements of regional significance, and those improvements necessary or incidental thereto, and shall from time to time revise and amend the plan.

2. The Authority may, when a transportation plan is adopted according to subdivision 1, construct or acquire, by purchase, lease, contract, or otherwise, the transportation facilities specified in such transportation plan.

3. The Authority may enter into agreements or leases with public or private entities for the operation of its facilities, or may operate such facilities itself.

4. The Authority may enter into contracts or agreements with the counties and cities embraced by the Authority, with other transportation commissions of transportation districts adjoining any county or city embraced by the Authority, with any transportation authority, or with any state, local, private or federal entity to provide, or cause to be provided, transportation facilities and services to the area embraced by the Authority.

5. The Authority shall not have the power to regulate services provided by taxicabs, either within municipalities or across municipal boundaries, which regulation is expressly reserved to the municipalities within which taxicabs operate.

6. Notwithstanding any other provision of law to the contrary the Authority may:
   a. Acquire land or any interest therein by purchase, lease, or gift and provide transportation facilities thereon for use in connection with any transportation service;
   b. Acquire land or any interest therein by purchase, lease, or gift in advance of the need for sale or contribution to an agency, for use by that agency in connection with an adopted transportation plan;
   c. Prepare a plan for mass transportation services with persons, cities, counties, agencies, authorities, or transportation commissions and may further contract with any such person or other entity to provide necessary facilities, equipment, operations and maintenance, access, and insurance pursuant to such plan.

## NORTHERN VIRGINIA TRANSPORTATION COMMISSION

**Appointing Authority(ies):** State members appointed by the General Assembly; local governing bodies appoint representatives of Counties of Arlington, Fairfax and Loudoun; Cities of Alexandria, Fairfax and Falls Church.  The Board of Supervisors appoints one Board member.

**Number of Members:** Twenty commissioners make up NVTC. Thirteen are locally elected officials from its six member jurisdictions: Arlington (3), Fairfax (5), and Loudoun (1) Counties, and the cities of Alexandria (2), Fairfax (1), and Falls Church (1). Five of the 19 commissioners are appointed from the General Assembly (2 senators and 4 delegates). The other commissioner represents the Virginia Department of Rail and Public Transportation (VDRPT).

**At-Large or District:**  At-large

**Term:**  Appointed at Board's annual organizational meeting

**Current Loudoun County Representative:**  One (1) BOS representative – Ken Reid for 2015 with Scott York as an Alternate.

**Meeting Date, Place and Time:**  First Thursday of each month starting at 8:00 p.m. (except August and when that date coincides with a holiday) at  NVTC Offices in Arlington.

**Staff Contact:**  Kelly Coyner, Executive Director, NVTC, (571) 524-3322

**Executive Director** - Kelly Coyner
> Northern Virginia Transportation Commission
> 2300 Wilson Blvd., Suite 620
> Arlington, VA  22201
> e-mail: kellycoyner pat warren @nctc.org

**Stipend or Expense Payment:** local board members receive $50 per meeting.

**Mandating Agency:**  State Law

**General Purpose:**  NVTC was created by the General Assembly in 1964.  It provides a public transportation policy forum for the region and is charged with allocating the two- percent local gas tax and other State and Federal funds for public transit.  Loudoun County's gas tax is collected through NVTC.  The County's agreement with NVTC, however, permits the County to disburse the gas tax funds according to the Transportation Plan and guidelines adopted by the Board of Supervisors.  The gas tax collected from the other jurisdictions is used for funding Metro rail.

## ROUTE 28 HIGHWAY TRANSPORTATION IMPROVEMENT DISTRICT COMMISSION

**Appointing Authority(ies):** Board of Supervisors of Loudoun and Fairfax Counties each appoint four Board members

**Number of Members:** 9 - four Board members from each county and the Secretary of Transportation from the Commonwealth of Virginia

**At-Large or District:** At-large

**Term:** one year

**Loudoun Current Representatives:** Four (4) BOS representative - Scott York, James Bonfils, Suzanne Volpe and Matt Letourneau for 2015.

**Meeting Date, Place and Time:** Once a year (generally late March), or as necessary, at a place and time determined

**Staff Contacts:**

Fairfax County staff contact:  Michael Riddle at (703) 877-5659, Email:
michael.riddle@fairfaxcounty.gov
Loudoun County staff contact: Terrie Laycock at (703) 777- 0553, Email:
Terrie.Laycock@loudoun.gov

**Stipend or Expense Payment:** None

**Mandating Agency:** State Law

**By-laws on File:** yes

**General Purpose:** The Route 28 Highway Transportation Improvement District was created, pursuant to State law, and covers 14,800 acres of land in both counties.  Contracts exist between both Counties and the State.  The State has issued bonds to fund three phases of improvements to Route 28.  Phase One was undertaken in 1988 and included widening Route 28 to six-lanes and construction of interchanges at Route 50, the Dulles Toll Road, and Route 7.   Phase Two was the construction of ten interchanges at Nokes Boulevard, Waxpool Road, Sterling Boulevard, Old Ox Road and Innovation Avenue in Loudoun County and at Barnsfield Road, McLearan Road, Frying Pan Road, Willard Road and Westfields Road in Fairfax County.   According to the contract, the Commission must request each County to impose a special improvements tax no greater than $.0.20 per $100 valuation on commercial and industrial properties in both counties within the District to retire the State bonds.  The tax rate is considered annually by the Commission and is adopted annually by the two respective County Boards of Supervisors.

## ROUTE 28. DISTRICT HIGHWAY ADVISORY BOARD

**Appointing Authority (ies):** Board of Supervisors of Loudoun and Fairfax Counties and landowner elections in both counties

**Number of Members:** 12 - six landowners from each County; three each appointed by Board of Supervisors of Fairfax and Loudoun Counties and three additional members from each County elected by landowners in each County

**At-Large or District:** At-large

**Term:** Four year term

**Current Representatives:** The Advisory Board is composed of six members from Loudoun County and six from Fairfax County. Three of the six from each of the counties are appointed by the respective Boards of Supervisors and three are elected from landowners in each of the counties. The each serves four years term. See attached list.

BOS appointed landowners members: Mike Huber (term expires: January 19, 2014), ~~Michelle Frank (term expires: January 19, 2014)~~, Craig Fritsche, (term expires: January 19, 2014)
Michele Frank resigned. Mr. Charles Thornton has been appointed as an At-Large Member. His appointment term expires January 19th, 2016.
NOTE:
1. Mike Huber is reappointed to Route 28 District Highway Advisory Board on March 5th 2014 Business meeting by Chairman Scott York. His term expires on 01/19/2018.
2. Craig Fritsche is reappointed to Route 28 District Highway Advisory Board on March 5th 2014 Business meeting by Chairman Scott York. His term expires on 01/19/2018.
(Update by Rachna Prakash-03/07/2014)

Loudoun Members elected by Landowners: Mary Beth Avedesian, Tadeusz (Ted) W. Lewis and Matt Pierce (terms expire January 19, 2016).

**Meeting Date, Place and Time:** Annual Meeting (generally held in March) at a place and time to be determined.

**Staff Contacts:**

Loudoun County: Terrie Laycock (703) 777-0553; email: Terrie.Laycock@loudoun.gov
Fairfax County: Michael Riddle, Ph: 703-877-5555; email: michaelriddle@fairfaxcounty.gov

**Stipend or Expense Payment:** none

**Mandating Agency:** State Law

**By-laws on File:** There are no by-laws. The Advisory Board follows State law.

**General Purpose:** The Advisory Board is to report to the Route 28 Highway Transportation District Commission in an annual report on the transportation needs of the District and any other matters of concern.

No. 17-2002, viewed 12/18/2018

**Board Policies**

**Advisory Boards, Commissions and Committees**

<u>**General Policies**</u>
(applicable to all boards, commissions and committees appointed by the BOS)

1.  There can be no changes to the composition of the group without Board approval.

2.  All substantive changes to the group and/or by-laws require Board approval.

3.  All members of the group must be appointed by the Board.

4.  The group must provide input to the Board on some cyclical basis as to activity, products, etc.

5.  Staff serving on advisory boards should not be voting members (the Affordable Dwelling Unit Advisory Board are exceptions to this policy).

6.  Subsequent to the Board of Supervisors identifying its strategic plan and initiatives, work initiatives projects will be sent to each advisory board and any advisory body seeking to work on any non-Board directed projects should, by majority vote, forward its request for full Board approval, direction and allocation of resources, including staff support.

7.  Members of advisory boards may not use proxies for meeting attendance and they may not use proxies for voting.

8.  Advisory board by-law changes should be submitted through the Board Standing Committee that most closely relates to the function of that advisory board support.

9.  As of September 2, 2015, the Board of Supervisors may remove an appointee from a committee, commission or board should the leadership of such entity by the Board after the district office of a nominating supervisor has had the opportunity to pursue corrective measures.

<u>**Conflict of Interest Policy**</u>
(applicable to all groups that provide advice and recommendations to the Board and staff)

A member should avoid even the appearance of a conflict of interest and should recuse himself or herself from participating in deliberation, discussions, recommendations or advice which might be interpreted as questionable or borderline conflict of interest and which might be perceived as rendering direct personal or professional gain for himself or herself or for family members.

## Standard Meeting Procedures

(applicable to all boards, commissions and committees that receive local tax funding either directly or indirectly or in the form of County staff)

1. Notice of all meetings to be posted on the central Government Calendar.

2. Meetings to occur in a location that is easily accessible to the public.

3. All meetings to be taped under the condition there is adequate staff support.

4. Minutes of all meetings to be made publicly available in a timely fashion under the condition there is adequate staff support.

5. Minutes to include a summary of any discussions or deliberations and a record of any votes taken, including a record of how members voted on each motion under the condition there is adequate staff support.

For groups that serve a quasi-judicial or quasi-official role, ruling on decisions made by County staff, there are two additional requirements:

6. Minutes must record a reason for all decisions made under the condition there is adequate staff support.

7. Both appellants and staff shall receive an equal opportunity to present their case.

## "Advertising and Appointment Procedures"

There are also "Advertising and Appointment Procedures" that were developed in the Committee on Committees in April, 2009, and provided to the BOS, but were not actually voted on because the document was viewed as an internal operating procedure. A copy of these is attached as a separate file.

**Boards, Commissions and Committees**
**Advertising and Appointment Procedures**
**(April, 2009)**

There are a number of citizen boards, commissions and committees that serve in an advisory capacity to the Loudoun County Board of Supervisors. While some groups are prescribed by the Code of Virginia, many have been created and authorized through action by the Board of Supervisors. Many boards, commissions and committees are ongoing in nature, while some are temporary ad hoc committees created to accomplish specified tasks. A portion of the groups are comprised of appointees from each electoral district. However, many are comprised of at-large seats that may require appointees to have specific areas of expertise and/or representation.

Following is a description of the procedures used in advertising vacancies and appointing members to boards, commissions and committees. The Board of Supervisors follows the Rules of Order when making appointments.

**Term Limitations**
Many seats on the boards, commissions and committees are for four-year terms that are concurrent with the Board of Supervisors' terms. These appointee terms end when the Board of Supervisors leaves office, though appointees may continue to serve until they are replaced by the new Board. However, some boards, commissions and committees have appointees serving staggered terms; these are typically described in the by-laws of each group.

**Advertising for a Vacancy**
The Loudoun County Public Affairs Office publicized vacancies for boards, commissions and committees. A vacancy may be due to term expiration or due to the resignation of an appointee. Vacancies are advertised through press releases and are posted on the County's website. Vacancies are advertised for at least 30 days. If one or more applications have been received after the initial 30-day advertising period, advertising for the vacancy will end.

**Applying for a Vacancy**
Interested applicants must submit (as of March 2014) an application form to the Office of the Board of Supervisors (even if a letter has been sent to staff or to a committee member) via postal mail or e-mail. Questions regarding the mission, role, or objectives of a board, commission or committee should be directed to the Office of the Board of Supervisors may be referred to the appropriate staff contact.

**Processing in the Board's Office**
Applications for district-specific vacancies are forwarded to the respective supervisors. Applications for at-large vacancies are forwarded to all Board members. Originals are retained in the Board's front desk files and applicant names and contact information is entered into the database in the Board's office.

**Appointee Selection**

Board members make their selections from interested applicants, in some cases after phone or in-person interviews. The Board of Supervisors appoints all individuals to boards, commissions and committees.

**Nomination and Confirmation of Appointees**

Information regarding vacancies is communicated to the Board through an Appointment Item as part of the business meeting packet. Information listed in that Appointment Item includes committee seats, vacancies, advertising dates, proposed nominations and confirmations and terms. Resumes, letters or of interest and any recommendations are attached to this Item.

Generally nominations take place at one Board business meeting with confirmation at the next Board business meeting. It is possible for the Board to suspend the Rules of Order and for a confirmation to take place immediately after nomination if there is an urgent need to do so.

**Notification of Appointment**

Following each Board business meeting, the Chairman (on behalf of the full Board) will send appointment letters to those confirmed. The appointing supervisor and staff contact receive copies of these letters. Each appointee is provided with a copy of the Virginia Freedom of Information Act, as required by provisions of the Act.

**Notification of Applicants no Appointed**

Applicants who are not appointed are thanked for their interest via letter, e-mail or telephone.

**Training of Appointees**

The staff contact is responsible for notifying new appointees of the meeting schedule and location, as well as for providing training or orientation to the board, commission or committee.

# LOUDOUN COUNTY
## ADVISORY BOARDS, COMMISSIONS AND COMMITTEES

| Advisory Body | Board Member Representative? | Citizen Appointee(s)? |
|---|---|---|
| Advisory Commission on Youth | | X |
| Advisory Plans Examiners Board | | X |
| Affordable Dwelling Unit Advisory Board | X | X |
| Agricultural District Advisory Committee | X | X |
| Animal Advisory Committee | | X |
| Art Advisory Committee | | X |
| Board of Equalization | | X |
| Board of Zoning Appeals * | | X |
| Building Code and Appeals Board | | X |
| Communications Commission | | X |
| Commission on Aging | | X |
| Community Criminal Justice Board | | X |
| Community Policy and Management Team | X | X |
| Community Services Board | | X |
| Commuter Bus Advisory Board | | X |
| Courthouse Grounds Facility Committee | | X |
| Disability Services Board | | X |
| Dulles Town Center Community Development Authority | | X |
| Economic Development Advisory Commission | | X |
| Economic Development Authority | | X |
| Electoral Board * | | |
| Facilities Standards Manual Public Review Committee | | X |
| Family Services Advisory Board | X | X |
| Finance Board * | X | |
| Fiscal Impact Committee | X | X |
| Heritage Committee | | X |
| Heritage Farm Museum Working Committee | | X |
| Historic District Review Committee | | X |
| Housing Advisory Board | | X |
| Housing Choice Voucher Resident Advisory Board | | X |
| Landfill Special Exception Review Committee (formerly Woods Road Special Exception Review Committee) | | X |
| Library Board of Trustees | | X |
| Loudoun Health Council | | X |
| Loudoun Water (formerly the Sanitation Authority) | | X |
| Other Post-Employment Benefits Investment Committee | X | X |
| Parks, Recreation & Open Space Board | | X |
| Planning Commission | | X |
| Rural Economic Development Council | | X |
| Towing Advisory Board | | X |
| Transportation Safety Commission | | X |
| Water Resources Technical Advisory Committee | | X |
| Zoning Ordinance Action Group ( ZOAG) | | X |

*Indicates members are appointed by the Circuit Court*

# Loudoun County
## Advisory Boards, Commissions and Committees

Loudoun County's many advisory boards, commissions and committees provide opportunities for direct involvement in local government by residents of Loudoun County. The Board of Supervisors appoints citizens to fill vacancies on most of the following county and regional advisory boards, commissions, and committees.

- Advisory Commission on Youth
- Advisory Plans Examiners Board
- Affordable Dwelling Unit Advisory Board
- Agricultural District Advisory Committee
- Animal Advisory Committee
- Art Advisory Committee
- Board of Equalization
- Board of Zoning Appeals
- Building Code and Appeals Board
- Communications Commission
- Commission on Aging
- Community Criminal Justice Board
- Community Policy and Management Team
- Community Services Board
- Commuter Bus Advisory Board
- Courthouse Grounds Facility Committee
- Disability Services Board
- Dulles Town Center Community Development Authority
- Economic Development Authority
- Economic Development Advisory Commission
- Electoral Board
- Facilities Standards Manual Public Review Committee
- Family Services Advisory Board

- Finance Board
- Fiscal Impact Committee
- Heritage Committee
- Heritage Farm Museum Working Committee
- Historic District Review Committee
- Housing Advisory Board
- Housing Choice Voucher Resident Advisory Board
- Landfill Special Exception Review Committee (formerly Woods Road Special Exception Review Committee)
- Library Board of Trustees
- Loudoun Health Council
- Loudoun Water (formerly the Sanitation Authority)
- Other Post-Employment Benefits Investment Committee
- Parks, Recreation & Open Space Board
- Planning Commission
- Rural Economic Development Council
- Towing Advisory Board
- Transportation Safety Commission
- Water Resources Technical Advisory Committee
- Zoning Ordinance Action Group

# ADVISORY COMMISSION ON YOUTH

**Appointing Authority(ies):**   The Advisory Commission on Youth consists of nine representatives appointed by the Board of Supervisors, three youth representatives from the Youth Advisory Council, as well as three community representatives.  Liaisons from local government agencies and the public schools also participate.

**Number of Members:**  15

**At-Large or District:**  By District

**Term:**  Concurrent with the term of the Board of Supervisors

**Board Member Representative:** None

**Meeting Date, Place and Time:**  Fourth Monday of each month, 7:00 p.m. at 20145 Ashbrook Place, Suite 170, Ashburn, VA 20147

**Staff Contact:**  Kris Smolens, Department of Parks and Recreation at (703) 771-5306

**Stipend or Expense Payment:  None**

**Mandating Agency:  Virginia Code Section 66-29 through 35**

**General Purpose:**    The Loudoun County Advisory Commission on Youth (ACOY) works to foster the programs and services necessary for the wholesome development of the youth in Loudoun County.

ACOY works to reduce incidents resulting from high-risk adolescent behaviors by promoting youth leadership and healthy lifestyles through

- Strengthening community and family bonds;
- Establishing a community-responsive youth policy;
- Creating a protective environment for our young people; and
- Increasing the number of positive activities available to Loudoun youth

No. 17-2002, viewed 12/18/2018

## ADVISORY PLANS EXAMINER BOARD

**Appointing Authority(ies):** Board of Supervisors

**Number of Members:** 6 members

**At-Large or District:** at-large - three persons in private practice certified as licensed professional engineers or land surveyors; one person employed by the County; one person employed by the Virginia Department of Transportation which shall serve as a non-voting advisory member; and one citizen member.

**Term:** Staggered four-year terms.

**Board Member Representative:** None

**Meeting Date, Place and Time:** When needed - Meetings held in County Government Complex

**Staff Contact:** Gary Clare, Department of Building and Development at (703)777-0231

**Stipend or Expense Payment:** None

**Mandating Agency:** Pursuant to Virginia Code Section 15.1-501.1 Loudoun County Land Subdivision and Development Ordinance Chapter 1246.03.

**General Purpose:** The Board makes recommendations to the Board of Supervisors on the general operations of the program, on the qualifications of plans examiners and plans review specialists who may participate in the expedited processing procedure, on initial and continuing education programs needed to qualify and; maintain qualifications for such a program and on the administration and operations of such a program. In addition, APEB shall submit recommendations to the Board of Supervisors as to those persons who meet the established qualifications for participation in the program, and APEB will submit recommendations to the Board of Supervisors as to whether those persons who have previously qualified to participate din the program shall be disqualified, suspended or otherwise disciplined for failure to continue to meet the qualifications set out in Code 1246.02(2) and (e) and 1246.02(d) and (e).

Engineers and Surveyors Institute
Executive Director:    Terrance C. Ryan, PhD., P.E.
                       Engineers & Surveyors Institute
                       4460 Brookfield Corporate Drive, Suite A
                       Chantilly, VA  20151
                       703 263-2232   e-mail--esi@esi-nova.org

## AFFORDABLE DWELLING UNIT ADVISORY BOARD

**Appointing Authority(ies):**    Board of Supervisors

**Number of Members:**  Eleven Members:
1. Two members shall be either civil engineers and/or land surveyors and/or architects, each of whom shall be registered or certified with relevant agency of the Commonwealth, or planners, all of whom shall have extensive experience in practice in Loudoun County.
2. One member shall be a representative of a lending institution, which finances residential development in Loudoun County.
3. Four members shall consist of:
   a. A representative from Board of Supervisors, or its designee;
   b. A representative from the Loudoun County Planning Department;
   c. A residential builder or developer with extensive experience in producing single-family detached and attached dwelling units;
   d. A residential builder or developer with extensive experience in producing multi-family dwelling units.
4. One member shall be a representative of a qualified non-profit housing group providing service in Loudoun County, if one exists.
5. One member shall be a real estate agent.
6. One member shall be a program participant.
7. One member shall be a member of the public at-large who is not qualified to fill one of the membership positions in Paragraphs (1) through (4) above.
8. Of the above-described membership, at least five members shall be citizens of Loudoun County and at least four members shall be employed in the private sector.

**At-Large or District:**  At-Large

**Term:**  Four (4) year terms, staggered

**Board Member Representative:** Yes, or designee

**Meeting Date, Place and Time:**  Second Tuesday of each month – 8:00 a.m. - Shenandoah Square Current Meeting Place:  Shenandoah Conference Room, 2nd Floor @ 102 Heritage Way, Leesburg, Suite 103

**Staff Contact:  Kelly Marrocco, Department of Family Services at (571) 258-3819**
       **Sarah Coyle Etro, Department of Family Services at (703) 777-0387**

**Stipend or Expense Payment:**  None

**Mandating Agency:** Governed by Chapter 1450 of the Codified Ordinance and Article VII of the Loudoun County Zoning Ordinance.

**General Purpose:** The Affordable Dwelling Unit Advisory Board shall advise the Board of Supervisors regarding the establishment of the amount and terms of all sales and rental prices of affordable units. The advisory Board may appoint subcommittees of local builders and construction experts to assist in recommending the costs of prototypical single-family detached, single-family attached, and multi-family affordable units.

It will have authority to hear and make recommendations on request for modifications of the requirements of the Affordable Dwelling Unit Program (Section 7-100 of the Loudoun County Zoning Ordinance) and the Codified Ordinance Chapter 1450.01.

No. 17-2002, viewed 12/18/2018

## AGRICULTURAL DISTRICT ADVISORY COMMITTEE

**Appointing Authority(ies):** Board of Supervisors

**Number of Members:**  10  (four landowners engaged in agriculture or forestal production, four other landowners of the locality, one commissioner of revenue or property assessment officer, and one member of the local governing board)

**At-Large or District:**  At-large

**Term:**  Concurrent with the term of the Board of Supervisors

**Board Member Representative:** Yes

**Meeting Date, Place and Time:**  As needed

**Staff Contact**: Kellie Boles, Department of Economic Development at (703)737-8820.

**Stipend or Expense Payment:  None**

**Mandating Agency:  Code of Virginia Title 15.2, Chapter 43**

**General Purpose:** This Committee makes recommendations to the Planning Commission and Board of Supervisors regarding new agricultural districts, renewal of existing districts, additions to districts and withdrawals from districts.  This Committee shall render expert advice as to the nature of farming and forestry and agricultural and forestal resources within the district and their relation to the entire locality.

## ANIMAL ADVISORY COMMITTEE

**Appointing Authority(ies):**  Board of Supervisors

**Number of Members:**  9

**At-Large or District:**  One representative from each electoral district (no district residency requirements)

**Term:**  Concurrent with the term of the Board of Supervisors

**Board Member Representative:** None

**Meeting Date, Place and Time:**  Fourth Wednesday of every month at 7:00 p.m. in the Mickey Gordon Room, PRCS Administration Building, 215 Depot Court in Leesburg.

**Staff Contact:**  Donna Levesque, Department of Animal Services at (703)771- 5121

**Stipend or Expense Payment:**  None

**Mandating Agency:**  Established by the Board of Supervisors

**General Purpose:**  The Animal Advisory Committee provides recommendations on animal program issues to the Director, the County Administrator and the Board of Supervisors; advises the Board of Supervisors on the effectiveness of the Animal Services Program; serves as ombudsmen for animal program issues and problems; and works to promote a positive public image of the Department.

## LOUDOUN COUNTY ART ADVISORY COMMITTEE

**Appointing Authority(ies):** Board of Supervisors

**Number of Members:** 7

**At-Large or District:** At-large

**Term:** Concurrent with the term of the Board of Supervisors

**Board Member Representative:** None

**Meeting Date, Place and Time:** Second Tuesday at 1:00 p.m. in the Middleburg Room of the County Government Center.

**Staff Contact:** Elizabeth Bracey, Department of Parks and Recreation at (540) 338-7973.

**Stipend or Expense Payment:** None

**Mandating Agency:** Loudoun County Board of Supervisors.

**General Purpose:** The Art Advisory Committee is responsible for maintaining and exhibiting the county's permanent art collection which includes donated works and those on short or long-term loan, as well periodic exhibitions of artwork by Loudoun artists.

The Board of Supervisors established the Art Advisory Committee in 1978 to provide opportunity to display art by Loudoun artists that reflect the community as well as enhance the buildings and its grounds.  In 1984, the Supervisors asked the committee to undertake, in addition to this program, establishing and maintaining a permanent collection of artwork by Loudoun artists.

The permanent collection has been developed through gifts of the artist or by donors who purchased works for the County government. All works have been approved by the Arts Advisory Committee in order to maintain a collection of quality artwork that reflects Loudoun County and the artists who call Loudoun home.  The entire collection of approximately eighty pieces includes three donated sculptures which were placed in the Government Center gardens in August 2005 and nine portraits of former Loudoun County judges which are located in the Old Courthouse building. The Committee maintains an up-to-date Inventory List of all works in the collection.

## BOARD OF EQUALIZATION

**Appointing Authority(ies):**  Appointed by Board of Supervisors

**Number of Members:** Five

**At-Large or District:** At-large

**Term:** Three year term

**Board Member Representative:** None

**Meeting Date, Place and Time:** When needed; Board Room of the County Government Center

**Staff Contact:** Rebecca Kummel, Department of Management and Financial Services at (703)777-0289

**Stipend or Expense Payment: $73.50 half day, $147.00 full day**

**Mandating Agency:** Virginia Code Section 15.2-840 Section

**General Purpose:**  This group of citizens is appointed by the Chief Judge of the Circuit Court to hear all objections to the real estate assessment of any taxpayer.  As an independent body, the BOE is charged with the responsibility of determining, when a taxpayer files an appeal, whether the Assessor's Office has equalized the assessments among property owners in specific geographic areas in the county. The BOE has the authority to increase, decrease or affirm individual real property assessments in order to ensure uniformity in assessments and equal distribution of the county's tax burden. The BOE may only hear appeals for the current tax year assessment.

# BOARD OF ZONING APPEALS

**Appointing Authority(ies):**  Circuit Court

**Number of Members:**  7

**Term:**  5 years

**Board Member Representative:** None

**Meeting Date, Place and Time:**  Fourth Thursday of each month, 7:30-11:00 p.m.; Board Room of the County Government Center

**Staff Contact:**  Kimberly Heckber, Department of Planning and Zoning at (703) 737-8915.

**Stiped or Expense Payment:**  $3,197 annually

**Mandating Agency:**  Virginia Code Section 15.2-2308 and Section 6-200 of the Revised 1993 Zoning Ordinance

**General Purpose:**  The BZA is an appellate Board, appointed by the Circuit Court, which hears requests for zoning variances, special exceptions, appeals of Zoning Administrator's decision, and other related Zoning Ordinance matters.  While the activities of the Board are funded by the Board of Supervisors, the BZA relies on Zoning Administration for staff support, including its Recording Secretary.  The purposes, functions, and standards for action of the Board of Zoning Appeals are explicitly stated by Section 15.2-2308-2311 of the Code of Virginia.  The County zoning regulations include administrative and procedural regulations.

## BUILDING CODE AND APPEALS BOARD

**Appointing Authority(ies):** Board of Supervisors

**Number of Members:**  9

**At-Large or District:**  At-large - with background in building industry

**Term:**  Four-year terms staggered

**Board Member Representative:** None

**Meeting Date, Place and Time:**  Meet as needed

**Staff Contact:**    Raymond "Wally" Rinaldi, Department of Building and Development at (703) 771-5449

**Stipend or Expense Payment:  None**

**Mandating Agency:**  Chapter 6 Title 36, Section 105 of the Code Virginia - Section 116 of the Virginia Uniform Statewide Building Code

**General Purpose:**    The Board handles appeals of decisions of the Loudoun Building official concerning application of the Building Code or refusal to grant a modifications to the provisions of the Code covering the manner of construction of materials to be used in the erection, alteration of a building or structure.

## COMMUNICATIONS COMMISSION

**Appointing Authority(ies):** Board of Supervisors

**Number of Members:** 10

**At-Large or District:** One from each electoral district, one a-large, and one public school representative

**Term:** Concurrent with the term of the Board of Supervisors

**Board Member Representative:** None

**Meeting Date, Place and Time:** second Wednesday of the month at 7 p.m. - Location varies

**Staff Contact:** Shelly Morris, Department of Information Technology, at (703) 777-0199
Wendy Wickens, Department of Information Technology, at (703) 771-5412

**Stipend or Expense Payment:** None

**Mandating Agency:** Board of Supervisors - in connection with the implementation of the new Cable Television Act of 1992 (Public Law 102-385)

**General Purpose:** The Communications Commission, formerly the Cable and Open Video and the Cable TV Advisory Committee (CTVAC), was formed to advise the Board of Supervisors on issues pertaining to the county's cable operations. Associated with this activity is the implementation of the Cable Television Act of 1992.

In November 2005, the Board adopted new by-laws which changed the CTVAC to the Cable and Open Video Systems Commission and expand the scope of the commission, referencing that Open Video System (OVS) service providers are included.

## COMMISSION ON AGING

**Appointing Authority(ies):**   Board of Supervisors

**Number of Members:**  9

**At-Large or District:** 8 district, 1 at-large

**Term:**  Concurrent with the term of the Board of Supervisors

**Board of Supervisors Representative:** None

**Meeting Date, Place and Time:** Second Thursday of each month at 10:00-11:30 AM at 20145 Ashbrook Place, Ashburn, VA 20147.

**Staff Contact:** Lynn Reid, Area Agency on Aging at (703)777-0388

**Stipend or Expense Payment:**  None

**Mandating Agency:**  The Older Americans Act of 1965 requires the appointment of Commissions on Aging

**General Purpose:**   The Commission serves in an advisory capacity to the Board of Supervisors and the Area Agency on Aging.  The Commission provides advocacy to enhance the well being of older Loudoun residents.

# COMMUNITY CRIMINAL JUSTICE BOARD

**Appointing Authority(ies):**  Ten members are mandated by the state of Virginia; nine members are appointed by the Board of Supervisors (eight of its members are appointed by electoral district with one at-large appointment made by the Chairman of the Board of Supervisors).  The term of service for the appointees runs concurrently with each four year term of the Board of Supervisors.

**Number of Members:**  19 (10 mandated members; 9 appointed members)

**At-Large or District:**  By District - representing various aspects of the community and criminal justice system.

**Term:**  Concurrent with the term of the Board of Supervisors

**Board of Supervisors Representative:** None

**Meeting Date, Place and Time:**  Second Wednesday of every other month at 5:30 PM – Government Center, Leesburg Conference Room.

**Staff Contact:**  Kaye Wallace, Dept of Community Corrections - 703-737-8234

**Stipend or Expense Payment:** None

**Mandating Agency:**  Virginia Code Section 9.1-178

**General Purpose:**
On July 1, 1995, the General Assembly enacted legislation requiring each jurisdiction to create a local Community Criminal Justice Board (CCJB) upon the development of a local pretrial services or a community-based probation program.

The purpose of the Community Criminal Justice Board shall be to enable Loudoun County to develop, establish, administer, monitor, and maintain community-based corrections programs for certain individuals who meet the eligibility criteria established under Section 19.2-303.3 of the Code of Virginia or other applicable provisions of state law. The programs so established should effect the following purposes:

- To allow localities greater flexibility and involvement responding to the problem of crime in their communities;
- To provide more effective protection of society and to promote efficiency and economy in the delivery of correctional services;
- To provide increased opportunities for offenders to make restitution to victims of crimes through financial reimbursement or community services;
- To permit localities to operate and utilize local community-based probation programs and services specifically designed to meet the rehabilitative needs of selected offenders; and
- To provide appropriate post-sentencing alternatives in localities for certain offenders with the goal of reducing the incidence of repeat offenses.

## COMMUNITY POLICY AND MANAGEMENT TEAM

**Appointing Authority(ies):** Board of Supervisors

**Number of Members:** 10

**At-Large or District:** At-Large

Directors of:
1. Mental Health and Mental Retardation
2. Department of Social Services
3. Juvenile Court Services Unit
4. Department of Health
5. Director of Pupil Services, Loudoun Schools
6. Two Provider Representative - member of a private organization or association of providers for children's or family services
7. Two Parent Representative - member who is not an employee of any public or private program which serves children and families
8. Management Services

**Term:** Terms of office for provider and parent representatives are for two years

**Board of Supervisor Representative:** Yes; Julie Grandfield, Assistant County Administrator, serves as Board of Supervisors' representative.

**Meeting Date, Place and Time:** Third Thursday each month, 10:00 a.m., Shenandoah Building, 102 Heritage Way SE, Leesburg, Department of Family Services Conference Room A

**Staff Contact:** Lesley Abashian, Family Services, (703 737-8248)

**Stipend or Expense Payment:** None

**Mandating Agency:** Board of Supervisors

**General Purpose:** On November 18, 1992, the Board of Supervisors, in compliance with the 1993 Comprehensive Service Act for At Risk Youth and Families, established the Team for services to at-risk youth and families. The Team provides administrative oversight and coordination, resolves problems, and reduces barriers identified by the FAPT (Family Assessment and Planning Team).

## COMMUNITY SERVICES BOARD

**Appointing Authority(ies):**  Board of Supervisors

**Number of Members:**  18 – (At their March 15, 2005 Board meeting, the Board of Supervisors moved to approve an increase in membership to 18 members.)  (Code of Virginia states no less than six and no more than 18 members)

**At-Large or District:**  At-large

**Term:**  Three years staggered with eligibility for two additional three-year terms.

**Board of Supervisors Representative:** None

**Meeting Date, Place and Time:**  Second Thursday each month - 6:00 p.m. – 906 Trailview Blvd, The Aspen Room

**Staff Contact:** Margaret Graham, Acting-Director, at (703)-777-0650

                    Lynne Travis at (703) 777-0378

**Stipend or Expense Payment:  $600.00 per year**

**Mandating Agency:  Virginia Code Chapter 10, Section 37.2-500**

**General Purpose:**    To act as the agent of the County of Loudoun in the establishment and operation of community mental health, mental retardation and substance abuse programs as provided for in Chapter 10 of Title 37.1 of the Code of Virginia.

No. 17 Public Viewed 12/18/2018

## COMMUTER BUS ADVISORY BOARD (CBAB)

**Appointing Authority(ies):** Board of Supervisors

**Number of Members:**  Nine members (County residency and use of county commuter bus system required)

**At-Large or District:**  By district - (not necessary to reside in district represented)

**Term:**  Concurrent with the term of the Board of Supervisors

**Board of Supervisors Representative:** None

**Meeting Date, Place and Time:  Each CBAB sets their own schedule for meetings.  Currently they meet the second Monday of each month, at 7 PM.**  Meets in County Government Building.

**Staff Contact:**  Paul Mounier, Office of Transportation Services at (703) 771-5842.

**Stipend or Expense Payment:**  None

**Mandating Agency:  Board of Supervisors**

**General Purpose:**  The Board acts in an advisory capacity to Staff and the Board of Supervisors on all policy and operational matters pertaining to the system of buses operating express bus service between Loudoun County and the Washington Metropolitan area.  The Board is aware of day-to-day problems, provides a forum to discuss them in detail, and, where appropriate, makes recommendations to staff and the Board of Supervisors.

## COURTHOUSE GROUNDS AND FACILITY COMMITTEE

**Appointing Authority(ies):** Board of Supervisors

**Number of Members:** 15 Members and 2 Ex-Officio Judiciary Members -- twelve interested citizens, one representative of the Leesburg Town Council which may be a citizen or a member of the Leesburg Town Staff, and two of the judiciary as ex-officio members,

**At-Large or District:** At-large

**Term:** Concurrent with the term of the Board of Supervisors

**Board Member Representative:** None

**Meeting Date, Place and Time:** Fourth Tuesday of each month except December.

**Staff Contact** Mimi Greene, Office of Public Affairs at (703)777-0211

**Stipend or Expense Payment:** None

**Mandating Agency:** Board of Supervisors

**General Purpose:** The purpose of the Courthouse Grounds and Facility Committee is to provide a long-term and unified vision for the court complex grounds; to address ideas regarding ways to make the facility and grounds unique to Loudoun County, and to suggest a process for ongoing decision making as new suggestions are brought forward by the community.

# DISABILITY SERVICES BOARD

**Appointing Authority(ies):**  Loudoun County Board of Supervisors

**Number of Members:**  15

**At-Large or District:**  At-large - one shall be an official of Loudoun County government, one shall be a member of the Community Services Board, a minimum of two shall be business persons or consumers, and a minimum of five shall be disabled persons or a member of a family with a disabled person.

**Term:** Three year terms with option for reappointment to one additional 3 year term and a maximum of 8 years of services.  If a vacancy occurs after a term of office has commenced, the vacancy will be filled by appointment by the Board of Supervisors, and such appointment shall be for a term of three years from the date of appointment

**Board of Supervisors Representative:**

**Meeting Date, Place and Time:**  Third Thursday of each month at 7:00 p.m. in the Purcellville Room on the first floor of the Loudoun County Government Center, 1 Harrison Street S.E. in Leesburg.

**Staff Contact:  Catherine Motivans**, Office of Public Affairs at (571) 258-3282

**Stipend or Expense Payment:**  None

**Mandating Agency:  Board of Supervisors**

**General Purpose:**    This Board reports to the Board of Supervisors.  Major tasks are to provide input to the Board of Supervisors and local agencies on service needs and priorities of persons with physical and sensory disabilities. As well the DSB provides information and resource referral to local government, businesses and individuals regarding the Americans with Disabilities Act.

The DSB provides:
1. input to state and local agencies on service needs and priorities of persons with physical and sensory disabilities;
2. information and resource referral to local governments regarding the Americans with Disabilities Act; and
3. such other assistance and advice to local governments as may be requested.

## DULLES TOWN CENTER COMMUNITY DEVELOPMENT AUTHORITY (CDA)

**Appointing Authority(ies):**   The Board of Supervisors, provided a majority of the CDA Board shall consist of petitioning landowners or their nominees.

**Number of Members:**  5

**At-Large or District:**   A majority of the CDA Board (3 members) shall consist of petitioning landowners or their nominees; the other two members are appointed from the County at large.

**Term:**  Staggered four year terms

**Meeting Date, Place and Time:**  As announced.

**Contact:**  Benjamin Tompkins, Counsel for the Authority at (703 641-4268
ReedSmith, LLP
3110 Fairview Park Drive, Suite 1400
Falls Church, VA  22042
The County Administrator, members of the Board of Supervisors, County Attorney and Deputy County Administrator are faxed noticed of all CDA meetings

**Stipend or Expense Payment:**  $250 per meeting

**Mandating Agency:**  The CDA district was created by ordinance at the option of the Board of supervisors, upon petition of the landowners in the district.

**General Purpose:**   To finance public infrastructure at the Dulles Town Center project through a special assessment district.

No. 17-2002, viewed 12/18/2018

## ECONOMIC DEVELOPMENT ADVISORY COMMISSION

**Appointing Authority(ies):** Board of Supervisors

**Number of Members:** Membership shall consist of up to a maximum of twenty-eight (28) persons appointed by the Board from and divided into three groups: A) position, B) industry, and C) appointed advisory members. Group A, position members, serve terms coincident with their position terms while Group B, industry members, serve three-year terms and Group C, appointed advisory members, serve one-year terms.

**At-Large or District:** At-large

**Term:** Expirations vary.

**Board of Supervisors Representative:** None

**Meeting Date, Place and Time:** First Friday, 8:00 a.m.   Loudoun Water.

**Staff Contact:** Lois Kirkpatrick, Department of Economic Development – (703) 737-8385

**Stipend or Expense Payment:** None

**Mandating Agency:** Board of Supervisors

**General Purpose:** The mission of the Commission is to promote the long-term economic growth and development of Loudoun County in a way that is economically sustainable and results in the expansion of its commercial and industrial tax base.

No. 17-2002, viewed 12/18/2018

## ECONOMIC DEVELOPMENT AUTHORITY
### (formerly IDA)

**Appointing Authority(ies):**   Board of Supervisors

**Number of Members:**   7

**At-Large or District:**   At-large

**Term:**   Four years staggered

**Board Member Representative:** None

**Meeting Date, Place and Time:** The authority holds regularly scheduled meetings on the fourth Thursday of each month at 3:00 p.m. in a public meeting room in the County Government Center, 1 Harrison Street, S.E. in Leesburg. Special meetings of the authority are called from time to time and the scheduling of such meetings are posted

**Staff Contact:**  Stephen Robin, Esquire
**141 Woodberry Road**
**Leesburg, VA 20176**
**Voice:  703-443-1001**
**Fax:  703-443-6721**
**Email:**  steverobin@verizon.net

**Stipend or Expense Payment:**  $150/meeting (approved 4/2/2001)

**Mandating Agency:**  Virginia Code Sections 15.2 - 4900f.

**General Purpose:**    This authority recommends to the Board of Supervisors and, upon Board approval, issues tax exempt revenue bonds in accordance with the Industrial development and Revenue Bond Act, Chapter 49, title 15.2, of the Code of Virginia.  In so doing, the Authority considers applications for financing certain types of facilities for non-profit organizations and for companies which manufacture or assemble products, and recommends to the Board of Supervisors whether or not approval should be given by the Board to enable such organizations and companies to benefit from financing at lower than normal commercial rates.

## ELECTORAL BOARD

**Appointing Authority(ies):** Appointed by Circuit Court Judges

**Number of Members:** The Electoral Board is composed of three appointed members who are responsible for running elections in the county, including hiring pollworkers, choosing polling places, printing ballots, maintaining financial reports of candidates, and organizing election procedures.

**At-Large or District:** At-large

**Term:** Three-year staggered terms expiring last day of February

**Board of Supervisors Representative:** None

**Meeting Date, Place and Time:** Electoral Board Office, first Wednesday of each month -3:00 p.m.

**Staff Contact:** Judy Brown, General Registrar (703) 777-0380

**Stipend or Expense Payment:** Secretary, Chairman and Vice Chairman receive mileage and salaries which are funded by the Stated (reimbursed to County once a year).

**Mandating Agency: Virginia State Code 24.2-106**

**General Purpose:** Oversees the election process.

### FACILITIES STANDARDS MANUAL PUBLIC REVIEW COMMITTEE

**Appointing Authority(ies):**  Board of Supervisors

**Number of Members:**  No less than seven (7) members

**At-Large or District:**  At-large

**Term:**  Concurrent with the term of the Board of Supervisors

**Board of Supervisors Representative:** None

**Meeting Date, Place and Time:**  Third Wednesday of month from 3:00 p.m. to 5:00 p.m.  Location varies.

**Staff Contact:**  Laura Edmonds, Department of Building and Development at (703) 737-8923

**Stipend or Expense Payment:  None**

**Mandating Agency:  Facilities Standards Manual, Chapter 1**

**General Purpose:**    Chapter 1 of the Facilities Standards Manual requires that the Board of Supervisors appoint a Public Review Committee to review and provide comments on proposed revisions to the ordinance prior to the public hearing process.

## FAMILY SERVICES ADVISORY BOARD
### (Formerly Social Services Board)

**Appointing Authority(ies):**  Board of Supervisors

**Number of Members:**  Membership shall be no less than 5 and no more than 13.

**At-Large or District:**   At-large - a member of the Board of Supervisors serves as an ex-officio member (Vice Chair, Susan Buckley for 2010-2011)

**Term:**  Staggered terms up to four years. Can serve no more than two consecutive full terms.

**Board of Supervisors Representative:**

**Meeting Date, Place and Time:**  Every 2rd Tuesday of each month at 6:30 p.m. in the Shenandoah Office Building, Shenandoah Square, 102 Heritage Way, N. E., Leesburg, in the Lansdowne Room on the 2nd floor. Some meetings may be held at one of the offsite locations, Young Adult Project, Family Connections or Juvenile Detention Center.

**Staff Contact:**  Ellen Grunewald, Director, Department of Family Services at (703) 771- 5873

**Stipend or Expense Payment:**  $600 annual

**Mandating Agency:** Virginia Code Section 63-2-305

**General Purpose:**  The Family Services Advisory Board is a board responsible for advising the County Administrator or his/her designee on the policies, budget, programs and practices of the Department of Family Services.

No. 17-2002, viewed 12/18/2018

## FINANCE BOARD

**Appointing Authority:** Circuit Court

**Number of Members:** 4 (plus County Administrator as ex-officio member)

**At-Large or District:** Consists of Commonwealth Attorney, County Treasurer, Chairman of the Board of Supervisors, County Administrator (ex-officio), and a citizen member.

**Term:** for duration of term in elected office

**Meeting Date, Place and Time: Only as needed**

**Staff Contact: Denise M. Pugh,** Treasurer's Office, 703-777-0468

**Stipend or Expense Payment:** Citizen member shall receive a stipend of not less than $20.00 and mileage per meeting

**Mandating Agency:** Code of Virginia § 58.1-3151 provides authority for the County to establish this Board to oversee responsible investment of County funds. The citizen member is appointed by the circuit court. The Board of Supervisors may choose to abolish this Board and absorb the duties of this Board.

**General Purpose:** Responsible for investment of County funds.

No. 17-2002, viewed 12/18/2018

## FISCAL IMPACT COMMITTEE

**Appointing Authority:** Board of Supervisors

**Number of Members:** 6

**At-Large or District:** Four at-large, those with expertise in economics, demographics, statistics, or forecasting; a Member of the Loudoun County Public Schools; and a Member of the Board of Supervisors, as an ex-officio member

**Term:** Concurrent with the term of the Board of Supervisors

**Meeting Date, Place and Time:** Meet as needed at the County Government Center

**Staff Contact:** Beth Hilkemeyer, Management and Financial Services, (703) 777-8756
Dan Csimar, Management and Financial Services, (703) 771-5997

**Stipend or Expense Payment:** None

**Mandating Agency:** Board of Supervisors

**General Purpose:** Established on February 3, 1992, by the Board. As directed by the Board of Supervisors, the Fiscal Impact Committee meets on an annual basis to develop a series of recommendations on financial, demographic, and economic information that is used as input to the County's fiscal impact model. The Committee also develops recommendations for "growth scenarios" that are critical to the development of the long range capital and land use planning documents to include the Capital Needs Assessment.

Over the last four years, the Committee has reviewed the Capital Facility Standards (CFS) that are used for long range capital planning and the development of the Capital Intensity Factors (CIF) that are used in proffer negotiations. The Committee also reviewed and made recommendations regarding the development of the County's long range capital facilities inventory document: the Ten-Year Capital Needs Assessment (CNA).

## HERITAGE COMMISSION

**Appointing Authority(ies):** Board of Supervisors

**Number of Members:** 16 members, one commissioner from each District, one At-Large Commissioner and seven commissioners with knowledge in some or all of the following:

- History , preservation, restoration, and adaptive residential or commercial use of historic buildings.

- Loudoun County's prehistoric and historic archaeology and preservation of material culture and sites.

- Conservation of Loudoun County's natural environment.

- History and culture of the people and places of Loudoun County.

- Heritage tourism, business, financial and philanthropic sectors in heritage preservation.

- Public and private institutions and organizations that contribute to the identification, documentation, promotion, preservation, and celebration of Loudoun County's heritage resources.

**Term:** Concurrent with the term of the Board of Supervisors

**Meeting Date, Place and Time:** First Tuesday of each month at 6:30 PM.

**Staff Contact:** Heidi Siebentritt, Department of Planning at (703) 777-0246

**Stipend or Expense Payment:** None

**Mandating Agency: None**

**General Purpose:** The Commission advises the Board of Supervisors on issues regarding the County's heritage resources and the implementation of the Countywide Heritage Preservation Plan. The Commission supports and encourages the identification, documentation, protection and preservation of the County's natural and cultural heritage.

## HERITAGE FARM MUSEUM WORKING COMMITTEE

**Appointing Authority(ies):** Board of Supervisors

**Number of Members:** A six member committee comprised of the Parks, Recreation and Community Services department head or designee, County Administration designee, three members of the Board of Directors of the (Heritage Farm Museum) Corporation and one member of the public appointed by the Board of Supervisors.

**Term:** Indefinite

**Meeting Date, Place and Time:** Quarterly- as scheduled-place and time varies

**Staff Contact:** Steve Torpy, Parks and Recreation at (703)777-0345

**Stipend or Expense Payment:** None provided

**Mandating Agency:** Not mandated but created by Board of Supervisor through an agreement with Heritage Farm Museum Inc.

**General Purpose:** The Committee will advise in particular on the current operation of the Museum and on development issue when appropriate.

No. 17-2002, viewed 12/18/2018

## HISTORIC DISTRICT REVIEW COMMITTEE

**Appointing Authority(ies):** Board of Supervisors

**Number of Members:** 7

Committee members are appointed at large by the Board of Supervisors and serve three-year staggered terms.

**At-Large or District:** At-large

**Term:** Three years staggered

**Board of Supervisors Representative:** None

**Meeting Date, Place and Time:** Second Monday of each month at 6:00 p.m. in the Purcellville Room on the first floor of the Loudoun County Government Center

**Staff Contact:** Lauren Murphy, Department of Planning – 703 777-0164

**Stipend or Expense Payment:** None

**Mandating Agency:** Virginia Code Section 14.1-503 and Loudoun County Zoning Ordinance Article IV - Division B, Article 6-300 to 6-307 and 6-1800 to 6-1980.

**General Purpose:** This Committee in accordance with Virginia Code and the Loudoun County Zoning Ordinance is charged with approving and denying new construction and alterations, additions and reconstruction of all structures in historic districts and siting of those structures.

**Mandating Agency:** Virginia Code Section 14.1-503 and Loudoun County Zoning Ordinance Article IV - Division B, Article 6-300 to 6-307 and 6-1800 t0 6-1909.

**General Purpose:** This Committee, in accordance with the Virginia Code and the Loudoun County Zoning Ordinance, is charged with the review and approval of all proposed new construction in the historic districts, including the siting of those structures, proposed alterations to existing buildings and structures, or the proposed demolition of any building or structure in County designated historic districts.

## HOUSING ADVISORY BOARD

**Appointing Authority(ies):**   Board of Supervisors

Number of Members:   The Board consists of members who represent specific categories as follows:

Group A Members:
- a.      Representative of the Economic Development Commission
- b.      Representative of the Industrial Development Authority
- c.      Representative of the Affordable Dwelling Unit Advisory Board

Group B members:
- a.      One non-profit affordable housing developer
- b.      One for-profit affordable housing developer
- c.      One affordable housing finance consultant/advisor
- d.      One-non-profit and/or faith-based service provider
- e.      Public at-large
- f.      Public at-large
- g.      Public at-large
- h.      Public at-large
- i.      Public at-large
- j.      Public at-large

**Term:**   Group A and B --- four-year staggered terms commencing January 1st.  Vacancies shall be filled in accordance with procedures outlined in by-laws.

**Meeting Date, Place and Time:**  First Wednesday, of every other month beginning in January at 4:00 p.m., _ in the Shenandoah Room on the second floor of the Shenandoah Building, 102 Heritage Way, N.E. in Leesburg.

**Staff Contact:**  Brian Reagan, Department of Family Services, at (571) 258-3305
                        Sarah Coyle Etro, Department of Family Services, at (703) 777-0387.

**Stipend or Expense Payment:**  None

**Mandating Agency:**  (Workforce Housing program as described in the EDC's report entitled *Workforce Housing: Affordable Housing to Strengthen Loudoun's Business Community*)

**General Purpose:**   The purposes of the HAB are as follows:
1. To support policies and make recommendations to the Board of Supervisors for program development;
2. To serve as a source of study and advocacy for the Board of Supervisors on the supply and demand issues of affordable housing;
3. To work cooperatively with other jurisdictions to encourage regional affordable housing solutions;
4. To mobilize business and community support to develop and sustain workforce housing programs;
5. To provide input on the affordable housing needs regarding funding options due to Urban County Status and recommend approval of grant applications;
6.  To support community education and outreach on affordable housing initiatives

## HOUSING CHOICE VOUCHER RESIDENT ADVISORY BOARD

**Appointing Authority(ies):** Board of Supervisors

**Number of Members:** Five members and two alternates.

**At-Large or District:** At Large

**Term:** Three year staggered terms. Members and alternates shall be appointed and replaced as terms expire. No member shall serve more than two terms.

**Board Member Representative:** None

**Meeting Date, Place and Time:** Meetings are held in the conference room of the Department of Family Services in the Shenandoah Building, 102 Heritage Way, N.E., on the first Monday of February and September, beginning at 6:30 p.m. and ending no later than 8:30 p.m. If schools are closed due to inclement weather, the February meeting shall be moved to the second Monday of February.

**Contact**:  Antwaun Jackson, Department of Family Services, at (703) 737-8213
Sarah Coyle Etro, Department of Family Services, at (703) 777-0387

**Mandating Agency:** As required by Code of Federal Regulations 24 903.13

**General Purpose:** The purpose of the Resident Advisory Board shall be to propose and review Administrative Plan additions, changes, Annual and Five Year Federal Public Housing Agency (PHA) plans, and suggests Loudoun County Housing Services (LCHS) operations manual changes.

## LANDFILL SPECIAL EXCEPTION REVIEW COMMITTEE
### Formerly WOODS ROAD SPECIAL EXCEPTION COMMITTEE

**Appointing Authority(ies):** Board of Supervisors

Number of Members:    There are seven to ten members of the committee, appointed at-large by the Board of Supervisors for a four-year term.  At least one membership slot will be reserved for a landfill area resident living within one mile of the existing or proposed waste footprint.

**At-Large or District:**    At-large

**Term:** Concurrent with the term of the Board of Supervisors

**Meeting Date, Place and Time:** The committee meets at least once a year.

**Staff Contact:** Michael Fairbanks, Construction and Waste Management at (703) 777-0168

**Stipend or Expense Payment:** None

**Mandating Agency:** Board of Supervisors/Condition #30 of SPEX 1992-0027

**General Purpose:**
The purpose of The Landfill Special Exception Review Committee (LSERC) is to ensure conformance to Condition 30 of the Conditions of Approval for Special Exception SPEX 1992-0027, Woods Road Solid Waste Management Facility (WRSWMF). *

(*Landfill Special Exception Review Committee Charge and By-Laws, Article II. PURPOSE, as Revised Louodun County Board of Supervisors, January 6, 2009.)

## LIBRARY BOARD OF TRUSTEES

**Appointing Authority(ies):**   Board of Supervisors

**Number of Members:**  9

**At-Large or District:**  One representative from each electoral district

**Term:**  Four years staggered

**Meeting Date, Place and Time:** Third Wednesday of each month, 7:30 p.m. at the Rust Library unless an alternate location is otherwise posted.

**Staff Contact:**  Chang Liu, Director, Library Services at (703) 771-5235

**Stipend or Expense Payment:**  Mileage reimbursement

**Mandating Agency:**  Code of Virginia Section 42.1-33 through 42.1-45

**General Purpose:**  In accordance with the Code of Virginia, the management and control of the public library system is vested in the Library Board of Trustees.  The Library Board has control of the expenditures of funds credited to the library fund.  They may also accept donations, bequests of money, personal property or real estate for the establishment and maintenance of the public library system.

## LOUDOUN COUNTY HEALTH COUNCIL

**Appointing Authority(ies):**  Members of the Board of Supervisors. The Loudoun County Board of Supervisors unanimously approved the formation of the Loudoun Health Council at its May 2, 2006, business meeting. The Health Council held its first meeting on November 16, 2006.

**Number of Members:**

1. Group A – Permanent Committee Members (representative from each of the following agencies:
   - Inova Loudoun Hospital
   - Loudoun Community Health Center
   - Loudoun Free Clinic
   - Loudoun County Department of Fire and Rescue Services
   - Loudoun County Health Department
   - Loudoun County Department of Family Services
   - Loudoun County Department of Mental Health, Substance Abuse & Developmental Services  (formerly call the Department of Mental Health/Mental Retardation/Substance Abuse Services)
   - Loudoun County Public Schools
2. Group B – Staggered Term Membership (12 minimum, 19 maximum)
   - Local Physician – 2 year term
   - Representative elected by (Coalition of Loudoun Towns) – 2 year term
   - Health-Related Non-Profit -  2 year term
   - Loudoun Chamber of Commerce – 1 year initial term, then 2 year term
   - Faith Community – 1 year initial term, then 2 year term
   - Business - 1 year initial term, then 2 year term
   - Three Citizens- 1 year initial term, then 2 year term

**At-Large or District:**  At-large

**Board of Supervisors Representative:** None

**Meeting Date, Place and Time:**  Second Thursday of every month from 3:000 p.m. to 4:30 p.m. at the Loudoun County Government Center.

**Contact:**   Dr. David Goodfriend, Department of Health at (703) 771-5829

**Stipend or Expense Payment:**   None

**General Purpose:** The mission of the Loudoun Health Council is to develop a consensus on strategies to prepare for and respond to a major outbreak of disease; to improve the health of the community in general; to increase the value of the local health care system for the entire community; to align community resources with selected priorities for action; and to identify where resources should be concentrated.

# LOUDOUN WATER

**Appointing Authority(ies):**  Board of Supervisors

**Number of Members:**  9

**At-Large or District:**  At-large

**Term:**  Four-year staggered

**Board of Supervisors Representative:** None

**Meeting Date, Place and Time:**  Second Thursday of each month, 3:00 p.m. – Loudoun Water building located at 44865 Loudoun Water Way, Ashburn, VA

**Staff Contact:**  Jewell Lilly, Loudoun Water, at (571) 291-7970 or by email: jlilly@loudounwater.org; or Denise Reyes at (703) 771-5072.  Loudoun Water is located at 44865 Loudoun Water Way P.O. Box 4000,  Ashburn, VA 20146

**Stipend or Expense Payment:**   Chair    **-** $6,600 annually - $550/month
Members - $4,800 annually - $400/month

**Mandating Agency:**  Code of Virginia  15.1-1239 through 1270

**General Purpose:**   The Loudoun County Sanitation Authority was created as a public body politic and corporate under the provisions of the Virginia Water and Sewer Authorities Act, (Chapter 28, Title 15.1, Section  1239 et seq., Code of Virginia, 1950, as amended), for the purpose of acquiring, constructing, operating and maintaining for Loudoun County (a) an integrated water supply and distribution system, and (b) an integrated sewerage and sewage disposal system, and for the purpose of exercising the powers conferred by said Water and Sewer Authorities Act in relation to the foregoing.

The Authority was created on May 27, 1959 by resolution of the Loudoun County Board of Supervisors to provide water and wastewater service to residents of unincorporated areas of Loudoun County. The suburban service area in Eastern Loudoun County is bordered on the north by The Town of Leesburg and the Potomac River.  It is bordered on the east by the Fairfax County/Loudoun County boundary line.  It is bordered on the south by Prince William County and the west by Goose Creek and Beaverdam Reservoir.  Headquartered in Leesburg, VA, the Authority is financially independent from the County of Loudoun.  Operations are funded by water and wastewater service charges.  The Authority is a nonprofit organization and not tax-supported by county taxpayers.

The Authority's goal is to provide the highest quality water and the best water and wastewater service at the lowest cost possible.

No. 17-2002 Received 12/18/2018

## LYME DISEASE COMMISSION

**Appointing Authority(ies):**  Board of Supervisors

**Number of Members:**  9

**At-Large or District:**  District Representatives

**Term:**  Concurrent with the term of the Board of Supervisors

**Board of Supervisors Representative:** None

**Meeting Date, Place and Time:**  as needed

**Staff Contact:**  Dr. David Goodfriend, Health Department, at (703) 771-5829

**Stipend or Expense Payment:**    none

**Mandating Agency:**  Board of Supervisors

**General Purpose:**   The mission of the Lyme Disease Commission is to work with county staff to implement the Board of Supervisors' 10-Point Action Plan to Mitigate Lyme Disease.

# OPEB (Other Post-Employment Benefits)
# Investment Committee

**Appointing Authority(ies):** Board of Supervisors

**Number of Members:** The OPEB Investment Committee is a five-member committee with one citizen member appointed at-large by the Board of Supervisors. In accordance with state code, the county's Chief Financial Officer (Director of the Department of Management and Financial Services) and the Treasurer serve as members of the investment committee. In addition to these members, the Board of Supervisors has included the Superintendent of Loudoun County Public Schools, or the Superintendent's designee, and the Chairman of the Board of Supervisors Finance/Government Services and Operations Committee to also serve on this committee.

**Term:** Two-year staggered

**Board Member Representative:** Yes, Chairman of the Finance/Government Services and Operations Committee

**Current Loudoun County Representative:** Mark Adams, Director of Management and Financial Services, 703-777-0563 or Debbie Capitan, Management and Financial Services, 703-777-0215

**Meeting Date, Place and Time:** When needed - Meetings held in County Government Complex

**Staff Contact:** Robin York, Management and Financial Services, at (571) 258-3212

**Stipend or Expense Payment:** None

**Mandating Agency:** Virginia Code §15.2-1547

**General Purpose:** The purpose of the Committee is to assist in managing investments for the county's retirement benefit plan, to include the county government and public schools.

Specific topics to be addressed by the OPEB Investment Committee will include: 1) Creation of Committee by-laws and an investment policy for funds in the OPEB Trust; 2) Evaluation of investment options and investment managers; 3) Recommendations or presentations to the Board of Supervisors on all above mentioned topics.

## PARKS, RECREATION & OPEN SPACE BOARD

**Appointing Authority(ies):** Board of Supervisors

**Number of Members:** 9

**At-Large or District:** One representative from each electoral district

**Term:** Concurrent with the term of the Board of Supervisors

**Meeting Date, Place and Time:** First Saturday of every month, 7:30 a.m. – Parks, Recreation and Community Services Office--- 215 Depot Court, Leesburg, VA 20175

**Board of Supervisors representative**: None

**Staff Contact:** Steve Torpy, Director, Parks & Recreation, at (703) 777-0345

**Stipend or Expense Payment:** None

**Mandating Agency:** County of Loudoun

**General Purpose:** The Loudoun County Parks, Recreation & Open Space Board is made up of citizens appointed by the Board of Supervisors representing their respective districts. The purpose of the board is to provide a forum for citizens' suggestions or concerns, to advise the staff on community recreation needs, coordinate and sponsor research on issues and alternatives related to open space and land use in the county, and to make staff aware of and sensitive to public needs.

The purpose of this Board is to act in an advisory capacity to the Board of Supervisors in recommending policies relating to:

1.    Recreation programs, making use of the physical properties available within the County.

2.    Public parks systems for the enjoyment of the citizens of the County.

3.    Building the parks and recreation atmosphere into and about the public schools and parks and to identify it with all public and provisions for year-round, healthful supervised recreation for all.

4.    Focusing public attention constantly upon the need of adequate provision for year-round, healthful supervised recreation for all.

5.    Encouraging the donation of property and funds for the benefit of the Loudoun County Parks and Recreation Program

# PLANNING COMMISSION

**Appointing Authority(ies):**  Board of Supervisors

**Number of Members:** 9

**At-Large or District:**  One representative at large and one from each electoral district

**Term:**  Concurrent with the term of the Board of Supervisors

**Board of Supervisors Representative:** None

**Meeting Date, Place and Time:**  Meet various times and dates for general meetings, committees and work sessions ---Worksessions are held on the second Wednesday and Public Hearings are held on the fourth Wednesdays of each month in the County Administration Building.
\
**Staff Contact:**  John Merrithew, Assistant Director of Planning, at (703) 777-0516
Nancy Bryan, Deputy Clerk to the Planning Commission, at (703) 777-0246

**Stipend or Expense Payment:**  (salary with mileage and meal reimbursement)
$21,315 members
$22,334 chairman

**Mandating Agency:**  Virginia Code 15.2.-2200 and Section 15.2-2212

**General Purpose:**  The Planning Commission is a nine-member advisory body required by State law, appointed and funded by the Board of Supervisors.  The Commission provides recommendations on issues concerning land development ordinances, comprehensive planning, future land use policies and the Capital Improvement Program for the County.  The Planning Commission has no staff of its own; however, Planning Department staff supply professional and support services to the Commission.  As is provided by State law, the Commission is empowered to prepare and recommend a Comprehensive Plan and a zoning map for the physical development of the territory and its jurisdiction.  This Advisory Board reviews a variety of land development applications (e.g., rezoning and special exceptions) and makes recommendations to the Board of Supervisors for consideration in approving or denying the proposed projects.

## RURAL ECONOMIC DEVELOPMENT COUNCIL

**Appointing Authority(ies):**   Board of Supervisors

**Members:**

**At-Large or District:** 11 are specific industry sector representatives, 6 at-large, 5 are representatives of Economic Development Commission; Loudoun Soil and Water Conservation District; Loudoun County Farm Bureau; Visit Loudoun; and Agricultural District Advisory Committee.

A.   Membership Categories
   Membership shall consist of up to a maximum of twenty two (22) persons appointed by the Board of Supervisors from three (3) groups of members as follows:

1. Group A Members (5): Board/Commission Representatives (Concurrent with terms being served, if the representative resigns from the board on which he/she serves, a replacement should be named.)
   The following shall be appointed as members of the Council:
   a.   Representative, Economic Development Commission;
   b.   Representative, Loudoun Soil and Water Conservation District;
   c.   Representative, Loudoun County Farm Bureau;
   d.   Representative, Visit Loudoun;
   e.   Agricultural District Advisory Committee;

2. Group B Members (11): Industry
   Council Members shall be appointed through the nominating process described below to represent, to the extent practicable, specific industries as follows:
   a.   Production agriculture;
   b.   Banking and finance, Real Estate/Conservation;
   c.   Rural-based business;
   d.   Professional services;
   e.   Agribusiness;
   f.   Wine industry;
   g.   Horticultural industry;
   h.   Equine industry;
   i.   Environmental Resources
   j.   Outdoor Recreation;
   j.   Education;
   k.   Direct Marketing;
   l.   Rural Bed and Breakfast/Lodging Establishment;
   m.   Historic Tourism Property.

3. Group C Members (6):  At large
   Group C Members shall be appointed through the nominating process described in Article III, section C of the bylaws, on an at-large basis, based on their knowledge of or contribution to the Loudoun County economy.

4. Group D Members:  Non-Voting Advisory Members
   1. <u>Standing Advisory Members</u> (5);  Council
      *The following shall serve on the Council, without term limitations or voting rights, as Standing Advisory Members:*

      a. Loudoun County Administrator;
      b. Director, Loudoun County Cooperative Extension;
      c. Rural Planner, Loudoun County Department of Building and Development;
      d. Executive Director, Small Business Development Center;
      e. Director, Department of Economic Development,
      f. President, Loudoun County Chamber of Commerce.

   2. <u>Members Emeritus</u>
      Members of the Council who served the Council as an officer and who have completed their Council membership may be designated by the Council as Members Emeritus and, is so designated, may serve on the Council.  The term of Members Emeritus shall be set by the Council at the time of appointment and shall not exceed one (1) year.  Members Emeritus are eligible for reappointment as the Council may determine.

   3. <u>DED/Extension Staff Participation</u>
      Staff of the Loudoun County Department of Economic Development and staff of the Loudoun County Cooperative Extension are not members of the Council but their participation is required to provide technical assistance and professional expertise.  Staff serving on the Council shall not be voting members.  Staff must be familiar with the Virginia Freedom of Information Act (FOIA) and make sure the Council is in compliance with provisions of FOIA.  Lastly, it is up to the staff contact(s) to ensure compliance with any related BOS policy.

B. Membership Terms
   Group A members shall serve terms concurrent with the positions they hold. Group B and C members shall serve two-year terms commencing January 1st.  Vacancies shall be filled in accordance with procedures outlined in this Article in the same manner as the original appointments. Members may serve consecutive terms. In the event any Group B or C Member unreasonably fails to attend any three (3) or more consecutive meetings, the REDC may declare the seat vacant and seek a replacement.

C. Standing Advisory Members
   The Loudoun County Administrator, the Director, Department of Economic Development, and the Director, Cooperative Extension shall serve on the Council, without term limitations.

D. Nominating Process
   A nominating committee shall be appointed by the Chairman not later than September 1st of each year and shall be charged with the responsibility of producing a slate of nominees for Group B and Group C Member positions which will become vacant at the end of the year or for any position(s) which may become vacant at any time. The Nominating Committee shall solicit applications in accordance with all applicable Loudoun County policies with the

support of Department(s) staff, shall conduct application interviews as may be appropriate, and shall propose slate, the Council shall review the proposed slate, may amend the proposed slate, and shall produce a final slate of nominees not later than the Council's November meeting. Immediately upon approving its final slate of nominees, the Council shall deliver this slate to the Board of Supervisors for appointment.

**Board of Supervisors Representative:** None

**Meeting Date, Place and Time:** First Monday of each month from 5:00pm-7:00pm at various locations in the County.

**Staff Contact:** Kellie Boles, Department of Economic Development at (703)737-8820

**Stipend or Expense Payment:** None

**Mandating Agency:** Board of Supervisors

**General Purpose:**

The purposes of the Council are as follows:

1. Recommend to the Loudoun County Board of Supervisors (hereafter referred to as the "Board") a Rural Economic Development Strategy to carry out the recommendations contained in the Revised General Plan; coordinate the implementation of that plan between and amongst the Department of Economic Development, the Loudoun Chamber of Commerce, Visit Loudoun, the Small Business Development Center, Loudoun's towns, and other agencies that support economic development in Loudoun; and it will recommend strategic changes/updates to the Board no less than yearly;

2. Furnish information and provide recommendations to the Loudoun County Board of Supervisors (BOS) relative to programs and policies affecting the economic growth and development of Rural Loudoun County;

3. Review significant projects, policies, and programs that effect rural economic development as determined by the BOS;

4. Provide a forum through which agricultural industry and rural business sector leaders meet to exchange ideas and experiences relative to rural economic development practices and policies;

5. Provide support and advice to the Department of Economic Development relative to rural economic development, marketing, and promotion activities among the several public and private groups engaged in such activities throughout the county; and,

6. Monitor and evaluate year-over-year change in the Rural Economy as prepared by the Department of Economic Development.

**TOWING ADVISORY BOARD** (Trespass, or Non-Consensual Towing)

**Appointing Authority(ies):** Board of Supervisors

**No. of Members:** 3

Comprised of three (3) members as set by the Board of Supervisors in order to meet Virginia State requirements. Members must include one law enforcement representative, one member of the towing industry and one citizen representative

**Term:** Concurrent with the term of the Board of Supervisors

**Staff Contact:**     John Sandy, County Administration (703) 771-5962

**Stipend or Expense Payment:**     None

**General Purpose:**
The Towing Advisory Board, or Trespass Towing Advisory Board was created by the Loudoun County Board of Supervisors to develop a proposed ordinance for the Board of Supervisors in order to set regulations and standards for non-consensual, or trespass tows within the geographic boundaries of Loudoun County. It does not include proposing such an ordinance or regulations for Loudoun County's incorporated towns or the Washington Dulles International Airport, or other governmental jurisdiction.

**POLICE DIRECTED TOWING ADVISORY BOARD (Law Enforcement Directed Towing)**

**Appointing Authority(ies):** Board of Supervisors

**No. of Members:** 5 (minimum of 3)

The Board of Supervisors appointed five (5) members: one citizen representative, two towing representatives, and two law enforcement representatives. Appointees must include towing representatives and law enforcement representatives in equal representation with citizen representation.

**Term:** Concurrent with the term of the Board of Supervisors

**Staff Contact:**     John Sandy, County Administration (703) 771-5962

**Stipend or Expense Payment:**     None

**General Purpose:**
The Police Directed Towing Advisory Board, or Law Enforcement Towing Advisory Board was created by the Board of Supervisors to provide recommendations to the Board with regard to Loudoun County Sheriff's Office's directed towing activities. This advisory work excludes police, or law enforcement directed towing by town police departments, the State Police, MWAA, or any other non-Loudoun governmental law enforcement agency within Loudoun County.

## TRANSPORTATION IMPROVEMENT & SAFETY COMMISSION

**Appointing Authority(ies):** Board of Supervisors

**Number of Members:** 9 (citizen appointees serve at-large. Members of the Board of Supervisors are provided the courtesy of appointing one representative from each district)

**At-Large or District:** Membership also includes representatives from: Fire and Rescue Services, VDOT, Town of Leesburg Police Department, Town of Leesburg, Middleburg Police Department, Purcellville Police Department, Virginia State Police, Loudoun County Public Schools (Department of Transportation) Loudoun County Sheriff's Department, Bull Run ASAP, DMV. One member of the Board of Supervisors may be designated by the Board as an ex officio member of the Commission.

**Term:** Concurrent with the term of the Board of Supervisors

**Meeting Date, Place and Time:** Fourth Wednesday of each month at 7:30 p.m. in the Leesburg Police Department's Community Room at 65 Plaza Street, NE, Leesburg, VA at 7:30 p.m.

**Board Member Representative:** None

**Staff Contact:** Eloisa Thring, Office of Transportation Services (571) 258-3526

**Stipend or Expense Payment:** None, but have on previous occasions been reimbursed for minor expenses.

**Mandating Agency:** Federal Highway Safety Act of 1966; Title 33.1, Chapter 10, Sections 33.1-390 through 33.1396 of the Code of Virginia. (These mandates have been lifted due to discrimination findings for jurisdictions who have no commissions and therefore were denied access to federal and state grant funds whose applications required the approval of a local transportation safety commission. Because of the success of the Loudoun commission, it has continued to address transportation safety concerns.)

**General Purpose:** The purpose of the Loudoun County Transportation Safety Commission shall be to coordinate and promote traffic safety programs, projects and initiatives within the county and to provide a professional network through which jurisdictions within the county can receive guidance and/or support for their individual traffic safety efforts.

Objectives:
- To identify traffic safety priorities for the county and coordinate activities that will address these priorities.
- To assist and train community traffic safety groups and to develop and implement programs that will target their needs.
- To educate and inform citizens within the county about transportation safety issues and about safety programs.
- To support and advocate for programs, policies and legislation that will enhance comprehensive transportation safety effort and will provide for the safety of local residents on our highways
- To provide a network through which community groups can be represented and linked to sate and federal level sources to identity and promote methods that will facilitate the coordination of traffic safety efforts among the existing traffic safety programs.
- To promote the use of federal and state resources and grant funds and to assist in the application process.

## WATER RESOURCES TECHNICAL ADVISORY COMMITTEE

**Appointing Authority(ies):**   Board of Supervisors

**Number of Members:**   Up to 11 voting members comprised of Loudoun County citizens with particular expertise and interest in surface water, groundwater, and/or watershed management. Non-voting representation from the Loudoun Soil and Water Conservation District, Loudoun Water, and the Loudoun County Health Department Division of Environmental Health.  (In October 2004, the Board of Supervisors voted to expand the original number of members from 9 to up to 11.)

**At-Large or District:**   At-large

**Term:**   Concurrent with the term of the Board of Supervisors

**Board of Supervisors Representative:** None

**Meeting Date, Place and Time:**  The date, time and location of the committee's meetings are posted on the Loudoun County Government Calendar at least three days prior to a meeting. Documents relating to the committee are online at http://www.loudoun.gov/wrtac

**Contact:**  Glen Rubis, Building and Development, 703-777-0222

**Stipend or Expense Payment:**  None

**General Purpose:**  In January 2001, the Board of Supervisors supported the Land Use Committee's recommendation to create a Water Resource Technical Advisory Committee (WRTAC) comprised of nine Loudoun County citizens with particular expertise and interest in surface water, groundwater, and watershed management.  To ensure that the WRTAC can meet both current and potential County water resource related programs, the Land Use Committee has proposed the following scope of work as a delineation of the role and responsibilities of the WRTAC:

1.  Provide a quality control function for the County's groundwater quality and quantity, surface water quality and quantity, habitat, watershed management, flood control management, and stormwater management programs from both the local and regional prospective.

2.  Review and provide recommendations for work plan parameters, collected data, staff recommendations and program enhancements for the County's water resource programs.

3.  Provide the Board of Supervisors a quarterly report of the WRTAC's findings and recommendations related to the County's water resource programs.

4.  Provide the Board of Supervisors input/recommendation for policy direction related to programs and associated issues (i.e. land use planning).

5.  Provide technical assistance to staff.

## ZONING ORDINANCE ACTION GROUP

**Appointing Authority(ies):**   Board of Supervisors

**Number of Members:**  7-15

**At-Large or District:**   At-large

**Term:**   Staggered four year terms

**Board of Supervisors Representative:** None

**Meeting Date, Place and Time:**  First Wednesday of each month from 8:30-10:30 AM in the Round Hill Room, Loudoun County Government Center.

**Contact:**  Brian Wegener, Department of Planning and Zoning, at (703) 771-5146

**Stipend or Expense Payment:** none

**Purpose:** The ZOAG is created for the purpose of supporting the Board of Supervisors, the Planning Commission, and County Staff in identifying, reviewing, recommending, and preparing amendments to the *Revised 1993 Loudoun County Zoning Ordinance* ("Zoning Ordinance") in order to: 1) correct errors and inconsistencies; 2) clarify regulations; 3) make the Zoning Ordinance more user friendly; 4) keep the Zoning Ordinance current to reflect changes in market conditions and the emergence of new uses; and 5) notify the Board of Supervisors when proposed Zoning Ordinance amendments are inconsistent with the Comprehensive Plan and may require a Comprehensive Plan amendment. The Board of Supervisors may direct that certain proposed amendments to the Zoning Ordinance be referred to the ZOAG for review prior to requesting County Staff to initiate the referral process and the scheduling of a public hearing for consideration of such amendments to the Zoning Ordinance.

> ZOAG membership may include representatives from organizations such as, but not limited to, NAIOP, Chamber of Commerce, Loudoun Economic Development Commission, Rural Economic Development Commission, Northern Virginia Building Industry Association, Piedmont Environmental Council, Dulles Area Association of Realtors, the Coalition of Loudoun Towns, and others.



*Loudoun County*
WHERE TRADITION MEETS INNOVATION

# Chapter 7

# Issue Papers

No. 17-2002, viewed 12/18/2018



*Loudoun County*
*Board of Supervisors*
*2016-2020*

# 2016 Issues Papers for New Board of Supervisors

1. **Economic Development**

   1a.  Loudoun 2020: A Strategic Plan for Business Prosperity

2. **Family Services**

   2a.  Affordable Housing Issues – Implementation of the Affordable Housing Stakeholders Group Recommendations

3. **Finance & Procurement**

   3a.  Miscellaneous Internal Audits
   3b.  Tall Oaks Special Assessment District
   3c.  Enterprise Resource Planning (ERP) Project Phase 2 Implementation

4. **Fire, Rescue and Emergency Management**

   4a.  Loudoun County Addressing Issues
   4b.  Leesburg South Fire Rescue Station Location
   4c.  Local Fire Prevention Regulations
   4d.  Special Events Ordinance

5. **General Services**

   5a.  Community Water and Wastewater Program and the Howardsville Community Wastewater Project
   5b.  Compressed Natural Gas Fleet Conversion Study
   5c.  Asphalt Management – Parking Lots at County Facilities

6. **Health Department**

   6a.  Chapter 1066 Ordinance Revision
   6b.  Hidden Lane Landfill Superfund Site
   6c.  Local Administration of Health Department
   6d.  Communicable Disease Control and Bioterrorism Preparedness

7. **Human Resources**

   7a.  Review of the County's Classification System and Pay Plan
   7b.  Pay for Performance

8. **Information Technology**

   8a.  Loudoun County Broadband Issues

9. **Legislative**

9a.  2016 Virginia General Assembly State Legislative Program Update/Revision
9b.  Federal Legislative Report –The Ferguson Group, LLC

## 10. Non-Profit Funding

10a.  Loudoun Museum

## 11. Parks, Recreation & Community Services

11a.  Parks, Recreation and Community Services Citizen Accessibility to Programs, Activities, Special Events, etc.

## 12. Planning and Zoning

12a.  Planning Commission – Responsibilities and Recommended Qualifications
12b.  Proposal for a New Comprehensive Plan
12c.  Silver Line Comprehensive Plan Amendment Update
12d.  Communications Commission Telecommunications Facilities Planning and Zoning Initiatives - Expansion of Broadband Services in Loudoun County
12e.  Application of Virginia Electric and Power Company for approval and certification of electric transmission facilities consisting of the Poland Road 230 kV Double Circuit Transmission Line Loop and 230-34.5 kV Poland Road Substation, SCC Case No. PUE-2015-00053Limited
12f.  Future Zoning Ordinance Amendments
12g.  Process for Zoning Ordinance Amendments – Evaluation of Current Process

## 13. Public Safety

13a.  Peumansend Creek Regional Jail Authority Future Membership

## 14. Strategic Plan Items

14a.  Remaining Items from the 2012-2015 Strategic Plan
14b.  Limited Agricultural Breweries

## 15. Transportation and Capital Infrastructure

15a.  Comprehensive Update to the Transit Development Plan
15b.  Route 15 Congestion
15c.  Courts Expansion Project
15d.  Dulles Rail Silver Line Extension
15e.  Dulles Rail Parking Garages
15f.  Bus Procurement
15g.  Taxicab Ordinance Development

## 2016 BOARD OF SUPERVISORS BRIEFING

# # 1a

**SUBJECT:**  **Loudoun 2020:  A Strategic Plan for Business Prosperity**

**STAFF CONTACTS:**  Buddy Rizer, Director, Department of Economic Development
Miguel Salinas, Department of Economic Development

---

**BACKGROUND:** In FY 2015, there was more than $1.3 billion in commercial real estate investment in Loudoun County representing a 459 percent increase over FY 2014. The investment was made by 57 companies that were recruited to Loudoun by DED or retained in Loudoun through DED efforts.This is is a 46 percent increase over the number of companies assisted the year before. These companies added or retained more than 3,400 jobs and 3.7 million square feet of commercial real estate in Loudoun from July 1, 2014 to June 30, 2015.

Even with this success, DED is facing several challenges related to the local market and its impact on future business recruitment and retention. Despite Loudoun's solid record of business growth, the office market remains an area of concern both in the County and regionally. This slow growth in this segment is driven in part by the region's reliance on federal spending. Statewide, Virginia's economy is very dependent on the public sector. Since 2010, federal procurement contracts in the State of Virginia have declined by 11.4 percent[1]. Based on an economic model by Chmura Economics & Analytics and the George Mason University Center for Regional Analysis that evaluates the impact that the Department of Defense (DoD) has on Virginia's economy, it's estimated that by 2018 DoD procurement spending will decrease in Northern Virginia by 35.7 percent. Further federal cutbacks through sequestration could continue to impact Virginia, and consequently Loudoun. In addition, Loudoun's robust data center market may be reaching its peak within the next five years. In addition to real estate taxes, the data center market currently brings approximately $70 million annually in personal property taxes without significantly adding to transportation congestion or County capital facility needs. The peaking of this cluster in Loudoun County means that DED will need to focus on larger growth in other clusters to offset the slowdown in this market with larger growth in its other clusters.

There are also shifts occurring in the real estate decisions and land use patterns of office users. As noted during a May 2014 Urban Land Institute (ULI) presentation, the ratio for office square feet per employee is trending downward. In addition, following the recent recession companies have reduced the amount of square feet allocated per worker by using a combination of technology, shared office space, teleworking arrangements, and open floor plans. Staff analyzed and researched commercial real estate trends related to square feet per employee, talked with brokers and developers, and looked at the square feet per employee factors used in studies.  Staff also spot checked the data with recent projects and new leases in Loudoun County. Based on staff's analysis, the average office square feet per employee has declined from approximately 340 rentable square feet in the early 2000s to approximately 225 rentable square feet or lower, currently.

---

[1] www.USAspending.gov, January 2015

Firms are also choosing to locate in new, more efficient buildings, close to amenities and transit options. According to recent analysis by the real estate firm of Cassidy Turley, "tenants are relocating from commodity Class B buildings away from mass transit to renovated, high-quality buildings adjacent to Metrorail….product offering these qualities while also accommodating highly efficient layouts desired by public and private sector tenants alike are likely to continue to win market share[2]." A 2013 Washington Post article cited data from Jones Lang LaSalle, CoStar Group and Delta Associates that 84 percent of the 5.5 million square feet of office space under construction at that time was located within ¼ mile of a Metrorail station[3]. Staff expects that trend to continue. The preference of office employees to live and work within transit-oriented districts offering vibrant, amenity-rich streets runs contrary to the policies of the County's comprehensive plan to locate millions of square feet of office within planned Keynote Employment areas; which equate to corporate campuses that are typically single-use, surfaced parked, heavily landscaped campuses with few if any amenities.

**Loudoun 2020: A Strategic Plan for Business Prosperity**

Loudoun County's DED has a tremendous opportunity prior to the opening of Phase 2 Metrorail Silver Line to address the aforementioned market challenges in innovative ways. DED's Loudoun 2020 will be a strategic plan that identifies specific objectives and strategies to accomplish DED's main goals: 1) Diversify Loudoun's economy by attracting and developing businesses within multiple industry clusters, 2) Promote Loudoun as a world-class location and destination for business enterprises and tourism, and 3) Maintain, support and increase Loudoun's prosperous business environment through business assistance, business retention and expansion and small business and entrepreneurship programs.

It will be imperative to move towards a clear and focused vision for DED that can be clearly articulated to prospective businesses and workers. DED has initially identified three components of the strategic plan:

- To be more resilient against the unpredictable fluctuations in federal spending and to respond to the eventual peak demand for data centers in the County, Loudoun 2020 will focus on strategies to grow and diversify the tax base by increasing the amount of commercial development in DEDs other business clusters; aerospace; aviation/transportation; federal government contracting; information and communications technology, personalized medicine/health information and analytics; and agriculture and related businesses.[4]

---

[2] Northern Virginia Office Snapshot, Third Quarter 2014. Cassidyturly.com
[3] *Washington Post*, Jonathan O'Connell, October 13, 2013
[4] DED will add a Retail, Entertainment and Culture cluster once a cluster study is completed in mid to late December 2015. The study will recommend strategies to attract retail businesses, support small and locally owned retail businesses in Loudoun County, and identify ways to leverage the county's mixed-use centers to attract additional businesses.

USCA4 Appeal: 17-2002      Doc: 88-1        Filed: 01/07/2019      Pg: 247 of 547

- With Dulles International Airport calling Loudoun home, the County is the world's gateway to the Washington D.C. technology corridor. With the opening of the Metrorail Silver Line stations in the County and millions of square feet of office and retail planned within the mixed-use and transit-oriented developments, there is a tremendous opportunity to build on the strengths of these walkable, amenity-rich communities; the kind of communities that today attract regional, national and global businesses to the region. Loudoun 2020 will also promote a vision to further Loudoun's efforts to become a hub for international investment by conducting a marketing and branding campaign to support the Board endorsed International Business Development Strategy.

- Loudoun 2020 will identify and recommend additional financial and regulatory incentives that may be considered by the Board of Supervisors as a tool for business attraction, retention and start-ups. Current options preliminarily identified include establishment of a business license incentive program for businesses that locate in the County for the first time; creation of a local technology zone; and establishment of a development taxation program for the technology zone. The Board may want to consider whether these options would be beneficial to the County and whether additional research and consideration by staff and legal counsel is warranted. Loudoun 2020 will further "vet" these options and research additional federal and state programs and local "best practices" that may be considered and applied to Loudoun County.

Implementation of the Loudoun 2020 strategic plan will provide greater assurances that Loudoun's commercial tax base will continue to grow; positively impacting Loudoun's overall fiscal health.

The objectives and strategies that come from the plan will help to inform the County's economic development policies during the expected wholesale review of its comprehensive plan and any subsequent small area or sector planning.

**Partnerships and Outreach**

In 2013, The Board of Supervisors changed the name of the Loudoun Industrial Development Authority to the  Economic Development Authority (EDA) with the goal of making the organization an integral part of Loudoun County's economic development efforts.  The EDA has issued more than $1 billion in tax-exempt revenue bonds in accordance with the Code of Virginia and has been involved in distribution of the Board Approved Incentive Program. The EDA has agreed to be a partner in the scoping and development of the Loudoun 2020 strategic planning efforts.  DED would also look to involve other internal and external stakeholders as part of the process in order to get a wide variety of perspectives in the program development.

**ISSUES**:  As we approach 2020 and beyond, Loudoun County's economy will continue to evolve.  The County will need to become less reliant on residential taxes and grow the commercial tax base in the rail tax district. The commercial tax base must also continue to diversify in order to be more resilient against fluctuations in federal spending or too dependent on the data center cluster. In order for the County to make data-driven strategic decisions, and

determine the action steps necessary for implementation, DED believes additional information and resources will be needed.

**PURPOSE:**  To inform the Board of Supervisors of the upcoming strategic planning exercise that will be scoped and developed by the Department of Economic Development (DED).

**ANTICIPATED ACTION DATE:**  DED and other stakeholders will scope and develop the process for the Loudoun 2020 strategic planning exercise during the first quarter of Calendar Year (CY) 2016 and conduct the exercise during the second and third quarters of CY 2016.  It is anticipated that an information item will be brought to the Board in the 4th quarter of CY 2016.

**ADDITIONAL INFORMATION:**

Please contact Buddy Rizer or Miguel Salinas in the Department of Economic Development for additional information.

No. 17-2002, viewed 12/18/2018

**2016 BOARD OF SUPERVISORS BRIEFING**

# # 2a

| | |
|---|---|
| **SUBJECT:** | **Affordable Housing Issues – Implementation of the Affordable Housing Stakeholders Group Recommendations** |
| **STAFF CONTACTS:** | Ellen Grunewald, Director, Family Services |
| | Sarah Coyle Etro, Assistant Director, Family Services |

**BACKGROUND:**　　On September 4, 2013 the Board of Supervisors (Board) created an Affordable Housing Stakeholders Group (HSG) to review the County's existing housing programs to determine their sustainability, viability, and efficiency in addressing the unmet housing needs of Loudoun's citizens and the workforce. The HSG devoted over 50 hours to the effort from October 2013 through April 2014  in 16 meetings that included a tour of Affordable Dwelling Units (ADUs), a public input session with 22 speakers (numerous written comments received), presentations by regional housing experts and County staff on the many policies and programs in place to achieve affordable housing. Based on the data, information and public input, the HSG developed a list of issues which were developed into goals and a list of recommended actions.

The Board of Supervisors met on January 21, 2015 in the Committee-of-the-Whole to discuss the goals and recommendations, embracing all of the HSG recommendations as a guide to addressing affordable housing in the County. The Board directed staff to work with the Board-appointed Housing Advisory Board to develop a scope of services for a consultant to develop a housing needs assessment and directed staff to develop a work plan for a detailed build-out analysis of Loudoun's land use plan. The results of these studies will come before the Board in the first year of its term.

HSG Goal 1 states "the County's long range housing strategy provides for a spectrum of housing opportunities to support economic health and quality of life" with the objectives of establishing clear and quantifiable housing goals; providing and maintaining affordable housing to accommodate needs within the County and the region; and establishing the optimum organizational structure to ensure successful implementation. In order to achieve Goal 1 and its associated objectives, the housing needs assessment will provide a framework for the County to understand housing needs given current and projected demographic and employment data, and will help identify any housing gaps. By understanding existing conditions, trends, projections, and gaps, the County will be better equipped to establish housing goals and priorities, identify an implementation plan, and required resources.

The County's consultant, AECOM Consult, completed a study of the County's housing needs in August, 2006 entitled "Basic Housing and Employment Data and Projections." This study addressed several questions important to the County at the time, including: What is the market demand for housing in Loudoun County? What is the right mix of housing units in Loudoun County? What should the annual supply of affordable housing in Loudoun County be? What jobs are coming to Loudoun County and what will they pay? The study provided valuable information

USCA4 Appeal: 17-2002     Doc: 88-1     Filed: 01/07/2019     Pg: 250 of 547

#2a:  Affordable Housing Issues – Implementation of the Affordable HSG Recommendations
Board of Supervisors Orientation
November 14, 2015
Page 2

which formed the basis for revisions to the County's housing polices with the adoption of CPAM-2007-0001, Countywide Housing Policies in September 2007. The main adjustment to the County's strategy was the identification of the broad range of unmet housing needs for households with incomes from 0 percent to 100 percent of the Area Median Income (AMI).

Given that the AECOM study is almost 10 years old and that there have been dramatic changes in the region's housing market and the County's development in that time period, the HSG recommended an update to the study to include an analysis of current and future population, household characteristics and housing and employment needs, identification of the number of housing units and their cost to the current and future workforce, identification of the needs and gaps in the provision of affordable housing as well as a build-out analysis, all of which could serve as the basis for developing a comprehensive strategy for housing development.

**ANTICIPATED ACTION DATE:**  On October 7, 2015, the Board authorized funding for completion of the Housing Needs Assessment and directed staff to finalize the scope of services and cost estimate for a public sector and private sector employee survey for housing needs.  A work plan for determining a build out analysis was also approved on October 7, 2015.   It is estimated that the results of the Housing Needs Assessment will be brought back to the Board for review and consideration by June 30, 2016.

**ADDITIONAL INFORMATION:**

The Copy Teste of the HSG recommendations can found at the following link:
http://lfportal.loudoun.gov/LFPortalinternet/0/doc/154539/Electronic.aspx

The HSG report that includes recommendations can be found at the following link:
http://lfportal.loudoun.gov/LFPortalinternet/0/doc/154426/Electronic.aspx

Meeting materials including membership, agendas, hand-outs, and other information about the work of the HSG can be found at the following
link: http://www.loudoun.gov/index.aspx?nid=3091

The County's guiding housing principles included in the Revised General Plan as amended by CPAM-2007-0001 include:

- The County "seeks to promote housing options for all people who live and/or work in Loudoun.
- County policies and programs will focus on the unmet housing needs of households earning up to 100 percent of the Washington Metropolitan Area Median Income (AMI) that being the area of greatest need.
- The County will regularly examine and estimate unmet housing needs, and housing programs will be evaluated for their effectiveness in addressing those needs."

The County's housing policies can be found at the following link:
http://www.loudoun.gov/DocumentCenter/View/1017

#2a:  Affordable Housing Issues – Implementation of the Affordable HSG Recommendations
Board of Supervisors Orientation
November 14, 2015
Page 3

AMI is the median household income for a metropolitan area and it varies by household size. In 2015, the Washington Metropolitan Area AMI is $109,200 for a family of four.

**Estimated Loudoun County Households by AMI in 2015**

| AMI | Income Range | Households in 2015 |
|---|---|---|
| <=30% | $0 to $32,750 | 10,279 |
| >30% or <=50% | $32,750 to $54,600 | 11,757 |
| >50% or <=70% | $54,600 to $76,440 | 11,277 |
| >70% or <=80% | $76,440 to $87,360 | 5,497 |
| >80% or <=100% | $87360 to $109,200 | 12,640 |
| >100% | More than $109,200 | 69,607 |
| Total | | 121,057 |

Sources: Office of Housing and Urban Development, 2015 Area Median Family Income (uncapped); U.S. Census Bureau, *2014 American Community Survey, Table B19001*; Loudoun County Government Department of Planning and Zoning, *Estimates Series*, April 22, 2015.

For jobs located in Loudoun, the average wage by industry is shown in the following table.  The AMI range listed is indicative of the housing need that may exist by industry for people who want to live in Loudoun and assumes one worker per family.

**Jobs in Loudoun County by Top 7 Employing Industries, 1st Quarter 2015**

| Industry | Rank by Number of Employees | Average Weekly Wage | Average Annual Wage (weekly wage x 52) | AMI Range (Family of 4) |
|---|---|---|---|---|
| **Accommodation & Food Services** | 5 | $434 | $22,568 | <30% |
| **Construction** | 4 | $1087 | $56,524 | 50% to 70% |
| **Government** | 1 | $1171 | $60,892 | 50% to 70% |
| **Health Care & Social Assistance** | 6 | $921 | $47,892 | 30% to 50% |
| **Professional, Scientific, & Technical Services** | 2 | $2177 | $113,204 | >100% |
| **Retail Trade** | 3 | $537 | $27,924 | <30% |
| **Transportation & Warehousing** | 7 | $867 | $45,084 | 30% to 50% |

Source: Virginia Employment Commission, Labor Market Information, *Loudoun County Community Profile, 10/3/2015*.  http://virginialmi.com/report_center/community_profiles/5104000107.pdf

The AECOM study can be found at the following link:
http://www.loudoun.gov/documentcenter/view/1564

Please feel free to contact staff for additional information.

**2016 BOARD OF SUPERVISORS BRIEFING**

# 3a

| | |
|---|---|
| **SUBJECT:** | **Miscellaneous Internal Audits** |
| **STAFF CONTACTS:** | John Sandy, Assistant County Administrator |
| | Penny Newquist, Department of Finance and Procurement |
| | Janet Romanchyk, Department of Finance and Procurement |

**BACKGROUND:** The County conducts audit functions at the direction of the Board of Supervisors (Board). This audit function is composed of three parts:

1. *Annual financial audit*—an audit of the financial statements of Loudoun County Government and Loudoun County Public Schools, conducted by an outside vendor (currently Cherry Bekaert, LLC).
2. *Internal cash auditor*—a position within the Treasurer's Office that is responsible for cash audits for all departments handling cash transactions.
3. *Miscellaneous audits*—financial, compliance and performance audits completed at the direction of the Board.

The role of an internal audit is to provide independent assurance that the County's risk management, governance and internal control processes are operating effectively, and review compliance with laws and regulations. Recommendations are based on the analyses and assessment of documents and business practices.

As directed by the Board September 2012, staff issued a Request for Proposal (RFP) for an "as needed" miscellaneous financial, compliance and performance audit contract. CliftonLarsonAllen LLP (CLA) was selected and awarded the contract in April 2013, in the amount of $101,210 to conduct three internal audits during its first contract year covering Performance Bonds, Municipal Bonds, and a Payment Card Industry Data Security Standard (PCI DSS) Compliance Audit for Processing Credit Card Transactions. Additional audits performed during a CLA's second year contract year included a review of the County's Public Facilities Fund, the Comprehensive Services Act for At-Risk Youth and Families Program Performance Audit, and an Entity-wide Risk Assessment Audit to assist in the development of future audit plans. An audit of the Housing Choice Voucher and Affordable Dwelling Unit is underway.

The Department of Family Services' Housing and Community Development Division administers the Housing Choice Voucher (HCV) Program (Rental Assistance Program), funded by the U.S. Department of Housing and Urban Development (HUD), to provide rent subsidies for low-income families; and the Affordable Dwelling Unit (ADU) Program, which facilitates the sale and rental of new housing to moderate income households. This internal audit includes a review and evaluation of these programs' processes and procedures.

**PURPOSE:** The Finance/Government Operations Committee serves as the Audit Committee for the County. As such, all audits are presented to the Committee and results are discussed. Recommendations are reviewed with the Committee to determine if future action is necessary. One internal audit is currently in process and expected to be before the Finance Committee; the HCV and ADU Program Audit.

**ANTICIPATED ACTION DATE:** January 2016

**ADDITIONAL INFORMATION:** Please feel free to contact staff for additional information.

No. 17-2002, viewed 12/18/2018

## 2016 BOARD OF SUPERVISORS BRIEFING

**SUBJECT:**          **Tall Oaks Special Assessment District**                          # 3b

**STAFF CONTACTS:**   Janet Romanchyk, Finance and Procurement
                      Ernest N. Brown, General Services

---

**BACKGROUND:**  "Tall Oaks" is a ten-lot commercial subdivision zoned Planned Development – Industrial Park (PD-IP).  The subdivision is located between Maries and Woodlands Road with frontage on Cascades Parkway in Sterling and consists of multiple owners of one (1) and two (2) acre parcels in the Sterling election district.  Many of the septic systems in this subdivision have failed resulting in abandoned properties and potential public health hazards.

In 2004, in order to facilitate the extension of public water and sewer to the Tall Oaks subdivision, the Board of Supervisors (Board) requested that Loudoun Water provide funding for the project with repayment by the property owners through a Special Assessment District. Under Virginia code section 15.2-2402 et seq, the County may create a Special Assessment District through 1) agreement with all landowners, 2) upon petition of 60 percent of the landowners, or 3) by a two-thirds vote of the Board.  Nine of the ten property owners petitioned the Board to establish a District.  In 2005, the Board created a Special Assessment District to fund water and sewer improvements.  One property in the subdivision filed a Bill of Complaint for Declaratory Judgement and Injunctive Relief in the Circuit Court.  The case was not litigated and the special assessment was not implemented at that time.  In 2010, eight of the ten property owners requested County assistance with funding the water and sewer improvements, however no formal Board action was taken at that time.

The Tall Oaks community is again requesting County assistance with funding water and sewer improvements.  Eight of the ten property owners are expected to support a special assessment to pay for these improvements.  A meeting with property owners was held on September 22, 2015 with the Department of General Services, Loudoun Water, and the Department of Finance and Procurement to provide updated information on costs and an estimate of each property owner's potential annual assessment cost. In response to the legal action initiated in 2005, the County is now pursing the option of creating a Special Assessment District that includes only those property owners that support the extension of water and sewer improvements through assessments.

**PURPOSE**:  Parcels within the Tall Oaks subdivision are currently served by substandard onsite sewage systems and water wells. Establishing a Special Assessment District will facilitate the extension of central water and sewer which will resolve the public health risks associated with the existing inadequate water and wastewater facilities. Additional benefits include:

- Development consistent with the Revised General Plan can be achieved;
- Parcels may be assessed at higher valuations upon having access to public utilities; and

- Increased potential for in-fill development and an increase in the commercial tax base with development and redevelopment of business properties.

**ANTICIPATED ACTION DATE:**  Staff anticipates that the Public Hearing on the Special Assessment District will take place in February 2016, which will be followed by the Board's decision on establishing the Special Assessment District.

**ADDITIONAL INFORMATION:**  Please feel free to contact staff for additional information.

**ATTACHMENT:**  Summary of Estimated Payback Options (9/18/15)

No. 17-2002, viewed 12/18/2018

# SUMMARY - ESTIMATED PAYBACK OPTIONS FOR $943,610 IN IMPROVEMENTS *(Prepared 9/8/15)*

| PIN | 10 PROPERTY OWNERS | Sewer Share | Water Share | Payments (P&I) 10 Years | 10 years Semi Annual Payment | 10 years Annual Payment | Payments (P&I) 20 Years | 20 years Semi Annual Payment | 20 years Annual Payment |
|---|---|---|---|---|---|---|---|---|---|
| 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 | Stones of Herndon, Inc. | 7.58% | 8.58% | 75,431.97 | 3,771.60 | 7,543.20 | 76,826.02 | 1,920.65 | 3,841.30 |
| 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 | EAB Enterprises, LLC | 7.83% | 8.87% | 77,946.37 | 3,897.32 | 7,794.64 | 79,386.89 | 1,984.67 | 3,969.34 |
| 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 | Terminal Tires, Inc. | 7.07% | 8.01% | 70,403.18 | 3,520.16 | 7,040.32 | 71,704.28 | 1,792.61 | 3,585.21 |
| 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 | H & Z Holdings LLC | 8.08% | 9.15% | 80,460.77 | 4,023.04 | 8,046.08 | 81,947.75 | 2,048.69 | 4,097.39 |
| 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 | H & Z Holdings LLC | 8.08% | 9.15% | 80,460.77 | 4,023.04 | 8,046.08 | 81,947.75 | 2,048.69 | 4,097.39 |
| 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 | Burns Robert J & Kimberly R/S | 10.52% | 11.92% | 104,766.63 | 5,238.33 | 10,476.66 | 106,702.80 | 2,667.57 | 5,335.14 |
| 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 | Melvin, Thuy-Anh N | 8.75% | 9.91% | 87,165.84 | 4,358.29 | 8,716.58 | 88,776.73 | 2,219.42 | 4,438.84 |
| 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 | Bristol Sterling Limited Partnership | 11.45% | 12.96% | 113,986.09 | 5,699.30 | 11,398.61 | 116,092.65 | 2,902.32 | 5,804.63 |
| 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 | Cascades Business Center, LLC | 18.94% | 21.45% | 188,579.94 | 9,429.00 | 18,857.99 | 192,065.04 | 4,801.63 | 9,603.25 |
| 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 | Grant Office Park LLC* | 11.70% | 0.00% | 82,845.34 | 4,142.27 | 8,284.53 | 84,376.39 | 2,109.41 | 4,218.82 |
| | Amounts are rounded | 100.00% | 100.00% | $ 962,046.90 | $ 48,102.35 | 96,204.69 | $ 979,826.30 | $ 24,495.66 | $ 48,991.32 |

$694,490  Sewer
$249,120  Water
$943,610  Total Project Water & Sewer

Interest rate set by VA Code to US Treasury 1 Year Constant Maturity

## 10 Year - Level Payment

| | |
|---|---|
| Loan Amount: | $943,610.00 |
| Interest Rate: | 0.37% |
| Number of Years: | 10 |
| Loan Amount | (943,610) |
| Semi-Annual Interest | 0.185% |
| Number of Payments | 20 |
| Semi-Annual Payment | 48,102.35 |
| Annual payment | 96,204.69 |
| Principal | $943,610.00 |
| Interest | $18,436.90 |
| Total P&I | $962,046.90 |

## 20 Year - Level Payment

| | |
|---|---|
| Loan Amount: | 943,610 |
| Interest Rate: | 0.37% |
| Number of Years: | 20 |
| Loan Amount | (943,610) |
| Semi-Annual Interest | 0.185% |
| Number of Payments | 40 |
| Semi-Annual Payment | $24,495.66 |
| Annual payment | 48,991.32 |
| Principal | $943,610 |
| Total Interest | $36,216 |
| Total P&I | $979,826.30 |

## 2016 BOARD OF SUPERVISORS BRIEFING

# # 3c

**SUBJECT:**              **Enterprise Resource Planning (ERP) Project**

**STAFF CONTACTS:**       Robert Middaugh, Assistant County Administrator
                         John Sandy, Assistant County Administrator
                         Wendy Wickens, Dept. of Information Technology
                         Penny Newquist, Dept. of Finance and Procurement

---

**BACKGROUND:** In 2009 the County conducted a review of the legacy financial systems and determined that financial and human resources systems required replacement. On November 2, 2011, the Board of Supervisors (Board) authorized the Purchasing Agent to negotiate and award a contract for an Enterprise Resource Planning (ERP) System for Loudoun County Government and Loudoun County Public Schools (LCPS) to Applications Software Technology Corporation (AST)/Oracle. This contract included implementation of the ERP system in three phases. Implementation of Phase 1 began in January 2012 and went live on July 1, 2013. Phase 3 was completed in May 2014. Phase 2 implementation is currently underway.

The ERP project consists of three (3) Phases and includes the following modules for each phase:

> **Phase 1: Financials, Procurement, Grants and Document Management**
> General Ledger, Accounts Payables, Accounts Receivables, Fixed Assets, Purchasing, Cash Management, Projects/Grants, and Hyperion Budgeting, iProcurement, iExpenses, Inventory & Document Management Integration.

> **Phase 2: Human Capital Management (HCM) Applications**
> HR, Self Service HR, Advanced Benefits, Payroll, Oracle Time and Labor, Self Service Human Resources, iRecruitment, Learning Management, Performance Management, Compensation Workbench & Document Management Integration

> **Phase 3: Advanced Procurement**
> iSupplier, Procurement Contracts, Services Procurement, Sourcing & Document Management Integration

During the December 4, 2013 Board Business Meeting, funding totaling $9.4 million was added to the project budget to complete outstanding items for Phase 1 and to provide additional resources for completion of Phase 2. An additional 7.00 FTEs were added to the Department of Information Technology and the former Department of Management and Financial Services' Finance and Budget Divisions and to provide needed support of the system.

Phase 2 implementation began in January 2014. After several project "Go Live" date delays, AST was issued a notification that they were in material breach of the contract in August 2015. To move the project forward, AST and the County collaboratively defined an approach that will result in a fully functioning system. To further ensure all critical path dates and milestones are

thoroughly met moving forward, Loudoun County requested technical assistance from ORACLE to supplement County and AST staff efforts. The current planned "Go Live" date is March/April 2016.

The Board's Finance/Government Services and Operations Committee (FGSOC) now serves as the project review committee and determines any suitable release of the December 2013 supplemental funding approved by the Board.    The FGSOC has released all funds at this point in time, although the County does not intend to expend all of these funds until the project is complete.

**PURPOSE:** This provides the Board a synopsis of the ERP Project to date including all three (3) phases.

**ANTICIPATED ACTION DATE:**  April 2016.

**ADDITIONAL INFORMATION:**   Please feel free to contact staff for additional information.

No. 17-2002, viewed 12/18/2018

**2016 BOARD OF SUPERVISORS BRIEFING**

# # 4a

| | |
|---|---|
| **SUBJECT:** | **Loudoun County Addressing Issues** |
| **STAFF CONTACTS:** | W. Keith Brower, Jr., Chief, Fire, Rescue and Emergency Management |
| | Larry Stipek, Director, Mapping & Geographic Information |

**BACKGROUND:** In the early 1990's, Loudoun County passed a uniform addressing ordinance (5-digit) which codified the rules and methods for assigning addresses to homes and businesses. The purpose of the ordinance was to assign uniform, logical addresses and to eliminate confusing street names in an effort to improve the response times for the delivery of essential fire, rescue and law enforcement services. When the ordinance was adopted, certain areas of the County were exempt from the ordinance. Those areas included the incorporated towns of Lovettsville, Round Hill, Purcellville, Hamilton, Middleburg, and Leesburg in addition to their prior planning areas ("urban growth areas") and the pre-existing planned communities of the Sterling postal areas (Sterling Park, Sugarland Run, Glen Heather and Countryside).

Over time, development has taken place in these areas and has resulted in mixed address ranges (3-digit addresses mixed with 5-digit addresses, such as exist on Davis Drive and Forest Ridge Drive in the Sterling area), inconsistent ranges with respect to "odd" and "even" addresses (such as exist on South Sterling Boulevard) and structures with addresses which do not coincide with the actual street of access (such as exists on Triple Seven Road and Palisades Parkway). These situations have caused confusion for emergency response personnel as well as the general public.

Other priority address related issues exist which include non-contiguous street names (such as Gum Springs Road and Stone Springs Boulevard, Welbourne Road and Millville Road, Shellhorn Road and Broadlands Boulevard, and Waxpool Road) and duplicate/sound-alike street names which are not within the same communities (Rosemont Place, Rosemont Farm Place and Rosemont Terrace Woods; Llangollen Road and Longollen Road; Walsh Farm Road and Welsh Farm Road) and "pipestem-style" roads which, due to the number of homes accessed, should have a unique street name (such as exists in the area of 18610 Foggy Bottom Road).

**PURPOSE:** Fire, rescue and law enforcement incidents often have no visible indicators as to the location of the emergency. Despite the fact that Loudoun County utilizes several methods of obtaining and verifying the correct address of the emergency, often callers become confused as to their actual location and this can result in the routing of emergency personnel to the incorrect location.

In addition, in 2016, DFREM expects to become a participant in the Regional CAD2CAD program. CAD2CAD is being implemented across the Northern Virginia region and is designed to ensure the dispatch of the closest available fire and rescue units, regardless of jurisdiction. As an example, an ambulance from Fairfax County may be the closest ambulance to a medical emergency in Sterling Park. The technology behind CAD2CAD depends in part upon the uniformity of address ranges to properly recognize and route units to an emergency via the

quickest response routes.  If the data used by CAD2CAD is inconsistent, response times could be delayed.

Staff recommends:

1. Developing a plan to prioritize and re-address "non-conforming" locations;
2. Developing a plan to re-name duplicate/sound alike roads where they constitute a public safety concern; and
3. Directing staff to bring forth changes/additions to Chapter 1026 of the Codified Ordinances of Loudoun County to add clarity to areas of the ordinance are ambiguous or are otherwise unenforceable.

These actions, which will generate resistance from the public, will serve the greater good by assisting public safety personnel in responding to and arriving on scene as quickly as possible.

**ANTICIPATED ACTION DATE:** Recommended changes to Chapter 1026 of the Codified Ordinances can be presented for Board consideration by June, 2016. Plans to address non-confirming or duplicate/sound alike road names can also be presented to the Board by June, 2016. Implementation of the plan changes is a much longer process that will take a year and the potential need for added resources to accomplish.

**ADDITIONAL INFORMATION:**  Please feel free to contact staff for additional information.

## 2016 BOARD OF SUPERVISORS BRIEFING

# # 4b

**SUBJECT:**          **Leesburg South Fire Rescue Station Location**

**STAFF CONTACT:**    W. Keith Brower, Jr., Chief, Fire, Rescue and Emergency Management
                      Joe Kroboth, Director, Transportation and Capital Infrastructure

---

**BACKGROUND:**  This project provides funding to construct a County-owned fire and rescue station.  The location as planned is a proffered 19-acre site on Shreve Mill Road near the intersection with the Evergreen Mills Road and is planned to be co-located with the LCSO Public Safety Firing Range.  This project is funded with local tax funding, cash proffers, and general obligation bonds. The general obligation bonds will be scheduled for placement on the November 2017 referendum.  Design of the fire and rescue station is scheduled for FY 17 with construction in FY 18.

A fire and rescue station in this area was planned to improve overall response time to the citizens in the area.  In addition to pending growth in the area, the Red Cedar subdivision is within the new station's service area. Current response times to his community from the Leesburg fire and rescue stations (north) and from the Brambleton station (south) are in the range of 8-10 minutes. Further, many of the properties in this area are in excess of 5 road miles from either existing station, resulting in spell out (ISO) ratings of 10, meaning they are subject to the highest property insurance rates.  It is anticipated that the new station will greatly improve response times and result in much improved ISO ratings for these properties.

Presently, the design for the Public Safety Firing Range has begun and has resulted in recent information from the Department of Transportation and Capital Infrastructure (DTCI) indicating there may be site development issues with that project that could possibly impact the location and construction of the fire and rescue station.  The Department of Fire, Rescue and Emergency Management (DFREM) has developed a station "prototype" using a "best practices" approach to functional station design.  Among the features of this design are components such as single story construction, front and rear drive through apparatus bays and provision of efficient personnel movement from sleeping areas to the apparatus bays.  At this point, staff believes the station could be co-located with the Public Safety Firing Range, however, there is concern that the design would not be optimal from a best practices standpoint.

**PURPOSE:**  Both DFREM and DTCI believe it is prudent to begin research on possible alternative sites within the proposed service area which may better support a fire and rescue station.

**ANTICIPATED ACTION DATE:** January-June 2016

**ADDITIONAL INFORMATION:**  The station project is scheduled for the November 2017 referendum.  If approved, construction funds would be appropriated in FY 2018.

## 2016 BOARD OF SUPERVISORS BRIEFING

**SUBJECT:**          **Local Fire Prevention Regulations**          # 4c

**STAFF CONTACTS:**   Chief Fire Marshal and Fire Official for Loudoun County Linda Hale, Fire Marshal's Office (LC FMO)

**BACKGROUND:**   In compliance with 1602.04 of the Codified Ordinances of Loudoun County, and 101.5 Local Regulations of the Statewide Fire Prevention Code, the Loudoun County Fire Prevention Code (Chapter 1602 of the Loudoun County Ordinances) have been developed and adopted.  These regulations are now in need of review for updates in order to stay current with recent changes to the national and state model fire prevention codes.  Further, the rapid growth of the rural economy and the "night life" initiative being reviewed by the Economic Development Advisory Commission, requires the development of regulations to safeguard the public.

Every three years, the International Code Council reviews the model building, fire prevention and related codes to ensure regulations are reflective of changes in materials, practices or trends facing general industry.  Once these model codes are changed, they are passed on to the states for review and then to localities.  The Loudoun County Fire Prevention Code (LCFPC) is due for a general review based upon changes that have been implemented at the national and state level. One area of this review has to do with ensuring that current regulations provide for the safe occupancy of buildings which are being used for multiple purposes.  Examples include local buildings which are permitted as restaurants by day and become "non-permitted[1]" night clubs after hours.  The change from a lighted, low noise environment to that where low lighting, increased noise levels and dancing occur, without the proper provision of egress, lighting, and fire alarm/fire suppression systems, increases the risk for occupant escape during a fire.

Another area of the fire prevention code requiring review is the operational and inspection fees which are adopted by the local governing body.  These fees are intended to offset the operational costs of fire prevention inspections.  Loudoun's fees have not been updated since 2010 and are far below those in use within the Northern Virginia region.  Additionally, the scope of fees is limited in comparison to the region.  A fee study with other Northern Virginia FMO Jurisdictions is being spearheaded by the LC FMO to provide the data showing the extent of the gap.  This study has begun the fall of 2015, and is estimated to be completed in the fourth quarter of FY'16.

Finally, the agricultural exemptions under the Uniform Statewide Building Code are being used to expand the rural economy in a manner that is often inconsistent with public safety.  Wineries are transforming farm use structures, which have storage of machinery and flammable liquids,

---

[1] Non-permitted facilities or uses are those that by the LCFPC are not required to obtain a fire marshal operating permit,  those that are non-compliant and operating without the required fire marshal operating permit., or individuals that change their use without being evaluated for fire and life safety impacts.  As there are escalating scales of safety precautions based on increased life safety and potential hazard impacts.  This does not effect the LC FMO's legal authority to inspect these facilities for compliance with the LCFPC when they are identified.

into places of public assembly.  These buildings lack requirements for fire safety inspections and are not required to possess separation, fire detection, fire suppression and means of egress consistent with modern buildings.  Similarly, Bed and Breakfast establishments and farm breweries are not required to follow comprehensive fire prevention regulations.  Loudoun County has attempted to require fire safety inspections for these uses using the zoning ordinance, however, these regulations belong in the fire prevention code.

**PURPOSE:**  To update and amend chapter 1602 to align with the adopted national and statewide fire prevention codes.  This will include potential amendments to the permit fee schedule and development of regulations for agricultural and "dual use" structures.

**ANTICIPATED ACTION DATE:** FREM will be bringing an item in early 2016 to amend Chapter 1602 of the Codified Ordinances.

**ADDITIONAL INFORMATION:**  Please feel free to contact staff for additional information.

No. 17-2002, viewed 12/18/2018

## 2016 BOARD OF SUPERVISORS BRIEFING

# 4d

**SUBJECT:**         **Special Events Ordinance**

**STAFF CONTACTS:**    Kevin Johnson, Coordinator, Emergency Management
                           Terra Capps, Special Events Coordinator, Emergency Management

**BACKGROUND:** Hundreds of special events occur annually at venues throughout Loudoun County. Events range from athletic events, bike tours/rides, concerts, equestrian activities, fairs and festivals, parades and runs/races. These special events range in size, scope and complexity requiring event organizers, and county and state agencies to coordinate their planning efforts to ensure the protection of public health and safety. Coordinating the County's planning efforts for events requiring interagency coordination is the responsibility of the Loudoun County Office of Emergency Management – Special Events Coordinator and the Special Event Advisory Committee (SEAC). Agencies invited to participate on the SEAC include representatives from Building and Development, Health Department, General Services – Solid Waste Management, Leesburg Police Department, Loudoun County Public Schools, Loudoun County Sheriff's Office, Middleburg Police Department, Office of Emergency Management, Purcellville Police Department, Risk Management, Towns of Leesburg, Middleburg, and Purcellville, Virginia Alcohol Beverage Control, Virginia Department of Transportation, Virginia State Police and Visit Loudoun. The SEAC works directly with the event organizers providing resources through the planning process to aide them in completing all the required permit applications, licenses, and site safety plans and procedures in advance of all established deadlines to prevent last-minute challenges. Event organizers submit information pertaining to the event through the Online Event Information System, which provides general information about the event and specific details about the types of activities and services being requested.

**PURPOSE:** The Special Events Ordinance will codify the well-established process that is currently utilized on a frequent basis by event organizers. The ordinance will require event organizers to actively participate in the process, and enable interagency reviews and assessments of the operational, public safety, and logistical components of proposals for special events. Additionally, the ordinance will provide enforcement capability to take corrective actions required to ensure the protection of public health and safety. The Ordinance will also stipulate penalties for non-compliance with the process and/or day-of activities as outlined in the permitting process.

**ANTICIPATED ACTION DATE:** The Office of Emergency Management plans to bring a draft Special Events Ordinance to the Board of Supervisors as early as the Spring of 2016.

**ADDITIONAL INFORMATION:** Please feel free to contact staff for additional information.

**2016 BOARD OF SUPERVISORS BRIEFING**

# # 5a

| | |
|---|---|
| **SUBJECT:** | **Community Water and Wastewater Program and the Howardsville Community Wastewater Project** |
| **STAFF CONTACT:** | Ernest N. Brown, Director, General Services |
| | Alan Brewer, Water and Environmental Programs Division Manager |

**BACKGROUND:** Clean and sufficient drinking water and adequate treatment and disposal of sewage are critical elements to protect public health and the environment. The County has a long history of working with citizens, communities, state and federal agencies, and nonprofit organizations to solve community water and wastewater problems. This ongoing commitment led the Board of Supervisors (Board) to recognize the importance of developing a detailed, systematic and sustainable approach to solve existing and future water and wastewater problems in the County.

In 2011, based on Board direction, the County completed the Water and Wastewater Needs Assessment (Assessment). The purpose of the Assessment was to provide an overview of existing water and wastewater issues in the County and to identify communities with potential water and wastewater needs. In 2015, the Board approved a fiscal policy, community prioritization process, and Memorandum of Understanding with Loudoun Water, all of which led to a systematic process to solve community water and wastewater problems. Additional information on the community water and wastewater program can be found at http://loudoun.gov/index.aspx?nid=3633. Several communities such as St Louis, Willisville and Howardsville were addressed by the Board prior to the formalization of the Program, Both St Louis and Willisville were successfully mitigated. Howardsville is currently in the Feasibility stage and while part of the Assessment, the Board provided an initial allocation of funding to take action. The historic community of Howardsville is located in the Blue Ridge District along Greengarden Road in southwestern Loudoun County. Outhouses and septic systems, many of which have failed, serve the homes in this community.

Specifically, in 2010, the County commissioned a water and wastewater feasibility study (Study) for the Howardsville community. The Study reviewed the current conditions in the community and outlined potential water and wastewater solutions. Given the generally poor soil conditions on individual properties, the Study recommended that Howardsville be served by a community wastewater treatment system with disposal to a subsurface drainfield. In Fiscal Year 2015 (FY15), the Board allocated $1,470,000 for the Howardsville Community Wastewater Project as part of the County's Capital Improvements Program. Subsequent to the Study and funding allocation, significant challenges have slowed the project. These challenges include: a viable site for a treatment plant and subsurface disposal system have yet to be identified; unclear deeds, titles, and property boundaries; and environmental and historical constraints.

**PURPOSE:**  The purpose of the Community Water and Wastewater Program is to assist and support communities with obtaining safe, adequate and proper drinking water and wastewater facilities.

The purpose of the Howardsville project, which is currently underway and the predecessor to the Program, is to provide a sustainable, safe wastewater system for the community.

**ANTICIPATED ACTION DATE:**  While the overall program is moving forward and is based on individual communities soliciting assistance, the Howardsville project is underway and several decisive actions will come before the Board within the next year. It is anticipated that the Board will need ratify a Planning Commission, Commission Permit for a sewer service district for Howardsville in early 2016.

It is likely that additional funding for the Howardsville project will be necessary to overcome the challenges described above.  If this is the case, staff will prepare a request for the Board's consideration.

**ADDITIONAL INFORMATION:**  Additional information on the community water and wastewater program can be found at http://loudoun.gov/index.aspx?nid=3633.  Please feel free to contact staff for additional information.

No. 17-2002, viewed 12/18/2018

### 2016 BOARD OF SUPERVISORS BRIEFING

# # 5b

**SUBJECT:**            **Compressed Natural Gas Fleet Conversion Study**

**STAFF CONTACT:**     Ernest N. Brown, Director, General Services
                      Andy Bollinger, Acting Assistant Director for Maintenance Operations

---

**BACKGROUND:**    For several decades, local governments and private industry have been transitioning their vehicle fleets to Compressed Natural Gas (CNG) as an economic and environmental benefit.  As CNG technology improves and the costs of energy (fuels) increase, the viability of transitioning public fleets becomes more cost effective.

Loudoun County Government (LCG) operates a fleet of more than 1,700 vehicles and pieces of equipment. Loudoun County Fleet Management (LCFM), a division of the Department of General Services (DGS), manages the majority of the fleet. Loudoun County Transit (LCT) manages a small commuter bus fleet. LCFM procures fleet maintenance and repair services from a number of sources: Loudoun County Public Schools (LCPS) for most light and medium-duty vehicles; First Vehicle Services, an on-site contract services provider, for fire and emergency medical services vehicles; Transdev, for commuter buses; and local vendors for landfill heavy equipment.

On March 18, 2015, the County's Board of Supervisors (Board) directed the County Administrator to perform a study of the feasibility of converting some or all County vehicles to run on compressed natural gas. Subsequently, DGS contracted with Mercury Associates, Inc. (under Contract No. QQ-01861) to assess the costs and benefits of Loudoun County introducing compressed natural gas- (CNG) fueled vehicles into selected components of its fleet and building a CNG fueling station to fuel these vehicles.

Mercury has previously conducted alternative fuel vehicle and/or CNG fuel feasibility studies for such entities as the Bonneville Power Administration of the US Department of Energy, the State of Alaska, the City of San Antonio, TX, and the Village of Mount Prospect, IL.

DGS is working closely and collaboratively with Loudoun County Public Schools and, based on the Board's action regarding the Loudoun County Government fleet, LCPS will explore the advantages and disadvantages of converting their fleet of buses and other vehicles to CNG.  In that the School bus fleet has appreciable different fueling location demands, it was determined to approach each organization separately and successively.

**PURPOSE:**   The purpose of the CNG Fleet transition study is to assess the advantages and disadvantages, as well as other considerations, of converting the Loudoun County Fleet to CNG.

### ADVANTAGES OF USING CNG:

- Natural gas is produced domestically and has more stable pricing than gasoline and diesel

fuel, much of which comes from imported petroleum.

- Natural gas pipelines networks are extensive in the U.S.; therefore, availability of CNG is widespread.

- Natural gas is less expensive than gasoline or diesel fuel on a gas gallon equivalent (GGE) basis.

- Natural gas burns cleaner than other fuels, which reduces vehicle-related greenhouse gas emissions, which are widely believed to contribute to global warming.

- Natural gas has lower flammability than conventional vehicle fuels, making it more difficult to ignite unintentionally. The ignition temperature of CNG is over 1,000 degrees Fahrenheit, as opposed to those of gasoline and diesel, which are 540 and 420 degrees, respectively.

- Compressed natural gas cannot spill like conventional fuels; if leaked from a storage tank or pipeline the gas merely dissipates in the air.

- There is a wide variety of vehicle models available, from compact sedans through Class 8 trucks that are designed and manufactured to run on CNG.

- Bi-fuel vehicle options are available for consumers who want the benefits of CNG without giving up the flexibility of using gasoline when and where CNG is not available for vehicle refueling.

- Natural gas vehicle performance is comparable to that of gasoline and diesel-powered vehicles.

- Depending on the types of CNG refueling equipment used, Natural gas vehicle fueling times can be comparable to those of gasoline or diesel-powered vehicles.

**DISADVANTAGES OF USING CNG:**

- Natural gas vehicle fueling equipment is expensive, meaning that large amounts of fuel must be consumed by the vehicles that use it for the investors in such equipment to realize a positive return on investment (ROI) in a reasonable period.

- Retail CNG sites are available, but their use may require Natural gas vehicle users to travel out of their way to obtain fuel.

- Repair facilities may require modification before CNG vehicles can safely be worked on indoors. Not only does this present a cost in adopting CNG as a fleet fuel, but also disrupts shop activities during the renovation process. Questions about the need for facility modifications or design features that are necessary to comply with National Fire Protection Association (NFPA) standards will need to be addressed.

- Indoor vehicle storage buildings may require modification before CNG vehicles can be parked in them safely.

**OTHER CONSIDERATIONS:**

- Spell out (NGV) operators may require education about the refueling procedures, and be wary of using CNG due to negative perceptions about safety and reliability.

- Maintenance personnel may require training to recognize the hazards associated with performing repairs on CNG vehicles. High-pressure storage tanks and associated plumbing pose a risk to personnel when performing fuel system repairs. Proper training is required to manage these risks.

- NFPA standards require that CNG tanks are inspected every three years, 36,000 miles, and after NGVs are involved in accidents.

- If bi-fuel vehicles are purchased, policies need to be developed to promote the use of CNG to the extent that the fleet owner wishes to realize the benefits of using it as a fleet fuel.

- CNG buses may be taller than their conventionally fueled counterparts if roof-mounted tanks are used.

**ANTICIPATED ACTION DATE:**  It is anticipated that the Board will be presented with the findings of the Study in December 2015  If the Board determines that transitioning the County Fleet to CNG is a preferred course of action, a more comprehensive CNG fleet transition proposal will be presented for Board deliberation in early 2016.  Specifically, the Board will be presented with options to begin transitioning both heavy and light vehicle fleets to CNG and setting the direction for staff to plan and implement the construction of fueling stations.

**ADDITIONAL INFORMATION:**  Please feel free to contact staff for additional information.

## 2016 BOARD OF SUPERVISORS BRIEFING

# # 5c

**SUBJECT:**          **Asphalt Management – Park and Ride lots and Parking Lots at County Facilities**

**STAFF CONTACTS:**    Ernest Brown, Director, General Services
                         Don McGarry, Public Works Division Manager

**BACKGROUND:** Over the last two decades, Loudoun County has experienced significant growth. In order to meet the growth demands, paved infrastructure such as park and rides, building parking lots, internal roadways for parks, government facilities (jail, public safety centers, etc.) and numerous other assets have been constructed. As expected, over time, asphalt pavements deteriorate. Proper forethought and intentional planning for the maintenance of these assets is critical to preserve the County investment and sustain the service provided to the public. Pavement deterioration can be delayed through a comprehensive asphalt pavement inspection and maintenance program. In FY 2106, the Department of General Services contracted for and developed a comprehensive assessment of current asphalt assets to determine the appropriate maintenance strategy to preserve and maintain the Counties investment and to ensure the maximum productive service life of these assets.

**PURPOSE:** The primary causes of asphalt deterioration are sunlight, wind, winter application of sand and salt, and the intrusion of water along with the freeze/thaw cycle. Each of these causes result in the loss of the bitumen binding the asphalt pavement. The result is cracking as the asphalt slabs contract and harden. This deterioration, if left uncorrected leads to pavement failure, including potholes, gravelling, and base failure – visible as alligator cracking or "dishing."

Loudoun County has not previously had a pavement management program. Repairs were made to pavements at County sites when they were already "broken," exhibiting alligator cracking, potholes, or dishing – indicating that the base under the pavement was compromised. This approach is not only the most expensive means to address the asphalt inventory but has resulted in a substantial backlog of pavement maintenance and repair projects.

The Department of General Services proposes a multi-year inspection, maintenance and repair program to include all County facility asphalt pavements. Routine inspections of each parking lot and road section every two years allows County staff to determine appropriate maintenance techniques to forestall continued deterioration. While every surface has an expected service life and will eventually need to be repaved, this program allows for the effective and proactive maintenance of existing surfaces as well as repaving those that have met their service life either through historical lack of maintenance or as a matter of natural course.

The Department of General Services, in partnership with the County Engineering consultants, have identified the five year repair and maintenance schedule of costs associated with meeting the current asphalt infrastructure condition. These costs are presented below:

| Construction Years | 2016 | 2017 | 2018 | 2019 | 2020 | 2017 - 2020 TOTALS |
|---|---|---|---|---|---|---|
| Construction | $193,985 | $1,250,000 | $1,287,500 | $1,326,125 | $1,365,909 | $5,423,519 |
| Design | $125,000 | $ 128,750 | $ 132,613 | $ 136,591 | | $ 522,953 |
| Contingencies | | $ 125,000 | $ 128,750 | $ 132,613 | $ 136,591 | $ 522,953 |
| Total | $318,985 | $1,503,750 | $1,548,863 | $1,595,328 | $1,502,500 | $6,469,425 |

**Note: 2016 Construction costs are actual costs based on projects completed or underway.**

**ANTICIPATED ACTION DATE:** It is anticipated that the Board will be presented with funding requests to meet the asphalt maintenance and infrastructure preservation needs during the FY 2017 Budget process. It is imperative that intervention begin now on this infrastructure to avoid extensive costs associated with full reconstruction that is often required when asphalt surfaces are not properly maintained.

**ADDITIONAL INFORMATION:** Please feel free to contact staff for additional information.

## 2016 BOARD OF SUPERVISORS BRIEFING

# # 6a

**SUBJECT:**          **Chapter 1066 Ordinance Revision**

**STAFF CONTACTS:**    David Goodfriend, Health Department

---

**BACKGROUND:**  Onsite sewage treatment systems are now accepted as a permanent and important means of sewage disposal. In the past, these systems were considered temporary solutions until connection could be made to a central sewage treatment plant. Onsite sewage treatment systems, when properly maintained, help recharge groundwater resources. As of late 2015, Loudoun County has approximately 13,010 conventional, 1661 alternative, 29 discharging and 129 pump and haul systems. These systems must be managed, maintained and operated as important sewage treatment infrastructure.

Chapter 1066 of the Codified Ordinances of Loudoun County regulates onsite sewage treatment systems in Loudoun County. Authority for Chapter 1066 is found in §15.2-2157A of the Code of Virginia. Chapter 1066 was enacted in 1976, then amended and re-enacted in its entirety on February 16, 1994. It was amended on May 4, 2010 to include increased setbacks in the Limestone Overlay District. Chapter 1066.17, added on December 15, 2009, provided requirements aimed at preventing septic tank collapse and leakage. Chapter 1066.07(b), added on October 4, 2011, provided requirements for the pump-out of septic tanks. Chapter 1066.07(b) was amended by the Board of Supervisors (Board) on September 16, 2015 to provide an inspection provision that may be utilized in lieu of the required five (5) year pump-out of septic tanks. Although Chapter 1066 has been amended several times, it has not had a comprehensive update since its enactment in 1976.

**PURPOSE:**  To educate the Board of Supervisors on the current schedule for revising Chapter 1066 of the Loudoun County Codified Ordinances.

**ANTICIPATED ACTION DATE:**  Draft changes are anticipated to be presented to the Board in May 2016 for review. Staff will then request to forward to a Board Public Hearing. If recommended by the Board to go to public hearing, it is anticipated the public hearing will take place in July 2016.

**ADDITIONAL INFORMATION:**   Additional information on onsite sewage disposal systems is available online at http://va-loudouncounty.civicplus.com/index.aspx?nid=1379.  The current version of Chapter 1066 of the Loudoun County ordinances is available at http://www.amlegal.com/nxt/gateway.dll/Virginia/loudounco_va/codifiedordinancesofthecounty ofloudounvi?f=templates$fn=default.htm$3.0$vid=amlegal:loudounco_va

Please feel free to contact staff for additional information.

## 2016 BOARD OF SUPERVISORS BRIEFING

# 6b

**SUBJECT:**          **Hidden Lane Landfill Superfund Site**

**STAFF CONTACTS:**   David Goodfriend, Health Department
                      Ernest Brown, General Services

**BACKGROUND:**   The Hidden Lane Landfill is an Environmental Protection Agency (EPA) Superfund Site near the Broad Run Farms Community in Sterling. In 1971, the privately owned and operated Hidden Lane Landfill, began operations as a site for the disposal of construction and demolition debris as well as other waste. During the landfill's 13 years in service, the County and citizens consistently reported that the owners were in violation of the Zoning and Refuse Disposal Ordinances, including disposal of domestic and other waste at the site. The County filed suit against the property owners in 1976. In 1983, after years of effort, the Courts ruled in favor of the County and stated that the landfill owners violated the Zoning Ordinance and granted a permanent injunction prohibiting further operation of the landfill.

Since the closure of the landfill, methane gas was found in adjacent homes in the Countryside subdivision (1986, 1998), and trichloroethylene (TCE) was found in adjacent residential water wells in the Broad Run Farms neighborhood (1989). CountrySide is served by public water, not residential drinking water wells. Loudoun County and the Commonwealth of Virginia ultimately determined that these pollutants likely originated from the landfill itself and are serious risks to human health. Carbon filters were installed on the affected wells to minimize the risk of human exposure to TCE in the Broad Run Farms community. However, the TCE in groundwater still presents a potential risk to human health and the environment, resulting in the listing of the Hidden Lane Landfill as a Superfund Site on the EPA National Priorities List (NPL) in 2008. Superfund sites are polluted locations requiring a long-term response to clean up hazardous material contaminations which meet specific criteria under Federal law. This designation allows the EPA to clean up such sites and to compel responsible parties to perform cleanups or reimburse the government for EPA-lead cleanups.

Since 2008, the EPA has been conducting an ongoing investigation on the Superfund Site. In 2009, the EPA initiated their investigation of the ground water (Phase 1) in order to locate the extent of the TCE contaminant and define the plume. This action involved the drilling and monitoring of wells. However, the EPA found TCE deeper than initially suspected, which necessitated the installation of deeper wells. In 2011, the EPA located and defined the TCE plume. Phase 3 began in 2012 to confirm the extent of the contaminant and to determine if the TCE is migrating. With the TCE located and mapped, the EPA could evaluate the effects of the contamination and possible solutions for remediation.

Over the past two years, the EPA has been conducting a number of studies. An Ecological Risk Assessment and a Human Health Risk Assessment are among these studies. The EPA determined, "the Site poses no significant risk to the nearby aquatic (rivers, streams, ponds) or terrestrial (plants, animals, insects, etc.) ecologies or their living populations." Currently, the

USCA4 Appeal: 17-2002    Doc: 88-1    Filed: 01/07/2019    Pg: 274 of 547

EPA is initiating a Treatability Study to determine what possible methods of remediation will work at this particular site. There is currently not an estimated completion date for the Treatability Study to be completed.  Loudoun County has been working with the EPA to increase the transparency of their process to both the County government and to affected residents.

**PURPOSE:**  To educate the Board of Supervisors on the current progress in addressing ongoing concerns with the Hidden Lane landfill.

**ANTICIPATED ACTION DATE:**  Ongoing

**ADDITIONAL INFORMATION:**    Additional information on the Hidden Lane landfill is available online at http://www.loudoun.gov/index.aspx?nid=2122.  Please feel free to contact staff for additional information.

No. 17-2002, viewed 12/18/2018

## 2016 BOARD OF SUPERVISORS BRIEFING

# # 6c

**SUBJECT:**          **Local Administration of Health Department**

**STAFF CONTACTS:**    David Goodfriend, Health Department
Julie Grandfield, County Administration

---

**BACKGROUND:**   Section 32.1-30 of the Code of Virginia states that "each county and city shall establish and maintain a local department of health which shall be headed by a local health director."   Section 32.1-31 further states that "the governing body of any county or city may enter into a contract with the Board [of Health] for the operation of the local health department in such county or city."  This contract, called a Local Government Agreement, is signed each year by the Virginia Department of Health Commissioner and the Loudoun County Administrator, and specifies both the services to be provided and the State, and County tax funds to be contributed towards this "Cooperative budget."  In addition to this Cooperative budget, the health department's budget includes State earned revenue, grant funds, and any additional County funds that are retained locally.  In FY 15, the State contributed $1,373,300 in general tax funds and Loudoun County contributed a total of $4,332,600 in local tax funds to the operation of the health department.

The Loudoun County Health Department includes 47 full time State employees, 9 part time state employees, and 28 full time County employees.  County employees exist in each of the health department's three divisions (Community Health, Environmental Health and Administration) and include both front line and supervisory staff.  The additional County funds that are retained locally to cover the costs of the Health Department's County employees and associated non-personnel costs, such as computers, travel, and supplies.

For "State administered" health departments, which includes that of Loudoun County, the Cooperative budget is maintained by the State.  Fairfax and Arlington Counties are the two health departments in Virginia that are not administered by the State; for these "locally administered" health departments, their Cooperative budget is maintained by the County, all their employees are hired through their Counties' human resources processes, and they do not maintain distinct State personnel or budget systems.

Any County or City can request to have the administration status of their health department changed.  The steps for a State administered health department to become locally administered include obtaining enabling authority from the Virginia General Assembly and then having the County work with the State on a transition of State employees, equipment and budget into the County system.

**PURPOSE:**  As Loudoun County has grown, the County government's contribution to the health department has increased to best meet the needs of its community.  As a result, local tax funding of the Loudoun County Health Department is now three times that of the tax funding provided by the State.  Additionally, the mix of State and County positions, funding and

information technology systems decreases departmental efficiency and effectiveness, and increases the risk of error managing these disparate systems.  The County intends on conducting an initial review of expected costs and savings associated with a change of administration.   Any recommended action to initiate a change in governance would come to the Board of Supervisors.

**ANTICIPATED ACTION DATE:**  At the pleasure of the Board

**ADDITIONAL INFORMATION:**   Additional information on the Health Department's local budget is available at www.loudoun.gov/budget.   A copy of the Health Department's local government agreement is on file with County Administration.  Please feel free to contact staff for additional information.

No. 17-2002, viewed 12/18/2018

**2016 BOARD OF SUPERVISORS BRIEFING**

# # 6d

**SUBJECT:**          **Communicable Disease Control and Bioterrorism Preparedness**

**STAFF CONTACTS:**   David Goodfriend, Health Department

---

**BACKGROUND:**   §§32.1-35, 32.1-39 of the Code of Virginia requires the Health Department to conduct surveillance and investigation of diseases. In FY 2015, this program identified 250 people infected with tuberculosis (TB) in Loudoun County, 35 people suspected or confirmed as being sick with TB, 85 reports of vaccine preventable disease, approximately 2,500 vaccination visits, and 436 reports of Lyme, of which 210 cases met the case definition of Lyme disease upon investigation. According to the performance measures, the number of reports of vaccine preventable childhood diseases increased from 37 in FY 2014 to 85 in FY 2015. The total number of reportable disease in Loudoun County increased from 1045 in FY 2014 to 1270 in FY 2015. In the last four years, chlamydia cases rose 36 percent, pertussis cases rose 80 percent and the number of gastroenteritis investigations increased 46 percent.

The Health Department has also been conducting daily Ebola surveillance since October 2014 and has responded to a wide range of outbreaks or cases of such serious diseases as meningitis, measles or TB. Washington Dulles International Airport receives the second most travelers from Ebola affected countries. As the primary responders to issues coming through this airport, Loudoun County may at any moment have to evaluate a traveler for symptoms of Ebola; consequently, the County has established and exercised a process for evaluating, referring, quarantining and/or isolating individuals who may be sick with Ebola. Similarly, the County may at any moment need to respond to other diseases of public health threat, whether naturally occurring or due to a terrorist action, coming through the airport or through other means, such as the 2001 anthrax attack in Loudoun.

To help accomplish this mission, the Health Department created a Medical Reserve Corps (MRC) in 2003 to expand the number of medical and nonmedical people available to respond to an emergency in Loudoun County. The MRC now consists of over 1300 Loudoun County volunteers, many of whom have responded to events, participated in exercises and/or taken first aid, CPR and other free emergency preparedness trainings over this time.

**PURPOSE:**   To educate the Board of Supervisors on the current efforts by the Health Department to prevent the spread of communicable diseases in Loudoun County, both naturally occurring and due to bioterrorism.

**ANTICIPATED ACTION DATE:** Ongoing

**ADDITIONAL INFORMATION:**   Additional information on the Health Department's role in preventing the spread of communicable diseases is available online at http://www.loudoun.gov/cd. Please feel free to contact staff for additional information.

**2016 BOARD OF SUPERVISORS BRIEFING**

# 7a

| | |
|---|---|
| **SUBJECT:** | **Review of the County's Classification System and Pay Plan** |
| **STAFF CONTACTS:** | Jeanette D. Green, Director, Human Resources |
| | Ronda Allen, Workforce Planning Manager, Human Resources |

---

**BACKGROUND:**   Loudoun County employs approximately 3,366 regular employees and 2,937 temporary employees in thirty-two (32) different departments and offices grouped into five major areas: general government administration; public safety and judicial administration; health and welfare; parks, recreation and culture; and community development.

The Board of Supervisors approves the County's compensation philosophy and policies.  The Board's current compensation philosophy is to deliver average pay at 95% of the competitive market.  The competitive market is defined as including the City of Alexandria and the counties of Arlington, Fairfax, and Prince William.  Chapter 5 of the County's Human Resources Handbook details the Board's policies on the County's classification and pay plan. Chapter 5 states that the County's classification and pay plan is intended to be competitive with the labor market and other public and private sector employers, equitable in the classification of positions and the delivery of pay, and compliant with applicable federal, state and local regulations.

Currently, the County operates under a broadband classification system and pay plan implemented by the Board in 1995. Simply stated, broadbanding is the grouping of jobs with similar duties, responsibilities, and levels of accountability into job classifications. Broadband classifications are broad in scope and describe the general body of work, not the specific duties that belong to all of the jobs included within that classification. Chapter 5 outlines specifications for each broadband classification that detail the nature of work and the education and experience requirements associated with that classification.

The County's current broadband system includes three (3) separate pay structures (General Workforce, Uniformed Fire and Rescue, and Uniformed Sherriff's Office) comprising a total of nine (9) broadband job classifications. The nine (9) broadband classifications are Advisors and Managers (A), Executive (E), General Support and Services (G), Program and Administrative Services (P), Specialists (S), Technical and Trades (T), Uniformed Fire and Rescue (F), and Uniformed Sherriff's Office (U and O). These classifications are very general in nature and are designed to identify and define the job family. They also provide a consistent and common standard by which these job families can be utilized across departments and offices within the County to classify positions. A department may utilize more descriptive "working titles" for specific positions. For example, employees within the broadband classification of Advisors and Manager, hold working titles such as Employee Relations Manager, Emergency Services Manager, Juvenile Detention Center Manager, and Benefits and Risk Manager.

Each of the nine (9) broadband classifications is divided into various levels reflecting increasing degrees of job complexity and education and/or experience requirements (ex. Specialist I. II, III. and

USCA4 Appeal: 17-2002     Doc: 88-1     Filed: 01/07/2019     Pg: 279 of 547

IV). Each level within a broadband classification is assigned to a specific pay band (Attachment 1). When the current broadband system was implemented by the Board in 1995, the initial pay bands were set based upon an analysis of salary data within the labor market at that time.

**ISSUES:** The County's classification system and pay plan were implemented in 1995. While the County has made tweaks to both the classification system and pay plan over the last twenty years to attempt to meet the needs of our growing and increasingly complex organization, there are indications that the current classification system and pay plan can no longer adequately meet the present and future needs of the organization.

<u>**Issues with the Current Classification System**</u>

➢ *Difficulty Classifying Certain Positions:*

As the County government grows, and the number, types, and complexity of County jobs increase, certain County positions do not fit well into any of the nine (9) major job classifications under the system. For example, many information technology jobs do not fit well into the current system.

➢ *High Minimum Education and Experience Requirements:*

The County's classification specifications set the minimum education and experience requirements for each broadband classification level. In recent years, the County has had challenges in recruiting applicants who meet the minimum education and experience requirements for mid to high level positions with the County; an indication that perhaps the minimum education and experience requirements have been set too high for certain classifications. While the County wishes to attract highly credentialed and experienced talent to the County's workforce, the well-documented national wave of Baby Boomer[1] retirements will make it increasingly difficult to attract seasoned professionals to the County's workforce. As the wave of Baby Boomer retirements increase, the County will increasingly compete to attract less experienced applicants to fill the resulting vacancies. This will be difficult to do if the experience and education requirements for County positions are set so high as to screen out otherwise qualified applicants who are simply lacking the requisite number of years of experience. It is also important to note that market surveys often indicate that comparator jurisdictions have lower education and/or experience requirements than the County for certain similar position.

➢ *Lack of Standardized Job Descriptions:*

Under the current system the County does not utilize traditional, standardized job descriptions. Instead, each employee's supervisor is tasked with drafting an individualized performance plan which defines the broad job components and specific performance

---

[1] Baby Boomer Generation (born between 1946-1964). Currently, 33.61% of the County workforce falls within this category.

USCA4 Appeal: 17-2002     Doc: 88-1     Filed: 01/07/2019     Pg: 280 of 547

#7a:  Review of the County's Classification System and Pay Plan
Board of Supervisors Orientation
November 14, 2015
Page 3

expectations or duties of the employee's position. The detail and quality of individual performance plans often varies based on the skill and effort of the supervisor drafting the plan. A failure to clearly outline the essential functions of an employee's job within the performance plan can lead to issues effectively administering the County's workers' compensation program and the reasonable accommodation process under the federal Americans with Disabilities Act. These programs require clear documentation of an employee's essential job functions, including physical job requirements, in order to effectively administer the program and comply with associated legal regulations. Further, detailed job descriptions are essential for the effective administration of the County's performance assessment and discipline management systems.

The lack of standardized job descriptions also makes it easier for the duties of a specific position to change over time; this in turn makes it more difficult for the Department of Human Resources (Human Resources) to monitor and determine whether employees are working within the appropriate job classification. Further, this also makes it more difficult for Human Resources to ensure that positions are properly classified as exempt or non-exempt in accordance with the federal Fair Labor Standards Act.

**<u>Issues with the Pay Plan</u>**

➢ ***Difficulty Meeting the Board's Goal of Delivering Compensation at 95% of the Comparator Market:***

Chapter 5 of the Human Resources Handbook specifically states that salary surveys will be conducted periodically to assess the County's compensation levels compared to the market. Human Resources surveys the comparator market for pay increases and adjustments to the minimum and maximum of the pay bands on an annual basis in conjunction with the County's budget process. Further, periodically, the County conducts a compensation study for certain benchmark positions to determine how well the County is meeting its goal of delivering pay at 95% of the comparator market. The most recent compensation study was conducted in December 2010 by Knowledge Bank, Inc. for a selection of benchmark positions. This study found several benchmark positions to be below 95% of the comparator market and recommended market adjustments be placed on these positions to bring average compensation within the 95% range of comparator jurisdictions.

A market adjustment is an adjustment to the minimum and maximum of a position's pay band for the purpose of attracting, hiring and retaining employees in specialized or high demand occupations. As of the date of this briefing, there are 449 County employees in 164 positions who receive a market adjustment on their pay. For example, Systems Administrators in the Department of Information Technology have a market of adjustment of 20%; Engineer positions in the Department of Building and Development and the Department of Transportation and Capital Infrastructure receive a market adjustment of between 12-15%; and Dispatcher positions in Fire, Rescue and Emergency Management and the Sheriff's Office receive a market adjustment of 20%. The County's frequent reliance

USCA4 Appeal: 17-2002    Doc: 88-1    Filed: 01/07/2019    Pg: 281 of 547

#7a: Review of the County's Classification System and Pay Plan
Board of Supervisors Orientation
November 14, 2015
Page 4

on market adjustments to deliver pay at or near the 95% target established by the Board's compensation philosophy is an indication that the County's overall Pay Plan is in need of updating. It is also important to note that market adjustments are just one compensation tool in a complex compensation system that includes stipends, shift differentials, and on call pay. This has contributed to the County's current pay plan being difficult to both understand and administer.

➢ **Administrative Burdens**

The need to update the County's pay plan and classification system has contributed to a spike in position reclassification requests and requests for salary adjustments. Human Resources received 84 reclassification requests in FY13, 98 in FY14, and 93 in FY15. Moreover, Human Resources has approved 132 salary adjustments for individual employees since FY11. It is important to note that the spike in reclassifications and salary adjustments is in part a reflection of the freezing of the County's special pay band increase program in 2008. This program allowed Department Heads to offer employees a 5% increase in pay based on an employee's superior performance and/or acquisition and application of a particular skillset that added significant value to the organization.

➢ **Morale Issues**

Many County positions were not selected as benchmark positions in the most recent compensation study. As such, there is a strong likelihood that a number of other County positions are also lower than 95% of the comparator market. There is a general awareness of this throughout the organization which has led to morale issues. In recent years, employees have repeatedly cited non-competitive pay as a complaint in County surveys and in other forums in which employee feedback has been solicited.

➢ **Issues with Attracting and Hiring Top Talent**

If salaries for various positions remain significantly below the market, the County will continue to face difficulty attracting and hiring top talent. This problem is further exacerbated by the competitiveness of the DC area job market and the high cost of buying a home in Loudoun County.[2]

➢ **Issues with Retaining Top Talent**

Retention of top talent is also a concern. The County's turnover rate has seen a sustained increase in recent years, jumping from 8.2% in FY11 to 11.1% in FY15. The current projected turnover for FY 16 is 15.6%. As noted above, in recent years, Human Resources has conducted numerous employee surveys and non-competitive pay is consistently cited as a concern by many County employees.

---

[2] The cumulative median sale price of all types of homes in Loudoun County was $430,000 through August 2015. Currently, 35% of County employees live outside of Loudoun County.

> *Total Compensation*

The issue of competitive pay must be viewed in the context of the total compensation package provided to employees. The cost to the employees of the County's health plan has continued to increase year over year. An overall increase of approximately 12% has been approved for the Health Plan Year 2016.  Further, employees saw an elimination of funding in 2009 for the employer match contribution to participants in the County's 457(b) deferred compensation plan. Previously County employees who participated in the plan received a dollar for dollar employer match of up to $20 per pay period ($520 per year) as an incentive for employees to participate in the plan. Finally, it is important to note that effective July 1, 2012, the Virginia General Assembly required all members of the Virginia Retirement System (VRS) to pay a member contribution to their VRS retirement plan. In response, the County implemented a 5% employee member contribution along with a 5% salary increase to offset the contribution. Unfortunately this resulted in an approximate 1% reduction in pay for all employees due to the 5% salary increase being based on the old salary and the 5% member contribution being calculated on the new salary.

**PURPOSE:**  The purpose of this briefing is to provide the Board with an overview of the County's classification system and pay plan and to create awareness of the current challenges with maintaining the current system and pay plan. Staff will present an item to the Board in FY16 recommending the Board:

1. Consider whether it is appropriate to maintain the Board's current compensation philosophy of delivering pay at 95% of the comparator market;

2. Direct staff to hire a consultant to review and evaluate all aspects of the County's current classification system and based on that evaluation develop a new systematic classification system including standardized job descriptions with minimum qualifications, clearly identified essential job functions, and clearly identified physical requirements; and

3. Direct staff to review and evaluate all aspects of the County's pay plan and based on that evaluation develop a new market competitive compensation plan, including identifying the market competitive salary range for each job classification.

**ANTICIPATED ACTION DATE:**  No action required at this time.

**ADDITIONAL INFORMATION:**  Please feel free to contact staff for additional information.

**ATTACHMENT:**

1. Loudoun County FY16 Payscales (General Workforce, Fire and Rescue, and Sheriff's Office)

Loudoun County Fire and Rescue Salary Schedule - LEO-Eligible Uniformed Positions, 42 hours per week

Salary Ranges at 5% Increments

As of 9/10/15

(Annual salary = hourly rate x 2,184 hours per year)

| Payband | FY 2015 Minimum | 5% | 10% | 15% | 20% | 25% | 30% | 35% | Midrange | 45% | 50% | 55% | 60% | 65% | 70% | FY 2016 Maximum |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| F1 | 41,539 | 43,616 | 45,693 | 47,770 | 49,847 | 51,924 | 54,001 | 56,078 | 57,715 | 60,232 | 62,308 | 64,385 | 66,462 | 68,539 | 70,616 | 73,891 |
| (Bi-weekly) | 1,597.65 | 1,677.54 | 1,757.42 | 1,837.30 | 1,917.18 | 1,997.07 | 2,076.95 | 2,156.83 | 2,219.80 | 2,316.60 | 2,396.48 | 2,476.36 | 2,556.24 | 2,636.13 | 2,716.01 | 2,841.95 |
| (Hr.) | 19.02 | 19.97 | 20.92 | 21.87 | 22.82 | 23.77 | 24.73 | 25.68 | 26.43 | 27.58 | 28.53 | 29.48 | 30.43 | 31.38 | 32.33 | 33.83 |
| F2 | 46,524 | 48,851 | 51,177 | 53,503 | 55,829 | 58,156 | 60,482 | 62,808 | 64,630 | 67,460 | 69,787 | 72,113 | 74,439 | 76,765 | 79,092 | 82,736 |
| (Bi-weekly) | 1,789.40 | 1,878.87 | 1,968.34 | 2,057.81 | 2,147.28 | 2,236.75 | 2,326.22 | 2,415.69 | 2,485.77 | 2,594.63 | 2,684.10 | 2,773.57 | 2,863.04 | 2,952.51 | 3,041.98 | 3,182.14 |
| (Hr.) | 21.30 | 22.37 | 23.43 | 24.50 | 25.56 | 26.63 | 27.69 | 28.76 | 29.59 | 30.89 | 31.95 | 33.02 | 34.08 | 35.15 | 36.21 | 37.88 |
| F3 | 50,246 | 52,758 | 55,271 | 57,783 | 60,295 | 62,807 | 65,320 | 67,832 | 69,800 | 72,857 | 75,369 | 77,881 | 80,394 | 82,906 | 85,418 | 89,354 |
| (Bi-weekly) | 1,932.54 | 2,029.16 | 2,125.79 | 2,222.42 | 2,319.04 | 2,415.67 | 2,512.30 | 2,608.93 | 2,684.62 | 2,802.18 | 2,898.81 | 2,995.43 | 3,092.06 | 3,188.69 | 3,285.31 | 3,436.71 |
| (Hr.) | 23.01 | 24.16 | 25.31 | 26.46 | 27.61 | 28.76 | 29.91 | 31.06 | 31.96 | 33.36 | 34.51 | 35.66 | 36.81 | 37.96 | 39.11 | 40.91 |
| F4 | 54,358 | 57,075 | 59,793 | 62,511 | 65,229 | 67,947 | 70,665 | 73,383 | 75,513 | 78,819 | 81,536 | 84,254 | 86,972 | 89,690 | 92,408 | 96,668 |
| (Bi-weekly) | 2,090.68 | 2,195.21 | 2,299.75 | 2,404.28 | 2,508.81 | 2,613.35 | 2,717.88 | 2,822.41 | 2,904.34 | 3,031.48 | 3,136.02 | 3,240.55 | 3,345.08 | 3,449.62 | 3,554.15 | 3,718.00 |
| (Hr.) | 24.89 | 26.13 | 27.38 | 28.62 | 29.87 | 31.11 | 32.36 | 33.60 | 34.58 | 36.09 | 37.33 | 38.58 | 39.82 | 41.07 | 42.31 | 44.26 |
| F5 | 58,882 | 61,826 | 64,770 | 67,715 | 70,659 | 73,603 | 76,547 | 79,491 | 82,444 | 85,379 | 88,323 | 91,267 | 94,212 | 97,156 | 100,100 | 106,005 |
| (Bi-weekly) | 2,264.70 | 2,377.94 | 2,491.17 | 2,604.41 | 2,717.64 | 2,830.88 | 2,944.11 | 3,057.35 | 3,170.91 | 3,283.82 | 3,397.05 | 3,510.29 | 3,623.52 | 3,736.76 | 3,849.99 | 4,077.12 |
| (Hr.) | 26.96 | 28.31 | 29.66 | 31.00 | 32.35 | 33.70 | 35.05 | 36.40 | 37.75 | 39.09 | 40.44 | 41.79 | 43.14 | 44.49 | 45.83 | 48.54 |
| F6 | 68,655 | 72,088 | 75,521 | 78,954 | 82,387 | 85,819 | 89,252 | 92,685 | 95,374 | 99,550 | 102,983 | 106,416 | 109,849 | 113,282 | 116,714 | 122,093 |
| (Bi-weekly) | 2,640.60 | 2,772.63 | 2,904.66 | 3,036.69 | 3,168.72 | 3,300.74 | 3,432.77 | 3,564.80 | 3,668.23 | 3,828.86 | 3,960.89 | 4,092.92 | 4,224.95 | 4,356.98 | 4,489.01 | 4,695.87 |
| (Hr.) | 31.44 | 33.01 | 34.58 | 36.15 | 37.72 | 39.29 | 40.87 | 42.44 | 43.67 | 45.58 | 47.15 | 48.73 | 50.30 | 51.87 | 53.44 | 55.90 |

Loudoun County Fire and Rescue Salary Schedule - LEO-Eligible Uniformed Positions, 42 hours per week

Salary Ranges at 5% Increments

As of 9/10/15

(Annual salary = hourly rate x 2,080 hours per year)

| Payband | FY 2016 Minimum | 5% | 10% | 15% | 20% | 25% | 30% | 35% | Midrange | 45% | 50% | 55% | 60% | 65% | 70% | FY 2016 Maximum |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| F7 | 79,740 | 83,727 | 87,714 | 91,701 | 95,688 | 99,675 | 103,661 | 107,648 | 110,648 | 115,622 | 119,609 | 123,596 | 127,583 | 131,570 | 135,557 | 141,557 |
| (Bi-weekly) | 3,066.91 | 3,220.25 | 3,373.60 | 3,526.94 | 3,680.29 | 3,833.63 | 3,986.98 | 4,140.33 | 4,255.70 | 4,447.02 | 4,600.36 | 4,753.71 | 4,907.05 | 5,060.40 | 5,213.74 | 5,444.49 |
| (Hr.) | 38.34 | 40.25 | 42.17 | 44.09 | 46.00 | 47.92 | 49.84 | 51.75 | 53.20 | 55.59 | 57.50 | 59.42 | 61.34 | 63.25 | 65.17 | 68.06 |
| F8 | 89,628 | 94,110 | 98,591 | 103,073 | 107,554 | 112,036 | 116,517 | 120,998 | 124,369 | 129,961 | 134,443 | 138,924 | 143,406 | 147,887 | 152,368 | 159,109 |
| (Bi-weekly) | 3,447.25 | 3,619.61 | 3,791.97 | 3,964.34 | 4,136.70 | 4,309.06 | 4,481.42 | 4,653.79 | 4,783.42 | 4,998.51 | 5,170.87 | 5,343.24 | 5,515.60 | 5,687.96 | 5,860.32 | 6,119.59 |
| (Hr.) | 43.09 | 45.25 | 47.40 | 49.55 | 51.71 | 53.86 | 56.02 | 58.17 | 59.79 | 62.48 | 64.64 | 66.79 | 68.94 | 71.10 | 73.25 | 76.49 |

## Loudoun County General Workforce Salary Schedule, 37.5 hours per week

Salary Ranges at 5% Increments

As of 9/10/15

(Annual salary = hourly rate x 1,950 hours per year)

| Payband | FY 2016 Minimum | 5% | 10% | 15% | 20% | 25% | 30% | 35% | Midrange | 45% | 50% | 55% | 60% | FY 2016 Maximum |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| G1 | 18,548 | 19,475 | 20,403 | 21,330 | 22,258 | 23,185 | 24,112 | 25,040 | 26,570 | 26,895 | 27,822 | 28,749 | 29,677 | 34,593 |
| (Bi-weekly) | 713.38 | 749.05 | 784.72 | 820.39 | 856.06 | 891.73 | 927.40 | 963.07 | 1,021.93 | 1,034.40 | 1,070.07 | 1,105.74 | 1,141.41 | 1,330.48 |
| (Hr.) | 9.51 | 9.99 | 10.46 | 10.94 | 11.41 | 11.89 | 12.37 | 12.84 | 13.63 | 13.79 | 14.27 | 14.74 | 15.22 | 17.74 |
| G2 | 21,470 | 22,544 | 23,617 | 24,691 | 25,764 | 26,838 | 27,911 | 28,985 | 30,757 | 31,132 | 32,205 | 33,279 | 34,352 | 40,045 |
| (Bi-weekly) | 825.78 | 867.07 | 908.36 | 949.65 | 990.94 | 1,032.23 | 1,073.52 | 1,114.80 | 1,182.98 | 1,197.38 | 1,238.67 | 1,279.96 | 1,321.25 | 1,540.18 |
| (Hr.) | 11.01 | 11.56 | 12.11 | 12.66 | 13.21 | 13.76 | 14.31 | 14.86 | 15.77 | 15.96 | 16.52 | 17.07 | 17.62 | 20.54 |
| G3 | 24,856 | 26,098 | 27,341 | 28,584 | 29,827 | 31,070 | 32,312 | 33,555 | 35,607 | 36,041 | 37,283 | 38,526 | 39,769 | 46,359 |
| (Bi-weekly) | 955.99 | 1,003.78 | 1,051.58 | 1,099.38 | 1,147.18 | 1,194.98 | 1,242.78 | 1,290.58 | 1,369.52 | 1,386.18 | 1,433.98 | 1,481.78 | 1,529.58 | 1,783.05 |
| (Hr.) | 12.75 | 13.38 | 14.02 | 14.66 | 15.30 | 15.93 | 16.57 | 17.21 | 18.26 | 18.48 | 19.12 | 19.76 | 20.39 | 23.77 |
| G4, P1, T1 | 28,773 | 30,211 | 31,650 | 33,089 | 34,527 | 35,966 | 37,405 | 38,843 | 41,218 | 41,720 | 43,159 | 44,598 | 46,036 | 53,664 |
| (Bi-weekly) | 1,106.64 | 1,161.98 | 1,217.31 | 1,272.64 | 1,327.97 | 1,383.31 | 1,438.64 | 1,493.97 | 1,585.32 | 1,604.63 | 1,659.97 | 1,715.30 | 1,770.63 | 2,064.00 |
| (Hr.) | 14.76 | 15.49 | 16.23 | 16.97 | 17.71 | 18.44 | 19.18 | 19.92 | 21.14 | 21.40 | 22.13 | 22.87 | 23.61 | 27.52 |
| P2, T2 | 33,310 | 34,975 | 36,641 | 38,306 | 39,972 | 41,637 | 43,303 | 44,968 | 47,718 | 48,299 | 49,965 | 51,630 | 53,296 | 62,126 |
| (Bi-weekly) | 1,281.15 | 1,345.20 | 1,409.26 | 1,473.32 | 1,537.37 | 1,601.43 | 1,665.49 | 1,729.55 | 1,835.31 | 1,857.66 | 1,921.72 | 1,985.78 | 2,049.83 | 2,389.48 |
| (Hr.) | 17.08 | 17.94 | 18.79 | 19.64 | 20.50 | 21.35 | 22.21 | 23.06 | 24.47 | 24.77 | 25.62 | 26.48 | 27.33 | 31.86 |
| S1 | 34,206 | 35,917 | 37,627 | 39,337 | 41,048 | 42,758 | 44,468 | 46,179 | 49,002 | 49,596 | 51,310 | 53,020 | 54,730 | 63,799 |
| (Bi-weekly) | 1,315.63 | 1,381.41 | 1,447.19 | 1,512.97 | 1,578.76 | 1,644.54 | 1,710.32 | 1,776.10 | 1,884.71 | 1,907.66 | 1,973.45 | 2,039.23 | 2,105.01 | 2,453.79 |
| (Hr.) | 17.54 | 18.42 | 19.30 | 20.17 | 21.05 | 21.93 | 22.80 | 23.68 | 25.13 | 25.44 | 26.31 | 27.19 | 28.07 | 32.72 |
| P3, T3 | 38,561 | 40,489 | 42,417 | 44,345 | 46,273 | 48,201 | 50,129 | 52,057 | 55,240 | 55,913 | 57,841 | 59,769 | 61,697 | 71,919 |
| (Bi-weekly) | 1,483.10 | 1,557.25 | 1,631.41 | 1,705.56 | 1,779.72 | 1,853.87 | 1,928.03 | 2,002.18 | 2,124.61 | 2,150.49 | 2,224.65 | 2,298.80 | 2,372.96 | 2,766.13 |
| (Hr.) | 19.77 | 20.76 | 21.75 | 22.74 | 23.73 | 24.72 | 25.71 | 26.70 | 28.33 | 28.67 | 29.66 | 30.65 | 31.64 | 36.88 |
| S2 | 41,598 | 43,678 | 45,758 | 47,838 | 49,918 | 51,998 | 54,078 | 56,158 | 59,592 | 60,318 | 62,397 | 64,477 | 66,557 | 77,585 |
| (Bi-weekly) | 1,599.93 | 1,679.93 | 1,759.93 | 1,839.92 | 1,919.92 | 1,999.92 | 2,079.91 | 2,159.91 | 2,291.99 | 2,319.90 | 2,399.90 | 2,479.90 | 2,559.89 | 2,984.05 |
| (Hr.) | 21.33 | 22.40 | 23.47 | 24.53 | 25.60 | 26.67 | 27.73 | 28.80 | 30.56 | 30.93 | 32.00 | 33.07 | 34.13 | 39.79 |
| P4, T4 | 44,636 | 46,868 | 49,100 | 51,332 | 53,564 | 55,796 | 58,027 | 60,259 | 63,944 | 64,723 | 66,955 | 69,186 | 71,418 | 83,251 |
| (Bi-weekly) | 1,716.79 | 1,802.63 | 1,888.46 | 1,974.30 | 2,060.14 | 2,145.98 | 2,231.82 | 2,317.66 | 2,459.38 | 2,489.34 | 2,575.18 | 2,661.02 | 2,746.86 | 3,201.98 |
| (Hr.) | 22.89 | 24.04 | 25.18 | 26.32 | 27.47 | 28.61 | 29.76 | 30.90 | 32.79 | 33.19 | 34.34 | 35.48 | 36.62 | 42.69 |
| S3 | 46,304 | 48,619 | 50,934 | 53,250 | 55,565 | 57,880 | 60,195 | 62,510 | 67,567 | 67,141 | 69,456 | 71,771 | 74,086 | 88,830 |
| (Bi-weekly) | 1,780.92 | 1,869.97 | 1,959.01 | 2,048.06 | 2,137.11 | 2,226.15 | 2,315.20 | 2,404.24 | 2,598.72 | 2,582.34 | 2,671.38 | 2,760.43 | 2,849.47 | 3,416.53 |
| (Hr.) | 23.75 | 24.93 | 26.12 | 27.31 | 28.49 | 29.68 | 30.87 | 32.06 | 34.65 | 34.43 | 35.62 | 36.81 | 37.99 | 45.55 |
| S4, A1 | 52,621 | 55,252 | 57,883 | 60,514 | 63,145 | 65,776 | 68,407 | 71,038 | 76,784 | 76,300 | 78,931 | 81,562 | 84,193 | 100,947 |
| (Bi-weekly) | 2,023.88 | 2,125.08 | 2,226.27 | 2,327.46 | 2,428.66 | 2,529.85 | 2,631.05 | 2,732.24 | 2,953.23 | 2,934.01 | 3,035.82 | 3,137.02 | 3,238.21 | 3,882.57 |
| (Hr.) | 26.99 | 28.33 | 29.68 | 31.03 | 32.38 | 33.73 | 35.08 | 36.43 | 39.38 | 39.13 | 40.48 | 41.83 | 43.18 | 51.77 |

## Loudoun County General Workforce Salary Schedule, 37.5 hours per week

Salary Ranges at 5% Increments

As of 9/10/15

(Annual salary = hourly rate x 1,950 hours per year)

| Payband | FY 2016 Minimum | 5% | 10% | 15% | 20% | 25% | 30% | 35% | Midrange | 45% | 50% | 55% | 60% | FY 2016 Maximum |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A2 | 63,316 | 66,482 | 69,648 | 72,813 | 75,979 | 79,145 | 82,311 | 85,477 | 92,391 | 91,808 | 94,974 | 98,140 | 101,306 | 121,465 |
| (Bi-weekly) | 2,435.23 | 2,556.99 | 2,678.75 | 2,800.52 | 2,922.28 | 3,044.04 | 3,165.80 | 3,287.56 | 3,553.48 | 3,531.09 | 3,652.85 | 3,774.61 | 3,896.37 | 4,671.74 |
| (Hr.) | 32.47 | 34.09 | 35.72 | 37.34 | 38.96 | 40.59 | 42.21 | 43.83 | 47.38 | 47.08 | 48.70 | 50.33 | 51.95 | 62.29 |
| A3, E1 | 71,954 | 75,552 | 79,150 | 82,748 | 86,345 | 89,943 | 93,541 | 97,139 | 104,995 | 104,334 | 107,932 | 111,529 | 115,127 | 138,036 |
| (Bi-weekly) | 2,767.48 | 2,905.85 | 3,044.23 | 3,182.60 | 3,320.97 | 3,459.35 | 3,597.72 | 3,736.10 | 4,038.28 | 4,012.84 | 4,151.22 | 4,289.59 | 4,427.97 | 5,309.09 |
| (Hr.) | 36.90 | 38.74 | 40.59 | 42.43 | 44.28 | 46.12 | 47.97 | 49.81 | 53.84 | 53.50 | 55.35 | 57.19 | 59.04 | 70.79 |
| A4, E2 | 81,772 | 85,860 | 89,949 | 94,037 | 98,126 | 102,214 | 106,303 | 110,392 | 119,321 | 118,569 | 122,657 | 126,746 | 130,834 | 156,870 |
| (Bi-weekly) | 3,145.06 | 3,302.31 | 3,459.56 | 3,616.82 | 3,774.07 | 3,931.32 | 4,088.58 | 4,245.83 | 4,589.25 | 4,560.34 | 4,717.59 | 4,874.84 | 5,032.09 | 6,033.45 |
| (Hr.) | 41.93 | 44.03 | 46.13 | 48.22 | 50.32 | 52.42 | 54.51 | 56.61 | 61.19 | 60.80 | 62.90 | 65.00 | 67.09 | 80.45 |
| E3 | 92,927 | 97,574 | 102,220 | 106,866 | 111,513 | 116,159 | 120,805 | 125,452 | 135,599 | 134,744 | 139,391 | 144,037 | 148,683 | 178,270 |
| (Bi-weekly) | 3,574.12 | 3,752.83 | 3,931.53 | 4,110.24 | 4,288.95 | 4,467.65 | 4,646.36 | 4,825.06 | 5,215.34 | 5,182.48 | 5,361.18 | 5,539.89 | 5,718.60 | 6,856.56 |
| (Hr.) | 47.65 | 50.04 | 52.42 | 54.80 | 57.19 | 59.57 | 61.95 | 64.33 | 69.54 | 69.10 | 71.48 | 73.87 | 76.25 | 91.42 |
| E4 | 105,605 | 110,886 | 116,166 | 121,446 | 126,727 | 132,007 | 137,287 | 142,567 | 154,099 | 153,128 | 158,408 | 163,688 | 168,969 | 202,592 |
| (Bi-weekly) | 4,061.75 | 4,264.84 | 4,467.92 | 4,671.01 | 4,874.10 | 5,077.19 | 5,280.27 | 5,483.36 | 5,926.88 | 5,889.54 | 6,092.62 | 6,295.71 | 6,498.80 | 7,792.01 |
| (Hr.) | 54.16 | 56.86 | 59.57 | 62.28 | 64.99 | 67.70 | 70.40 | 73.11 | 79.03 | 78.53 | 81.23 | 83.94 | 86.65 | 103.89 |

No. 17-2002

## Loudoun County General Workforce Salary Schedule, 40 hours per week

Salary Ranges at 5% Increments

As of 9/10/15

(Annual salary = hourly rate x 2,080 hours per year)

| Payband | | FY 2016 Minimum | 5% | 10% | 15% | 20% | 25% | 30% | 35% | Midrange | 40% | 45% | 50% | 55% | 60% | FY 2016 Maximum |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| G1 | (Bi-weekly) | 19,784 | 20,774 | 21,763 | 22,752 | 23,741 | 24,731 | 25,720 | 26,709 | 28,342 | 27,698 | 28,687 | 29,677 | 30,666 | 31,655 | 36,899 |
| | (Hr.) | 9.51 | 9.99 | 10.46 | 10.94 | 11.41 | 11.89 | 12.37 | 12.84 | 13.63 | 13.32 | 13.79 | 14.27 | 14.74 | 15.22 | 17.74 |
| G2 | (Bi-weekly) | 22,902 | 24,047 | 25,192 | 26,337 | 27,482 | 28,627 | 29,772 | 30,917 | 32,808 | 32,062 | 33,207 | 34,352 | 35,498 | 36,643 | 42,714 |
| | (Hr.) | 11.01 | 11.56 | 12.11 | 12.66 | 13.21 | 13.76 | 14.31 | 14.86 | 15.77 | 15.41 | 15.97 | 16.52 | 17.07 | 17.62 | 20.54 |
| G3 | (Bi-weekly) | 26,513 | 27,838 | 29,164 | 30,490 | 31,815 | 33,141 | 34,466 | 35,792 | 37,981 | 37,118 | 38,443 | 39,769 | 41,095 | 42,420 | 49,450 |
| | (Hr.) | 12.75 | 13.38 | 14.02 | 14.66 | 15.30 | 15.93 | 16.57 | 17.21 | 18.26 | 17.85 | 18.48 | 19.12 | 19.76 | 20.39 | 23.77 |
| G4, P1, T1 | (Bi-weekly) | 30,691 | 32,225 | 33,760 | 35,295 | 36,829 | 38,364 | 39,898 | 41,433 | 43,966 | 42,967 | 44,502 | 46,036 | 47,571 | 49,105 | 57,242 |
| | (Hr.) | 14.76 | 15.49 | 16.23 | 16.97 | 17.71 | 18.44 | 19.18 | 19.92 | 21.14 | 20.66 | 21.40 | 22.13 | 22.87 | 23.61 | 27.52 |
| P2, T2 | (Bi-weekly) | 35,530 | 37,307 | 39,083 | 40,860 | 42,637 | 44,413 | 46,190 | 47,966 | 50,899 | 49,743 | 51,519 | 53,296 | 55,072 | 56,849 | 66,268 |
| | (Hr.) | 17.08 | 17.94 | 18.79 | 19.64 | 20.50 | 21.35 | 22.21 | 23.06 | 24.47 | 23.91 | 24.77 | 25.62 | 26.48 | 27.33 | 31.86 |
| S1 | (Bi-weekly) | 36,487 | 38,311 | 40,135 | 41,960 | 43,784 | 45,609 | 47,433 | 49,257 | 52,269 | 51,082 | 52,906 | 54,730 | 56,555 | 58,379 | 68,052 |
| | (Hr.) | 17.54 | 18.42 | 19.30 | 20.17 | 21.05 | 21.93 | 22.80 | 23.68 | 25.13 | 24.56 | 25.44 | 26.31 | 27.19 | 28.07 | 32.72 |
| P3, T3 | (Bi-weekly) | 41,131 | 43,188 | 45,244 | 47,301 | 49,357 | 51,414 | 53,471 | 55,527 | 58,923 | 57,584 | 59,640 | 61,697 | 63,753 | 65,810 | 76,714 |
| | (Hr.) | 19.77 | 20.76 | 21.75 | 22.74 | 23.73 | 24.72 | 25.71 | 26.70 | 28.33 | 27.68 | 28.67 | 29.66 | 30.65 | 31.64 | 36.88 |
| S2 | (Bi-weekly) | 44,372 | 46,590 | 48,809 | 51,027 | 53,246 | 55,464 | 57,683 | 59,902 | 63,565 | 62,120 | 64,339 | 66,557 | 68,776 | 70,994 | 82,758 |
| | (Hr.) | 21.33 | 22.40 | 23.47 | 24.53 | 25.60 | 26.67 | 27.73 | 28.80 | 30.56 | 29.87 | 30.93 | 32.00 | 33.07 | 34.13 | 39.79 |
| P4, T4 | (Bi-weekly) | 47,612 | 49,993 | 52,373 | 54,754 | 57,135 | 59,515 | 61,896 | 64,277 | 68,207 | 66,657 | 69,038 | 71,418 | 73,799 | 76,180 | 88,802 |
| | (Hr.) | 22.89 | 24.04 | 25.18 | 26.32 | 27.47 | 28.61 | 29.76 | 30.90 | 32.79 | 32.05 | 33.19 | 34.34 | 35.48 | 36.62 | 42.69 |
| S3 | (Bi-weekly) | 49,391 | 51,860 | 54,330 | 56,800 | 59,269 | 61,739 | 64,208 | 66,678 | 72,071 | 69,147 | 71,617 | 74,086 | 76,556 | 79,025 | 94,752 |
| | (Hr.) | 23.75 | 24.93 | 26.12 | 27.31 | 28.49 | 29.68 | 30.87 | 32.06 | 34.65 | 33.24 | 34.43 | 35.62 | 36.81 | 37.99 | 45.55 |
| S4, A1 | (Bi-weekly) | 56,129 | 58,935 | 61,742 | 64,548 | 67,355 | 70,161 | 72,968 | 75,774 | 81,903 | 78,581 | 81,387 | 84,193 | 87,000 | 89,806 | 107,677 |
| | (Hr.) | 26.99 | 28.33 | 29.68 | 31.03 | 32.38 | 33.73 | 35.08 | 36.43 | 39.38 | 37.78 | 39.13 | 40.48 | 41.83 | 43.18 | 51.77 |

## Loudoun County General Workforce Salary Schedule, 40 hours per week

Salary Ranges at 5% Increments

As of 9/10/15

(Annual salary = hourly rate x 2,080 hours per year)

| Payband | FY 2016 Minimum | 5% | 10% | 15% | 20% | 25% | 30% | 35% | Midrange | 40% | 45% | 50% | 55% | 60% | FY 2016 Maximum |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A2 | 67,537 | 70,914 | 74,291 | 77,668 | 81,044 | 84,421 | 87,798 | 91,175 | 98,550 | 94,552 | 97,929 | 101,306 | 104,682 | 108,059 | 129,563 |
| (Bi-weekly) | 2,597.58 | 2,727.46 | 2,857.34 | 2,987.22 | 3,117.10 | 3,246.97 | 3,376.85 | 3,506.73 | 3,790.38 | 3,636.61 | 3,766.49 | 3,896.37 | 4,026.25 | 4,156.13 | 4,983.19 |
| (Hr.) | 32.47 | 34.09 | 35.72 | 37.34 | 38.96 | 40.59 | 42.21 | 43.83 | 47.38 | 45.46 | 47.08 | 48.70 | 50.33 | 51.95 | 62.29 |
| A3, E1 | 76,751 | 80,589 | 84,427 | 88,264 | 92,102 | 95,939 | 99,777 | 103,614 | 111,995 | 107,452 | 111,290 | 115,127 | 118,965 | 122,802 | 147,239 |
| (Bi-weekly) | 2,951.98 | 3,099.58 | 3,247.18 | 3,394.77 | 3,542.37 | 3,689.97 | 3,837.57 | 3,985.17 | 4,307.50 | 4,132.77 | 4,280.37 | 4,427.97 | 4,575.56 | 4,723.16 | 5,663.03 |
| (Hr.) | 36.90 | 38.74 | 40.59 | 42.43 | 44.28 | 46.12 | 47.97 | 49.81 | 53.84 | 51.66 | 53.50 | 55.35 | 57.19 | 59.04 | 70.79 |
| A4, E2 | 87,223 | 91,584 | 95,945 | 100,306 | 104,668 | 109,029 | 113,390 | 117,751 | 127,275 | 122,112 | 126,473 | 130,834 | 135,196 | 139,557 | 167,328 |
| (Bi-weekly) | 3,354.73 | 3,522.47 | 3,690.20 | 3,857.94 | 4,025.68 | 4,193.41 | 4,361.15 | 4,528.88 | 4,895.20 | 4,696.62 | 4,864.36 | 5,032.09 | 5,199.83 | 5,367.57 | 6,435.68 |
| (Hr.) | 41.93 | 44.03 | 46.13 | 48.22 | 50.32 | 52.42 | 54.51 | 56.61 | 61.19 | 58.71 | 60.80 | 62.90 | 65.00 | 67.09 | 80.45 |
| E3 | 99,122 | 104,078 | 109,035 | 113,991 | 118,947 | 123,903 | 128,859 | 133,815 | 144,639 | 138,771 | 143,727 | 148,683 | 153,640 | 158,596 | 190,155 |
| (Bi-weekly) | 3,812.40 | 4,003.02 | 4,193.64 | 4,384.26 | 4,574.88 | 4,765.50 | 4,956.12 | 5,146.74 | 5,563.03 | 5,337.36 | 5,527.98 | 5,718.60 | 5,909.22 | 6,099.83 | 7,313.66 |
| (Hr.) | 47.65 | 50.04 | 52.42 | 54.80 | 57.19 | 59.57 | 61.95 | 64.33 | 69.54 | 66.72 | 69.10 | 71.48 | 73.87 | 76.25 | 91.42 |
| E4 | 112,646 | 118,278 | 123,910 | 129,543 | 135,175 | 140,807 | 146,440 | 152,072 | 164,372 | 157,704 | 163,336 | 168,969 | 174,601 | 180,233 | 216,098 |
| (Bi-weekly) | 4,332.53 | 4,549.16 | 4,765.78 | 4,982.41 | 5,199.04 | 5,415.66 | 5,632.29 | 5,848.92 | 6,322.00 | 6,065.54 | 6,282.17 | 6,498.80 | 6,715.42 | 6,932.05 | 8,311.48 |
| (Hr.) | 54.16 | 56.86 | 59.57 | 62.28 | 64.99 | 67.70 | 70.40 | 73.11 | 79.03 | 75.82 | 78.53 | 81.23 | 83.94 | 86.65 | 103.89 |

Loudoun County General Workforce Salary Schedule, 42 hours per week

Salary Ranges at 5% Increments

As of 9/10/15

(Annual salary = hourly rate x 2,184 hours per year)

| Payband | FY 2016 Minimum | 5% | 10% | 15% | 20% | 25% | 30% | 35% | Midrange | 40% | 45% | 50% | 55% | 60% | FY 2016 Maximum |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **G1** | 20,774 | 21,812 | 22,851 | 23,890 | 24,928 | 25,967 | 27,006 | 28,044 | 29,759 | 29,083 | 30,122 | 31,161 | 32,199 | 33,238 | 38,744 |
| (Bi-weekly) | 798.99 | 838.94 | 878.89 | 918.84 | 958.79 | 998.74 | 1,038.69 | 1,078.63 | 1,144.56 | 1,118.58 | 1,158.53 | 1,198.48 | 1,238.43 | 1,278.38 | 1,490.14 |
| (Hr.) | 9.51 | 9.99 | 10.46 | 10.94 | 11.41 | 11.89 | 12.37 | 12.84 | 13.63 | 13.32 | 13.79 | 14.27 | 14.74 | 15.22 | 17.74 |
| **G2** | 24,047 | 25,249 | 26,451 | 27,654 | 28,856 | 30,058 | 31,261 | 32,463 | 34,448 | 33,665 | 34,868 | 36,070 | 37,272 | 38,475 | 44,850 |
| (Bi-weekly) | 924.87 | 971.12 | 1,017.36 | 1,063.61 | 1,109.85 | 1,156.09 | 1,202.34 | 1,248.58 | 1,324.94 | 1,294.82 | 1,341.07 | 1,387.31 | 1,433.56 | 1,479.80 | 1,725.00 |
| (Hr.) | 11.01 | 11.56 | 12.11 | 12.66 | 13.21 | 13.76 | 14.31 | 14.86 | 15.77 | 15.41 | 15.97 | 16.52 | 17.07 | 17.62 | 20.54 |
| **G3** | 27,838 | 29,230 | 30,622 | 32,014 | 33,406 | 34,798 | 36,190 | 37,582 | 39,880 | 38,974 | 40,366 | 41,757 | 43,149 | 44,541 | 51,922 |
| (Bi-weekly) | 1,070.70 | 1,124.24 | 1,177.77 | 1,231.31 | 1,284.84 | 1,338.38 | 1,391.91 | 1,445.45 | 1,533.86 | 1,498.99 | 1,552.52 | 1,606.06 | 1,659.59 | 1,713.13 | 1,997.01 |
| (Hr.) | 12.75 | 13.38 | 14.02 | 14.66 | 15.30 | 15.93 | 16.57 | 17.21 | 18.26 | 17.85 | 18.48 | 19.12 | 19.76 | 20.39 | 23.77 |
| **G4, P1, T1** | 32,225 | 33,837 | 35,448 | 37,059 | 38,671 | 40,282 | 41,893 | 43,504 | 46,165 | 45,116 | 46,727 | 48,338 | 49,949 | 51,561 | 60,104 |
| (Bi-weekly) | 1,239.44 | 1,301.41 | 1,363.39 | 1,425.36 | 1,487.33 | 1,549.30 | 1,611.27 | 1,673.25 | 1,775.56 | 1,735.22 | 1,797.19 | 1,859.16 | 1,921.13 | 1,983.11 | 2,311.68 |
| (Hr.) | 14.76 | 15.49 | 16.23 | 16.97 | 17.71 | 18.44 | 19.18 | 19.92 | 21.14 | 20.66 | 21.40 | 22.13 | 22.87 | 23.61 | 27.52 |
| **P2, T2** | 37,307 | 39,172 | 41,038 | 42,903 | 44,768 | 46,634 | 48,499 | 50,364 | 53,444 | 52,230 | 54,095 | 55,960 | 57,826 | 59,691 | 69,582 |
| (Bi-weekly) | 1,434.88 | 1,506.63 | 1,578.37 | 1,650.12 | 1,721.86 | 1,793.60 | 1,865.35 | 1,937.09 | 2,055.55 | 2,008.84 | 2,080.58 | 2,152.32 | 2,224.07 | 2,295.81 | 2,676.22 |
| (Hr.) | 17.08 | 17.94 | 18.79 | 19.64 | 20.50 | 21.35 | 22.21 | 23.06 | 24.47 | 23.91 | 24.77 | 25.62 | 26.48 | 27.33 | 31.86 |
| **S1** | 38,311 | 40,227 | 42,142 | 44,058 | 45,973 | 47,889 | 49,805 | 51,720 | 54,883 | 53,636 | 55,551 | 57,467 | 59,382 | 61,298 | 71,454 |
| (Bi-weekly) | 1,473.51 | 1,547.18 | 1,620.86 | 1,694.53 | 1,768.21 | 1,841.88 | 1,915.56 | 1,989.23 | 2,110.88 | 2,062.91 | 2,136.58 | 2,210.26 | 2,283.93 | 2,357.61 | 2,748.25 |
| (Hr.) | 17.54 | 18.42 | 19.30 | 20.17 | 21.05 | 21.93 | 22.80 | 23.68 | 25.13 | 24.56 | 25.44 | 26.31 | 27.19 | 28.07 | 32.72 |
| **P3, T3** | 43,188 | 45,347 | 47,507 | 49,666 | 51,825 | 53,985 | 56,144 | 58,304 | 61,869 | 60,463 | 62,622 | 64,782 | 66,941 | 69,100 | 80,550 |
| (Bi-weekly) | 1,661.07 | 1,744.12 | 1,827.18 | 1,910.23 | 1,993.28 | 2,076.34 | 2,159.39 | 2,242.44 | 2,379.57 | 2,325.50 | 2,408.55 | 2,491.60 | 2,574.66 | 2,657.71 | 3,098.07 |
| (Hr.) | 19.77 | 20.76 | 21.75 | 22.74 | 23.73 | 24.72 | 25.71 | 26.70 | 28.33 | 27.68 | 28.67 | 29.66 | 30.65 | 31.64 | 36.88 |
| **S2** | 46,590 | 48,920 | 51,249 | 53,579 | 55,908 | 58,238 | 60,567 | 62,897 | 66,743 | 65,226 | 67,556 | 69,885 | 72,215 | 74,544 | 86,896 |
| (Bi-weekly) | 1,791.93 | 1,881.52 | 1,971.12 | 2,060.72 | 2,150.31 | 2,239.91 | 2,329.50 | 2,419.10 | 2,567.03 | 2,508.70 | 2,598.29 | 2,687.89 | 2,777.49 | 2,867.08 | 3,342.14 |
| (Hr.) | 21.33 | 22.40 | 23.47 | 24.53 | 25.60 | 26.67 | 27.73 | 28.80 | 30.56 | 29.87 | 30.93 | 32.00 | 33.07 | 34.13 | 39.79 |
| **P4, T4** | 49,993 | 52,492 | 54,992 | 57,492 | 59,991 | 62,491 | 64,991 | 67,490 | 71,617 | 69,990 | 72,490 | 74,989 | 77,489 | 79,989 | 93,242 |
| (Bi-weekly) | 1,922.80 | 2,018.94 | 2,115.08 | 2,211.22 | 2,307.36 | 2,403.50 | 2,499.64 | 2,595.78 | 2,754.51 | 2,691.92 | 2,788.06 | 2,884.20 | 2,980.34 | 3,076.48 | 3,586.21 |
| (Hr.) | 22.89 | 24.04 | 25.18 | 26.32 | 27.47 | 28.61 | 29.76 | 30.90 | 32.79 | 32.05 | 33.19 | 34.34 | 35.48 | 36.62 | 42.69 |
| **S3** | 51,860 | 54,453 | 57,046 | 59,640 | 62,233 | 64,826 | 67,419 | 70,012 | 75,675 | 72,605 | 75,198 | 77,791 | 80,384 | 82,977 | 99,489 |
| (Bi-weekly) | 1,994.63 | 2,094.36 | 2,194.10 | 2,293.83 | 2,393.56 | 2,493.29 | 2,593.02 | 2,692.75 | 2,910.57 | 2,792.48 | 2,892.22 | 2,991.95 | 3,091.68 | 3,191.41 | 3,826.51 |
| (Hr.) | 23.75 | 24.93 | 26.12 | 27.31 | 28.49 | 29.68 | 30.87 | 32.06 | 34.65 | 33.24 | 34.43 | 35.62 | 36.81 | 37.99 | 45.55 |
| **S4, A1** | 58,935 | 61,882 | 64,829 | 67,776 | 70,723 | 73,669 | 76,616 | 79,563 | 85,998 | 82,510 | 85,456 | 88,403 | 91,350 | 94,297 | 113,061 |
| (Bi-weekly) | 2,266.75 | 2,380.09 | 2,493.42 | 2,606.76 | 2,720.10 | 2,833.43 | 2,946.77 | 3,060.11 | 3,307.61 | 3,173.45 | 3,286.78 | 3,400.12 | 3,513.46 | 3,626.80 | 4,348.48 |
| (Hr.) | 26.99 | 28.33 | 29.68 | 31.03 | 32.38 | 33.73 | 35.08 | 36.43 | 39.38 | 37.78 | 39.13 | 40.48 | 41.83 | 43.18 | 51.77 |

## Loudoun County General Workforce Salary Schedule, 42 hours per week

Salary Ranges at 5% Increments

As of 9/10/15

(Annual salary = hourly rate x 2,184 hours per year)

| Payband | FY 2016 Minimum | 5% | 10% | 15% | 20% | 25% | 30% | 35% | Midrange | 40% | 45% | 50% | 55% | 60% | FY 2016 Maximum |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A2 | 70,914 | 74,460 | 78,005 | 81,551 | 85,097 | 88,642 | 92,188 | 95,734 | 103,477 | 99,280 | 102,825 | 106,371 | 109,917 | 113,462 | 136,041 |
| (Bi-weekly) | 2,727.46 | 2,863.83 | 3,000.20 | 3,136.58 | 3,272.95 | 3,409.32 | 3,545.70 | 3,682.07 | 3,979.90 | 3,818.44 | 3,954.82 | 4,091.19 | 4,227.56 | 4,363.93 | 5,232.35 |
| (Hr.) | 32.47 | 34.09 | 35.72 | 37.34 | 38.96 | 40.59 | 42.21 | 43.83 | 47.38 | 45.46 | 47.08 | 48.70 | 50.33 | 51.95 | 62.29 |
| A3, E1 | 80,589 | 84,618 | 88,648 | 92,677 | 96,707 | 100,736 | 104,766 | 108,795 | 117,595 | 112,825 | 116,854 | 120,883 | 124,913 | 128,942 | 154,601 |
| (Bi-weekly) | 3,099.58 | 3,254.55 | 3,409.53 | 3,564.51 | 3,719.49 | 3,874.47 | 4,029.45 | 4,184.43 | 4,522.88 | 4,339.41 | 4,494.39 | 4,649.36 | 4,804.34 | 4,959.32 | 5,946.18 |
| (Hr.) | 36.90 | 38.74 | 40.59 | 42.43 | 44.28 | 46.12 | 47.97 | 49.81 | 53.84 | 51.66 | 53.50 | 55.35 | 57.19 | 59.04 | 70.79 |
| A4, E2 | 91,584 | 96,163 | 100,743 | 105,322 | 109,901 | 114,480 | 119,059 | 123,639 | 133,639 | 128,218 | 132,797 | 137,376 | 141,955 | 146,535 | 175,694 |
| (Bi-weekly) | 3,522.47 | 3,698.59 | 3,874.71 | 4,050.84 | 4,226.96 | 4,403.08 | 4,579.21 | 4,755.33 | 5,139.96 | 4,931.45 | 5,107.58 | 5,283.70 | 5,459.82 | 5,635.95 | 6,757.46 |
| (Hr.) | 41.93 | 44.03 | 46.13 | 48.22 | 50.32 | 52.42 | 54.51 | 56.61 | 61.19 | 58.71 | 60.80 | 62.90 | 65.00 | 67.09 | 80.45 |
| E3 | 104,078 | 109,282 | 114,486 | 119,690 | 124,894 | 130,098 | 135,302 | 140,506 | 151,871 | 145,710 | 150,914 | 156,118 | 161,322 | 166,525 | 199,663 |
| (Bi-weekly) | 4,003.02 | 4,203.17 | 4,403.32 | 4,603.47 | 4,803.62 | 5,003.77 | 5,203.92 | 5,404.07 | 5,841.18 | 5,604.22 | 5,804.37 | 6,004.53 | 6,204.68 | 6,404.83 | 7,679.34 |
| (Hr.) | 47.65 | 50.04 | 52.42 | 54.80 | 57.19 | 59.57 | 61.95 | 64.33 | 69.54 | 66.72 | 69.10 | 71.48 | 73.87 | 76.25 | 91.42 |
| E4 | 118,278 | 124,192 | 130,106 | 136,020 | 141,934 | 147,848 | 153,762 | 159,675 | 172,591 | 165,589 | 171,503 | 177,417 | 183,331 | 189,245 | 226,903 |
| (Bi-weekly) | 4,549.16 | 4,776.62 | 5,004.07 | 5,231.53 | 5,458.99 | 5,686.45 | 5,913.91 | 6,141.36 | 6,638.10 | 6,368.82 | 6,596.28 | 6,823.74 | 7,051.20 | 7,278.65 | 8,727.05 |
| (Hr.) | 54.16 | 56.86 | 59.57 | 62.28 | 64.99 | 67.70 | 70.40 | 73.11 | 79.03 | 75.82 | 78.53 | 81.23 | 83.94 | 86.65 | 103.89 |

## Loudoun County Sheriff's Office Salary Schedule - LEO-Eligible Uniformed Positions
Salary Ranges at 5% Increments
As of 9/10/15
(Annual salary = hourly rate x 2,184 hours per year)

| Payband | FY 2016 Minimum | 5% | 10% | 15% | 20% | 25% | 30% | 35% | Midrange | 45% | 50% | 55% | 60% | FY 2016 Maximum |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| U1 | 41,885 | 43,979 | 46,073 | 48,167 | 50,261 | 52,356 | 54,450 | 56,544 | 56,654 | 60,733 | 62,827 | 64,921 | 67,015 | 71,424 |
| (Bi-weekly) | 1,610.95 | 1,691.49 | 1,772.04 | 1,852.59 | 1,933.13 | 2,013.68 | 2,094.23 | 2,174.78 | 2,179.02 | 2,335.87 | 2,416.42 | 2,496.96 | 2,577.51 | 2,747.09 |
| (Hr.) | 19.18 | 20.14 | 21.10 | 22.05 | 23.01 | 23.97 | 24.93 | 25.89 | 25.94 | 27.81 | 28.77 | 29.73 | 30.68 | 32.70 |
| U2 | 46,072 | 48,375 | 50,679 | 52,982 | 55,286 | 57,589 | 59,893 | 62,197 | 62,317 | 66,804 | 69,107 | 71,411 | 73,715 | 78,563 |
| (Bi-weekly) | 1,771.98 | 1,860.58 | 1,949.18 | 2,037.78 | 2,126.38 | 2,214.98 | 2,303.58 | 2,392.18 | 2,396.82 | 2,569.38 | 2,657.98 | 2,746.58 | 2,835.17 | 3,021.67 |
| (Hr.) | 21.10 | 22.15 | 23.20 | 24.26 | 25.31 | 26.37 | 27.42 | 28.53 | 28.53 | 30.59 | 31.64 | 32.70 | 33.75 | 35.97 |
| U3, M1, U4 | 50,680 | 53,214 | 55,748 | 58,283 | 60,817 | 63,351 | 65,885 | 68,419 | 68,552 | 73,487 | 76,021 | 78,555 | 81,089 | 86,423 |
| (Bi-weekly) | 1,949.25 | 2,046.71 | 2,144.17 | 2,241.64 | 2,339.10 | 2,436.56 | 2,534.02 | 2,631.49 | 2,636.61 | 2,826.41 | 2,923.87 | 3,021.33 | 3,118.80 | 3,323.96 |
| (Hr.) | 23.21 | 24.37 | 25.53 | 26.69 | 27.85 | 29.01 | 30.17 | 31.33 | 31.39 | 33.65 | 34.81 | 35.97 | 37.13 | 39.57 |
| U5, M2 | 53,094 | 55,748 | 58,403 | 61,058 | 63,712 | 66,367 | 69,022 | 71,676 | 71,815 | 76,986 | 79,640 | 82,295 | 84,950 | 90,536 |
| (Bi-weekly) | 2,042.06 | 2,144.17 | 2,246.27 | 2,348.37 | 2,450.47 | 2,552.58 | 2,654.68 | 2,756.78 | 2,762.11 | 2,960.99 | 3,063.09 | 3,165.20 | 3,267.30 | 3,482.16 |
| (Hr.) | 24.31 | 25.53 | 26.74 | 27.96 | 29.17 | 30.39 | 31.60 | 32.82 | 32.88 | 35.25 | 36.47 | 37.68 | 38.90 | 41.45 |
| U6 | 55,748 | 58,536 | 61,323 | 64,110 | 66,898 | 69,685 | 72,473 | 75,260 | 76,419 | 80,835 | 83,622 | 86,410 | 89,197 | 97,089 |
| (Bi-weekly) | 2,144.16 | 2,251.37 | 2,358.58 | 2,465.79 | 2,572.99 | 2,680.20 | 2,787.41 | 2,894.62 | 2,939.18 | 3,109.03 | 3,216.24 | 3,323.45 | 3,430.66 | 3,734.20 |
| (Hr.) | 25.53 | 26.80 | 28.08 | 29.35 | 30.63 | 31.91 | 33.18 | 34.46 | 34.99 | 37.01 | 38.29 | 39.56 | 40.84 | 44.45 |
| U7, M3 | 58,403 | 61,323 | 64,243 | 67,163 | 70,083 | 73,003 | 75,924 | 78,844 | 78,996 | 84,684 | 87,604 | 90,524 | 93,444 | 99,590 |
| (Bi-weekly) | 2,246.26 | 2,358.57 | 2,470.89 | 2,583.20 | 2,695.51 | 2,807.82 | 2,920.14 | 3,032.45 | 3,038.32 | 3,257.08 | 3,369.39 | 3,481.70 | 3,594.02 | 3,830.37 |
| (Hr.) | 26.74 | 28.08 | 29.42 | 30.75 | 32.09 | 33.43 | 34.76 | 36.10 | 36.17 | 38.77 | 40.11 | 41.45 | 42.79 | 45.60 |
| U8 | 61,323 | 64,389 | 67,455 | 70,521 | 73,587 | 76,653 | 79,719 | 82,786 | 83,894 | 88,918 | 91,984 | 95,050 | 98,116 | 106,466 |
| (Bi-weekly) | 2,358.56 | 2,476.49 | 2,594.42 | 2,712.35 | 2,830.28 | 2,948.21 | 3,066.13 | 3,184.06 | 3,226.70 | 3,419.92 | 3,537.85 | 3,655.77 | 3,773.70 | 4,094.84 |
| (Hr.) | 28.08 | 29.48 | 30.89 | 32.29 | 33.69 | 35.10 | 36.50 | 37.91 | 38.41 | 40.71 | 42.12 | 43.52 | 44.93 | 48.75 |
| U9 | 67,454 | 70,827 | 74,200 | 77,572 | 80,945 | 84,318 | 87,691 | 91,063 | 92,489 | 97,809 | 101,181 | 104,554 | 107,927 | 117,525 |
| (Bi-weekly) | 2,594.39 | 2,724.11 | 2,853.83 | 2,983.55 | 3,113.27 | 3,242.99 | 3,372.71 | 3,502.43 | 3,557.28 | 3,761.87 | 3,891.59 | 4,021.31 | 4,151.03 | 4,520.17 |
| (Hr.) | 30.89 | 32.43 | 33.97 | 35.52 | 37.06 | 38.61 | 40.15 | 41.70 | 42.35 | 44.78 | 46.33 | 47.87 | 49.42 | 53.81 |
| O1 | 77,548 | 81,425 | 85,303 | 89,180 | 93,057 | 96,935 | 100,812 | 104,689 | 104,993 | 112,444 | 116,322 | 120,199 | 124,076 | 132,237 |
| (Bi-weekly) | 2,982.61 | 3,131.74 | 3,280.87 | 3,430.00 | 3,579.13 | 3,728.26 | 3,877.39 | 4,026.52 | 4,034.33 | 4,324.78 | 4,473.91 | 4,623.04 | 4,772.17 | 5,086.06 |
| (Hr.) | 35.51 | 37.28 | 39.06 | 40.83 | 42.61 | 44.38 | 46.16 | 47.93 | 48.03 | 51.49 | 53.26 | 55.04 | 56.81 | 60.55 |
| O2 | 87,163 | 91,521 | 95,880 | 100,238 | 104,596 | 108,954 | 113,312 | 117,670 | 117,899 | 126,387 | 130,745 | 135,103 | 139,461 | 148,635 |
| (Bi-weekly) | 3,352.43 | 3,520.05 | 3,687.67 | 3,855.30 | 4,022.92 | 4,190.54 | 4,358.16 | 4,525.78 | 4,534.57 | 4,861.03 | 5,028.65 | 5,196.27 | 5,363.89 | 5,716.72 |
| (Hr.) | 39.91 | 41.91 | 43.90 | 45.90 | 47.89 | 49.89 | 51.88 | 53.88 | 53.98 | 57.87 | 59.86 | 61.86 | 63.86 | 68.06 |
| O3 | 97,971 | 102,870 | 107,768 | 112,667 | 117,566 | 122,464 | 127,363 | 132,261 | 132,518 | 142,058 | 146,957 | 151,855 | 156,754 | 167,065 |
| (Bi-weekly) | 3,768.13 | 3,956.53 | 4,144.94 | 4,333.34 | 4,521.75 | 4,710.16 | 4,898.56 | 5,086.97 | 5,096.85 | 5,463.78 | 5,652.19 | 5,840.59 | 6,029.00 | 6,425.57 |
| (Hr.) | 44.86 | 47.10 | 49.34 | 51.59 | 53.83 | 56.07 | 58.32 | 60.56 | 60.68 | 65.05 | 67.29 | 69.53 | 71.77 | 76.49 |

Notes:
1. Salaries based on a 42 hours work week/2,184 hours per year for non-exempt classifications.
2. Maximum of the pay range for U6, U8 and U9 paybands have been frozen to FY 2014 level due to miscalculations in the previous years.

## 2016 BOARD OF SUPERVISORS BRIEFING

# # 7b

**SUBJECT:**          **Pay for Performance**

**STAFF CONTACTS:**   Jeanette D. Green, Director, Human Resources
Ronda Allen, Workforce Planning Manager, Human Resources
Geneva Douglas, Employee Relations Manager, Human Resources

**BACKGROUND:**   On October 4, 2011, the Board voted 7-2 (Burton and Miller, opposed) to approve the recommendations of the Finance/Government Services and Operations Committee (FGSOC) to revise the County's performance assessment system as follows: 1) Identify three to five specific objectives in each employee's performance evaluation to be achieved during the performance assessment period; 2) Change to a five-tier rating scale; 3) Use existing compensation tools to reward outstanding performance; and 4) Require departmental supervisors to attend performance evaluation training.

The new system was implemented on July 1, 2013. Attachment 1 details the new system as compared to the previous system. The goals of the new system include: differentiating pay based on performance; discouraging rating inflation; aligning work activities with strategic goals; and placing increased emphasis on employee soft skills.

The County has operated under the new system for two assessment cycles (FY 14 and FY 15). For the FY 2014 cycle, County employees were eligible for a salary increase of an average of 3 percent. For the FY 2015 cycle, 3 percent of regular payroll was budgeted for pay increases. In accordance with County policy, the County Administrator set the levels of pay-for-performance as follows:

| Rating Category | FY 14 Assessment Cycle Pay for Performance | FY 15 Assessment Cycle Pay for Performance |
|---|---|---|
| *Does Not Meet Expectations* | 0% | 0% |
| *Needs Improvement* | 0% | 0% |
| *Fully Successful* | 2.5% | 2.75% |
| *Exceeds Expectations* | 3% | 3.5% |
| *Outstanding* | 3% plus a $2,000 bonus | 4% |

In FY 2014 the allocated budget for pay-for-performance was monitored at the countywide level and the total amount expended on pay increases did not exceed the budgeted amount. In FY 2015, the allocated budget for pay-for-performance was monitored at the department level.  Further, a new procedure was implemented by the County Administrator requiring each Department Head to certify in writing to the Budget Office that the department did not exceed 3 percent of regular payroll in administering pay-for-performance within their department.

**ISSUES:**   Attachment # details the ratings distribution for FY 2014 and FY 2015. The data indicates that the new system is functioning as intended: pay increases are being differentiated based on performance; the organization is experiencing a shift towards "Fully Successful" as the most

prevalent rating; employees are each assigned 3-5 fiscal year objectives; and core competencies (soft skills) have increased weight in the overall assessment score. Overall, Human Resources has received positive feedback regarding the addition of fiscal year goals, the increased weight of the core competencies, and the expanded five-tier rating scale. However, Human Resources has also received a considerable amount of negative feedback regarding the new system, including:

➢ **Administratively Burdensome:** The new system is administratively burdensome. From July 1 to mid-August each year, managers must dedicate a significant amount of time to administering the new system, while remaining within the allocated budget. This burden is particularly onerous in larger departments.

➢ **Confusion about the Rating Tiers:** Despite communication efforts explaining that "Fully Successful" is the expected standard of performance, many continue to perceive "Fully Successful" as a poor rating. Others have expressed difficulty in distinguishing between the "Exceeds Expectations" and "Outstanding" ratings.

➢ **Difficulty with Rating Fiscal Year Objectives:** Many supervisors have expressed that it is difficult to apply the five-tier rating scale when rating employees on fiscal year objectives.

➢ **Forced Bell Curve/Quota System:** The budgetary constraints associated with pay-for-performance act as a forced "bell curve" or "quota" system, in that employees are rated against each other and supervisors may be required by the Department Reviewer to change ratings in order to stay within budget.

➢ **Levels of Pay-for-Performance:** After the FY 2014 cycle, feedback was received that there was not enough difference between the 2.5 percent increase for "Fully Successful" and the 3 percent increase for "Exceeds Expectations." Some felt that 2.5 percent was too small of an increase for the "Fully Successful" level. For the FY 2015 cycle, the County Administrator approved an increase of 2.75 percent for "Fully Successful" and 3.5 percent for "Exceeds Expectations." Despite these changes, complaints continue that an overall 3 percent budget is not a large enough budget to create a meaningful differentiation in pay for each rating tier.

➢ **Perceived Rating Inequities:** Some employees expressed the perception that the highest performance ratings/increases were reserved for highly compensated employees in the organization and that an "Outstanding" rating is unattainable for most employees at the lower levels in the organization.

➢ **Ineffective System for Public Safety Departments:** Employees and supervisors within the County's public safety departments have consistently shared that the new system is ineffective for assessing the performance of public safety employees such as Firefighters and Deputies. These concerns have also been shared by other departments who have a large number of employees within a job classification that all perform substantially similar work. Specific issues cited include difficulty in setting fiscal year objectives and difficulty distinguishing performance among employees in these groups.

USCA4 Appeal: 17-2002      Doc: 88-1      Filed: 01/07/2019      Pg: 293 of 547

**PURPOSE:**  The purpose of this briefing is to provide the Board with an overview of the County's performance assessment system, including the pay-for-performance program and to create awareness of the issues that have been raised by employees and supervisors with regard to the new system. Should the Board choose to fund a pay increase for FY 2017, staff will seek direction on how to implement such an increase.  Potential options include:

1. Implement FY 2017 pay increase in accordance with the new pay-for-performance system.
2. Implement FY 2017 pay increase as a flat across the board cost of living adjustment (COLA).
3. Implement FY 2017 pay increase as a flat across the board merit increase.
4. Other options based on Board direction.

**ANTICIPATED ACTION DATE:**  March 2016

**ADDITIONAL INFORMATION:**  Please feel free to contact staff for additional information.

**ATTACHMENTS:**

1. System Comparison
2. FY 14 and FY 15 Ratings Distribution

**ATTACHMENT #1: SYSTEM COMPARISON**

|  | Previous System (effective 1993–June 30, 2013) | New System (effective July 1, 2013) |
|---|---|---|
| **Rating Tiers** | *3 tier system:*<br>1. Does Not Meet Expectations<br>2. Meets Expectations, and<br>3. Exceeds Expectations | *5 tier system:*<br>1. Does Not Meet Expectations<br>2. Needs Improvement<br>3. Fully Successful<br>4. Exceeds Expectations<br>5. Outstanding |
| **Points** | 200 maximum | 400 maximum |
| **Weighted Score** | ▪ 90% Job Components<br>▪ 10% Performance Factors (soft skills) | ▪ 50% Job Components<br>▪ 25% Fiscal Year Objectives<br>▪ 25% Core Competencies (soft skills) |
| **Objectives** | Not Applicable | 3-5 fiscal year objectives per each employee |
| **Pay for Performance** | Originally designed to allow for differentiating pay based on performance, however never used in this manner. | Requires the level of compensation to be differentiated based on the annual performance rating. |

**ATTACHMENT #2: FY 14 AND FY 15 RATINGS DISTRIBUTION**

| Rating Category | FY 14 # of Assessments | FY 14 % | FY 15 # of Assessments | FY 15 % | % Increase/Decrease |
|---|---|---|---|---|---|
| *Does Not Meet Expectations* | 3 | 0.10% | 0 | 0.00% | -100.00% |
| *Needs Improvement* | 18 | 0.59% | 25 | 0.80% | 38.89% |
| *Fully Successful* | 1299 | 42.44% | 1603 | 51.41% | 23.40% |
| *Exceeds Expectations* | 1516 | 49.53% | 1338 | 42.91% | -11.74% |
| *Outstanding* | 225 | 7.35% | 152 | 4.87% | -32.44% |
| **TOTAL** | **3061** | **100%** | **3118** | **100%** | |

No. 17-2002 Viewed 12/17/2018

## 2016 BOARD OF SUPERVISORS BRIEFING

**SUBJECT:**    **Loudoun County Broadband Issues**                           **# 8a**

**STAFF CONTACTS:**    Wendy Wickens, Director, Information Technology
Zenon Dragosz, Administrator for Broadband and Cable TV Services
Bill McIntyre, Assistant Director of Information Technology

**BACKGROUND**:  There currently are two authorized, and one unauthorized, Video Franchise (Cable Television Systems) providers servicing the unincorporated areas of Loudoun County with wired (Fiber, and/or Coax) services. These providers operate under the mandates established by the Federal Communications Commission (FCC), State, and local Loudoun County ordinances regarding the provision of Video/Communications services to the residents, businesses, public schools, libraries, community centers, government offices, and public safety locations (Sheriff, Fire & Rescue, Emergency Medical Services (EMS))  of Loudoun County.

Loudoun County entered into 15-year, non-exclusive Video Franchise Agreements (VFA) for the provision of video services to the unincorporated areas of Loudoun County with Verizon FiOS (2006), and Comcast Communications (2007).  The Comcast franchise was a re-franchise agreement extension resulting from Comcast's purchase of Adelphia Communications. Additionally, the County entered into a seven (7) year exclusive Franchise Agreement for Open Video Systems (OVS) with OpenBand Multimedia LLC (2005) for the provision of video services to three Home Owners Association (HOA) locations in Eastern Loudoun County (Lansdowne on the Potomac, Lansdowne Village Greens, and Broadlands Southern Walk).

There are seven incorporated towns within Loudoun County, which the County does not have jurisdictional authority over for the provision of broadband services. These towns include: Leesburg, Purcellville, Lovettsville, Hillsboro, Middleburg, Hamilton, and Round Hill.

Using Leesburg, and Route 15, as the dividing line between Eastern and Western Loudoun, Eastern Loudoun County is well serviced by both Comcast and Verizon. In contrast, service provision is currently only available to the most densely populated, unincorporated, locations in Western Loudoun County. The primary reason for this is the requirement in the VFA to provide services to a minimum of 20 homes per mile as measured from the nearest technically feasible connection point, or 15 homes per mile if all homeowners commit to purchasing services.

Wireless broadband in Loudoun County has, until recently, been provided by three major wireless broadband providers (RoadStar, Loudoun Wireless, and Lucketts.net). Starting in the fall of 2014, AllPoints Broadband has acquired these broadband providers and is currently the only provider of wireless broadband services in Loudoun County.

**PURPOSE:**  The purpose of this briefing is to provide the Board of Supervisors with the history behind the provision of broadband services in Loudoun County and present the issues and

current efforts underway surrounding the expansion of Broadband into Western Loudoun County.

**MAJOR ISSUES:** Staff from the Department of Information Technology (DIT), ~~Staff~~ and the Communications Commission, ~~has~~ have identified the following major issues:

1. Expansion of Broadband services to the unserved/underserved locations in Loudoun County is hampered by the current VFAs that have no provisions for the evolution of technological changes (Internet, Voice over Internet Protocol (VoIP), etc.), and have no reopener clause to address evolving community needs and trends.

2. Broadband services expansion are a critical need, in Western Loudoun County, for the provision of services to:

   ▪ Support education (Loudoun County Public Schools (LCPS), home school, remote college/university studies, research and homework assignments)

   ▪ Home-based business operations

   ▪ Telecommuting

   ▪ Telemedicine/Telehealth solutions

   ▪ Expanded Rural Economic Development (farms, wineries, breweries, distilleries, cideries, etc.)

   ▪ Workforce Development and Retention

   ▪ Fill-in the current gaps in public safety radio communications. These gaps were identified in the Gap Analysis Study that was initiated by the Board of Supervisors in 2012, and presented to the Board in 2014. The results of the study identified areas within Loudoun County where there was a lack of services from both a public safety perspective as well as from a Broadband availability perspective. Additionally, the study provided the steps that need to be taken to "fill-in" these gaps to avoid loss of communication.

3. The inability to obtain government grants for the expansion of broadband into rural localities partially due to the inaccuracy of FCC coverage data that does not show the true coverage availability because of the methodology being used. By using census tracts as a basis, if one location within a tract has the ability to receive high speed broadband, then the entire tract is deemed to be able to receive the same service.

4. Wireless broadband providers are not required to secure a Franchise Agreement from Loudoun County for the provision of their services. Franchise Agreements are only required for entities that wish to provide Video Services within a designated franchised area of service; hence, the County has no regulatory authority over the operations of wireless broadband providers.

5. There has been very slow growth of wireless broadband facilities in Western Loudoun County partially due to local ordinance restrictions pertaining to towers, their locations, heights, and visual impacts.

USCA4 Appeal: 17-2002      Doc: 88-1      Filed: 01/07/2019      Pg: 298 of 547

6.  Wireless broadband service provision is additionally hampered by the topography of Western Loudoun, and the amount and height of tree coverage that obscures the "Line-of-Sight" requirements of wireless technology for the provision of good quality of service.

7.  The Communications Commission, working in conjunction with the Loudoun County Department of Planning and Zoning, and DIT, is currently in the process of reviewing several Zoning Ordinance Amendments (ZOAMS), and updating these ordinances to address existing zoning related challenges.    The outcome of these amendments include documentation that can be referenced for any current, and future, technological changes that may be inhibiting the expansion of wireless services in all parts of the County.

8.  OpenBand has failed to meet their re-franchise date requirements and has had their VFA to operate in Loudoun County revoked. OpenBand continues to operate and provide video, voice, and data services to the communities without a formal Franchise to provide Video Services which is a violation to FCC, State, and Local laws. (Reference Loudoun County Ordinance Chapter 805, Cable Television; Franchising and Regulation, Section 805.03 – General Provisions, subsection d – Unlawful Acts; Penalties, paragraph (1), and 47 U.S.C. Part III – Franchising and Regulation §541, General franchise requirements, subsection b-No cable service without franchise; exception under prior law, paragraph (1)). Competitive providers are not able to provide video services to these developments due to the agreements between the individual HOA's, OpenBand, and the various conservancies that have granted 65 year exclusivity agreements to OpenBand for the control of the community easements. The County Attorney's office has chosen to not pursue any regulatory action for the time being on this provision, since the alternative would be for OpenBand to disconnect all households from any video services, with no alternative to fill the resulting void in service.

9.  Revising Rights-of-Way (ROW) requirements to incorporate a "dig once" policy.

10. Requiring developers to adhere to the "dig once" policy and provide additional dark conduits to be placed in ground during initial construction for future Broadband deployment.

11. Requirement for road construction projects to place dark conduit in ground during their open trench stage for future broadband deployment.

12. The streamlining of County permitting and zoning processes to provide a fast track for broadband expansion.

13. The reduction, or elimination of fees (or rents) in exchange for services or use of infrastructure.

14. The requirement for anyone wishing to use the County ROW, to provide a to-be-determined amount of dark fiber for the use by County government. Such dark fiber can be used as compensation for a partner's participation in a Public-Private Partnership (P3) agreement (indefeasible right-of-use (IRU) agreement).

15. Encouragement, voluntarily, through incentive or through ordinance, of private pole owners to consolidate attachments, reserve pole space, or take other steps to streamline the pole attachment/make ready process.

16. Encouragement, voluntarily, through incentive, or through ordinance, of private developers to provide additional pathways from the public ROW to the entrance demarcation locations for new developments and/or buildings.

**ANTICIPATED ACTION DATE:**  Action by the Board will vary by issue and item.  Results from the RFI solicitation for information regarding P3 solutions specific to Loudoun County, and the decision of whether to move forward in pursuit of a Request for Public Partnership (RFPP).

**ADDITIONAL INFORMATION:**  Projects currently underway to resolve the broadband issues are:

1. DIT Staff is currently drafting a Request for Information (RFI), as directed by the Board, to solicit information regarding P3 opportunities, and requirements, for:

   - The expansion of broadband services into western Loudoun County (either through a wired, or wireless solution)

   - The replacement of the current Verizon (Transparent Local Area Network Service) TLS agreements to provide video, voice, and data services to LCPS locations, libraries, community centers, government facilities, public safety locations including Sheriff, Fire & Rescue and EMS facilities.

3. DIT Staff is currently working with County's Geographic Information Systems staff to identify, and provide, data maps that show existing tower/monopole locations, government owned facilities available for use, and existing dark fiber route locations owned by the County.

4. Several Planning and Zoning Initiatives are currently under review by the Communications Commission, in coordination with the County's Department of Planning & Zoning.  These are detailed in a separate Issue Paper.

5. The Board of Supervisor's 2016 legislative program includes support of VACo's broadband initiatives to expand broadband accessibility throughout the Commonwealth.   The Board also supported changes to the FCC reporting requirements for Broadband providers in order to allow for more accurate mapping of existing coverage and availability.

**ADDITIONAL INFORMATION:**  Please feel free to contact staff for additional information.

**2016 BOARD OF SUPERVISORS BRIEFING**

# # 9a

**SUBJECT:**            **Loudoun County Board of Supervisors Legislative
                        Program for the 2016 Virginia General Assembly Session**

**STAFF CONTACT:**      Charles Yudd, Assistant County Administrator
                        Gwen Kennedy, County Administration
                        Jeff Gore and Roger Wiley, Hefty and Wiley, PC

---

**BACKGROUND:**

Each year the Board adopts a legislative program. This program indicates its priority issues and initiatives for the upcoming Virginia General Assembly Session. As part of this program, the Board also requests its General Assembly delegation (i.e., delegates and senators) to introduce specific legislation of importance to Loudoun County. This year's program includes newly adopted items combined with prior adopted positions/statements that have been discussed during the Board's business meetings since September 2015 in addition to prior adopted positions from the 2015 Session and earlier. The Board seeks input from the public on the proposed legislative program, and conducted a public hearing on the 2016 legislative program on November 12, 2015.

The Board's legislative program is included in Attachment 1 and is divided into three (3) sections; the first section, "Priority Statements," includes the four (4) broad statements which will broadly guide the Board on what they hope to accomplish during the 2016 Virginia General Assembly Session. These statements continue to mirror for the most part the overall statements and issue areas discussed during the 2012-2015 Board of Supervisors' inaugural strategic planning session on September 24, 2012, especially in the areas of transportation and land use. It also incorporates additional transportation priorities as decided by the Board during its July 2013 Transportation Summit. These statements also provide focus for the Board's legislative liaisons in Richmond throughout the session. The second section, "Priority Initiatives," contains those areas in which the Board actively seeks initiation of legislation on their behalf during the upcoming 2016 General Assembly Session. The third and final section of the program document, "Policy Statements," includes a number of positions adopted by the Board of Supervisors on a variety of issues. If proposed legislation arises within these areas, the Board has adopted positions as evidenced in this section of this document.

**Prior Board's Legislative Package.**—Prior to the start of Virginia General Assembly Session, each Board of Supervisors has traditionally developed a legislative package. As a result, the prior Board considered specific measures to be included in their 2016 Legislative Package on November 4, 2015, and through November 12, 2015. Staff recommends that the Board provide guidance on each of these issues:

USCA4 Appeal: 17-2002    Doc: 88-1    Filed: 01/07/2019    Pg: 301 of 547

### Proposed New Priority Initiatives from  2012-2015 Board of Supervisors (as of 11/12/2015):

1. ***County funded mental health services for volunteer fire & rescue***
   Chairman York moved that the Board of Supervisors support legislation that would provide for County funded mental health services for volunteer fire & rescue. (Seconded by Supervisor Letourneau. The motion passed 8-0.)

2. ***Local authority to promulgate civil penalties for all types of onsite sewage treatment systems***
   Supervisor Clarke moved that the Board of Supervisors support legislation that would allow localities to promulgate civil penalties for different types of sewage treatment systems. (Seconded by Supervisor Volpe. The motion passed 8-0.)

3. ***Residential property disclosure statement of wastewater system***
   Supervisor Clarke moved that the Board of Supervisors support legislation that would add language related to wastewater system (onsite sewage system) and conducting due diligence on costs to the residential property disclosure statement. (Seconded by Supervisor Volpe. The motion passed 8-0.)

4. ***Agreements to provide transportation for nonpublic school pupils***
   Supervisor Volpe moved that the Board of Supervisors support legislation that allows a local school board to provide transportation via public school bus or other mean to non-public schools for field trips. (Seconded by Supervisor Delgaudio. The motion passed 8-0.)

5. ***Opposition to Northern Virginia Transportation Commission (NVTC) involvement in distribution of  I-66 toll revenue***
   Supervisor Reid moved that the Board of Supervisors support legislation that opposes the NVTC involvement in the setting and distribution of I-66 inside the beltway toll revenue. (Seconded by Vice Chairman Buona. The motion passed 8-0.)[1]

6. ***Disclosure of Underlying Zoning to Property Purchasers***
   Supervisor Higgins moved that the Board of Supervisors support or seek legislation that adds language to §55.519 B. 2 that notifies purchasers of residential property to exercise due diligence on the zoning classification or permitted uses of parcels adjacent to the subject parcel. (Seconded by Supervisor Volpe. The motion passed 9-0.)[i]

7. ***State Corporation Commission Public Hearings***
   Supervisor Clarke moved that the Board of Supervisors seek changes to the Code of Virginia to require a local public hearing, by request of a local governing body, for State Corporation Commission proceedings associated with approval of electrical power line applications. (Seconded by Supervisor Volpe.)

---

[1] On July 1, 2015, the Board of Supervisors approved a resolution to oppose tolling on I-66 inside the Beltway and to recommend that this section of I-66 be widened in each direction to help provide congestion relief.

USCA4 Appeal: 17-2002     Doc: 88-1     Filed: 01/07/2019     Pg: 302 of 547

Supervisor Clarke accepted Supervisor Reid's friendly amendment to add the words "and Greenway Toll Road applications" to the motion.

Supervisor Clarke accepted Supervisor Letourneau's friendly amendment to remove the words "associated with approval of electrical power line applications and Greenway application."
(Supervisor Clarke's motion, as amended, passed 9-0.)

8. *Northern Virginia Transportation Commission*
   Supervisor Reid moved that the Board of Supervisors request legislation to amend Section 33.2-1904 to expand the representation for Loudoun County on the Northern Virginia Transportation Commission (NVTC), either through weighted voting or by adding a Non-Legislative voting member. Support any legislation that broadens NVTC oversight on WMATA issues. (Seconded by Supervisor Volpe. The motion passed 9-0.)

9. *Revisions to Plat Requirements for Boundary Line Adjustments Between Localities*
   Seek Legislation that would amend the Code of Virginia to allow for Loudoun County to utilize Geographic Information System (GIS) Maps establish the Virginia State Plan Coordinates System for the purposes of boundary line adjustments. (Seconded by Supervisor Clarke. The motion passed 9-0.)

**Proposed New Policy Statements from 2012-2015 Board of Supervisors (as of 11/12/2015):**

1. *The Dulles Greenway*

   Chairman York moved that the board of Supervisors support measures that address toll rate concerns including but not limited to potential state acquisition of the Dulles Greenway and distance-based and time-based tolling structures to reduce the costs for Greenway users and to reduce toll-induced traffic congestion on alternative routes. (Seconded by Vice Chairman Buona. The motion passed 8-1, Supervisor Reid opposed.)

2. *Sunset of Data Center Sales Tax*
   Supervisor Letourneau moved that the Board of Supervisors extend or eliminate the sunset date for the Data Center sales tax exemption, currently scheduled to sunset in 2020. (Seconded by Supervisor Volpe. The motion passed 9-0.)

3. *Revenue Sharing Program*
   Chairman York moved that the Board of Supervisors support continued use of this program as an effective way to leverage local/state funds and oppose decreasing the recent funding allocations for this program. (Seconded by Supervisor Reid. The motion passed 9-0.)

4. ***Washington Metropolitan Area Transit Authority***
   Supervisor Reid moved that the Board of Supervisors support legislation that initiates review and update of the WMATA Compact, including but not limited to, subjecting WMATA's financial records to audit by the signatories. (Seconded by Supervisor Volpe. The motion passed 9-0.)

5. ***Broadband Coverage by Census Tract***
   Supervisor Clarke moved that the Board of Supervisors support the VACo Broadband Position expanding broadband accessibility throughout the Commonwealth.
   Supervisor Clarke further moved that the Board of Supervisors support changes to the FCC 477 reporting requirements for Broadband providers in order to allow for more accurate mapping of existing broadband coverage and availability. (Seconded by Supervisor Higgins. The motion passed 9-0.)

   Supervisor Clarke further moved that the Board of Supervisors support changes to the FCC 477 reporting requirements for Broadband providers in order to allow for more accurate mapping of existing broadband coverage and availability. (Seconded by Supervisor Higgins. The motion passed 9-0.)

6. ***Lyme Disease; Long-Term Antibiotic Therapy Allowed Policy***
   Supervisor Higgins moved that the Board of Supervisors support or request legislation that allows a licensed physician to prescribe, administer, or dispense long-term antibiotic therapy to a patient diagnosed with Lyme disease and also specifies that the Board of Medicine shall not initiate a disciplinary action against a licensed physician solely for prescribing, administering, or dispensing long-term antibiotic therapy to a patient clinically diagnosed with Lyme disease, provided such clinical diagnosis and treatment has been documented in the patient's medical record by such licensed physician. (Seconded by Supervisor Clarke.)

   Chairman York moved an alternate motion to table this item. (Seconded by Vice Chairman Buona. The motion passed 7-1-1, Supervisor Reid opposed; Supervisor Volpe absent for the vote.)

7. ***Virtual Weigh Stations Study***
   Supervisor Reid moved that the Board of Supervisors support a study by the Virginia Department of Transportation and the Virginia Department of Motor Vehicles that researches the use of virtual weigh stations for enforcement of over-sized or over-weight vehicles. (Seconded by Supervisor Letourneau.  The motion passed 9-0)

8. ***Automated HOV Enforcement***
   Supervisor Reid moved that the Board of Supervisors support studies and research by the Virginia Department of Transportation and the Virginia Department of Motor Vehicles (DMV) focused on automated HOV enforcement.  ( Seconded by Supervisor Volpe.  The motion passed 7-1-1, Supervisor Bonfils opposed; Vice Chairman Buona abstained.)

USCA4 Appeal: 17-2002      Doc: 88-1      Filed: 01/07/2019      Pg: 304 of 547

#9a:  Loudoun County BOS Legislative Program for the 2016 Virginia General Assembly Session
Board of Supervisors Orientation
November 14, 2015
Page 5

Staff understands that the incoming Board may want to vote on specific issues currently in the County's legislative package at its initial business meeting in January 2016, and discuss other issues that may interest them at this time for inclusion in the package.

**Additional Legislative Issues/Changes to Current Legislative Package –** As expected, legislative issues beyond what was considered in the initial package may surface prior to and during the 2016 General Assembly Session.  Typically, these proposals may come from a variety of sources—individual Board members, Board standing and ad-hoc committees, Board-appointed advisory boards, members of the public, County staff and/or a result of General Assembly-appointed study committees or measures introduced during the legislative session.

Board positions on any particular bill and the staff developed motion as part of their action items usually are in the form of the following:  support, oppose, take no position at this time, or abstain on this bill, or similar legislation.

**2016 General Assembly Session**

For the 2016 Session, the General Assembly members must submit bill drafting requests by December 7, 2015, in order to meet the major "pre-filing" deadline. During the 60-day "long session" legislators do not have limits on the number of pre-file bills they can introduce; however House members will be limited to 5 non-prefile measures and Senators will be limited to 10 non-prefile measures. The 2016 General Assembly Session is expected to last for 60 days, beginning on Wednesday, January 13 and ending around Friday, March 11, 2016.  A new biennial budget for FY2017 and FY2018 will be introduced during the 2016 session.

The other positions in the prior Board's legislative package are attempts to provide broad direction to staff and the General Assembly on various issues, or a Board reaction to past legislative items that are likely to resurface again.  With a limited number of opportunities for new bills per legislator (post-December 7th), it will be difficult to get new bills introduced through legislators at this late date.  However, if the Board so desires, staff will attempt to get Board-initiated issues introduced through our local delegation prior to January 2nd, if at all possible.

**Legislative Review and Referral Process.**—For any given session, there are nearly 3,000 bills introduced in the General Assembly.  Initially, all legislation is screened by the County's contract legislative liaisons in Richmond and staff in Leesburg, providing the first filter for bills that may interest the Board, especially those bills that, if enacted, may ultimately affect Loudoun County regulations, policies and general government operations and fiscal situation. County Administration manages the legislative analysis and referral function and manages the contract for the lobbyists in Richmond.  Typically, 10% of the all introduced bills for each session are distributed to staff experts for comment.  Staff reviews include, when feasible, a fiscal impact of the legislation, the legislation's impact on Board-adopted policies and regulations and its effect on Loudoun government.

Due to the rapid nature of legislative process, there is rarely an opportunity to send pending legislation to a Board standing committee once the General Assembly session is underway. The biggest obstacle is to overcome how to get a "reading" from the Board on either new legislation (or amendments to new legislation) when a Board position is needed <u>and</u> the Board will not be in public session in time for meaningful public comment before the General Assembly. Per the guidance of earlier Board policies, staff recommends that the Board designate at their discretion, one or two Board members or a staff member to be the initial contact, and then someone will have to poll the rest of the Board.

**Opportunities to Keep Informed and Participate During Session** – There are several ways that the Board may stay informed throughout the General Assembly Session:

1. <u>General Information Distribution</u>.—Publications summarizing legislative issues will be kept in a central place in the Board's office. Bill summaries and alerts prepared by the Virginia Association of Counties (VACO), Virginia Municipal League (VML), and the Northern Virginia Regional Commission (NVRC) are published weekly. Additionally, the Virginia General Assembly has a legislative information system website which may be found at the following address: http://leg1.state.va.us/lis.htm

2. <u>Participation on Virginia Association of Counties or Virginia Municipal League Policy Committees and Direct Lobbying Efforts</u>.—Board members have the ability to volunteer to participate on numerous association policy standing committees throughout the calendar year. Both VACo and VML will be soliciting localities for new members of these Board and committees which develop overall statewide legislative programs for such topical areas as transportation, community development, finance and taxation, and economic development etc. Board members may be asked from time to time by staff and the legislative liaisons to attend Virginia General Assembly meetings both during and out of session to include committee meetings to lobby on behalf of Board adopted legislative initiatives. Board members may also be asked if they wish to participate on study committees or commissions that impact localities or areas of their expertise.

   At the 2015 VACo conference held November 8 – 10, 2015, Loudoun County was successful in having Loudoun priority initiatives and policy statements included in the 2016 VACo legislative program. An update will be provided as part of the orientation sessions.

3. <u>Weekly Telephone Conference Call</u>.—At the Board's discretion, a weekly telephone conference could occur during the General Assembly Session. During each conference call, the County's contracted legislative liaisons (in Richmond) and County support staff (in Leesburg) brief a designated Board member on any new issues and provide a status report on any issues in the County's legislative package. In prior years, the Board has designated one or two Board members (the Chairman, Vice-Chairman or a Standing Committee Chair) to attend the weekly conference call. The day of the week and the time for this conference call will depend on the Board member so designated.

The time of the call (noon) is typically used since it is a time, for the most part, that will not conflict with General Assembly committee meetings. The General Assembly floor session convenes at noon each day. Committee and subcommittee meetings are scheduled from early morning to evening except when there is a floor session.

4. <u>Board Meeting Agenda</u>.—During the General Assembly session, legislative issues are presented to the Board immediately prior to public input at each Board general business meeting on Mondays and then proposed positions, or actions by the Board, if necessary are taken up at the regular Board business meeting the next day (on Tuesdays). Action by the Board for issues that may be included in any mid- to- late week legislative update would be voted on at this early time on the agenda. New issues that demand the Board's attention and which come about after the mid- to late-week update are handed out at the beginning of the Board business meeting. These items are typically presented by the designated Board member(s) attending the weekly conference call, and/or by the appropriate staff. Action on these new items are an addendum to the Legislative Report item on the Board's agenda at the business meeting and no action would be taken until later in the meeting.

5. <u>Polling Board Members</u>.—On occasion and according to Board adopted policy, an informal position from the Board may become necessary. This occurs when the legislative liaisons need the Board to provide them direction on pending legislation before the Board is able to meet in a public session. Three rules on this polling have been:

   1. The Board Chairman, Vice-Chairman, or a designee (e.g., the Chairman of a Board standing committee) are the first two Board members polled.

   2. An extra effort is made to contact all nine Board members. To assist in this effort, it was suggested that all Board members use their alpha pagers during the General Assembly session. At the next scheduled regular Board meeting, official votes would be taken on the issues on which the Board has been polled.

   3. After any "informal" poll is taken, the legislation liaison always advises State legislators that the Board's "informal" position has not been voted on during a public session.

**State Budget Process**[2]

Virginia has a biennial budget system, which means it adopts a two-year budget. The biennial budget is enacted into law in even-numbered years, and amendments to it are enacted in odd-numbered years. Developing the Commonwealth's budget is a process which takes many months and involves many participants, from the public to state agencies to the legislature. The process includes five distinct phases:

---

[2] This information was excerpted from the Virginia General Assembly's webpage: virginiageneralassembly.gov

1) Agency budget preparation phase. State agencies analyze their programs and needs through a strategic planning process which includes a review of their mission and how well they serve their customers through customer satisfaction surveys or other methods of public input. Based on this analysis, agencies prepare and submit their requests for funding to the Department of Planning and Budget (DPB). Agencies generally present their proposals to DPB in the early fall.

(2) Budget development phase. DPB analyzes the budget requests of agencies to verify costs, confirm the need for services, investigate any alternatives for funding, and identify policy issues for the Governor's consideration. This analysis takes place during the fall. In the late fall, the Governor and his Cabinet Secretaries work together to prepare a proposed budget which reflects the Administration's priorities. The Governor submits his budget proposals to the General Assembly on or before December 20 in the form of a bill. The Budget Bill is a legal document listing budget appropriations at a detailed line-item level. He also distributes a "Budget Document" which sets forth his proposals in a more readable form. The Budget Document is an Executive Branch document and can be found on DPB's Virginia's Budget page. There is also a "Budget Bill" which is a legislative document.

(3) Legislative action phase. The Governor's proposed budget is submitted to the General Assembly in the form of a "bill." In each house, the budget bill is referred to committees which hold public hearings and committee discussions. In the House of Delegates, the House Appropriations Committee reviews the budget bill. In the Senate, the budget bill is referred to the Senate Finance Committee. The committees may introduce amendments to the budget bill. After review by each of these committees, the amended budget bill is brought to the floor of each house, where other amendments may be made. Each house votes on the amended budget bill. After each house votes on its own version of the budget bill, the bill "crosses over" to the other house where it is again debated and voted on. Before the General Assembly adjourns for the session, a conference committee resolves any differences between the versions passed by the two houses. The General Assembly then sends the budget bill to the Governor for his signature.

(4) Governor's review phase. The Governor reviews the bill passed by the General Assembly. He may sign it, veto the entire bill or certain line items, or recommend amendments. If the Governor vetoes the bill or any items of the bill, it goes back to the General Assembly during the reconvened session. If he recommends amendments, the bill is returned to the reconvened session for consideration and action by the General Assembly on the Governor's proposed amendments.

**(5)** Budget execution phase. The budget passed by the General Assembly and enacted into law goes into effect on July 1 in even-numbered years and on the date of passage in odd-numbered years. DPB website FAQs

**PURPOSE:** This intent is for the Board of Supervisors to enact its desired legislative program and priorities for the upcoming 2016 Virginia General Assembly Session. The adopted legislative program and its updates throughout the Session provide direction to staff and the Board's legislative liaisons in Richmond in their efforts to champion the Board's program and initiatives. The legislative program is useful as a tool for communicating priorities to the public. It assists the Board's desired administrative and legislative efforts with both the executive and

legislative branches of state government and most importantly Loudoun County's Virginia General Assembly Session and the Northern Virginia Regional delegation.

**ANTICIPATED ACTION DATE:**  January 2016 through April 2016 and updates throughout the year.

**ADDITIONAL INFORMATION:**

- Virginia Association of Counties (VACO) (www.vaco.org)
- Virginia Municipal League (VML) (www.vml.org)
- Virginia Legislative Information System (http://leg1.state.va.us/lis.htm)
- Board of Supervisors Legislative Program webpage and Prior Board Action Items (www.loudoun.gov)

**ATTACHMENT:**

1. Loudoun County Board of Supervisors 2016 Legislative Program

Draft 11/6/2015



# Loudoun County
# Board of Supervisors

# 2016

# Legislative Program



### Loudoun County Board of Supervisors

Scott K. York, Chairman at Large
Ralph M. Buona, Vice Chairman, Ashburn District
Suzanne M. Volpe, Algonkian District
Jim Bonfils, Broad Run District
Janet S. Clarke, Blue Ridge District
Geary M. Higgins, Catoctin District
Matthew F. Letourneau, Dulles District
Kenneth D. Reid, Leesburg District
Eugene A. Delgaudio, Sterling District

Attachment 1

**Draft 11/6/2015**

This page left intentionally blank



**Draft 11/6/2015**

## PRIORITY STATEMENTS

1. **Transportation**

   The county supports increased state funding for primary and secondary road construction and maintenance, including providing adequate funding to pave higher volume dirt roads and safely maintain rural roads. The continued economic vitality of the region and the quality of life of its citizens require greater state investment in transportation infrastructure, and existing revenue sources are no longer adequate to keep pace with the county's transportation needs. Continued state neglect of our transportation system imposes a tax on our citizens in the form of time wasted sitting in congestion and longer commutes, and it serves as a disincentive for businesses to locate or expand in the area. The Board of Supervisors identified the following transportation priorities in 2012, and most of these projects are moving forward toward construction. The Commonwealth's continued commitment to these priorities, where applicable, is requested.

   - State Route 606 (Old Ox Road/Loudoun Co. Parkway) Widening Project Between US Route 50 & Route 28;
   - State Route 625 (Waxpool Road) Improvements Project
   - State Route 659 (Belmont Ridge Road) Widening Project Between Gloucester
   - Parkway and Hay Road and Truro Parish Drive and Croson Lane
   - US Route 50/State Route 606 Interchange

   The Commonwealth's commitment to these priorities is also requested:
   - Loudoun County Parkway (missing link);
   - Route 659: Belmont Ridge Road (accelerate funding/joint projects);
   - Route 625: Waxpool Road (expand to six (6) lanes to Ashburn Road);
   - Route 7/Battlefield Parkway Interchange;
   - Route 15 Bypass/Battlefield Parkway Interchange;
   - Route 15 Bypass/Edwards Ferry Interchange;
   - Route 625: Waxpool/Loudoun County Parkway Intersection;
   - Northstar Boulevard/Arcola/Glasscock Area;
   - Route 7/Route 690 Interchange;
   - Route 9/287 intersection improvements;
   - Sterling Boulevard Extension (Rail Station needs); and
   - Bi-County Parkway between Loudoun and Prince William counties (Loudoun CTP version)

2. **Land Use**

   The county supports maintaining its existing statutory authority in the area of land use and development. The ability to adequately plan, zone, and enforce land use regulations is necessary to maintain the quality of life in our communities and an environment that encourages business to invest in the county. The county is opposed to legislative measures that erode local land use authority.

3. **Taxing Authority**

   The county supports keeping its existing taxing authority. Loudoun, like most localities, is heavily reliant on the real property tax to fund necessary public operations, from schools and parks to public safety. Reducing or eliminating the few other local revenue streams, such as BPOL or machinery and tools taxes, would only put greater pressure on property owners and the real estate tax.

4. **State Funding**

   The county supports the state living up to its financial commitments in the areas of public education, public safety, and health and human services, and opposes state imposed mandates on the county that are inadequately funded by the state.

3

Draft 11/6/2015

# PRIORITY INITIATIVES

## *Education*

**Cost of Competing –** Seek and support the full restoration of the Northern Virginia cost of competing funding for teachers and support staff in the state's FY '17-'18 biennial budget.

## New Priority Initiatives:

**Agreements to Provide Transportation for Nonpublic School Pupils (NEW)**
Seek or support legislation that allows a local school board to provide transportation via public school bus or other means to nonpublic schools for field trips in addition to providing transportation to and from such schools.

**County Funded Mental Health Services for Volunteer Fire & Rescue (NEW)**
Seek legislation to amend §15.2-1517 of the Code of Virginia to provide localities with the option of funding mental health treatment/counseling services through Employee Assistance Program-type "health insurance programs" for volunteer firefighters/EMTs.

**Disclosure of Underlining Zoning to Property Purchasers (NEW)**
Seek or support legislation that adds language to §55.519 B.2 that notifies purchasers of residential property to exercise due diligence on the zoning classification or permitted uses of parcels adjacent to the subject parcel.

**Local Authority to Promulgate Civil Penalties for all Types of Onsite Sewage Treatment Systems (NEW)**
Support and/or seek legislation that allows localities to promulgate a schedule of civil penalties for different types of sewage systems.

**Northern Virginia Transportation Commission (NEW)**
Request legislation to amend Section 33.2-1904 to expand the representation for Loudoun County on the Northern Virginia Transportation Commission (NVTC), either through weighted voting or by adding a Non-Legislative voting member.

**Residential Property Disclosure Statement of Wastewater System (NEW)**
Seek or support legislation that adds language related to wastewater system (onsite sewage system) and conducting due diligence on costs to the residential property disclosure statement.

**Revisions to Plat Requirements for Boundary Line Adjustments between Localities (NEW)**
Seek legislation that would amend the Code of Virginia to allow for Loudoun County to utilize Geographic Information System (GIS) Maps established by the Virginia State Plane Coordinates System for the purposes of boundary line adjustments.

**State Corporation Commission Public Hearings (NEW)**
Seek changes to the Code of Virginia to require a local public hearing, by request of a local governing body, for State Corporation Commission proceedings that involve projects that significantly impact the County.

4

Draft 11/6/2015

# POLICY STATEMENTS

### *Broadband*

**Broadband Coverage and Availability (NEW)**
Support the Virginia Association of Counties (VACo) Broadband Position on expanding broadband accessibility throughout the Commonwealth; and support changes to the FCC Form 477 reporting requirements for Broadband providers in order to allow for more accurate mapping of existing broadband coverage and availability.

### *Economic Development*

**Commonwealth Opportunity Fund**
Support the on-going replenishment of the Commonwealth Opportunity Fund.

### *Education*

**Teacher pensions**
Support legislation to require the State to place its share of teacher pension liabilities on its financial statements.

**Out-of-state enrollment in state institutions of higher education** - Support legislation requiring the state's institutions of higher education to maintain undergraduate enrollment ratios of no greater than 25% out-of-state students.  Further, support legislation to enforce such standard with financial or other disincentives.

**Increases to SOQ Funding**
Support a significant increase in State education funding so that the State fully funds its share of the actual costs of meeting the Standards of Quality (SOQ).

**Relax Mandates**
In the event of reductions to State general funding for public education, support relaxing State mandates and increasing local autonomy in order to give local school divisions the flexibility to efficiently target resources where they are most needed.

**School Construction Support**
Support additional new State revenues to assist localities to fund new school construction, renovation of public school facilities, technology infrastructure and debt service.

**Year-End-Funds Appropriated to School Divisions**
Support existing state law that all year-end funds appropriated to the School Divisions by local governing bodies revert to the locality, retaining discretion with the governing bodies to evaluate and approve the reallocations of year-end fund balances to address the capital or one-time expenditure requirements of local school districts.

**Draft 11/6/2015**

*Employment and Benefits*

**Line of Duty Benefits for Public Safety Personnel**
Support efforts to shift responsibility for Line of Duty benefits back to the state which pushed this long time program back to local governments. Should localities continue to be required to pay these benefits, they should at the very least be authorized to establish the level of benefits, instead of the state mandating benefits.

**Worker's Compensation**
Support the current Virginia Worker's Compensation Act and oppose any expansion of the heart/lung/cancer presumption statute.

**Adopt state schedule for Worker's Compensation medical services**
Support legislation to implement a schedule for medical services provided under a worker's compensation claim that reduces such costs for the county and provides more uniformity and predictability in the rates.

**Expanded Benefits**
Oppose any legislation mandating new and/or expanded benefits on local governments that are not fully funded in perpetuity by the State, and oppose new or expanded employment benefits for public employees and/or volunteers unless a local option is provided.

**Collective Bargaining**
Oppose any attempt by the state or federal government to impose collective bargaining or stipulate grievance procedures for state and local employees.

*Elections*

**Election Districts**
Support technical corrections to the state legislative election districts in the County as a part of the omnibus election district "clean-up" legislation. This will avoid unnecessary local costs resulting from election precincts with very small numbers of voters, and will help limit the inconvenience to some voters that resulted from the recent decennial redistricting.

*Health and Human Services*

**Children Services Act (CSA); Support state funding and certain programmatic changes, including but not limited to:**

- Support the State maintaining the sum-sufficiency provisions in Code of Virginia, § 2.2-5211 relating to the General Assembly's obligation to fund special education and foster care services and to meet relevant federal mandates for the provision of these services.

- Support adequate State funding to cover both mandated and court-ordered non-mandated placement of children.

- Support an update to the 1996 benchmark currently utilized to determine the amount of administrative funds allocated to cover local costs associated with administering the Children's Services Act.

**Draft 11/6/2015**

- Support legislation that allows foster care youth to be eligible for the full array of foster care services under CSA until they turn 21.

- The State should fully fund localities for state mandated human services, including the Children's Services Act, and should provide program flexibility so that localities can provide comprehensive and case-tailored services.

- Oppose changes to CSA law, regulation or polices that bypass the Family Assistant Planning Team (FAPT) and Community Policy and Management Team (CPMT) role in determining appropriate Residential Treatment Facility placements for which CSA funds will be sought.

**Doctor Protections for Long-Term Antibiotic Therapy (NEW)**
Support legislation that allows a licensed physician to prescribe, administer, or dispense long-term antibiotic therapy to a patient diagnosed with Lyme disease and also specifies that the Board of Medicine shall not initiate a disciplinary action against a licensed physician solely for prescribing, administering, or dispensing long-term antibiotic therapy to a patient clinically diagnosed with Lyme disease, provided such clinical diagnosis and treatment has been documented in the patient's medical record by such licensed physician.

**Governor's Task Force on Lyme Disease**
Continue to support state administrative, budget or legislative action necessary for implementation of the recommendations of the Governor's Task Force on Lyme Disease except in areas where they become unfunded mandates on localities.

> *Note:* Item 85 in Chapter 665 of the 2015 Virginia Actos of the Assembly directs the Secretary of Agriculture and Forestry to report to the Chairmen of the House Appropriations and Senate Finance Committees the findings of a task force assembled to address certain discrete issues related to Lyme disease "point of disease" prevention strategies ("Task Force"). The Task Force's mandate is to conduct the following: 1. Identify areas in Virginia with the highest prevalence of Lyme disease. In the event that a "point of disease" prevention strategy is adopted, the legislation contemplates that these identified areas would serve as implementation sites, 2. Determine estimated costs of implementing a "point of disease" prevention program in the identified areas, and 3. Identify sources of revenue to fund a "point of disease" prevention program. Specifically, the Task Force was directed to review potential federal grants, local funding, private foundations, and state sources.

**State Income Tax Credits for Accessible Units**
Support increasing the total amount of state income tax credits granted for the Livable Home Tax Credit program in any given fiscal year from $1 million to $2 million and increase the total amount of state income tax credits made available through the program allocated for the purchase or construction of new residences from $500,000 to $1 million and funds allocated for retrofitting or renovation of existing residences from $500,000 to $1 million.

*__Land Use, Zoning, and Property Maintenance__*

**Phase II Watershed Implementation Plan/State funding for agricultural BMP and other cost-sharing programs**
Support efforts to increase state appropriations for cost-sharing programs, including but not limited to the Virginia Natural Resources Commitment Fund (VNRCF). The VNRF supports Virginia Agricultural Cost-Share (Cost-Share) programs including installation of cost-effective best management practices that are necessary to meet Phase II Watershed Implementation Plan local pollution reduction goals.

**Draft 11/6/2015**

**Alternative Onsite Sewage Systems**
Oppose legislation that further restricts local authority in this area.

**Conditional Zoning (Cash and In-Kind Proffers)**
Support existing local authority to accept cash and in-kind proffers from developers to assist localities in financing the capital facilities and infrastructure needed to serve new development and oppose legislation to eliminate or restrict that authority.

**Connection Fees**
Support the existing authority of localities or locally created authorities to impose connection fees and rates adequate to support the full cost of water, wastewater and stormwater utility systems, and oppose any legislation that would limit that authority.

**Erosion and Sediment Control/Stormwater Management**
Oppose legislation that reduces or eliminates local authority in the areas of erosion and sediment control and stormwater management.

**Impact Fees**
Oppose any proposal for replacing proffers with development impact fees, if such a change would diminish the amount of such capital assistance received by localities.

**Local Authority Enhancement**
Support, generally, the granting of additional land use, zoning and property maintenance authority to localities, especially in areas experiencing high rates of sustained growth, and as a means to address the fiscal burdens experienced by localities in providing needed public services to local residents.

**Payments in Lieu of Facility Contributions**
Support any and all legislation to allocate stale cash contributions made by developers in lieu of improvements otherwise required by ordinances.

**Soil & Site Evaluation Determines Type of Sewage System**
Support legislation that would require that a soil and site evaluation determine if a conventional septic system can be designed to serve a proposed use. If so, the conventional septic system shall be proposed but if a conventional septic system cannot be designed for the site, a statement must accompany the soil evaluation, signed by a licensed onsite soil evaluator that states the site restrictions that restrict the site to an alternative onsite septic system.

**Undergrounding Electric Distribution, or "Feeder" Lines**
Support legislation which increases and/or promotes the number of underground electric distribution, or "feeder" lines in addition to the pilot programs for long-range transmission lines.

*Stormwater Management*

**Reduce state share of permit fee**
Support a reduction in the Commonwealth of Virginia's current 28% portion of the Stormwater Management Programs permit fee, since the County, not the state, is predominantly administering the program locally.

**Draft 11/6/2015**

*Public Safety*

**Fire sprinklers in New Residential Construction**
Support action by the Board of Housing and Community Development and/or enabling legislation by the Virginia General Assembly to enable local governing bodies the ability to self- determine  the appropriate regulations or codified ordinances for residential sprinkler requirements for their localities.

*Predatory Lending*

Support legislation strictly prohibiting and deterring all predatory, usurious lending practices, including but not limited to provisions that would:

- Impose an interest rate cap of thirty-six percent (36%), calculated as an effective annual percentage rate including all fees or charges of any kind, for any consumer credit extended in the Commonwealth of Virginia;

- Prohibit a creditor's use of a personal check or other device as a means, directly or indirectly, to gain access to a consumer's bank account; and incorporate into the Virginia Code the protections to gain access to a consumer's bank account and incorporate into the Virginia Code the protections regarding consumer credit to military personnel as reflected in the Military Lending Act, 10 United States Code Section 987.

*Tax and Revenue*

**Machinery and Tools / Business and Professional Occupation License Taxes**
The state should not eliminate these local revenue sources, unless the General Assembly provides replacement sources of revenue for localities. In Loudoun County alone, BPOL receipts were $31.1 million and M&T receipts were $1.18 million in FY 15. Estimates for FY 16 are $32.6 million (BPOL) and $1.19 million (M&T). This revenue should not be unilaterally eliminated - especially when the state is reducing its funding commitments to public education, human services, and other state responsible, but locally administered programs.  Eliminating these local sources of revenue simply puts even more pressure on property owners through the local real estate tax, especially if counties are never given the ability to diversify their revenue base like municipalities can.

**Revenue Sharing with State**
Support any State revenue sharing formula to assist local governments with public infrastructure needs  so long as the formula includes recognition of the needs in high residential growth localities.

**Sunset of Data Center Sales Tax (NEW)**
Support legislation that extends or eliminates the sunset date for the Data Center sales tax exemption, currently scheduled to sunset in 2020.

**Taxation Study**
Support either a General Assembly sponsored, or a Virginia Department of Taxation study to review all local government allocations provided by the Personal Property Tax Relief Act of 2006

**Draft 11/6/2015**

**Transient occupancy Tax**

The Commonwealth should not allow online travel companies to avoid paying the full transient occupancy tax and the Board supports legislation to clarify this in statute.

### *Transportation*

**Automated HOV Enforcement (NEW)**

Support studies and research by the Virginia Department of Transportation (VDOT) and the Virginia Department of Motor Vehicles (DMV) focuses on automated HOV enforcement.

**"Devolution" of Secondary Road Maintenance**

Oppose any legislative or regulatory moratorium on the transfer of newly constructed secondary roads to VDOT for the purposes of ongoing maintenance, and oppose any legislation that would require the transfer of secondary road construction and maintenance responsibilities to counties.

**Dulles Greenway**

Support measures and legislation that address toll rate concerns including but not limited to potential state acquisition of the Dulles Greenway and distance-based and time-based tolling structures to reduce the costs for Greenway users and to reduce toll-induced traffic congestion on alternative routes.

**Move Station to Accommodate Weighing Truck Traffic for Both Routes 50 and 15**

Support administrative or budget action that would allow the Virginia Department of Motor Vehicles the ability to move their truck weigh station on Route 50 west of Gilbert's Corner in order to accommodate weighing trucks on Route 15 at Gilbert's Corner and at Route 50.

**NVTC Involvement in Distribution of I-66 Toll Revenue (NEW)**

Support legislation that opposes the NVTC involvement in setting and distribution of I-66 inside the beltway toll revenue.

**I-66 Tolls (NEW)**

Support legislation that opposes tolling on Interstate 66 Inside the Beltway.

**NVTC Oversight of WMATA (NEW)**

Support any legislation that broadens NVTC oversight on WMATA issues.

**Virtual Weigh Station Study (NEW)**

Support a study by the Virginia Department of Transportation and the Virginia Department of Motor Vehicles that researches the use of virtual weigh stations for enforcement of over-sized or over-weight vehicles.

**Washington Metropolitan Area Transit Authority (WMATA) (NEW)**

Support legislation that initiates review and update of the WMATA Compact, including but not limited to, subjecting WMATA's financial records to audit by the signatories.

### *Transportation Funding*

**General**

Support additional state and regional transportation funding for highway, transit, bicycle and pedestrian improvements.

**Draft 11/6/2015**

**Bi-County Parkway between Prince William County and Loudoun County**
Support the bi-county parkway between Prince William and Loudoun Counties as called for in the Loudoun Countywide Transportation Plan. The parkway is needed to foster the region's economic development, reduce existing traffic congestion and accommodate planned residential growth. In addition, by greatly improving both passenger and commercial cargo access to the Dulles International Airport the bi-county parkway will produce tangible quality of life and economic benefits for the entire Commonwealth.

**Revenue Sharing Program (NEW)**
Support continued use of this program as an effective way to leverage local/state funds and oppose decreasing the recent funding allocations for this program.

**Virginia Department of Transportation Staffing Levels**
Support state funding for providing additional staffing of VDOT personnel designated for and preferably located in Loudoun County for the purposes of greater efficiency.

*__General Government__*

**Unfunded Mandates**

**New State Mandates & Shifting Responsibility to Localities**
Oppose any new state mandates that are not fully funded by the Commonwealth, and oppose the shifting of fiscal responsibility from the state to localities for existing programs.

**Governor's Task Force for Local Government Mandate Review Recommendations**
Support the recommendations of the Governor's Task Force for Local Government Mandate Review.

**Dog and cat license fees**
Support legislation amending state law to allow local cat/dog license fees to be set at a "fair and reasonable" level by the locality, instead of current law that limits the fee to no more than $10.00.

Support amendments to state law to allow local treasurers to use a portion of the dog/cat license fees they collect to go towards the cost of processing and administering those fees.

**Coordination of state, county and courts holiday schedules**
Support legislation to provide for a uniform approach to holidays in Virginia where there is consistency between the Courts, the Governor and the local governments.

**Excess Court Fees**
Support legislation that returns the majority of excess court fees formula back to the original 1/3 for the Commonwealth and 2/3 for the locality. Support and/or seek legislation that would make this change only applicable to the 20th Judicial Circuit (in addition to the 31st Judicial Circuit, the only circuit that was exempted formula this state formula change).

**Retention of Election Ballots**
Support legislation to authorize Circuit Court Clerks to retain digital images of election ballots instead of the actual paper ballots for the required (2 year) time period.

This page left intentionally blank



**Draft 11/6/2015**



# *Loudoun County Facts*

Loudoun County was a part of the five million acre Northern Neck of Virginia Proprietary granted by King Charles II of England to seven noblemen in 1649. The Town of Leesburg, named after one of the signers of the Declaration of Independence, has continuously served as the County Seat since 1757. Loudoun County encompasses a 520 square mile area on the rolling Piedmont section of Northern Virginia and is bordered by the Blue Ridge Mountains on the northwest and the Potomac River on the northeast. It is 25 miles northwest of Washington D.C. and is one of the fastest growing counties in the Washington Metropolitan region and the Commonwealth of Virginia. Between 2000 and 2010, Loudoun was the fifth fastest growing county in the nation and is home to several of the nation's leading technology-oriented businesses such as Verizon Business, Raytheon, NeuStar, Digital Realty Trust, Equinix, Orbital Sciences Corporation, M.C. Dean, and the Howard Hughes Medical Institute Research Campus at Janelia Farm.

| | |
|---|---:|
| Population – 2015 estimate | 363,524 |
| 2010 Census | 312,311 |
| 2000 Census | 169,599 |
| Population growth 2000-2015 | 114% |
| Population – 2020 forecast | 412,538 |
| Density (persons per square mile) - 2015 estimate | 699 |
| Median Age – 2014 | 35.4 years |
| Student population estimate - September 2015 | 76,263 |
| September 2000 | 33,864 |
| Student population growth 2000 – 2015 | 125% |
| Student population forecast – September 2019 | 81,756 |
| Bond ratings | |
| Fitch | AAA |
| Moody's | Aaa |
| Standard & Poor's | AAA |
| Total households | 104,583 (2010) 121,057 (2015 estimate) 137,062 (2020 forecast) |
| Household size average – 2010 Census | 2.98 (Loudoun)  2.64 (DC MSA)  2.54 (Virginia) 2.58 (U.S.) |
| Real property tax rate – FY 2016 | $1.135 per $100 of assessed value |
| Machinery and tools tax rate – CY 2015 | $2.75 per $100 of assessed value |
| Commercial & industrial (% of total base) 2015 estimate | 18% |
| Assessed value of taxable real property – 2015 actual | $70.3 billion |
| Personal property tax rate – FY 2015 | $4.20 per $100 of assessed value |
| State reimbursement for personal property taxes | $48.1 million |
| Assessed value of personal property – 2015 estimate | $6.4 billion |
| FY 2016 Adopted School System operating budget | $992 million |
| FY 2016 Adopted General Government operating budget | $454.4 million |
| School System employees – FY 2016 adopted | 10,345 |
| General Government employees – FY 2016 adopted | 3,655 |
| Adopted Capital Improvement Program (FY 2015-FY 2020) | $1.946 billion |
| % of 6-Yr CIP total expenditures debt financed | 58% |
| FY 2015 Debt service expenditures* | $165.5 million |
| FY 2015 Debt per capita* | $3,160 |
| FY 2015 Debt to estimated value of taxable real property* | 1.63% |
| FY 2015 Debt to per capita income* | 4.76% |
| FY 2015 Debt service to governmental fund expenditures* | 7.41% |
| Schools | 84 (2013) 87 (2015) |
| Voting precincts –August 2015 | 93 |
| Registered voters – August 2015 | 214,919 |
| Local electoral districts (includes at-large) | 9 |

*Based on unaudited numbers and subject to change

## 2016 BOARD OF SUPERVISORS BRIEFING

# # 9b

**SUBJECT:**          **Federal Legislative Report – The Ferguson Group, LLC**

**STAFF CONTACT:**    Charles Yudd, Assistant County Administrator
                      Gwen Kennedy, County Administration

---

**BACKGROUND:**   On December 29, 2014, Loudoun County entered into a contract with The Ferguson Group, LLC to serve as the Board of Supervisors' (Board) federal lobbyists in Washington D.C. as part of the County's Federal Legislative Program. This firm was selected using the County's standard procurement process (RFP solicitation: October 2014). The Ferguson Group is headquartered in Washington D.C. and represents local governments throughout the United States. They do not represent any local government clients within the National Capital and/or the Northern Virginia Regions. Upon development and subsequent adoption of the County's Federal Legislative Program, The Ferguson Group has been working to achieve the various initiatives, priorities, and positions approved by the Board.

Besides assisting the Board with its on-going federal issues of interest and further development of a more formal federal program for lobbying and outreach, it is important to note that the firm has considerable expertise in assisting local governments in their federal grants solicitations. The Ferguson Group came highly recommended and has a proven national track record in their work with local governments in addition to building coalitions with other localities.

Throughout 2015, The Ferguson Group  has  held meetings with multiple county agencies and departments in an initial effort to develop, and now implement, the County's federal program. They held in-depth discussions with staff in the following departments: Economic Development, Transportation and Capital Infrastructure (DTCI), Fire, Rescue and Emergency Management, the Sheriff's Office, Water Resources and Environment, Human Services, and Visit Loudoun. These meetings have helped The Ferguson Group develop an understanding of the county departments and their local priorities, as well as their past, present and future grant solicitation efforts. Again, the initial meetings resulted in a comprehensive federal program that includes specific projects, regulations, laws, and policies that were presented to the Board Chair and Vice-Chair, and ultimately adopted by the Board.

More specifically, the firm has developed a working group to address the Board's continued concerns with the General Services Administration Federal per diem rule. That group includes Loudoun County's Congressional Delegation, Visit Loudoun, the U.S. Department of Transportation, and the Metropolitan Washington Airports Authority. They also closely monitored the reauthorization of the Federal Aviation Administration to ensure status quo with the FAA's perimeter rule in an effort to protect the health of Dulles Airport.

With respect to the DTCI, The Ferguson Group set up a meeting with the U.S. Department of Transportation TIGER Office to discuss an unsuccessful TIGER grant that was previously submitted by Loudoun County. They have also developed working knowledge of the Board's

transportation priority projects, and the overall funding federal, state and local structure for transportation and transportation funding. The firm has also worked with the Department of Fire, Rescue and Emergency Management on issues related to the Urban Area Security Initiative, various grant opportunities, and relevant legislative initiatives supported by the Fire Chief.

The Ferguson Group has provided the county with real-time updates on legislative, policy and administrative action throughout the year. This has given the county the opportunity to respond directly to our Congressional delegation and the Administration. For example, we have received updates on the status of the EPA's Waters of the U.S. Rule and legislative and judicial action related to that rule. We have had an opportunity to weigh in on the most recent transportation reauthorization bill, which is especially important since our Member of Congress, Barbara Comstock, is a member of the relevant legislative committee. The firm also worked directly with the Sheriff to analyze the actual impact that an Executive Order on federal asset forfeiture would have on the Sheriff's Department.

Each year, the firm will work with the departments listed above to update the federal agenda for the Board's approval. The Ferguson Group will be directed the same way as the state relation's firm, utilizing the Chair and Vice-Chair as a conduit to the Board of Supervisors when certain issues require a Board of Supervisors position and/or action. This prevents staff from moving forward with any issues on the federal level without Board of Supervisors approval or consent. The county's policies and procedures with respect to grants will be followed as normal.

In November 2015, The Ferguson Group is scheduled to meet with a multi-departmental team to advance discussion on grant opportunities and to establish goals for targeted grant applications in key areas for the upcoming year. Status reports will be provided to the Board of Supervisors as part of the federal legislative program scheduled for February.

### LOUDOUN COUNTY, VIRGINIA
### 2015 FEDERAL AGENDA
**(approved by Board of Supervisors on February 18, 2015)**

| PROJECT / ISSUE | ACTION ITEM | STATUS |
|---|---|---|
| **Economic Development** | | |
| **GSA Per Diem Designation** | Change area to benefit Loudoun hotels/motels | Discussed issue with Congressional delegation. Strategy meetings with Visit Loudoun and County staff; upcoming meeting with Visit Loudoun and local stakeholders (5/11) and GSA (not yet scheduled). Potential options:<br>■ Use statutory definition of National Capital Region extend DC NSA to Loudoun County. |

| | | |
|---|---|---|
| | | ▪ Use transit designation to extend DC NSA to Dulles portion of Loudoun County. |
| **FAA Perimeter Rule Exemptions (DCA)** | Change rule/limit the number of exemptions for DCA | Communicated Loudoun's concerns with Congressional delegation. |
| **Agricultural Development/Agri-Business** | Modify certain regulations and expand opportunities | Provided comprehensive US Department of Agriculture Funding Guide. Follow up meeting with County staff to discuss grant opportunities. Monitoring relevant grant opportunities.<br><br>Coordinating with NOVEC on partnering with the County to secure Rural Economic Development Loan and Grant (REDLG) program funds for various projects within the County. |
| **Foreign Senior Executives and Specialists Permits** | Streamline process/add permits to benefit Loudoun | Communicated Loudoun's concerns with Congressional delegation. Need issue clarification. |
| **GSA Locational Criteria for Major Federal Agency Moves** | Seek changes to benefit Loudoun | |
| **Transportation** | | |
| **Transportation Reauthorization (MAP-21)** | Advocate priorities and support reauthorization passage | Provided County with draft priorities for reauthorization. Awaiting adoption. |
| **TIGER Grant** | Apply and secure funding | Communicated with Congressional delegation about possible grant application. Coordinated meeting with DOT TIGER Grant Office; County staff decided not to apply this round. |
| **WMATA Funding** | Support increased and continued funding | Submitted appropriations request to Senator Warner. |
| **MWAA Board of Directors** | Support changes in composition to including a local elected official | |
| **Grants for Silver Line Phase 2 Road Improvements** | Advocate and seek appropriations | Discuss project with Congressional delegation. |

No. 17-2002 viewed 12/19/2018

| | | |
|---|---|---|
| **FAA Reauthorization and Passenger Facility Charges** | Seek passage and potential increases to support IAD | Awaiting guidance from Board. Current authorization expires September 30, 2015. |
| **Other Transportation Issues/Needs to Monitor** | See listing below | Monitoring grant and other funding opportunities. |
| **Fire, Rescue and Emergency Management** | | |
| **FY15-FY16 Appropriations and Competitive Grants** | Advocate and pursue grant opportunities | Provided comprehensive Justice and Public Safety Funding Guide. Follow up meeting with County staff to discuss grant opportunities. |
| **Building Safety** | Support incentive based legislation and local options | No known bills at this time. |
| **Environmental Regulations** | Actively monitor regulations/oppose unfunded mandates | Monitor federal agency and Congressional action. |
| **Volunteer Opportunities** | Support legislation and delineate regulations (employee/volunteers) | Supported bills that provide tax incentives to volunteer first responders (H.R. 343, S. 609, H.R. 1171/S. 616). |
| **Law Enforcement, Community Corrections and Courts** | | |
| **Body Cameras: Sheriff's Office** | Stop unfunded mandates/advocate funding/grants | Monitoring federal policies on body cameras and grant opportunities. |
| **Asset Forfeiture: Sheriff's Office** | Protect current program as currently allowed | Drafted white paper on AG's Order related to asset forfeiture in coordination with the Sheriff. |
| **Technology/Interoperability Clerk of the Circuit Court** | Advocate and pursue any grant opportunities | Monitoring grant opportunities. |
| **Environment, Energy and Water Resources** | | |
| **Hidden Lane Superfund Site** | Provide guidance and recommended strategies | Coordinated meeting with County and EPA Region III; helping to expedite the County's FOIA request. |
| **Chesapeake Bay Watershed** | Monitor/provide advice and advocacy/grant opportunities | Monitoring grant opportunities. |
| **Waters of the United States Regulation** | Keep county informed of regulatory process | Monitor changes to EPA/Corps' definition of waters under Clean Water Act jurisdiction and OMB action. |
| **Water/Wastewater Infrastructure** | Advocate and explore grant opportunities | Monitor funding opportunities under WIFIA to fund infrastructure projects. |

USCA4 Appeal: 17-2002     Doc: 88-1     Filed: 01/07/2019     Pg: 326 of 547

| FEMA Flood Mapping | Keep county informed and provide information on Community Rating System | Assisted County staff to clarify FEMA's "No Rise Community" letter dated March 27, 2015. |
|---|---|---|
| **Human Services** | | |
| **Disability Services: Transit** | Advocate for funding and support grant solicitations | Provided fact sheets on using Section 108 loans to fund para-transit needs. |
| **Disability Services: Housing** | Seek funds for units; pursue tax credits for builders | Monitoring grant opportunities. |
| **Disability Services: Website Requirements** | Oppose unfunded mandate and seek funds | Monitoring grant opportunities. |
| **Family Services: Housing and Homeless Prevention** | Advocate for funding and support grant solicitations | Monitoring grant opportunities. |
| **Mental Health/Substance Abuse and Disability Services** | Advocate for funding and support grant solicitations | Monitoring grant opportunities. |
| **Health: FY15-FY 16 Appropriations and Competitive Grants** | Advocate for funding and support grant solicitations | Monitoring grant opportunities. |
| **Health: Cost Recovery in Health Emergencies** | Advocate for funding and support grant solicitations | Monitoring grant opportunities. |
| **PRCS: FY15-FY16 Appropriations and Competitive Grants** | Advocate for funding and support grant solicitations | Monitoring grant opportunities. |
| **PRCS: Volunteer Background Checks** | Research federal requirements/seek funded mandate | |
| **Unaccompanied Immigrant Children** | Seek federal reimbursement for local costs | Reviewed draft letter from Chairman York to President Obama. Submitted appropriations request to Senator Warner. |
| **Fiscal** | | |
| **Tax-Exempt Municipal Bonds** | Advocate for preservation of tax-exempt status | Communicated Loudoun's support for preserving tax-exempt municipal bonds to Congressional delegation. |
| **Creation of Qualified Public Infrastructure Bonds** | Support proposal as a tool for localities | Monitor Administration's GROW Act. |
| **Marketplace Fairness Act** | Support reintroduction and passage | Marketplace Fairness Act (MFA) reintroduced in the Senate (S. 698). Discussion draft released by House Judiciary Chairman Bob Goodlatte (R-VA) that addresses online sales tax but with a different approach than MFA. |

Further updates will be provided to the Board, as well as a comprehensive annual review of the firm's efforts, as the information above is only representative of their overall efforts.

**ADDITONAL INFORMATION:**  Please feel free to contact staff if you have additional questions.

No. 17-2002, viewed 12/18/2018

**BOARD OF SUPERVISORS BRIEFING**

# # 10a

**SUBJECT:**  **Loudoun Museum**

**STAFF CONTACTS:**   Julie Grandfield, County Administration
Megan Bourke, Budget Department

---

**BACKGROUND:**   The Loudoun Museum began operating in 1967 to collect, preserve and interpret objects that document the history of Loudoun.  It is the only general history and cultural museum in the County.

Since the mid-1970's, the County has provided funding to the Loudoun Museum. The funding is currently allocated to the Museum through the County's competitive grant process for local non-profit health, welfare and recreation/arts organizations. The County has been the Loudoun Museum's primary funding source for many years; other revenue streams consist of private donations, membership contributions, and ticket sales to the Museum and from its special events. The Town of Leesburg leases the building to the Museum at a nominal charge, though a large percentage of the Museum's collection is not on display due to space constraints.  The County stores the remainder of the collection (that is not on display) in an unused County building.

Recently, the Museum has experienced a severe funding shortage and has sought the Board's support on three occasions.  In 2012, the Board directed the Museum to create a long-term plan in which the operation would move towards self-reliance, lessening the need for funding from the County.  Several months later, the Museum submitted a three-year Turn-Around Business Plan, a Resource Development Plan and a Three-Year Implementation Budget to the Board.  The Plan was accepted by the Board and funding was provided that year.  Funding has continued in the intervening years.

During the FY 2015 non-profit grant process, the County allocated $36,007 to the Museum through the competitive process.  The Board subsequently provided for FY 2015 an additional $26,769 (for a total of $62,776) in order to keep level funding with FY 2014.

For FY 2016, the County allocated $36,007 to the Museum through the competitive grant process. Shortly after receiving notification of this funding level, the Loudoun Museum notified the County (Attachment 1) that, unless the County provided additional funding to the Museum, the Museum would not have sufficient funds to operate and would need to begin the dissolution process, eventually resulting in closure of the facility.   An item was taken to the Board in July 2015 on the issue (Attachment 2).  The item detailed two alternatives: the first would provide an additional $55,000 for the continued operation of the Museum and evaluation of options to move forward, and the second would be to not provide any additional funding (which would have likely meant the Museum would begin dissolution). During discussion of the item, some members of the Board expressed concern that it appeared that the Museum was in the same place as three years ago and that the results anticipated in the business and resource development plans had not come to fruition.

At the July meeting, the Board authorized an additional $55,000 for FY 2016 (for a total of $91,007) and directed staff to report back to the Board by December 31, 2015.  Staff was requested to include in the report:  the possibility of the County taking over the operations of the Loudoun Museum; other jurisdictions' models for historical collections/museums, including location, financial cost and visitor numbers; a location in the County that has the capacity to display a larger collection of artifacts or several locations throughout the County to display artifacts; and the possibilities of either Library Services or Parks, Recreation and Community Services managing the artifacts.  Should there be no financial plan in place by December, the Museum would have six months to carry-out the dissolution process.

Since then, staff has been meeting monthly with many community representatives and Museum staff to discuss ideas, possible partnership options and funding opportunities.  At one of these meetings, Liz Whiting, President of the Loudoun Museum Board of Trustees, requested that the County enter into a partnership with the Museum similar to that of the Heritage Farm Museum. The County has a formal agreement with the Heritage Farm Museum (which is also a separate 501(c)(3)) in which the County provides $137,000 to the organization each year.[1]  The two situations are fundamentally different in that, unlike the Museum, the County owns the property and the facilities of the Heritage Farm Museum.

As of the date of this issue paper, the report for the Board, which is slated to be presented in December, 2015, is under development.   It is possible that the Board may postpone action until the new Board of Supervisors takes office.

**PURPOSE:**  To determine the degree to which County funding is provided to the Loudoun Museum and to determine if the operating model of the Museum should be changed.

**ANTICIPATED ACTION DATE:**  December 2, 2015 or after the new Board takes office.

**ADDITIONAL INFORMATION:**  Please feel to contact staff for additional information.

**ATTACHMENTS:**

1.  Letter from Liza Whiting
2.  July 15, 2015 Board of Supervisors Action Item

---

[1] The Heritage Farm Museum agreement is due for review and possible renewal during the FY 17 budget process.

LOUDOUN MUSEUM

July 10, 2015

Via E-Mail
The Honorable Scott K. York, Chairman, and
Members, Loudoun County Board of Supervisors
Leesburg, VA 20177

Dear Chairman York and Board Members:

I am writing on behalf of the Board of Trustees of the Loudoun Museum to advise that, despite long-term support of our operations by Loudoun County, we are obliged to initiate proceedings to dissolve the Museum and disperse its collections in light of our conclusion that income projections for FY 2016 and ensuing years will not provide sufficient funds to continue services to the public and to safeguard the 8,000 artifacts for which we are responsible.

We reached this conclusion with great sorrow and after long study. We determined that the nearly 90% reduction in grant revenues since 2008, to include a 40% reduction in County grant support between FY 2015 and FY 2016 alone, demonstrates to us (and our major private donors) that we are still searching for the right formula for matching community support with public grants and private donations to allow the Museum to succeed. The majority of our income each year is committed to personnel (at 1.75 FTE) and facilities costs required to safeguard the collections. Following years of reductions to live within our means, we simply cannot further shrink our operations and perform our duties.

We must find a new way of doing business if the Loudoun Museum is to remain open to our citizens and its collections are to be preserved for their enjoyment in perpetuity. County staff have worked with Supervisor Higgins to prepare the agenda item before you July 15, which we endorse, to increase funding to enable the Museum to operate throughout FY 2016, with a mandate to report back to the Board with recommendations for restructuring the Museum's operations with the participation of the County and the Town of Leesburg in order to place the Museum on a path to sustainability.

Nearly 50 years' partnering by the County, the Town, their citizens, and the Museum's members, donors and volunteers, has built a world-renowned collection that uniquely tells the history of Loudoun County. We hope the process recommended to you in this agenda item will allow those partnerships to endure and flourish.

Sincerely,

Elizabeth D. Whiting, President
Loudoun Museum Board of Trustees

cc:     Loudoun Museum Trustees
        County Administrator

Attachment: Highlights of the Loudoun Museum

16 Loudoun Street SW • Leesburg, Virginia 20175
703-777-7427 • Fax: 703-777-8873 • www.loudounmuseum.org

*Attachment 1*



# Highlights of the Loudoun Museum

## Updated July 6, 2015

No. 17-2002, viewed 12/18/2018

### Collections

The Loudoun Museum cares for nearly 8,000 artifacts important in the county's history. Whether a schoolgirl's sampler, fine furniture, a deed of sale for a slave, or documents signed by George Washington and James Monroe, they encompass all aspects of life in Loudoun.

### Collection Highlights

**Artifacts:** One-third of the Loudoun Museum Collection consists of textiles made in Loudoun County and northern Virginia between the 18th and 20th centuries. It includes schoolgirl samplers, quilts, coverlets, costumes, men and women's clothing, as well as needlework tools and accessories.

**Library:** Over 500 research files on Loudoun County history, residents, architecture, and development. Over 500 books on Loudoun County and American History. Rare books from the 18th, 19th and 20th centuries. Audio/visual materials and historic photographs of county sites, events and people.

**Archives:** Over 2,000 manuscripts and photographs related to Loudoun County and Virginia history. The Lucas-Heaton letters—correspondence between the Lucas brothers, former slaves who emigrated to the American colony of Liberia, and the Heaton brothers, of Purcellville, who freed them. Documents signed by George Washington and James Monroe. Colonial, antebellum and Civil War currency. Letters, journals and ledgers.

### Website

### Website Highlights

Since February of 2013, the Museum's collections have been made accessible online. This resource gives access to over included 6,100 records, with over 4,100 associated images. This represents over 75% of the collections made available to the public online. A certain portion of the collections will never be able to go online, as they are restricted by loan agreements.

More than half of similar institutions have no online presence for their collections at all. Of the other approximately 50% with online collections, two-thirds have less than 25% of their collections online. With online display at approximately 75% and ongoing efforts to expand the quantity and quality of the online records, the Loudoun Museum is at the forefront of what is widely acknowledged to be the future of the industry.

The main focus of the online collections is now on the images. These are photographs and scans of collections items that allow the user to view the artifact online, complementing the research information provided in the records. With clear and accessible records, the collections are handled less frequently, they are more easily researched and interpreted, and are available to a wide audience. This capability is invaluable for staff, students, and the community as a whole.

2

**Story Maps**

Another online engagement initiative currently underway is Story Maps, an ESRI Geographical Information System program that allows the combination of authoritative maps with narrative text, images, and multimedia content. This enables segments on the collections to become interactive, multidimensional narratives accessible online. It is a new form of exhibition, which allows curated stories to come to life in a way that illuminates the interconnectedness of local history. Several volunteers are now working to research and upload stories represented by our broad collections to this online resource, with the ultimate goal of integrating these narratives into the lesson plans of classrooms throughout the County.

The first completed project within this exciting new system will tell the story of the Lucas-Heaton letters. This collection tracks the correspondence between the Heaton brothers of Purcellvile and the Lucas brothers, former slaves who emigrated to the American colony of Liberia. Using this system, visitors to the website can track the history of the two families, as well as the American Colonization Society that advanced the notion that abolitionists should support the relocation of former slaves to Africa.

**Website Analytics**

Consistent visitor rates over last two years, averaging just over 10,000 per year. This does not include support sites, such as our Hauntings and PastPerfect Online web traffic. The website for our major fundraiser, Hauntings, saw a 39% increase in traffic in its second year, to nearly 5,000 visitors. Our online collections database, hosted through PastPerfect Software, averaged close to 1,500 users conducting up to 3,800 searches per year. Collections items from the Museum showed up in 26,000 google searches worldwide.

**Events and Attendance**

Attendance of the Museum is on track to surpass the previous year. In the first seven months of FY15, Museum admission has been 2,112 visitors. Compared to last year's twelve month total of 2,327 visitors, it is safe to assume that the totals for this year will show an increase in visitation.

The number of total visitation to the Museum and its programming currently presents an 85% resident client rate, compared with a 51% rate in FY14. While providing information about our County to visitors from other counties, states, and countries is a core part of the Museum's mission as well, it is clear that the efforts to engage and educate the local community are seeing great success.

**Weekly programming** in the Log Cabin created an additional 2,871 visitors since July of 2014 (when full tracking methods were implemented.) This is in addition to regular museum visitation. With no fees for the additional programs, the donations during this period went up by $630.

**Monthly programming** outside of regular open hours include First Friday open houses, special tours for Scout groups and school children, event hosting for local groups, and lectures. The total attendance of these programs was 978 from July 2014-January 2015.

**Hauntings** attendance was up significantly in 2014. 538 visitors attended over the two evenings of the event, for total sales of $9,300. This is a 22% increase in visitors from 2013, which was up 17% from 2012. Donations to Hauntings from individual and business sponsors totaled $3,300.

3

## Volunteers

While Board and committee members continue to donate thousands of hours to the Museum each year, this past year marked a reemergence of the Museum's larger volunteer program. Prior to the scale back of Museum operations and staff, there was a steady schedule of volunteers helping to further the mission and programs. The loss of one paid employee therefore lead to an exponential loss of volunteer labor, and a corresponding drop in the ability to introduce and maintain projects.

This trend is finally seeing reversal, as streamlining of other functions has allowed staff to focus on cultivating a renewed roster of volunteers. In partnership with the Northern Virginia Community College's Historic Preservation certificate program, the Museum now has two interns working on collections projects this semester. They will spend a minimum of 200 hours combined on their projects by the end of the semester.

Other volunteers include recent college graduates, retired educators, and other members of the local community who dedicate their time to the Museum. We also partnered with the local NJROTC chapter from Loudoun County High School. Projects cover the many varied functions of the Museum, and have included facilities maintenance, data entry, reading to children, and exhibit design. General volunteers will account for an estimated 1,000 hours of work donated this year.

Finally, our major volunteer facilitated event is Hauntings. We rely almost exclusively on volunteers to make the event the success it is each year. In 2014, 55 volunteers dedicated a total of 640 hours to make the two-day event happen. This in addition to countless hours donated by Board and Hauntings Committee members to plan and execute the event.

## Financial and Operational:

### Board of Trustees:

In the past two years, the Museum Board welcomed four new members, with one more currently being considered by the nominating committee. These new members bring a wealth of new ideas and experience to invigorate the Museum's activities and strategies for the future. These new members have already demonstrated vision and skill in a broad range of areas, from cutting edge IT systems to innovative fundraising approaches.

### Technology:

The initiative of one of the new Board members to overhaul the technological capacity of the Museum greatly increased the services available internally and externally. New kiosks allow visitors to complete research on site. New servers and cloud services have expanded greatly the capacity and security of in-house documentation.

The Museum also has taken steps to automate as many processes as possible to streamline the accounting system. One interest paying account replaced three accounts at the Museum's former bank. All of our bill payments are automated, reducing the annual cost of accounting services. Additionally, payroll, payroll taxes, and W-2s are now handled by a third party. A thorough review of all line items in the budget lead to reduced costs in several accounts compared to previous years. This has enabled the Museum to operate at optimum efficiency, allowing staff to invest more energy in the regrowth of programs and collections management described above.

4

**Date of Meeting:** <u>July 15, 2015</u>

# #5

**BOARD OF SUPERVISORS**
**BUSINESS MEETING**
**ACTION ITEM**

**SUBJECT**:                                **Supplemental Funding for the Loudoun Museum**

**ELECTION DISTRICT**:              Leesburg

**CRITICAL ACTION DATE**:        July 15, 2015

**STAFF CONTACTS**:                  Julie Grandfield, County Administration
                                                   Erin McLellan, Budget Office
                                                   Megan Bourke, Budget Office

**PURPOSE:** The purpose of this item is to present a FY 2016 supplemental funding proposal for the Loudoun Museum and to receive Board of Supervisors' direction for staff to engage the Loudoun Museum in a discussion of its long-term financial future and present those findings to the Board in March 2016.

**RECOMMENDATION**:

**Staff:** Staff recommends the Board approve supplemental funding in the amount of $55,000 for the Loudoun Museum and direct staff to engage the Museum in a discussion on its long-term financial future.

---

**BACKGROUND**: The Loudoun Museum, begun in 1967 to collect, preserve and interpret objects that document the history of Loudoun, is the only general history and cultural museum within the County. With its over 8,000 artifacts displayed in permanent and rotating exhibits, the Museum provides professional curation and preservation of Loudoun's place in history.

Since the mid-1970s, Loudoun County has provided funding to the Loudoun Museum. In July 2012, the Loudoun Museum presented to the Board a Turn Around Business Plan, a Resource Development Plan, and a three-year implementation budget. The Board was supportive of these plans and, since that time, has continued to provide funding to the Loudoun Museum through its competitive non-profit grant program.

In FY 2014, the Loudoun Museum received $63,000 through the non-profit grant process. In FY 2015, the Loudoun Museum received a total of $62,776 in funding from Loudoun County; $36,007 was provided through the FY 2015 non-profit grant process, and the Board approved an additional allocation of $26,769 in September 2014 to maintain level funding from FY 2014. On

June 17, 2015, the Board approved a funding allocation of $36,007 for the Loudoun Museum through the FY 2016 non-profit grant process (7-1-1, Delgaudio opposed, Letourneau absent).

In June 2015, representatives from the Loudoun Museum met with County staff to discuss the Museum's financial future. The Museum advised staff that if the County does not provide supplemental funding to the Loudoun Museum for FY 2016, it will need to dissolve.[1]

Staff believes the County has an interest in ensuring the Loudoun Museum can maintain its operations in a sustainable fashion; alternatively, it also has an interest in ensuring that the Museum is able to complete its dissolution appropriately. Understanding these two objectives, staff has developed the following work plan for the Board's consideration.

**ISSUES**:  The Loudoun Museum has an annual operating budget of approximately $109,000. Revenues are comprised of marketing income, program income, the County's non-profit grant contribution, donations, and other small miscellaneous sources. For FY 2016, the Museum is projecting a shortfall of $52,000, which is approximately made up of a loss in donations and the County's supplemental funding amount approved for FY 2015.

The Loudoun Museum and staff have discussed a phased plan to evaluate the future of the Museum. The first phase is to secure supplemental funding from the County in the amount of $55,000, which would bring the County's total contribution to the Museum to $91,007 for FY 2016. This contribution will allow the Loudoun Museum to continue to operate for the next fiscal year and have approximately $3,000 to add to fund balance at year-end.

The Museum has indicated that if the County provides this additional funding, some of its past donors would consider reinstating their donations for another fiscal year. If donations are received, they would be reserved and added to the Museum's existing fund balance; staff estimates this total would be close to $54,000 at the conclusion of FY 2016 (inclusive of the $3,000 mentioned above).

The second phase of this process is to convene a working group of County staff and Loudoun Museum staff and Board of Trustee members to discuss the long-term financial future of the Museum. Staff estimates this evaluation period will take eight months. At its conclusion, staff will present to the Board its recommendation on how the County should move forward with its relationship with the Loudoun Museum. If at the end of this process, all parties agree that the best way forward is for the Museum to dissolve, the Loudoun Museum should sufficient funds to begin the process in April of FY 2016 and conclude the process in December of FY 2017; funding in FY 2017 would be made up entirely of the Museum's estimated fund balance of $54,000.

---

[1] *Dissolution* is a legally required process of steps to appropriately convey a museum's collection once the decision has been made to cease existence.

It is important to note that the Loudoun Museum estimates the total cost to dissolve is similar to the Museum's annual budget. This is because, in addition to the expenses related to the actual dispersion of the collection (e.g., insuring, packing, shipping), dissolution will involve the purchase of additional advertising services for its loaned and FIC ("Found in Collection") items, the cost of closing its corporate existence, and accommodating additional volunteers that will be needed to aid in the process.

**ALTERNATIVES:**  If the Board is not supportive of contributing additional funds to the Loudoun Museum, the Museum will immediately take action to begin dissolution. The Museum has estimated this process will take approximately nine months to complete. The decision to dissolve may impact the Museum's ability to collect all its budgeted revenues for FY 2016; in this case, the Museum would need to fundraise this shortfall. Staff estimates this shortfall to be approximately $2,900.

**FISCAL IMPACT**:  The Loudoun Museum is requesting an additional $55,000 for its FY 2016 operations. This funding is available in unallocated FY 2016 General Fund appropriation.

**DRAFT MOTIONS**:

1.  I move that the Board of Supervisors **approve** funding for the Loudoun Museum in the amount of $55,000.

AND

I further move that the Board of Supervisors direct staff to engage the Loudoun Museum in a discussion of its long-term financial future and report to the Board its findings in March 2016.

OR

2.  I move an alternate motion.

**ATTACHMENT:**

   1.  Letter from Elizabeth Whiting, President of Loudoun Museum Board of Trustees

## 2016 BOARD OF SUPERVISORS BRIEFING

# # 11a

**SUBJECT:**          **Parks, Recreation and Community Services Citizen Accessibility to Programs, Activities, Special Events, etc.**

**STAFF CONTACTS:**  Steve Torpy, Director, Parks, Recreation and Community Services

---

**BACKGROUND:**  In 2015 the Department of Parks, Recreation and Community Services (PRCS) started work on an overall fee policy that started with an outside contractor doing a comprehensive study of the recreation center fees as well as the outdoor swimming pool fees and fee recovery.  This study led to the necessity to evaluate the entire fee structure within the department and the potential adoption of an overall fee policy that reflects the Board of Supervisors' (Board) policy direction across all programs, similar to what many municipal parks and recreation departments have across the country.

As a part of the more expansive view of parks fees, there appears to be revenue recovery rates which limit or eliminate some citizen's ability to participate. An example is the County After School Activities (CASA) program, which is an after school recreational program. The program started in the Sterling District and has expanded County-wide and is viewed as a valuable program for families.  While some families can apply for financial assistance through the Department of Family Services, those funds are limited. There are now limited CASA sites in the Sterling District and PRCS has experienced closures in other Districts as well. While some of the CASA closures were due to the total number of eligible children in the affected area, many of the CASA sites were shut down for lack of sufficient number of children based on the potential participant's inability to pay.  It is believed that there are people who need or would use this service under a different fee structure.

Beyond fees, there are certain other barriers which may limit certain populations access to PRCS programs. Those barriers could be physical, social, geographic and cultural.  Some examples of this include areas of the County where there is a void of programming space to include indoor space or even park acreage.  Certain communities, such as in some of the rural areas and even in some of the more suburban areas, do not have any parks, and have very limited to no indoor programming space.  With the changing demographics of Loudoun County, it is also very critical that PRCS continue to stay attuned to these changes and provide appropriate programming for the various age groups, cultural groups, and citizens who may have special needs.

**PURPOSE:**  The purpose is to update the Board on the challenge of providing services to all populations in the County including those of all ages, cultures, ability and socioeconomic status.

**ANTICIPATED ACTION DATE:**  PRCS is currently working on a comprehensive fee policy item that will be brought to the Board prior to the end of this fiscal year.  It will present a variety of policy options for the Board that can impact the accessibility of PRCS programming across the County.  With Board guidance, it will be possible for affected populations to more broadly participate in PRCS programs.

**ADDITIONAL INFORMATION:**  Please feel free to contact staff for additional information.

**2016 BOARD OF SUPERVISORS BRIEFING**

# # 12a

| | |
|---|---|
| **SUBJECT:** | **Planning Commission – Responsibilities and Recommended Qualifications** |
| **STAFF CONTACTS:** | Ricky Barker, Director, Planning and Zoning |
| | John Merrithew, Assistant Director, Planning and Zoning |

**BACKGROUND:** The Planning Commission consists of one (1) at large member and eight (8) district members who are appointed by the respective nine (9) members of the Board of Supervisors. Planning Commission members serve terms of four (4) years concurrent with the Board of Supervisors' (Board) terms of office.

The Planning Commission is a public advisory body and its purpose is to review and advise the Board on public and private activities involving the physical, social, and economic development of the County. In addition, the Commission is, by State Code, responsible for the review and development of a recommended comprehensive plan for the Board's consideration and adoption.

Through their review of land use applications and the development of planning policy and regulatory documents, the Planning Commission affords residents who serve on this body the opportunity to actively participate in the planning of the County and its welfare; to learn all facets of the regulations governing such functions; and to interact with a wide variety of citizens to help shape Loudoun's future.

**Responsibilities**: The Planning Commission's primary responsibility to the Board is in developing, advising and supporting the County's comprehensive plan. This document includes County policy statements on growth, transportation, economic development, and the environment. The Commission reviews all proposed amendments to the comprehensive plan and periodically conducts special studies to keep the plan current.

The Commission advises the Board on zoning related issues and legislative land development applications including rezonings and special exception applications. The Planning Commission reviews rezonings and special exception applications for compliance with the Comprehensive Plan and to ensure the uses are compatible with their locations and surrounding land uses. The Commission is the first public opportunity for community concerns to be heard.

The Commission co-operates with the towns and other municipal or regional planning commissions, and other agencies or groups, to further local planning programs and to assure harmonious and integrated planning for the area.

During their review of land use applications, County staff will provide written reports detailing background information, outlining staff's evaluation of the application, and applicable County policies and regulations. Commissioners can meet with staff and with applicant representatives as needed during their review. Commissioners may conduct field trips, either as a body (with

USCA4 Appeal: 17-2002     Doc: 88-1     Filed: 01/07/2019     Pg: 340 of 547

proper public notice) or individually, to view property that may be proposed for development to better understand the relationship of the proposed development with surrounding land uses. Commissioners may also need to attend the Board's meetings, or other various boards or committees, as deemed necessary.

**Time Requirements:**   Commissioners will need to attend a minimum of two (2) nights per month (currently the first and third Tuesday of each month).  With special projects such as comprehensive plan updates, Commissioners can expect at least one meeting a week.  Meetings typically run from 6:00 PM to 11:00 PM.

Outside of meetings, commissioners may spend at least six (6) to eight (8) hours per month reviewing agenda items submitted in the Planning Commission packets.  Commissioners will also spend time reviewing and responding to emails, letters and phone calls from the public and from applicants.  Depending on the election district the Commissioner represents, this may take a considerable amount of time.  Development and recommendations for the comprehensive plan update will also be time consuming in the initial period of the upcoming term.

**Qualifications, Recommended Skills, and Abilities:**   Planning Commissioners must be residents of Loudoun County and reside in the District they represent.  The recommended skills and abilities for a Planning Commissioner are listed below:

- Attention to detail;
- Critical and objective thinker;
- Open minded;
- Good communicator;
- Good interpersonal skills;
- Ability to read drawings, blueprints, and architectural plans;
- An understanding of land use planning, natural resources, landscape architecture, local government, economic development, or other related areas;
- Willingness to contribute and speak in a public forum; and
- Ability to make decisions after consideration of feedback from the public, the applicant, other interested parties, and staff.

**Salary:**  Planning Commissioners currently receive an annual salary of $21,315.  The Chairman receives $22,334, annually.

**ANTICIPATED ACTION DATE:**  The Board needs to make appointments to the Planning Commission during its first meeting in January 2016.

**ADDITIONAL INFORMATION:**  Information related to the Planning Commission may be found at http://www.loudoun.gov/pc.  Please feel free to contact staff for additional information.

## 2016 BOARD OF SUPERVISORS BRIEFING

# # 12b

**SUBJECT:**          **Proposal for a New Comprehensive Plan**

**STAFF CONTACTS:**     Ricky Barker, Director, Planning and Zoning

---

**BACKGROUND:** The Comprehensive Plan is the community-based vision for Loudoun's future and the land use policy document adopted by the Board of Supervisors. Plan policies guide the Board of Supervisor's (Board) land use development decisions and are the foundation for service plans, economic development, and other strategies, and for regulatory tools such as the Zoning and Subdivision ordinances.

The County's Comprehensive Plan consists of the <u>Revised General Plan</u> ("Plan") and Amendments, specific strategic plans and the <u>Revised Countywide Transportation Plan</u>. The goals of the Plan include promoting reasonable residential growth, alleviating future traffic congestion, promoting a diverse economy, protecting the rural economy, and preserving environmental and historical features.

**PURPOSE:** This briefing paper outlines the need for a new comprehensive plan, identifies an organizational structure, proposes a process, and sets forth a tentative schedule.

### Need for the Update:

Although amended many times through targeted amendments, the Plan has not been comprehensively reviewed since its adoption in 2001. Staff recommends using the existing <u>Revised General Plan</u> as an important resource for the development of a New Comprehensive Plan for Loudoun County.

Key Reasons for a New Comprehensive Plan:

1. **State Requirements** – Sections 15.2.2223 through 15.2-2232 of the Code of Virginia require that every local government prepare and adopt a comprehensive plan for the territory under its jurisdiction. The purpose is to guide and accomplish a coordinated, adjusted and harmonious development of the territory which will, in accordance with present and probable future needs and resources, best promote the health, safety, morals, order, convenience, prosperity and general welfare of the inhabitants, including the elderly and persons with disabilities. The plan is intended to be general in nature, in that it shall designate the general or approximate location, character, and extent of each feature, including any road improvement and any transportation improvement, shown on the plan and shall indicate where existing lands or facilities are proposed to be extended, widened, removed, relocated, vacated, narrowed, abandoned, or changed in use. The plan is to serve as the guiding document for all legislative land use planning decisions including adoption of zoning and subdivision ordinances, and is to be reviewed at least once every 5 years by the planning commission to determine whether it is advisable to

USCA4 Appeal: 17-2002    Doc: 88-1    Filed: 01/07/2019    Pg: 342 of 547

amend the plan. Although our Plan has been amended several times throughout the years to make adjustments for the harmonious development of the County in accordance with current, changing, and future needs and resources, a comprehensive review of the entire Plan has not occurred.

2. **Location and Density of Development** - Loudoun's population has grown by more than 200,000 people since the last Comprehensive Update. Due to its desired location and high quality of life, Loudoun County will continue to experience significant development pressures to supply the growing demand for new housing and commercial development. The location and density of where this new growth should occur and what form it should takes need to be decided upon as part of the new Plan. In addition, the Plan will need to examine the need for services and infrastructure to serve this future growth in a fiscally responsible way (e.g., schools, parks and recreation, transportation system, and emergency services, etc.).

3. **Changes in the Market** - Market and land use trends have evolved and the Plan does not effectively support new development trends. Most of the trends are the result of an ever-changing population (more diverse and younger) that is attracted to the use of transit, multifamily-type housing, and nearby entertainment. A strong preference for transit, a growing market for mixed use, and a greater emphasis on entertainment/retail development call for a re-evaluation of the County's suburban land use policies.

4. **Office Development and Keynote Employment Policy Area** – Suburban-style office development is not expected to be a near term economic contributor to the County. Homogenous office parks are not a sustainable land use pattern. Alternative means of addressing office development and alternative land uses should be considered. Areas zoned and/or planned along Route 7, Loudoun County Parkway for office development and areas such as the Keynote corridors need to be re-evaluated to consider alternative land use and development patterns.

5. **Pressure to Expand Suburban Policy Area** – Several recent legislative applications in the current Transition Policy Area are in conflict with the current Plan and reflect increasing development pressures. Current plan policies need to be evaluated to reinforce current objectives or modify them as appropriate.

6. **Remaining Fiscally Balanced** – Loudoun has a long tradition of balancing the impacts of growth through carefully evaluating new development proposals and how they are addressing their impacts. Loudoun has dedicated staff and resources to remain competitive and to attract businesses and jobs. The Plan's development policies need to be updated to stay economically competitive in attracting desired types of development and to align with the Board's economic development strategies such as a more diversified industry cluster strategy.

7. **Impact of Metro Stations** - The introduction of Metrorail transit and the Board's investment in significant road improvements and bus service suggest changes to the

eastern County development pattern and will most likely impact the demand for housing and business development in other parts of the County.

**Organizational Structure:**

One primary component for successfully developing a new comprehensive plan is to determine roles and responsibilities of key stakeholders:  Board of Supervisors, Planning Commission, Planning and Zoning staff, and Technical Advisory Committee (see below).

No. 17-2002, viewed 12/18/2018

| Stakeholder | Roles/Responsibilities |
|---|---|
| Board of Supervisors | 1. Establish the scope, process, and approve the funding and allocation of resources;<br>2. Provide overall guidance and direction throughout the process;<br>3. Review and Evaluate the Planning Commission's Recommended Plan;<br>4. Develop a Board of Supervisor's Draft Plan;<br>5. Conduct the Required Adoption Process; and<br>6. Adopt the New Comprehensive Plan. |
| Planning Commission | 1. Follow the Board's established scope and process;<br>2. Implement an effective public involvement process (e.g., conduct public meetings, meet with stakeholder groups, etc.);<br>3. Develop a Planning Commission's Recommended Plan. |
| Planning and Zoning Staff | 1. Develop draft recommendations on the scope, process, and recommended allocation of resources;<br>2. Manage the administrative and logistics (including overseeing consultants);<br>3. Lead the public outreach effort;<br>4. Facilitate a Technical Advisory Committee made up of staff from County Administration and key County Departments and Agencies that provide information and recommendations;<br>5. Providing staff recommendations to the Planning Commission on various components/items related to the Plan; and<br>6. Assist the Planning Commission in developing its Plan Recommendation. |
| Technical Advisory Committee | 1. Represents key County Department and Agencies;<br>2. Serves as a resource for the Board and Planning Commission for technical and professional information, guidance and recommendations; and<br>3. Coordinate the staff work and resources from the various departments and agencies. |
| **Community Advisory Task** | **1. Represents key stakeholders (e.g., citizen groups, environmental organizations, homebuilders, real estate associations, non-residential associations, Loudoun Chamber of Commerce, etc.)**<br>**2. Serves as an advisory group to the Board and Planning Commission to provide feedback and recommendations during the plan's development.** |

**Process:**

Staff recommends three phases of the process: 1) Development and Adoption of a Plan Charter; 2) Plan Development; and 3) Plan Adoption. The time it takes to complete this process will depend upon the scope of the project. If the scope focuses on addressing the key reasons for updating the plan, staff estimates that this process will take 18 months.

| PROCESS SUMMARY | PRODUCT |
|---|---|
| **Phase I – Development and Adoption of a Plan Charter** - Identifies the key areas that need to be addressed, the process that will be used, the level of public involvement, and a proposed schedule. | |
| **PLAN EVALUATION:** Demographic update: local and regional growth and economic projections, development trends. | Draft Plan Scope – Key Areas To Address |
| Staff presents preliminary evaluation of key areas and receives Board feedback and preliminary recommendations on key areas. | |
| Stakeholder assessment of Plan to identify key areas to address: Formation of a Stakeholder Advisory Task Force (Representatives from key stakeholder groups) | |
| Staff outlines issues to be addressed and conceptual policy direction (where identified). | |
| Staff provides an opportunity for community feedback on draft assessment and identification of additional issues and opportunities. | Final Plan Scope |
| Staff revises outline of issues to be addressed, conceptual policy direction based on feedback from the general public and the Stakeholder Advisory Task Force. | |
| Plan Charter presented to the Board for review and adoption. Charter includes key areas to address (including certain policies), recommended process, resource allocation, and schedule. | Adopted Plan Charter (Forwarded to Planning Commission to begin Plan Development) |
| **Phase II – Plan Development** – Development of a draft comprehensive plan. This will include the evaluation of current policies and land use designations and development of new policies to address new issues. | |
| Staff holds work sessions with Planning Commission to review Plan Charter and to develop and finalize the work program for a completed draft of the New Comprehensive Plan. | Work Program with Detailed Schedule |
| Staff holds additional work sessions with Planning Commission to explore the key areas and develop/revise policies to address them. | Preliminary Plan Recommendations |
| Staff holds meetings throughout the process to review preliminary policy recommendations with Stakeholders Advisory Task Force to receive feedback and make changes to present back to Planning Commission. | Revised Plan Recommendations |
| **COMMUNITY REVIEW:** Staff and Planning Commission present initial draft of revisions to the public in a series of review meetings and through various electronic feedback opportunities. Commission revises document as needed. | Revised Plan Draft |
| **Phase III – Adoption** – Formal process required by State code for adoption of a new comprehensive plan. | |
| **COMMISSION REVIEW -** Final draft Plan to Planning Commission and participate in Commission review. | New Revised Plan Draft |
| Revised draft is sent to Planning Commission Public Hearing | PC Public Hearing Plan Draft |
| Planning Commission incorporates public comment and recommends to BOS | Final PC draft |
| Work Sessions held with the Board to present Plan, receive feedback and revise Plan. | Board Public Hearing Draft |
| The Board conducts required public hearing, draft revised as needed. | Adopted Comprehensive Plan |

With the last comprehensive plan update, the Board relied on the Planning Commission to develop a draft comprehensive plan for its review. Staff recommends the Commission take on this role; however, we also recommend that a Community Advisory Task Force be formed to assist the Planning Commission in developing its recommendation. The Task Force will be both a sounding board for the Commission's preliminary recommendations as well as proposing plan recommendations. A selected committee of knowledgeable participants to work with staff and

the Commission will help to develop a plan that is realistic. The Planning Commission will have a critical and historically demanding role reviewing and making recommendations on the Plan prior to Board action. All phases would include outreach to the community. The outreach serves several functions:   a variety of input can identify unforeseen issues and opportunities; knowledgeable stakeholders can bring innovative concepts to the table; and to the extent consensus is reached, a broader community will "own" the recommendations and support future decisions implementing the policy.

The process can take advantage of the research that has been conducted by the Board in recent community outreach efforts (Dulles and Ashburn), as well as the economic development retail study, transportation and other studies. This may relieve the need for extensive consultant services during the Plan process. However, technical consultant support will be needed in the areas of fiscal, transportation, and market analysis to measure the impacts of proposed land use changes. The costs of consultants will be determined at the time of adoption of the Plan Charter because the scope of work and schedule will be directly related to the consultant's needs.

  A dedicated staff team of three to six positions from the Planning and Zoning Department will be needed to conduct the day-to-day process. At times during the plan process, additional staff from the P&Z Department and other County departments and agencies will need to dedicate significant time to this effort. The P&Z Department does have staff to accomplish this effort provided that other lower priority projects/assignments are postponed. In addition, changes to current planning and zoning-related processes and procedures may need to be done to reduce the work-load demands (e.g., providing for more administrative review of items such as certain telecommunication towers, certain uses, and zoning modifications.)

**Alternative Processes:**

If there is a desire to shorten the process for developing a new comprehensive plan, the Board may choose to narrow the scope of the project and/or develop the plan in several parts. The Board can direct staff to only focus on the following areas:

1. Transitional Policy Area – Determining whether and to what extent the County should extend higher density growth into this area.
2. Suburban Policy Area – Building on the Ashburn and Dulles community outreach project, the County can determine what specific policies and proposed land uses need to be changed. Some of these changes can address the designated office areas such as Keynote and propose more mixed use developments within these areas.

One advantage of this approach is that the new comprehensive plan would be done in less time (estimated time – 1 year). The disadvantages of this approach would be that some other key policy changes could be delayed and changes to these two policy areas may lead to the need to change other aspects of the current General Plan. To address these disadvantages, the Board could save these other changes until a "Part II" update.

**ANTICIPATED ACTION DATE:**   Staff will bring a report to the Board during the first quarter of 2016 to develop and adopt a Plan Charter.

**ADDITIONAL INFORMATION:** Information related to the current Revised General Plan may be found at http://www.loudoun.gov/index.aspx?nid=1066. Other information regarding the Dulles Community Outreach project and the Silver Line related studies can be found at http://www.loudoun.gov/index.aspx?nid=3369 and http://www.loudoun.gov/index.aspx?NID=3200.

Please feel free to contact staff for additional information.

No. 17-2002, viewed 12/18/2018

## 2016 BOARD OF SUPERVISORS BRIEFING

# # 12c

**SUBJECT:**        **Silver Line Comprehensive Plan Amendment**

**STAFF CONTACTS:**    Ricky Barker, Director, Planning and Zoning
                              Rich Klusek, Senior Planner, Planning and Zoning

**BACKGROUND:** At the September 17, 2014 Board Business Meeting, the Board initiated two projects in support of a potential Comprehensive Plan Amendment (CPAM) for the Silver Line/Metrorail Service District. The County has contracted with HR&A Advisors and Kimley Horn Associates to perform a Market Analysis and Best Practice Study (Part A) and with Stantec to conduct the Scenario Planning Project (Part B).

The results of these two studies will be used to develop a draft CPAM for the areas around the two future metro stations. Once adopted, this Plan will guide the Board of Supervisors (Board) on the most appropriate future land uses and densities around these stations. The Plan will be used to evaluate future rezonings cases and related development plans and to guide the Board in its decision on whether or not to approve them.

The recommendations of the Market Analysis and Best Practice Study and an update to the Scenario Planning Project were presented at a Board Business meeting on September 16, 2015.

## PART A: MARKET ANALYSIS AND BEST PRACTICES STUDY

HR&A Advisors and Kimley Horn Associates have completed the four key tasks outlined in the Scope of Services. The tasks included: 1) Research and Background, 2) Market Analysis, 3) Airport Compatibility Studies, and 4) Recommendations.

After the consultant presentation of the findings and Board discussion at the September 16, 2015 Board Business Meeting, the Board voted 5-1-2 (Delgaudio opposed, Clarke and Reid absent) to accept the consultant's recommendations regarding 1) Maintaining Transit Related Employment Center (TREC) policies and zoning; 2) Considering partnerships and opportunities for catalytic anchor uses; 3) Working with the Metropolitan Washington Airports Authority (MWAA) to encourage airport-compatible development; 4) Maintaining existing policies to encourage commercial development at the Ashburn Station Area; and 5) Considering policy and zoning revisions to allow interim uses to help activate the Station Areas, provide income for property owners, and generate tax revenues. These recommendations will be used to assist the County in developing a Comprehensive Plan Amendment for properties in and around the two future metro stations.

## PART B: SCENARIO PLANNING STUDY

The land use scenario planning process is part of a broader effort to update Loudoun County's comprehensive plan to account for potential changes in growth and development resulting from

the construction of Metrorail's Silver Line. The scenario plan will evaluate current planned land uses and multiple alternative future land uses in order to guide future development that will:

1. Achieve a desired land use pattern,
2. Promote future employment generation,
3. Minimize demands on the County's transportation infrastructure, and
4. Maximize tax revenue to support Metrorail operations.

Through public outreach, stakeholder interviews, and scenario testing, the community will establish a vision for future growth that maximizes the benefits of investing in Metrorail. Ultimately, the scenario planning process will serve as a basis for a new land use plan that will be used as a decision making tool to guide and evaluate future land use decisions.

To date Stantec and staff have undertaken background research activities, developed a project website, conducted two public workshops, and met with stakeholders on two occasions. The first workshop was held on May 28, 2015 and the second workshop took place on August 26. Stakeholder interviews were held on May 29, 2015 and August 27.

At the September 16 Board meeting, Stantec provided a presentation of the process that has taken place and described four scenarios that have been developed. The methodology used to measure tradeoffs between scenarios was also discussed. Following the presentation, the Board agreed to provide staff an opportunity to gather Board feedback through individual meetings.

At the October 7, 2015 meeting, Staff updated the Board with the additional feedback received and Board members provided additional comments and overall feedback. This feedback will be used by Stantec as the consultant team develops a recommended scenario that best achieves the four goals for the Metrorail Tax District. Some of the ideas and themes from the individual Board meetings include the following:

1. The future land use plan amendment needs to provide the opportunity to maximize revenues in tax district.
2. The future land use plan amendment must clearly ensure that the local and regional transportation system can adequately accommodate the projected development.
3. The County's existing Airport Overlay District must be maintained to support the existing and future growth of Dulles Airport.
4. Planned future housing needs to cater to preferences of millennials and older populations by providing urban multifamily options not currently available in the County.
5. Board members who shared feedback, thus far, have expressed interest in the compact development scenario provided that the County is able to adequately plan for and address the public infrastructure and facility needs (e.g., transportation, schools, etc.).
6. Focus on setting a vision for land use in the study area and then allow the flexibility for the development of projects (i.e., do not tie residential development with the construction of the non-residential).

7.  Appropriately located data centers (further away from the metro stations) with proper infrastructure planning are important.

8.  All modes of transportation (e.g., pedestrians, bicyclists, buses, shuttles, etc.) must be accommodated to maximize use of Metro (including future transit stop shelters).

9.  Interim uses within the study area should be considered.

10. The future land use plan amendment needs to consider and plan for future schools and other facilities including possible locations.

11. New single family housing is not desired within the study area.

12. Board members have differing viewpoints with regard to residential development outside of, but in proximity to the Airport Overlay District.

13. Metrorail should be viewed as an economic development tool.

14. The Ashburn Station should be considered the primary location for mixed-use development.

15. Performance standards should be considered for any data centers.

**SILVER LINE CPAM NEXT STEPS:**  Staff anticipates presentation of a final report on the Land Use Scenarios at the Board's December 2, 2015 meeting.  At this meeting, staff will seek direction from the Board to prepare for the development of a small area comprehensive plan update.

**ANTICIPATED ACTION DATE:**  Staff will bring a report to the Board in early 2016 to review the proposed CPAMand receive direction on moving the amendment forward through the required public review and approval process.

**ADDITIONAL INFORMATION:**  Information related to the Scenario Planning project may be found at http://silverlinescenarioplanning.com.  Information regarding the Silver Line Comprehensive Plan Amendment including the Market Study and Best Practices Study may be found at http://www.loudoun.gov/silverlinecpam.  Please feel free to contact staff for additional information.

**2016 BOARD OF SUPERVISORS BRIEFING**

# # 12d

| | |
|---|---|
| **SUBJECT:** | **Communications Commission Telecommunications Facilities Planning and Zoning Initiatives - Expansion of Broadband Services in Loudoun County** |
| **STAFF CONTACTS:** | Ricky Barker, Director, Planning and Zoning |
| | Pat Giglio, Planner III, Planning and Zoning |

**BACKGROUND:** Western Loudoun County has long been lacking a viable high-speed, affordable, broadband solution for the provision of internet services for educational purposes, small businesses, job search opportunities, home-based businesses, telecommuters, telemedicine/telehealth solutions, and expanded rural economic development. The availability of increased broadband connectivity would also serve to fill the gaps in the existing network used by public safety.

The Communications Commission, formerly the Cable and Open Video Systems Commission, was originally formed to advise the Board of Supervisors (Board) on issues pertaining to the county's cable TV operations. Associated with this activity is the implementation of the Cable Television Act of 1992. In March 2012, the Board expanded the scope of the Commission to include broadband issues.

**PURPOSE:** A team of County Staff has worked with the Communications Commission to review, evaluate, and develop initiatives intended to improve telecommunication service, particularly in the County's rural area. Staff is currently meeting monthly with the Commission to prepare proposed ordinance amendments and policy/process changes to accommodate the deployment of wireless technology and the development of telecommunication facilities in the County. At this time, a total of five (5) initiatives have been recommended by the Commission to pursue:

1. Develop a Zoning Ordinance Amendment (ZOAM) to permit Telecommunication Facilities in Rural Hamlets (A3 & A10), Planned Development Rural Villages (PD-RV) and Countryside Village (PD-CV) by Special Exception;

2. Develop a ZOAM to permit telecommunication monopoles 80' Above Ground Level (AGL) or less to facilitate the distribution of wireless internet services with performance standards;

3. Create an expedited processes for stealth designed telecommunication facilities 80'-120 AGL;

4. Develop a ZOAM to permit Telecommunication uses and/or structures less than 40 feet in height in all zoning districts to facilitate deployment of micro/small cell network; and

5. Designate Permitted Commercial Tower Development Areas (PCTDA) within the County for zoning and planning purposes.

In addition, staff was directed by the Board in July 2015 to explore reducing application-related fees to encourage telecommunication applications. Recently, several Board members have also requested that staff develop ordinance amendments to provide more administrative review of certain telecommunication towers (e.g., addition of telecommunication facilities on existing non-residential buildings, expansions to existing towers, etc.).

**ANTICIPATED ACTION DATE:** Staff will bring a report to the Board during the first quarter of 2016 to change certain processes/procedures related to telecommunication and to adopt a resolution of intent to amend the Zoning Ordinance.

**ADDITIONAL INFORMATION:** Information related to the Communication Commission can be found by clicking the following link
http://va-loudouncounty.civicplus.com/index.aspx?NID=453.  Please feel free to contact staff for additional information.

No. 17-2002, viewed 12/18/2018

**BOARD OF SUPERVISORS BRIEFING**

# # 12e

| | |
|---|---|
| **SUBJECT:** | **Application of Virginia Electric and Power Company for Approval and Certification of Electric Transmission Facilities Consisting of the Poland Road 230 kV Double Circuit Transmission Line Loop and 230-34.5 kV Poland Road Substation, SCC Case No. PUE-2015-00053** |
| **STAFF CONTACTS:** | Ricky Barker, Director, Planning and Zoning<br>John Merrithew, Assistant Director, Planning and Zoning |

**BACKGROUND:** Dominion Virginia Power (DVP) submitted an application to the State Corporation Commission (SCC) for certification and approval of a proposed 230-34.5 kilovolt (kV) Poland Road substation and an approximately 4.0 mile overhead 230 kV double circuit transmission line. The transmission line route taps an existing 230 kV line on the west side of Stone Ridge and travels east along Route 50 to the proposed substation near Poland Road and Route 50. The proposed double-circuit 230 kV line will be located within a 100-foot right-of-way and will feature 110 to 125-foot single-shaft galvanized steel poles equipped with three support arms on either side of the pole and two small arms near the top of the pole. The estimated service date is June 2018.

The Dominion application includes a proposed route and two alternative routes. The proposed alignment parallels Route 50 and may have significant visual impacts on the corridor, may impact the viability of businesses in the area (including Stone Spring Hospital) and may limit the development potential of properties that the line crosses.

On July 15, 2015, the Board of Supervisors adopted a resolution opposing the DVP proposal offering three alternative alignments. The County proposed the alternative routes to the SCC, requested that the SCC public hearings be delayed to allow Dominion time to assess the County alternatives, and that the public hearings be held in Loudoun County. Local hearings were held for October 26, 2015 at the Loudoun County Administration Building and October 29 at Freedom High School. Over 1,000 people attended these meetings and expressed their opposition to the proposed transmission lines. Specifically, their concerns included:

1. Lowering of property values for residential and businesses developments in the area;
2. Reducing the desirability of this area for future residential and non-residential development;
3. Removal and disruption to the 100 foot-wide landscape corridor along Route 50 required to be installed by developments to create a Loudoun County Entrance Gateway corridor;
4. Interference by the transmission line with the flights of emergency helicopters to the Stone Springs Hospital;
5. Harmful health impacts from the transmission line; and
6. Support for the County's proposed alternatives that significantly reduced the impact on the Route 50 corridor.

The Yardley Ridge transmission line proposal would extend a new 230 kV transmission line approximately ½ mile from an existing line, which follows the Broad Run to a proposed NOVEC substation near the intersection of Loudoun County Parkway and Route 606. The County has not identified issues with the proposal.

**ANTICIPATED ACTION DATE:** Staff will bring a report to the Board in early 2016 to take a position on the routing of the Dominion Virginia Power (DVP) Poland Road 230 kV Transmission Line and Substation under consideration by the SCC. The SCC will accept public comment through January 6, 2016. SCC staff will file their report on January 13, 2016 and an evidentiary hearing is scheduled for February 2, 2016 in Richmond.

**ADDITIONAL INFORMATION:**

- http://www.loudoun.gov/powerlines
- https://www.dom.com/corporate/what-we-do/electricity/transmission-lines-and-projects/poland-rd-230kv-transmission-line-and-substation-project
- http://www.scc.virginia.gov/docketsearch

Please feel free to contact staff for additional information.

12e: Poland Road Substation
Board of Supervisors Orientation
November 14, 2015
Page 3

## ATTACHMENT



| | Alternative Route | Total Length (ft.) | Heavy Angles (no.) | Road Crossings (no.) | Residences within 0-150 feet of CL (no.) | Residences within 151-500 feet of CL (no.) | Businesses within 250 feet of CL (no.) | Public Facilities within 500 feet of CL (no.) | National Register Listed Properties within 1 Miles (no.) | National Register Eligible Properties within 0.5 Miles (no.) | Archaeological Sites within ROW (no.) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| County Routes | Alternative 1 | 22,070 | 6 | 12 | 2 | 6 | 2 | 0 | 2 | 16 | 0 |
| | Alternative 1b | 19,240 | 4 | 10 | 1 | 5 | 8 | 0 | 2 | 16 | 0 |
| | Alternative 2 | 26,490 | 8 | 14 | 1 | 5 | 5 | 0 | 2 | 15 | 4 |
| | Alternative 2b | 23,660 | 6 | 12 | 1 | 8 | 11 | 0 | 2 | 15 | 4 |
| | Alternative 3 | 17,520 | 4 | 7 | 1 | 2 | 12 | 2 | 1 | 15 | 0 |
| Dom Routes | Proposed Route | 20940 | 5 | 9 | 2 | 9 | 21 | 3 | 2 | 17 | 1 |
| | Alternate Route A | 23980 | 11 | 7 | 5 | 14 | 10 | 0 | 2 | 16 | 2 |
| | Alternate Route B | 19830 | 1 | 8 | 2 | 30 | 22 | 4 | 2 | 17 | 2 |

No. 17-2002, viewed 12/18/2018

## 2016 BOARD OF SUPERVISORS BRIEFING

# # 12f

**SUBJECT:**          **Future Zoning Ordinance Amendments**

**STAFF CONTACTS:**    Ricky Barker, Director, Planning and Zoning
                       Mark Stultz, Zoning Administrator, Planning and Zoning

**BACKGROUND:**    The Planning and Zoning Department administers and enforces the provisions and regulations of the Loudoun County Zoning Ordinances. Staff reviews development plans/projects within the county to ensure compliance with the governing zoning ordinance and any applicable proffers or conditions of approval. The Zoning Ordinance outlines all the zoning districts and special overlay areas within the county, and provides details relevant to each specific zoning district, such as but not limited to, guidelines for the subdivision of land (minimum parcel size, yard requirements, etc.), permitted and special exception uses, and correlating additional development requirements.

The Zoning Ordinance is a mechanism for the implementation of the provisions of the comprehensive plan and has been established in order to ensure consistent and efficient land use throughout the county.

On February 14, 2012, the Board of Supervisors (Board) adopted a work plan to review and develop Zoning Ordinance Amendment(s) (ZOAM) for the purpose of advancing commercial development throughout the County and encouraging a more business-friendly environment. The Board established a Zoning Ordinance Action Group (ZOAG) and charged them with developing and recommending Zoning Ordinance Amendments (ZOAM). Since its formation, the ZOAG has been working with staff and the Board to provide a more flexible and easier to use zoning ordinance.

In recent months, Staff has been working with ZOAG on a variety of zoning ordinance amendments that the Board will need to address in the upcoming months.

1. Town Center Zoning District – To provide more flexibility on uses and standards to address market changes and to encourage additional development within this District.
2. Historic Structure Exemptions– To encourage more effective reuse of historic structures.
3. Non-Suburban District Standards and Uses – To provide more flexibility on development standards and uses to support and advance the rural economy in western Loudoun. This includes allowing uses such as indoor recreation establishments and rural corporate retreats in certain rural zoning districts.

The Board has also directed staff to amend the zoning ordinance to address specific issues.

1. Data Center Uses – To require this use to be a special exception with the Commercial Light Industry Zoning District.

USCA4 Appeal: 17-2002     Doc: 88-1     Filed: 01/07/2019     Pg: 358 of 547

2. Setbacks – To lessen the setback requirements for covered decks and porches within certain residential districts.

**ANTICIPATED ACTION DATE:** Staff will bring these various zoning ordinance amendments to the Board during the first six months of 2016.

**ADDITIONAL INFORMATION:** The on-line versions of our zoning ordinances may be found at http://www.loudoun.gov/index.aspx?NID=1755. Please feel free to contact staff for additional information.

No. 17-2002, viewed 12/18/2018

## 2016 BOARD OF SUPERVISORS BRIEFING

# # 12g

**SUBJECT:**            **Process for Zoning Ordinance Amendments – Evaluation of Current Process**

**STAFF CONTACTS:**     Ricky Barker, Director, Planning and Zoning
                        Mark Stultz, Zoning Administrator, Planning and Zoning

---

**BACKGROUND:**  On February 14, 2012, the Board of Supervisors (Board) adopted a work plan to review and develop Zoning Ordinance Amendments (ZOAM) for the purpose of advancing commercial development throughout the County and encouraging a more business-friendly environment.  The Board established a Zoning Ordinance Action Group (ZOAG) and charged them with developing and recommending amendments to the Zoning Ordinance.  Since its formation, this group has worked with staff and the Board to make numerous changes to the Zoning Ordinance to meet the Board's purpose.

ZOAG began its process for making these zoning ordinance amendments through gathering a list of suggested amendments from various stakeholders within the County.  ZOAG then prioritized this list and presented it to the Board for its direction on priority amendments.  Over the past three years, ZOAG has worked with staff and the Board to accomplish many of the recommended amendments.  For most amendments, staff took the lead in writing proposed ordinance amendments and worked with ZOAG to receive their feedback and then make adjustments to proposed amendments to reflect ZOAG's recommendations.  Staff would then provide its concerns regarding the proposed amendment to the Planning Commission and Board.

Staff has evaluated the process for zoning ordinance amendments and believes that it has produced a significant number of amendments to meet the Board's objectives of being more business friendly.  Staff wants to receive feedback from the Board on whether any changes to the process are desired.  One possible change for the Board to consider would be to have the staff take on a stronger leadership role for the update and maintenance of the zoning ordinance.  Due to its knowledge and understanding of ordinances, Staff is well equipped to take on a stronger leadership role by  working with the Board to establish priorities for proposed amendments and then  working with ZOAG to gain feedback at appropriate times during the process. Staff believes that this suggested modification to the existing ordinance amendment process still meets the purpose of developing ZOAMs that advance commercial development.  ZOAG can still play a strong role in the process through providing feedback and recommendations on proposed ordinance amendments. In addition, ZOAG has accomplished almost all of the changes suggested by stakeholders.  Now may be a good time to transition the leadership role to staff.

Currently, staff has a significant list of proposed ordinance amendments that will improve efficiencies and effectiveness, while also improving customer service through a more streamlined process and ordinance that is more flexible.  With the current process, working on ZOAG-related amendments has not allowed staff the time to process our proposed amendments. Staff is committed to developing ordinance amendments that are reasonable and effectively

address the Board's strategic initiatives. By taking a stronger leadership role in the ordinance development process, staff can continue to actively work with ZOAG to gain their unique perspective and advice while fulfilling the Board's strategic objectives.

Staff also recommends that the Board consider appointing additional members for the ZOAG that include representatives from other stakeholder groups (e.g., homeowner associations, environmental organizations, towns). These additional representatives would provide unique perspectives that may address concerns on proposed amendments in advance of public hearings and during the amendment preparation process.

**ANTICIPATED ACTION DATE:  If desired by the Board,** staff will bring a report to the Board during the first quarter of 2016 to set forth a more defined process for zoning ordinance amendments for feedback and direction.

**ADDITIONAL INFORMATION:**  Information on our current zoning ordinance amendments can be found at http://www.loudoun.gov/index.aspx?nid=2935. The bylaws for ZOAG are attached. Please feel free to contact staff for additional information.

**ATTACHMENT:** Zoning Ordinance Action Group By-Laws (2012)

No. 17-2002, viewed 12/18/2018

## Zoning Ordinance Action Group (ZOAG) Bylaws

**Purpose:** The ZOAG is created for the purpose of supporting the Board of Supervisors, the Planning Commission, and County Staff in identifying, reviewing, recommending, and preparing amendments to the *Revised 1993 Loudoun County Zoning Ordinance* ("Zoning Ordinance") in order to: 1) correct errors and inconsistencies; 2) clarify regulations; 3) make the Zoning Ordinance more user friendly; 4) keep the Zoning Ordinance current to reflect changes in market conditions and the emergence of new uses; and 5) notify the Board of Supervisors when proposed Zoning Ordinance amendments are inconsistent with the Comprehensive Plan and may require a Comprehensive Plan amendment. The Board of Supervisors may direct that certain proposed amendments to the Zoning Ordinance be referred to the ZOAG for review prior to requesting County Staff to initiate the referral process and the scheduling of a public hearing for consideration of such amendments to the Zoning Ordinance.

**Authority and Establishment:** The ZOAG is established pursuant to Section 15.2-1411 of the Code of Virginia.

**Membership:** The ZOAG shall be composed of at least seven (7), but no more than fifteen (15), members appointed by the Board of Supervisors. The candidates for appointment may be any persons whom the Board of Supervisors deems qualified, including, but not limited to, individuals with knowledge and experience in zoning, planning, land development, land use law, and economic development; and may be requested from business and civic organizations.[1] Business and Civic organizations referenced in footnote 1 are requested to submit their designated representative recommendations within 45 days[2] of the Board action to the staff contact[3] in the Board of Supervisors Office. If less than 15 organizations designate a representative within 45 days, then the Board of Supervisors can individually bring forward nominations of individuals interested based on relevant experience up to the maximum panel size of 15 members.

1
2
3

---

[1] ZOAG membership may include representatives from organizations such as, but not limited to, NAIOP, Chamber of Commerce, Loudoun Economic Development Commission, Rural Economic Development Council, Northern Virginia Building Industry Association, Piedmont Environmental Council, Dulles Area Association of Realtors, the Coalition of Loudoun Towns, and others.

[2] 45 days of the most recent Board Action calling for nominations (9/5/12)

[3] Contact the Board's office at 703-777-0204.

At least half of the members shall be appointed for a term of four (4) consecutive calendar years and half of the members appointed for a term of two (2) consecutive calendar years in the beginning year of the ZOAG in order to initiate staggered terms. Thereafter, each member shall be appointed for four (4) consecutive calendar years. Members of the ZOAG may be replaced during the calendar year should they be unable to serve or as deemed necessary by the Board of Supervisors. Members may be reappointed. If a member resigns, the Board of Supervisors may appoint a replacement.

The Zoning Administrator or the Zoning Administrator's designee may serve as a liaison to assist with understanding the interpretation of the three (3) Loudoun County Zoning Ordinances, to provide background in regard to the administration of these Zoning Ordinances, and to provide other support as necessary.

**Officers and Committees:** A chairman, vice chairman, and any other officers established by the ZOAG shall be elected by majority vote of the entire membership. The ZOAG may form any sub-committees that it considers necessary.

**Meetings:** The ZOAG shall hold public meetings at least twice a year, or as otherwise set by the ZOAG as its work so requires, at a time and place to be designated by the ZOAG. The agendas for the ZOAG meetings will be published in advance on the County website. Official minutes of the meeting will be taken and published on the County website.

(A) A majority of the membership of the ZOAG shall constitute a quorum. The presence of a quorum of the members of the ZOAG shall be required for the consideration of any matter. Any action taken shall require the affirmative vote of a majority of the ZOAG members present and voting.

(B) Members shall at all times be in compliance with FOIA regulations.

**Records:** The ZOAG shall keep records of all of its proceedings, and all such records shall be made available upon request for public inspection.

**Duties:** The ZOAG may identify, review, recommend, and prepare amendments to the Zoning Ordinance for Planning Commission and County Staff review, or could be requested to review amendments proposed by the Board of Supervisors. The Board of Supervisors may direct that certain proposed amendments to the Zoning Ordinance be referred to the ZOAG for review prior to requesting County Staff to initiate the referral process and the scheduling of a public hearing for consideration of such Zoning Ordinance amendments. The ZOAG shall advise the Board of Supervisors, Planning Commission, and Zoning Administrator of their findings and recommendations. To allow for more timely consideration of proposed amendments, the ZOAG may recommend to the Board that amendments to the Zoning Ordinance be brought forward on a section by section basis and processed individually rather than grouping all amendments together in one potentially large package

2016 BOARD OF SUPERVISORS BRIEFING

# # 13a

**SUBJECT:**          **Peumansend Creek Regional Jail Authority Membership**

**STAFF CONTACT:**    Sheriff Michael Chapman, Sheriff's Office
                      John Sandy, Assistant County Administrator

_____

**BACKGROUND:**    The Peumansend Creek Regional Jail is a 336 bed, medium grade security adult detention center located on Fort AP Hill in Caroline County, Virginia.  Loudoun County is a founding member of the Peumansend Creek Regional Jail Authority (PCRJA) established in 1996 to house inmates from the following jurisdictions—Loudoun County, Prince William County, Cities of Richmond and Alexandria, Arlington County and Caroline County.  The facility was constructed using lease revenue bonds issued in 1996 with a 20-year term.  The mission of this facility is to provide detention services and those related operations deemed necessary for the protection of society, the health and custody of the inmates, and provide a safe working climate for the staff.  Related services and programs are provided to the inmate population whereby an inmate has an opportunity to participate in these services and programs as determined in the assessments conducted by the classification staff at the time of intake.

The PCRJA is an independent political subdivision created by the following jurisdictions located in the Commonwealth of Virginia.  As part of the August 29, 1996 established service agreement, Loudoun County received 40 contracted beds/spaces at this facility which is located on land provided by the federal government.  Total actual costs to Loudoun County for housing these inmates, at this facility, was $510,760 for FY 2016.  This amount includes $83,268 in annual debt service to pay off the bonds that were issued to construct the facility in addition to actual operating costs of $427,492.   This average daily FY 2016 cost for housing inmates at this facility is $29.27 per day.

According to the PCRJA Service Agreement, which governs the operation and maintenance of the facility, any member jurisdiction may pull out of the facility once its entire financial obligation (i.e., debt service and any other accounts) is met.  For Loudoun County, its financial obligations will be met fully on June 1, 2017 (FY 2017); and it may officially leave on June 30, 2017.  Notification of intent through a Board of Supervisors' (Board) resolution, or ordinance is required prior to <u>September 1 of the prior year</u>, (i.e., prior to September 1, 2016 (FY 2017)).  All remaining member jurisdictions must be noticed.   If for whatever reason, the Loudoun County's Board of Supervisors decides to "pull out" of the facility any appreciable savings (including debt service) to Loudoun will not be achieved until FY 2018.

If Loudoun remains a member, then it will achieve some FY 2018 savings since the bonds that constructed the facility will be paid in full by June 1, 2017.  Though, Loudoun as a continuing participant will still incur operating costs for housing our inmates.  The exact operating costs could fluctuate since the facility under a new Service Agreement may operate under a different model (e.g., beds may be reallocated, and a change in the type of offender housed there may occur etc.)

The City of Alexandria already provided official notification in 2015 that it intends to leave and is well ahead of schedule. Their Sheriff provided notice in an effort to assist any remaining members with future operational plans for the facility. The City has a long history of not using most of their 50 inmate beds per the Service Agreement. When a jurisdiction fails to use their beds, they still have to pay for them. Simply, they were losing money and believed their inmates should be housed locally. However, the Loudoun's Sheriff's Office has a nearly 100 percent utilization rate for its 40 beds during the last several years.

Sheriff Chapman and his team are weighing their options with respect to this decision. Prior to making any recommendation to the Board with regard to status (leave or stay), they are attempting to better understand any future operational model for the jail once Alexandria pulls out. A future operational model may actually assist with Loudoun's detention needs, or it may not. Other factors under analysis include on-going transportations costs to and from that facility to Loudoun and future capacity at Loudoun's current Adult Detention Center. If the Sheriff makes a recommendation, staff will ensure that the Board has a chance to review it carefully for their decision. Once again, the Board is not mandated to make its notice of a withdrawal decision until prior to September 1, 2016.

**PURPOSE:** The purpose of this item is to inform the Board that the Sheriff may recommend that Loudoun County government withdrawal from the PCRJA, which will require Board action prior to September 1, 2016.

**ANTICIPATED ACTION DATE:** Depending upon the Board's regular Business Meeting schedule this action can take no later than July 21, 2016. The official deadline is September 1, 2016 for notification of withdrawal. Once notice is given to all remaining members, the county will no longer be obligated on June 30, 2017 and will need to re-locate its inmates.

**ADDITIONAL INFORMATION:** Peumansend Creek Regional Jail Authority Website (www.pcrj.org). Please feel free to contact staff for additional information.

**2016 BOARD OF SUPERVISORS BRIEFING**

# # 14a

**SUBJECT:**     **Overview of 2012-2015 Board of Supervisor's Strategic Plan; Remaining Items and Possible Next Steps**

**BACKGROUND**:   Since 2012, the Board of Supervisors (Board) has prioritized its development and land use initiatives through a Strategic Plan. Staff has provided multiple updates on the status and progress of the Strategic Plan to the Board. The last update was provided on June 17, 2015.  Strategic Plan Updates provided to the Board can be found online at www.loudoun.gov/strategicplan.

During the June 17 meeting, three different initiatives were placed in queue.  These included the Comprehensive Plan Amendment to the Countywide Transportation Plan for Evergreen Mill Road, the Zoning Ordinance Amendment for covered decks and porches, and the Zoning Ordinance Amendment on the timeline to review commission permits.  These initiatives were to be placed on the Strategic Plan as resources became available.  During the September 16, 2015 Business meeting, the Board directed staff to prepare a Resolution of Intent to Amend the Revised 1993 Loudoun County Zoning Ordinance in order to add and define the manufacturing and sale of craft beverages as a separate use in non-residential zoning districts, excluding heavy industrial, in the suburban policy area.  At the October 21, 2015 meeting, the Board requested the item be expedited and placed as a priority on the strategic plan.

*Completed Strategic Plan Initiatives*

The 2012-2015 Board completed five additional initiatives since the June 17 Strategic plan update.  The Board approved amendments to the Revised 1993 Loudoun County Zoning Ordinance for fire and rescue temporary facilities (ZOAM-2014-008) and home occupations (ZOAM-2015-0002).  The Board also approved a Comprehensive Plan Amendment (CPAM-2014-0002) to the Countywide Transportation Plan for Prentice Drive, and approved a revised Capital Intensity Factor (CIF) for age-restricted housing.  The final report for the Dulles Community Outreach Project was presented to the Board on September 16, 2015.

Over the last four years, the Board has completed 30 strategic plan initiatives[1].  Completed strategic plan initiatives, found in the table below and in Attachment 1, include nineteen (19) Zoning Ordinance Amendments (ZOAMs), five (5) Comprehensive Plan Amendments (CPAMs), one Zoning Map Amendment (ZMAP), three sets of amendments to the Facility Standards Manual (DOAMs), the approval of the revised CIF for age-restricted housing, and the Dulles Community Outreach Project.  Staff from the Departments of Planning and Zoning Staff,

---

[1] As of 11/4/15

USCA4 Appeal: 17-2002    Doc: 88-1    Filed: 01/07/2019    Pg: 366 of 547

# 14a Overview of 2012-2015 Board of Supervisor's Strategic Plan;
Remaining Items and Possible Next Steps
Loudoun County BOS Orientation
November 14, 2015
Page 2

Building and Development Transportation and Capital Infrastructure led these initiatives. Staff worked with the Zoning Ordinance Action Group (ZOAG), the Facility Standards Manual Public Review Committee, and other stakeholders to complete each initiative.

| Completed Strategic Plan Initiatives | Board Adoption Date |
|---|---|
| Phase 1 FSM Amendments | October 3, 2012 |
| Commercial & Industrial Zoning Ordinance Amendment | January 16, 2013 |
| Purcellville Urban Growth Area Management Plan Repeal | March 6, 2013 |
| Zoning Ordinance Amendment regarding a10 Day Appeal Period for Short-Term Recurring Zoning Violations | March 13, 2013 |
| Phase 2 FSM Amendments | May 8, 2013 |
| Article 6 Zoning Ordinance Amendments | July 3, 2013 |
| Route 28 Corridor Plan Zoning Implementation Zoning Ordinance Amendment | December 4, 2013 |
| JLMA Utilities Requirement Zoning Ordinance Amendment | December 4, 2013 |
| North Lower Sycolin Plan Amendment | December 11, 2013 |
| Child Care Home Use Zoning Ordinance Amendment | January 2, 2014 |
| Data Center Zoning Ordinance Amendments | April 2, 2014 |
| Special Exception to Permitted Uses Zoning Ordinance Amendments | April 2, 2014 |
| Reclassification of Public Schools Zoning Ordinance Amendment | April 16, 2014 |
| Commercial Light Industry (CLI) District Zoning Ordinance Amendment | May 7, 2014 |
| Bed & Breakfast Zoning Ordinance Amendments | May 21, 2014 |
| Countywide Transportation Plan Comprehensive Plan Amendment (CTP CPAM) Technical Updates | June 11, 2014 |
| Route 28 Corridor Plan Implementation Zoning Map Amendment | June 11, 2014 |
| Kennels/ Indoor Kennels Zoning Ordinance Amendment | October 8, 2014 |
| Private Schools Zoning Ordinance Amendment | December 10, 2014 |
| Breweries/Agricultural Processing Zoning Ordinance Amendment | January 21, 2015 |
| Dog Parks Zoning Ordinance Amendment | December 10, 2014 |
| FSM Phase 3 Amendment | February 11, 2015 |
| HVAC Equipment in Required Yards and Setbacks Zoning Ordinance Amendment | April 8, 2015 |
| Telecommunications Facilities in the Planned Development Housing (PD-H) and Residential (R) Zoning Districts Zoning Ordinance Amendment | May 13, 2015 |
| Comprehensive Plan Amendment to the Countywide Transportation Plan for George Washington Boulevard and Route 7 Overpass | June 10, 2015 |
| Capital Intensity Factor for Age-restricted and Continuing Care Retirement Communities | June 17, 2015 |

| Completed Strategic Plan Initiatives | Board Adoption Date |
|---|---|
| Comprehensive Plan Amendment to the Countywide Transportation Plan for Prentice Drive | July 1, 2015 |
| Fire and Rescue Temporary Facilities Zoning Ordinance Amendment | July 8, 2015 |
| Home Occupations Zoning Ordinance Amendment | July 8, 2015 |
| Dulles Community Outreach Project | September 16, 2015 |

*Remaining Items*

Staff is currently working on the Silver line studies, one CPAM, six (6) ZOAMs, FEMA Map updates, ZOAG work plan items, and telecom amendments that may result in a CPAM and ZOAM. Staff anticipates completing the Silver line studies, the Mixed Use District ZOAM, the Evergreen Mill Road CPAM to the Countywide Transportation Plan (CTP), the Steep Slopes ZOAM, and Floodplain Overlay District ZOAM by the end of the 2012-2015 Board term. [2]

There are currently five items in queue: ZOAM on Covered Decks and Porches, ZOAM on CMPT Review Timeline, and ZOAM on Data Centers in the Commercial Light Industry (CLI) Zoning District. Staff anticipates beginning work on these in the first quarter of 2016. In addition to these items, the board concurred with adding two additional items to the queue, at their November 4th 2015 business meeting:

- **Variance ZOAM- Zoning Ordinance amendment to reflect amendments to the Code of Virginia regarding variances.** Amendments to the general Board of Zoning Appeals (BZA) statutes in the Code of Virginia were made during the 2015 General Assembly session by the adoption of HB 1849, and became effective on July 1, 2015. These amendments changed to the definition of variance and the standards for a variance, among other changes. Amendments to the Zoning Ordinance Section 6-200. *Board of Zoning Appeals*, and Section 6-1600, *Variances*, are necessary in order to reflect the adopted amendments to the Code of Virginia.

---

[2] In addition to the strategic plan items, the DPZ is processing a variety of legislative and administration land use applications. As of October 28, there are 118 active rezonings, special exceptions, minor special exceptions, and concept plan amendments currently in various stages of staff review or before the Board and Commission. Zoning staff is reviewing 103 active site plans and site plan amendments, as well as 30 variances, appeals, and Zoning Correspondence requests (zoning verifications, proffer determinations, vesting determinations). Since December 2012, the Board has acted on 266 legislative applications including 34 rezonings. (note added from 11/4/15 Strategic Plan Update staff report.

- **Temporary Signs ZOAM- Zoning Ordinance amendment to revise the regulations the maximum permitted size of temporary signs.** In June 2012, a Virginia Attorney General's opinion was issued addressing the local regulation of political signs. The Attorney General's opinion stated that "any zoning ordinance that places heavier burdens or greater restrictions on temporary political signs than are placed on any other classification of temporary sign is pre-empted by state law, thereby rendering any such ordinance invalid." The Zoning Ordinance's current regulations in regard to temporary signs do not conform to the Attorney General's opinion. For example, "temporary construction signs" are permitted to have a maximum size of up to 20 square feet, and other temporary signs, including political signs, are permitted to have a maximum size of 4 square feet. Based on the Attorney General's opinion, the County has stayed enforcement of temporary political signs that are in violation of the Zoning Ordinance's sign requirements t. Although staff has stayed the enforcement of such signs, staff cannot issue sign permits for such signs because they still exceed the maximum size currently specified in the Zoning Ordinance. Staff recommends that an amendment to the Zoning Ordinance be initiated as soon as possible to address this issue.

During the final update to the Board of Supervisors, which occurred at the November 4th business meeting, the Board requested that an item be added to the strategic plan to address stormwater management issues in the suburban policy area in areas that may not have existing storm drainage easements and include storm drains that are in great need of maintenance and repair. (Motion by Supervisor Volpe, seconded by Supervisor Delgaudio. The motion passed 9-0). The Board also requested that staff research a potential strategic plan item that would address a zoning ordinance amendment to allow towns to build community wells by-right with performance standards. Staff was asked to return to the Board of Supervisors with a work program on this item.

*A Method to Prioritize Workload Initiatives*

The large volume of work completed in the strategic plan is remarkable and represents what can be accomplished given a solid framework of issue identification, prioritization, and follow-through. In the past, similar efforts were deployed as large components whereas this effort used discrete amendments to accomplish strategic plan goals. The current effort allowed for individual projects to proceed at the pace necessary for the specifics of the amendment. In the past some smaller efforts that could have been completed earlier were delayed because they were contained within one larger amendment package. The Board's practice of receiving regular updates on the initiatives and then selecting projects to be prioritized and enter the queue has proved to be an effective method to manage this type of workload volume.

Although the strategic plan has traditionally been focused on land use initiatives, the model can be used for implementation of initiatives on a broader basis for many other County initiatives. Staff could examine broadening the strategic plan based on future Board direction.

*Other Items*

Item 15 b addresses staff concerns regarding limited agricultural breweries which were subject to new legislation adopted by the General Assembly in 2014 and a zoning ordinance amendment adopted by the Board of Supervisors in January of 2015.

As an example of other potential strategic plan items, the Department of Parks Recreation and Community Services has identified that are projects within the Capital Needs Assessment (CNA) that will be triggered in the next six year CIP (Capital Improvement Plan) program that do not have any sites identified. The adopted CNA calls for a variety of projects in the next 6 year cycle that will require the acquisition of a minimum of 800 acres to fulfill. While many of the PRCS facilities will not be needed for years, with the pace of development in the County it may not be possible to fill the land needs unless a concerted acquisition program is undertaken in the near future. Board direction will be needed on the priority of land acquisition for Parks facilities to address projected needs in order to formulate a working plan.

Staff will continue to identify other priority matters that could be included in a future strategic work plan.

**ATTACHMENT**: Strategic Plan Timeline (updated as of 11/12/15)

# Strategic Plan Initiatives Timeline

## Updated as of November 12, 2015

Timeline columns: 2014 (2nd Quarter: Apr May Jun; 3rd Quarter: Jul Aug Sep; 4th Quarter: Oct Nov Dec) — 2015 (1st Quarter: Jan Feb Mar; 2nd Quarter: Apr May Jun; 3rd Quarter: Jul Aug Sep; 4th Quarter: Oct Nov Dec) — 2016 (1st Quarter: Jan Feb Mar; 2nd Quarter: Apr May Jun)

### PLANNING & ZONING (Active)

- Silver Line District Development Patterns
- ZOAM- Noise Standards
- CPAM& ZOAM-Communication Commission Telecom Amendments
- ZOAM- Mixed Use Districts (PD-MUB; ZOAG Pkg #1)
- ZOAM-Rural Uses and Historic Structures (ZOAG Pkg #2, Phase 1)
- ZOAM- Craft Beverages

### Building & Development (Active)

- ZOAM- Steep Slopes
- ZOAM-Floodplain Overlay District (FOD)
- FEMA Maps (ZMAP- Floodplain Overlay District)

### In Queue/Staff Development

- ZOAM- Covered Decks and Porches
- ZOAM- CMPT Review Timeline
- ZOAM- Data Centers in CLI
- ZOAM- Variances
- ZOAM- Temporary Signs
- Storm Drain Easements in Suburban Policy Area

### ZOAG

- Pkg #1/ Mixed Use Districts (PD-TC)
- Pkg #1/ Commercial FAR in TR Districts & FAR Averaging
- Pkg #2 / Rural Issues, LO & Historic Structures (Phase 2)
- Pkg # 4/ Parking Requirements

## PHASE DESCRIPTIONS

| PHASE | Description |
|---|---|
| Resolution of Intent to Amend/Board Direction | The Resolution of Intent to Amend or Board direction was provided to move forward with the item. |
| Staff Development | Staff is conducting research, drafting and following through the steps as outlined in the work plan. |
| Planning Commission (PC) Review | The PC is reviewing the item as presented by staff. Staff conducts additional research and provides the PC with additional documentation as requested. Staff further revises the item for final BOS approval. (Note: This may include additional work session and/or committee review). |
| Pending Board Direction | BOS direction is pending for the strategic plan initiative. |
| Board of Supervisors (BOS) Review | BOS reviews the item as presented by staff. Staff conducts additional research and provides the BOS with additional documentation as requested. Staff further revises the item for final BOS approval. (Note: This may include additional work sessions and/or committee review.) |
| Procurement | Planning and Zoning (P &Z) staff work with Procurement staff to draft and develop the RFQ/RFP, interview consultants, and make final decision/selection. |
| Zoning Ordinance Advisory Group (ZOAG) Review | ZOAG works on draft text to recommend to the Board. Staff provides administrative support and works with ZOAG to draft recommended text. |

# 2016 BOARD OF SUPERVISORS BRIEFING

# # 14b

**SUBJECT:**          **Limited Agricultural Breweries**

**STAFF CONTACTS:**     David Goodfriend, Health Department
                            Buddy Rizer, Economic Development
                            Ricky Barker, Planning and Zoning
                            Deputy Chief Linda Hale, Fire and Rescue

---

**BACKGROUND:**         Last year the General Assembly approved §4.1-208 (http://law.lis.virginia.gov/vacode/4.1-208) to establish a category of limited breweries in Virginia. Subsequent to that legislation, a number of limited breweries have opened or submitted plans to their localities or to the health department, many of which are in areas not served by public water or sewer.

In Virginia, authority for well approval is shared with the local health department and with the Virginia Department of Health (VDH) Office of Drinking Water depending, in large part, on the expected number of people served and the number of days per year that number will be served. Authority for food approval is shared with the local health department and with the Virginia Department of Agriculture and Consumer Services (VDACS) depending, in large part, on whether beer will also be distributed offsite and on the menu of other foods that will be served.

Loudoun County has been actively promoting limited breweries as part of growing the rural economy in support of the Rural Economy Business Development Strategy. On January 21, 2015, the Board of Supervisors (Board) approved an amendment to the Revised 1993 Loudoun County Zoning Ordinance to establish Limited Brewery as a new use within the Agricultural-Rural-1 (AR-1), Agricultural-Rural-2 (AR-2), Agriculture-10 (A-10) and Agricultural Residential (A-3) Zoning Districts and to establish additional regulations for such use. Since then, some neighbors of existing and proposed breweries have expressed concerns about safety, traffic, and changes to ground water as a result of the presence of these breweries in their neighborhoods.

If the Board desires to address potential impacts of breweries within these agricultural districts, staff can develop possible development standards within the County's authority under the state legislation. The Board would need to direct staff to pursue a zoning ordinance amendment that would go through the required process that includes opportunity for public input.

Likewise, there is concern from the Department of Fire, Rescue and Emergency Management regarding the lack of fire and life safety requirements for breweries. Unless a brewery incorporates a restaurant, it is fully exempt from the requirements of the Uniform Statewide Building Code (USBC), which prescribes fire protection features and related components to

ensure safe occupancy and egress from the building. Even with the applicability of the USBC, the ability to apply the provisions of the Statewide Fire Prevention Code (SFPC) with regard to fire department access, firefighting water supply, hazardous materials storage and the elimination of common fire hazards is not clear in state law.

Proposals to either further facilitate or limit these breweries may be proposed during the upcoming General Assembly session.

**PURPOSE:** To educate the Board of Supervisors on an issue that will likely come before the Board of Supervisors and General Assembly this year.

**ANTICIPATED ACTION DATE:** If the Board desires to pursue a zoning ordinance amendment, the process could be completed within the first quarter of 2016 depending upon other Board priorities.

**ADDITIONAL INFORMATION:** Additional information on Loudoun's Ale Trail is available at http://www.visitloudoun.org/trip-ideas/loco-ale-trail. Information on Loudoun County's limited brewery zoning amendment is available at http://va-loudouncounty.civicplus.com/index.aspx?NID=3321. An article on neighbor concerns with a proposed brewery is available at http://www.leesburgtoday.com/news/bluemont-residents-lash-out-at-brewery-owner/article_6156ae44-618f-11e5-9df1-0f2cbf85e48a.html. Please feel free to contact staff for additional information.

**2016 BOARD OF SUPERVISORS BRIEFING**

# # 15a

**SUBJECT:**            **Comprehensive Update to the Transit Development Plan**

**STAFF CONTACTS:**     Paul Mounier, Transportation and Capital Infrastructure
                        Kathy Leidich, Transportation and Capital Infrastructure
                        Joe Kroboth, Transportation and Capital Infrastructure

---

**BACKGROUND:** The Virginia Department of Rail and Public Transportation (DRPT) requires transit agencies in the Commonwealth to complete a Comprehensive Transit Development Plan (TDP) update every six years and provide updates to the plan annually in order to qualify for state funding assistance.   The current Loudoun County TDP was developed in 2011, based on the policies, concepts and public participation used to develop Chapter 3 of the Countywide Transportation Plan (CTP).

Since the 2011 TDP was adopted, there have been four annual updates to the plan submitted to DRPT.   Staff from the Department of Transportation and Capital Infrastructure (DTCI) is currently working with a consultant to complete the six-year comprehensive update to the TDP. The Plan update will span the years FY 2017-FY 2023.   During this timeframe, Silver Line Phase 2 Metrorail service is projected to begin operation in the County, which will significantly impact the provision of transit service and transportation within the County.

In order to preserve the County's eligibility for this assistance, the TDP must be updated annually and a comprehensive update must be completed every six years.   The TDP is a comprehensive six-year- action plan for the provision of transit service.   It serves as a guide for the County's Transit and Commuter Service program and is designed to improve the efficiency and effectiveness of the program by identifying the required resources for modifying and enhancing the services provided to the public.   It provides recommendations for transit services and includes operational and capital costs for the recommended services.

**PURPOSE:** DRPT provides state capital and operating assistance to the County's Transit and Commuter Service program.

**ANTICIPATED ACTION DATE:** It is anticipated the TDP will be brought to the Board of Supervisors for approval/adoption between January and March 2016.

**ADDITIONAL INFORMATION:** These plans provide a solid foundation for funding requests and feed directly into the programming process. To capture the benefit of this planning tool, DRPT requires that any public transit operator receiving state funding prepare, adopt, and submit a TDP.

DRPT has worked with transit operators across the Commonwealth to complete TDPs. All transit operators in Virginia were required to have a completed TDP by December 1, 2011, and the plans are updated every six years. Developing a TDP generates the following benefits:

USCA4 Appeal: 17-2002    Doc: 88-1    Filed: 01/07/2019    Pg: 374 of 547

- Serves as a management and policy document for the transit operator;
- Provides DRPT with the information necessary for programming and planning requirements;
- Provides a clear and up-to-date record of the transit operator's capital and operating budgets in order to assess the operator's financial capacity to carry out proposed levels of service and capital improvements;
- Provides the basis for inclusion of an operator's capital and operating programs in the Six-Year Improvement Program (SYIP), Statewide Transportation Improvement Program (STIP), Transportation Improvement Program (TIP) and Constrained Long Range Plan (CLRP);
- Maximizes the investment of public funds and achieves the greatest possible public benefit; and
- Improves the efficiency and effectiveness of public transportation services in Virginia.

Please feel free to contact staff for additional information.

No. 17-2002, viewed 12/18/2018

## 2016 BOARD OF SUPERVISORS BRIEFING

# # 15b

**SUBJECT:**           **Route 15 Congestion**

**STAFF CONTACTS:**   Terrie Laycock, Transportation and Capital Infrastructure
                      Joe Kroboth, Transportation and Capital Infrastructure

---

**BACKGROUND:**   On September 23, 2014 the Mayor of the Town of Leesburg sent a letter to the County requesting the County staff's assistance to collaborate with the Town of Leesburg and the Virginia Department of Transportation (VDOT) staff to develop an improvement plan to relieve traffic congestion on the Route 15 Bypass in the vicinity of Battlefield Parkway.  Staffs from the Department of Transportation and Capital Infrastructure (DTCI), the Town of Leesburg and VDOT met several times to review a brief study the Town commissioned by Wells and Associates that included recommendations to address the congestion on the Route 15 Bypass within the Leesburg corporate limits.  DTCI raised a concern that the Wells and Associate Study did not include impacts to Route 15 outside the Leesburg corporate limits.  In February, 2015 VDOT identified State funds to perform a more rigorous traffic analysis that would include options and provide impacts to the Route 15 corridor north of the Leesburg corporate limits into the County.  On May 27, 2015 VDOT issued a notice to proceed to VHB to conduct a planning-level study to identify low-cost short-term congestion relief improvements that can be implemented within the study limits defined by Battlefield Parkway to the south and Whites Ferry Road to the north.  The 2010 Revised Countywide Transportation Plan (CTP) calls for Route 15 to remain a two-lane road from the Town Corporate limits to the border with the State of Maryland at the Potomac River.  Thus, the VHB study will not include evaluation of major capacity improvements within the Study area.

**PURPOSE:**   Loudoun County and the Town of Leesburg have expressed concerns to VDOT about traffic congestion in the vicinity of the Route 15 Bypass.  Leesburg is predominantly concerned by congestion in the northbound direction and suggests that the reduction in capacity on Route 15 north of Town is the root of the traffic spillback.  The purpose of this study is to identify short-term, low-cost congestion relief improvements.

**ANTICIPATED ACTION DATE:**   The final VHB study should be available by the end of 2015.  When the report is in final form, it will be presented to the Board of Supervisors and the Leesburg Town Council for consideration and possible action.

**ADDITIONAL INFORMATION:**   Citizens have raised the broader concern of congestion on Route 15 from the Potomac River south into the Town of Leesburg.  This issue was analyzed during the development of the Revised 2010 CTP.  The CTP states "*Analysis has shown that congestion will be a serious concern on this road by 2030 and would require additional capacity.  Given the context of this facility, however, outside the Town of Leesburg, US Route 15 should remain a two-lane road with 12-foot travel lanes and safety improvements to be built as needed and funded, except for the segment between VA Route 704 (Harmony Church Road) and the Leesburg Town Limits, where US Route 15 is planned to be widened to four lanes.*"  If there

is a desire on the part of the Board to revisit the overall Route 15 Corridor congestion issues, given the policy direction in the <u>Revised 2010 CTP</u>, Board direction to staff would be required.

Please feel free to contact staff for additional information.

No. 17-2002, viewed 12/18/2018

**2016 BOARD OF SUPERVISORS BRIEFING**

# # 15c

**SUBJECT:**          **Courts Expansion Project**

**STAFF CONTACTS:**    Peter Hargreaves, Transportation and Capital Infrastructure
Mark Hoffman, Transportation and Capital Infrastructure
Joe Kroboth, Transportation and Capital Infrastructure

---

**BACKGROUND:**    In 1997, Loudoun County began a two-phased expansion of its Courts Complex facilities due to increased caseloads and space needs identified in a Courts Space Planning Study.  Phase I and Phase II of the Courts Complex expansion included renovation of the old courts and administration buildings and construction of new court-house facilities.  The Phase I and Phase II Courts Complex expansion occurred between 1998 and 2004.

The Courts Complex Phase III project was identified to meet future court room and courts support office space needs to be constructed on the site of the former Adult Detention Center at Church Street and Market Street in Leesburg.  In 1998, the County proceeded to complete the required land use approvals for the Phase III project projecting a need for a 60,000 square feet Phase III Courts building.  The Town of Leesburg approved the Phase III County plan on June 23, 1998 (ZM#155 Town of Leesburg).  Based on case load growth projections, the Phase III court room and office space project was planned to begin in 2011.

Subsequent to those actions, the case load and space requirements were monitored and updated through two additional updates of the original 1997 study.  Based on the results of those updates, the Courts Phase III capital project was amended in the FY 2011 Adopted Capital Improvements Program (CIP) increasing the required square footage from 60,000 to 85,000 square feet.

Dewberry Architects, Inc. (Dewberry) began the design process for the Courts Phase III project in November 2013 with space programming.  In July 2014, the Board of Supervisors approved a modification to the adopted scope for the Courts Phase III project to add approximately 7,000 square feet to provide for the Phase IV space requirements, thus bringing the total project scope to be constructed with Phase III to a maximum of 92,000 square feet for the new General District Courthouse on the Church Street site. The reason the additional 7,000 square feet was added to the Phase IV project is that the cost to accommodate this addition was viewed as being negligible relative to the physical disruption it would cause in the future.

A companion project included in the courthouse expansion is the design and construction of structured parking on County owned land, known as the Pennington Lot, at the intersection of Church Street and North Street in the Town.   The parking structure is outside of the Town Historic District.

After careful analysis of possible layouts for the new General District Courthouse, Dewberry developed thirteen (13) possible layouts for the new building.  Each was driven by the minimum size of a District Courtroom in the Commonwealth of Virginia.  Design options were greatly hampered by the overall lot size, nearby constraints such as the cemetery and roadway network,

and the "L" shape configuration of the lot itself. The existing County-owned structures at 106, 108, 110 and 112 Edwards Ferry Road were also considered as they are located on the same parcel. The thirteen (13) initial concepts were narrowed down to five (5) concepts, all of which required the removal of the four (4) structures. In January 2015, the five (5) concepts were narrowed down to one. The Board of Supervisors selected Concept 5D (9-0). In November 2014, the County submitted four applications for a Certificate of Appropriateness (COA) to remove four existing structures along Edwards Ferry Road. These four COA's, designated as COA #1-4, were rejected by the Town Board of Architectural Review (BAR) on May 18, 2015. Following a Board directed appeal to the Town Council in July 2015, the Council approved COA #1-4 and the demolition of the four (4) structures. This appeal decision facilitated the placement of the courts building at the desired location.

The building design of the Courts Phase III project is currently moving through the Town of Leesburg BAR process. COA #5, which covers the building massing, setback distances, location of the front entrance, height, roof form, window spacing and materials, textures, cornice line and color, is currently under consideration by the BAR The application for COA #5 was submitted on September 21, 2015. The Town Ordiance requires the BAR approval or denial within 75 days of the date of the application, which translates to December 4, 2015). In addition to the building design components addressed in COA #5, COA #6 is anticipated which will addresses the new courthouse landscape and an interpretive display which commemorates the four structures that will be removed along Edwards Ferry Road to make way for the Courts Complex Phase III project. This COA #6 application was submitted on October 19, 2015 with a BAR action date of January 1, 2016. COA #7 which is for the removal of a 1970's addition to the historic Valley Bank and the design for the Courtyard Plaza. This application was also submitted on October 19, 2015 with a BAR action date of January 1, 2016. Future COA's will address fencing on the courthouse campus and public signage and wayfinding. .

In addition to the BAR review, the project is moving through the Town of Leesburg for Rezoning and Plan Amendment approval process. This is an iterative process with final approval anticipated to be received by mid-2016. After the approval of all COA's, the project will be able to be fully designed and readied for construction after the Pennington Parking structure is complete in which is scheduled for June 2017.

**PURPOSE:** The Courts Complex Phase III project has proven to be difficult as the project type is complex, the site where the building will be located is constrained, zoning and plan amendments for the placement of the building at the northeast intersection of Church Street and Edwards Ferry Road require numerous Town of Leesburg approvals, proffers, and agreements. Finally, the Town of Leesburg's BAR approval will be required on the COA's submitted for the project. All these influencing factors will impact the adopted Fiscal Year 2016 CIP budget.

**ANTICIPATED ACTION DATE:** It is anticipated that a contract award for the construction of the Courts Phase IV Pennington Parking Structure, will be brought to the Board for approval between May and June 2016.

**ADDITIONAL INFORMATION:** Please feel free to contact staff for additional information.

# BOARD OF SUPERVISORS BRIEFING

**SUBJECT:**     **Dulles Rail – Silver Line Extension**               # 15d

**STAFF CONTACTS:**   Alan Winn, Transportation and Capital Infrastructure
Tom Farley, Transportation and Capital Infrastructure
Joe Kroboth, Transportation and Capital Infrastructure

---

**BACKGROUND**: The Metropolitan Washington Airports Authority (MWAA), in partnership with the Commonwealth of Virginia, Fairfax County, Loudoun County, and in cooperation with the Washington Metropolitan Transit Authority (WMATA) is managing the construction of the Silver Line; a 23.1-mile extension of WMATA's Metrorail system in the rapidly growing Dulles Corridor located in the Northern part of the Commonwealth within the greater Washington, D.C. Metropolitan Area. On July 3, 2012, the Loudoun County Board of Supervisors approved proceeding with its funding participation in Phase 2 of the Project under the July 19, 2007 "Agreement to Fund the Capital Cost of Construction of Metrorail in the Dulles Corridor."

The 23-mile $5.7B extension is being built in two phases. Phase 1, connecting Tysons Corner and Reston with downtown Washington, DC and beyond began service on July 26, 2014. Phase 2 is the final 11.4 miles of the Silver Line which will operate from the current Wiehle Avenue in Reston through Dulles International Airport to its terminus at Ashburn Station. Phase 2 includes six new Metrorail stations. Two stations are located in Loudoun County, including: Loudoun Gateway (Route 606) Station, and Ashburn (Route 772) Station – the Silver Line terminus station -- located at Route 772 and Ashburn Village Boulevard.

Phase 2 funding partners include the Commonwealth of Virginia, MWAA, Fairfax County, and Loudoun County. USDOT has awarded the funding partners collectively the largest Transportation Infrastructure Finance and Innovation Act (TIFIA) long-term low interest loan in the programs history. Pursuant to the July 2007 Funding Agreement between the partners, Loudoun County agreed to fund 4.8% of the costs associated with both Phases 1 and 2 combined. This amount, estimated at $273 million, will be used primarily to fund Phase 2 costs.

Construction of the Loudoun Gateway Station is scheduled to commence on or around April 21, 2016 with completion on or around May 23, 2018. Construction of the Ashburn Station is scheduled to commence on or around November 7, 2016 with completion on or around September, 14, 2018 (Source: Construction Schedule; Package A Revised Phase 2 Baseline Schedule; May 11, 2015). Main line rail construction in Loudoun is expected to commence on or around September 13, 2017 and extend through January 2, 2019. The contractual completion date is August 22, 2019 (Completion Date Source: Monthly Schedule Update to Federal Transit Administration; August 2015).

**PURPOSE:** Population and employment is forecast to continue throughout Loudoun County at a rate greater than the national average. The transportation network must expand to efficiently accommodate increased intra-and inter-county travel needs. The Silver Line is significant in its inherent ability to accommodate high capacity travel demand between Loudoun and the DC

Region.  Improved access provides impetus for economic development and heightened and sustained economic activity in the vicinity of Loudoun's 2 Silver Line Stations and environs. County staff is activity engaged in assisting developers in planning development and in reviewing development plans for consideration with, and potential approval by, the Board of Supervisors.

**ANTICIPATED ACTION DATE:** Phase 2 design is complete, construction is underway, and service start-up is targeted for early 2020.

**ADDITIONAL INFORMATION:** www.dullesmetro.com.  Please feel free to contact staff for additional information.

No. 17-2002, viewed 12/18/2018

## 2016 BOARD OF SUPERVISORS BRIEFING

# # 15e

**SUBJECT:**            **Dulles Rail Parking Garages**

**STAFF CONTACTS:**     Joe Kroboth, Transportation and Capital Infrastructure
                        Cheryl Middleton, Finance and Procurement
                        Courtney Sydnor, Office of the County Attorney

---

**BACKGROUND:**    On November 15, 2011, the Board of Supervisors (Board) approved a Memorandum of Agreement (MOA) outlining commitments pertaining to Phase 2 of the Dulles Corridor Metrorail Project between Loudoun County, the U.S. Department of Transportation, the Washington Metropolitan Area Transit Association, Fairfax County, the Commonwealth of Virginia, and the Metropolitan Washington Airports Authority. Included in the MOA was a commitment from the County to use its best efforts to secure additional funding sources that will be sufficient to fund the cost to design and construct three parking facilities – two at the Ashburn Station (one north and one south of the Greenway) and one at the Loudoun Gateway Station.

Under the Commonwealth of Virginia Public Private Transportation Act, local jurisdictions may enter into Public Private Partnerships to develop transportation related infrastructure. Proposals were solicited in September 2013 for the three parking garages. After reviewing the proposals and conducting a public hearing, the Board directed staff on June 18, 2014 to enter into negotiations for a comprehensive agreement with Comstock Partners for the design, construction and operation of the parking garage at the Ashburn Station north.

Advancing in parallel to the comprehensive agreement negotiations are two coordinated County legislative actions for consideration by the Board. Planned for December Board action is consideration of ZCPA 2015-0012 and SPEX 2015-0033. This Zoning Concept Plan Amendment (ZCPA) application seeks approval to revise the location of the northern commuter parking garage associated with the future Ashburn Metrorail station. The garage relocation is from the west side of the station area located just west of Loudoun Station Drive, as currently approved in ZMAP 2002-0055, to a site on the east side of the station area at the intersection of Metro Center Drive and Gramercy Park Drive. The Special Exception (SPEX) application seeks approval for the commuter parking structure to be built on this site by Comstock Properties. The commuter garage will provide 1,433 spaces reserved for Metrorail commuters.

The Board also directed staff to enter into negotiations for a comprehensive agreement with Nexus Properties for the design, financing, construction and operation of two parking garages. Nexus Properties is responsible for building a 1,540 space garage at Ashburn Station south and a 1,965 space garage at the Loudoun Gateway Station. A Special Exception (SPEX) is required to seek approval to allow for the garage to be built at Ashburn Station south in the Moorefield Station development area. This area is within the Planned Development-Transit Related Center (PD-TRC) zoning district. This SPEX application was prepared and submitted by the Department of Transportation and Capital Infrastructure in May 2015 with Board approval anticipated late 2015/early 2016.

The Loudoun Gateway Station parking garage site, is on land owned by the US Government under the control of the Metropolitan Washington Airports Authority (MWAA). Consequently, Development plans will be processed administratively through MWAA and require no legislative approvals. Lease arrangements between MWAA and the County are being finalized for the Loudoun Gateway garage site,

Contract negotiations for all three garages are proceeding. The Comstock comprehensive agreement is nearing completion with a December 2015 target date. Comprehensive agreement negotiations with Nexus Properties are ramping up with a target timeframe of January or February 2016.

In light of the revised project completion date of early 2020 announced by MWAA in May 2015, the timeframes expected for completion of comprehensive agreements, and for legislative and administrative actions for the garages to occur are within an acceptable timeframe for the garages to be constructed and their systems tested at least one year prior to the 2020 Phase 2 Silver Line Substantial Completion Date of August 22, 2019.

In order to maintain leverage during the negotiation process, on March 5, 2014, the Board authorized funding and directed staff to proceed with the consultant selection and preparation of design-build performance criteria packages for the Dulles Rail parking garages. This effort is occurring concurrently with Comstock Partners and Nexus Properties negotiations. If comprehensive agreements cannot be reached with either of these vendors, design and construction of the garages will be solicited through a design-build Request for Proposal process.

**PURPOSE:** The parking garages are part of the overall Dulles Rail Phase 2 project and must be delivered by certain deadlines to satisfy our obligations. This issue is being brought forward as the Board will be asked to review and approve the comprehensive agreements with the private vendors, or decide to discontinue the negotiations and pursue the self-perform option if agreement cannot be reached or the deadline to initiate construction approaches.

**ANTICIPATED ACTION DATE:** It is anticipated that the Comstock Agreement (Ashburn North) will be presented to the Board in December 2015. However, any last minute issues could force that presentation to January or February 2016. The Nexus Agreement (Ashburn South and Loudoun Gateway) continues to require much more effort and time before it is mature enough to present to the Board. Staff estimates the Nexus Comprehensive Agreement will be brought to the Board in February or March 2016.

**ADDITIONAL INFORMATION:** The adopted Capital Improvements Program Budget includes $130,000,000 in funding should the County need to design and construct the parking garages. Please feel free to contact staff for additional information.

# BOARD OF SUPERVISORS BRIEFING

# # 15f

**SUBJECT:**         **Bus Procurement**

**STAFF CONTACTS:**   Paul Mounier, Transportation and Capital Infrastructure
                      Kathleen Leidich, Transportation and Capital Infrastructure

## BACKGROUND:

Transit and commuter services are provided in Loudoun County through two operating contracts to private sector companies. The local fixed-route and paratransit service contract is held by a company named MV Transportation, under a three-year contract which includes renewal options beyond the three years. The Commuter and Metro connection service contract is held by a company named Transdev, formerly known as Veolia, under a five-year contract also with renewal options up to a ten year contract. Both contracts allow for termination or negotiations of terms upon the opening of the Silver line Metro Rail service in Loudoun.

Under the terms of the local fixed-route contract, the private company provides the bus fleet and charges an hourly operating rate. Based on the currently approved routes, 32 mini-buses are used to provide the local fixed-route and paratransit service. These mini-buses have between 12 and 30 seats per bus.

The Commuter and Metro rail Connection Service is provided using a mixed composition of buses. The total fleet consists of 72 buses. The fleet breakdown is 55 County-owned motor coach commuter buses; 9 leased motor coach commuter buses; 5 transit buses, manufactured by Gillig and used for connections from park and ride lots to metro stations; and 3 mini-buses, used to provide a reverse commute service from the Metro stations in Fairfax County to businesses in Loudoun County. The motor coach buses have 55 seats and the metro connection transit buses have 40 seats.

Following the opening of Phase 1 of the Silver Line, Loudoun shifted transit services to provide more service to the Metro Stations. Even more shifts will occur upon the opening of Phase 2, anticipated to occur in the latter part of calendar year 2019.

The currently adopted Transit Development Plan (TDP) is undergoing a comprehensive update, and that process is summarized in a separate issues paper. The current TDP and Capital Improvement Program outlines a strategy for developing park and ride facilities and the bus service to feed the Metrorail Stations. At this time, five park and ride lots are under various levels of development that will add between 1,250 and 1,300 parking spaces over the next two-three years. These include: Stone Ridge, located on Millstream Drive, consisting of 300 parking spaces; One Loudoun, located on Savin Hill Drive, consisting of 200 parking spaces; Dulles Town Center, located at the intersection of Dulles Center Blvd and Atlantic Blvd, consisting of 200 additional spaces (100 existing plus 200 additional yields 300 total); Leesburg East, to be located along the Route 7 corridor east of Leesburg, consisting of 300-350 parking spaces; and

Western Loudoun, to be located in the greater Purcellville, VA area, planned for 250 parking spaces.

Some existing park and ride facilities located in close proximity to the proposed Metrorail stations (i.e. Loudoun Station, 300 spaces and Broadlands, 164 spaces and potentially others) may cease to exist once rail service opens. Once those lots cease operation, the bus assets serving those lots will be available to service the new park and ride lots. However, the number of buses freed up from the existing service is not anticipated to be sufficient to serve all the new lots. As such, the procurement of additional buses will be necessary to meet anticipated demand. Given the transit bus seating capacity of 40 seats and assuming bus seat utilization of 80 percent during the peak period, 40 bus trips will be necessary to cover the service requirements. Assuming the peak commuter period spans two hours (120 minutes), the following table summarizes the number of buses estimated to be needed to provide service:

| Location | Parking Spaces | RT Time (minutes) | # Bus Trips Note 1 | Interval Note 2 | # Buses Note 3 |
|---|---|---|---|---|---|
| | A | B | C | D | E |
| Stone Ridge | 300 | 15 | 9 | 15 | 3 |
| One Loudoun | 200 | 30 | 6 | 20 | 2 |
| Dulles Town Center | 200 | 30 | 6 | 20 | 2 |
| Leesburg East | 350 | 30 | 11 | 10 | 3 |
| Western | 250 | 90 | 8 | 15 | 6 |
| Total | | | | | 16 |
| Estimate of existing buses that will be free for redeployment | | | | | -5 |
| Buses needed to fill service delivery (note 4) | | | | | 11 |

1. 40 seats per bus at 80% efficiency = 32 seats occupied per bus, C = # of spaces divided by 32
2. D = 120 minutes in peak period divided by # of bus trips = departure interval
3. E= 120 minute peak period divided by departure interval = Number of buses required
4. 3 buses are currently programmed in the CIP; 11 buses less 3 buses on order = 8 buses needed

Manufacturing and delivery of a typical transit bus is 18-20 months. The procurement process is estimated to take 2-4 months, depending on the existence of existing contracts that can be used.

Given the analysis outlined in the table above, staff estimates the need for 8 transit buses.

**PURPOSE:** There are currently three transit buses listed for purchase in the FY 2016 Capital Improvement Program. Staff is proposing the purchase of eight additional transit buses in FY 2016 to accommodate the projected number of park/ride spaces coming on line within the next two-three years, as described above.

County transit staff is currently evaluating the composition of the bus fleet and developing a procurement plan to ensure the bus system will be properly sized and equipped to successfully support Metrorail service when it becomes operational in the County (Current projection is FY 2020). There are currently nine transit buses on order and expected to arrive in the 2016/2017

timeframe that will be used to replace the ten buses currently providing the Metro connection service.

**ANTICIPATED ACTION DATE:**  Staff anticipates presenting an action item to the Finance and Government Services and Operations Committee (FGSOC) early in 2016 that will provide a funding plan for the proposed purchase of eleven transit buses (3 buses currently in the CIP + 8 additional buses to serve the planned park and ride lots). The procurement process for acquiring these buses should be completed in FY 2016 or early FY 2017 to ensure their delivery before Metrorail service begins operations in the County.

**ADDITIONAL INFORMATION:**  The estimated cost to procure eleven buses is $5.5 million. Staff has secured a State Capital Assistance grant from the Virginia Department of Rail and Public Transportation (DRPT) to cover 68 percent of the expense.  A local match of $1.76 million will be identified by staff at the time the item is brought forward.

Following procurement guidelines, the capital funding required to purchase the buses would need to be available in FY 2016 or early FY 2017, at the time the buses are ordered. The projected annual operating cost for these transit buses would be approximately $180,000 per bus. Because the delivery time for these buses is projected to be 18-20 months, funding for operating these buses would need to be included in the FY 2018 or FY 2019 operating budget, depending on the actual ordering date.

There are currently two studies underway that may impact bus procurement effort and the type of buses to be purchased.  DTCI staff has recently completed work with a consultant to evaluate the bus replacement fund.  Also, County General Services staff has recently completed work with a consultant to study whether a conversion of the bus fleet to compressed natural gas (CNG) fueled vehicles would be feasible and beneficial. The outcomes of these studies will likely be available in early 2016.

Please feel free to contact staff for additional information.

**2016 BOARD OF SUPERVISORS BRIEFING**

# # 15g

**SUBJECT:**         **Taxicab Ordinance Development**

**STAFF CONTACTS:**   Kathleen Leidich, Transportation and Capital Infrastructure
                      Joe Kroboth, Transportation and Capital Infrastructure

---

**BACKGROUND:**   Taxicabs are an important mobility option for Loudoun County and will continue to be after the arrival of Metrorail in the next several years.  There is currently no adopted ordinance in the County to regulate the operation of taxicabs.  Currently, all of the Northern Virginia Counties surrounding Loudoun have taxicab ordinances governing this service within their jurisdictions.  Taxicab ordinances generally regulate cab fares, maintenance of vehicles, insurance requirements, driver licensing standards, issuance of operator certificates, and other vehicle requirements as a means of ensuring passenger safety, improving quality of service, and encouraging fair competition.

In February 2015, the Virginia General Assembly approved HB #1662 which regulates the operation of transportation network companies (TNCs), such as Uber and Lyft, on a statewide basis.  This legislation does not enable local (i.e. County) regulation of TNC services.  As of July 1, 2015, all vehicles operating as TNC services must be registered through the Department of Motor Vehicles and adhere to the requirements provided in HB #1662.

The taxicab ordinance is currently being developed by a multi-departmental team of County Staff.  Transportation and Capital Infrastructure is serving as the lead department for this project.  The partnering departments currently include the County Attorney's office and the Sheriff's office.  As the ordinance development process continues, the Treasurer's Office and Department of Management and Budget will also be involved.

**PURPOSE:**   The purpose of the ordinance is to ensure passenger safety, improve quality of service and encourage fair competition among taxicab service providers. Once approved by the Board, the ordinance will be incorporated into the County's codified ordinances.

**ANTICIPATED ACTION:**   During the remainder of FY 2016, Staff will be finalizing the draft ordinance and completing the final preparation for the adoption and implementation of the taxicab ordinance. This preparation will include developing the cost analysis for implementing the ordinance.   After its adoption by the Board, Staff will be tasked with developing the performance, recruitment, and staffing plans and for the administrative and enforcement functions required by the ordinance, along with conducting training for the County's regulating/enforcement staff and taxicab drivers/operators on the new ordinance and enforcement procedures.  As with any codified certification and licensing requirements, there will be a fee schedule adopted as a component of the taxicab ordinance.

**ADDITIONAL INFORMATION**:  Please feel free to contact staff for additional information.



# Chapter 8

# Guide to Emergency Response

## and

# Significant Incident Notification to

# Board of Supervisors



*Loudoun County*
*Board of Supervisors*
*2016-2020*



# LOUDOUN COUNTY VIRGINIA

# LOUDOUN COUNTY BOARD OF SUPERVISORS GUIDE TO EMERGENCY OPERATIONS

October 2015

THIS PAGE LEFT INTENTIONALLY BLANK

No. 17-2002, viewed 12/18/2018

## INTRODUCTION

This provides information for the Board of Supervisors with regard to County Emergency Operations.

## ORGANIZATION AND ASSIGNMENT OF RESPONSIBILITIES

Information below identifies individuals and groups who have functional and/or operational responsibilities before, during, or immediately following a significant event. The Director of Emergency Management may engage any County department and assign specific tasks or missions even if the department is not pre-identified in the Emergency Operations Plan.

### Elected Officials

During an emergency, the Board of Supervisors:

‣ Actively participates in the delivery of public information messaging as provided by the Public Information Officer;
‣ Endorses a declaration of local emergency pursuant to the process described in Title 44 of the Code of Virginia; and
‣ Communicates with the Government Liaison Officer to share incident information and to provide input regarding the current situation.

Prior to a significant event, in the on-going and perpetual phase of preparedness, the Board of Supervisors:

‣ Endorses the Coordinator of Emergency Management as recommended by the Director of Emergency Management;
‣ Adopts and promulgates the Emergency Operations Plan pursuant to the process described in Title 44 of the Code of Virginia; and
‣ Supports and promotes the Emergency Management Program and its mission to protect lives and property in Loudoun County

Each of the seven incorporated towns within Loudoun County elects a Mayor and Town Council from among their citizens. During a significant event, these elected officials:

‣ Actively participate in the delivery of public information messaging as provided by the Public Information Officer; and
‣ Communicates with the Government Liaison Officer to share incident information and to provide input regarding the current situation.

### Director of Emergency Management

As stipulated in the Code of Virginia, the Director of Emergency Management (Director) is the final Authority during all significant events. As such, the Director declares local emergencies, authorizes emergency protective actions, manages and controls certain commodities and services, requests resources from other localities, authorizes the use of County facilities for alternative functions, and amends or suspends certain human resource policies. In addition, the Director performs the following duties during a significant event:

- Designates a qualified individual to serve as the Government Liaison Officer;
- Determines the need to convene the Policy Group; and
- Develops and communicates strategic goals relevant to the successful resolution of the significant event.

Prior to a significant event, in the on-going and perpetual phase of preparedness, the Director:

- Appoints the Coordinator of Emergency Management and seeks endorsement from the Board of Supervisors;
- Chairs the Emergency Management Executive Committee and provides strategic direction for the Emergency Management Program including the endorsement of planning initiatives, consideration for grant procurements, and input associated with multi-discipline operational incidents; and
- Supports and promotes the Emergency Management Program and its mission to protect lives and property in Loudoun County.

### Emergency Management Executive Committee (EMEC)

Members of EMEC serve as the Policy Group during EOC activations. The group is comprised of leadership from the following agencies:

- Office of the County Administrator
- Department of Animal Services
- Department of Family Services
- Department of Fire, Rescue and Emergency Management
- Department of General Services
- Department of Information Technology
- Department of Management and Financial Services
- Department of Parks, Recreation and Community Services
- Health Department
- Loudoun County Public Schools
- Public Affairs and Communications
- Sheriff's Office

During a significant event, the Policy Group:

- Provides discipline-specific subject matter expertise to assist the Director of Emergency Management during strategic goal development process; and
- Formulates policy guidance and recommendations for the Director of Emergency Management regarding emergency policy decisions.

Prior to a significant event, in the on-going and perpetual phase of preparedness, EMEC:

▶ Provides strategic direction for the Emergency Management Program including the endorsement of planning initiatives, consideration for grant procurements, and input associated with multi-discipline operational incidents; and

▶ Supports and promotes the Emergency Management Program and its mission to protect lives and property in Loudoun County.

### Government Liaison Officer

The Government Liaison Officer (GLO) is a representative from County Administration, generally an Assistant County Administrator, who interacts with elected officials and other government leaders. The GLO is an ex-officio member of the Policy Group and reports to the Director of Emergency Management. During a significant event, the GLO performs the following duties:

▶ Maintain situational awareness

▶ Identify and notify elected officials and other government leaders whose constituents are among those impacted by the event

▶ Serve as the primary point-of-contact for the local officials and government leaders as well as state and federal officials who may contact the jurisdiction during significant events

▶ Provide meaningful and informative communication between the officials, leaders and Director of Emergency Management

▶ In the event that the emergency does not warrant the physical presence of the Director of Emergency Management and/or the Policy Group, the GLO may still be called upon to perform any or all of the duties described based on the event-specific needs.

### Coordinator of Emergency Management

The Coordinator of Emergency Management (Coordinator) manages the day-to-day operation of the Emergency Management Program. During a significant event, the Coordinator serves as the EOC Manager and performs the following duties:

▶ Presents emergency protective action recommendations to the Director;

▶ Assigns qualified staff to Management and Control positions based on size, scope, and complexity of the significant event;

▶ Facilitates development of Strategic Goals with the Director and Policy Group;

▶ Serves as the conduit for guidance and direction from the Policy Group to the Management and Control Group;

▶ Directs the Management and Control Group and ensures that all EOC staff and processes are managed effectively and efficiently; and

▶ Authorizes and approves all key plans and documents

Prior to a significant event, in the on-going and perpetual phase of preparedness, the Coordinator:

▸ Ensures the Emergency Operations Center is in a constant state of readiness;
▸ Executes strategic direction from the Director and EMEC including the development of planning initiatives, management of grant procurements, and coordination associated with multi-discipline operational incidents; and
▸ Supports and promotes the Emergency Management Program and its mission to protect lives and property in Loudoun County

### Public Information Officer

The Public Information Officer (PIO) is a member of the Management and Control Group.  The PIO reports to the Emergency Operations Center (EOC) Manager and is responsible for the collection and authorized release of information related to the County's response and/or recovery efforts during a significant event.  The PIO manages any Joint Information Center (JIC) activities deemed necessary.  During a significant event, the GLO performs the following duties:

▸ Identification of PIO activities
▸ Provide assistance in notifying the public regarding any emergency protective actions as directed by the EOC Manager
▸ Establish a Joint Information Center (JIC) as needed
▸ Prepare a media briefing as needed
▸ Collect and assemble event information
▸ Provide liaison between media outlets and EOC personnel
▸ Respond to special requests for information

### EMERGENCY OPERATIONS PLAN

The Loudoun County Emergency Operations Plan (EOP) describes the roles, responsibilities and actions necessary to provide an effective, efficient, and coordinated response to a significant event in Loudoun County, Virginia.  The EOP provides a framework of direction to identified agencies in order to successfully prepare for, respond to, and begin the recovery process from a significant event that affects the County.

In addition to meeting statutory obligations defined in Title 44 of the Code of Virginia, the EOP:

▸ Assigns responsibilities and identifies actions for organizations and individuals during a significant event;
▸ Establishes lines of authority and organizational relationships and demonstrates how missions and assignments are coordinated;
▸ Provides direction, control, and coordination of Loudoun County resources during a significant event;
▸ Describes the procedures and support requirements necessary for the activation and operation of the Emergency Operations Center (EOC);

- ‣ Promotes and outlines operational plans, policies, and procedures necessary for identified agencies to develop and implement in order to effectively respond during a significant event; and
- ‣ Describes the management and control, operations, planning, logistics, and finance administration sections employed during an EOC activation

The EOP is an all-hazard, multi-discipline response plan designed to manage and coordinate Emergency Support Functions (ESF) assignments.  ESFs are comprised of agencies that perform tasks during an EOC activation that are similar to their day-to-day, normal operations.

The EOP also serves as a coordination guide used to execute operational plans, polices, and procedures utilized by ESFs to mitigate and resolve impacts of a significant event.  ESFs are organized and managed using the nationally recognized Incident Command System (ICS).  Following one of the tenets of ICS, this plan is flexible and scalable and is designed for use for any planned or no-notice event. By statute, a declaration of local emergency triggers the activation of the EOP; however, this plan will be implemented during any significant event, which requires multi-discipline collaboration even in the absence of a local declaration.

This plan applies to all primary and support agencies listed in the ESF Annex and any other department or agency deemed necessary by the Director of Emergency Management.  All agencies will employ a whole community, all-inclusive planning approach with private-sector partners and citizens of the community who play a large role in preparedness, response, recovery, and mitigation.

The EOP is constructed using a nationally recognized model found in the National Response Framework and the Commonwealth of Virginia Emergency Operations Plan. However, while this plan has been developed consistent with similar documents at the state and federal level, it is uniquely tailored to meet the specific needs of Loudoun County.

This plan does not:

- ‣ Dictate agency duties outside of what occurs in the EOC.
- ‣ Describe or identify tactical level objectives, requirements, and tasks associated with achieving strategic goals.
- ‣ Supersede any statute, law, or ordinance

### System Status and Activation Level

The Emergency Management System refers to the posture of the emergency management program and its partners.  The status is an indication of the level of activity associated with a significant event:

| | |
|---|---|
| ‣ Routine: | The Emergency Management System is operating in a normal, day-to-day capacity.  Existing resources without impact to normal operations handle incidents or events. |
| ‣ Increased Readiness: | This is a pre-event status indicating that a significant event is imminent.  Programmatic focus is on gathering, compiling, analyzing, and reporting situational awareness and incident intelligence. |

▸ Operational

A significant event has occurred.  Operational activities may include on-scene liaison support, impact area assessments, and/or the activation of the EOC.

### EOC Activation Levels

▸ Not Activated:

Normal situational awareness monitoring conducted by OEM staff.

▸ Monitoring:

Increased monitoring capability for a specific incident or event.  This will typically involve emergency management staff and representatives from key response agencies.

▸ Partial Activation:

Select activation of ESFs that may be engaged in a significant event.

▸ Full Activation:

Activation with more than half of ESFs engaged in a significant event.

## DISASTER DECLARATIONS

A disaster declaration falls into one of three specific categories.  Each has unique characteristics and provides enhanced support and additional authority during the declaration period:

▸ Local Emergency Declaration

A declaration of local emergency is recommended when the severity of the event warrants coordinated actions of the local government to combat such threatened or actual disaster, protect the health and safety of persons and property, and provide emergency assistance to the victims of such an event. Activation of the EOC and execution of the EOP may be warranted even when a local emergency is not declared.

Loudoun County will adhere to all declaration processes and procedures defined in Title 44 of the Code of Virginia.  The Director of Emergency Management or designee may declare a local emergency.  The local elected body (Board of Supervisors) at its next regularly scheduled meeting or within 14-days, whichever occurs first, must confirm all declarations.

A local declaration empowers the County to respond in a nimble and efficient manner.  As defined in Title 44 of the Code of Virginia, during a local emergency, the County may:

▪ Control, restrict, allocate, or regulate the use, sale, production, or distribution of food, fuel, clothing and other commodities;
▪ Enter into contracts and incur obligations without regard to time-consuming procedures and formalities prescribed by law.

‣ State of Emergency Declaration

The Governor declares a State of Emergency when the safety and welfare of the people of the Commonwealth require the exercise of emergency measures due to a threatened or actual disaster. This declaration provides the County access to resources and assistance from the departments and agencies of the Commonwealth. These requests are coordinated through the Virginia Emergency Operations Center (VEOC).

‣ Federal (Presidential) Declarations

Pursuant to the Robert T. Stafford Disaster Relief and Emergency Assistance Act, a Federal Declaration of Emergency or Major Disaster is authorized by the President of the United States at the request of the Governor of the Commonwealth of Virginia. The request from the Governor should illustrate that the disaster is of such severity and magnitude that effective response is beyond the capabilities of the state and local governments. Assistance programs that are available through a Federal Emergency or Major Disaster

Declaration include:

- Individual Assistance consisting of financial assistance, direct assistance, and disaster loans;
- Public Assistance for state and local governments and certain non-profit organizations; and
- Hazard Mitigation grant program to help communities implement mitigation measures following a Presidential Major Disaster Declaration.

## EMERGENCY OPERATIONS CENTER

The Coordinator of Emergency Management is responsible for the day-to-day administration of OEM and the County's Emergency Management Program. The foundation of the program and ultimately its success relies on the ability to establish, maintain and enhance relationships that foster efficient and effective collaboration with partners through all phases of emergency management.

In addition to other programmatic responsibilities, a primary mission of OEM is gathering, compiling, analyzing, and reporting situational awareness. Whether during normal day-to-day operations or in anticipation of a significant event, OEM personnel consistently monitor a number of trusted sources of information to ascertain updated intelligence regarding severe weather, special or high-profile events, large scale public safety emergencies, or potential threats. This situational awareness is regularly and frequently shared with the Director of Emergency Management. When a significant event is imminent, OEM will generate an Informational Bulletin that describes the event, on-going actions, and anticipated actions. This document is distributed to County leadership, ESF personnel and mission critical partners.

When an event threatens to have significant impacts on the County, the Coordinator develops an operational plan based on the latest intelligence available. This plan includes the following elements:

‣ Any emergency protective actions that may be required or indicated;
‣ A determination as to whether or not the EOC will be activated, and if so, at what level;
‣ If an EOC activation is indicated, what ESFs and EOC sections will be activated; and
‣ Any additional operational considerations

A briefing is prepared for the Director who will consider the recommendations made by the Coordinator and provide input and endorse the plan. The Coordinator will ensure that all ESF personnel impacted by the activation are notified. OEM staff will typically develop an Incident Action Plan (IAP) for the first operational period.

EOC operations are divided into two twelve-hour shifts referred to as operational periods. Activities are coordinated and directed by the Loudoun County emergency Operations Center Policies and Procedures Guide and the EOP. The EOC Manager will ensure that the Virginia Emergency Operations Center is notified of the local activation. Throughout each operational period, personnel will follow the planning process as described in the EOC Policies and Procedures Guide.

While maintaining updated situational awareness regarding the incident, strategic goals are developed and prioritized by the Director and Policy Group. EOC personnel necessary to achieve these goals generate operational objectives and tasks. ESF personnel develop tactical and operational plans that accomplish the objectives. This process continues and repeats itself until the significant event is resolved.

Restoration of essential services is a primary focus during an EOC activation. If unmet needs still exist following restoration, the focus transitions to that of community recovery. Prior to the full demobilization of the EOC, community recovery actions will be initiated. These actions may include identification and prioritization of recovery issues; development and execution of long-term community recovery plans; and authorization and establishment of recovery work-groups who will lead the recovery effort following the closure of the EOC.

## PHASES OF EMERGENCY MANAGEMENT

| Mitigation | This phase includes any activities that prevent an emergency, reduce the likelihood of occurrence, or reduce the damaging effects of unavoidable hazards. Mitigation activities should be considered long before an emergency. |
| --- | --- |
| Preparedness | This phase includes developing plans, policies, procedures, processes before an event occurs; training and exercise; and outreach and education. |
| Response | This phase includes situational awareness, on-scene EOC liaison activities; impact area assessments; and activation of the Emergency Operations Center. |
| Recovery | This phase includes the steps necessary for the community to restore critical infrastructure and rebuild homes and lives following the significant event. |

No. 17-2002, viewed 12/18/2018

**RELEASE OF PUBLIC INFORMATION  & MEDIA GUIDE DURING EMERGENCIES**

### Significant Incident and Emergencies

- Release of Public Information
  During most significant incidents or emergencies, local public information officers with public safety departments (uniformed or civilian) or the County's Public Affairs and Communications Officer will release public information regarding incidents in manner that is best suited for the situation. On occasion, information regarding sensitive matters must be withheld from the public initially to protect the integrity of the investigation or to protect privacy.

  Information is typically released to the media in person, through phone calls with public information officers, by news release, and via Alert Loudoun text messages. Members of the public receive information via news release on the County's website (www.loudoun.gov), social media, and Alert Loudoun text messages.

  When three or more County departments are involved in an incident, the County's Public Affairs and Communications Officer will coordinate public information and serve as or designate a spokesperson. This helps avoid the inadvertent release of conflicting public information by multiple departments.

### Emergency Operations Center Activations

- County Spokesperson
  According to the County's EOP, the County's Public Affairs and Communications Officer, or his/her designee, will serve as the Public Information Officer (PIO) whenever the EOP is activated.

- Release of Public Information
  During a disaster, all media requests should first come through the PIO (or Joint Information Center, when activated) in the Emergency Operations Center. Therefore, direct inquiries from members of the media should be referred to the PIO.

  o The County's public affairs and communications staff will assist the PIO in the dissemination of incident and public safety information and will coordinate all media relations.
  o County public information staff remain in contact with the media. During emergencies, it is critical that only consistent and accurate public information is released.
  o The on-scene Incident Commander or PIO may release public information at the scene in coordination with the EOC.

o If a Board members is at the scene of an incident and chooses to conduct an interview with the media, the on-scene PIO may assist the Board member by providing public information and coordinating the interview.

## Roles of Board Members During Emergencies

Members of the Board of Supervisors frequently have the occasion to communicate with constituents and the media about significant incidents and emergencies. When doing so, it is important that incident-related information is coordinated with the incident commander and public information officer to ensure consistent messaging to the public.

The best practice is for Board members to provide only public information through their communication channels. If a Board member chooses not to respond to a member of the media, is appropriate and acceptable to refer the media to a PIO at any time for incident information.

Board members play an important role in communication with the public during emergencies. Board members have the opportunity to influence community members and the media, as well as employees, by demonstrating caring and compassion, commitment, openness, and knowledge.

- When the EOP is activated/EOC is open, Coordinate Public information activities with the County:

  o Before speaking with the media, contact the PIO to coordinate media relations activities.

  o Before making any promises to the media, coordinate information and activities with the Incident Commander and/or PIO.

Board members with questions concerning the release of public information during significant incidents and emergencies and how to work with the media, contact the Public Affairs and Communications Officer in the County Administrator's Office at 703.771.5086; or contact the PIO in the EOC at 571.258.2615.

If you need help for an emergency, please call 911.

If you need to contact the EOC for any reason during an actual or forecasted natural or man-made disaster, or a major emergency, please call 703.777.2243. This is the general dispatch line and it is available 24 hours, 7 days-a-week. The persons at this number can connect you to the necessary parties at the EOC, if it is activated.

### Tips for Working with the Media

- Answer all questions directly and as completely as possible.
- If you do not know the answer to a question, say so. Don't risk a guess. Erroneous information can cause the public to take incorrect actions and can damage your credibility. Ask the reporter to leave his or her name and telephone number so that you can provide an answer.
- Do not exaggerate the facts. Give facts as you know them and cite your own sources. In an emergency or disaster, the information you reveal could threaten lives if it is incorrect.
- Tell the truth and avoid using "no comment." No comment gives the impression that you have something to hide.
- Never give "off the record" information. "Off the record" has differing meaning to different reporters/media outlets. Even if you say something "off the record," it may be used.
- Never argue with reporters. Don't be rude even if the interviewer or reporter appears to doubt your credibility.
- If you are interrupted, wait for the interrupter to finish and then proceed with your answer. You may wish to repeat the original question to bring the reporter back on track.
- Challenge any efforts to put words in your mouth. If you don't, you may end up appearing to agree with something you actually disagree with.
- Do not act evasive. Your evasiveness may be interpreted as an attempt to hide something.
- Be alert. Avoid answering speculative "what if" questions. Be prepared to lead the interview from problems and negatives to positive points you want to make.
- Cultivate good relationships with the media prior to an emergency. If you cultivate good relationships with the media prior to an emergency, you'll get better support from the media during the hectic hours of responding to an emergency. The media, when supportive, can convey important information to the public about issues such as evacuations and disaster assistance information
- Delivering Your Message Effectively:
  o Speak naturally and avoid using "jargon" or terminology that is not familiar to those working outside of emergency management.
  o Say the most important thing first and then elaborate if necessary. Avoid long, rambling responses – be succinct and clear in your responses.
  o Make one point at a time. Speak in simple sentences rather than compound sentences. During times of high stress people are generally only able to remember short, concise bits of information.
  o Be believable, personable and conversational. Credibility is vital to getting your message across.

o If you must read a prepared statement, review the information before going "live".   Read in a relaxed manner – avoid stilted, halting speeches.



# LOUDOUN COUNTY VIRGINIA

# LOUDOUN COUNTY SIGNIFICANT INCIDENT NOTIFICATIONS TO BOARD OF SUPERVISORS

## DEPARTMENT OF FIRE, RESCUE AND EMERGENCY MANAGEMENT

## SHERIFF'S OFFICE

October 2015

THIS PAGE LEFT INTENTIONALLY BLANK

## PURPOSE

Provides an overview of the types of significant emergency incidents handled by the Department of Fire, Rescue and Emergency Management (FREM) and the Sheriff's Office and how Board members may expect to be notified of such incidents during their term in office.

## SIGNIFICANT INCIDENT NOTIFICATIONS FOR ELECTED OFFICIALS

### Importance of Notifications

Emergency notification and communication with locally elected officials, especially members of the Board of Supervisors, is integral to having a well-informed citizenry during any disaster or emergency regardless of scale. Incidents sometime arrive and pass with unrealistic public expectations with regard to their resolution, especially with regard to county's ability to manage them. For local government to play a more positive role in managing these expectations and turn false perceptions into fact and knowledge, Board members need well-timed and pertinent information. They need to understand first hand from emergency managers, first responders and other senior county officials several basic questions: what, where, when, how, who and why? They need to understand the operational complexities pertaining to a particular incident and the timing and nature of resolution. All of this information assists them in making informed briefings to the public, businesses, the media and other stakeholders.

With this goal in mind, the Department of Fire, Rescue and Emergency Management (FREM), the Sheriff's Office have established standard protocol for keeping Board members and other elected officials as informed as possible during certain types of incidents. Emergency communication throughout the county is handled through the county's Emergency Communications Center (ECC) and its network of transmission infrastructure (i.e., towers, internet servers) and devices (i.e., radios and cellular phones).

Please note that there are significant incidents handled by FREM only (e.g., fire, rescue and Fire Marshal's Office law enforcement calls) and those that only involve the Sheriff's Office (i.e., primarily law enforcement related). The agency that has command of the incident will adhere to their specified policy for notification to Board of Supervisors members as outlined in this Guide.

### Board of Supervisors' Contact Information is Requested

Each Board member is asked, as part of the orientation proceedings, to provide the Office of the County Administrator his or her respective contact information. These data should include both daytime and evening contact data (e.g., published and unpublished addresses, telephone numbers, email addresses etc). Once the information is provided to the County Administrator, it is then provided to the ECC and OEM staff, where it will remain on file as part of the emergency management

operations.   Periodic updates to these data are performed at the Board member's discretion.  This information will always be kept confidential by these agencies.

### Typical Devices for Receiving Notifications

As part of this orientation, or within the first few days in office, each Board member will be provided a PC and/or tablet-type device and offered the option of use of cellular device, or "smart phone."  Ideally, the Board member should keep at least one of these mobile devices with them at all times and fully charged to the greatest extent possible.  These will serve as the mobile devices for communicating with Board members about emergencies, in combination with any work or personal email accounts, all at the Board member's option.

No. 17-2002, viewed 12/18/2018

## FREM POLICY FOR BOARD MEMBER NOTIFICATION FOR SIGNIFICANT INCIDENTS

### Designated Communicator for FREM Significant Incidents/Periods for Notification

During many emergency incidents the FREM staff person that determines what communications messages the Board members receive is the Staff Duty Officer (SDO). The SDO is usually a senior level staff member within the FREM (e.g. Battalion Chief, Deputy Chief, Assistant Chief, or Fire Chief). The SDO, at their discretion and under pre-designed protocols, briefs pertinent elected officials, media and staff on certain fire-rescue emergency incidents that may affect a Board members district or the county-at-large. Other FREM senior staff subject matter experts such as an Assistant Chief, Chief Fire Marshal, or Coordinator of Emergency Management may also provide Board members with details and background of an escalating event or situation.

During normal working hours, the SDO is the principal staff contact for fire-rescue emergency incidents. After normal business hours, the SDO is considered the senior on-duty FREM staff person in absence of the Chief of the department.  In both capacities, the SDO must stay abreast of significant emergency incidents in addition to other duties within the department.  The SDO coverage is 24/7 on a rotational basis.

The SDO basically serves as the official spokesperson for the incident command and control function depending upon the significance and nature of the incident.  The SDO briefs designated Board members and provides answers to their inquiries with the assistance of pertinent senior staff as required.  SDO notifications generally fall into two categories: Advising county officials of emergency incidents and other situations, and internal communications to departmental staff.  The SDO is immediately available to receive information and consult with the ECC and other FREM officials on all types of fire-rescue incidents.

The SDO is responsible for all required notifications, including the Chief of FREM or his or her designee.  Every effort will be made to ensure the Chief is notified prior to advising other county officials including Board members.

### Types of FREM Significant Incidents that May Require Notifications

There are several types of fire-rescue emergency incidents that may require notifications of Board members and other elected officials.  These are all per the discretion of the SDO in consultation with pertinent FREM staff, including the Chief and other key county officials.  Consideration is given to the importance of the information and the receiving party's need to know given the time of the day and the details of the situation.

The Chief of FREM, the appropriate member of the Board of Supervisors, the Chair of the Board of Supervisors, the County Administrator and appropriate Deputy/Assistant County Administrator, the Public Affairs and Communications Officer and the FREM Public Information Office (PIO) are notified during one of these types of incidents.

- Serious injury or fatality to a county employee or a fire and rescue volunteer member that occurs while the employee/volunteer is on duty;
- Fires or accidents/damage involving the county or volunteer company owned or rented buildings, property or equipment;
- Significant incidents that result in a substantial dollar loss, citizen death, or serious injury, displacement, or require evacuation;
- Aircraft, major transit accidents, and mass casualties/fatalities;
- Incidents with, or having the potential for, significant environmental damage or impact on essential services, transportation routes, economic, or cultural interests;
- Large scale natural, or man-made disasters, or emergency events affecting the National Capital Region that may have severe or unintended consequences to Loudoun County, or its immediate neighbors;
- Any politically sensitive incident;
- Escalated Bomb Squad situations; and
- Blasting complications or concerns.

## Methods for FREM Significant Incident Notifications

Board member notifications usually happen via email, telephone, or through some other means. Under rare circumstances, during a significant event, the SDO, in consultation with FREM staff and the Office of the County Administrator may recommend that Board members be present for certain events. Board members will be provided transportation or escorted to the event using county vehicles. In most cases, however, Board members will simply be briefed at their preferred location (i.e., home or workplace) when and where possible.

## SHERIFF'S OFFICE SIGNIFICANT INCIDENTS AND NOTIFICATION TO BOARD MEMBERS

### Designated Communicator for Sheriff's Office Significant Incidents/Periods for Notification

During regular work hours, the person that determines what messages the Board members receive will be the Sheriff, his designee, or the ranking supervisor in charge of the division involved in the incident that has occurred. In cases where the Emergency Operations Center (EOC) is activated, the ranking officer assigned to the EOC will have the responsibility of ensuring that proper notifications are made to Board members. This will be done by closely working with the SDO or the ranking officer from FREM. After hours notifications to the Board will be the responsibility of the SDO or the ranking supervisor in his or her absence.

### Types of Sheriff's Office Significant Incidents that May Require Notifications

There are a number of incidents that may require notifications of Board members and other elected officials. The specific individuals notified will be at the discretion of the Sheriff or his designee in consultation with command staff. Consideration shall be given to the importance of the information and the receiving party's need to know given the time of day and the details of the situation. Special considerations should be made concerning the compromising of sensitive investigative information. The appropriate members of the Board of Supervisors are to be notified during one of these types of incidents:

- Death of a person in custody of the Sheriff's.
- Escape of a prisoner from the ADC, JDC, or one from custody that poses an imminent threat to the civilian population.
- Use of force incidents involving life threatening injuries or death to a civilian.
- Barricade/hostage situations requiring displacement or evacuation of civilians.
- Vehicle pursuit which ends in a crash causing life threatening injuries or death to the suspect or other civilians.
- Accidents involving county vehicles which result in life threatening injuries or death.
- Homicide investigation or suspicious death investigation.
- Incidents involving large scale mutual aid requests (specifically requests beyond the norm of specialty units, e.g., K9, CSI etc.)
- Civil disturbance incidents where the civil disturbance unit (CDU) is activated.
- Large scale search and rescue events.
- Any other large scale investigation or incident that has direct impact on the community.
- Any politically sensitive incident. Notifications of this sort will not be made until the Sheriff, his designee or command staff is consulted on the circumstances and the appropriate notification procedure has been decided.
- Life threatening injuries or death occurring to a Sheriff's Office employee while on duty.

### Sheriff's Office Notifications are Sensitive in Nature

Law enforcement notifications are sensitive in nature and the information Board members receive pursuant to this policy is given to them in confidence. Due to evidentiary, legal and liability issues, any official information that is released to the media or the public concerning law enforcement operations must be coordinated with the Sheriff's Office. Special attention must be paid to any cases involving deaths, victims of serious crime, and juvenile victims or suspects due to mandatory notification procedures in State law that the Sheriff's Office must follow. In cases where the release of information or notification can compromise the integrity of an investigation or the safety of any citizen or deputy, notification must be delayed.

### Methods for Sheriff's Office Significant Incident Notifications

In most cases, Board members will receive a notification via text message, or email which will include the point-of-contact (i.e., the SDO, or ranking officer's contact phone number), if there are questions.

### Board Members Wishing to Responding to a Sheriff's Office Significant Incident

If a member of the Board of Supervisors wishes to respond to a crime or accident scene, he or she should notify the Sheriff's Office Emergency Communications Center (**ECC: (703) 777-1021**) and provide the dispatcher with his or her name, position as a member of the Board of Supervisors, and their intent to respond to the crime scene.

Upon responding to the crime scene the Board member should be cognizant of any traffic or other hazards and identify himself or herself to a deputy on the scene and ask to see the ranking officer on the scene. The ranking officer or his designee will make arrangements to brief the Board member(s) of the situation at their earliest convenience.

**NOTE:** Board members must understand that scenes are very busy, especially in the initial hour, and there may be a delay before a ranking officer can take time away from incident command functions to brief them.

It should be noted that often the Sheriff's Office works in concert with FREM on incidents, and the notification efforts should be coordinated with FREM to make sure that the notifications are made timely and are not duplicated.



# Chapter 9

# Public Affairs and Communications

No. 17-2002 reviewed 12/18/2018



*Loudoun County*
*Board of Supervisors*
*2016-2020*



# Public Affairs and Communications Division
# Office of the County Administrator
### *Supporting the Board of Supervisors and County Departments*

## Overview

The Public Affairs and Communications Division of County Administration coordinates countywide internal and external communications and public affairs activities, and public information during full activations of the Emergency Operations Center.

The division provides communication and constituent services to the Board of Supervisors and County government departments in order to inform and engage County residents, communities, businesses and other stakeholders, as well as to connect them to programs and services.

Areas of responsibility include:

- Constituent Services
- Loudoun Express Request (LEx)
- Public Information
- Communication Services, (e.g., Web, photography, and event planning/publicity)
- Accessibility Services
- Media Relations
- Cable Channel Operations
- Countywide Digital Content
- Emergency Support Function 15: External Affairs

## How We Support the Board of Supervisors

### Public Affairs

#### Constituent Services
Members of the Board of Supervisors are contacted frequently by constituents who are seeking help from the County government or assistance in resolving a wide range of concerns. The Public Affairs Manager serves as a point of contact for Board members and their aides when preparing responses to constituent requests. The Public Affairs Manager assists Board offices by connecting them with the appropriate departmental staff, providing information and explanations of County processes and resources, and—when appropriate—responding directly to constituents to resolve inquiries.

#### Loudoun Express Request
Loudoun Express Request—better known as LEx—is Loudoun County's online Customer Relationship Management (CRM) tool. Requests may be submitted via the County's website or the LEx mobile app. LEx automatically routes request to the appropriate County department for response. The Public Affairs Manager will provide LEx training for Board members and their staff.



www.loudoun.gov/lex

Benefits of LEx include:

- LEx is one of the most efficient methods for constituents to submit requests for services or report concerns at any time of the day.
- Board members and their aides may submit their constituents' request directly into LEx, prompting County staff to respond.
- LEx allows users to track the progress of requests—even to follow and receive updates on some requests that have been entered by a fellow community member.
- LEx plots requests on an interactive map for the public to view the location and type of requests.
- Board offices may use the tool's capabilities to internally track their constituent relations activities.

Doc 17-2002, viewed 12/18/2018

## How We Support the Board of Supervisors

### Public Affairs *continued*

#### Accessibility Services
Accessibility Services provides targeted support and outreach to people with disabilities and multicultural communities, with a special focus on reaching people with limited English proficiency. The Accessibility Services Manager serves as the federally-mandated Americans with Disabilities Act (ADA) Coordinator and oversees the ADA-related grievance procedures for the County. The manager also directs the County's Limited English Proficiency (LEP) plan as mandated by Title VI of the Civil Rights Act.

The county's Accessibility Services Manager can assist the Board of Supervisors in the following areas:
- Accessibility complaints related to county government programs and/or facilities.
- Access to foreign language interpretation and written translation services.
- Access to assisted listening devices and/or American Sign Language interpretation at public meetings for the deaf and hard of hearing.
- Assist with outreach efforts to ethnic media, organizations and other stakeholders.
- Provide training, support and/or counsel on accessibility issues, including reasonable accommodation information for strategic communications and community engagement activities.



The Accessibility Services Manager maintains an "ADA Portal" and a "Multilingual Resources Portal" on the County's Intranet. These online portals serve as an internal resource to Board members, aides, and County staff. They how to access interpretation and translation services, information about reasonable accommodations, training resources, frequently asked questions on accessibility services, and much more.

Accessibility Links:
- The above resources can be accessed on the County's Intranet at intranet.loudoun.gov/180/Accessibility.
- Accessibility information for the general public is posted at www.loudoun.gov/accessibility

#### Government Center Conference Room Scheduling
The Public Affairs office provides assistance in scheduling public conference rooms that are located in the Government Center for use by the Board of Supervisors, County staff, and the public.

#### Homeowner Associations Lists
The Public Affairs Manager maintains a non-comprehensive email address list of known contacts for Homeowners Associations (HOA). Links to HOAs that have websites are posted at www.loudoun.gov/hoa.

## How We Support the Board of Supervisors

### Communications

**Public Information**
- The Public Affairs and Communications Division routinely publishes information to the general public regarding Board-directed initiatives, projects, meetings, and events.
- Communications staff stay abreast of Board of Supervisors activities and proactively publish information on behalf of the Board. The Board may direct staff to publish information on behalf of the Corporate Board that falls outside routine communications activity.
- The County publishes information through a broad range of channels including news releases, email, website, text alerts, and social media.
- County departments also routinely publish department-specific information.

**Media Relations**
- The Public Affairs and Communications Officer serves as the County's spokesperson. In this capacity, he/she communicates the actions and the positions of the Board of Supervisors to the media or refers members of the media to Board members when appropriate.



- Board members and their aides also may refer members of the media to the Public Affairs and Communications Officer to field and respond to requests for information.
- Communications staff issue news releases and coordinate news conferences on behalf of the Board of Supervisors.

**Emergency and Crisis Communication**
- The Public Affairs and Communications Officer is responsible for leading *Emergency Support Function 15: External Affairs*. During full activations of the Emergency Operations Center, members of the Public Affairs and Communications Division work in concert with emergency management officials and various stakeholders within the National Incident Management System (NIMS) framework to release public information appropriately. Emergency communication activities include a process for notifying the Board of Supervisors.
- The Public Affairs and Communications Officer participates in regional preparedness activities to promote coordination of information during incidents with a regional impact.
- Routine notifications to the Board of Supervisors regarding significant incidents are provided by the Sheriff's Office and the Department of Fire, Rescue and Emergency Management.

**Board of Supervisors and Planning Commission Meetings**
- The Public Affairs and Communications Division works closely with the Chief of Staff and clerks to support Board of Supervisors and Planning Commission meetings.
- The Public Affairs and Communications Division provides television production support to the Board and ensures meetings are televised live on the County's cable channel and webcast online.
- The Public Affairs and Communications Division provides photography services for presentations during Board meetings.

## How We Support the Board of Supervisors

### Communications *continued*

#### Online Communication

- **Website and Intranet:** Public Affairs and Communications Division supports the Board of Supervisors' publishing of information on the County website, www.loudoun.gov; and on the County's employee intranet, intranet.loudoun.gov. The Web Content Manager serves as a point of contact to Board members and their aides for online communications support on the official County platforms.



- **Social Media:** The Public Affairs and Communications Division routinely publishes information about Board of Supervisors actions and initiatives on the County's official social media accounts:
  - facebook.com/LoudounCountyVa
  - twitter.com/LoudounCoGovt
- **Alert Loudoun:** www.loudoun.gov/alerts
  - The Public Affairs and Communications Division publishes general information via the County's text and email alerting system, Alert Loudoun.
  - The Sheriff's Office publishes information about traffic disruptions, auto crashes, etc.
  - County departments routinely publish department-specific information.
  - Loudoun County Public Schools, the incorporated Towns, and Loudoun Water also publish their own information.

#### Community Relations

- The Public Affairs and Communications Division supports the County's community relations activities, which foster effective two-way communication between residents and the County government.
- The division maintains a list of trained facilitators who may be called upon to participate in community meetings. This type of community outreach facilitates community input on a wide range of Board directed initiatives.

#### Photography



- The Public Affairs and Communications Division routinely takes photos at Board of Supervisors events, such as groundbreaking and ribbon cutting ceremonies. The Board of Supervisors may request this service for events that are sponsored by the Board.
- Staff coordinates with a photography vendor to provide portraits of the Board of Supervisors and individual portraits of Board members at the start of the term.

No. 17-2002, viewed 12/18/2018

## How We Support the Board of Supervisors

### Communications *continued*

#### Television/Video



- In addition to televising Board of Supervisors and Planning Commission meetings, the Public Affairs and Communications Division has a limited capacity to produce videos on behalf of the Board of Supervisors.
- Depending on the scope of a video project, communications staff may recommend hiring a contractor to produce the video under the direction of the County. Communications staff will request quotes from vendors and manage communications contracts.

#### Publications/Newsletters and Other Communication Services

- The Public Affairs and Communications Division provides or coordinates contract support for a full range of communication services.
- The Board of Supervisors may direct communications staff to accomplish various print projects that include producing publications, such as brochures, banners, posters, and reports.
- Depending on the scope of a project, communications staff may recommend hiring a communications contractor to produce communication tools under the direction of the County. Communications staff will request quotes from vendors and manage contracts.
- Communications staff will review and edit Board members' newsletters and post them on the County's website. Staff also can perform graphic art work or secure a vendor to accomplish the work when necessary.

#### Event Planning/Coordination



- The Communications Manager coordinates various events on behalf of the Board of Supervisors, such as ground breakings and ribbon cuttings for County projects. This service includes sending invitations and coordinating event logistics.

#### Communication Consultant

- While the Public Affairs and Communications Division serves the Board of Supervisors as a whole, individual Board members have a need for public affairs and communications support. The Public Affairs and Communications Officer can provide strategic communication guidance to Board offices.
- Staff may expand the County's communication capacity through contracted services, when appropriate. Communication staff have worked with a number of regional vendors that provide a full range of communication services. At the Board's direction, staff may request quotes for services and manage communication vendor contracts for special projects or services that are outside the scope or capacity of the Public Affairs and Communications Division.

# Public Affair and Communications Contacts

**Main: 703-777-0113, TTY 711 | publicaffairs@loudoun.gov**

| | | | |
|---|---|---|---|
| Glen Barbour | Public Affairs and Communications Officer | 703-771-5086 (desk)<br>571-442-1119 (mobile) | Glen.Barbour@loudoun.gov |

### Public Affairs

| | | | |
|---|---|---|---|
| Emily Watkins | Public Affairs Manager | 703-777-0450 | Emily.Watkins@loudoun.gov |
| Catherine Motivans | Accessibility Services Manager | 571-258-3282 | Catherine.Motivans@loudoun.gov |
| Mimi Greene | Public Affairs Specialist | 703-777-0211 | Mimi.Greene@loudoun.gov |
| Melissa Prell* | Receptionist/Switchboard Operator<br>*contracted temporary support | 703-777-0113 | Melissa.Prell@loudoun.gov |

### Communications

| | | | |
|---|---|---|---|
| Robin Geiger | Communications Manager | 703-771-5511 | Robin.Geiger@loudoun.gov |
| Nancy McCormick | Web Content Manager | 703-737-8856 | Nancy.mccormick@loudoun.gov |
| Lorie Flading | Communications Specialist | 703-737-8771 | Lorie.flading@loudoun.gov |
| Stan Rogers | Broadcast and Video Production Manager | 703-771-5465 | stan.rogers@loudoun.gov |

*November 2015*

No. 17-2002, viewed 12/18/2018





# Chapter 10

# Board Staff Aides

- **General Information**

- **Sample Offer Letter**

- **Staff Aide Policies**

- **Benefits Eligibility Summary**



*Loudoun County*
*Board of Supervisors*
*2016-2020*

### General Information Regarding the Employment of Board Member Staff Aides
(*Last Revised November 2015*)

Overview

- Each Board has the option to hire one or more staff aides to provide support to the Board member relating to constituent affairs and Board of Supervisors activities.

- Staff aides are general expected to handle correspondence to and from a Board member's office, and aides typically manage the Board member's email, calendar, and contacts.

- Aides also support the Board member by writing action items on behalf of the Board member or conducting other policy-related work.

- It is up to each respective Board member to define the duties and responsibilities of his/her staff aides and to monitor their job performance.

Role and Responsibilities Generally

- Board aides often act as the first line of contact between a member of the public and the Board member.

- Aides are able to keep a full-time presence at the County officers for phone calls, walk-in visitors, and to work with staff on issues for the District Office.

- Compensable work hours paid for with County funds must be in support of County government needs and activities.

- Political activity must not occur using County property, or during County paid time.

- In working with Board members and their offices, County staff views a Board member's staff aide(s) as an extension of each Board member.

Funding

- Board members' district budgets include sufficient funding for hiring one or more staff aides. Typically, one staff aide will be hired full-time, with another staff aide serving part-time.

  The Chief of Staff can provide guidance on salary levels based on anticipate staff aide duties and district budget constraints.

- Each District budget is broken down by suggested areas of expense (staff aide salaries, conduct of business, supplies, etc.), although the funds can be spent for any office-related purpose at the approval of the supervising Board member. Additional information related

to both the District and Corporate budgets may be found in the Board Orientation Manual.

- The amount that can be allocated for staff aide salaries is directly related to the other expenses the District Office may incur.

- Benefits may also be provided as outlined in the <u>Benefits Eligibility for Staff Aides</u> chart included with the attachments to the *Board's Policies for Board of Supervisors' Staff Aide*s, which is also included in the Board Orientation Manual. Most benefits are paid out of the District budget but health insurance, if eligibility is met, is paid by the Board's Corporate budget

No. 17-2002, viewed 12/18/2018

Benefits, Generally

- Staff aides are eligible for benefits shown in the Benefits Eligibility for Staff Aides chart included with the attachments to the *Board's Policies for Board of Supervisors' Staff Aide*s.

- Some benefits are contingent on number of hours worked. Any change in a staff aide's approved hours of work may impact the District budget in terms of both salary and required contribution for fringe benefits.

- Health care benefits are available to staff aides working 20 or more hours per week; the required contributions by the County and the individual are contingent on number of hours the staff aide works per week. Health care benefits, if elected are paid out of the Corporate Board budget.

- Staff aides do not receive overtime payment nor are they eligible for exchange time, although a Board member may give lump-sum bonuses or extra days of leave with pay (up to six extra days per year) for exceptional work and service.

HR Processes, Generally

- The Chief of Staff position within the Office of the County Administrator, is the Board's direct contact for personnel requests, including hiring, salary changes, and termination.

- A template for an offer letter, which provides suggested language for an offer is attached. Staff will develop an offer letter for each staff aide to be hired in order to keep a permanent personnel file.

- When Board members are seeking to fill their staff side positions, County staff have are able to create job postings within the County's HR job listing webpage (www.loudoun.gov/jobs). Staff can create these job postings separate from regular employee position postings. Furthermore, staff is able to make available to Board members that ability to post staff aide positions on the County's Employment Opportunities webpage, increasing the visibility of the Board Aide position vacancy. Each job posting is provided a unique URL, in order to assist Board members when positing to other web pages or publications.

- Any changes to a staff aide's employment, including salary changes, number of hours worked, etc. must be processed through the County's HR/Payroll System.

- The Chief of Staff position within the Office of the County Administrator will coordinate and approve these changes in the County's HR/Payroll System after discussion and written approval from the supervising Board member.

Timesheets

- Staff aides must complete timesheets every two weeks to indicate the number of hours worked.

- The timesheet must be provided to the appropriate staff person within the Office of the County Administrator as designated by the Chief of Staff position by the close of business on the Wednesday on which a pay period ends.

- Failure of a staff aide to submit a timesheet on time may result in the Staff Aide's pay being deferred, paid late, or paid an incorrect amount (requiring future reconciliation).

- The supervising Board member must sign the timesheet in order for it to be processed.

- Should the Board member not be able to sign the timesheet by the deadline needed for payroll, the Board member may choose one of the options outlined below according to procedure first established in January 2011 by direction of the County Administrator and applicable until revised:

  a. A staff aide may complete a timesheet prior to the end of the pay period, noting anticipated hours and leave for the remainder of the pay period. A Board member's signature can be obtained at this point even though the pay period has not officially ended.  Any revisions to the hours worked or leave taken can be handled though a revision to the timesheet at a later date through the appropriate payroll reconciliation process.

  b. The timesheet can be faxed to the Board member for their signature and then faxed back to the staff aide to be included with the formal submission of the timesheet to payroll. The supervising Board member's signature need not be on the original document.

  c. Similarly, the timesheet could be scanned and emailed to the supervisory Board member from the Board Aide. With office technology provided through the county, Board members may "sign" the .pdf file on their tablet, or PC and then email it back to their Board Aide.  That file can then be printed and included with the formal submission of the timesheet.

- Should situations arise in which a timesheet was incorrectly submitted, the Chief of Staff and applicable county staff will assist the Board member and their Aide(s) in preparing the necessary documentation to reconcile the timesheet with the Department of Finance and Procurement, Payroll Unit.

<u>Other Matters</u>:

- Staff strongly recommends that the Board aides go through the County's formal *"New Employee Orientation"* program. The day and a half program session assists new county employees, even Board aides, to understand more about County Government, standard practices and procedures and benefits information.

- Staff from the Office of the County Administrator will also meet regularly with Board aides to discuss issues more direct to the Board's District office, such as but not limited to the following:

  - ➢ constituent issues and complaints;
  - ➢ Board of Supervisors' legislative, public hearing, and standing committee items;
  - ➢ office technology (tablets, PCs, phones and county information systems etc.); and
  - ➢ general administrative policies and procedures such as communications, meeting notice procedures, allowable expenditures etc.


**<u>Main Point of Contact for All Board Aide Policies and Procedures</u>:**

Caleb Weitz, Chief of Staff,
Office of the County Administrator
(Caleb.Weitz@Loudoun.gov)
571-258-3334


**ATTACHMENT**
Board Staff Aides Sample Offer Letter



**Loudoun County, Virginia**
www.loudoun.gov
Office of the Board of Supervisors
1 Harrison Street, S.E., 5th Floor, P.O. Box 7000, Leesburg, VA 20177-7000
Telephone (703) 777-0204 • Fax (703) 777-0421 • bos@loudoun.gov

(DATE)

Dear (NAME):

This letter confirms our recent conversations regarding your appointment as my Staff Aide. Following are the details of your appointment:

| | |
|---|---|
| Title: | Staff Aide |
| Department: | Board of Supervisors' Office |
| Appointment Type: | Unclassified, at-will appointee |
| Salary: | $XX.XX/hour |
| Hours Per Week | XX.XX |
| Benefits | See Attached Benefits Summary |

Attached is a copy of the policies governing your appointment. Please make sure that you read them.

As discussed with you previously, please ensure that you follow through on any necessary paperwork to complete you appointment. Direct deposit of your paycheck is required so please take a voided check along with the branch name, address, and telephone number with you the first day of work and provide this information to the Department of Human Resources (DHR), 4th Floor of the Loudoun Government Center, 1 Harrison Street in Leesburg.

You will need to complete your tax withholding forms, any other required benefits forms, and the I-9 form either before or within your first three (3) days of employment at the Department of Human Resources. While in DHR, you should also obtain a Loudoun County government issued photo ID. Please ensure that you schedule yourself for new Employee Orientation as soon as possible after you enter employment. Valuable benefits information and other pertinent information regarding County government will be offered as part of this Orientation.

I welcome the opportunity to work with you. If you accept this offer of appointment, please sign the this letter and return it to Mr. Caleb Weitz, Chief of Staff, Office of the County Administrator. Please contact me directly in the Board of Supervisors' Office or Mr. Weitz at 571.258.3334, if you have any questions.

Sincerely,


(Supervisor)
(District)

No. 17-2002, viewed 12/18/2018

ACCEPTANCE FORM

I hereby accept this offer of appointment and the terms and conditions as outlined within this letter.

_____

Staff Aide Signature and Date (Month/Day/Year)

Attachments:
- Policies for Board of Supervisors' Staff Aides (Adopted December 5, 2012; effective January 1, 2013; *Last Revised: November 4, 2015*)
- Benefits Summary

No. 17-2002, viewed 12/18/2018

**Policies for Board of Supervisors' Staff Aides**
**(Adopted December 5, 2012; effective January 1, 2013; *Last Revised: November 4, 2015*)**

**A. Status of Staff Aides and Applicability of Policies and Procedures**

1. Staff Aides are appointed by and serve solely at the pleasure, discretion, and will of their respective Board Members. There is no established timeframe to the length of the appointment. Nevertheless, when the term of a Board Member ends, so does the employment of his/her Staff Aide. These unclassified positions are neither temporary nor regular positions under the County personnel system.

2. Staff Aides to Members of the Board of Supervisors are personal staff of elected public officials whose positions are selected or appointed by the officials, are under the elected officials' direct supervision, and are not subject to the personnel system of the employing public agency. As such, Staff Aides are not considered an "employee" under the Fair Labor Standards Act, nor are they covered by the provisions of the Act. Similarly, the positions are not considered an "employee" under Title VII of the Civil Rights Act of 1964.

3. Staff Aides are generally not covered by or subject to the County's personnel policies; including employment, compensation, disciplinary, termination, development and awards, and grievance policies. Staff Aides are subject to administrative and operational policies and procedures pertaining to County equipment, systems, facilities, vehicles and all policies and procedures related to fringe benefits.

4. Staff Aides are paid when the County is unexpectedly closed for emergencies, based upon authorized work hours.

**B. Job Duties/Payband Continuum and Staff Aide Pay**

1. The attached job description/payband continuum (Attachment I) contains the Staff Aide payband, i.e. salary range, along with corresponding sample job duties. Using the continuum, each Board member determines the salary of his/her Staff Aide.

2. This payband will increase at the same rate and frequency of increases to County salary scales, though the Staff Aide positions remain unclassified.

3. Each respective Board member determines when a salary change is appropriate, as well as the degree of salary change, for his/her Staff Aide(s). Staff Aides do not receive any form of salary adjustments/increases provided to general County employees. The salaries of Staff Aides change only when directed and authorized by the supervising Board Member.

4. At the discretion of each Board member, Staff Aides may be paid on an hourly basis for hours worked or may be salaried employees. Regardless of how the Staff Aide is paid, a timesheet that accurately reflects the actual hours worked is required each pay period.

5. Staff Aide positions do not receive any form of overtime ("time-and-a half") pay nor do they receive any form of exchange time or personal leave (as defined in the HR Policy Handbook, Chapter 6).

6. Board members may provide lump-sum bonuses to Staff Aides (above and beyond hourly compensation), contingent on sufficient funds being available in the district budget.

## C. Benefits

1. Staff Aides are eligible to receive benefits as listed in Attachment II.   All County policies, procedures and administrative requirements associated with these fringe benefits are applicable.

2. As part of the benefits granted, Staff Aides receive paid annual and sick leave, and paid holidays based on authorized work hours.

## D. Job Performance, Work Activity and Management Oversight

1. Each Board Member determines his/her Staff Aide's job responsibilities, duties, work activity and provides work direction and oversight.  Staff Aides' compensable work hours that are paid for with County funds must be in support of County government needs and activities.

2. It is the responsibility of each respective Board Member to monitor and evaluate the job performance of his/her Aide.  The format and frequency of performance evaluations, if any, are at the Board Member's discretion.

3. It is the responsibility of each Board Member to decide upon the type of corrective action, if needed, for his/her own Aide and to implement the corrective action.

## E. Funding for Staff Support

Funding for staff support is contained in Board Members' district budgets.  Board Members must work within the parameters of their district budgets in setting Aides' salaries, determining the number of hours of work, providing salary increases, and awarding bonuses. The election of certain benefits by the Staff Aide (excluding health care benefits) will affect the amount of funding available in a district budget.  The election of health care benefits will affect the funding available in the corporate Board budget.

## F. Telecommuting

While the Staff Aide's primary work location is the County Government Center, Staff Aides may work from home or other alternate locations with the approval of his/her respective Board Member. Such telecommuting time shall not exceed five calendar days per pay period, whether those days are full or partial days of telecommuting activity. For the purposes of this policy, telecommuting is considered to be the proactive decision, with approval of the Board member, to conduct County business at a location other than the County offices, to include connecting to the County network (through VPN or other means), performing routine tasks and responsibilities, and handling constituent affairs.

Page 2

Attending off-site meetings or conducting minimal activity (such as unplanned phone calls or email) is not considered to be telecommuting.

## G. Requests for Information or Work

Per County Administrator policy, Staff Aides (on behalf of their Board Members) may request explanation or information directly of County departmental staff if it is believed that the information is readily available and easy to access.   Whenever possible, all other requests must be directed through County Administration.  This is because staff in County Administration is best suited to appropriately direct the requests and to determine which requests need approval from a majority of the Board or the full Board.

## H. Restricted and Prohibited Activities

Staff Aide positions are held to the highest standards of conduct. While not all inclusive, the following sections shall guide standards of conduct.

1. No County resources (including but not limited to: office space, equipment, computers, telephones, mobile devices, internet access, etc.) shall be used for any type of political activity or campaigning or in support of such activities. Moreover, compensable work activity shall not include political activity or campaigning of any type.

2. Staff Aides shall not accept outside employment if such employment could conflict with the Staff Aide's ability to perform his/her job in an effective and efficient manner. The Staff Aide must obtain written approval from their respective Supervisor prior to accepting outside employment. Outside employment with or for the Board member and/or the Board member's private employment or business activities is deemed a conflict with the Staff Aide's ability to perform his/her job for the purposes of this section.

   Outside employment is defined as any paid work performed for the Loudoun County Government or as an employee or contractor of an organization or entity other than Loudoun County Government.  Outside employment includes, but is not limited to; jobs with organizations or entities other than Loudoun County Government, work resulting from ownership of a business, sole proprietorship, L.L.C., or employment with a business which contracts with the County.

3. Under no circumstances shall Staff Aides be compelled by any Board member to perform any activities for a Board member related to their political campaigns, private employment, or any other activity that is not directly related to County business.

4. Under no circumstances shall Staff Aides be compelled or permitted to perform activities of a personal nature for their Board member during the hours they are performing work involving official Board of Supervisors business

## I. Staff Aide Recourse

Pursuant to Section A.3 of this Staff Aide policy, Staff Aides are not covered by county personnel grievance policies.  It is understood, however, that Board members shall treat Staff Aides in a professional manner with respect.  Should a Staff Aide have concerns with

Page 3

his or her Board member's actions or stated direction of work activity, he/she is encouraged to bring the matter to the attention of the County Administrator, who will refer the matter to either or both the Chairman and the Vice Chairman of the Board.  Should the concern relate to either the Chairman or the Vice Chairman, the County Administrator will take the concern to the Chairman or Vice Chairman (to whom the issue does not apply) and also to the Chairman of the Finance/Government Services & Operations (FGSO) Committee.

The Chairman, the Vice Chairman, and/or the FGSO Chairman shall look into the matter by consulting with the affected Supervisor, County Staff (as appropriate), and any others necessary to ascertain the facts behind the matter.  The Chairman, the Vice Chairman, and/or the FGSO Chairman shall determine the proper path to be pursued, including bringing the matter to the full Board, if appropriate. County staff, through the County Administrator, is authorized to perform standard human resources activities, as appropriate, in order to support the intent of this section, at the request of the Chairman, Vice Chairman, and/or the FGSO Chairman.

**Questions**
Chief of Staff, Office of the County Administrator
All policies and overall issues related to Staff Aides and Board District Budgets

**Attachments**
    Attachment I - Job Description and Payband Continuum
    Attachment II - Benefits Eligibility Summary for Staff Aides

No. 17-2002, viewed 2/18/2018

ATTACHMENT I

## Board of Supervisors' Staff Aides
## Job Description and Payband Continuum
### (effective July 1, 2012)

The listed duties are examples and intended only to be illustrative of the designated levels.

Board members may pay Staff Aides at any point on this payband [assuming district budget has sufficient funds].

| Administrative | Project-Based | Advisory/Strategic |
|---|---|---|
| $31,380.38 /year ($16.0925 /hour) | $69,222.08/year ($35.4985 /hour) | $107,063.78/year ($54.9045 /hour) |

| Administrative | Project-Based | Advisory/Strategic |
|---|---|---|
| Organize and file documents | Conduct research | Conduct extensive and/or complex research |
| Read, sort and respond to routine mail | Meet with citizens | Prepare special reports and documents |
| Manage calendar | Create newsletters | Interact with the press |
| Schedule appointments and meetings | Represent Board member in meetings | Prepare issue papers |
| Attend meetings to observe and take notes | Research and respond to FOIA requests | Prepare Board member-initiated items |
| Respond to routine questions or concern | Publicize community meetings | Study, research and analyze budgetary data |
| Make copies | Draft press releases | Liaison with advocacy groups |
| Write letters | Maintain databases and mailing lists | Advise Board member |
| Answer phones | Any task designated as "administrative" | Initiate and develop ideas for legislative items |
| | | Any task designated as "administrative" or "project-based" |

*This job description does not pertain to unpaid volunteers or to interns (who may be unpaid or hired at a lower rate of pay).*

ATTACHMENT 2

## BENEFITS ELIGIBILITY SUMMARY FOR STAFF AIDES

Eligibility:  By virtue of Board Action, Staff Aides are eligible for many of the County's fringe benefits.  All related County policies and procedures apply to the administration of these benefits (Chapter 6 of the HR Handbook). Information can be found on the Benefits portal pertaining to the health plan, Family and Medical Leave (FMLA), Disability Benefits, and more.

| **Staff Aide Benefits** [1] | **Staff Aides** Less than 40 Hrs. Bi-Weekly | **Staff Aides** 40-59 Hrs. Bi-Weekly | **Staff Aides** 60-74 Hrs. Bi-Weekly | **Staff Aides** 75+ hrs. Bi-Weekly |
|---|---|---|---|---|
| **LEAVE TYPES/BENEFITS:** | *< 20 hrs/wk* | *20-29 hrs/wk* | *30-37 hrs/wk* | *Full-time 37.5 hrs/wk* |
| **Holidays**[2] | | ✓ | ✓ | ✓ |
| | | | | |
| **Leave Types/Benefits:** | | | | |
| • Annual Leave (including Longevity Leave)[2] | | ✓ | ✓ | ✓ |
| • Family and Medical Leave (FMLA)[3] | | ✓ | ✓ | ✓ |
| • Military Exigency & Caregiver Leave[3] | | ✓ | ✓ | ✓ |
| • Sick Leave[2] | | ✓ | ✓ | ✓ |
| • Leave Donations[4] | | ✓ | ✓ | ✓ |
| • Injury Leave[5] | | ✓ | ✓ | ✓ |
| • Bereavement Leave | | ✓ | ✓ | ✓ |
| • Leave Without Pay | ✓ | ✓ | ✓ | ✓ |
| • Exceptional Performance / Recognition Leave | | ✓ | ✓ | ✓ |
| | | | | |
| **Health and Welfare Benefits:** [6] | | | | |
| • Group Health Plan | | ✓ | ✓ | ✓ |
| • Limited Disability (Short and Long Term)[7] | | | ✓ | ✓ |
| • Long-term Care Insurance (LTC) | | ✓ | ✓ | ✓ |
| | | | | |
| **Retirement Benefits:** | | | | |
| • Deferred Compensation – 457 Plan | ✓ | ✓ | ✓ | ✓ |
| • Payroll Roth IRA | ✓ | ✓ | ✓ | ✓ |
| | | | | |
| **Flexible Benefits Plan:** | | | | |
| • Dependent Care Flexible Spending Account (FSA) (matching County contribution up to $1,000 per yr) | | ✓ | ✓ | ✓ |
| • Health Care Flexible Spending Account (FSA) | | ✓ | ✓ | ✓ |
| | | | | |
| **Additional Benefits:** | | | | |
| • Employee Assistance Program (EAP) | ✓ | ✓ | ✓ | ✓ |
| • Tuition Assistance Program (TAP) | | | ✓ | ✓ |
| • Credit Union Membership | ✓ | ✓ | ✓ | ✓ |
| • County Sponsored Training | ✓ | ✓ | ✓ | ✓ |

[1] Staff Aides with a temporary increase in hours (up to 75 hours bi-weekly or more) are not eligible for full benefits.  Aides who exhibit a temporary decrease in hours below regular full-time (75 hours) will receive reduced benefits. Aides must work 75 hours bi-weekly or more to maintain full benefits.
[2] Annual /sick leave and paid holidays are prorated depending on the aide's scheduled hours.  Longevity leave is credited to annual leave balances at the beginning of the calendar quarter in which it is earned.
[3] Staff aides must work for at least 1040 hours within the preceding 12 months period to be eligible for FMLA, Military Exigency or Caregiver Leave.
[4] Refer to 6.4.04 of the Human Resources Handbook for eligibility criteria.
[5] Paid in coordination with compensable workers' compensation claim
[6] Enrollment must be completed within 45 days of hire or 30 days of employment status change or qualifying event.  Benefits are effective 1st of the month following enrollment.
[7] County pays full cost of the Core plan.  Buy-up option is paid in full by the staff aide and enrollment must be completed within 31 days of hire.  Enrollment for the Buy-up option is open annually for a designated period but is subject to Evidence of Insurability.  Cost is based on applicant's age and salary.

   

# Chapter 11

# Miscellaneous

- **County Administration Organization Chart**
- **County Administration Contact List**
- **County Attorney Organization Chart**
- **Leadership Team Contact List**
- **2016 Holiday Schedule**
- **Map Index**
- **Acronyms**
- **Allowable Expenditure Policy**
- **Communications Policy**
- **Department Director Contact List**
- **Travel Procedures**
- **Mileage  Reimbursement Policy**
- **VDOT Guide**



*Loudoun County*
*Board of Supervisors*
*2016-2020*



**COUNTY ADMINISTRATION ORGANIZATION AND AREAS OF RESPONSIBILITY**

*Updated October 13, 2015*

# Office of the County Administrator
# Contact Information
## 10/07/15

**Main Number: 703 777-0200**
**FAX:  703 777-0325**
email – **coadmin@loudoun.gov**
**http://www.loudoun.gov**

| Name | Title | E-Mail |
|------|-------|--------|
| | | |
| **Tim Hemstreet** | County Administrator | Tim.Hemstreet@loudoun.gov |
| **Julie Grandfield** | Assistant County Administrator | Julie.Grandfield@loudoun.gov |
| **Robert Middaugh** | Assistant County Administrator | Robert.Middaugh@loudoun.gov |
| **John Sandy** | Assistant County Administrator | John.Sandy@loudoun.gov |
| **Kenny Young** | Assistant County Administrator | Kenny.Young@loudoun.gov |
| **Charles Yudd** | Assistant County Administrator | Charles.Yudd@loudoun.gov |
| **Caleb Weitz** | Chief of Staff | Caleb.Weitz@loudoun.gov |
| **Glen Barbour** | Public Affairs Manager | Glen.Barbour@loudoun.gov |
| **Lisa Erickson** | Special Projects Assistant | Lisa.Erickson@loudoun.gov |
| **Amanda Fisher** | Administrative Assistant | Amanda.Fisher@loudoun.gov |
| **Lorie Flading** | Communications Specialist | Lorie.Flading@Loudoun.gov |
| **Robin Geiger** | Communications Manager | Robin.Geiger@loudoun.gov |
| **Mimi Greene** | Lobby Receptionist | Mimi.Greene@loudoun.gov |
| **Eileen Hall-Tobey** | Administrative Manager | Eileen.HallTobey@loudoun.gov |
| **Jenny Grimmell** | Deputy Clerk | Jenny.Grimmell@loudoun.gov |
| **Gwen Kennedy** | Project Manager | Gwen.Kennedy@loudoun.gov |
| **Amanda Logan** | Assistant Deputy Clerk | Amanda.Logan@loudoun.gov |
| **Eileen Mallory** | Executive Assistant | Eileen.Mallory@loudoun.gov |
| **Nancy McCormick** | Communications Specialist | Nancy.McCormick@loudoun.gov |
| **Catherine Motivans** | Public Affairs Specialist | Catherine.Motivans@loudoun.gov |
| **Melissa Prell** | Receptionist | Melissa.Prell@loudoun.gov |
| **Stan Rogers** | Video and Broadcast Manager | Stan.Rogers@loudoun.gov |
| **Amy Stewart** | Administrative Assistant | Amy.Stewart@loudoun.gov |
| **Ann Stewart** | Executive Assistant | Ann.Stewart@loudoun.gov |
| **Emily Watkins** | Public Affairs Manager | Emily.Watkins@loudoun.gov |
| | | |

Not Reviewed 12/10/2015

/G:BOSOrientation2016

**COUNTY ATTORNEY OFFICE**
**Organization Chart**
**(Effective November 1, 2015)**

Leo Rogers
County Attorney
703-777-0478

Susan Milbourne
Administrative Manager
703-771-5053
Office Manager and provides
administrative support to the
County Attorney

Courtney Sydnor
Deputy County Attorney
703-771-5055
Finance, PRCS, Economic
Development, PPTA/PPEA,
Real Estate Transactions
(ADU, leases, acquisitions)

Ronald Brown
Deputy County Attorney
703-777-0511
Land use, code enforcement,
zoning

Milissa Spring
Deputy County Attorney
703-777-0523
Sheriff's Office, Fire-
Rescue, Animal Services,
Human Resources, Housing,
MHSADS, FOIA

Terrie Collins
Legal Services Assistant
703-777-0307
Provides administrative
support to the attorneys
for Community Services,
Public Safety and
Employment

Belkys Escobar
Asst. County Attorney
571-258-3119
Local taxation, misc.
Treasurer and Comm. of
Revenue, collections and
bankruptcy, assessment
appeals

Zaida Thompson
Asst. County Attorney
703-777-0371
Code and ordinance
enforcement, subdivision
and site Plan review

Sandra Glenney
Asst. County Attorney
571-258-3135
Department of Family
Services, child welfare
and adult protective cases

Susan Kelley
Legal Services Assistant
703-777-0307
Office Receptionist and
provides administrative
support to the attorneys
for Real Estate, Contracts,
Finance and Tax

Kenneth Golski
Asst. County Attorney
703-737-8682
Procurement, leases,
misc. contracts

Jason Hobbie
Asst. County Attorney
703-777-0167
Ag Districts, DFS ADUs,
General Services (SWM),
ordinance amendment
review

Leslie Barnes
Asst. County Attorney
703-777-0309
Department of Family
Services, child welfare
cases, Juvenile Detention
Center

Sandra Gunter
Legal Services Assistant
703-777-0307
Provides administrative
support to the attorneys
for Community
Development

Steve Jackson
Asst. County Attorney
703-777-0549
Collections and
bankruptcy, assessment
appeals, general litigation

Laurie Sigler
Asst. County Attorney
703-771-5054
Legislative apps, proffer
& SPEX review, Planning
Commission, public
notice ad review

Vacant
Asst. County Attorney

John Powell
Asst. County Attorney
703-777-0328
Right-of-way
acquisitions, eminent
domain

Mindy Palleija
Paralegal
703-777-0307
Subdivision/site plan
documents review

Lisa Bailey
Paralegal
703-777-0307
Supports the Department
of Family Services
attorneys

Brian Boone
Paralegal
703-777-0307
Bankruptcy and
collections, land records
and development records
research, general research

Ursula Fenton
Paralegal
703-777-0307
Procurement and leases



**Loudoun County, Virginia**
www.loudoun.gov

Human Resources / Benefits
1 Harrison St., SE, 4th Floor, P.O. Box 7000 Leesburg, VA 20177-7000
Telephone (703) 777-0517 • Fax (571) 258-3212

| County of Loudoun Designated Holiday Schedule 2016 | | |
|---|---|---|
| **Holiday** | **Calendar Date** | **Date Observed** [2] |
| **New Year's Day** | January 1st | *Friday, January 1, 2016* |
| **Martin Luther King Day** | *3rd Monday in January* | *Monday, January 18, 2016* |
| **Presidents' Day** | *3rd Monday in February* | *Monday, February 15, 2016* |
| **Memorial Day** | *Last Monday in May* | *Monday, May 30, 2016* |
| **Independence Day** | *July 4th* | *Monday, July 4, 2016* |
| **Labor Day** | *1st Monday in September* | *Monday, September 5, 2016* |
| **Columbus Day** | *2nd Monday in October* | *Monday, October 10, 2016* |
| **Veterans Day** | *November 11th* | *Friday, November 11, 2016* |
| **Thanksgiving** | *November 23rd – ½ day afternoon[3]*  *4th Thursday in November & the following Friday* | *Wednesday, November 23, 2016 (1/2 day afternoon)*  *Thursday, November 24, 2016 Friday, November 25, 2016* |
| **Christmas** | *December 24th [3]*  *December 25th* | *Friday, December 23, 2016*  *Monday, December 26, 2016* |
| **Floating Holiday** | *January 1st – December 31st* | *TBD – upon employee request [1]* |

[1]*6.3 (E) Employee eligible for paid holidays will receive one (1) floating holiday per calendar year.  The day must be requested in advance and in accordance with department protocol and is subject to supervisor's approval.*
*(1) Required Use Per Year: If an employee fails to take their floating holiday each calendar year, it is automatically forfeited at the end of the calendar year.*

[2]*Departments with 7 day operations will observe the holiday on the actual holiday.*

[3]*Denotes additional time off in accordance with state holiday calendar.*

**2017**

| **New Year's Day** | *January 1st* | *Monday, January 2, 2017* |
|---|---|---|

*November 2, 2015*

No. 17-2002, viewed 12/18/2018



# LOUDOUN COUNTY VIRGINIA

OFFICE OF MAPPING AND GEOGRAPHIC INFORMATION

1Harrison Street, 2nd floor,

MS 65

Leesburg, Virginia  20177

Telephone:  703-771-5778      Fax: 703-771-5075



| MAP NUMBERS | TITLE |
|---|---|
| | |
| 2013-084 | Airport Noise Contours |
| 2015-166 | Beaverdam Creek Historic Roadways District |
| 2014 | Countywide Transportation |
| 2015-191 | Election Districts Countywide |
| 2012-008 | Algonkian Election District |
| 2015-194 | Ashburn Election District |
| 2015-137 | Blue Ridge Election District |
| 2015-197 | Broad Run Election District |
| 2015-195 | Catoctin Election District |
| 2015-196 | Dulles Election District |
| 2012-018 | Leesburg Election District |
| 2012-014 | Sterling Election District |
| 2006-004 | Floodplain, Topography, and Stream Centerline |
| 2015-167 | Historic and Cultural Conservation Districts |
| 2010-019 | Limestone Overlay District |
| 2000-001 | Mountainside Development Overlay District |
| 2013-296 | Open Space Easements |
| 2009-125 | Original Land Grants |
| 2015-041 | Owned and Leased Properties-Loudoun County |
| 2014-168 | Planimetric Index Map |
| | Plan of Leesburg |
| 2014-338 | Planned Land Use |
| 2014-108 | Postal Areas ( Zip Codes ) |
| 2014-260 | Status of Road Segments |
| 2015-161 | Waterford Historic |
| 2015-186 | Wireless Telecom |
| 2015-235 | Zoning Map |
| | |
| | Yardley Taylor 1853 (Photograph) |

Useful Links:  http://logis.loudoun.gov/

Web Logis:  http://logis.loudoun.gov/weblogis/   (Provides access to the County's Enterprise Geographic Information System data layers.)

On-line Map Gallery:  https://www.flickr.com/photos/omagi/sets/

UPDATED 10/20/15

# *A C R O N Y M S AND OTHER TERMS*

| | |
|---|---|
| A-3, A-10 | Agricultural Zoning |
| AAA | (Triple A) Area Agency on Aging |
| AADP | Annexation Area Development Policies |
| ACOY | Advisory Commission on Youth |
| ACR | Active Citizen Request |
| ADAC | Agricultural District Advisory Committee |
| ADC | Adult Detention Center |
| Admin | County Administration |
| ADU | Affordable Dwelling Unit |
| ADUAB | Affordable Dwelling Unit Advisory Board |
| AEA | Annual Economic Adjustment (COLA) |
| AFD | Agricultural Forestal District |
| AMI | Area Median Income |
| APS | Adult Protective Services |
| ARC of Loudoun | Association of Retarded Citizens of Loudoun |
| | |
| BA | Budget Adjustment |
| B&D | Building and Development |
| BLA | Boundary Line Adjustment |
| BOE | Board of Equalization |
| BOS | Board of Supervisors |
| BPOL | Business, Professional and Occupational License |
| BZA | Board of Zoning Appeals |
| | |
| C-1 | Commercial |
| CAC | Child Advocacy Center |
| CAD | Computer Aided Dispatch System |
| CAFR | Comprehensive Annual Financial Report |
| CAMA | Computer-assisted Mass Appraisal (system) |
| CAPP | Capital Asset Preservation Program |
| CAO | Chief Administrative Officer |
| CASA | County After School Activities |
| CATV | Cable Television |
| CCJB | Community Criminal Justice Board |
| CDBG | Community Development Block Grant |

No. 17-2002 Viewed 12/16/2018

# *A C R O N Y M S AND OTHER TERMS*

| | |
|---|---|
| CFS | Capital Facility Standards |
| CIF | Capital Intensity Factor |
| CIP | Capital Improvements Program |
| CNA | Capital Needs Assessment |
| COG or MWCOG | Metropolitan Washington Council of Governments |
| COLA | Cost of Living Adjustment |
| COLT | Coalition of Loudoun Towns |
| Comp Plan | Comprehensive Plan; Revised General Plan |
| COOP | Continuity Of Operations Plan |
| CPAM | Comprehensive Plan Amendment |
| CPAP | Construction Plans and Profiles |
| CPMT | Community Policy and Management Team |
| CPS | Child Protective Services |
| CSA | Children's Services Act |
| CSB | Community Services Board |
| CSG | Community Services Group |
| CTP | Countywide Transportation Plan |
| | |
| DARE | Drug Abuse Resistance Education |
| DART | Domestic Abuse Response Team |
| DATA | Dulles Area Transportation Association |
| DCWM | Department of Construction and Waste Management |
| DED | Department of Economic Development |
| DFS | Department of Family Services |
| DIT | Department of Information Technology |
| DMB | Department of Management & Budget |
| DNAMP | Dulles North Area Management Plan |
| DOAM | Development Ordinance Amendment |
| DSB | Disability Services Board |
| | |
| EAC | Employee Advisory Committee |
| EAP | Employee Assistance Program |
| ECC | Emergency Communications Center |
| ECHO | Every Citizen Has an Opportunity |
| EDA | Economic Development Authority |
| EDAC | Economic Development Advisory Commission |
| EDC | Economic Development Commission |

No. 17-2002, viewed 12/13/2018

### A C R O N Y M S AND OTHER TERMS

| | |
|---|---|
| ELAMP | Eastern Loudoun Area Management Plan |
| EOC | Emergency Operations Center |
| EOP | Emergency Operations Plan |
| ERP | Enterprise Resource Planning Software |
| ESI | Engineers and Surveyors Institute |
| | |
| FAA | Federal Aviation Administration |
| FAMIS | Financial Accounting and Management Information System |
| FAR | Floor Area Ratio |
| FGSO | Finance/Government Services and Operations Committee |
| FIC | Fiscal Impact Committee |
| FIM | Fiscal Impact Model |
| FOIA | Freedom of Information Act |
| FOD | Floodplain Overlay District |
| FSM | Facilities Standards Manual |
| FTE | Full-time Equivalent |
| FY | Fiscal Year |
| | |
| GASB | Governmental Accounting Standards Board |
| GDC | General District Court |
| GIS | Geographic Information Systems |
| GO | General Obligation Bonds |
| GOV MAX | Budget planning and resource allocation tool |
| | |
| HAB | Housing Advisory Board |
| HHW | Household Hazardous Waste |
| HAZMAT | Hazardous Materials |
| HIPAA | Health Insurance Portability and Accountability Act |
| HSG | Housing Stakeholders Group |
| | |
| IDA | Industrial Development Authority |
| IDB | Industrial Development Bonds |
| | |
| J&DR | Juvenile and Domestic Relations District Court |
| JDC | Juvenile Detention Center |
| JCSU | Juvenile Court Services Unit |
| JTPA | Job Training Partnership Act |

No. 17-2002 viewed 12/18/2018

## A C R O N Y M S AND OTHER TERMS

|  |  |
|---|---|
| KLB | Keep Loudoun Beautiful |
|  |  |
| LAMP | Leesburg Area Management Plan |
| LCAS | Loudoun County Animal Shelter |
| LAWS | Loudoun Abused Women's Shelter |
| LCPS | Loudoun County Public Schools |
| LCSA | Loudoun County Sanitation Authority (now operating as Loudoun Water) |
| LCSO | Loudoun County Sheriff's Office |
| LCVA | Loudoun Convention and Visitors Association (now called "Visit Loudoun") |
| LECP | Local Emergency Planning Commission (HAZMAT) |
| LMIS | Land Management Information System |
| LSDO | Land Subdivision Development Ordinance |
| LTF | Local Tax Funding |
| LYI | Loudoun Youth Initiative |
|  |  |
| MDOD | Mountainside Development Overlay District |
| MHSADS | Mental Health, Substance Abuse and Disability Services |
| MWAA | Metropolitan Washington Airports Authority |
|  |  |
| NACo | National Association of Counties |
| NAIOP | National Association of Industrial and Office Parks |
| NVBIA | Northern Virginia Building Industry Association |
| NVCJA | Northern Virginia Criminal Justice Academy |
| NVRC | Northern Virginia Regional Commission |
| NVRPA | Northern Virginia Regional Park Authority |
| NVTA | Northern Virginia Transportation Authority |
| NVTC | Northern Virginia Transportation Commission |
|  |  |
| OCC | Office of Capital Construction (now part of DCWM) |
| OEM | Office of Emergency Management |
| OMAGI | Office of Mapping and Geographic Information |
| OPEB | Other Post Employment Benefits |
| OSWM | Office of Solid Waste Management (now part of DCWM) |
| OVS | Open Video System |

No. 17-2002    Filed 12/18/2018

## A C R O N Y M S AND OTHER TERMS

|  |  |
|---|---|
| PAC | Public Affairs and Communication |
| PC | Planning Commission |
| PD-GI | Planned Development/General Industrial |
| PD-IP | Planned Development/Industrial Park |
| PD-OP | Planned Development/Office Park |
| PD-RDP | Planned Development/Research Development Park |
| PD-SC | Planned Development/Shopping Center |
| PDR | Purchase of Development Rights |
| PEC | Piedmont Environmental Council |
| PH | Public Hearing |
| PIO | Public Information Officer |
| POSE | Permanent Open Space Easement |
| PPEA | Public-Private Education Facilities Act |
| PPTA | Public-Private Transportation Act |
| PRCS | Parks, Recreation & Community Services |
| PUGAMP | Purcellville Urban Growth Area Management Plan |
| PY | Plan Year (Health Plan) |
|  |  |
| REDC | Rural Economic Development Council |
| RGP | Revised General Plan |
| RHAMP | Round Hill Area Management Plan |
| RIF | Reduction-in-Force |
| RLMP | Rural Land Management Plan |
| ROA | Resolution of Appreciation |
|  |  |
| SBEX | Subdivision Exception |
| SCC | State Corporation Commission |
| SBRD | Subdivision Record Plat |
| SCS | Soil Conservation Service |
| SJR-HJR | Senate Joint Resolution - House Joint Resolution |
| SPEX | Special Exception |
| STPL | Site Plan |
| SWCD | Soil and Water Conservation District |
| SWOT | Strengths, Weaknesses, Opportunities, Threats analysis |
|  |  |
| TCC | Transportation Coordinating Council |

## *A C R O N Y M S AND OTHER TERMS*

| | |
|---|---|
| TDR | Transfer of Development Rights |
| TDO | Temporary Detention Order |
| TPB | Transportation Planning Board |
| TLUC | Transportation and Land Use Committee |
| TRANSACTION 2030 | Regional Transportation Plan (adopted by NVTA 11-06) |
| TRIP II | Toll Road Investors Partnership (Dulles Greenway) |
| TY | Tax Year |
| | |
| VACO | Virginia Association of Counties |
| VDOT | Virginia Department of Transportation |
| VML | Virginia Municipal League |
| VPDES | Virginia Pollution Discharge Elimination System |
| VPSA | Virginia Public School Authority |
| VRS | Virginia Retirement System |
| VRTA | Virginia Regional Transit Association |
| | |
| W&OD | Washington and Old Dominion (Bike Trail) |
| WMATA | Washington Metropolitan Area Transit Authority |
| | |
| YAS | Youth After School program |
| | |
| ZCPA | Zoning Concept Plan Amendment |
| ZMAP | Zoning Map Amendment |
| ZO | Zoning Ordinance |
| ZOAG | Zoning Ordinance Action Group |
| ZOAM | Zoning Ordinance Amendment |
| ZMOD | Zoning Modification |

/BOSorientation2016/10-13-15

6



# Loudoun County Government
## Administrative Policies and Procedures

| **Title:** Allowable Expenditure of County Funds | **Effective Date:** 9/3/03 |
|---|---|
| **Number:** ACC-01 | **Date Last Reviewed/Revised**: 11/1/15 |
| | **Date of Next Review:** 11/1/17 |

## Purpose:

The purpose of this policy is to provide guidelines regarding allowable and acceptable expenditures of County funds. These guidelines apply regardless of the payment method, e.g. credit card, cash, check, purchase order, etc. These guidelines also apply regardless of the location in which the expenditure occurs, e.g. in Loudoun, in metro area, on day travel and on long-distance travel. Also refer to the County's Travel Policies and Procurement Card (PCard) Policy.

## Guidelines:

1. Any goods or services purchased with County funds must be solely for the benefit of the County.

    a. Expenditures must be necessary for the conduct of County business and for the support of a County function or service as approved by the Board of Supervisors.

    b. County funds and resources shall not be used to process personal transactions, even if they occur in concert with a business transaction/use. The employee must personally arrange and pay for any personal transactions.

    c. Gift cards as part of a County service to an individual (i.e. client related services for Family Services and MHSADS, commuter programs in DTCI, etc.) are permitted.

2. The accounting of all expenditures is public information and subject to public scrutiny. As such, all employees making or authorizing the purchase of goods or services should be prepared, if needed, to justify or defend the expenditure.

3. The following are considered allowable expenses:
    a. Meals purchased locally (non-travel related) are allowable only in the context of meals designated as necessary for the conduct of business (i.e. working lunches) by the Department Head. This guideline should be applied very prudently and must be approved in advance by the Department Head;
    b. Expenditures for employee recognition:
        i. Retirement celebrations for active employees eligible for full retirement under VRS (i.e., not just vested under VRS), up to $300, as approved by the department head and for department heads or above in an amount determined by the County Administrator. (Funds for these celebrations are to come from department budgets; however, they may be

supplemented by employee contributions.)

    ii. Retirement gift from County Administration for department heads with a value not to exceed the current IRS non-taxable limit.

    iii. HR Service Awards program and related recognition awards.

    iv. Infrequent employee recognition at the department level is allowable through the purchase of nominal items (not to exceed $25) from the County store.

    v. Funds to support the annual employee picnic or similar County sponsored event;

c. Flowers (or similar expressions of sympathy-excluding donations) may be purchased (up to a $150 value) only under the following circumstances:

    o Line of Duty death of an Active Employee or Active Volunteer.

    o Death of an Active Employee or Active Volunteer.

4. The following are examples of non-allowable expenses unless otherwise permitted by Section 3 above or other County policies. Items that cannot be purchased include, but are not limited to:

    a. Alcoholic beverages, including those consumed with meals or during the conduct of business;

    b. Entry fees for sporting tournaments (e.g. golf, softball etc.);

    c. Expenses for social or recreational events;

    d. Campaign related expenses;

    e. Contributions to non-profit organizations including to charities outside of normal departmental business;

    f. Non-work related travel expenses;

    g. Non-work related meals;

    h. Any illegal activities or fines related to illegal activities such as traffic tickets;

    i. Gambling (including raffles);

    j. Gift cards for employees;

    k. Expenses related to personal gifts;

    l. Personal expenses of any form (including flowers for illnesses).

5. It is the responsibility of all employees to adhere to these guidelines.   All Department Heads must ensure that expenditures in their departments meet these guidelines.

## Responsible Department/Division:

County Administration/Department of Finance and Procurement

***This policy remains in effect until revised or rescinded.***



# Loudoun County Government
## Administrative Policies and Procedures

| **Title:** Communication with Board Members | **Effective Date:** November 1, 2015 |
|---|---|
| **Number: COMM-02** | **Date Last Reviewed/Revised:** November 1, 2015 |
| | **Date of Next Review:** October 31, 2017 |

## I. Purpose

To ensure a timely, consistent and accurate dissemination of information to members of the Board of Supervisors relating to activities and projects.

This policy replaces the County Administrator's *Policy Regarding Written Correspondence to Members of the Board of Supervisors*, dated August 19, 2010.

## II. Definitions

**"Assistant County Administrator:"** The Assistant County Administrator assigned by the County Administrator to serve as the operational liaison to each Department.

**"Board:"** The Board of Supervisors for Loudoun County, VA.

"**Director:**" Each Department Director or his/her designee in the absence of the Director.

**"District Specific Issue/Topic:"** A district specific matter or normal constituent work activity, such as district specific traffic issues; routine, ministerial reports of a routine nature; and readily available information that is not of significance or related to an issue pending before the Board.

**"Issue of Significance:"** A matter or topic not presently before the Board, but is of interest to the entire Board. Examples may be a summary of an event, status report on a particular project, or a written description/summary of something that affects the County as a whole.

**"Issue Pending Before the Board:"** An issue that is currently before the Board as an agenda item for a Business or Board Standing Committee. In addition, these issues may include items that were before the Board in the past but are about ongoing, important issues to the Board. Finally, these issues may include items that you have a reasonable expectation may be on future Board agendas.

**"Written communications:"** Communications to the Board of Supervisors, including individual Board Members and their staff aide(s), in the form of an email, memorandums and formal correspondence.

*COMMUNICATION WITH BOARD MEMBERS POLICY*

**III.    Procedures/Policy**

In general, communications with the Board of Supervisors, including individual Board Members and their aides, to include email, memorandums, informational notices and formal correspondence should come directly from, or through, the Department Director. The Assistant County Administrator and the County Administrator should be copied on all written correspondence. When the communication is not sent from the Director, the Director shall also be copied (see Section D below).

Normal constituent work and activity, such as responding to district specific issues, providing routine and readily available information that is not of significance or related to an issue pending before the Board, and/or providing ministerial reports of a routine nature, does not need to come from or through the Department Director. It is expected though, that the Department Director would be aware of these types of issues when Board Member discussions or a request for information is involved.

Members of County staff who communicate with the Board should use his or her best judgement when implementing the policies and procedures below. When in doubt, consult your Department Director or Assistant County Administrator prior to communicating with the Board.

a.    **In Person Communication with a Board Member:**

Staff often finds themselves in the presence of Board Members in settings outside of formal Board Business or Standing Committee meetings.  During these interactions, the Board Members may pose questions, or seek information.  Staff is cautioned to avoid providing information without adequate research or data collection.  Accuracy of the information provided to Board Members is of the highest priority.  Staff shall make all attempts to be professional and provide the information requested if known.  If a staff member does not know an answer, inform the Board Member and let him/her know that staff will look into the matter and provide an accurate response in a timely manner.  Following the conversation, and at the earliest convenience, send an email to the Department Director summarizing the information discussed and provided.

If the discussion migrates into an "issue of significance" or includes an "item pending before the Board," then continue to provide the Board Member with the requested information and advise the Board Member that in your judgement, this matter may be of interest to all Board Members.  As such, staff must notify all Board Members of the information requested.  When this occurs, draft an email to the Department Director indicating the circumstances surrounding the conversation and request the email be forwarded to the full Board for information.

If in staff's judgement, the matter is of a serious nature that potentially involves conflict or disagreement among the Board Members that requires assistance and attention by the Director or County Administration, notify the Director via the telephone (cell phone) immediately.

2

*COMMUNICATION WITH BOARD MEMBERS POLICY*

**b. Meeting Coordination and Notice to Board Members:**

In the process of coordinating and attending meetings, several scenarios may occur where Board Members should be involved, spanning basic notification to an increased level of schedule coordination. The following matrix is provided to assist staff to ensure the appropriate level of Board Member involvement.

- **Who Needs to be Aware of This Information?**
  All Department Heads and their staff that may be involved in attending and/or participating in Community Meeting, Meeting with other Elected Bodies, meeting with Home Owners Associations and briefings with Board Members. It is the responsibility of the Department Director to ensure that the staff within his/her department who meet this criteria are aware of the staff responsibilities listed below.

- **What Does Staff Need to Do?**
  Staff should follow the steps listed below under the section titled "Staff Responsibilities."

| TYPE OF MEETING | STAFF RESPONSIBILITIES |
|---|---|
| 1. STAFF BEFORE AN ELECTED BODY including Home Owners Associations.<br><br>Staff appearing before another elected public body or individual elected official from a City, Town, Adjoining County, State Elected Official or comparable individual. Staff being invited to attend a meeting of an HOA or other community association.<br><br>Note: these do not include routine County-led meetings that are part of a regular process. For example, meetings with HOAs on issues relating to County-managed storm water management ponds, and community meetings conducted as part of a SPEX or ZMAP/ZCPA application for County projects. | a. Notify the Chairman and the respective District Supervisor(s) of the meeting purpose, location, date and time.<br><br>• Notification may be made via email with copies to the County Administrator, Assistant County Administrator, Department Director and the Department Division Director.<br><br>• Coordination of schedules with the Board Chairman or representative District Supervisor is not required for this type of meeting. |

*continues on next page*

3

*COMMUNICATION WITH BOARD MEMBERS POLICY*

| **TYPE OF MEETING** | **STAFF RESPONSIBILITIES** |
|---|---|
| 2. BOARD MEMBER(S) BRIEFING MEETING<br><br>Briefing on a project-related or Board Business/Public Hearing/Standing Committee meeting item. | a. Offer the Chairman a briefing on the same project/item, if the briefing is not being made to the entire Board, when:<br>• A Board Member requests a briefing, or when the Director or a County Administration representative recommends that one or more Board Members receive a briefing on a particular project; and/or<br>• An item is pending before the Board at a Business Meeting, Public Hearing or a Standing Committee Meeting.<br>b. Ensure a Director, or County Administration representative is present for all Board Member briefings.<br>• The County Administrator and the Assistant County Administrator will be present at their discretion. Staff shall:<br> 1) Consult with the Assistant County Administrator and the County Administrator to confirm their interest in attending.<br> 2) Notify the Department Director<br> 3) When possible, notification for the meeting shall be disseminated well in advance (typically five [5] working days, or more).<br>c. Make all notifications by email as soon as possible. |

*continues on next page*

*COMMUNICATION WITH BOARD MEMBERS POLICY*

| TYPE OF MEETING | STAFF RESPONSIBILITIES |
|---|---|
| 3. COUNTY AGENCY/ DEPARTMENT-LED COMMUNITY MEETING<br><br>County-led, project-related community information/input meeting that the Department has initiated. | The Director or their designee shall:<br>a. Coordinate the date, time, and location of the meeting with the Chairman and the respective District Supervisor well in advance of the meeting (30-60 days in advance, when possible).<br>b. Notify the Assistant County Administrator, and the County Administrator of the meeting date, time and location by email as soon as possible.<br><ul><li>If the District Supervisor and the Chairman have elected to not attend the meeting and has advised staff to proceed with the planned meeting date, notify the Department Director, Assistant County Administrator, and the County Administrator immediately upon gaining this information.</li><li>If the Director or their designee encounter conflicting information, please consult with the department's designated Assistant County Administrator.</li></ul> |
| 4. DISTRICT-SPECIFIC ISSUE MEETING<br><br>Meeting with a Supervisor on a District-Specific Issue | If staff is requested to attend a public meeting with a district supervisor regarding to a district-specific issue, and members of the public are anticipated to be present, staff shall:<br>a. Notify the Board Chairman of the meeting and topic by email as soon as possible.<br>b. Notify the Department Director by email as soon as possible.<br><ul><li>Staff should be mindful to ask the District Supervisor if the public are expected to be present at this District Specific Issue meeting.</li><li>If staff is requested to attend a meeting with a district supervisor regarding a district-specific issue and members of the public are NOT anticipated to be present, staff does not have to notify the Chairman of the meeting and the topic.</li></ul> |

*COMMUNICATION WITH BOARD MEMBERS POLICY*

c.  **Response to Telephone Call from a Board Member:**

It is not uncommon for a Board Member, or staff aide, to contact staff directly via the telephone regarding a specific issue or project in their respective district.  Staff shall make all attempts to be professional and provide the information requested.  If the discussion remains focused on a District project or issue, provide the appropriate requested information, respond to questions, and then follow up the telephone call with an email to the Department Director summarizing the information discussed and provided to the Board Member.

If the discussion migrates into an "issue of significance," or includes an "item pending before the Board," then continue to provide the Board Member with the requested information.  Also, advise the Board Member that in staff's judgement, this matter involves an "issue of significance" or "item pending before the Board" and that staff is compelled to share the same information with all Board Members.

When this occurs, draft an email to the Director indicating the circumstances surrounding the conversation (including all the information provided to the Board Member) and request the information be forwarded to the full Board for information.

Staff should consult their Division Manager, Assistant and/or Deputy Director and/or the Director to determine what level of written response is required beyond a basic email and the final distribution list to be used.  If a memorandum response is determined to be appropriate, staff shall prepare a draft and distribute the draft to their immediate supervisor for review.  The immediate supervisor shall provide edits and submit a proposed final draft to the Director for review.  The Director or their designee will complete the final draft and forward the memoranda to the Full Board and County Administration in accordance with the Written Communications portion of this policy.

d.  **Written Communications to the Board, Individual Board Members, and their Staff Aides:**

In general, written correspondence, to include email, from staff to the Board of Supervisors, to an individual Board member, and/or a Board member's staff aide, should come directly from or through a Department Director. In addition, the Department's County Administration operational liaison and/or the County Administrator should be copied on the written correspondence.

Examples of written correspondence include responses to requests for information; clarification of previous information provided; questions about information provided on the issue, or similar; and formal memos prepared for the Board's information, whether at the request of the Board or generated by staff.

The following matrix is provided to assist staff to ensure the appropriate actions when communication in writing with members of the Board.

*COMMUNICATION WITH BOARD MEMBERS POLICY*

| **TYPE OF WRITTEN COMMUNICATION** | **STAFF RESPONSIBILITIES** |
|---|---|
| 1. REGARDING ISSUES PENDING BEFORE THE BOARD<br><br>An issue that is currently before the Board as an agenda item for a Business or Board Standing Committee. In addition, these issues may include items that were before the Board in the past but are about ongoing, important issues to the Board. Finally, these issues may include items that you have a reasonable expectation may be on future Board agendas. | The written correspondence must:<br>  a. Be provided to the entire Board, not just to one or to a select number of Board members.<br>    • An exception to this is if the full Board had designated one or two members to act as liaisons on a particular subject, in which case staff may communicate directly with those Board members as specified by the Board. |
| 2. REGARDING AN ISSUE OF SIGNIFICANCE TO THE BOARD<br><br>An issue of significance is one that may not be presently before the Board, but is of interest to the entire Board.<br><br>Examples may be a summary of an emergency event or incident; a written description of a large community event; or a written description or summary of something that affects the County as a whole. | The written correspondence must:<br>  a. Be provided to the entire Board, not just to one or to a select number of Board members.<br>    • An exception to this is if the full Board had designated one or two members to act as liaisons on a particular subject, in which case staff may communicate directly with those Board members as specified by the Board. |
| 3. REGARDING A DISTRICT SPECIFIC INCIDENT OR ISSUE THAT IS OF A SIGNIFICANT NATURE<br><br>Examples include an incident or issue of significance may include an emergency incident, a large community event, or something that affects the district as a whole. | The written correspondence should be routed from or through a Department Director. In addition, the information should:<br>  a. Be provided to the individual Board member when a request applies to a specific district or constituent issue and does not involve a discussion before the full Board.<br>  b. The Board Chairman should be copied on district-specific communications.<br>  c. If the communication is to the Board Chairman regarding a district-specific topic, the District Supervisor also should be copied on the communication. |

7

*COMMUNICATION WITH BOARD MEMBERS POLICY*

**Additional Staff Responsibilities**

- **Memorandums**
  In many cases, a memo should be reviewed by County Administration prior to distribution to the full Board. This is primarily important when Administration has already been involved in discussions with staff regarding a particular issue. It is expected that when a memo is provided to the Board, if not through email, the Department Director will initial the memo to indicate his or her review and approval.

- **Routine Constituent Activity**
  Normal constituent work and activity, such as responding to Erosion and Sediment Control complaints, addressing district-specific traffic issues, providing routine and readily available information that is not of significance or related to a matter before the Board, and/or providing ministerial reports of routine nature, does not need to come from or through the Department director. It is expected, though, that the Department Director remain aware of these types of issues when a Board member is involved.

**Responsible Department:**    County Administration

*This policy remains in effect until revised or rescinded.*

No. 17-2002, viewed 12/18/2018

8



| | **Loudoun County Government**<br>**Administrative Policies and Procedures** |
|---|---|

| **Title:** Travel Procedures | **Effective Date:** 2/1/05 |
|---|---|
| **Number:** TRV-03 | **Date Last Reviewed/Revised:** 07/31/12 |
| | **Date of Next Review:** 7/31/14 |

## Purpose:

These procedures address allowable and payable travel costs for employees and members of boards and commissions while on official and approved business outside of Loudoun County.

Travel is defined as use of a County vehicle, use of a personal vehicle, use of other forms of transportation, lodging, meals and incidental expenses associated with conducting County business or professional development. This may include, but is not limited to, travel for meetings, conferences, educational workshops, seminars and training, and conventions from which the employee and the County directly benefit.

Payment occurs only for travel expenses that are reasonable and necessary; travel expenses are public information and must be able to sustain the test of public review.

Also refer to the County's Purchasing Policy and Credit Card Policy.

## General Guidelines

A) These procedures apply to all Loudoun County employees and members of boards and commissions.

B) Each employee and department head is expected to exercise sound and prudent judgment when arranging for, incurring and approving travel expenditures.

C) Travel expenditures must not exceed a department's total travel budgetary allocation.

## Approval and Attendance

**A)** All travel must be pre-approved within the department.

**B)** Employees should not attend non-County sponsored conferences, training sessions, or seminars if a similar event is to be provided by the County within a reasonable amount of time.

**C)** Employees are not guaranteed attendance at conferences and training seminars. Managers and department heads have the authority to approve or disapprove requests for conferences, training, seminars and other business travel. Departments shall provide these opportunities appropriately and fairly.

**D)** County Administration approval is required when multiple (more than one) employees are planning on attending an event that is outside of the metropolitan Washington/Baltimore region and will involve overnight travel. This approval is required even if the employees are from different departments.

## Transportation

**A)** It is expected that the most direct, practical and economical mode and route of travel is arranged and used. Transportation is paid only if it is reasonable and necessary to accomplish the County's business.

**B)** County vehicles: County vehicles should be used for day or overnight travel whenever possible. Refer to Policy VEH-02 (Motor Pool Vehicles) for procedures regarding the request and use of County vehicles.

**C)** Personal vehicles: Personal vehicles should be used for transportation for local, day or overnight travel only when a County vehicle is not available or use of a County vehicle is highly inconvenient. The rate of reimbursement is equal to the rate established by the Internal Revenue Service (IRS). Payment is provided (at the employee's request) for travel in personal vehicles that are necessary during the course of a workday. The distance normally traveled from home to worksite (or the equivalent distance) is not payable. If an employee is required to go home and return to work, the department head, depending on the circumstances, may approve mileage reimbursement.

**D)** Airplane, Train, Taxicab, Shuttle Bus, Public Transportation, and Rental Car: It is expected that the most economical and efficient mode and route of travel is used and that all travel is necessary to accomplish the County's business. Transportation should be shared by employees traveling together whenever possible. Rental cars may be used only when necessary for official purposes while traveling. Travel arrangements may be made via the Internet or through a travel agency.

**E)** Minor Transportation Expenses: Receipts are not required for minor costs (generally defined as $10.00 or less per incident) related to travel. This may include, but is not limited to tolls, Metrorail fares, subway fares, bus fares, etc.

## Lodging

**A)** Accommodations are arranged on a single occupancy basis only, unless there is more than one County employee traveling and a room is being shared. Accommodations are arranged at (or closest to) the site of business. A receipt for lodging expenses will

be needed and must be provided to departmental administrative staff upon return from travel.

B) Lodging for overnight stays must be necessary and reasonable to accomplish the County's business.  It is the department head's discretion (with consideration of circumstances, such as distance from home and times that training begins and ends, etc.) as to what constitutes a legitimate need for overnight lodging.

## Meals

Prior to traveling, the employee should request a per diem rate for the specific dates of travel as outlined below:

The per diem rate is for meals and incidental expenses related to meals (meal tax and meal tip) while traveling.

> Full Days of Travel:    For full days of travel, the per diem rate is $55/day.
>
> Partial Days of Travel:    For partial days of travel, per diem rates are:
>
> > **Morning** (generally from 6:00 – 10:00 AM):  $12
> >
> > **Mid-Day (**generally, from 11:00 AM – 2:00 PM):  $15
> >
> > **Evening** (generally, from 5:00 PM – 9:00 PM):  $28

Upon return from travel, the employee does not need to submit receipts or to itemize meal expenses for the per diem. If the employee did not receive the per diem prior to traveling, a reimbursement up to the per diem rate will be made.  See Payment of Travel Expenses.

If meals are provided at the conference, seminar, etc. the employee is expected to deduct the appropriate amount from the per diem (or reimburse the County for the appropriate amount if the per diem was advanced).  Managers have the right to review travel plans and expense accountability statements.

**See "Payment of Travel Expenses"** for explanations related to use of County credit cards, direct billing or cash obtained by an expense reimbursement.

## Phone Calls

A) **Business Calls:** While on overnight travel, work-related phone calls (e.g. to the office, to voicemail or other necessary business calls) may be billed to the hotel room. These calls should be only as long as necessary to carry out the County's business.

**B) Non-Business (Personal) Calls:** To pay for personal calls while on overnight travel, employees are generally expected to use their personal cell phones or to use prepaid phone cards, which are available through Central Telephone. Employees are not expected to return cards in which the full card time has not been used.

If the employee does not have a personal cell phone and has not had sufficient time prior to the trip to obtain a prepaid phone card, personal calls may be charged to the hotel room, but these should be very limited in duration and frequency.

## Payment Of Travel Expenses

While the County recognizes that a number of different payment methods (County credit card, direct billing and/or expense reimbursement) may be used when traveling, the employee is responsible for ensuring that the County is not double-billed in any way. As an example, the employee should not accept and keep a full day per diem when one of the day's meals has been charged to a County credit card.

**A) Credit Card:** If a personal or County credit card is used for any purchase, the cardholder must obtain the customer copy of the charge slip **and a detailed** receipt. If a County credit card is used to purchase meals, the customer copy of the charge slip **and** detailed receipts are required. (See Itemized Meal and Incidental Expenses**)**.

**B)** Airfare, registration fees, and lodging, should be charged to a county credit card when making the arrangements. The charges can also be directly billed to the County if no card is available for use.

**C) Expense Reimbursement:** If the employee has allowable and reimbursable business expenses, he/she should request reimbursement within thirty (30) days after completion of the travel by submitting a Travel Reimbursement (TR) iform.

## Personal and Non-Allowable Travel Expenses

County resources (including credit cards) are not to be used to process personal and non-allowable travel arrangements and expenditures. The employee must personally pay for these expenses at time of checkout or through direct billing to the employee's residence. Personal and non-allowable travel expenses:

A)      Costs of alcoholic beverages, even during meals;
B)      Personal expenses of any form, such as laundry, haircuts, valet service, gym usage, or personal phone calls in excess of the phone card;
C)      Any illegal activity, such as traffic tickets;
D)      Gambling;
E)      Expenses for any social or recreational activities, such as golf, tours, movies, etc.;
F)      Insurance premiums paid by the traveler;
G)      Any funds or personal belongings lost or stolen;

H)      Expenses incurred if travel stay has been extended due to personal choice or if an additional personal side trip accompanies the County's business travel;

I)      Expenses related to guests (although the employee should contact his/her buyer if this does not meet the employee's traveling needs).

**Responsible Department:**  Management and Financial Services

*This policy remains in effect until revised or rescinded.*

No. 17-2002, viewed 12/18/2018



| **Loudoun County Government** |
| **Administrative Policies and Procedures** |

| **Title:  Mileage Reimbursement** | **Effective Date:  7/18/08** |
| **Number: TRV-04** | **Date Last Reviewed/Revised**: 6/30/12 |
| | **Date of Next Review**: 6/30/14 |

**Purpose:** To establish standards for mileage reimbursement when using a personal vehicle for approved County business.

**Guidelines:**

1) When a County vehicle is not available or use of a County vehicle is highly inconvenient, personal vehicles may be used for transportation for approved local, day or overnight travel only.

2) The Loudoun County mileage reimbursement rate is established by the Internal Revenue Service (IRS).

3) Mileage reimbursement is provided, at the employee's request, for approved local, day or overnight travel in personal vehicles in excess of the employee's normal commuting distance.  The employee's normal commuting distance is the total round trip mileage from the employee's residence to the employee's standard County worksite.  The employee's normal commuting distance (or the equivalent distance) is not reimbursable.

4) Mileage to an alternate work location is eligible for reimbursement only if it exceeds the employee's normal commuting distance.

5) To determine eligible mileage reimbursement for an employee traveling to an approved alternate work location in connection with his/her job duties, calculate the distance from the employee's residence to the alternate location and subtract the distance from the employee's residence to his/her standard County worksite.

- For example, the distance from the employee's residence to his/her standard County worksite is 20 miles.  The distance from the employee's residence to the alternate location is 40 miles.  The employee will be reimbursed for 20 miles of travel – the actual travel mileage (40 miles) less travel from employee residence to standard County worksite (20 miles).

6) Employees whose performance plans require them to routinely perform their job functions at alternate worksites, will be reimbursed for mileage in excess of his/her normal commuting distance. Calculate the total mileage traveled in the workday on approved County business and subtract the employee's normal commuting distance to determine the mileage eligible for reimbursement, similar to number 5 above.

7) Employees who telework are subject to these mileage reimbursement guidelines and will not be reimbursed for mileage incurred in traveling from their residence or telework location to their standard County worksite.

8) Positions that telework full-time should also have a standard County worksite identified. In the absence of an identified standard County worksite, the Government Center at 1 Harrison Street, S.E. in Leesburg will be considered the standard County worksite. Employees who are required by their supervisor, in writing, to report to a location other than their primary location for a time period greater than one week, that shall be the employee's primary work location during the above mentioned time period.

**Definitions:**

Standard County worksite: The County government location which is the employee's primary worksite of record.

Alternate location: An approved worksite other than the standard County worksite or an employee's telework location, where the employee may be working.

**Responsible Department: MFS- Human Resources/Financial Services**

*This policy remains in effect until revised or rescinded.*

# Board of Supervisors Manual

*A quick reference guide to common VDOT activities*



© 2015 Commonwealth of Virginia

# *Table of Contents*

**Preface** ................................................................................................................................ 3

**Maintenance** ........................................................................................................................ 4
   Adopt a highway ..................................................................................................... 4
   Dams ........................................................................................................................ 5
   Drainage and drainage easements ........................................................................... 6
   Maintenance Budget ............................................................................................... 7
   Mowing ................................................................................................................... 8
      Volunteer Roadside Management Program ........................................................ 8
      Community Service Landscape Program ............................................................ 8
   Offender Labor ........................................................................................................ 9
   Private Streets ....................................................................................................... 10
   Snow Removal ....................................................................................................... 11

**Construction** ...................................................................................................................... 12
   County Standards .................................................................................................. 12
   Donated Right of Way .......................................................................................... 13
   Locally Administered Projects .............................................................................. 14
   Locally Funded – VDOT administered projects ................................................... 15
   Noise Abatement ................................................................................................... 16
   Paving a Road ........................................................................................................ 18
      Design Options available for paving unpaved roads .......................................... 18
      Funding Options for Paving Unpaved Roads .................................................... 19
   Primary, Urban, and Interstate Allocation Process ............................................... 21
   Project Development Timeline ............................................................................... 22
   Secondary Construction Budget ............................................................................ 24
   Secondary Six-Year Plan ....................................................................................... 25

**Planning** ............................................................................................................................ 27
   Comprehensive Plan Consistency with State Plans and Programs ......................... 27
   Corridor and Feasibility Studies ............................................................................ 28
   Federal Functional Classification .......................................................................... 29
   Highway Needs Assessment (HNA) ...................................................................... 31
   MPO Transportation Plans and Programs ............................................................. 32
   National Highway System ..................................................................................... 33
   Regional Long-Range Plans for Transportation (Rural RLRPs) ........................... 34
   Small Urban Area Transportation Studies (SUATS) ............................................. 35
   Strategically Targeted Affordable Roadway Solutions (STARS) .......................... 36
   Transportation Improvement Programs (TIPs/ Statewide TIP) ............................. 37
   Virginia Surface Transportation Plan (VSTP) ...................................................... 38
   VTRANS – Virginia's Statewide Multimodal Transportation Plan ...................... 39

**Funding programs** ............................................................................................................ 40
   Airport Access Program ........................................................................................ 40
   Appalachian Regional Commission Local Access Road Program ......................... 41
   Economic Development Access Program ............................................................... 42
   Federal Lands Access Program .............................................................................. 44
   Highway Safety Improvement Program ................................................................ 45
   Recreational Access Program ................................................................................ 46
   Revenue Sharing Program ..................................................................................... 47
   Safe Routes to School ........................................................................................... 48
   Transportation Alternatives Program .................................................................... 49

No. 17-2002, viewed 12/18/2018

Board of Supervisors Manual 2015

# Operations .................................................................................................... 50

Memorial/Dedication Bridges, Highways and Interchanges ........................... 50
Neighborhood Traffic ...................................................................................... 51
  Additional $200 Fine Sign ............................................................................ 51
  Traffic Calming ............................................................................................. 52
  Watch For Children Sign .............................................................................. 53
Park and Ride Lots .......................................................................................... 55
Public Landings ............................................................................................... 56
Trail Blazers and "Public Boat Landings" ..................................................... 56
Red Light Running Cameras (Photo Enforcement) ........................................ 57
Residential Cut-Through Traffic ..................................................................... 58
Roadside Memorials ........................................................................................ 59
Roadway Lighting ............................................................................................ 60
Roundabouts .................................................................................................... 61
Signs ................................................................................................................. 62
  Flashing School  Zone Speed Limit Signs ................................................... 62
  Share the road sign ....................................................................................... 62
  Street name sign ............................................................................................ 63
  Supplemental Guide Signs ............................................................................ 63
Speed Limits .................................................................................................... 65
Through Truck Restriction .............................................................................. 66
Traffic Counts ................................................................................................. 67
Traffic Signal, Sign or Pavement Marking Requests ...................................... 68

# Land development .......................................................................................... 69

Access Management ......................................................................................... 69
Additions to the Secondary System of State Highways .................................. 70
Guide to Transportation Efficient Land Use Planning and Design ................. 71
Land Development/Site Plans .......................................................................... 72
Permits (Land Use) .......................................................................................... 73
Rural Additions ............................................................................................... 74
Secondary/ Subdivision Street Standards ....................................................... 76

# Miscellaneous ................................................................................................. 77

Abandonment of Secondary Roads ................................................................. 77
Bicycle and Pedestrian Accommodation ......................................................... 78
Devolution ....................................................................................................... 79
Discontinuance of a Secondary Road .............................................................. 80
Golf Carts and Utility Vehicles ...................................................................... 81
Highway Rail Grade Crossings ....................................................................... 83
Towns with Populations Under 3,500 ............................................................. 84
Virginia Byways .............................................................................................. 85

USCA4 Appeal: 17-2002    Doc: 88-1        Filed: 01/07/2019    Pg: 465 of 547

# PREFACE

This manual was developed as a quick reference guide to the more common activities associated with the Virginia Department of Transportation (VDOT).

The purpose of this manual is to provide new members of the County Board of Supervisors, or other public officials, with a better understanding of the Department.  The topics cover the activities most commonly performed by the residency and district offices, and may assist in answering questions generated from constituents.

In all cases, the information is a broad overview of policy or guidelines.  Each residency and district office has unique characteristics that may require that they perform some functions beyond what is stated in this manual. For more detailed information, always contact the local residency or district office of VDOT.   Also, VDOT's Customer Service Center is designed to provide the public with one number (1-800-367-7623) to remember for any transportation related question or request they might have.

We hope that this manual is a useful and productive tool in understanding and working with VDOT.

*This manual is prepared and periodically reviewed and revised by VDOT's Local Assistance Division in consultation with other VDOT staff and the Residency Administrator/Engineer Committee.*

Board of Supervisors Manual 2015

# MAINTENANCE

# Adopt a highway

The Virginia Department of Transportation's (VDOT) Adopt-a-Highway Program is one of several initiatives* in the Commonwealth that is focused on cleaning, enhancing, and preserving the state's environment.

There are currently over 560 volunteer groups totaling 17,028 participants around the state that have agreed to pick up litter on selected sections of highway four times each year for three years. The sections of highway average two miles each and have saved the taxpayers of Virginia an estimated $3 million dollars each year.  The program began in 1988 and is one of the largest programs in the country.   From January 1, 2013, to December 31, 2013, volunteers contributed over 30,400 hours of time and collected over 24,900 bags of trash from 1,118 miles of roads. VDOT acknowledges the efforts of families, civic groups, and businesses by erecting an Adopt-a-Highway sign imprinted with the name of the organization at the beginning of their adopted highway.

For additional information on the Adopt-a-Highway Program, see VDOT's website:
http://www.virginiadot.org/programs/prog-aah-default.asp

* Other programs supported by VDOT are Offender Community Service Landscape Program, Volunteer Roadside Management Program, and Offender Labor.

Board of Supervisors Manual 2015

# Dams

The Virginia Department of Transportation does not accept dams as part of the secondary system of state highways, nor does it accept the responsibilities and liabilities associated with any dam as the owner is always responsible for the dam and for performing periodic inspections of dams.  An agreement with the county is required as a prerequisite for the Department's acceptance of a street that crosses a dam or an extrinsic structure.

The need for an agreement must be considered on the merits of each case. However, all such agreements are to be submitted to the local designated VDOT contact who will coordinate final negotiation, review, approval, and execution before a related addition assembly is submitted.  Ideally, to avoid last minute problems, local VDOT officials notify the staff of the locality during preliminary plat reviews that such an agreement will be required before the related facilities are constructed.  Dam agreement forms may be obtained at the local VDOT office and requires two documents with original signatures (one for the locality and one for VDOT's Central Office).

For additional information on Dams and Dam agreements please refer to VDOT's Guide to Additions, Abandonments, and Discontinuances located at
http://www.virginiadot.org/business/resources/additionsabandonmentsanddiscontiniuances.pdf

In addition, VDOT will not typically approve the use of highway embankments as dams.  When there are extraordinary circumstances based on unique site and roadway conditions, however, requests for approval should be submitted to the VDOT State Hydraulics Engineer.  The State Maintenance Division Administrator should also be contacted on all such requests.

Board of Supervisors Manual 2015

# Drainage and drainage easements

Adequate drainage conveyances and facilities are integral components of a safe and structurally sound roadway infrastructure. Inadequate or improperly maintained drainage facilities are responsible for most pavement failures and soil erosion. A road may have its serviceability seriously curtailed, or may even be made impassable as a result of improper drainage maintenance, or inadequate facilities. One of the most important duties of maintenance personnel is the repair and maintenance of the highway drainage system and the importance of this activity cannot be over-emphasized.

The highway drainage system includes open channels (paved and unpaved), underdrains, gutters, inlet and outlet structures, catch basins, drop inlets, manholes, storm sewers, and stormwater management facilities.

Preventive Maintenance (PM) is any planned cyclical activity performed in advance of a critical need for repair, to reduce or arrest the rate of future deterioration. The activities may correct minor defects as a secondary benefit, but are not initiated based upon an observed deterioration. The goals of a PM program are to extend the useful life of VDOT's maintainable assets and to preserve their investment. Example of the types of PM activities for drainage items include:

- Clean soil, debris and vegetation from the underdrain outlet (yearly)
- Clean cross pipe inlet and outlet to allow proper flow (1-2 years)
- Application of herbicide to prevent vegetation growth on unpaved shoulders (yearly)

VDOT should maintain an easement to protect the roadway and its drainage system, when Department personnel deem it appropriate and necessary. Generally there are two types of easements. The first is recorded in the name of the Department and is usually obtained by Department personnel to resolve individual drainage problems, or as a part of highway improvement projects. The second is dedicated to the County for public use, as a part of subdivisions developed under County ordinances.

The Department's responsibility regarding the two different types of easements is as follows:

**Drainage Easements Acquired by the Department**
    The Department assumes full maintenance responsibility within the limits of the drainage easement.

**Drainage Easements Dedicated to a County as Part of a Subdivision Plat**
    The Department will maintain only that portion of the drainage easement, which falls within the right of way limits accepted by the Department when the street is added to the State-maintained system of highways. The Department will not maintain easements dedicated to a County as part of a subdivision plat. Work within the easement, but outside of the right of way will only be performed when obstructions, etc., create problems within the right of way.

USCA4 Appeal: 17-2002     Doc: 88-1     Filed: 01/07/2019     Pg: 469 of 547

# Maintenance Budget

Beginning in 2002, the Department adopted an asset management approach to planning, budgeting, and execution of maintenance and operations.  Under this approach, maintenance and operations budgets are developed and distributed based on the quantity and cost of work needed to preserve, maintain, and operate at a target condition or level of service for roadway assets VDOT is responsible for.  Data on asset inventory (counts and total quantities) are collected by contractors and VDOT staff either on an annual or on-going basis.  Statistical extrapolation is used to fill gaps where data has not been collected.

VDOT performs maintenance work on assets and provides services which it groups into five categories based on functional similarity:

| **Work Category** | **Example assets and services** |
| --- | --- |
| Roadway | Pavement, bridges, shoulders, tunnels |
| Traffic and Safety | Guardrail, signs, markings, signals, lighting |
| Emergency Response | ITS assets, snow and ice removal, incident response |
| Roadside | Vegetation, drainage, barriers |
| Facility, Equip, and Other Services | Rest areas, ferries, equipment, administration |

Maintenance activities can be described as:
- Ordinary Maintenance—work that preserves roadway assets, corrects minor defects or problems, and extends the life of the asset.
- Planned Preventive Maintenance—any planned activity performed in advance of a need or repair or in advance of accumulated deterioration. PM is planned, cyclical, not condition-based, and does not add structural capacity to the pavement structure.
- Repair/Corrective Maintenance—work that is required to return a damaged or deteriorated asset to design functionality and capability.
- Restore/Replace Activities—the replacement or complete restoration of assets that cannot be repaired.
- Major Rehabilitation—applies to bridges and pavement only.  This work includes full depth reconstruction where the entire pavement asset is removed and replaced.  The work may also include restoring structural integrity or correcting major safety defects for bridges and pavements.

VDOT uses inventory and condition data, as well as unit cost of maintenance, replacement, and operations activities and performance targets to determine the quantity and cost of activities needed to reach and maintain the network of assets at a targeted level of condition or level of service.  The Statewide maintenance and operations allocation is then distributed to the nine construction districts using district level information from the needs assessment.  District allocations are distributed at the program level.  Districts then distribute funds from their allocation to their residencies, area headquarters, and district offices.  Once each organizational unit in the maintenance and operations program receives their budget, they develop more detailed plans for where the money will be spent over the course of the fiscal year.  The detailed budgets are then uploaded to the financial management system where they are managed against expenditures.

Board of Supervisors Manual 2015

# Mowing

Mowing practices are shown in of VDOT's Maintenance Best Practices Manual.  These practices provide the minimum requirements for all mowing operations on roadsides.  Practices include those mowing activities that are initiated based on the following primary business needs.

1. Ensuring all related highway safety requirements are met, including but not limited to clear zone, sight distance and guardrail deflection angle requirements, and proper and adequate drainage.

2. Protecting the traveled roadway and to enable the visual inspection of and access to roadside assets and other highway infrastructure including but not limited to ditches, culverts, stormwater basins, pipes and under drains so that other maintenance needs can be identified and planned for.

3. Ensuring efficient management of woody vegetation within the right of way.

Any permissible modifications in the application of these practices must be approved by the District Administrator with documented justification. Copies of this approval are to be sent to the State Maintenance Engineer prior to implementing such changes.

## Volunteer Roadside Management Program

This program provides entities such as a local government, private business, community, individual, or civic organization an opportunity to improve the appearance of the right of way by participating in the sponsorship of maintaining existing turf and ornamental plants.  Participation in this program can be coordinated through the Residency office and will be formalized with a Land use Permit.

## Community Service Landscape Program

This program, established in accordance with Code of Virginia 33.2.231, allows persons convicted of nonviolent misdemeanors who have received a suspended sentence or probation to fulfill their community service requirements by mowing rights-of-way and performing other landscaping maintenance tasks for roads and highways that the Department has the responsibility to maintain. This program is only available in locations where the Local Probation Agency has entered into an agreement with VDOT.

Board of Supervisors Manual 2015

# Offender Labor

VDOT utilizes Offender labor for maintenance activities along roadways in select areas statewide. Supervised Offenders are authorized to perform such work based on a joint Memorandum of Agreement between VDOT and the Virginia Department of Corrections (DOC).  VDOT employs DOC's Offenders on manual, labor-intensive, unskilled activities such as litter pick-up, brush cutting, tree pruning, hand mowing, and culvert cleaning in <u>rural</u> areas.  Because of security and safety issues, DOC Offender labor is not allowed in urban areas such as Richmond, Northern Virginia, Williamsburg, Virginia Beach, etc.  Inmates must also be in a "trustee" status, that is, not convicted of a serious crime.  .  VDOT has been partnering with DOC in using Offender labor to reduce VDOT costs and help maintain roads for over 100 years.

VDOT's Maintenance Best Practices Manual contains work areas in which Offenders cannot and can be used.  These restrictions are listed below.

### Prohibited Work Areas for Offender Crews
A. Within the political boundaries of any city or town unless specifically exempted per DOC Regulations and in accordance with DOC Operation Procedures Nos. 462 and 463.
B. Within any outlying part of a city or town, to include any smaller adjacent community, residential neighborhoods or subdivisions, and shopping centers on the outskirts of a city or town.
C. In rural areas, Offender labor shall not be used in the following locations:
1. Interstate highway rest areas, unless closed to the public
2. Within 50 yards of businesses or homes at interchanges
3. Within villages and subdivisions along highways and roads
4. Within 50 yards of businesses at intersections and along highways and roads.
5. Within 200 yards of a school that is in session.
6. VDOT facilities except as specifically authorized by the Department of Corrections.

### Approved Work Areas for Offender Crews
A. Rural portions of Interstate highways, including access ramps, except rest areas open to the public, and within 50 yards of commercial facilities (such as, gas stations, motels, stores) and/or homes at interchanges.
B. Along rural portions of primary and secondary highways and roads except in villages, subdivisions or within 50 yards of any built-up area(s) (for example, crossroads or intersections with gas stations, convenience stores, homes).
C. Any other state-maintained road that meets the requirements of items A and B above and does not otherwise violate the provision of the section on prohibited work areas and does not jeopardize public safety.
D. Within rural areas of the cities of Chesapeake and Suffolk, and other approved towns and cities, subject to the same restrictions as in item B & C above.

Board of Supervisors Manual 2015

# Private Streets

Private streets are those where the use is permissive or privileged by right of ownership/membership.  For the purposes of this manual, "private streets" refers to streets that are not maintained by VDOT, whether or not such streets are actually "private."

VDOT's involvement in the review of private street subdivision plans is limited to their impact on the existing public roadway network in terms of traffic generation, access, and drainage. However, VDOT may review private street subdivision street plans in detail if requested by the local government, which agrees to reimburse VDOT costs on an accounts receivable basis provided the VDOT District agrees to provide those services.

Localities can establish in their subdivision ordinance construction standards for private subdivision streets and require that a street maintenance agreement be established.  However, if lot owners on a private subdivision street do not maintain the street over time, it can fall into a state of disrepair, becoming an emergency services response issue.

Section 15.2-2242 of the Code allows localities to require that the related plat and deeds contain a statement advising the lot purchaser that the streets in the subdivision do not meet state standards and will not be maintained by VDOT or the locality.  Furthermore, § 33.2-336 requires locality subdivision ordinances that allow streets below state standards to include a statement that such streets shall not be accepted into the state system unless improved to current VDOT standards and the improvement costs cannot be funded with money allocated by the Commonwealth Transportation Board.

Private street connections to state maintained roadways must meet all VDOT criteria for subdivision street connections, such as sight distance, pavement structure, auxiliary lanes, signalization, and permits. The Road Design Manual, Appendix F contains geometric design criteria for the construction of private street connections (entrances) to a public road.  Private street connections made to existing VDOT maintained roadways without first obtaining a Land Use Permit for the connection are illegal, may create safety issues and may be removed.

Streets are eligible to be accepted into the state's system if they are built to VDOT standards, the required right of way is dedicated to public use, and the street meets all applicable requirements and regulations governing VDOT acceptance.

Some older residential streets may be eligible as a rural addition if they are either brought up to standards by others or the street is otherwise eligible for addition and improvement under the rural addition program as mentioned in the section on additions.

A VDOT Commissioner's Directive titled "Road Signs and Speed Limits on Private Roads" provides for the certification of road signs and speed limits on certain private roads as provided for in §46.2-1307 and §46.2-1307.1 in the Code of Virginia, for law enforcement purposes.

Board of Supervisors Manual 2015

# Snow Removal

The Department will provide snow and ice control services at a level of service consistent with local jurisdictional needs including, but not limited to, emergency access, customer input, commuter and educational systems, economic movement of goods, average daily traffic, industrial access, and other traffic data.

Highway needs for snow and ice control overlap highway systems and, as a result, are separated and identified by functional classifications of the highway rather than by roadway systems.  Highways and roads are classified into categories of priority routes to ensure the optimal and safe movement of goods and traffic along Virginia's highways during snow and icy conditions.

For example, priority 1 highways include all interstate routes, most primary routes, and a few very high-service secondary routes.  These routes should be kept free of ice and snow so that traffic can proceed in safety without severe delays, except during periods of heavy falling or drifting snow and ice storms.  Generally, this is accomplished within 24 hours after the storm ends.

All routes receive progressive and continuous effort to meet the snow removal goals.  Routes not designated as priority 1 highways will receive attention as soon as practical and will have appropriate chemical treatment and plowing generally no later than 48 hours after the end of the storm.  Dependent upon the forecast, VDOT may apply chemical deicing abrasive to bridges and select routes at the beginning of a storm or possibly prior to the onset of precipitation.   On residential streets, sanding is performed as needed and plowing is performed when feasible.

Each year the local residency revises snow removal plans for the coming snow season based on local needs and available resources.  Contractor supplied hired equipment is used to complement state forces.

VDOT does not remove snow from private or commercial roads or entrances.  Upon written request VDOT will assist the cleaning of entrances for fire departments, emergency squads, and other emergency providers as operations allow.

VDOT provides snow removal service in most incorporated towns of less than 3,500 populations, and on primary roads in some towns with populations over 3,500 depending on which section of the *Code of Virginia* by which the town is operating.

VDOT does not remove snow or ice on sidewalks.

VDOT does not remove snow off railroad grade crossings.  The railroad has the responsibility to remove snow from the grade crossings.  If the railroad company does not remove the snow then the Residency Administrator will contact the railroad company official regarding removal.

Visit the VDOT web site at http://www.virginiadot.org/travel/eoc-main.asp

Board of Supervisors Manual 2015

# CONSTRUCTION

## County Standards

For streets that are intended to become part of the state highway systems or for improvements to existing state highways, counties may develop their own design standards and construction specifications, which meet or exceed VDOT and AASHTO. However, they must be reviewed and approved by VDOT for projects off the National Highway System, and also by FHWA for projects on the National Highway System. Local governments are expected to notify the VDOT Project Coordinator or other local designated VDOT liaison whenever alternative designs and specifications are being utilized.

If a county proposes use of a recognized acceptable concept or material not previously approved for VDOT use, a request shall be submitted to the local designated VDOT liaison for review. The local designated VDOT manager, through consultation with appropriate divisions, will determine if the request will be approved for a VDOT maintained street. If it is determined that the non-standard item may be installed within the dedicated right of way and should be maintained by others, a permit will be required.

Board of Supervisors Manual 2015

# Donated Right of Way

For purposes of this section, Right of Way includes fee acquisitions, and easements, both permanent and temporary.

Donated right of way is a means of quickly obtaining right of way for constructing those roads listed on the approved Secondary Six-Year Plan. These roads usually do not have any major environmental, historical, or citizen opposition associated with them. If all property owners on the road agree with the proposed construction, and right of way can be negotiated through donation, the time and cost of preliminary engineering can be reduced.

Roads on which donated right of way is obtained can be constructed at a much lower cost. The costs associated with design, title search, appraisal, soils investigation, attorneys' fees and right of way agents are virtually eliminated. However, it is recommended that sufficient title research be performed to ensure that the Commonwealth obtains clear and indefeasible title. The Regional Right of Way and Utilities Manager should be consulted for advice and guidance.

When a road is included in the Secondary Six-Year Plan and comes within approximately two years of construction, typically, the residency sends letters to all property owners adjacent to the road advising them that we are beginning our right of way process. VDOT personnel will then contact affected property owners, explain the work necessary to improve the road, and negotiate for donated right of way.

Although it is called donated right of way, the property owner does have the right to receive just compensation for their property or any property interest to be donated… Items such as fences, shrubs or trees can be replaced or owners may be paid for the loss.

The Code of Federal Regulations (CFR 24.108) require that the landowner be informed of their right to compensation, and their right to have a determination of the value of the donated property provided to them. If, after being fully informed, they decide to waive the right to compensation and/or to receive a determination of the value of the donated property, VDOT requires that a "Donation of Land Acknowledgement" be signed by the owner(s). This document must be recorded with the deed of conveyance.

There are several standard deeds that may be used depending on the requirements of the roadway and the property. These deeds are signed by all property owners before a notary public and are recorded in the Circuit Court Clerk's Office of the affected county.

By using donated right of way procedures, roads may be constructed more quickly and at a cost significantly less than by using the full design and right of way purchase processes.

Board of Supervisors members can assist in the acquisition of donated rights of way by informing the interested parties of this process and encouraging their cooperation with VDOT representatives.

The administrating agency is responsible for the appropriate environmental review processes.

Board of Supervisors Manual 2015

# Locally Administered Projects

Various sections of the *Code of Virginia* provide localities the opportunity to administer transportation projects financed by the Virginia Department of Transportation (VDOT) and to supplement the funding of projects within their jurisdictions.

§33.2-209 allows the Commissioner of Highways to enter into agreements with localities, authorities, and other organizations in order to improve and maintain Virginia's transportation system.
§33.2-357 allows localities to administer Revenue Sharing projects.
§33.2-338 allows counties to administer primary highway and secondary highway projects.

A project administration agreement is required between the locality and VDOT for any locally administered project. This agreement spells out the terms for a locality to administer a specific project and must be finalized before the locality starts work on the project. For projects utilizing federal funding, federal authorization is required before starting each phase of the project (preliminary engineering, right of way, or construction). Any expenditure made prior to Federal Highway Administration approval of a project phase will not be reimbursed.

The Locally Administered Project process is initiated by the locality by completing and submitting a Request to Administer Construction Project Form to the Residency Administrator or other designated local VDOT liaison.

When a locality decides to take advantage of this opportunity it must adhere to applicable Commonwealth Transportation Board (CTB) policies and procedures as well as federal regulations, if using federal funding. Assistance regarding this process can be found on the VDOT web site at http://www.virginiadot.org/business/local-assistance-locally%20administered.asp. A reference guide titled "Locally Administered Projects Manual" is also available on this web site.

Board of Supervisors Manual 2015

# Locally Funded – VDOT administered projects

§33.2-338 of the Code of Virginia allows the Department to agree to administer projects funded by counties

Generally, VDOT expects that local governments administer construction projects developed outside VDOT's six-year plan.  However, the *Code of Virginia* also provides for VDOT administration of projects funded entirely from local revenue sources. This most often occurs when local governments sell bonds for transportation improvement projects, but revenue can be provided with any local revenue source.  When a locality wishes to take advantage of this opportunity, it should first coordinate with the Residency Administrator or other designated local VDOT liaison who will, in turn, coordinate with the VDOT District staff to ensure adequate VDOT workload capacity exists to meet the locality's performance expectations.  When agreeing to administer a locally funded project, VDOT will require that the project be entered into the appropriate six-year plan and that the project be administered in accordance with VDOT policies and procedures.  Project funding is generally required in advance.  Once both parties agree that VDOT will administer the project, an agreement outlining administration and funding responsibilities is prepared.

No. 17-2002, viewed 12/18/2018

Board of Supervisors Manual 2015

# Noise Abatement

In 1989, VDOT formally established a policy to lessen the impact of highway traffic noise on people in neighborhoods and in other noise-sensitive areas, such as churches, schools, hospitals and certain public recreational areas.  The State Noise Abatement Policy was updated in 1997 and was based on Federal Highway Administration (FHWA) regulations.

In response to new technology and the industry practices, FHWA proposed changes to federal noise abatement policy and regulation.  The final rule was published on July 13, 2010 with an effective date of July 13, 2011.  It required each State DOT to revise its noise policy to be in accordance with this final rule.  The FHWA reviewed VDOT's revised noise policy for conformance to the final rule and to assure uniformity and consistency nationwide.  The new policy sets out statements on general applicability (FHWA resources, General Assembly mandate, and administration of the policy) as well as creates a companion document to cover details in a comprehensive manner.  The companion document is titled "Highway Traffic Noise Impact Analysis Guidance Manual" which was amended July 14, 2014.  The VDOT noise policy and guidance manual can be located at: http://www.virginiadot.org/projects/pr-noise-walls-about.asp.

A noise wall is a specially designed structure built to reduce noise levels created by nearby highway traffic. It is built only after noise impact studies are conducted and certain conditions are met.  VDOT conducts studies and looks into options for reducing noise levels along proposed federally funded highway improvement projects. Projects must meet one of the following conditions to be considered for noise abatement:

    (1) The construction of a highway on new location; or,
    (2) The physical alteration of an existing highway where there is either:
        (i) Substantial Horizontal Alteration. A project that halves the distance between the traffic noise source and the closest receptor between the existing condition to the future build condition; or,
        (ii) Substantial Vertical Alteration. A project that removes shielding therefore exposing the line-of-sight between the receptor and the traffic noise source. This is done by either altering the vertical alignment of the highway or by altering the topography between the highway traffic noise source and the receptor; or,
(3) The addition of a through-traffic lane(s). This includes the addition of a through-traffic lane that functions as a HOV lane, High-Occupancy Toll (HOT) lane, bus lane, or truck climbing lane; or,
(4) The addition of an auxiliary lane, except for when the auxiliary lane is a turn lane; or,
(5) The addition or relocation of interchange lanes or ramps added to a quadrant to complete an existing partial interchange; or,
(6) Restriping existing pavement for the purpose of adding a through-traffic lane or an auxiliary lane; or,
(7) The addition of a new or substantial alteration of a weigh station, rest stop, ride-share lot or toll plaza.

Board of Supervisors Manual 2015

## *Noise Abatement, continued*

Noise Abatement Specialists use computer models to analyze and predict noise levels based on the loudest hour of the day for future conditions. They also measure existing noise levels in various locations along the proposed highway project when there is no existing roadway to use for the computer models. Along with the road's design, they must consider the area's topography, the distance between the road and nearby properties, traffic speeds and the noise generated by different types of vehicles. The computer model uses that data to predict the future noise level, which is compared with Federal Highway Administration (FHWA) and VDOT noise abatement criteria. If this comparison identifies an impact, VDOT noise abatement specialists must investigate noise reduction options.

Several options are available. First, VDOT noise abatement specialists recommend to the roadway engineers to shift the road away from the affected properties, or reduce the speed limit or, restrict heavy truck traffic on the road, or design the road so its surface is lower through the affected area, creating a natural sound barrier. Another option is the use of earthen berms to mitigate the noise where space constraints allow the use of a berm. If designing the road differently will not reduce noise, VDOT engineers then consider noise barriers. The noise barriers can reduce traffic noise significantly and improve quality of life for people living behind them. However, noise barriers must meet the following conditions to be feasible and/or reasonable:

To be feasible a noise barrier:

> (1) must reduce noise levels by at least a 5 decibels fifty percent (50%) or more of the impacted receptors experience 5 dB(A) or more of insertion loss to be feasible; and;
> (2) it must be possible to design and construct the noise abatement measure in the proposed location. The factors related to the design and construction include: safety, barrier height, topography, drainage, utilities, and maintenance of the abatement measure, maintenance access to adjacent properties, and general access to adjacent properties (i.e. arterial widening projects)

All of the reasonableness factors listed below must collectively be achieved in order for a noise abatement measure to be deemed reasonable:

> (1) the viewpoints of the affected citizens shall be obtained through surveys. Fifty percent (50%) or more of the respondents shall be required to favor the noise abatement measure in determining reasonableness, and
> (2) the noise barrier must be 1,600 square feet or less per benefited receptor to be considered cost-effective, and
> (3) the noise barrier shall reduce noise levels by 7 decibels for at least one (1) noise impacted property.

Board of Supervisors Manual 2015

# Paving a Road

When the secondary system of highways was established in 1932, VDOT accepted nearly 34,000 miles of unpaved roads.  Today, nearly 9,000 miles of state maintained unpaved roads still exist and are an important part of each county's Secondary Six-Year Plan in addressing the unpaved road needs.

The process of revising the Secondary Six-Year Plan includes an advertised public hearing to provide all citizens an opportunity to ask that their road be included in the plan.  If all these requirements are met, a road will be improved and paved when funding reserved in the plan becomes available for spending.

## Design Options available for paving unpaved roads.

The General Assembly has provided additional options in paving unpaved roads in recent years. This has provided increased flexibility and allowed more unpaved roads to be paved than previously possible. The options currently available include the Rural Rustic Road approach, the Pave-In Place approach and the traditional reconstruction approach when greater improvements and additional right of way are necessary.

### Rural Rustic Road Program

In 2003, the "Rural Rustic Road" Program was implemented allowing a flexible approach to paving many unpaved roads. For a road to qualify for rural rustic road treatment, several criteria must be met:

1.   The county's Board of Supervisors must pass a resolution declaring the road to be a "Rural Rustic Road";

2.   The Board of Supervisors indicates that expected growth and traffic increase along the road in the near future is minimal;

3.   The curves along the road should be generally adequate for the traffic and any increase in speeds expected after the improvement;

4.   Roadway drainage must currently be sufficient or require only minor improvements;

5.   The daily traffic volume must not exceed 1500 vehicles.

Board of Supervisors Manual 2015

## *Paving a Road, continued*

Roads that are good candidates are paved with minimum disruption beyond the ditches and usually result in a significant cost savings. For roads with traffic volumes greater than 400 vehicles per day, 18 foot pavement width is desirable and some typical section improvements may be necessary. The Residency Administrator or other designated local VDOT manager will determine whether this approach is suitable for a requested unpaved road. The Rural Rustic Road approach should
be considered first when paving a road but it should be recognized that not all roads are good candidates for this concept.

Additional information is available on VDOT's website at
http://www.virginiadot.org/business/local-assistance-programs.asp#Rural Rustic

### Pave-In-Place Program

If the rural rustic road approach is not a good option for a road, the pave-in-place approach might be considered if:

1.    The traffic is under 750 vehicles per day;

2.    Only minor improvements are needed to accommodate traffic; and

3.    Needed improvements can be made within the available, existing right of way. Easements might be necessary for spot improvements.

Under the pave-in-place option, the road is improved to a minimum standard of 18 feet of pavement with 2-foot shoulders.

### Traditional Reconstruction with Additional Right of Way

If significant improvements are needed or if significant development is proposed along the road, a more traditional approach is used to reconstruct the unpaved road and improve the alignment. A minimum 40-foot right of way is usually required for these projects with additional right of way or easements acquired based on the proposed improvement.

The residents along the road are usually asked to donate any additional right of way needed. If that is done, the funds otherwise required to buy right of way can be used for construction. If additional right of way is needed and will be donated, the donated right of way should be acquired before the project is added to the Secondary Six-Year Plan.

## Funding Options for Paving Unpaved Roads

There are designated funds allocated specifically for unpaved roads as noted below. In addition, Counties may use regular secondary construction funds and supplement these funds with other state or local funds to hard-surface their existing unpaved roads and the funding source will dictate whether restrictions apply.  The Secondary Six Year Plan information on page 24 describes the allocation process and any unpaved road funds designated under § 33.2.358 B or § 33.2-359.1 are added to the county's six year plan for distribution.

Board of Supervisors Manual 2015

## *Paving a Road, continued*

- **CTB Formula – Unpaved Road Funds –** § 33.2-358.
  This statute provides for funding unpaved roads carrying more than 50 vehicles per day. These funds cannot be used for any purpose other than hard-surfacing existing unpaved roads. Up to 5% of the funds set aside under this statute are available for unpaved roads distributed based on the pro rata share of unpaved roads meeting this criteria. Allocations under this statute will cease beginning July 1, 2020 unless otherwise extended.
    - **High Volume Unpaved Road Program**
      These funds are a subset of any funding available under § 33.2-358. To provide some additional funding for the higher volume roads, 10% of the unpaved road funding available under this Code Section will be available for high volume unpaved roads (over 500 vpd). The CTB approved this new program effective July 1, 2014 and an application process has been be initiated to allow Counties to apply for this supplemental funding for qualifying unpaved road projects.

- **Unpaved Road Secondary Funds – §** 33.2-359.
  This statute provides that before funds are allocated for distribution for highway construction to the primary, secondary and urban highway systems, 5.67% of the available balance will be set aside for the hard-surfacing of unpaved roads which carry 50 vehicles or more per day. Funds allocated to the county under this statute can be added to the county's regular secondary system construction funds and used for other projects but a mileage adjustment of one mile will be made for each $250,000 diverted and not used for unpaved roads. Funds are not allocated to Unpaved Road Secondary Funds if there are insufficient funds for distribution through the Systems Construction formula.

- **Revenue Sharing**
  Counties also have the option of applying for Revenue Sharing funds to address the hard-surfacing of unpaved roads in the secondary system pursuant to § 33.2-357. There are no minimum traffic volume requirements and the normal Revenue Sharing Program guidelines apply. Additional information about application deadlines, eligibility requirements and the transfer process are in the Revenue Sharing Program Guidelines available at the following link: http://www.virginiadot.org/business/local-assistance.asp.

- **Supplemental Funding – 3rd Party Funding/Accounts Receivable**
  Additional funding may be provided by localities to supplement programmed allocations on eligible secondary unpaved road projects. A standard Project Administration Agreement (PAA) for Locally Funded/VDOT Administered projects identifying 3rd Party funds and outlining payment schedules is required. Guidance for developing the PAA is provided by the Local Assistance Division and documented in the Locally Administered Projects Manual in Chapter 10 and is available at:
  http://www.virginiadot.org/business/locally_administered_projects_manual.asp.

Board of Supervisors Manual 2015

# Primary, Urban, and Interstate Allocation Process

Each year the Commonwealth Transportation Board updates the Six-Year Improvement Program that distributes funds available for construction on the interstate, primary, and urban highway systems, as well as funds available for the secondary system and the other transportation modes; ports, airports, and rail and public transportation. The allocation of state construction funds is distributed per the Code of Virginia, §33.2-358, generally.

The allocation distribution process requires funding to be made available first for the maintenance of highway systems including maintenance payments to localities maintaining their highway system. After maintenance, funds are set aside for administrative, general expenses and other provisions are addressed, including an amount not to exceed $500M in any given year to six categories which includes 5% to pave unpaved roads carrying more than 200 VPD that will cease July 1, 2020; and including up to ten percent of the remaining funds for financing rail projects that mitigate highway congestion. Funds are next allocated to the interstate system exclusive of federal funds and unpaved road funds and then distributed to the primary, secondary and urban systems based on a funding formula as designated in §33.2-358. Forty percent is allocated to the primary system, and thirty percent each is made available to the secondary and urban systems. Each distribution is exclusive of federal-aid matching funds. The Department has not had sufficient funds for distribution through the systems construction formula for the primary, secondary or urban systems since FY09. Funds are distributed through the alternate construction formula which sunsets in FY20."

To seek the maximum input from the Commonwealth's citizens, planning and programming meetings are typically held during the fall in each of the state's nine construction districts. Advice and input are solicited from members of the General Assembly, County Boards of Supervisors, City and Town Council Members, Planning Districts, Metropolitan Planning Organizations, other public officials, and the general public.

Based on input received from the fall meetings, VDOT staff prepares a working draft of the Six-Year Improvement Program complying with the policy goals of the Commonwealth Transportation Board that include paying off deficits on completed projects and not creating new deficits, fully funding construction projects by the time they are complete, bringing phased projects or programs to a reasonable stage of completion, and requiring that new projects added to the program be eligible for federal funds.

The working draft of the Six-Year Improvement Program is released in the early spring and then final public hearings are held. After the public hearings, the Commonwealth Transportation Board will adopt the final Six-Year Improvement Program for the next fiscal year. The Six-Year Improvement Program also contains projects funded under the current Federal Transportation legislation as well as the specially funded projects designated by the U. S. Route 58 Corridor Development Program, Highway and Rail Safety Improvement Programs and others.

USCA4 Appeal: 17-2002    Doc: 88-1    Filed: 01/07/2019    Pg: 484 of 547

# Project Development Timeline

The following outlines major phases of the road building process.  Many of the tasks included within each phase occur concurrently.  Each project's unique circumstances, requirements, risks, and complexities tailor the project development process to the individual project.  VDOT projects are reflected in Virginia's Six-Year Improvement Program, which is updated annually.  Public comment is solicited and welcome at many points throughout the process. It is best to become involved as early as possible in the transportation decision-making process.

**1.** The **Planning Phase** may last from 1-24 months.
a)  Often acting upon requests for road improvements from local governments, VDOT planners work with federal and other state agencies, local governments, regional planning organizations, and residents to develop short- and long-range plans for improving the highway system.  How long the planning and programming process takes depends on factors relating to the significance of a recommended transportation improvement.  Factors include the functional role of a roadway proposal (with respect to regional travel, mobility and/or access), costs and availability of revenues, environmental and/or economic impact, and the support of the affected agencies, regional planning organizations, jurisdictions and the public. Participating regional planning organizations include urbanized area Metropolitan Planning Organizations and Planning District Commissions, as well as Virginia's non-urbanized area Planning District Commissions.
b)  Virginia's statewide long range transportation plan (VTrans) contains Virginia's strategic highway and transit goals, and top corridors of statewide significance.
c)  VDOT and DRPT develop a long range Virginia Surface Transportation Plan (VSTP) that identifies recommendations based on state transportation need-based assessments and the plans of metropolitan areas' Constrained Long Range Plans and non-metropolitan areas' Rural Regional Long Range Plans.  The recommendations are prioritized and provided to the Commonwealth Transportation Board (CTB) citizen panel appointed by the Governor for consideration during the annual updates to Virginia's six year improvement program.  The CTB also considers projects based on technical information and the input received from government agencies, regional planning organizations, local governments and the public.

**2.** The **Scoping Phase** may last between 1-8 months depending on project complexity and includes:  confirming the project purpose and need, initiating the environmental review process (ERP) which identifies if the State Environmental Review Process is required, determining the level of environmental document (if required) and the need for water quality permits, identifying stakeholders, establishing the project team, holding the initial scoping team meeting, performing the survey, developing the initial design, considering context sensitive solutions, and evaluating public involvement strategies. The initial step is to refine project goals and objectives, determine the location and/or the typical section of a roadway. This is based on anticipated traffic volume, the roadway's functional classification (arterial, collector, local), and terrain (level, mountainous, rolling).

**3. Preliminary Design Phase** may range from 1-18 months and includes:  design of roadway, structures and bridges, traffic control devices/intelligent transportation systems, and landscaping; determining right of way and utility impacts, performing constructability and work zone reviews,

Board of Supervisors Manual 2015

## *Project Development Timeline, continued*

completing the environmental document for NEPA, holding the public hearing team meeting and public hearing, and obtaining design approval.

a) A preliminary design is prepared and reviewed by all stakeholders in the project, such as affected property owners and local governments.
b) Sometimes offering two or more possible proposals, VDOT conducts information meetings and/or public hearings to involve citizens before making a final decision on the location of the roadway and details such as right-of-way width, type of intersections and interchanges, and materials needed.  Information meetings and public hearings are advertised in the newspaper and other media, and citizens have 10 days to offer comments or documents about the proposed location and/or design after the information meeting or public hearing.
c) The CTB must approve the location and major design features before final design and right of way acquisition can begin.

**4.** The **Detailed Design Phase** may last between 1-12 months and includes:  design of roadway, structures and bridges, traffic control devices/intelligent transportation systems, and landscaping; determining right of way and utility impacts, developing erosion and sedimentation/hydraulic plans, performing utility design, holding the utility field inspection, authorizing right of way (total takes), performing constructability and work zone reviews, and holding the field inspection team meeting.

**5.** The **Final Design and Right of Way Acquisition Phase** may range from 1-24 months and includes:  finalizing the design of roadways, structures and bridges, traffic control devices/intelligent transportation systems, and landscaping; finalizing right of way and utility impacts, erosion and sedimentation plans, and utility design; obtaining environmental permits, holding the utility field inspection, authorizing right of way and utilities (partial takes), performing constructability, work zone, maintenance of traffic/transportation management plan reviews, and holding the pre-advertisement conference team meeting.

**6.** The **Advertisement Phase** may last from 1-5 months and includes:  finalizing plans, specifications, and estimates, completing the bidability review, securing environmental and right of way certifications, verifying funding, and obtaining environmental permits.

**7.** The **Construction Phase** may range from 1 to over 36 months.
a) Based upon an engineering estimate of what will be required to build a road, VDOT invites contractors to bid on a project, and the Commonwealth awards a contract to the lowest qualified bidder, stipulating cost and length of time for completion.
b) Overseeing every step of the work, VDOT inspects for quality, conformity to project requirements, and environmental protection.
c) VDOT inspectors manage traffic flow through the project, keeping affected property owners informed and ensuring that work zone safety guidelines are met.
d) Once a project is completed, a road is opened only after a satisfactory inspection.  Completion delays can occur due to inclement weather, late delivery of materials, and unforeseen discoveries such as underground utilities or unstable soil.

Board of Supervisors Manual 2015

# Secondary Construction Budget

VDOT's construction is a pay-as-you-go program. Authorization to initiate different phases of a project is based on a spending plan that demonstrates funding will be available to cover expenses for that phase. 100% of the construction costs must be fully funded within 12 months of construction completion. When the Secondary Six-Year Plan is produced, the Department is dealing with approximations and projections in funding. The Board of Supervisors typically approves the Secondary Six-Year Plan and Construction Priority List in the first quarter of each calendar year based on those funding projections. The Department uses the approved priority list to apply the funds in the Secondary Construction Budget for the upcoming fiscal year.

Occasionally, project costs exceed the funds programmed in previous budgets for that project. This creates deficits that must be addressed. Generally the first priority in the Secondary Six-Year Plan and Secondary Construction Budget is to finance deficits. Allocations are then made available for county wide or incidental improvements such as traffic and safety services and rural additions. Allocations may be made for the unpaved roads, major reconstruction and bridge replacement projects based on priorities.

Normally construction projects in the first year of the Secondary Six-Year Plan are financed in the Secondary Construction Budget. After holding a public hearing on the proposed projects and considering citizen comments, the Board of Supervisors, with the concurrence of the Residency Administrator or other designated local VDOT manager, must adopt an official construction budget priority list for the first fiscal year, usually along with the resolution approving the updated Secondary Six-Year Plan. If the construction budget was not approved along with the Secondary Six Year Plan it must be adopted in a separate public hearing and along with a resolution approving budget priority list prior to June 30th each year. However it is recommended to have it approved in the March/April time frame.

The secondary construction budget is included in VDOT's Annual Fiscal Year Budget which is usually approved by the Commonwealth Transportation Board in late June each year. Until the secondary construction budget is approved by the Board of Supervisor's and the Department's budget is approved by the CTB, the allocations are not posted as indicated in the approved Secondary Six-Year Program and/or the final Secondary Construction Budget.

The allocations included in the budget are part of the approved Secondary Six-Year Plan and the Department's Six-Year Improvement Program. The allocations are not posted in the Department's Financial System until the Board of Supervisors has approved the secondary construction budget. This may delay the authorization for a project to begin PE, RW or CN activities.

# Secondary Six-Year Plan

Although the Department of Transportation has authority for the construction and maintenance of the secondary road system, Virginia laws create a partnership between the Department and the County Board of Supervisors in improving local transportation. The Board of Supervisors has the responsibility for establishing priorities for the Secondary Six-Year Plan. Typically in the fall of each year, workshops are held with the Board of Supervisors to develop a list of project priorities for the updated Secondary Six Year Plan. Once a draft is established, the county and VDOT will schedule the annual Secondary Six-Year Plan public hearing usually in the first quarter of the calendar year. These hearings gather information from the public to consider projects in the county to be added in the Secondary Six-Year Plan.

Highway funding for the Secondary Six Year Plan is derived from state and federal gasoline taxes, vehicle title fees, vehicle sales tax and one-half percent of state's sales tax and distributed to the primary, urban and secondary systems after addressing maintenance, administrative costs and other priorities established in the Code of Virginia. Funds are allocated to the interstate system exclusive of federal funds and then distributed to the primary, secondary and urban systems based on a funding formula as codified in §33.2-358.  Forty percent of the amount available for systems construction is allocated to the primary system, and thirty percent each is made available to the secondary and urban systems.  Each distribution is exclusive of federal-aid matching funds.

Distribution of the available secondary construction funds is based on §33.2-364, of the *Code of Virginia* which establishes a 20% area and 80% population factor. The area of each county is derived by Geographic Information Systems Mapping and population figures are obtained from the Weldon Cooper Center.  The distribution formula results in less-populated areas receiving less funding than urbanized areas.

There are two designated unpaved road funds specified in the Code of Virginia.  Distribution of Unpaved Secondary Roads Funds for unpaved roads carrying more than 50 VPD is based on the ratio of unpaved secondary roads in the county serving fifty or more vehicles per day to the total number of such roads in the Commonwealth as indicated in §33.2-359, of the *Code of Virginia*. The Unpaved Secondary Roads Fund was created by the General Assembly to address the need for paving secondary unpaved roads.

The Department has not had sufficient funds for distribution through the systems construction formula for the primary, secondary or urban systems or the unpaved road fund for roads with traffic volumes over fifty vpd since FY09.  Funds are distributed through the alternate construction formula which sunsets in FY20.

Distribution of CTB Formula Unpaved Roads Funds carrying more than 50 VPD is based on the ratio of unpaved secondary roads in the county serving 50 or more vehicles per day to the total number of such roads in the Commonwealth as indicated in subsection B of  § 33.2-358 , of the *Code of Virginia*.  These funds will cease on July 1, 2020 per this section of the *Code of Virginia*.

## *Secondary Six Year Plan, continued*

Distribution of available revenue for Telecommunications Fees (Public Right of Ways Use Fee) based on Section 56-468.1, of the Code of Virginia, and the revenues from the sale of Residue Parcels on the secondary system in the county are included in the annual Secondary Six-Year Plan revenue projections each year.

The predictability of funding amounts is greatly dictated by the financial climate of the times and changes of funding levels by the federal government. Therefore, in dealing with construction funds, especially in the Secondary Six-Year Plan, the Department is dealing with approximations or projections. The Secondary Six-Year Plan is based on estimated funding which is provided by the Financial Planning Division.

Updating the Secondary Six-Year Plans on an annual basis allows the department to provide an update on schedules and estimates of current projects in the plan. The process gives citizens a chance to request new improvements annually; facilitates Metropolitan Planning Organization (MPO) planning process required by MAP-21; allows the Board of Supervisors to evaluate their program annually and update it to address any changes in county priorities; and it allows the Residency Administrator or other designated local VDOT manager to review projects included in the plan to obligate federal funds as part of VDOT's annual Federal Fiscal Year Strategy. It should be noted however that changes in priority can impact the ability to fully utilize federal funds. Close coordination with VDOT is essential when considering shifts in priority to ensure federal funds can still be obligated and utilized efficiently.

Board of Supervisors Manual 2015

# PLANNING

# Comprehensive Plan Consistency with State Plans and Programs

Consistency between local, regional, and state plans is desirable for the orderly development of infrastructure. When plans and programs are not consistent, resources are expended for questionable benefit.

Chapter 729 of the 2012 Acts of Assembly included elements intended to promote consistency between the transportation plan portion of the local comprehensive plan and the Commonwealth Transportations Board's (CTB) VTrans (statewide transportation planning document), Six-Year Improvement Program, and the location of state routes chosen by the CTB. The Code of Virginia at §15.2-2223 requires a locality's transportation plan to be consistent with these state documents. Information on Chapter 729 can be found on VDOT's website at http://www.virginiadot.org/info/local-state_plan_and_program_consistency.asp.

The law requires a locality to send draft changes to its transportation plan to VDOT, which shall review the submitted changes and provide comments to the locality within 90 days. Once a locality's plan (or change to the plan) is adopted, it must provide a copy to VDOT.

VDOT staff reviewing local transportation plans will consider a plan consistent if it includes the projects set out in the above listed documents and does not include recommendations that would prevent those projects from advancing. Not all projects contained in the Six-Year Improvement Program need be incorporated into local transportation plans in order for those plans to be consistent; only those projects that are "significant new, improved, or relocated" highway projects need be included, which means projects on Major Collector (or higher classification) roadways that are:

i) On new location;
ii) Relocate a roadway; or
iii) Add one or more through lanes or an interchange.

If VDOT determines that a comprehensive plan's transportation plan is inconsistent with VTrans, the Six-Year Improvement Program, or route locations as noted above, VDOT must notify the Commonwealth Transportation Board of such inconsistency and the Board may take action to try and encourage consistency between the state plans and the local transportation plan.

Comprehensive plan reviews are routinely conducted by the District Office planning staff serving that particular locality.

Board of Supervisors Manual 2015

# Corridor and Feasibility Studies

VDOT's Transportation and Mobility Planning Division, in coordination with each district's planning staff, conducts both corridor and feasibility studies throughout the state. Corridor studies seek to identify the mix of transportation improvements that would be most effective in moving people and goods in specific travel corridors and balancing those improvements with available funding and neighborhood and community concerns.

Feasibility studies on a proposed strategy are conducted to determine the degree to which: (a) the design or location is economically justified, (b) an alternative is considered preferable from an environmental or social perspective, or (c) eventual construction and operation can be financed and managed. For more information on corridor and feasibility studies, visit: http://www.virginiadot.org/projects/pr-studiescorridor.asp .

Board of Supervisors Manual 2015

# Federal Functional Classification

Functional usage of a roadway is based upon its mobility and accessibility.  Choice of a travel route can be logically related to the roadway's ability to access land and the mobility through an area.  The Federal Highway Administration (FHWA) has set up functional classification guidelines.  The Federal Functional Classification Guidelines contain a list of classifications and descriptions given for each class of roadway.  Roads may be classified as local, collector or arterial roads.   Urban or rural U.S. Census designations also have importance because design features are based on these designations.  In example, in the rural areas the design speeds may be much higher than the design for urban streets.  In urban areas, the streets and roads may require a curb and gutter design while the rural roads will normally feature shoulders and ditches in the design.  Briefly, for each of three areas (rural, urbanized and smaller urban areas):

- Local roads function to provide a higher degree of access but lower travel mobility-flow,
- Collectors provide a mixture of access and mobility, for through movement and access, &
- Arterials, with two sub-classes "minor" and "principal", provide lower access and higher mobility with the functional standards for minor and principal arterials being relatively high for through traffic.

Functional classification is based on road-service features, and impacts several factors including:
- A project road improvement's design horizon year date (This affects the time span over which the facility must be minimally adequate: generally 11 years after advertisement for lesser functional classifications, or 22 years after advertisement for higher functional classifications
- Applicable geometric design standards of the VDOT Road Design Manual (which adopts the AASHTO Green Book's design LOS guidance on pages 84-85), as well as local and/or Subdivision Street Acceptance Requirements, collector or arterial standards.  Also, rural, urban or urbanized area classification is a  related consideration especially from possible changes from annexations, and/or population census updates with respect to urban or urbanized areas)
- The allocations of transportation funds to Districts of the state, such as for state primary roads (with respect to arterials).
- Development and/or maintenance of local roads are ineligible for federal funding and responsibilities for this class of roads are private, local and/or state government concerns.
- Access management features (spacing-frequency and/or type of access such as interchanges, intersections, and roadside entrance, exit and/or driveway points)
- Eligibility for traffic calming measures

A comprehensive update to Virginia's federal functional classification system was approved by FHWA in November, 2014.  The current functional classification maps may be viewed at http://www.virginiadot.org/projects/fxn_class/home.asp.

Board of Supervisors Manual 2015

*Federal Functional Classification, continued*

A County or City can request the classification or reclassification of a particular road segment under the system by working with their local VDOT office.  Except in the VDOT Northern Virginia District, the request of a metropolitan locality should be accompanied with a supporting Metropolitan Planning Organization resolution.  Information on performing an interim classification or reclassification is also available on VDOT's functional classification website.  Additional information on Federal Functional Classification can be found at: http://www.fhwa.dot.gov/planning/processes/statewide/related/highway_functional_classifications/.

Board of Supervisors Manual 2015

# Highway Needs Assessment (HNA)

The Highway Needs Assessment (HNA) is meant to address the highway portion of the requirement for an inventory of all transportation construction capacity needs, as indicated in the Code of Virginia §33.2-353:

The Commonwealth Transportation Board shall, with the assistance of the Office of Intermodal Planning and Investment, conduct a comprehensive review of statewide transportation needs in a Statewide Transportation Plan setting forth assessment of capacity needs for all corridors of statewide significance, regional networks, and improvements to promote urban development areas established pursuant to § 15.2-2223.1. The assessment shall consider all modes of transportation. Such corridors shall be planned to include multimodal transportation improvements, and the plan shall consider corridor location in planning for any major transportation infrastructure, including environmental impacts and the comprehensive land use plan of the locality in which the corridor is planned. In the designation of such corridors, the Commonwealth Transportation Board shall not be constrained by local, district, regional, or modal plans....

The HNA is one component of the overall statewide multimodal plan, VTrans. The HNA is comprised of objective, system-generated improvements (based largely on TRB's Highway Capacity Methodology) for all functionally classified highway systems across Virginia, with human input limited to highway inventory (pavement width, number of lanes, etc.) and the review of traffic forecasts. The capacity threshold for the HNA was defined as: LOS C- Rural Areas, LOS D- Urban Areas, and LOS D- Urbanized Areas. The system generates improvements to highways (including TSMs, pavement widening, and additional lanes) to meet the capacity thresholds, and develops cost estimates for these improvements.

The Transportation and Mobility Planning Division is responsible for conducting a Highway Needs Assessment to be used in the development of the State Highway Plan (SHP). The SHP provides staff level recommendations for the highway network including: highway capacity improvements, spot location improvements including intersection and interchange improvements, new facilities, operational and intelligent transportation system improvements, short-term improvements, bicycle and pedestrian improvements, freight recommendations and park and ride recommendations. The SHP is a component of the VTrans Multimodal Transportation Plan (VMTP) and the statewide multimodal policy plan, VTrans. All of these plans are on a four year cycle to coordinate with legislatively required updates to VTrans. The next VTrans update is due by the end of 2015.

Board of Supervisors Manual 2015

# MPO Transportation Plans and Programs

Virginia's Metropolitan Planning Organizations (MPOs) (work to address the transportation issues of each of Virginia's urbanized areas (areas of 50,000 population or more) through their long-range plan, short range program, transit planning, rideshare programs, park & ride efforts and corridor studies.   The membership of an MPO board typically consists of representatives of the metropolitan area's locally elected government along with representatives of the area's public transportation operators and state transportation officials.   A VDOT official is usually the designated state transportation representative on an MPO board.  Each MPO in Virginia utilizes various analytical techniques to identify current and future congestion problems and to test the effectiveness of proposed alternatives.  The MPOs are required to develop and maintain a fiscally Constrained Long-Range Transportation Plan (CLRP) for transportation in the MPO area.  Each CLRP is updated every 5 years in air quality attainment areas and every 4 years in air quality non-attainment areas.  These plans cover at least a 20 year planning horizon and include project recommendations for:

- Regionally significant capital improvements such as major widening, new location facilities, bridges and bridge replacements, etc.
- Operational Improvement for congestion management and safety – turn lanes, closing cross-overs, signal coordination, access management
- Transit and Travel Demand Management (TDM) – bus routes, transit improvements, park-and-ride lots, ride sharing

MPOs are also required to develop short range programming documents, known as Transportation Improvement Programs (TIPs).  TIPs are staged, multi year, inter-modal program that include of all FHWA and FTA funded transportation projects to be implemented in the next four years.   Each TIP is required to be financially constrained and consistent with the MPO's CLRP.

A State law was passed in 2011 under Chapter 554 (S 1112, affecting § 33.2-3202 and creating § 33.2-3201) that reflects the regional transportation planning duties and responsibilities of MPOs, and specifies that the state is to provide meaningful opportunity to MPOs for obtaining their inputs, communicate proposed state priorities and consider the regional priorities identified by the MPOs.

State laws passed in 2012 under Chapter 729 (HB 1248, affecting §15.2-2223, 33.2-214, etc.) direct that the metropolitan regional CLRP and Transportation Improvement Program of a MPO is to be consistent with Virginia's Six-Year Improvement Program, the statewide transportation plan (known as VTrans), and the route locations decided by the Commonwealth Transportation Board.

Board of Supervisors Manual 2015

# National Highway System

Virginia's National Highway System (NHS) is comprised of highways of national significance, that are important to the nation's economy, defense, and mobility Federal functional classification.  This system includes the Interstate System and other principal arterials, the Strategic Highway Network with major strategic  highway connectors to support defense or emergency response, and major intermodal facility connectors that provide access to major ports, airports, public transportation facilities, and other major facilities.

In June of 2012 Virginia had a total of 3,441 NHS miles.  Virginia's total NHS mileage was capped by federal targets. However, in July of 2012, a new federal transportation law, Moving Ahead for Progress in the 21st Century, removed the cap and significantly expanded the NHS network to include certain principal arterials.   VDOT has requested and received conditional approval on additional routes to the National Highway System network.  As of November 2012, the Virginia enhanced NHS network is estimated to be 4,358 miles.  NHS designation of a highway facility allows the use of more sources of federal funding and requires additional design considerations. VDOT has coordinated with local jurisdictions and regional planning organizations and is currently awaiting FHWA final approval of the enhanced NHS network.

For additional information on the National Highway System, including a map of NHS routes in Virginia, please see: http://www.fhwa.dot.gov/planning/nhs.

Board of Supervisors Manual 2015

# Regional Long-Range Plans for Transportation (Rural RLRPs)

This initiative is aimed at creating regional transportation plans in rural areas that complement those in the metropolitan areas of the state.   VDOT works with each region to evaluate the transportation system in the rural areas and to recommend a range of transportation improvements that could best satisfy existing and future transportation needs through partnerships with Virginia's Planning District Commissions and local governments.  The regional plan identifies needs based upon the Goals and Objectives established by the region.

The Virginia Department of Transportation uses these regional plans as a foundation for identifying Interstate and Primary system priorities for the Six-Year Improvement Program.  The plans are also useful to counties and their respective Residency Administrator or other designated local VDOT manager when developing the Secondary Six-Year Program.  While this plan covers functionally classified secondary roadways, it is important to note that each county has authority over the recommendations on the secondary system within their jurisdiction.  The list of recommendations from the regional long range plans is used in the statewide transportation planning process to better quantify the statewide magnitude of needs.  The analysis and plan recommendations are limited to those transportation facilities within the PDC's boundaries that are outside of established metropolitan study areas.  The transportation system that was evaluated is limited to federal functionally classified routes of minor collector and above.

Each RLRP has been developed as a vision plan and will be reviewed every five years.  It is VDOT's goal that each region will be able to use these plans to identify regional priorities for transportation funding.  The RLRP process will be used to vet recommendations on the interstate and primary highway systems from both the VMTP and STARS initiatives.

RLRP information is accessible on the web at -
http://www.virginiadot.org/projects/rural_regional_long-range_plans.asp.

# Small Urban Area Transportation Studies (SUATS)

VDOT has initiated a project to review the transportation plans for small urban areas across the Commonwealth. The project includes updates to 43 "small urban areas" (those towns and cities with populations less than 50,000 people). The existing plans address transportation issues and identify travel needs in each community for the next 20 years. Although the primary focus of each plan is the "thoroughfare highway system"—those arterial and collector roads and highways that connect urban areas, the plans also address local needs and other modes of transportation.

The information in the SUATS are a resource for addressing capacity and safety issues on the transportation system not only to VDOT, but to localities, organizations, and the public as well. This resource is an important component of local comprehensive and transportation plans. These studies illuminate the linkage between future land use and transportation needs, and address road safety, traffic congestion, multi-modal needs, and mode linkage problems. Recommendations on the primary road system from SUATS are included in the VSTP.  Reviews of small urban area transportation needs are being examined and considered through the newer rural RLRP process that creates regional transportation plans for rural areas.

Decisions have been made by VDOT district planners, PDCs and localities in certain areas of the state to eliminate the SUATS in their area and incorporate it into the RLRP process to have one planning document.

For more information regarding SUATS –visit the VDOT website at http://www.virginiadot.org/projects/sm_urbanplans/SUA_index.asp

Board of Supervisors Manual 2015

# Strategically Targeted Affordable Roadway Solutions (STARS)

The objective of the VDOT STARS II (Strategically Targeted Affordable Roadway Solutions) Program is to develop comprehensive, innovative transportation solutions to relieve congested bottlenecks and solve critical traffic and safety challenges throughout the Commonwealth.  The STARS II Program, which is led by the VDOT Transportation and Mobility Planning Division in partnership with the Traffic Engineering Division, brings together planners, traffic engineers, safety engineers, roadway design engineers, and maintenance specialists to jointly identify cost-effective measures aimed at improving safety and reducing congestion. These transportation solutions can typically be designed and implemented within three years depending on their impact on adjacent properties. Candidate STARS II projects are often identified at intersections, on corridors, and at bottleneck and safety hot spots primarily located in urban and suburban areas. Potential projects also focus on solving multimodal challenges for pedestrians, bicycles, passenger cars, and transit vehicles, where applicable.

## STARS II Process
Selected STARS II Program recommended improvements are then advanced to the preliminary design phase to identify a more detailed and accurate project cost estimate and schedule. During this design process, potential design exceptions, environmental or right-of-way issues, and subsurface utility conflicts are identified. This program phase allows for identification of potential project challenges and formation of creative and constructible solutions in the early stages of project development.

## STARS Improvements
**Short-term** - Short-term improvements can be implemented by state or local forces typically in less than one year.
     Examples - - cutting back foliage to improve visibility, adding supplemental guide signs or warning signs, pavement markings

**Intermediate Term** - Intermediate improvements are typically constructed by VDOT contractors with benefit/cost analyses generally performed to secure funding.
     Examples - additional travel lanes, intersection modifications, extension of an acceleration lane at an interchange

**Long Term** - Improvements in the long-term category are generally more extensive and, as such, are not ideal candidates for implementation under this program.
     Examples - major interchange modifications roadway realignments - projects with significant right-of- way impacts

For more information on the STARS program, contact the State Transportation Planner at 804.786.2985, or your local VDOT District Planner.

Board of Supervisors Manual 2015

# Transportation Improvement Programs (TIPs/ Statewide TIP)

A Transportation Improvement Program (TIP) is a short range programming document that identifies all the FHWA and FTA funded transportation regionally significant highway and public transit projects that are proposed to be advanced in a metropolitan region in the next four years. Each metropolitan area has a Metropolitan Planning Organization (MPO) that adopts a financially constrained TIP as well as a financially constrained long-range transportation plan for its metropolitan area.

The Statewide Transportation Improvement Program (STIP) is a complete list of all FHWA/FTA funded projects to be advanced within the state for the next four years. The projects in the STIP include those to be implemented in the metropolitan areas as well as in the non-metropolitan areas. The STIP outlines planned obligations of federal revenues and is financially constrained. Projects contained in the STIP should be consistent with the statewide transportation plan and planning processes, and MPO plans, TIPS and processes. The state must submit a new STIP to FHWA and FTA at least every four years for approval. Amendments or administrative modifications (adjustments) to the STIP can be processed and submitted at any time for approval.

The TIPs and STIP shall include all regionally significant projects requiring federal approval or permits even if no FHWA or FTA funds are used in their construction. A regionally significant project is generally defined as a project which serves regional transportation needs or may affect the air quality conformity finding for the region. Projects must be financially constrained and have been through a public involvement process.

Federal planning laws (23 USC 134 and 135) and regulations (23 CFR 450 and 420) govern TIP and STIP development.

Board of Supervisors Manual 2015

# Virginia Surface Transportation Plan (VSTP)

Developed jointly by the Virginia Department of Transportation (VDOT) and the Virginia Department of Rail and Public Transportation (DRPT), the Virginia Surface Transportation Plan (VSTP) serves as a blueprint for effective and sustainable statewide transportation investments, policies and planning initiatives.  Under the guidance of the Secretary of Transportation and consistent with the Governor's Strategic Multimodal Plan and goals of the Virginia statewide multimodal transportation policy plan, the VSTP provides performance based recommendations for public transit, rail, highway and transportation demand management.

Transportation needs identified in the plan are used to help determine highway projects for the Six-Year Improvement Program.  The VSTP is a vision plan, and is not financially constrained.

Transportation and Mobility Planning Division is responsible as the lead VDOT office for the development of the VSTP.  The VSTP is to be superseded by the VTrans Multimodal Transportation Plan to be developed by the end of 2015.
Information on the VSTP Plan is available at:
http://www.vtrans.org/virginia_surface_transportation_plan.asp

# VTRANS – Virginia's Statewide Multimodal Transportation Plan

VTrans is the Commonwealth of Virginia's statewide multimodal transportation plan, which identifies goals, strategies and policies to address multimodal transportation needs over a 20-year planning horizon in accordance with requirements set forth in 23 U.S.C. 135 and VA Code 33.2-353.  VTrans serves as the "umbrella" planning document for the state, establishing the direction from the Transportation Secretariat for all transportation planning initiatives.

The legislative requirements for the statewide multimodal transportation plan include: carrying out a continuing, comprehensive, and coordinated statewide multimodal transportation planning process, including the development of a statewide multimodal transportation plan that facilitates the efficient, economic movement of people and goods in all areas of the state.

VTrans goals include: economic vitality; safety and security; connectivity, accessibility and mobility for people and freight; environmental stewardship; maintenance and preservation; transportation and land use; and program delivery.

VTrans also identifies multimodal investment corridors (Corridors of Statewide Significance) that are critical throughways across and within the state, and identifies recommendations for improvements to those corridors based on the seven planning strategies to ensure future mobility. The development of VTrans is the responsibility of the Office of Intermodal Planning and Investment, supported by seven transportation agencies within the Transportation Secretariat and must be updated at least once every four years.  Additional information about VTrans can be found at www.vtrans.org.

Board of Supervisors Manual 2015

# FUNDING PROGRAMS

# Airport Access Program

The airport access road program is used to provide access roads to licensed public use airports.  The Commonwealth Transportation Board administers the program in cooperation with the Department of Aviation.  Funding for airport access projects, as provided under the authority of Section 33.2.1509 of the *Code of Virginia*, is allocated from the Economic Development, Airport and Rail Access Fund.

Prior to the allocation, the governing body of the county, city, or town must, by resolution, request the access funds.  Airport access funding may not be used for the acquisition of rights of way or adjustments of utilities, and the governing body must state in its resolution that these items will be provided at no cost to the program.  A maximum allocation of $650,000 ($500,000, unmatched and up to $150,000 matched dollar for dollar) may be awarded within a fiscal year to provide access for any one airport.

The locality requesting the access funding will be responsible for the appropriate environmental studies and permits, if applicable.

Additional information is available on VDOT's website at http://www.virginiadot.org/business/local-assistance-access-programs.asp

Board of Supervisors Manual 2015

# Appalachian Regional Commission Local Access Road Program

The Appalachian Regional Commission (ARC) Access Road Program aims to better link the Region's businesses, communities, and residents to the Appalachian Development Highway System (ADHS) and to other key parts of the Region's transportation network.  This program offers a flexible approach designed to meet the local needs and provide a financing mechanism to support a variety of economic development opportunities throughout the Region.

The Region includes 410 counties in 13 states.  It extends more than 200,000 miles from southern New York to northeast Mississippi and is home to nearly 23 million people.  Virginia has twenty-three counties and seven independent cities that are eligible for participation in the ARC program.  The following is a list of Virginia's localities: the counties of Alleghany, Bath, Bland, Botetourt, Carroll, Craig, Buchanan,  Dickenson, Floyd, Giles, Grayson, Highland, Lee, Montgomery, Pulaski, Rockbridge,  Russell, Scott, Smyth, Tazewell, Washington, Wise and Wythe, and  including the cities of Bristol, Buena Vista, Clifton Forge, Covington, Galax, Lexington, Norton and Radford.

Funding for this program is provided from a qualifying State's ADHS allocation.  No new funds are authorized for the ADHS Program under MAP-21. However, Virginia is authorized to use up to $3,000,000 annually for local access roads from balances of funds that have been allocated to it for the Appalachian Development Highway Program, except funds specifically designated by Congress for Corridor construction.

Eligible criteria for local access road projects are roads which serve industrial and commercial developments, residential developments, recreational areas, and educational areas.  The project eligibility will be determined by the ARC Board.

ARC local access road funds can be used for preliminary engineering, right of way and/or construction of new roads.  Local access road funding is not allowed for resurfacing/rehabilitation, upgrading and/or safety improvements on roads previously built with ARC local access road funds.

Approved Projects need to be included in the STIP and must follow FHWA and State requirements.

For additional information on the Appalachian Regional Commission, counties are encouraged to visit www.arc.gov.

Board of Supervisors Manual 2015

# Economic Development Access Program

The Economic Development Access Program is administered by the Commonwealth Transportation Board, which allocates funds, as provided under the authority of Section 33.2.1509 of the *Code of Virginia*, for eligible projects from the Economic Development, Airport and Rail Access Fund.  The purpose of the program is to finance the construction or improvement of roads, with the exception of primaries, to new or expanding qualifying economic development sites.  These roads will provide access from the nearest adequate publicly maintained road to the primary entrance of the qualifying site.  Qualifying establishments are determined by the Commonwealth Transportation Board in consultation with the Virginia Economic Development Partnership and the Virginia Department of Small Business and Supplier Diversity.

An initial request must be made to the local governing body by a qualifying establishment desiring financial assistance.   A letter of request to the appropriate local governing body must include the following:

- **A.** Intent to build or expand on a designated site
- **B.** Description and location of the site
- **C.** Target date for building construction
- **D.** Target date for beginning operation
- **E.** Private capital investment planned on the site, itemized
- **F.** Products to be manufactured
- **G.** The number of new jobs to be created
- **H.** Access road improvements requested
- **I.** Estimates of the numbers of additional employee vehicles and truck traffic which will use the access road on an average business day

The locality should ensure that the qualifying establishment submits a copy of this letter to the Residency Administrator or other designated local VDOT manager, along with a preliminary road plan showing the entire parcel of land and the locations of: the building, major site features, the proposed entrance, the proposed access road, and existing public roads in the vicinity of the site.  It is also advisable to forward a copy of this letter to the Virginia Economic Development Partnership and the Virginia Department of Small Business and Supplier Diversity.

If the local governing body supports the request, it should prepare and approve a resolution formally requesting the allocation of Economic Development Access Program funds.

If a new road is to be constructed, the resolution should state that right of way and utility adjustments will be provided at no cost to VDOT, and that the road will be added to the secondary system or to the local road system as appropriate.

Board of Supervisors Manual 2015

## *Economic Development Access Program, continued*

If the project involves improvement of an existing road, the resolution should state that right of way and utility adjustments will be provided at no cost to the Economic Development, Airport and Rail Access Fund.

Economic Development Access projects may be either regular (where an existing qualifying establishment is expanding, or a new qualifying establishment is under firm contract) or bonded (where no qualifying establishment is under contract to build).

The maximum allocation for any project is limited to the lesser of: the reasonable cost of an adequate road or 20 percent of the qualifying private investment made by the private qualifying establishment to be served exclusively by the access road project. The maximum unmatched allocation to a locality within any one fiscal year is $500,000.  Where the cost is estimated to exceed $500,000, the governing body may request up to $150,000 in supplemental funds, which must be matched on a dollar-for-dollar basis from the locality. Any ineligible project costs and all costs exceeding the maximum allocation must be borne by the locality. The Residency Administrator or other designated local VDOT manager will assist the locality in preparing sketches and cost estimates for the requested road improvements.  Certain developments meeting the criteria of Major Employment and Investment (MEI) sites as designated by the Virginia Economic Development Partnership may be considered for separate allocations for a design-only project and for successive allocations to accomplish the construction project.

Qualifying private investment includes the cost of land, the cost of site preparation and building construction, and the cost of newly purchased equipment essential to the operation of the establishment.

Eligible capital investment requires documentation by copies of deeds, executed construction contracts, checks, and purchase orders, and this documentation is subject to verification by VDOT. Capital costs incurred more than six months prior to the date of the resolution of the governing body will normally be disallowed.

If a locality desires road access for a possible site development, it is necessary that the governing body guarantee that a bond or other acceptable surety will be provided to cover the cost of the road that is not justified by qualifying development.  The time period for a bonded project is five years from the date of the CTB resolution approving the project and allocation.  As of July 2006, the CTB policy also allows consideration of investment established within twenty-four months following the termination of the original five-year period for a partial reimbursement of any returned funds.
The locality requesting the access funding will be responsible for the appropriate environmental studies and permits, if applicable.

Additional information is available in the Economic Development Access Program Guide and on the VDOT website at http://www.virginiadot.org/business/local-assistance-access-programs.asp

Board of Supervisors Manual 2015

# Federal Lands Access Program

Under MAP-21, the core Federal Lands Highway Programs were restructured.  With this new transportation bill the Forest Highway Program (FHP) and Public Lands Highways Discretionary Program (PLHD) came to an end.

The new Federal Lands Access Program (Access Program), which will be administered by Eastern Federal Lands (EFL), builds upon the structure of the former programs.  The goal of the Access Program is to improve transportation facilities that provide access to, are adjacent to, or are located within Federal lands.

Similar to the FHP, the statute requires a Tri-party committee to make programming decisions and develop a multi-year program of projects.  This committee will be known as the Programming Decision Committee (PDC).  The PDC is comprised of a representative of the Federal Highway Administration (FHWA), a representative of the Virginia Department of Transportation, and a representative of a county or other local governments within that State.  Projects will be selected through an application process.  The PDC will consider the selection criteria and Federal Land Management Agency input to optimize the use of the statewide Federal Lands Access Program funds.

The funds available to Virginia from this program vary from year to year and are subject to being reduced each year by applicable rescissions, set-asides, or any other limitations cited in law.  Unlike the FHP and PLHD, a local match of 20% is now required for the Federal Lands Access Program.  The funds made available under this program will be available for the current year plus three additional years.

Board of Supervisors Manual 2015

# Highway Safety Improvement Program

Federal transportation legislation, Moving Ahead for Progress in the 21st Century Act (MAP-21), was signed into law July 2012; and, increases funding for the Highway Safety Improvement Program (HSIP). The HSIP is structured to make significant progress in reducing highway fatalities and severe injuries. The HSIP requires a Strategic Highway Safety Plan (SHSP) to identify the targeted safety emphasis areas and key strategies and actions to reduce severe crashes. Virginia's SHSP through 2016 provides strategies using the 4E approach of engineering, education, enforcement and emergency response. The HSIP funding implements the engineering (infrastructure) improvements to address highway crashes related to roadway departures, intersections and speeding, and bicycle and pedestrian safety under § 23 USC Section 148. Set-aside funds for Highway-Rail Grade Crossing Safety Program are defined under § 23 USC Section 130.

VDOT has developed a Highway Safety Improvement Program (HSIP) for the Commonwealth of Virginia that involves the identification of high crash locations, an analysis of crash trends, a safety assessment of existing conditions and feasible countermeasures, and the prioritization and scheduling of improvement projects. This program includes the **Highway Safety Program (HSP),** the **Bicycle and Pedestrian Safety (BPS) Program** and the **Highway-Rail Grade Crossing (H-RGC) Program.**

The VDOT Traffic Engineering Division (TED) serves as the focal point for administration of the safety programs (HSIP) within the Commonwealth of Virginia. VDOT Districts identify safety problems and prioritize improvements to mitigate crashes. Local governments should submit and coordinate safety improvement proposals for locations they recommend for improvement to local District liaisons. The proposals are evaluated on a statewide basis or district basis to ensure that locations in need of improvement have a better opportunity to be selected and funded. The candidate projects are selected based on an economic analysis (Benefit/Cost ratio), number and type of target crashes, project cost and schedule or based on documented risk assessments for non-motorized and highway-rail grade crossing improvements.

The intent of the HSIP is to expend federal funds on safety improvements that can be designed and constructed within three years. Projects should not require acquisition of significant rights of way, nor should they require extensive environmental review and mitigation. Federal funds must be authorized within two months of the STIP approval. Selected projects failing to get funds authorized within two months must request a time extension from TED. Projects are subject to removal if the extension is not granted by TED.

Details on HSIP application guidelines, deadlines and project selection can be found on the VDOT TED website at http://www.virginiadot.org/business/trafficeng-default.asp

Board of Supervisors Manual 2015

# Recreational Access Program

The purpose of the Recreational Access Program is to provide adequate access to recreational areas or historic sites operated by the Commonwealth of Virginia, a local government, or authority. Both roads and bikeways are eligible for program funding.

The program is administered by the Commonwealth Transportation Board, and funding is provided under the authority of Section 33.2-1510 of the *Code of Virginia*, with the appropriate designation and recommendation by the Director of the Department of Conservation and Recreation for access to recreational areas or by the Director of the Department of Historic Resources for access to historical sites.  Roads constructed under this program become a part of the appropriate highway system. Separate bikeways constructed outside the right of way of the road become the responsibility of the locality,  authority or agency maintaining the site, which they serve.

Prior to the allocation, the governing body of the county, city, or town must, by resolution, request the access funds.  Recreational Access Program funding may not be used for the acquisition of rights of way or adjustments of utilities, and the governing body must state in its resolution that these items will be provided at no cost to the program. The road or bikeway should be located to provide the most direct, cost-effective, access to the site. The access project should end either at the entrance to the area or at an internal parking lot serving the park facility or historical area.

Recreational access roads and bikeways are expected to be open to the public at all times; however, they may be closed during specific hours for security purposes.  No fee may be charged for the use of these roads or bikeways.

A maximum of $400,000 may be allocated for an access road to a facility operated by a state agency. For a bikeway to a facility operated by a state agency, the maximum allocation is $75,000. These funds are intended for eligible costs associated with design and construction of access roads and bikeways. For an access road to a facility operated by a locality or authority, the maximum unmatched allocation is $250,000.  Up to an additional $100,000 may be allocated if matched dollar-for-dollar from other than highway sources.  An unmatched maximum of $60,000 may be allocated for a bikeway to a facility operated by a locality or authority.  Up to an additional $15,000 may be requested if matched on a dollar-for-dollar basis by the locality or authority.

There is no annual limit on the number of recreational access projects per jurisdiction.  The funding maximums apply only to individual projects.  Also, if the appropriate criteria are met, both an access road and a bikeway may be funded separately to serve the same facility.

The agency, locality or authority operating the facility will be responsible for the appropriate environmental studies and permits, if applicable. Additional information is available in the current guide for the Recreational Access Program and on the VDOT website at http://www.virginiadot.org/business/local-assistance-access-programs.asp

Board of Supervisors Manual 2015

# Revenue Sharing Program

The purpose of the Revenue Sharing Program is to provide additional funding for use by a county, city, or town to construct, reconstruct, improve or maintain the highway systems within such county, city, or town, and for eligible additions in certain counties of the Commonwealth. Locality funds are matched with state funds with statutory limitations on the amount of state funds authorized per locality.  The program is administered by VDOT in cooperation with participating localities under the authority of Section 33.2.357 of the *Code of Virginia*.  An annual allocation of funds for this program is designated by the Commonwealth Transportation Board.

Application for program funding must be made by resolution of the governing body of the jurisdiction requesting the funds.  The application package must include the resolution and the detailed application for funds form.  If a locality is requesting funds for a project outside its jurisdiction, concurrence from the affected jurisdiction must be provided.  Towns not maintaining their own streets are not eligible to receive revenue sharing funds directly; their requests must be included in the application of the county in which they are located. Project funding is allocated by resolution of the Commonwealth Transportation Board. Construction may be accomplished by VDOT or by the locality under agreement with VDOT.

The Revenue Sharing Program is typically used to provide funding for immediately needed highway systems projects or to supplement existing projects.  Projects receiving Revenue Sharing funds are to be initiated utilizing at least a portion of the funds within one year of the allocation. Funds may be de-allocated if the project is not initiated within three years.

Below is a list of work that could be considered eligible for Revenue Sharing financing:

- Deficits on completed VDOT administered construction or improvement projects
- Supplemental funding for projects listed in the adopted Six-Year Plan and ongoing construction or improvement projects.
- Construction or improvements included in either the adopted Six-Year Plan or the locality's capital plan
- Improvements necessary for the acceptance of specific subdivision streets otherwise eligible for acceptance into the system for maintenance
- New hard surfacing
- Certain new roadways that meet the qualifications outlined in the Revenue Sharing Guidelines
- Maintenance on highway systems consistent with the Department's operating policies

Details on application deadlines and project selection can be found on the VDOT website at http://www.virginiadot.org/business/local-assistance-access-programs.asp#Revenue_Sharing

Board of Supervisors Manual 2015

# Safe Routes to School

The Federal-aid Safe Routes to School (SRTS) Program was created by the *Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users Act* (SAFETEA-LU Section 1404) in 2005. Under SAFETEA-LU, SRTS funds were made available for infrastructure and non-infrastructure projects that promote walking and biking as a safe and convenient travel option for elementary and middle school children in grades K-8.  The recent federal-aid highway and transit reauthorization act, known as Moving Ahead for Progress in the 21st Century (MAP-21), has changed the funding structure for SRTS activities, shifting future funding from the SRTS program to a competitive grant process for the new Transportation Alternatives Program.

Applying for funding for SRTS activities is a competitive process.  VDOT administers two types of funds:

- Non-infrastructure funds are for education, encouragement, enforcement (law) and evaluation activities which further the stated purposes of SRTS
- Infrastructure project funds are for improvements that provide bicycle and pedestrian accommodations or safety enhancements.

All SRTS projects will be implemented using the Transportation Alternatives Program selection process.

The purposes of the SRTS program are:

1. *to enable and encourage children, including those with disabilities, to walk and bicycle to school;*
2. *to make bicycling and walking to school a safer and more appealing transportation alternative, thereby encouraging a healthy and active lifestyle from an early age; and*
3. *to facilitate the planning, development, and implementation of projects and activities that will improve safety and reduce traffic, fuel consumption, and air pollution in the vicinity of schools.*

All non-infrastructure projects require a formal endorsement by a school or school division.

The Virginia SRTS Program requires that applicants create an Activities and Programs Plan for the affected School(s).  The plan is a written document stating the school community's intentions for making walking and bicycling to school(s) sustainable and safe.  The plan must be submitted to VDOT and approved in advance of the submittal of applications for funding.

Information about non-infrastructure applications and other SRTS materials can be found on the VDOT SRTS website at: www.virginiadot.org/saferoutes

Board of Supervisors Manual 2015

# Transportation Alternatives Program

On June 29, 2012 Congress passed "Moving Ahead for Progress in the 21st Century" (MAP-21) which became effective October 1, 2012.  In the new legislation the former Transportation Enhancement (TE) Program as set forth in SAFETEA-LU, was replaced with the Transportation Alternatives Program (TAP). The newly created TAP combines several programs including many of the former Transportation Enhancement (TE) activities – now referred to as "Transportation Alternatives Eligibilities" – the Recreational Trails program and the Safe Routes to School program.

As set forth in MAP-21, funds for the Recreational Trails Program (administered by the Department of Conservation and Recreation) will be taken off the top before any additional sub-allocations occur.  The remaining TAP funds will be split, with 50 percent of these remaining funds being distributed based on population and 50 percent being distributed anywhere statewide.  In addition, MAP-21 established that Metropolitan Planning Organizations (MPOs) in the four identified Transportation Management Areas (TMAs) which are urbanized areas with a population over 200,000 will make project selections with the population based allocations in their TMA. The Commonwealth Transportation Board (CTB) will make project selections with the remaining allocations.

Several activities previously eligible under the Transportation Enhancement program are no longer eligible and some eligible activities have been modified. Below are the ten (10) transportation alternatives eligibilities as outlined in MAP-21:

1. Construction, planning and design of on-road and off-road trail facilities for pedestrians, bicyclists, and other non-motorized forms of transportation.
2. Construction, planning and design of infrastructure related projects and systems that provide safe routes for non-drivers.
3. Conversion and use of abandoned railroad corridors for trails for pedestrians, bicyclists or other non-motorized transportation users.
4. Construction of turnouts, overlooks and viewing areas.
5. Inventory, control or removal of outdoor advertising.
6. Historic preservation and rehabilitation of historic transportation facilities.
7. Vegetation management practices in transportation rights-of-way.
8. Archeological activities relating to impacts from the implementation of a transportation project eligible under Title 23.
9. Environmental mitigation activities including abatement and prevention activities to address water pollution related to highway runoff.
10. Environmental mitigation activities to reduce vehicle-caused wildlife mortality or to restore and maintain habitat connectivity.

Additional information about the Transportation Alternatives Program, the application process and eligible projects is available at http://www.virginiadot.org/business/prenhancegrants.asp.

USCA4 Appeal: 17-2002     Doc: 88-1     Filed: 01/07/2019     Pg: 512 of 547

# OPERATIONS

# Memorial/Dedication Bridges, Highways and Interchanges

Bridges highways and interchanges in Virginia can be named by the Commonwealth Transportation Board (CTB) or by action of the General Assembly. The naming of a facility by the CTB occurs at the request of a local jurisdiction, which must agree to bear the costs of providing and erecting appropriate signs. Maintenance of signs, once erected, will be performed by VDOT through its normal sign maintenance budget.

## Henry G Shirley
### Memorial Highway

Under Section 33.2-213 of the Code of Virginia, the CTB can name a bridge, highway or interchange to honor a deceased person.  The General Assembly may name a bridge or highway or interchange for any purpose or person (deceased or alive) through a bill that is enacted into law. The CTB may not name a bridge, highway or interchange that has previously been named by the General Assembly.

The procedure to request the CTB to designate a bridge highway or interchange in memorial or dedication is:

1. A request, in the form of a formal resolution from the local government, must be provided to the Residency Administrator or other designated local VDOT manager.  The resolution must indicate that the local jurisdiction will pay all costs for the sign, though funding may come in part or in full from the family or a support group. The most current version of Traffic Engineering Division Memorandum 278 carrying the General Subject, "Highway Signs", and the Specific Subject "Memorial/Dedication  Bridges, Highways, and Highway Segments" and the most current version of the "Virginia Supplement to the Manual on Uniform Traffic Control Devices (MUTCD)" shall be used by local governments as a guide in selecting the text for the proposed sign.  All new signs will be erected with brown background Sign size, exact location, and other display details will be at VDOT discretion.
2. VDOT's Maintenance Division will review the request and prepare all necessary documents for action by the CTB.
3. If approved by the CTB, VDOT will install the signs and bill the locality for all associated costs.

Board of Supervisors Manual 2015

# Neighborhood Traffic

## Additional $200 Fine Sign

The Additional $200 Fine Sign Program, last amended by the General Assembly in 2006 in § 46.2-878.2 of the *Code of Virginia*, allows a locality to request that VDOT install signs advising motorists of a maximum fine of $200, in addition to other penalties provided by laws, for exceeding the speed limit.

The sign must be installed on a local residential street, a collector street, or a minor arterial street with residential characteristics. The posted speed limit must be 35 mph or less. The VDOT District Administrator has approval authority for these signs.

It is the responsibility of the county or town to initiate these procedures by requesting, through a resolution of the local governing body, that VDOT install the appropriate signs as stipulated in §46.2-878 of the *Code of Virginia*.  This request will be submitted to the Residency Administrator or other designated local VDOT manager along with the following support data.

1. Identification of the neighborhood and specific highway(s) where the signs are to be installed.
2. Confirmation that the highway(s) meet the definitions of local residential, collector or minor arterial streets.
3. Notification that a speeding problem exists and that the increased penalty has community support.

The Residency Administrator or other designated local VDOT manager, upon receipt of the adopted resolution and supporting data, will review the assembly and submit it to the VDOT District Administrator. After VDOT staff reviews the field locations and upon approval of the District Administrator the requested signs will be installed. Sign installation will take place within 60 days of the date the request is approved.

The procedures and requirements for installation of these signs as outlined below are stipulated by the policy adopted by the Commonwealth Transportation Board on June 17, 1999 "Applicability of §46.2-878.2 of the Code of Virginia –Installation of Signs advising of Maximum Penalty for Exceeding Posted Maximum Speed Limit in Certain Residence Districts."

Signs installed in accordance with this program may be fully funded with countywide traffic services funding from the secondary or primary road allocations for the respective counties.

Board of Supervisors Manual 2015

## *Neighborhood Traffic, continued*

## Traffic Calming

The traffic calming process provides communities with a traffic management tool to deal specifically with speeding in residential areas.  The goal of VDOT's traffic calming program is to reduce vehicle speeds on local roads within subdivisions or residential neighborhoods, not to restrict access.

VDOT is currently revising its previously adopted "Traffic Calming Guide for Residential Streets," with those changes reflected here.  The revisions provide that VDOT's involvement in the traffic calming process occurs much later in the process, at the evaluation & implementation phase and that the County, acting through the Board of Supervisors (BOS), will initiate and conduct the traffic calming process, and garner the support of the affected public.

Requests for traffic calming are initiated by the Home Owners Association (HOA), Civic Association (CA) or group of homeowners through the Board of Supervisors (BOS) member.

A street must meet the basic eligibility requirement that it is a residential street with a posted speed limit of 35 mph or less with an identified speeding or speed-related safety issue in order to be considered for traffic calming. A typical roadway for traffic calming would be a subdivision street functionally classified as a local facility.  Further study is initiated to determine if traffic calming is warranted; issues explored include the determination of  a documented speeding problem), that the physical characteristics of the roadway can accommodate traffic calming measures, and that any traffic control devices affecting the decision or need for traffic calming are in place such as pavement markings, pedestrian crosswalks, warning signage etc..

The County, acting through the Board of Supervisors (BOS), will initiate and conduct the traffic calming process including scheduling and facilitating meetings, and garner the necessary support of the affected public.   VDOT will insure the appropriateness of the street(s) for traffic calming measures, provide technical support, and approve, and implement the traffic calming plan, subject to departmental priorities. For the traffic calming process, VDOT is represented by the local Resident Administrator (RA), except in Fairfax, Prince William, and Loudoun Counties where it is the Regional Traffic Engineer (RTE).

The proposed plan developed by the county should be presented to the community at a public meeting and approved by 60% or more of the affected households.  If the proposed plan is approved by the community, BOS action is required to endorse the plan.  Upon BOS endorsement, the locality notifies VDOT of the BOS action and requests installation of the devices.   The notification to VDOT should convey the proposed plan, the streets identified as part of the voting area, the results of the vote, and the source of funding for implementation.

Funding may be derived in a variety of formats such as from 100 percent county-generated or other funds (no VDOT funding), Revenue sharing funds with 50 percent county-generated or other funds and 50 percent VDOT funds or Secondary road construction funds (a maximum of 2 percent of the county's secondary road construction funds can be used with a three-year limit on its accumulation).

Board of Supervisors Manual 2015

## *Neighborhood Traffic, continued*

Maintenance will be funded through the county's VDOT road maintenance funds. Implementation and maintenance of optional landscaping will be provided by the local government or the community.

In cases where the traffic calming measures are being considered for streets developed subject to the Secondary Street Acceptance Requirements (SSAR), VDOT shall be reimbursed for all additional costs necessary to accommodate minimum street width standards adopted by the County that exceed those in Appendix B(1) of the Road Design Manual.

## Watch For Children Sign

"Watch for Children" Signs are warning signs placed on the roadway intended to warn motorists that children may be at play nearby. These signs are provided for in § 33.2-251 of the Code of Virginia. The code was amended effective July 1, 2012 to provide that a county or town may undertake the installation and maintenance of such signs by entering into an agreement with the Commissioner. Previously the County or Town initiated the installation of these signs through a request by resolution to the Commissioner of VDOT. That process is no longer an option.



In accordance with the revised statute;

1. A County or Town may initiate the installation of these signs only by entering into an agreement with VDOT that specifies the locations of the signs.
2. The county or town is solely responsible for the purchase, installation and maintenance of the signs and must pay all associated costs.
3. Secondary roadway construction or maintenance funds or any other VDOT monies may not be used to pay for such signs.
4. VDOT may not install these signs on behalf of a county or town.
5. The process prescribed in the previous statute whereby a County or Town could request by resolution that VDOT install these sign(s) is no longer an option.

The signs may be installed only where the statutory or posted speed limit is 35 mph or less at major entry points within a subdivision or at the major approach(s) to a residential development not within a subdivision.

The new signs will be notable by their fluorescent yellow-green color. The previous signs were yellow.

Maintenance of existing (yellow) W15-V1 signs installed by VDOT remain the responsibility of VDOT. VDOT has developed a template to be used for any agreements that includes guidance regarding the process and stipulates the requirements for installing these signs.

Board of Supervisors Manual 2015

## *Neighborhood Traffic, continued*

The VDOT District Administrator has approval authority for the initial agreements with a county or town to install these signs. The Land Development Engineer may authorize subsequent agreements to install additional signs.

All signs installed under this policy will be in accordance with the latest version of Traffic Engineering Division Memorandum TE-280.

No. 17-2002, viewed 12/18/2018

Board of Supervisors Manual 2015

# Park and Ride Lots

Park and Ride lots are parking lots used by commuters who prefer to drive only part of the way to their destination and either carpool, vanpool or use transit or another mode (i.e. bicycling or walking) for the other portion of their trip. Commuters often choose to take advantage of Park and Ride lots in order to reduce congestion on the roads, reduce adverse impacts to air quality and save money on gas and vehicle maintenance.  Typically, the lots are signed to indicate their purpose, and in most cases, parking is free (some transit / metro stations may charge a fee to park; all VDOT-owned lots are free to the public).  Overnight parking is allowed at most lots; however, certain lots have been identified as being too busy to allow overnight parking. Those lots are signed at the location.

VDOT keeps an inventory of approximately 300 Park and Ride lots, statewide. Of those lots, VDOT owns and maintains approximately 100. Other entities such as jurisdictions, private owners,  local transit companies, etc. own and maintain approximately 120 lots. Additionally, there are "unofficial" lots; meaning commuters use them regularly, but the area has never been officially established as a Park and Ride lot location.

The Park and Ride lot inventory was last audited on a statewide level in 2011. The audit results were used to update the Park and Ride inventory and VDOT now  updates this statewide inventory (including official as well as unofficial lots) annually in order to ensure the information provided is as detailed and comprehensive as possible. This includes adding any new lot locations that are not currently listed in the inventory, as well as adding additional information obtained regarding existing lots that are currently listed.

VDOT's external website contains a section dedicated to Park and Ride lots. Within that section, there is an interactive map where commuters can locate Virginia Park and Ride lots that can be utilized in their commute. A link to the interactive map is available at:
http://www.virginiadot.org/travel/parkride/home.asp   Commuters can click on a Park and Ride lot location shown on the map and be presented with information regarding the lot such as: name, address or intersection, route number, number of spaces (including handicap), if bus service is available, if the lot is lighted and/or paved, and what other amenities may be available (bike racks/lockers/bus shelter, etc).

In addition to the interactive map, the VDOT external website provides detailed information and additional links regarding parking and services available from some local metro and bus facilities, car/van pool opportunities, HOV lane updates, resources available in Maryland, Smart Tag, Slug Lines, etc.  The website also contains information for rideshare agencies or localities in need of Park and Ride resources.

In 2014, VDOT completed the Park and Ride Lot Investment Strategies wherein potential P&R lot locations were analyzed using commuter and traffic data. Up to 10 potential locations have been ranked in order of priority. As a result of this effort, a website was developed to house the Park and Ride recommendations;
http://www.arcgis.com/apps/MapTour/index.html?appid=e1350a00284e46428a535a18d4451aaf.
This process will be conducted annually, in order to maintain an up-to-date, prioritized list of P&R needs across the state.

Board of Supervisors Manual 2015

# Public Landings

Upon request by the Virginia Department of Game and Inland Fisheries (DGIF), VDOT will assume the responsibility for the maintenance of launching ramps located at public landings, which are under permit and have been constructed by others.  The maintenance of boat ramps will be in accordance with the general practices and specifications established by VDOT.  VDOT will also maintain the road leading to the ramp.

VDOT will be responsible for the maintenance of launching ramps, based on the following conditions:

A. The sponsor shall submit to the VDOT District Administrator (DA) a plan for the ramp in accordance with the minimum requirements as shown on standard plan LR-1 (found in VDOT's Road and Bridge Standards) and the Joint Memorandum of Understanding. Evidence of the concurrence of the Board of Supervisors shall accompany the submission. The DA shall review the proposed plan and make such suggested changes as he/she finds appropriate.  The DA is authorized to approve the plan.

B. The ramp shall be constructed in accordance with the approved plans and supplemental specifications for launching ramps.

C. Upon the request of the Board of Supervisor, VDOT will take over the completed ramp for maintenance.

Boat launching ramps should be maintained in as near their original constructed condition or subsequently improved condition as possible.  Launching ramps shall be inspected after each flood, storm or excessive high tide. Inspections should include a check for erosion or scour under or around the slab, and for deposits of sand or other debris on the ramp, which might affect its service.  Any erosion or debris should be corrected as soon as practical.

## Trail Blazers and "Public Boat Landings"

An agreement has been secured between VDOT and the DGIF for the erection of trailblazers within VDOT right of way bearing the message "PUBLIC BOAT LANDING".  The procedure for the erection of these signs is as follows:

A. The DGIF Boating Access Program Manager will contact the Residency Administrator, who will contact the District Traffic Engineer and arrange for a joint inspection of the intersections where trailblazers are required.  The exact location of each trailblazer is to be staked on the ground.

B. The trailblazer will begin at the nearest intersection primary route and follow the most direct routing to the boat landing.

C. DGIF will furnish the trailblazers posts, hardware, labor, and equipment necessary to complete the sign installation at the approved locations.  The signs will be erected in accordance with Department specifications for sign placement as shown in the Manual on Uniform Traffic Control Devices.

D. DGIF is responsible for all maintenance of the signs.  Should a sign need maintenance or replacement, contact the Facilities Director, DGIF, P.O. Box 11104, Richmond, Virginia 23230.

Board of Supervisors Manual 2015

# Red Light Running Cameras (Photo Enforcement)

The 2007 General Assembly added § 15.2-968.1 to the Code of Virginia allowing the use of cameras in Virginia counties, cities, and towns to enforce compliance with traffic signals. The legislation allows localities by ordinance to install and operate red light running camera systems at no more than one intersection for every 10,000 residents within the locality. In Planning District 8 (area served by the Northern Virginia Regional Commission), localities may install and operate red light running cameras at no more than 10 intersections or one intersection for every 10,000 residents, whichever is greater.

During the 2012 Legislative Session, additional changes were made to § 15.2-968.1 which removed VDOT from the process for approving red light running camera systems at intersections effective July 1, 2012. This legislation also removed VDOT from the process where signals are owned, operated and maintained by VDOT. In order to fulfill our responsibility regarding our signals, VDOT will use authority granted under the Land Use Permit process to manage those requests for installations of RLC systems on VDOT's right of way, regardless of who owns maintains and operates the signals. All other requirements of the original legislation, Chapter 903 Section 15.2-968.1, remain in effect and are summarized below.

The legislation requires both an engineering safety analysis and annual system monitoring. When selecting potential intersections for installation of red light running cameras, the legislation states localities shall consider the following factors:

- The accident rate for the intersection.
- The rate of red light violations occurring at the intersection.
- The difficulty experienced by law-enforcement officers to apprehend violators.
- The ability of law-enforcement officers to apprehend violators safely within a reasonable distance from the violation.

The engineering study should document the current signal's clearance intervals (yellow and all-red), whether the signal is coordinated with other signals along the corridor, and the current condition of other safety features (i.e., lane markings, median control, speed limits, signing, etc.). The engineering safety analysis is required to be stamped and signed by a licensed professional engineer.

The legislation also contains additional requirements for a minimum 0.5 second grace period between the time the signal turns red and the time the first violation is recorded by the camera; a public awareness campaign prior to implementation or expansion of a red light running camera program; placement of conspicuous signs within 500 feet of the intersection approach at which a red light running camera is installed; monthly system evaluations and annual program certifications.

Information detailing the engineering safety analysis, the request process for localities to install RLR cameras on VDOT maintained facilities and other information on red light running cameras can be found on VDOT's website at www.virginiadot.org/info/photored.asp.

Board of Supervisors Manual 2015

# Residential Cut-Through Traffic

The *Code of Virginia*, in section 46.2-809.1, allows for the development of a residential cut-through traffic policy and procedure for the control of residential cut-through traffic on designated secondary highways. "Residential cut-through traffic" refers to vehicular traffic passing through a residential area without stopping or without at least an origin or destination within the area. The provisions of this section do not apply in cities, any town that maintains its own system of streets, or any county that owns, operates, and maintains its own system of highways.

The Commonwealth Transportation Board adopted the Policy and Procedures for the program "Control of Residential Cut-Through Traffic" on May 9, 1996. The policy is accompanied by an "Operating Guide" that provides information on alternatives, analysis and procedures. The policy allows a county or town to request that VDOT review and address possible solutions to identified cut-through traffic problems in residential areas.

In order for a street to be eligible for consideration under the program it must be a local residential street with a minimum of 150 cut-through trips occurring in one hour in one direction and with 40% or more of the total one hour, single direction volume being cut-through traffic.

The county or town initiates these procedures by resolution of the local governing body requesting that VDOT review and address possible solutions to the identified problem of residential cut-through traffic.

This request is submitted by the county/town to the Residency Administrator or other designated local VDOT manager along with supporting data as prescribed in the policy which includes information on the subject roadway(s) and associated peripheral streets, documentation that the street meets the eligibility requirements and verification that a petition outlining the perceived problem and signed by at least 75 percent of the total occupied households within the primary use area is valid.

The request by the county or town prompts VDOT to complete a study of the roadway network identified in the formal request. The county or town and VDOT then work jointly to obtain comments from local agencies and the public and reach an agreement on the final remedial measures.

VDOT will determine the appropriate alternatives and convey the findings and recommendations of VDOT to the county/town.

If the local governing body and VDOT fail to agree on the remedial measures to be implemented, the governing body may appeal to the Commissioner of Highways. The Commissioner of Highways will analyze all the supporting data and render a decision, which will be binding.

Remedial measures utilized on local residential streets that meet the support data requirements set forth above may be fully funded with state secondary road funds (based on the availability of funds) with concurrence of the local boards of supervisors.

Board of Supervisors Manual 2015

# Roadside Memorials

VDOT's Roadside Memorial Program serves to maintain a safe highway system. At the site of fatal crashes or other fatal incidents, grieving families or friends often wish for a roadside memorial to be placed within the highway right of way.

The Department is sensitive to families and friends who have lost loved ones in crashes, or other incidents on the highways of the Commonwealth of Virginia.

- The establishment of the Roadside Memorial Program will serve to provide the families a formal remembrance of a loved one who lost his or her life on the highway.

- The Program fosters a healing process and a way for people to begin to feel closure on a very tragic event and provides a visual reminder to others to drive safely.

Both major goals — safe highway systems and roadside remembrance — should be met in order for the Roadside Memorial Program to be successful.

### Eligibility

Any human fatality that occurs on the state highway system is eligible for a Memorial Marker.

Family members of the victim may file a land use permit request for a Memorial Marker. If any member of the immediate family objects to the marker, the permit will be denied. If an adjacent property owner objects, the marker must be moved.

### Procedures

No state funds shall be utilized for the design, production, installation or maintenance of roadside memorials, plaques, and other devices placed within the right of way that commemorate the memory of persons killed in vehicle crashes within the right of way of any state highway. VDOT will only provide support in a very limited way by coordinating the specific location of the marker to ensure highway safety.

The program will be paid for entirely by the person(s) requesting the marker.

Requests for a memorial marker within the state highway right of way shall be submitted to the local VDOT Residency Administrator by completing a VDOT land use permit. The permit fee and the bond are to be waived.

The permit is to be issued through VDOT's Land Use Permit System, so that the installation date can be tracked. VDOT personnel will assist the permittee(s) to identify a safe location where the sign is to be erected and provide guidance as to other procedural requirements.

USCA4 Appeal: 17-2002     Doc: 88-1       Filed: 01/07/2019     Pg: 522 of 547

# Roadway Lighting

Roadway lighting on Virginia roadways is provided by VDOT when it is determined that it will assist the traveling public in its safe passage.  VDOT policy covers the conditions when VDOT may pay for the construction and maintenance of roadway lighting, or when costs should be borne by others.

In part, this policy states:

> VDOT may construct, maintain, and operate roadway lighting on highway systems which are maintained by it, where such lighting is deemed necessary for traffic safety by VDOT engineers.  The cost of the installation of the lighting shall be funded from annual construction allocations to the system.  The cost of maintenance and operation of lighting will be borne by the appropriate system maintenance funds.

> Where roadway lighting on highway systems is requested by other entities for their benefit and convenience, and is not deemed necessary for traffic safety by the engineers of VDOT, the installation, maintenance, and operation of the lighting shall be provided by and at the sole expense of those other entities, provided  all necessary permits and agreements have been secured.  Where approved lighting plans exist, VDOT may provide conduit and other roadway lighting amenities, at project cost, to avoid future disruptions to traffic.

Roadway, pedestrian, and decorative lighting included on a road by a land development project, where that road will become a part of the State System of Highways, will not necessarily become a part of the VDOT road inventory.  Permits for the continued operation of that lighting by others may be necessary.

Any request for a roadway lighting system or a modification to an existing system should be made in a formal written request submitted to the Residency Administrator or other designated local VDOT manager.

In order to qualify for VDOT installation of conduits and other amenities necessary to avoid traffic interruption during the installation of roadway, pedestrian, decorative or security lighting by others, post VDOT construction, a full plan of such lighting must be submitted for approval and the follow-on construction of the lighting must be planned within a reasonable amount of time, such that the conduits, etc. will remain in a serviceable condition.

Board of Supervisors Manual 2015

# Roundabouts

Roundabouts, have proven to be a safe and efficient geometric design to reduce delays and improve traffic operations, the Virginia Department of Transportation, supported by of House Joint Resolution 594 from the 2003 Virginia Legislature, has implemented the procedure for comparing a roundabout  with a traditional signal / stop condition  on construction projects. This procedure also includes reviewing and approving roundabout designs which best serve safety and operational needs at existing intersections planned for upgrades and proposed locations planned for development by Localities.

VDOT has developed a well-defined roundabout selection process that includes planning level screening criteria to determine if a roundabout is a feasible alternative and a comparison tool for evaluating and comparing various intersection control alternatives to a roundabout.  Roundabout designs are based on NCHRP Report 672, *Roundabouts: An Informational Guide*, Second Edition. See the following link:
http://onlinepubs.trb.org/onlinepubs/nchrp/nchrp_rpt_672.pdf.

During the preliminary plan development stages, all turning movements and applicable volumes for present day and design year volumes are compered. If the comparison results indicate a roundabout would serve a specific intersection better than a traffic signal, a roundabout should be the Designer's first priority of intersection control.   The approval process for roundabouts is as follows:

**Secondary System**- The VDOT Districts may approve up to a traffic design volume of 10,000 VPD. Roundabout designs in which the counts are beyond this volume should be submitted to the VDOT Central Office Roundabout Review Committee for review. The committee will make recommendations to the State Location and Design Engineer for approval or disapproval. Appeals of the State Location and Design Engineer's decision will go to the Chief Engineer for resolution. When a VDOT District receives a request for a roundabout from an outside entity, with a design volume under 10,000 VPD but desires Roundabout Committee review and input, the submittal may be sent to the State Location and Design Engineer. It will be reviewed and comments and/or recommendations will be returned in a timely manner.

**Primary or Urban Systems**- The VDOT Districts will submit roundabout designs to the VDOT Central Office Roundabout Committee for review. The approval and appeals will be the same as used above for these roadway systems with one exception, urban systems will require approval of the Local Assistance Division Administrator as well as the State Location and Design Engineer.

The process listed above applies to:

- Roundabouts proposed through new construction projects
- Roundabouts proposed during road safety improvements and/or upgrades
- Roundabouts proposed by Counties, Localities, Consultants and Developers

For more information, click on
http://www.extranet.vdot.state.va.us/locdes/Electronic_Pubs/2005%20RDM/AppendF.pdf
 and  www.VirginiaDOT.org/Roundabouts

Board of Supervisors Manual 2015

# Signs

## Flashing School  Zone Speed Limit Signs

When it has been requested by a Local Jurisdiction Board of Supervisors, a Local Jurisdiction School Board, the operating board of a privately operated school, or other similar authority and agreed to in a formal permitting process issued by the Department, flashing school zone speed limit signs may be  erected.  Such signs shall conform to Section 46.2.873 and Section 46.2-878 of the Code of Virginia, as amended, in design, placement, and operation.  The permit will specify what the school zone speed limit will be, as well as the allowable hours of day/days of week/months of year when the signs can be operational.  The permit will also specify the locations of the signs associated with the school zone speed limit.

The Authority requesting such sign(s) shall submit a request to the Residency Administrator or other designated local VDOT manager and shall bear all costs in connection with the purchase, installation and maintenance of the posts, poles, foundations, conduits, cables, cabinets, signals, attachment hardware, lights, solar panels, and other parts and accessories necessary for proper and efficient operation of the SIGNS, plus the cost of operations (electric current).  The Department will furnish to the Authority, without cost, sign panels bearing the standard message and drilled or cut to fit the signals and LED display installed.  In the event the Authority should fail to operate the signs in accordance with expected and agreed to operational practice, or fail to maintain the signs to the satisfaction of the Department, the SIGNS will be removed by the Department at the expense of the Authority.

## Share the road sign

The department maintains over 55,000 miles of roadway that is unrestricted with regard to use by bicyclist.  It is incumbent on both the motor vehicle operator and the bicycles alike, to use wisely the rights and authority given them.  It is both impractical and unnecessary to sign each and every roadway or roadway section open to bicyclist, to advise that the road must be shared.  However, certain roadways, where the volume of, the density of, or the frequency of bicyclist being present warrants a sign as a reminder to all, the department may install a Share the Road sign in accordance with the provisions of the latest Manual on Uniform Traffic Control Devices and the latest  Virginia Supplement to the MUTCD. Warranting of such sign shall be through an engineering study.



Any individual, group, or local government may request such signage through a written request submitted to the Residency Administrator or other designated local VDOT manager.

Within towns, such signs may be erected by the local government on roads maintained by the Department through a formal permitting process.  Request for such a permit shall be submitted to the Residency Administrator or other designated local VDOT manager.

Board of Supervisors Manual 2015

*Signs, continued*

## Street name sign

Title 33.2 of the Code of Virginia, "HIGHWAYS, BRIDGES AND FERRIES" contain a section directed at the need for the Department to install and maintain street name signs. That section, § 33.2-328, reads as follows:

> Whenever so requested by the governing body of a county, the Department of Transportation shall install a system of street name signs on state-maintained highways at such time and upon such terms and conditions as may be mutually agreed to between the county and the Commissioner of Highways.
>
> The Department shall install, using state forces or contract, the initial signing system and the county shall be responsible for continuing maintenance of the signs. Supply of the signs by the Department, either by manufacture or purchase, and initial installation can be paid for from appropriate secondary construction funds allocated to the county or from primary construction funds available to the Department.
>
> No highway funds shall be used by the county for the cost of maintaining the signing system.

In that the Department has now completed the initial installation of street name signs statewide, maintenance of said street name signs is the responsibility of the individual county government.

This responsibility shall be interpreted to include replacement signs and new signs on roads constructed by the county or under the authority of the county that will be submitted to the Department for inclusion into the state system of roads.

New street name signs, replacement or on new locations, shall be in conformance with the provisions of the latest Manual on Uniform Traffic Control Devices and the latest Virginia Supplement to the MUTCD.

## Supplemental Guide Signs

Supplemental Guide Signs are a special sub-set of guide signs. Typical or standard guide signs reference cities, towns, counties, or regions as destinations that may be found by choosing a certain route, or give reference to the mileage, upon a route, to these destinations.

Supplemental Guide signs can be used to provide information regarding destinations accessible from an interchange, other than places displayed on the standard interchange or intersection signing. However, such Supplemental Guide signing can reduce the effectiveness of other more important guide signing because of the possibility of overloading the road user's capacity to receive visual messages and make appropriate decisions.

Board of Supervisors Manual 2015

## *Signs, continued*

The US Department of Transportation, Federal Highway Administration, through endorsement of the MUTCD states:

> States and other agencies should adopt an appropriate policy for installing supplemental signs

> In developing policies for such signing, such items as population, amount of traffic generated, distance from the route, and the significance of the destination should be taken into account.

VDOT has developed a program for many of the business or specific services facilities such as gas food and lodging where a brand name is used, cultural sites or businesses of particular interest to the touring public.  In addition, VDOT has policy in place regarding non-business, general services types of facilities such as hospitals,  or the generic gas/food/lodging reference.

## *Signs, continued*

The Integrated Directional Signing Program, or IDSP as it is referenced, is the program that governs signs for businesses or specific services.  Information regarding the IDSP can be accessed thought: http://www.virginiadot.org/programs/sign-faqs.asp

When inquiries regarding general service signs, Way finding signs, trail markers and other similar signs not covered by the IDSP, are received, the inquiring party should be referred to the program manager at the Central Office, who maintains policy information regarding these sign types.  That manager can be reached at 804.225.4903.

No. 17-2002 Viewed 12/18/2018

Board of Supervisors Manual 2015

# Speed Limits

The black and white numbered (regulatory) speed limit signs are posted for public safety. Speed regulations and speed limits are intended to supplement motorists' judgment in determining speeds that are reasonable and proper for particular road conditions.  Limits are imposed to promote better traffic flow by reducing the wide variance in speeds and to assist enforcement personnel. It is important to know that posting a reduced speed limit does not of itself automatically reduce operating speeds. Enforcement is usually needed to achieve compliance.

The Virginia General Assembly has established statutory speed limits and granted authority to the Commissioner of Highways or his designee, to cities and certain counties and towns to change speed limits not to exceed the maximum allowed by law for highways under their jurisdiction. Section §46.2-878 of the *Code of Virginia* requires that a traffic engineering investigation be conducted prior to changes in speed limits. The engineering investigation involves a study of roadway geometrics such as lane width, pavement type and condition and terrain as well as the analysis of traffic related data such as prevailing vehicle speeds, average test runs, volumes, crash data and traffic control devices that affect or are affected by vehicle speeds.

When a locality desires a speed limit change for a VDOT maintained road, the Residency Administrator or other designated local VDOT manager should be contacted who will convey the request to the Regional Traffic Section for appropriate consideration.  The county will be advised of the findings of the review.  Where a speed limit change is warranted, the county will be notified prior to a speed limit change being implemented.

When the traffic engineering study recommends a change in speed limit, the results are provided to the Commissioner, or his designee, for approval. Upon approval, the Regional Traffic Section will post the applicable speed limit.

The criteria used by VDOT in determining whether a speed limit change or posting is warranted depend on the type of road and type of speed limit. A low volume secondary road that is gravel, or has a low level of traffic and crashes, will generally be reviewed only for warning sign needs. Roadways with a history of crashes or with a higher density of development will be reviewed as deemed appropriate by VDOT staff for further action.  Roadways with unposted speed limits are governed by the statutory speed limit.  Statutory speed limits are not generally posted on secondary roads. However, all Rural Rustic Roads are posted.

For roadways where there has been no significant change or improvement to the roadway (e.g., no project completed to reconstruct or realign the roadway) since the last review or study was conducted, another review or study of the governing speed limit will not generally be initiated.

Note that § 46.2-873.1 was revised effective July 1, 2014 to remove the provision that allowed any county, by ordinance, to set a maximum speed limit of 35 mph on Non-Surfaced Treated Roads within their jurisdiction and apply a 35 mph maximum speed limit on all Non-Surfaced Treated Roads statewide; previously it only applied to county's named in that Code Section.. However, VDOT does not generally post signs indicating the maximum speed limit on such roads due to the highly variable surface conditions. Also, VDOT has the authority to increase or decrease the 35 mph statutory limits set by § 46.2-873.1.

Board of Supervisors Manual 2015

# Through Truck Restriction

§ 46.2-809 of the *Code of Virginia* provides that a locality may formally request that VDOT restrict through trucks on certain segments of primary and secondary routes in the limited number of cases where doing so will promote the health, safety and welfare of the public without creating an undue hardship on any transportation users.

The procedures and requirements for initiating and implementing these measures as outlined below are stipulated by the policy adopted by the Commonwealth Transportation Board on October 16, 2003 "Guidelines for Considering Requests to Restrict Through Trucks on Primary and Secondary Highways.

For a request to be considered by VDOT, and in order to insure that all concerned parties have an opportunity to provide input concerning the proposed restriction and alternate route, the Board of Supervisors must hold a public hearing and make a formal request of the Department.  The following must be adhered to:

(A)   The public notices for the hearing must include a description of the proposed through truck restriction and the alternate route with the same termini.  A copy of the notices must be provided.

(B)   A public hearing must be held by the Board of Supervisors and a transcript of the hearing must be provided with the resolution.

(C)   The resolution must describe the proposed through truck restriction and a description of the alternate, including termini.

(D)   The Board of Supervisors must include in the resolution that it will use its good offices for enforcement of the proposed restriction by the appropriate local law enforcement agency.

Failure to comply with (A), (B), (C) and (D) will result in the request being returned.

The Board of Supervisors must make its formal request through the Residency Administrator or other designated local VDOT manager, certifying that it has met all the requirements noted above.

VDOT will conduct a traffic engineering study of the restriction request and prepare a report of the study findings and develop a recommendation which will consider the four criteria outlined in the CTB approved guidelines as well as the appropriate public input. This report and a recommendation to approve or deny the proposed restriction will be presented to the Commissioner if the request is on a secondary road or the Commonwealth Transportation Board if the request is on a primary road.

Following approval or denial by the Commissioner or CTB, the State Traffic Engineer will make all appropriate notifications.  The residency will be requested to post appropriate signs if the restriction is approved.

Board of Supervisors Manual 2015

# Traffic Counts

Traffic counts are a basis for safety, economic, and engineering considerations in guiding administrators and engineers for the development, operations, and management of highway systems.

The Department has a traffic count program that collects traffic data at over 100,000 locations across the Commonwealth.  These traffic counts are collected over a base three-year count cycle. All roads that are functionally classified higher than local are to be counted once during that three-year period. Roads that are functionally classified as local will be counted once every six years (if there is growth potential for the area) or once every twelve years (if they serve fully occupied housing subdivisions).

However, local roads that are unpaved with traffic counts below 50 VPD are to be counted once every three years.

A primary product of the Department's traffic count program is the publication of Annual Average Daily Traffic (AADT) estimates for the roadways.  The AADT estimates are used to create Vehicle Miles of Travel reports.  All of these publications and reports are available on the VDOT website at: http://www.virginiadot.org/info/ct-TrafficCounts.asp or by contacting your Residency Administrator or other designated local VDOT manager.

Board of Supervisors Manual 2015

# Traffic Signal, Sign or Pavement Marking Requests

To request a traffic signal, sign or pavement marking, contact your Residency Administrator or other designated local VDOT manager, who will forward the request to the Regional Traffic Engineer for evaluation of location, traffic volume, accidents, and other factors.  The findings of that evaluation will be used as the bases for determining whether to install a traffic signal, signs, and pavement markings.  Transportation agencies across the United States follow uniform guidelines to determine when these traffic control devices are appropriate to ensure consistency and provide for safe travel.  The primary guidelines are found in the most recent edition of the Manual on Uniform Traffic Control Devices (MUTCD) adopted by the Code of Federal Regulations and administered by the Federal Highway Administration and the Virginia Supplement to the MUTCD, adopted by the Commonwealth Transportation Board which provides for additional flexibility and Virginia specific requirements consistent with Virginia Code.  In jurisdictions that maintain their own street systems, requests should go to the appropriate local officials.

Some sign requests have additional requirements. Detailed information on these special requests can be found in the sign section in this manual.

Board of Supervisors Manual 2015

# LAND DEVELOPMENT

## Access Management

Roads are a critical public resource and constitute a major investment of the public's money.  To reduce the need for new roads and road widening projects, greater emphasis is being placed on maximizing the performance of Virginia's existing highway network.

Access management focuses on the location, spacing, design and operation of entrances, street intersections, median openings, and traffic signals.  Each of these creates conflict points where vehicles have to stop or slow down, disrupting the flow of traffic.  As the number of conflict points increase, so does traffic congestion and traffic crashes affecting the vehicular carrying capacity of the road.  The benefits that can accrue from managing access include:

- Less traffic congestion.
- Lower fuel consumption and air pollution.
- Fewer and less severe traffic crashes.
- More efficient movement of people and goods that promotes economic development by expanding the market area and labor market for businesses.
- Preserving highway traffic carrying capacity to avoid having to widen them or build new ones.

Access management regulations and standards became effective July 1, 2008 for the network of state principal arterial highways and October 14, 2009 for minor arterials, collectors, and local streets.  All roads have been classified according to their primary function:  arterials for moving traffic and collectors and local streets for providing access to property.

The regulations and standards were designed to balance the right of property owners to reasonable access to the highway with the right of users of the roads to mobility, safety, and efficient expenditure of public funds.  Key elements include:  spacing standards for entrances, intersections, median openings, and traffic signals; shared entrances; vehicular/pedestrian connections to adjacent properties; locating entrances a safe distance from interchange ramps; and entrance design.

A number of exceptions are identified in the regulations to accommodate those cases where a requirement could cause a hardship or prevent a property owner from using the highway.

The enabling legislation, regulations and standards, exception forms, highway functional classification maps, guidance documents, and general information on access management is available on VDOT's web site at www.virginiadot.org/projects/accessmgt.

Board of Supervisors Manual 2015

# Additions to the Secondary System of State Highways

Within counties, certain public roads exist that are not part of the secondary system of state highways maintained by VDOT. To become state maintained, the Board of Supervisors must request these roads be accepted by VDOT for maintenance and identify any funds necessary to improve those roads to minimum standards.

Additions to the secondary system of state highways generally result from:

♦ **Development -** These streets are usually the result of a subdivision or development of land and must meet the provisions of the Secondary Street Acceptance Requirements (SSAR), a part of the Administrative Code of Virginia and a regulation of the Commonwealth Transportation Board.

Streets developed under the Recreational Access, Economic Development Access, and Airport Access programs are subject to additional prerequisites that are set forth in other documents specific to the individual access program.

♦ **Rural Additions -** Streets added under this program may exist as a result of past development but were not initially proposed for maintenance by the Department as a part of the secondary system of state highways. Qualifying streets may be considered for acceptance if sufficient funding is made available by the Board of Supervisors as part of the resolution requesting addition.

The Board of Supervisor's resolution requesting the addition is expected to certify that the county's subdivision ordinance is in compliance with §33.2-335 and §33.2-336 of the *Code of Virginia*. Additional information about Rural Additions is summarized on page 72.

♦ **School Roads -** Roads used by school buses that are located on school property and lead from the primary system or the secondary system of state highways to the entrance of the school parking lot are eligible for state maintenance as part of the secondary system of state highways.

♦ **Streets in Towns (Population under 3,500)** - In most towns with a population less than 3,500, qualifying streets may be added to the secondary system of state highways. However, the authority under which the town operates (§33.2-339 or §33.2-340) may restrict annual mileage additions to no more than 1/4 mile. Project-related changes to the secondary system of state highways frequently include abandonments, additions and discontinuances.

♦ Project-related changes to the secondary system of state highways frequently include abandonments, additions and discontinuances

Board of Supervisors Manual 2015

# Guide to Transportation Efficient Land Use Planning and Design

VDOT, in conjunction with the State Office of Intermodal Planning and Investment, produced an informational guide for local governments to assist them in planning for and accommodating higher density mixed use development following Traditional Neighborhood Development (TND) design concepts.

This development design creates  transportation efficient mixed-use communities that replicate the qualities of a small town, places uses close enough to each other to allow walking and bicycling, provides a range of housing choices, and results in more efficient use of local infrastructure and capital facilities.  It offers an alternative to the suburban pattern of single family home subdivisions and separate shopping centers.

**Transportation Benefits**

The more compact and interconnected nature of TND development, in addition to its mix of uses, means that residents travel less often, travel shorter distances when they do, and have greater opportunities to travel by foot, bicycle, or transit.  The result is reduced costs for right of way, road widening, secondary street maintenance, and travel for commuters.

**Local Government Infrastructure Benefits**

The compactness brings solutions to the growing costs of providing water, sewer, and other infrastructures over the longer distances associated with suburban development.  Higher density mixed use communities require less road building, fewer miles of utility systems, and less plentiful and better designed parking facilities.

**Local Fiscal and Housing Market Benefits**

Close proximity of neighborhoods to public services and facilities translates into lower public operating costs and energy expenditures.  Shorter school bus routes and emergency response times are a result.  Growing market preference for TND real estate produces better project sales and higher assessment valuations.  The housing consumer gains expanded housing choice in terms of type, ownership vs. rental, and cost.

The Guide is available at
http://www.virginiadot.org/projects/transportation_efficient_land_use_and_design_guide.asp on the VDOT web site.

Board of Supervisors Manual 2015

# Land Development/Site Plans

Because the development of land has a direct impact on the transportation system, the Virginia Department of Transportation (VDOT) works with local jurisdictions to review rezoning requests, subdivision plats, construction plans,  and site plans, to evaluate traffic impacts, to ensure items on VDOT R/W or intended to be taken over for maintenance meet VDOT standards, and to identify and recommend roadway improvements needed to serve proposed development sites.

Chapter 527 of the 2006 Acts of Assembly (§ 15.2-2222.1 of the Code and the resulting Traffic Impact Analysis Regulations require localities to submit to VDOT proposed comprehensive plans plan amendments,  and rezoning requests, if they are expected to have a significant impact on state highways.  Information on Chapter 527 can be found on VDOT's website at http://www.virginiadot.org/info/traffic_impact_analysis_regulations.asp

Even if a development proposal does not meet the thresholds that would require submission to VDOT, localities should include the Department in the various stages of the development review process. Careful reviews of proposed development plans are important because traffic impacts caused by new developments can be costly for both VDOT and the local jurisdictions.  Since existing transportation needs exceed available funding, VDOT's limited funds cannot be relied upon to correct transportation problems created by new developments.

The Department's review of development plans includes a thorough analysis of traffic impacts and identifies improvements required to mitigate those impacts.  VDOT personnel examine the site plan or subdivision plat to determine if development plans provide designs adequate to accommodate traffic generated by the proposed site without adversely affecting state-maintained roads.  VDOT's comments and recommendations are shared with the local jurisdiction.

A traffic impact study may be required, by either the local jurisdiction or VDOT, to describe how the traffic generated by the site will be served by the existing or future road network.  This study must analyze a forecast of the traffic impacts of the fully developed site and identify solutions that will be implemented to accommodate the site traffic.  VDOT's review of the study  will also evaluate the development's compliance with VDOT's access management regulations and standards and any obvious issues with street acceptance
VDOT is responsible for regulating the location, design, construction, and maintenance of street and driveway connections on the State Highway System. Incumbent with this is the obligation to ensure protection of the transportation infrastructure, economy of maintenance, preservation of proper drainage, safe and efficient movement of vehicles and pedestrians thereon, and full accountability for the transportation investments bestowed by the citizens of Virginia upon VDOT.

VDOT participation early in the land development process can help ensure proper access is provided while the reliability of the road system is preserved.

Board of Supervisors Manual 2015

# Permits (Land Use)

A land use permit is a requirement of the General Rules and Regulations of the Commonwealth Transportation Board (24 VAC 30-21).  It ensures that all work performed in the right of way of any highway in the state highway system meets VDOT standards and policies, complies with highway laws and regulations, preserves the integrity and functionality of the highway, and provides for the safety of the traveling public.

Anyone who plans to work or perform an activity on or crossing any right of way under the jurisdiction of the Department must first obtain a land use permit.  A land use permit is also required when modifications are planned for an existing entrance due to change in land use, traffic volume, or type of traffic. A land use permit is a written document, signed and issued by an agent of VDOT, which regulates and approves work or activities to be performed in the right of way of a highway in the state highway system.  It describes and defines the scope of work, and specifies conditions and provisions for performing the work.

Land use permits for work in a locality are typically obtained at the VDOT District office serving that locality.  Regional  and District-wide permits are obtained from the Transportation and Mobility Planning Division in Richmond.  The Land Use Section in each District is responsible for reviewing plans for utilities, land development, private entrances, commercial entrances, logging entrances, surveying operations, and activities that require access to VDOT's right of way.  The review of land use permits for commercial and private entrances will be based on VDOT's access management regulations and standards that establish criteria for the design and location of proposed entrances.

USCA4 Appeal: 17-2002     Doc: 88-1     Filed: 01/07/2019     Pg: 536 of 547

# Rural Additions

Some public streets may qualify for addition to the secondary system of state highways, and subsequent improvement, as a rural addition. Such roads must be formally added to the system prior to improvements. State law prohibits expenditures of funds administered by the Department on roads that are not in the system.

Rural additions to the Secondary System of State Highways will be considered when requested by resolution of the Boards of Supervisors of the county where the proposed road(s) provide sufficient public service to warrant the expenditure of highway funds for maintenance and improvement thereof. A minimum 40' unrestricted right of way plus additional widths for cuts and fills where necessary, along with adequate drainage easements, must be established and recorded in the deed books of the county at no cost to the Commonwealth; except that a lesser right of way width, but not less than 30', may be considered where buildings or permanent structures (not including fences) were in place prior to December 31, 1961 (date of the Transportation Board's policy on right of way for the Secondary System). Further, the resolution of the Board of Supervisors shall specifically guarantee the necessary right of way and easements for the proposed road addition. Where a county has a policy requiring greater widths of right of way, its policy becomes the policy of the Commonwealth Transportation Board in that county. A certified copy of the plat indicating street right of way, drainage easements, and place of recordation and a detailed record of lot ownership, along with the required donation, shall be furnished with the submission of the resolution requesting the addition.

**Limitations**
Rural additions to the Secondary System will be limited during any one fiscal year to not more than 1 1/4 % of each county's Secondary mileage at the end of the preceding calendar year. In order to improve rural additions to the established minimum standard for rural roads, the Department of Transportation may expend not more than a sum equal to 5% of the allocation of construction funds for use on the Secondary System in that county.

**Right of Way and Utilities**
Rural addition funds administered by the Department are reserved for construction and engineering costs only. Costs for providing a clear, unencumbered right of way and any relocation of utilities, mail boxes, etc., are not eligible expenses covered by rural addition funds administered by the Department. Ineligible costs must be borne by others and assured by the county.

**Speculative Interests**
If property abutting a proposed rural addition is owned by speculative interests, its addition is not eligible under the authority of the CTB's Rural Addition Policy. Ownership or partnership in two or more parcels, or equivalent frontage, abutting such streets shall constitute a speculative interest for the purposes of this policy. However, proposed additions that serve speculative interest property may qualify for addition under §33.2-335, Code of Virginia. Speculative interests are assessed a pro rata share of the improvement costs, pursuant to §33.2-335, which share must be assured and provided by the county.

Board of Supervisors Manual 2015

## *Rural Additions, continued*

**Stormwater management**
A formal agreement(s) with the county is required if a stormwater management facility receives runoff from the road and/or the road crosses an impoundment dam and/or extrinsic structure. The agreement(s) must be in force before the road is accepted as part of the system.

Additional information regarding rural additions can be found at
http://www.virginiadot.org/business/resources/additionsabandonmentsanddiscontiniuances.pdf

USCA4 Appeal: 17-2002     Doc: 88-1     Filed: 01/07/2019     Pg: 538 of 547

# Secondary/Subdivision Street Standards

VDOT's Secondary Street Acceptance Requirements (SSAR) became effective in March 2009. The SSAR replaced the 2005 edition of the Subdivision Street Requirements (SSR). These establish the minimum requirements that new streets must meet to be considered for acceptance as part of the secondary system of state highways maintained by the Department. These requirements provide all necessary references related to planning, design, development and regulation of streets serving residential, mixed-use, commercial and industrial developments.

The SSAR constitutes a regulation of the Commonwealth Transportation Board and is part of the Virginia Administrative Code.

The CTB approved changes to the SSAR in 2011 that became effective January 1, 2012. The newly revised SSAR regulation contains a number of situations for which pending projects may be "grandfathered" to comply with the previous SSAR or the SSR standards.

All plats and plans initially submitted to VDOT after January 31, 2012 must comply with the revised SSAR.

Plans for new streets are initially submitted by the developer to the local government. Following the local government review of the submitted plans, county staff forwards the plans to the designated VDOT District Office through the county in which the subdivision is located. VDOT will determine if the plans comply with applicable standards and related requirements.

If the streets are designed and built according to the approved plans and all other prerequisites are met, the County Board of Supervisors adopts a resolution requesting VDOT's acceptance of the streets.

If it is determined that acceptance is appropriate, the street will be officially accepted for maintenance as part of the secondary system of state highways. Additional information concerning the SSAR can be found at the following VDOT website: http://www.virginiadot.org/projects/ssar/

Board of Supervisors Manual 2015

# MISCELLANEOUS

## Abandonment of Secondary Roads

There are two circumstances for abandoning a road that is a part of the secondary system of state highways.

1.    When the Board of Supervisors decide that:

   (a)    "No public necessity exists for the continuance of the secondary road as a public road" (i.e., lack of public use), or

   (b)    "The safety and welfare of the public would be served best by abandoning the section of road."

2.    When a new road "which serves the same citizens as the old road" has been constructed to Department standards and accepted into the secondary system.  The abandonment is enacted by the Commissioner of Highways in relations to project related changes.

The first circumstance requires the Board of Supervisors to announce its intent to abandon a road, including providing formal notice to the Commissioner and posting of a Willingness Notice to hold a public hearing.

Following a public hearing, assuming one is requested and properly held, the Board of Supervisors acts to either dismiss the abandonment or to abandon the road within a prescribed time frame.

For roads that have only a prescriptive easement for right of way, a lawful abandonment, under either of the above circumstances, extinguishes the prescriptive easement and the road ceases to be a public road.

For roads that have right of way dedicated to public use, abandonment has the effect of closing the road to public use, but interests in the real property dedicated for right of way may only be transferred by a separate conveyance; right of way dedicated to a county government may be conveyed by the county after the Commissioner certifies that the right of way is no longer necessary for transportation purposes; right of way dedicated to the Commonwealth may be conveyed only by the Department.  The conveyance of right of way may follow abandonment, but may not precede abandonment.

If the intent is to cease VDOT maintenance and responsibility but retain public road status, discontinuance should be considered.

Board of Supervisors Manual 2015

# Bicycle and Pedestrian Accommodation

VDOT is committed to accommodating bicyclists and pedestrians, including pedestrians with disabilities, along with motorized transportation modes in the planning, funding, design, construction, operation, and maintenance of Virginia's transportation network in order to achieve a safe, effective, and balanced multimodal transportation system.

The Commonwealth Transportation Board (CTB) Policy for Integrating Bicycle and Pedestrian Accommodations states that VDOT will initiate all projects with the presumption that the projects will accommodate bicycling and walking. Project development for bicycle and pedestrian accommodations will follow VDOT's project development process and concurrent engineering process. VDOT will encourage the participation of localities in concurrent engineering activities that guide the project development.  Local and regional bicycle and pedestrian plans will be the primary resource for project managers and the starting point for discussions with localities regarding what bicycle and/or pedestrian accommodations are desired.

Through the project scoping process, which determines what the project will include, the project manager and local representatives will develop a recommendation on how and whether to accommodate bicyclists and pedestrians in a project prior to the public hearing.  Following scoping, the locality must submit a letter of agreement or disagreement with the recommendation. After the public hearing, public involvement comments will be reviewed and incorporated into project development prior to the preparation of the design approval recommendation. If the locality disagrees with the bicycle and pedestrian design features as proposed, the District Administrator will meet with the locality and make a decision regarding the final direction for the project.  Formal appeals by the locality of decisions made by the District Administrator will be made to the Chief Engineer by means of a resolution adopted by the local governing body.  The resolution must be submitted to the District Administrator to be reviewed and considered prior to the submission of the design approval recommendation to the Chief Engineer. Local resolutions must be forwarded to the Chief Engineer for consideration during the project design approval or to the CTB for consideration during location and design approval, if needed for a project. The resolution and supporting information related to the recommendation must be included in the project documentation. The decisions made by VDOT and localities for the provision of bicycle and pedestrian travel must be consistent with state and federal laws regarding accommodations and access for bicycling and walking.

As indicated in the Secondary Street Acceptance Requirements, certain new secondary streets are required to provide pedestrian accommodations.  Details regarding these requirements can be found at http://www.virginiadot.org/projects/ssar/.  If separate facilities are deemed appropriate, they should be included in the initial construction, prior to VDOT acceptance. VDOT will accept the maintenance of sidewalks, bicycle facilities, and shared use paths located within the dedicated right of way when their construction is in compliance with the criteria and standards set out in VDOT's Road Design Manual.  Any sidewalks, bicycle facilities or shared use paths located on the right of way but not constructed to VDOT standards may be allowed under a land use permit.

 *More information on bicycle and pedestrian accommodations is available on the web at  http://www.virginiadot.org/programs/bk-default.asp.*

Board of Supervisors Manual 2015

# Devolution

Devolution is the process in which counties assume responsibility for all or a portion of their secondary road system.  VDOT has been responsible for the construction and maintenance of all secondary roads in the Commonwealth, except those in Henrico and Arlington counties, since 1932.  For more than 70 years VDOT has maintained the secondary system and, the County Boards of Supervisors and VDOT have cooperatively established priority lists of secondary construction projects within each county, with VDOT subsequently designing and constructing a majority of the roads.  It is often noted that Virginia is one of few states where the state Department of Transportation has responsibility for nearly all local roads.

In 2001, The General Assembly added § 33.2-342 to the *Code of Virginia*, allowing counties to assume responsibility for planning, constructing, maintaining, or operating all or a portion of their secondary system. In 2009, the General Assembly amended §33.2-342 of the *Code of Virginia* to clarify that any county that resumes full responsibility for all of the secondary system within the county's boundaries shall be deemed to have withdrawn from the state secondary system of highways, shall have full authority and control over the secondary system of highways within its boundaries, and shall receive payments in accordance with §33.2-366.

To have more control over construction project delivery, many counties already administer some of their improvement projects and use bond referendums to generate funds for transportation projects. Taking over responsibility for an individual construction project is addressed through VDOT's locally administered project program referenced on page 18.  Any locality interested in assuming responsibility for some or all of the secondary system should discuss this with the Residency Administrator or other designated local VDOT manager.  Devolution is voluntary and will include a programmatic agreement and a transition period to ensure no disruption of service.

VDOT's Local Assistance Division has prepared extensive guidance for counties considering Devolution and it may be found at: http://www.virginiadot.org/business/LAD_devolution.asp.

Board of Supervisors Manual 2015

# Discontinuance of a Secondary Road

Discontinuance is an act reserved for the Commonwealth Transportation Board (CTB) that terminates VDOT's maintenance responsibility and jurisdiction for a road, returning the road to the jurisdiction of the local government. The basis for discontinuance is a determination by the CTB that the road no longer provides a public service warranting its maintenance at public expense.

Non-project related discontinuances procedures:

The Department or the CTB may, in response to a petition of the local governing body or on its own motion, initiate the discontinuance of a section of roadway as part of the secondary system of state highways maintained by the Department.

VDOT will either issue a public notice of intent to discontinue maintenance and advise the County Board of Supervisors and all adjacent property owners of its willingness to hold a public hearing or skip the willingness step and go directly to a public hearing. A public hearing will be conducted if requested by the local governing body, an affected property owner, a citizen at large, or as a Department option in lieu of a willingness in order to expedite the process.

Following the willingness period or public hearing if one is requested, the Residency Administrator or other designated local VDOT manager prepares a discontinuance report with a recommendation and submits it to the Maintenance Division for a final recommendation and submission to the Commonwealth Transportation Board for approval.

The public involvement process associated with project development is considered to satisfy the public involvement needs for project related discontinuances and a public involvement process is not normally held after a project is completed.

Board of Supervisors Manual 2015

# Golf Carts and Utility Vehicles

Golf cart as defined in §46.2-100 of the Code of Virginia refers to a self-propelled vehicle designed to transport persons playing golf and their equipment on a golf course. A utility vehicle refers to a motor vehicle that is powered by an engine of no more than 25 horsepower and is designed for off-road use for general maintenance, security, agricultural, or horticultural purposes and does not include all-terrain vehicles or riding lawn mowers.

- Generally, a golf cart or utility vehicle can be operated on designated public highways where the speed limit of the road is 25 mph or lower.
- The speed, volume and character of the motor vehicle traffic are consistent with the safe operation of golf carts and utility vehicle usage.
- Route does not cross a roadway where the speed limit is greater than 25 mph except where the intersection is controlled by a traffic signal and the speed limit is 35 mph or less.  [Special conditions: In the Town of Colonial Beach, golf carts and utility vehicles may cross any highway at an intersection marked as a golf cart crossing by signs posted by the Virginia Department of Transportation.   In towns with populations of 2,000 or less golf carts and utility vehicles may cross a highway at an intersection marked by VDOT if the posted speed limit is no more than 35 mph and the crossing is required as the only means to provide golf cart access from one part of the town to another part of the town.]

However, a golf cart or utility vehicle may cross a highway where the speed limit on the road is no more than 35 miles per hour in order to travel from one portion of a golf course to another portion or to another adjacent golf course.

Also, a golf cart or utility vehicle may travel between a person's home and golf course on a highway where the speed limit on the road is no more than 35 miles per hour if the trip is no longer than one-half mile in either direction.

In addition, local government employees may operate golf cart or utility vehicles on highways with speed limits of 35 miles per hour or less located within the locality in order to fulfill a governmental purpose.

Similarly, employees of public or private two-year or four-year institutions of higher education may operate as necessary, golf carts or utility vehicles on highways with speed limits of 35 miles per hour or less located within the property limits of such institutions.

Also, golf carts or utility vehicles may be operated on a secondary highway system component that has a posted speed limit of no more than 35 miles per hour and is within three miles of a motor speedway with a seating capacity of at least 25,000 but less than 90,000 on the same day as any race or race-related event conducted on that speedway.

Board of Supervisors Manual 2015

## Golf Carts and Utility Vehicles, continued

In addition, employees of the Department of Conservation and Recreation, may operate to the extent necessary, golf carts or utility vehicles on highways with speed limits of no more than 35 miles per hour and located within Department of Conservation and Recreation property or upon Virginia Department of Transportation-maintained highways adjacent to Department of Conservation and Recreation property, to fulfill a governmental purpose.

Changes to the Code of Virginia Sections 46.2-916.1 through 46.2-916.3 that govern the use of golf carts on Virginia highways provide that the governing body of any county or city as well as towns that have established their own police force (except the towns of Claremont, Irvington, Saxis or Urbanna) may authorize the operation of golf carts and utility vehicles on public highways within its boundaries upon submission of evidence of its consideration that such use is appropriate with the speed, volume, and character of motor vehicle traffic using such highways and compatible with state and local transportation plans and consistent with the Commonwealth's Statewide Pedestrian Policy.

It is preferred that coordination with VDOT through the district land development staff occur prior to the passage of any ordinance authorizing the operation of such vehicles on any state-maintained facilities so that any concerns can be identified early in the process.

The locality shall submit evidence of its consideration to VDOT of the speed, volume, and character of motor vehicle traffic for routes being considered for golf cart and utility vehicle designation as required in the Code of Virginia.  Local law enforcement comments should be solicited and included.  Locality shall also indicate that golf cart and utility vehicle operation is compatible with state and local transportation plans and consistent with the Commonwealth's Statewide Pedestrian Policy. Locality should also provide an overall golf cart route plan to show connectivity to and from specific origins and destinations.  For example, residences to a local park, ball field, community center, etc.

The locality is responsible to erect and maintain signs under the VDOT land use permit process; VDOT shall not pay costs for sign installation or maintenance as per Code of Virginia.

VDOT has developed detailed guidelines for the operation of golf carts or utility vehicles on highways as well as the designation of routes for such operations.

For further provisions & additional details, see VA Code Sections 46.2-676, 46.2-916.1, 46.2-916.2 & 46.2-916.3 that govern the use of golf carts & utility vehicles.

Board of Supervisors Manual 2015

# Highway Rail Grade Crossings

By federal mandate, VDOT is responsible for providing safety and keeping a current inventory of all at public highway-rail crossings (approximately 3,000) to include VDOT maintained and urban maintained roads.  Approximately 1,873 of these are at grade locations.  The following addresses policy and procedure as it relates to maintenance and safety at highway-rail grade crossings of public highways in the Commonwealth of Virginia.

Grade Crossing Surfaces

- § 56-405 of the *Code of Virginia* requires railroad companies and/or crossing owners to maintain grade crossings of public highways and approaches
- Each VDOT Regional, District or Residency offices will contact the crossing owner to resolve crossing surface maintenance issues for roadway maintained by VDOT.  For roadways operated by local Jurisdiction, the local jurisdiction must contact the crossing owner.
- VDOT will provide ownership and contact information to the local jurisdiction upon request.

Automatic Warning Devices

- § 56-406.1 of the *Code of Virginia* requires railroads to cooperate with VDOT or the public road authority (local jurisdiction) as it pertains to the installation and maintenance of automatic warning devices at any at grade rail crossing on a public highway in the Commonwealth
- Federal funds are available as part of VDOT Highway Safety Improvement Program / Rail Crossing Safety.  Funding is to be primarily used for the upgrade or installation of automatic warning devices and crossing closure.  Crossing  elimination by grade separation at any public at grade highway-railroad crossing within the Commonwealth may also be partially funded.
- VDOT Traffic Engineering Division will provide non-emergency assistance for installation and maintenance of warning devices on VDOT maintained roadways
- VDOT Traffic Engineering Division will provide ownership and contact information to the local jurisdiction upon request.

RR Structures

- For potential projects or other concerns regarding structures over or under rail lines, VDOT should be contacted, seeking assistance, before any work is performed.

Quiet Zones

- Quiet Zones are the direct responsibility of  the Federal Railroad Administration (FRA) Office of Railroad Safety

Board of Supervisors Manual 2015

# Towns with Populations Under 3,500

VDOT is responsible for the maintenance and improvement of streets in most incorporated towns of less than 3,500 population.  However, there are a limited number of towns of less than 3,500 population that maintain their own streets.  Towns that request VDOT to maintain their streets operate under §33.2-339 of the Code of Virginia and are limited to two miles of secondary system streets initially and are allowed to add up to 0.25 mile of additional streets annually to the secondary system.  Streets established prior to January 1, 1962, must have a minimum 30 feet of right of way, and those established on or after January 1, 1962, must have 40 feet right of way.  These streets must be in accessible for travel under normal conditions.

Towns that do not request VDOT to maintain their roads under §33.2-339 operate under §33.2-340, are not subject to the same 0.25 mile limitation and may add streets if the following requirements are met:

- o  Minimum 30 feet right of way with 12 feet of hard surface if established prior to July 1, 1950.

- o  Minimum 50 feet right of way with 20 feet of hard surface if established on or after July 1, 1950.

- o  Minimum subdivision street requirements if constructed as a local street after July 1, 1996.

Improvement of secondary system streets within towns of less than 3,500 population is considered along with all other roads in the secondary system of the county in which the town is located.

Board of Supervisors Manual 2015

# Virginia Byways

The Virginia Byway program recognizes road corridors possessing aesthetic or cultural value near areas of historical, natural or recreational significance. By designating certain roads as Virginia Byways and widely distributing "A Map of Scenic Roads in Virginia", the program encourages travel to interesting destinations and away from high-traffic corridors. Byways also stimulate local economies by attracting visitors to lesser-known destinations.  Virginia Byway designation limits the placement of outdoor advertising signs on National Highway System (NHS) and Federal Aid Primary (FAP) routes, but it does not affect land use controls or limit road improvements.

To be considered for the Virginia Byway program, a segment of road must substantially meet the following criteria:
- The route provides important scenic values and experiences.
- The route proposed for designation should be at least 10 miles in length, or providing a connection to current designated Virginia Byways.
- There is a diversity of experiences, as in transition from one landscape scene to another.
- The route links together or provides access to scenic, historic, recreational, cultural, natural and archeological elements.
- The route bypasses major roads or provides opportunity to leave high-speed routes for variety and leisure in motoring. Landscape control or management along the route is feasible.
- The route allows for additional features that will enhance the motorist's experience and improve safety.
- Local government(s) has/have initiated zoning or other land-use controls, so as to reasonably protect the aesthetic and cultural value of the highway.

In order to request a Virginia Byway designation, local governments must adopt a resolution of support.  They must also provide documentation identifying all historical and/or cultural resources along the proposed designated route.  Upon receipt of a request from an interested party/local government, along with a map showing the beginning and ending termini and historical/cultural resource documentation, VDOT and the Department of Conservation (DCR) collect information on local zoning laws, traffic volumes and accident reports before evaluating the roads according to the criteria.  Local governments are also given an opportunity to hold a public hearing to consider designation.  Based on a joint review according to the criteria, VDOT and DCR recommend qualifying roads for consideration by the Commonwealth Transportation Board (CTB).  The CTB officially designates the Byways. Subsequently, signs are posted, and changes are made to the appropriate maps.

There is also a National Scenic Byway designation program, created by Congress and administered by the Federal Highway Administration (FHWA).  Virginia currently has five National Scenic Byways including the Blue Ridge Parkway, Skyline Drive, the Colonial Parkway, the George Washington Memorial Parkway, and the Journey Through Hallowed Ground.  Additional information on the National Scenic Byways program can be found at www.bywaysonline.org.